IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

U.S. BANK NATIONAL
ASSOCIATION
60 Livingston Avenue
St. Paul, MN 55107,
In its Capacity as Successor Trustee,

and

U.S. BANK TRUST NATIONAL                    CA No. _____
ASSOCIATION
60 Livingston Avenue
St. Paul, MN 55107,
In its Capacity as Successor Trustee,

           Plaintiffs,

v.

BRANCH BANKING & TRUST
COMPANY
200 West Second Street
Winston-Salem, NC 27101

           Defendant.

## **<u>COMPLAINT</u>**

Plaintiffs U.S. Bank National Association, and U.S. Bank Trust National

Association, each in its capacity as successor trustee (the "Successor Trustee"), as

and for its Complaint against defendant Branch Banking & Trust Company, states

and alleges as follows:

## Parties

1.     U.S. Bank National Association ("U.S. Bank") is a national banking association whose articles of association designate Ohio as the location of its main office, and whose principal place of business is Minneapolis, Minnesota. U.S. Bank is a citizen of Ohio under 28 U.S.C. § 1348 and *Wachovia Bank, Nat'l Ass'n v. Schmidt*, 546 U.S. 303, 126 S. Ct. 941, 945 (2006) ("Wachovia v. Schmidt").

2.     Plaintiff U.S. Bank Trust National Association ("U.S. Bank Trust") is a national banking association whose articles of association designate Delaware as the location of its main office, and whose principal place of business is in Wilmington, Delaware. U.S. Bank Trust is a citizen of Delaware under 28 U.S.C. § 1348 and Wachovia v. Schmidt.

3.     Branch Banking & Trust Company ("BB&T") is a bank organized under the laws of North Carolina and with its principal place of business in North Carolina.

## Jurisdiction

4.     The parties are of diverse citizenship.

5.     The amount or value of the property in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a).

## Venue

7.      BB&T is subject to personal jurisdiction in the District of Columbia

and, accordingly, venue is properly in this Court pursuant to 28 U.S.C. § 1391.

## Claim

8.      U.S. Bank is the successor to U.S. Bank Trust National Association

("USBT") (a former legal entity which merged into U.S. Bank that had the same

name as, but was an organization different from U.S. Bank Trust), as Grantor

Trustee (the "Grantor Trustee") of Keystone Grantor Trust 1998-P2 (the "Grantor

Trust") under the terms of a Grantor Trust Agreement (the "Grantor Trust

Agreement"), with Keystone Mortgage Corp., Inc., as Seller dated as of August 28,

1998.  A copy of the Grantor Trust Agreement is attached hereto as Exhibit A.

9.      U.S. Bank is also the successor to USBT as Indenture Trustee (the

"Indenture Trustee") under the Indenture (the "Indenture") dated August 31, 1998,

with Keystone Owner Trust 1998-P2.  A copy of the Indenture is attached hereto as

Exhibit B.

10.     U.S. Bank Trust is the successor to First Union Trust Company, N.A.,

as Owner Trustee (the "Owner Trustee") of Keystone Owner Trust 1998-P2 (the

"Owner Trust") under the terms of a Trust Agreement (the "Owner Trust

Agreement") dated as of August 31, 1998, with Keystone Mortgage Corp., Inc..  A

copy of the Owner Trust Agreement is attached hereto as Exhibit C.

11.    BB&T is successor to Republic Bank as Servicer for the Grantor Trust under the Sale and Servicing Agreement described herein.

12.    As part of the financing transaction described herein, a Sale and Servicing Agreement dated as of August 31, 1998 (the "Sale and Servicing Agreement") was entered into among the Grantor Trust, the Owner Trust, Keystone Mortgage Corp. Inc., as Seller, Republic Bank (BB&T's predecessor), as Servicer, Wilshire Servicing Corporation, U.S. Bank Trust National Association (U.S. Bank's predecessor) as Indenture Trustee and Grantor Trustee.  A copy of the Sale and Servicing Agreement is attached hereto as Exhibit D.

13.    Under the terms of the Sale and Servicing Agreement, Keystone Mortgage Corp., as Seller, transferred to the Grantor Trust more than 11,000 residential mortgage loans (the "Mortgage Loans").  A certificate of beneficial interest in the Grantor Trust's Mortgage Loans was issued to the Owner Trust.  The Owner Trust then issued and sold $542,400,000 principal amount of notes to investors, pledged the beneficial interest in the Mortgage Loans as collateral for the said notes, pursuant to the Indenture, and issued to other parties interests in and distribution rights to the residual cash and other assets of the Owner Trust available after the said notes are paid.

14.    Principal and interest payments payable on the Mortgage Loans, to the extent collected, first are applied to pay monthly debt service on the notes issued

by the Owner Trust under the Indenture, and any excess loan collections are payable to holders of the residual interest in the Owner Trust (the "Residual Holders").

15.     Under the terms of the Sale and Servicing Agreement, Republic Bank was appointed and obligated, and as legal successor to Republic Bank, BB&T is obligated, to "service" the Mortgage Loans as named servicer of the Grantor Trust ("Servicer"). The Servicer's powers and duties expressly include collecting from Mortgage Loan obligors the monthly payments as due on such loans, and in connection with defaulted Mortgage Loans, pursuing past due loan payments, exercising collection rights, enforcing remedies, settling default claims, and disposing of collateral properties, as necessary to obtain defaulted payment recoveries belonging to the Grantor Trust and provide increased funds to pay the Owner Trust's notes and distributions to its Residual Holders.

16.     Under the terms of the Sale and Servicing Agreement, the Grantor Trustee established a Collection Account (the "Collection Account"), and the Servicer is obligated to cause all amounts received or collected with respect to the Mortgage Loans, including defaulted Mortgage Loans, (defined as the "Payments" in the Sale and Servicing Agreement), net only of those amounts of Servicer fees expressly authorized by the Sale and Servicing Agreement, to be deposited into the Collection Account.

17.    The existence, amount and timing of collections from defaulted Mortgage Loans, and the deposit thereof as Payments into the Collection Account, are entirely within the control of the Servicer and it alone has the dealings with Mortgage Loan obligors and maintains the records and information related to such matters.  Pursuant to the Sale and Servicing Agreement the Successor Trustee must rely entirely upon the Servicer to collect and deposit such Payments into the Collection Account as property of the Grantor Trust.

18.    Under the terms of Section 4.02 of the Sale and Servicing Agreement, the Servicer may perform its responsibilities relating to servicing through sub-servicers or agents, but the Servicer is not relieved of any responsibility or obligation with respect to its servicing duties or any liability related thereto, and is obligated with respect to the actions of such sub-servicer or agent to the same extent and under the same terms and conditions as if the Servicer alone were performing all duties and obligations set forth in the Sale and Servicing Agreement in connection with the collections, servicing and administration of the Mortgage Loans.  Beginning in 2001, Republic (and subsequently BB&T) performed its responsibilities under the Sale and Servicing Agreement through a sub-servicer, Ocwen Federal Bank FSB ("Ocwen Bank").

19.    Contrary to it obligations and duties as Servicer under the Sale and Servicing Agreement, BB&T has failed to deposit and continues to fail to deposit

into the Collection Account the entire amount of the monthly Payments actually collected with respect to certain defaulted Mortgage Loans because its sub-servicer and agent, Ocwen Bank, has withheld and diverted and continues to withhold and divert from deposit to the Collection Account proceeds of such defaulted Mortgage Loan collection, equal to 50% of the collected amounts (the "Diverted Proceeds"). The aggregate amount of the Diverted Proceeds is currently in excess of $11,150,000.

20.    Such Mortgage Loan collection matters are governed exclusively by the Sale and Servicing Agreement.

21.    No such collection proceeds are authorized to be retained by the Servicer or its sub-servicer under any provision of the Sale and Servicing Agreement.

22.    No other legal or equitable basis exists to authorize retention of the Diverted Proceeds by the Servicer or its subservicer.

23.    Monthly servicing certificates provided to the Trustee by Ocwen Bank during the entire period it has acted as sub-servicer on behalf of BB&T as Servicer, contained false and misleading statements regarding the amount of defaulted Mortgage Loan collections constituting Payments to be deposited to the Collection Account for such months. By such false and misleading statements the amount of

such collections was understated and misrepresented to the Trustee in the amount of the Diverted Proceeds.

## Count I (Breach of Contract)

24.    Plaintiffs restate and reallege each of the allegations in paragraphs 1 through 23 of the Complaint.

25.    BB&T's past and continuing failure to deposit the Diverted Proceeds into the Collection Account has and continues to constitute a breach of its express duties under the Sale and Serving Agreement.

26.    BB&T's breach of the Sale and Servicing Agreement has damaged the Grantor Trust, and prevented payments due to the Residual Holders, by an amount equal to the Diverted Proceeds.

27.    Pursuant to Section 9.01 (b) of the Sale and Servicing Agreement, the Servicer agreed to indemnify the Trust, the Grantor Trustee and the Indenture Trustee against all costs, expenses and losses, including fees and expenses of counsel and litigation, arising out of the Servicer's breach of the Sale and Servicing Agreement.

28.    BB&T is liable to Plaintiffs for their costs, expenses and losses, including fees and expenses of counsel and litigation, arising out of the BB&T's breach of the Sale and Servicing Agreement.

## Count II (Conversion)

29.     Plaintiffs restate and reallege each of the allegations in paragraphs 1 through 28 of the Complaint.

30.     Plaintiffs owned and had the right to possession of the Diverted Proceeds. BB&T in its individual capacity and through its agent Ocwen Bank, has exercised dominion over the property or interference with the Diverted Proceeds, in derogation of Plaintiffs' rights, and thereby converted Plaintiffs' property.

## Count III (Misrepresentation)

31.     Plaintiffs restate and reallege each of the allegations in paragraphs 1 through 30 of the Complaint.

32.     BB&T made misrepresentations and/or material omissions of facts which were false and known by BB&T to be false, made for the purpose of inducing Plaintiffs to rely upon them. Plaintiffs justifiably relied on the misrepresentations and/or material omissions, and suffered injury as a result.

## Count IV (Breach of Fiduciary Duty)

33.     Plaintiffs restate and reallege each of the allegations in paragraphs 1 through 32 of the Complaint.

34.     With respect to the collection and deposit into the Collection Account of the Payments from defaulted Mortgage Loans and related actions, BB&T has owed and continues to owe fiduciary duties to the Grantor Trust.

35.     BB&T's past and continuing failure to deposit the Diverted Proceeds into the Collection Account has and continues to constitute a breach of its fiduciary duties to the Grantor Trust.

WHEREAS, Plaintiffs pray for judgment as follows:

A.     For judgment against BB&T in an amount equal to the Diverted Proceeds with respect to each of the counts stated above.

B.     For its costs, disbursements, expenses and legal fees incurred herein.

C.    For such other and further relief as the Court deems equitable and just.

DORSEY & WHITNEY LLP

By

Creighton R. Magid (DC Bar #476961)
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20036
Telephone: (202) 442-3555
Facsimile:  (202) 442-3199
magid.chip@dorsey.com

Patrick J. McLaughlin
mclaughlin.patrick@dorsey.com
Todd Pearson
pearson.todd@dorsey.com
DORSEY & WHITNEY LLP
50 S. 6th Street
Suite 1500
Minneapolis, MN 55402-1498
Telephone: (612) 340-2600
Facsimile:  (612) 340-2868

**ATTORNEYS FOR PLAINTIFFS U.S. BANK NATIONAL ASSOCIATION and U.S. BANK TRUST NATIONAL ASSOCIATION, each in its capacity as Successor Trustee**

# EXHIBIT A

EXHIBIT A

EXECUTION COPY

KEYSTONE MORTGAGE CORP., INC.

Depositor,

and

U.S. BANK TRUST NATIONAL ASSOCIATION,

Grantor Trustee and Contract of Insurance Holder

GRANTOR TRUST AGREEMENT

Dated August 28, 1998

Keystone Grantor Trust 1998-P2

USBT 100633

Table of Contents

Page

ARTICLE I
Definitions

Section 1.01. Definitions..................................................................................... 1
Section 1.02. Other Definitional Provisions ..................................................... 2

ARTICLE II
ORIGINAL ISSUANCE OF GRANTOR TRUST CERTIFICATE

Section 2.01. Issuance of Grantor Trust Certificate........................................... 2
Section 2.02. Grantor Trust Estate...................................................................... 3
Section 2.03. Representations and Warranties of the Depositor........................ 3

ARTICLE III
ADMINISTRATION AND SERVICING OF LOANS

Section 3.01. Servicer as Agent and Bailee of the Grantor Trust Certificate Holder...................... 4

ARTICLE IV
PAYMENTS TO GRANTOR TRUST CERTIFICATEHOLDERS

Section 4.01. Grantor Trust Certificate Account ............................................... 4
Section 4.02. Distributions................................................................................. 5

ARTICLE V
THE GRANTOR TRUST CERTIFICATE

Section 5.01. The Grantor Trust Certificate....................................................... 5
Section 5.02. Registration of Transfer and Exchange of Grantor Trust Certificate ...................... 6
Section 5.03. Mutilated, Destroyed, Lost or Stolen Grantor Trust Certificate ................ 8
Section 5.04. Persons Deemed Owners ............................................................. 8
Section 5.05. Appointment of Paying Agent ..................................................... 9

ARTICLE VI
CONCERNING THE GRANTOR TRUSTEE

Section 6.01. Duties of Grantor Trustee ............................................................ 9
Section 6.02. Certain Matters Affecting the Grantor Trustee........................... 11
Section 6.03. Grantor Trustee Not Liable for Grantor Trust Certificate or Loans ................... 12
Section 6.04. Grantor Trustee May Own Grantor Trust Certificate ................. 13
Section 6.05. Eligibility Requirements for Grantor Trustee .............................. 13
Section 6.06. Resignation and Removal of the Grantor Trustee........................ 13
Section 6.07. Successor Grantor Trustee ........................................................... 14
Section 6.08. Merger or Consolidation of Grantor Trustee ............................... 15
Section 6.09. Appointment of Co-Grantor Trustee or Separate Grantor Trustee ...................... 15

USBT 100634

Section 6.10. Appointment of Custodians ........................................................... 16
Section 6.11. Appointment of Office or Agency ................................................. 16
Section 6.12. Compliance with Withholding Requirements................................ 16
Section 6.13. Grantor Trust Reporting................................................................ 17
Section 6.14. Representations and Warranties.................................................... 17
Section 6.15. Compensation and Indemnity ....................................................... 18

ARTICLE VII
TERMINATION

Section 7.01. Termination Upon Purchase by the Trust or the Servicer or
            Liquidation of All Loans ............................................................ 18
Section 7.02. Termination by Grantor Trust Certificateholder........................... 19

ARTICLE VIII
MISCELLANEOUS PROVISIONS

Section 8.01. Amendment.................................................................................... 20
Section 8.02. Recordation of Grantor Trust Agreement; Counterparts .............. 21
Section 8.03. Limitation on Rights of Grantor Trust Certificateholder.............. 21
Section 8.04. Governing Law ............................................................................. 22
Section 8.05. Notices. ......................................................................................... 22
Section 8.06. Severability of Provisions ............................................................ 23

EXHIBITS

Exhibit A          Form of Grantor Trust Certificate
Exhibit B          Loan Schedule

USBT 100635

This Grantor Trust Agreement, dated August 28, 1998 (the "Grantor Trust Agreement"), between KEYSTONE MORTGAGE CORP., INC., a West Virginia corporation, as depositor (the "Depositor") and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as grantor trustee (the "Grantor Trustee") and as Contract of Insurance Holder (the "Contract of Insurance Holder"),

## W I T N E S S E T H   T H A T:

WHEREAS, pursuant to this Grantor Trust Agreement, the Depositor will transfer the Loans and all of its rights and remedies under the Sale and Servicing Agreement to the Grantor Trustee in trust for the benefit of the Holder of the Grantor Trust Certificate;

WHEREAS, pursuant to the terms of this Grantor Trust Agreement, the Grantor Trust will issue and transfer to or at the direction of the Depositor, the Grantor Trust Certificate evidencing 100% ownership interest in the assets of the Grantor Trust;

WHEREAS, the Depositor will convey the Grantor Trust Certificate to the Issuer in exchange for the Certificates of Beneficial Interest and the Notes,

WHEREAS, pursuant to the terms of the Trust Agreement the Issuer will pledge the Grantor Trust Certificate under the lien of the Indenture (defined below) and, the Issuer will issue and transfer to or at the direction of the Depositor, the Notes;

WHEREAS, pursuant to the terms of the Sale and Servicing Agreement described below, the Servicer will service the Loans directly or through one or more Subservicers; and

WHEREAS, the Initial Loans have an Initial aggregate Cut-off Date Principal Balance equal to approximately $410,000,000. The Loans are closed-end fixed-rate home improvement loans, debt consolidation loans and retail installment sale contracts.

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto agree as follows:

## ARTICLE I

## Definitions

Section 1.01. _Definitions_. For all purposes of this Grantor Trust Agreement, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the _Indenture_ dated as of August 31, 1998 (the "Indenture"), between Keystone Owner Trust 1998-P2, as Issuer, and U.S. Bank Trust National Association, as Indenture Trustee, and the Sale and Servicing Agreement dated as of August 31, 1998 (the "Sale and Servicing Agreement") among Keystone Mortgage Corp., Inc., Keystone Grantor Trust 1998-P2, Keystone Owner Trust 1998 P-2, Republic Bank, as Servicer, Wilshire Servicing Corporation, as Backup Servicer, and U.S. Bank Trust National Association, as the case may be. All other capitalized terms used herein shall have the meanings specified herein.

Section 1.02. <u>Other Definitional Provisions</u>. All terms defined in this Grantor Trust Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(a) As used in this Grantor Trust Agreement and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Grantor Trust Agreement or in any such certificate or other document, and accounting terms partly defined in this Grantor Trust Agreement or in any such certificate or other document, to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles. To the extent that the definitions of accounting terms in this Grantor Trust Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Grantor Trust Agreement or in any such certificate or other document shall control.

(b) The words "hereof," "herein," "hereunder" and words of similar import when used in this Grantor Trust Agreement shall refer to this Grantor Trust Agreement as a whole and not to any particular provision of this Grantor Trust Agreement; Section and Exhibit references contained in this Grantor Trust Agreement are references to Sections and Exhibits in or to this Grantor Trust Agreement unless otherwise specified; and the term "including" shall mean "including without limitation".

(c) The definitions contained in this Grantor Trust Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as the feminine and neuter genders of such terms.

(d) Any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

## ARTICLE II

## ORIGINAL ISSUANCE OF GRANTOR TRUST CERTIFICATE

Section 2.01. <u>Issuance of Grantor Trust Certificate</u>.

The Grantor Trustee acknowledges the assignment to it of the Loans and the delivery of the Loan Files to it, subject to any exceptions noted, together with the assignment to it of all other assets included in the Grantor Trust Estate, receipt of which is hereby acknowledged. Concurrently with the delivery on the Closing Date of the Grantor Trust Estate and in exchange therefor, the Grantor Trustee, pursuant to the written request of the Depositor executed by an officer of the Depositor has executed and caused to be authenticated and delivered to or upon the order of the Depositor the Grantor Trust Certificate, which evidences the entire beneficial ownership of the Grantor Trust Estate. The rights of the Grantor Trust Certificateholder to receive distributions from the proceeds of the Grantor Trust Estate, and all ownership interests of

USBT 100637

the Grantor Trust Certificateholder in such distributions, shall be as set forth in this Grantor Trust Agreement.

Section 2.02. <u>Grantor Trust Estate</u>.

The Grantor Trust is intended to qualify as an "investment trust" within the meaning of Treasury Regulation §301.7701-4(c), and it is neither the purpose nor the intent of the parties hereto to create a partnership, joint venture, or association taxable as a corporation between or among the Grantor Trust Certificateholder, the Grantor Trustee or the Depositor. In furtherance of the foregoing, the purpose of the Grantor Trust shall be to protect and conserve the assets of the Grantor Trust Estate, and the Grantor Trust shall not at any time engage in or carry on any kind of business or any kind of commercial or investment activity. In no event shall the Grantor Trustee or any other person have any power to vary the investment of the Grantor Trust Certificateholder in the Grantor Trust Certificate or to substitute new investments or reinvest so as to enable the Grantor Trust Estate to take advantage of variations in the market to improve the investment of the Grantor Trust Certificateholder in the Grantor Trust Certificate.

Section 2.03. <u>Representations and Warranties of the Depositor</u>.

(a) Except as has been previously obtained, no consent, approval, authorization or order of any court or governmental agency or body is required for: (i) the execution, delivery and performance by the Depositor of, or compliance by the Depositor with, this Agreement, (ii) the transfer of all FHA Insurance reserves relating to the FHA Loans to the Contract of Insurance Holder, (iii) the issuance of the Grantor Trust Certificate, (iv) the sale of the Loans or (v) the consummation of the transactions required of it by this Agreement, except: (A) such as shall have been obtained before the Closing Date, (B) the transfer of the FHA Insurance reserves by FHA to the Contract of Insurance Holder with respect to Loans as to which an FHA case number has not been assigned as of the Closing Date or Subsequent Transfer Rate, as applicable, and (C) such as may be required under state securities or "Blue Sky" laws in connection with the sale of the Notes by the Placement Agents;

(b) The Depositor received fair consideration and reasonably equivalent value in exchange for the sale of the Loans to the Grantor Trust;

(c) As of the Closing Date, HUD has approved in writing the transfer to the Contract of Insurance Holder of the full FHA reserve amount relating to the FHA Loans and all actions have been taken and all required consents have been obtained (or will be taken or obtained within the time permitted in the Sale and Servicing Agreement), in either case, necessary to effect transfer to the Contract of Insurance Holder of the full FHA reserve amount relating to each FHA Loan (except for Loans with respect to which a case number has not been assigned as of the Closing Date or Subsequent Transfer Date, as applicable). The FHA reserve amounts with respect to the FHA Loans transferred to the Contract of Insurance Holder both prior to and following the transfer of the FHA Loans to the Grantor Trust will be available to satisfy claims with respect to such FHA Loans but not in amounts in excess of the Trust Designated Insurance Amount.

ARTICLE III

ADMINISTRATION AND SERVICING OF LOANS

Section 3.01.  <u>Servicer as Agent and Bailee of the Grantor Trust Certificate Holder</u>. Solely for purposes of perfection under Section 9-305 of the Uniform Commercial Code or other similar applicable law, rule or regulation of the state in which such property is held by the Servicer during such period as the Servicer is maintaining possession of any part of the Grantor Trust Estate, the Grantor Trustee hereby acknowledges that the Servicer is acting as agent and bailee of the Grantor Trust Certificateholder in holding amounts on deposit in the Collection Account pursuant to Section 5.01(a) of the Sale and Servicing Agreement that are allocable to the Grantor Trust Certificate, as well as its agent and bailee in holding any Transaction Documents released to the Servicer pursuant to the Sale and Servicing Agreement, and any other items constituting a part of the Grantor Trust Estate which from time to time come into the possession of the Servicer.  It is intended that, by the Servicer's acceptance of such agency pursuant to Section 4.17 of the Sale and Servicing Agreement, the Grantor Trustee will be deemed to have possession of such Transaction Documents, such monies and such other items for purposes of Section 9-305 of the Uniform Commercial Code of the state in which such property is held by the Servicer.

ARTICLE IV

PAYMENTS TO GRANTOR TRUST CERTIFICATEHOLDERS

Section 4.01.  <u>Collection Account</u>.

(a)  The Grantor Trustee shall establish and maintain a Collection Account titled "U.S. Bank Trust National Association, which in each case is and shall continue to be an Eligible Account in the name of the Indenture Trustee and shall be designated "U.S. Bank Trust National Association, as Grantor Trustee in trust for Keystone Grantor Trust Certificate, Series 1998-P2, Collection Account."  Pursuant to Section 5.01(a) of the Sale and Servicing Agreement, the Servicer shall cause to be deposited in the Collection Account on behalf of the Grantor Trustee the amounts required to be deposited therein pursuant to Section 5.01(a) of the Sale and Servicing Agreement.  The Servicer may withdraw funds on deposit in the Collection Account to the extent permitted by Section 5.01(a) of the Sale and Servicing Agreement.

(b)  No later than the second Business Day preceding each Distribution Date, the Grantor Trustee shall withdraw amounts from the Collection Account representing Payments with respect to the related Determination Date on deposit therein and deposit such amounts into the Note Distribution Account and liquidate the Eligible Investments in which such amounts are invested and deposit all net investment earnings as provided in Section 5.04 of the Sale and Servicing Agreement.

(c)  The Grantor Trustee shall, upon written request from the Servicer. invest or cause the institution maintaining the Collection Account to invest the funds in the Collection Account in Eligible Investments designated in the name of the Grantor Trustee for the benefit of the Grantor Trust Certificateholder, which shall mature not later than the Business Day next preceding the

Distribution Date next following the date of such investment (except that (i) any investment in the institution with which the Collection Account is maintained may mature on such Distribution Date and (ii) any other investment may mature on such Distribution Date if the Grantor Trustee shall advance funds on such Distribution Date to the Collection Account in the amount payable on such investment on such Distribution Date, pending receipt thereof to the extent necessary to make distributions on the Grantor Trust Certificate) and shall not be sold or disposed of prior to maturity. All income and gain realized from any such investment shall be for the benefit of the Servicer and shall be subject to its withdrawal or order from time to time. The amount of any losses incurred in respect of any such investments shall be deposited in the Collection Account by the Servicer out of its own funds immediately as realized without any right of reimbursement.

Section 4.02. Distributions.

(a) On each Distribution Date, (i) the Grantor Trustee or (ii) the Paying Agent appointed by the Grantor Trustee, shall distribute to the Grantor Trust Certificateholder of record on the related Record Date (other than as provided in Section 7.01 respecting the final distribution) either in immediately available funds (by wire transfer or otherwise) to the account of such Grantor Trust Certificateholder at a bank or other entity having appropriate facilities therefor, if such Grantor Trust Certificateholder has so notified the Grantor Trustee or the Paying Agent, as the case may be, or, if such Grantor Trust Certificateholder has not so notified the Grantor Trustee or the Paying Agent by the related Record Date, by check mailed to such Grantor Trust Certificateholder at the address of such Holder appearing in the Grantor Trust Certificate Register, an amount equal to the sum of the Grantor Trust Certificate Interest Remittance Amount and the Grantor Trust Certificate Principal Remittance Amount.

(b) If the Servicer anticipates that a final distribution with respect to the Grantor Trust Certificate will be made on the next Distribution Date (including by reason of an optional purchase by the Trust or the Backup Servicer pursuant to Section 11.01 of the Sale and Servicing Agreement), the Servicer shall, no later than the Determination Date in the month of such final distribution, notify the Grantor Trustee pursuant to Section 11.02 of the Sale and Servicing Agreement and the Grantor Trustee shall, no later than two (2) Business Days after such Determination Date, send on such date to the Holder of the Grantor Trust Certificate a notice to the effect that the Grantor Trustee anticipates that the final distribution with respect to the Grantor Trust Certificate will be made on such Distribution Date but only upon presentation and surrender of such Grantor Trust Certificate at the office of the Grantor Trustee or as otherwise specified therein, and no interest shall accrue on such Grantor Trust Certificate from and after the end of the prior calendar month. In the event that the Grantor Trust Certificateholder required to surrender its Grantor Trust Certificate pursuant to Section 7.01(c) does not surrender its Grantor Trust Certificate for final cancellation, the Grantor Trustee shall cause funds distributable with respect to the Grantor Trust Certificate to be withdrawn from the Collection Account and credited to a separate escrow account for the benefit of the Grantor Trust Certificateholder as provided in Section 7.01(d).

USBT 100640

ARTICLE V

THE GRANTOR TRUST CERTIFICATE

Section 5.01. The Grantor Trust Certificate.

The Grantor Trust Certificate shall be substantially in the form set forth in Exhibit A and shall, on original issue, be executed and delivered by the Grantor Trustee to the Grantor Trust Certificate Registrar for authentication and delivery to or upon the order of the Depositor upon receipt by the Grantor Trustee. The Grantor Trust Certificate shall be issuable only as a single Certificate evidencing 100% of the beneficial interest in the Grantor Trust.

The Grantor Trust Certificate shall be executed by manual or facsimile signature on behalf of an authorized officer of the Grantor Trustee. The Grantor Trust Certificate bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Grantor Trustee shall bind the Grantor Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Grantor Trust Certificate or did not hold such offices at the date of such Grantor Trust Certificate. No Grantor Trust Certificate shall be entitled to any benefit under this Grantor Trust Agreement, or be valid for any purpose, unless there appears on such Grantor Trust Certificate a Grantor Trust Certificate of Authentication substantially in the form provided for herein executed by the Grantor Trust Certificate Registrar by manual signature, and such Grantor Trust Certificate of Authentication upon any Grantor Trust Certificate shall be conclusive evidence, and the only evidence, that such Grantor Trust Certificate has been duly authenticated and delivered hereunder. The Grantor Trust Certificate shall be dated the date of its authentication.

Section 5.02. Registration of Transfer and Exchange of Grantor Trust Certificate.

(a) The Grantor Trustee shall cause to be kept at one of the offices or agencies to be appointed by the Grantor Trustee in accordance with the provisions of Section 6.11 a Grantor Trust Certificate Register in which, subject to such reasonable regulations as it may prescribe, the Grantor Trustee shall provide for the registration of the Grantor Trust Certificate and of transfers and exchanges of the Grantor Trust Certificate as herein provided. The Grantor Trustee is initially appointed Grantor Trust Certificate Registrar for the purpose of registering the Grantor Trust Certificate and transfers and exchanges of the Grantor Trust Certificate as herein provided. The Grantor Trust Certificate Registrar, or the Grantor Trustee, shall notify the Servicer promptly of any transfer of the Grantor Trust Certificate and the name of any such transferee of the Grantor Trust Certificateholder.

(b) Upon surrender for registration of transfer of the Grantor Trust Certificate at any office or agency of the Grantor Trustee maintained for such purpose pursuant to Section 6.11 and upon satisfaction of the conditions set forth below, the Grantor Trustee shall execute and the Grantor Trust Certificate Registrar shall authenticate and deliver, in the name of the designated transferee or transferees, a new Grantor Trust Certificate representing a 100% Percentage Interest.

(c) Notwithstanding any other provision hereof, unless an Event of Default has occurred and is continuing the under the Indenture, or the Indenture is otherwise terminated, no transfer of the Grantor Trust Certificate shall be made. The foregoing provision shall not apply to or in any way limit: (i) the transfer of the Grantor Trust Certificate to the Owner Trustee pursuant to the Trust Agreement, (ii) the transfer of the Grantor Trust Certificate to the Grantor Trustee pursuant to this Grantor Trust Agreement, or (iii) the registration of the Grantor Trust Certificate in the name of the Grantor Trustee, or (iv) the rights of the Holder of the Grantor Trust Certificate to terminate the Grantor Trust and take delivery of the Loans in accordance with Section 7.02, or any actions that may be taken thereafter with respect to the Loans.

(d) No transfer, sale, pledge or other disposition of the Grantor Trust Certificate shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act of 1933, as amended (the "1933 Act"), and any applicable state securities laws or is made in accordance with said Act and laws. Except as otherwise provided in this Section 5.02(d), in the event that a transfer of the Grantor Trust Certificate is to be made either (i)(A) the Grantor Trustee shall require a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Grantor Trustee and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Grantor Trustee, the Owner Trustee, the Depositor or the Servicer; provided that such Opinion of Counsel will not be required in connection with the initial transfers of the Grantor Trust Certificate by the Depositor or any Affiliate thereof to an Affiliate of the Depositor or to the Issuer or the Indenture Trustee as pledgee of the Issuer and (B) the Grantor Trustee shall require the transferee to execute a representation letter, and the Grantor Trustee shall require the transferor to execute a representation letter, each acceptable to and in form and substance satisfactory to the Depositor and the Grantor Trustee certifying to the Depositor and the Grantor Trustee the facts surrounding such transfer, which representation letters shall not be an expense of the Grantor Trustee, the Depositor or the Servicer; provided, however, that such representation letters will not be required in connection with any transfer of any such Grantor Trust Certificate by the Depositor or any Affiliate thereof to an Affiliate of the Depositor, and the Grantor Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Grantor Trustee, shall be written representation) from the Depositor of the status, of such transferee as an Affiliate of the Depositor. The Holder of the Grantor Trust Certificate desiring to effect any such transfer, sale, pledge or other disposition shall, and does hereby agree to, indemnify the Grantor Trustee, the Depositor, the Servicer and the Grantor Trust Certificate Registrar against any liability that may result if the transfer, sale, pledge or other disposition is not so exempt or is not made in accordance with such federal and state laws and this Grantor Trust Agreement.

(e) In the case of any Grantor Trust Certificate presented for registration in the name of any Person, either (i) the Grantor Trustee shall require an Opinion of Counsel acceptable to and in form and substance satisfactory to the Grantor Trustee, the Depositor and the Servicer to the effect that the purchase or holding of such Grantor Trust Certificate is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Grantor Trustee, the Depositor or the Servicer to any obligation or liability

(including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in this Grantor Trust Agreement, which Opinion of Counsel shall not be an expense of the Grantor Trustee, the Depositor or the Servicer or (ii) the prospective transferee shall be required to provide the Grantor Trustee, the Depositor and the Servicer with a certification, which the Grantor Trustee may rely upon without further inquiry or investigation, or such other certifications as the Grantor Trustee may deem desirable or necessary in order to establish that such transferee or the Person in whose name such registration is requested is not an employee benefit plan or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code, or any Person (including an investment manager, a named fiduciary or a Grantor Trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition; provided, however, that such Opinion of Counsel or certification will not be required in connection with the initial transfers of the Grantor Trust Certificate by the Depositor or any Affiliate thereof to an Affiliate of the Depositor or to the Issuer or the Indenture Trustee as pledgee of the Issuer (in which case, the Depositor or any Affiliate thereof or the Issuer or the Indenture Trustee shall have deemed to have represented that such Affiliate or the Issuer or the Grantor Trustee is not a Plan or a Person investing "plan assets" of any Plan) and the Grantor Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Grantor Trustee, shall be a written representation) from the Depositor of the status of such transferee as an Affiliate of the Depositor.

(f) No service charge shall be made for any transfer or exchange of the Grantor Trust Certificate, but the Grantor Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of the Grantor Trust Certificate.

(g) The Grantor Trust Certificate surrendered for transfer and exchange shall be destroyed by the Grantor Trust Certificate Registrar.

Section 5.03. Mutilated, Destroyed, Lost or Stolen Grantor Trust Certificate.

If (i) any mutilated Grantor Trust Certificate is surrendered to the Grantor Trust Certificate Registrar, or the Grantor Trustee and the Grantor Trust Certificate Registrar receive evidence to their satisfaction of the destruction, loss or theft of the Grantor Trust Certificate, and (ii) there is delivered to the Grantor Trustee and the Grantor Trust Certificate Registrar such security or indemnity as may be required by them to save each of them harmless, then, in the absence of notice to the Grantor Trustee or the Grantor Trust Certificate Registrar that the Grantor Trust Certificate has been acquired by a bona fide purchaser, the Grantor Trustee shall execute and the Grantor Trust Certificate Registrar shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Grantor Trust Certificate, a new Grantor Trust Certificate of like tenor and Percentage Interest but bearing a number not contemporaneously outstanding. Upon the issuance of any new Grantor Trust Certificate under this Section, the Grantor Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other expenses (including the fees and expenses of the Grantor Trustee and the Grantor Trust Certificate Registrar) connected therewith. Any duplicate Grantor Trust Certificate issued pursuant to this Section shall constitute complete and indefeasible evidence of ownership in the Grantor Trust

USBT 100643

Estate, as if originally issued, whether or not the lost, stolen or destroyed Grantor Trust Certificate shall be found at any time.

Section 5.04.  Persons Deemed Owners.

Prior to due presentation of the Grantor Trust Certificate for registration of transfer, the Depositor, the Servicer, the Grantor Trustee, the Grantor Trust Certificate Registrar and any agent of the Depositor, the Servicer, the Grantor Trustee or the Grantor Trust Certificate Registrar may treat the Person in whose name the Grantor Trust Certificate is registered as the owner of the Grantor Trust Certificate for the purpose of receiving distributions pursuant to Section 4.02 and for all other purposes whatsoever, and neither the Depositor, the Servicer, the Grantor Trustee, the Grantor Trust Certificate Registrar nor any agent of the Depositor, the Servicer, the Grantor Trustee or the Grantor Trust Certificate Registrar shall be affected by notice to the contrary.

Section 5.05.  Appointment of Paying Agent.

The Grantor Trustee may appoint a Paying Agent for the purpose of making distributions to the Grantor Trust Certificateholder pursuant to Section 4.02.  In the event of any such appointment, on or prior to each Distribution Date the Servicer on behalf of the Grantor Trustee shall deposit or cause to be deposited with the Paying Agent a sum sufficient to make the payments to the Grantor Trust Certificateholder in the amounts and in the manner provided for in Section 4.02, such sum to be held in trust for the benefit of the Grantor Trust Certificateholder.

The Grantor Trustee shall cause each Paying Agent to execute and deliver to the Grantor Trustee an instrument in which such Paying Agent shall agree with the Grantor Trustee that such Paying Agent will hold all sums held by it for the payment to the Grantor Trust Certificateholder in trust for the benefit of the Grantor Trust Certificateholder entitled thereto until such sums shall be paid to such Grantor Trust Certificateholder.  Any sums so held by such Paying Agent shall be held only in Eligible Accounts to the extent such sums are not distributed to the Grantor Trust Certificateholder on the date of receipt by such Paying Agent.

ARTICLE VI

CONCERNING THE GRANTOR TRUSTEE

Section 6.01.  Duties of Grantor Trustee.

(a) The Grantor Trustee, prior to the occurrence of a Servicing Default and after the curing or waiver of all Servicing Defaults which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Grantor Trust Agreement.  In case a Servicing Default has occurred (which has not been cured or waived), the Grantor Trustee shall exercise such of the rights and powers vested in it by this Grantor Trust Agreement, and use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs.

USBT 100644

(b) The Grantor Trustee, upon receipt of all resolutions, Grantor Trust Certificate, statements, opinions, reports, documents, orders or other instruments furnished to the Grantor Trustee which are specifically required to be furnished pursuant to any provision of this Grantor Trust Agreement, shall examine them to determine whether they conform to the requirements of this Grantor Trust Agreement.     The Grantor Trustee shall notify the Grantor Trust Certificateholder of any such documents which do not materially conform to the requirements of this Grantor Trust Agreement in the event that the Grantor Trustee, after so requesting, does not receive satisfactorily corrected documents.

The Grantor Trustee shall furnish in a timely fashion to the Servicer such information as the Servicer may reasonably request from time to time for the Servicer to fulfill its duties as set forth in the Sale and Servicing Agreement and the Grantor Trustee shall furnish to the Indenture Trustee all information it receives from the Servicer and all notices received by it under the Sale and Servicing Agreement to the extent not otherwise required to be delivered to the Indenture Trustee.  The Grantor Trustee shall furnish promptly to the Indenture Trustee and the Owner Trustee all reports received from the Servicer.  The Grantor Trustee covenants and agrees that it shall perform its obligations hereunder in a manner so as to maintain the status of the Grantor Trust Estate as a grantor trust under U.S. federal income tax law and to prevent the imposition of any federal, state or local income, prohibited transaction, contribution or other tax on the Grantor Trust Estate to the extent that maintaining such status and avoiding such taxes are reasonably within the control of the Grantor Trustee and are reasonably within the scope of its duties under this Grantor Trust Agreement.

(c) No provision of this Grantor Trust Agreement shall be construed to relieve the Grantor Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct; provided, however, that:

(i)     Prior to the occurrence of a Servicing Default, and after the curing or waiver of all such Servicing Defaults which may have occurred, the duties and obligations of the Grantor Trustee shall be determined solely by the express provisions of this Grantor Trust Agreement, the Grantor Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Grantor Trust Agreement, no implied covenants or obligations shall be read into this Grantor Trust Agreement against the Grantor Trustee and, in the absence of bad faith on the part of the Grantor Trustee, the Grantor Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon any Grantor Trust Certificate or opinions furnished to the Grantor Trustee by the Depositor or the Servicer and which on their face, do not contradict the requirements of this Grantor Trust Agreement;

(ii)     The Grantor Trustee shall not be personally liable for an error of judgment made in good faith by a Responsible Officer or Responsible Officers of the Grantor Trustee, unless it shall be proved that the Grantor Trustee was negligent in ascertaining the pertinent facts;

(iii)     The Grantor Trustee shall not be personally liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the

USBT 100645

direction of the Grantor Trust Certificateholder as to the time, method and place of conducting any proceeding for any remedy available to the Grantor Trustee, or exercising any trust or power conferred upon the Grantor Trustee, under this Grantor Trust Agreement;

(iv)    The Grantor Trustee shall not be charged with knowledge of any failure or event that may give rise to any Servicing Default (other than a default in payment to the Grantor Trustee) unless a Responsible Officer of the Grantor Trustee assigned to and working in the Corporate Trust Office obtains actual knowledge of such failure or event or the Grantor Trustee receives written notice of such failure or event at its Corporate Trust Office from the Servicer, the Depositor or any Grantor Trust Certificateholder; and

(v)    Except to the extent provided in Sections 6.06 and 6.07, no provision in this Grantor Trust Agreement shall require the Grantor Trustee to expend or risk its own funds or otherwise incur any personal financial liability in the performance of any of its duties as Grantor Trustee hereunder, or in the exercise of any of its rights or powers, if the Grantor Trustee shall have reasonable grounds for believing that repayment of funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(d) As used in this Article, references to the rights, powers, duties and obligations of the Grantor Trustee under this Grantor Trust Agreement include the rights, powers, duties and obligations of the Grantor Trustee under the Sale and Servicing Agreement.

(e) The Grantor Trustee covenants and agrees that it shall perform its obligations hereunder in a manner so as to maintain the status of the Grantor Trust Estate as a grantor trust under subpart E, part I of subchapter J of the Code and not as an association taxable as a corporation, as a taxable mortgage pool, or as a partnership and to prevent the imposition of any U.S. federal, state or local income or other tax on the Grantor Trust Estate.

Section 6.02.  Certain Matters Affecting the Grantor Trustee.

Except as otherwise provided in Section 6.01:

(i)    The Grantor Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, Officers' Certificate, certificate of auditors or any other certificate, statement, instrument, opinion, report, notice, request, consent, order, appraisal, bond or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties;

(ii)    The Grantor Trustee may consult with counsel and any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or suffered or omitted by it hereunder in good faith and in accordance with such Opinion of Counsel;

(iii)    The Grantor Trustee shall be under no obligation to exercise any of the trusts or powers vested in it by this Grantor Trust Agreement or to institute, conduct or defend any litigation hereunder or in relation hereto at the request, order or direction of the Grantor Trust Certificateholder pursuant to the provisions of this Grantor Trust

Agreement, unless the Grantor Trust Certificateholder shall have offered to the Grantor Trustee reasonable security or indemnity against the costs, expenses and liabilities which may be incurred therein or thereby has given its consent; nothing contained herein shall, however, relieve the Grantor Trustee of the obligation, upon the occurrence of a Servicing Default (which has not been cured), to exercise such of the rights and powers vested in it by this Grantor Trust Agreement, and to use the same degree of care and skill in their exercise as a prudent investor would exercise or use under the circumstances in the conduct of such investor's own affairs;

(iv)    The Grantor Trustee shall not be personally liable for any action taken, suffered or omitted by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Grantor Trust Agreement;

(v)    Prior to the occurrence of a Servicing Default hereunder and after the curing of all Servicing Default which may have occurred, the Grantor Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, consent, order, approval, bond or other paper or document, unless requested in writing so to do by the Grantor Trust Certificateholder; provided, however, that if the payment within a reasonable time to the Grantor Trustee of the costs, expenses or liabilities likely to be incurred by it in the making of such investigation is, in the opinion of the Grantor Trustee, not reasonably assured to the Grantor Trustee by the security afforded to it by the terms of this Grantor Trust Agreement, the Grantor Trustee may require reasonable indemnity against such expense or liability as a condition to so proceeding.    The reasonable expense of every such examination shall be paid by the Servicer, if a Servicing Default shall have occurred and is continuing, and otherwise by the Grantor Trust Certificateholder requesting the investigation; and

(vi)    The Grantor Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee, and the Indenture Trustee shall not be responsible for any misconduct or negligence on the part of, or for the supervision of, any such agent, attorney, custodian or nominee appointed with due care by it hereunder.

Section 6.03.  Grantor Trustee Not Liable for Grantor Trust Certificate or Loans.

The recitals contained herein and in the Grantor Trust Certificate (other than the execution and authentication of the Grantor Trust Certificate and relating to the acceptance and receipt of the Loans) shall be taken as the statements of the Depositor, and the Grantor Trustee assumes no responsibility for their correctness. The Grantor Trustee makes no representations as to the validity or sufficiency of this Grantor Trust Agreement or of the Grantor Trust Certificate (except that the Grantor Trust Certificate shall be duly and validly executed by it and authenticated by it as Grantor Trust Certificate Registrar) or of any Loan or related document. Except as otherwise provided herein, the Grantor Trustee shall not be accountable for the use or application by the Depositor of the Grantor Trust Certificate or of the proceeds of the Grantor Trust Certificate, or for the use or application of any funds paid to the Depositor in respect of the

Loans or deposited in or withdrawn from the Custodial Account or the Grantor Trust Certificate Account by the Depositor or the Servicer.

USBT 100648

Section 6.04.  Grantor Trustee May Own Grantor Trust Certificate.

The Grantor Trustee in its individual or any other capacity may become the owner or pledgee of the Grantor Trust Certificate with the same rights it would have if it were not Grantor Trustee.

Section 6.05.  Eligibility Requirements for Grantor Trustee.

The Grantor Trustee hereunder shall at all times be a corporation or a national banking association having its principal office in a state and city acceptable to the Depositor and organized and doing business under the laws of such state or the United States of America, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by federal or state authority.  If such corporation or national banking association publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.  In case at any time the Grantor Trustee shall cease to be eligible in accordance with the provisions of this Section, the Grantor Trustee shall resign immediately in the manner and with the effect specified in Section 6.06.

Section 6.06.  Resignation and Removal of the Grantor Trustee.

(a)  The Grantor Trustee may at any time resign and be discharged from the trusts hereby created by giving 120 days written notice thereof to the Depositor.  Upon receiving such notice of resignation, the Depositor shall promptly appoint a successor Grantor Trustee by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Grantor Trustee and one copy to the successor Grantor Trustee.  If no successor Grantor Trustee shall have been so appointed and have accepted appointment within 120 days after the giving of such notice of resignation, the resigning Grantor Trustee may petition any court of competent jurisdiction for the appointment of a successor Grantor Trustee.

(b)  If at any time the Grantor Trustee shall cease to be eligible in accordance with the provisions of Section 6.05 and shall fail to resign after written request therefor by the Depositor, or if at any time the Grantor Trustee shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or a receiver of the Grantor Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Grantor Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Depositor may remove the Grantor Trustee and appoint a successor Grantor Trustee by written instrument, in duplicate, one copy of which instrument shall be delivered to the Grantor Trustee so removed and one copy to the successor Grantor Trustee.  In addition, in the event that the Depositor determines that the Grantor Trustee has failed (i) to distribute or cause to be distributed to the Grantor Trust Certificateholder any amount required to be distributed hereunder, if such amount is held by the Grantor Trustee or its Paying Agent (other than the Servicer or the Depositor) for distribution or (ii) to otherwise observe or perform in any material respect any of its covenants, agreements or obligations hereunder, and such failure shall continue unremedied for a period of 5 days (in respect of clause (i) above) or 30 days (in respect of clause (ii) above) after the date on

which written notice of such failure, requiring that the same be remedied, shall have been given to the Grantor Trustee by the Depositor, then the Depositor may remove the Grantor Trustee and appoint a successor Grantor Trustee by written instrument delivered as provided in Section 6.06(a).

(c) The Holder of the Grantor Trust Certificate may at any time remove the Grantor Trustee and appoint a successor Grantor Trustee by written instrument or instruments, in triplicate, signed by such Holder or its attorney-in-fact duly authorized, one complete set of which instruments shall be delivered to the Depositor, one complete set to the Grantor Trustee so removed and one complete set to the successor so appointed.

(d) Any resignation or removal of the Grantor Trustee and appointment of a successor Grantor Trustee pursuant to any of the provisions of this Section shall become effective upon acceptance of appointment by the successor Grantor Trustee as provided in Section 6.07. In connection with the appointment of a successor Grantor Trustee pursuant to the preceding sentence, the Depositor shall, on or before the date on which any such appointment becomes effective, obtain from each Rating Agency written confirmation that the appointment of any such successor Grantor Trustee will not result in the reduction of the ratings on any class of the Securities below the lesser of the then current or original ratings on such Securities.

Section 6.07.  Successor Grantor Trustee.

(a) Any successor Grantor Trustee appointed as provided in  Section 6.06 shall execute, acknowledge and deliver to the Depositor and to its predecessor Grantor Trustee an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor Grantor Trustee shall become effective and such successor Grantor Trustee shall become effective and such successor Grantor Trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with the like effect as if originally named as Grantor Trustee herein. The predecessor Grantor Trustee shall deliver to the successor Grantor Trustee all Loan Files and related documents and statements held by it hereunder (other than any Loan Files at the time held by a Custodian, which shall become the agent of any successor Grantor Trustee hereunder), and the Depositor, the Servicer and the predecessor Grantor Trustee shall execute and deliver such instruments and do such other things as may reasonably be required for more fully and certainly vesting and confirming in the successor Grantor Trustee all such rights, powers, duties and obligations.

(b) No successor Grantor Trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor Grantor Trustee shall be eligible under the provisions of Section 6.05.

(c) Upon acceptance of appointment by a successor Grantor Trustee as provided in this Section, the Depositor shall mail notice of the succession of such Grantor Trustee hereunder to the Holder of the Grantor Trust Certificate at its address as shown in the Grantor Trust Certificate Register. If the Depositor fails to mail such notice within 10 days after acceptance of appointment by the successor Grantor Trustee, the successor Grantor Trustee shall cause such notice to be mailed at the expense of the Depositor.

USBT 100650

Section 6.08.  Merger or Consolidation of Grantor Trustee.

Any corporation or national banking association into which the Grantor Trustee may be merged or converted or with which it may be consolidated or any corporation or national banking association resulting from any merger, conversion or consolidation to which the Grantor Trustee shall be a party, or any corporation or national banking association succeeding to the business of the Grantor Trustee, shall be the successor of the Grantor Trustee hereunder, provided such corporation or national banking association shall be eligible under the provisions of Section 6.05, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding.  The Grantor Trustee shall mail notice of any such merger or consolidation to the Grantor Trust Certificateholder at its address as shown in the Grantor Trust Certificate Register.

Section 6.09.  Appointment of Co-Grantor Trustee or Separate Grantor Trustee.

(a) Notwithstanding any other provisions hereof, at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Grantor Trust Estate or property securing the same may at the time be located, the Servicer and the Grantor Trustee acting jointly shall have the power and shall execute and deliver all instruments to appoint one or more Persons approved by the Grantor Trustee to act as co-Grantor Trustee or co-Grantor Trustees, jointly with the Grantor Trustee, or separate Grantor Trustee or separate Grantor Trustees, of all or any part of the Grantor Trust Estate, and to vest in such Person or Persons, in such capacity, such title to the Grantor Trust Estate, or any part thereof, and, subject to the other provisions of this Section 6.09, such powers, duties, obligations, rights and trusts as the Servicer and the Grantor Trustee may consider necessary or desirable.  If the Servicer shall not have joined in such appointment within 15 days after the receipt by it of a request so to do, or in case an Event of Default shall have occurred and be continuing, the Grantor Trustee alone shall have the power to make such appointment.  No co-Grantor Trustee or separate Grantor Trustee hereunder shall be required to meet the terms of eligibility as a successor Grantor Trustee under Section 6.05 hereunder and no notice to the Holder of the Grantor Trust Certificate of the appointment of co-Grantor Trustee(s) or separate Grantor Trustee(s) shall be required under Section 6.07 hereof.

(b) In the case of any appointment of a co-Grantor Trustee or separate Grantor Trustee pursuant to this Section 6.09 all rights, powers, duties and obligations conferred or imposed upon the Grantor Trustee shall be conferred or imposed upon and exercised or performed by the Grantor Trustee, and such separate Grantor Trustee or co-Grantor Trustee jointly, except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed (whether as Grantor Trustee hereunder or as successor to the Servicer hereunder), the Grantor Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Grantor Trust Estate or any portion thereof in any such jurisdiction) shall be exercised and performed by such separate Grantor Trustee or co-Grantor Trustee at the direction of the Grantor Trustee.

(c) Any notice, request or other writing given to the Grantor Trustee shall be deemed to have been given to each of the then separate Grantor Trustees and co-Grantor Trustees, as effectively as if given to each of them.  Every instrument appointing any separate Grantor

USBT 100651

Trustee or co-Grantor Trustee shall refer to this Grantor Trust Agreement and the conditions of this Article VI. Each separate Grantor Trustee and co-Grantor Trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Grantor Trustee or separately, as may be provided therein, subject to all the provisions of this Grantor Trust Agreement, specifically including every provision of this Grantor Trust Agreement relating to the conduct of, affecting the liability of, or affording protection to, the Grantor Trustee. Every such instrument shall be filed with the Grantor Trustee.

(d) Any separate Grantor Trustee or co-Grantor Trustee may, at any time, constitute the Grantor Trustee, its agent or attorney-in-fact, with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Grantor Trust Agreement on its behalf and in its name. If any separate Grantor Trustee or co-Grantor Trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Grantor Trustee, to the extent permitted by law, without the appointment of a new or successor Grantor Trustee.

Section 6.10. Appointment of Custodians.

The Grantor Trustee may, with the consent of the Servicer and the Depositor, appoint one or more Custodians who are not Affiliates of the Depositor, the Servicer or the Seller to hold all or a portion of the Loan Files as agent for the Grantor Trustee, by entering into a Custodial Agreement. Subject to Article VII, the Grantor Trustee agrees to comply with the terms of each Custodial Agreement and to enforce the terms and provisions thereof against the Custodian for the benefit of the Grantor Trust Certificateholder; provided, however, the Grantor Trustee shall be under no obligation to supervise the Custodian. Each Custodian shall be a depository institution subject to supervision by federal or state authority, shall have a combined capital and surplus of at least $15,000,000 and shall be qualified to do business in the jurisdiction in which it holds any Loan. Each Custodial Agreement may be amended only as provided in Section 8.01. The Grantor Trustee shall notify the Grantor Trust Certificateholder of the appointment of any Custodian (other than the Custodian appointed as of the Closing Date) pursuant to this Section 6.10.

Section 6.11. Appointment of Office or Agency.

The Grantor Trustee will maintain an office or agency in the St. Paul, Minnesota where Grantor Trust Certificate may be surrendered for registration of transfer or exchange. The Grantor Trustee will maintain an office at the address stated in Section 8.05(c) hereof where notices and demands to or upon the Grantor Trustee in respect of this Grantor Trust Agreement may be served.

Section 6.12. Compliance with Withholding Requirements.

Notwithstanding any other provisions of this Agreement, the Grantor Trustee shall comply with all U.S. federal withholding requirements with respect to distributions to the Grantor Trust Certificateholder. The consent of the Grantor Trust Certificateholder shall not be required for any such withholding; except that no withholding shall be made to the extent that the

Grantor Trust Certificateholder presents to the Grantor Trustee a form evidencing entitlement to elimination or reduction of such withholding. In the event the Grantor Trustee withholds any amount from the Grantor Trust Certificateholder pursuant to federal withholding requirements, the Grantor Trustee shall indicate to the Grantor Trust Certificateholder the amount so withheld.

Section 6.13. <u>Grantor Trust Reporting</u>.

The Grantor Trustee shall furnish or cause to be furnished to the Holder of the Grantor Trust Certificate and shall file or cause to be filed with the Internal Revenue Service, together with Form 1041 or such other form as may be applicable, such information with respect to the income and deductions of the Grantor Trust Estate at the time or times and in the manner required by the Code, including such other customary factual information as is available to the Grantor Trustee to enable the Grantor Trust Certificateholder to prepare its tax returns, including information required with respect to computing the accrual of original issue and market discount.

Section 6.14. <u>Representations and Warranties</u>.

The Grantor Trustee hereby represents that:

(i)     The Grantor Trustee is duly organized, validly existing national banking association with power and authority to own its properties and to conduct its business as such properties are currently owned and such business is presently conducted.

(ii)     The Grantor Trustee has the power and authority to execute and deliver this Grantor Trust Agreement and to carry out its terms; and the execution, delivery and performance of this Grantor Trust Agreement have been duly authorized by the Grantor Trustee by all necessary corporate action.

(iii)     The consummation of the transactions contemplated by this Grantor Trust Agreement and the fulfillment of the terms hereof do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time) a default under, the articles of organization or bylaws of the Grantor Trustee or any agreement or other instrument to which the Grantor Trustee is a party or by which it is bound.

(iv)     To the Grantor Trustee's best knowledge, there are no proceedings or investigations pending or threatened before any court, regulatory body, administrative agency or other governmental instrumentality having jurisdiction over the Grantor Trustee or its properties: (A) asserting the invalidity of this Grantor Trust Agreement (B) seeking to prevent the consummation of any of the transactions contemplated by this Grantor Trust Agreement or (C) seeking any determination or ruling that might materially and adversely affect the performance by the Grantor Trustee of its obligations under, or the validity or enforceability of, this Grantor Trust Agreement.

(v)     The Grantor Trustee does not have notice of any adverse claim (as such terms are used in Delaware UCC Section 8-302) with respect to the Loans.

USBT 100653

Section 6.15. <u>Compensation and Indemnity</u>. The Grantor Trustee shall be compensated and indemnified by the Servicer in accordance with Sections 5.01(d)(ii)(b) and 9.01(b) respectively, of the Sale and Servicing Agreement. The Grantor Trustee's compensation shall not be limited by any law on compensation of a trustee of an express trust. The Seller shall reimburse the Grantor Trustee for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services. Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Grantor Trustee's agents, counsel, accountants and experts. The Seller shall indemnify the Grantor Trustee against any and all loss, liability or expense (including attorneys' fees) incurred by it in connection with the administration of this trust and the performance of its duties hereunder. The Grantor Trustee shall notify the Depositor promptly of any claim for which it may seek indemnity. Failure by the Grantor Trustee to so notify the Depositor shall not relieve the Depositor of its obligations hereunder. The Depositor shall defend any such claim, and the Grantor Trustee may have separate counsel and the Depositor shall pay the fees and expenses of such counsel. The Depositor is not obligated to reimburse any expense or indemnify against any loss, liability or expense incurred by the Grantor Trustee through the Grantor Trustee's own willful misconduct, negligence or bad faith.

The Depositor's payment obligations to the Grantor Trustee pursuant to this Section 6.15 shall survive the discharge of this Grantor Trust Agreement.

ARTICLE VII

TERMINATION

Section 7.01. Termination Upon Purchase by the Trust or the Backup Servicer or Liquidation of All Loans.

(a) Unless earlier terminated pursuant to Section 7.02, the respective obligations and responsibilities of the Depositor and the Grantor Trustee created hereby in respect of the Grantor Trust Certificate (other than the obligation of the Grantor Trustee to make certain payments after the Final Distribution Date to the Grantor Trust Certificateholder and the obligation of the Depositor to send certain notices as hereinafter set forth) shall terminate upon the last action required to be taken by the Grantor Trustee on the Final Distribution Date pursuant to this Article VII following the earlier of:

(i)    the final payment or other liquidation of the last Loan remaining in the Grantor Trust Estate, or

(ii)    the purchase by the Trust or the Backup Servicer of all Loans pursuant to Section 11.01 of the Sale and Servicing Agreement; <u>provided</u>, <u>however</u>, that in no event shall the trust created hereby continue beyond the expiration of 21 years from the death of the last survivor of the descendants of Joseph P. Kennedy, the late ambassador of the United States to the Court of St. James's, living on the date hereof.

(b) Notice of any termination shall be provided in accordance with Section 4.02(b).

USBT 100654

(c) Upon presentation and surrender of the Grantor Trust Certificate by the Grantor Trust Certificateholder, (i) if not in connection with the Trust's or the Backup Servicer's election to purchase the Loans and other collateral pursuant to Section 11.01 of the Sale and Servicing Agreement, the Grantor Trustee shall distribute to the Grantor Trust Certificateholder the amount otherwise distributable on such Distribution Date, or (ii) if the Trust or the Backup Servicer elected to so purchase, the Grantor Trustee shall distribute to the Grantor Trust Certificateholder the purchase price specified in Section 11.01 of the Sale and Servicing Agreement.

(d) In the event that the Grantor Trust Certificateholder shall not surrender the Grantor Trust Certificate for final payment and cancellation on or before the January 25, 2029 (if so required by the terms hereof), the Grantor Trustee shall on such date cause all funds in the Collection Account not distributed in final distribution to the Grantor Trust Certificateholder to be withdrawn therefrom and credited to the Grantor Trust Certificateholder by depositing such funds in an escrow account for the benefit of the Grantor Trust Certificateholder, or the Grantor Trustee (in any other case) shall give a second written notice to the Grantor Trust Certificateholder to surrender the Grantor Trust Certificate for cancellation and receive the final distribution with respect thereto. If within six months after the second notice the Grantor Trust Certificate shall not have been surrendered for cancellation, the Grantor Trustee shall take appropriate steps, as applicable, to contact the Grantor Trust Certificateholder concerning surrender of the Grantor Trust Certificate. The costs and expenses of maintaining the escrow account and of contacting the Grantor Trust Certificateholder shall be paid out of the assets which remain in the escrow account. If within nine months after the second notice the Grantor Trust Certificate shall not have been surrendered for cancellation, the Grantor Trustee shall pay to the Depositor, all amounts distributable to the holder thereof and the Depositor, shall thereafter hold such amounts until distributed to such holders. No interest shall accrue or be payable to the Grantor Trust Certificateholder on any amount held in the escrow account or by the Servicer, as a result of the Grantor Trust Certificateholder's failure to surrender the Grantor Trust Certificate for final payment thereof in accordance with this Section 7.01 and the Grantor Trust Certificateholder shall look only to the Servicer for such payment.

Section 7.02.  <u>Termination by Grantor Trust Certificateholder</u>.

Upon the occurrence of an Event of Default under the Indenture or if the Indenture is otherwise terminated, the Holder of the Grantor Trust Certificate shall have the right to terminate this Grantor Trust Agreement at any time upon 30 days prior written notice to the Grantor Trustee, with copies to the Servicer, the Custodian and the Depositor specifying the effective date of such termination. Upon presentation and surrender of the Grantor Trust Certificate by the Holder thereof to the Grantor Trustee on such effective date: (i) the Loans and all other property of the Grantor Trust shall be conveyed to such Holder; (ii) the Grantor Trustee shall execute and deliver to such Holder all instruments necessary to evidence such conveyance, and shall release all monies and other property of the Grantor Trust held by the Grantor Trustee to such Holder; (iii) the Servicer shall continue to service the Loans pursuant to the Sale and Servicing Agreement, solely for such Holder, and such Holder shall have all rights of the Grantor Trustee thereunder, until the Sale and Servicing Agreement is terminated; and (v) such Holder will have full right and authority to sell, transfer and assign the Loans, subject to any applicable provisions of the Trust Agreement and this Grantor Trust Agreement.

USBT 100655

ARTICLE VIII

MISCELLANEOUS PROVISIONS

Section 8.01. <u>Amendment</u>.

(a) This Agreement or the Sale and Servicing Agreement may be amended from time to time by the Depositor and the Grantor Trustee, without the consent of the Grantor Trust Certificateholder:

          (i)     to cure any ambiguity,

          (ii)     to correct or supplement any provisions herein or therein, which may be inconsistent with any other provisions herein or therein or to correct any error,

          (iii)     to modify, eliminate or add to any of its provisions to such extent as shall be necessary or desirable to maintain the qualification of the Grantor Trust as a Grantor Trust at all times that any Grantor Trust Certificate is outstanding or to avoid or minimize the risk of the imposition of any tax on the Grantor Trust pursuant to the Code that would be a claim against the Grantor Trust, provided that the Grantor Trustee has received an Opinion of Counsel to the effect that (A) such action is necessary or desirable to maintain such qualification or to avoid or minimize the risk of the imposition of any such tax and (B) such action will not adversely affect in any material respect the interests of any Grantor Trust Certificateholder,

          (iv)     to make any other provisions with respect to matters or questions arising under this Grantor Trust Agreement, the Sale and Servicing Agreement or which shall not be materially inconsistent with the provisions of this Grantor Trust Agreement, provided that such action shall not, as evidenced by an Opinion of Counsel, adversely affect in any material respect the interests of any Grantor Trust Certificateholder provided that if the Rating Agencies have delivered a letter to the effect that such amendment will not result in a reduction of the ratings assigned to the Notes in which case no such Opinion of Counsel need be delivered.

(b) This Grantor Trust Agreement and the Sale and Servicing Agreement may also be amended from time to time by the Depositor and the Grantor Trustee with the consent of the Holder of the Grantor Trust Certificate, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Grantor Trust Agreement or of modifying in any manner the rights of the Holder of the Grantor Trust Certificate; <u>provided, however</u>, that any amendment must be accompanied by a letter from the Rating Agencies that such amendment will not result in a downgrading or withdrawal of the rating then assigned to the Securities.

(c) Notwithstanding any contrary provision of this Grantor Trust Agreement, the Grantor Trustee shall not consent to any amendment to this Grantor Trust Agreement or the Sale and Servicing Agreement unless it shall have first received an Opinion of Counsel to the effect that such amendment or the exercise of any power granted to the Servicer, the Depositor or the Grantor Trustee in accordance with such amendment (i) is authorized or permitted by the

21

USBT 100656

Agreement and (ii) will not result in the imposition of a tax on the Grantor Trust Estate or cause the Grantor Trust Estate to fail to be classified as a grantor trust under subpart E, part I of subchapter J of chapter 1 of the Code. The Grantor Trustee may but shall not be obligated to enter into any amendment pursuant to this Section that affects its rights, duties and immunities under this Grantor Trust Agreement or otherwise; provided however, such consent shall not be unreasonably withheld.

(d)    Promptly after the execution of any such amendment the Grantor Trustee shall furnish written notification of the substance of such amendment to the Grantor Trust Certificateholder. It shall not be necessary for the consent of the Grantor Trust Certificateholder under this Section 8.01 to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof. The manner of obtaining such consents and of evidencing the authorization of the execution thereof by Grantor Trust Certificateholder shall be subject to such reasonable regulations as the Grantor Trustee may prescribe.

Section 8.02.  <u>Recordation of Grantor Trust Agreement; Counterparts.</u>

(a) To the extent permitted by applicable law, this Grantor Trust Agreement is subject to recordation in all appropriate public offices for real property records in all the counties or other comparable jurisdictions in which any or all of the properties subject to the Mortgages are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer and at its expense on direction by the Grantor Trustee (pursuant to the request of the Holder of the Grantor Trust Certificate), but only upon direction accompanied by an Opinion of Counsel to the effect that such recordation materially and beneficially affects the interests of the Grantor Trust Certificateholder.

(b) For the purpose of facilitating the recordation of this Grantor Trust Agreement as herein provided and for other purposes, this Grantor Trust Agreement may be executed simultaneously in any number of counterparts, each of which counterparts shall be deemed to be an original, and such counterparts shall constitute but one and the same instrument.

Section 8.03.  <u>Limitation on Rights of Grantor Trust Certificateholder.</u>

(a) The death or incapacity of the Grantor Trust Certificateholder shall not operate to terminate this Grantor Trust Agreement or the Grantor Trust Estate, nor entitle such Grantor Trust Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of the Grantor Trust Estate, nor otherwise affect the rights, obligations and liabilities of any of the parties hereto.

(b) No Grantor Trust Certificateholder shall have any right to vote (except as expressly provided herein) or in any manner otherwise control the operation and management of the Grantor Trust Estate, or the obligations of the parties hereto, nor shall anything herein set forth, or contained in the terms of the Grantor Trust Certificate, be construed so as to constitute the Grantor Trust Certificateholder from time to time as partners or members of an association; nor shall the Grantor Trust Certificateholder be under any liability to any third person by reason of any action taken by the parties to this Grantor Trust Agreement pursuant to any provision hereof.

USBT 100657

(c) No Grantor Trust Certificateholder shall have any right by virtue of any provision of this Grantor Trust Agreement to institute any suit, action or proceeding in equity or at law upon or under or with respect to this Grantor Trust Agreement, unless such Holder previously shall have given to the Grantor Trustee a written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the Holder of the Grantor Trust Certificate, shall have made written request to the Grantor Trustee to institute such action, suit or proceeding in its own name as Grantor Trustee hereunder and shall have offered to the Grantor Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby shall have given its written consent, and the Grantor Trustee, for 60 days after its receipt of such notice, request and offer of indemnity, shall have neglected or refused to institute any such action, suit or proceeding. For the protection and enforcement of the provisions of this Section 8.03, each and every Grantor Trust Certificateholder and the Grantor Trustee shall be entitled to such relief as can be given either at law or in equity.

Section 8.04. <u>Governing Law</u>.

This Grantor Trust Agreement and the Grantor Trust Certificate shall be governed by and construed in accordance with the laws of the State of New York and the obligations, rights and remedies of the parties hereunder shall be determined in accordance with such laws.

Section 8.05. <u>Notices</u>.

All demands and notices hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid (except for notices to the Grantor Trustee which shall be deemed to have been duly given only when received), to (a) in the case of the Depositor, Keystone Mortgage Corp., Inc., 69 Main Street, Keystone, West Virginia 24852, Attention: Terry Church, or such other address as may hereafter be furnished to the Servicer and the Grantor Trustee in writing by the Depositor, (b) in the case of the Servicer, Republic Bank, 1400 66th Street North, 4th Floor, St. Petersburg, FL 33710, Attention: Steve McWhorter, or such other address as may be hereafter furnished to the Depositor and the Grantor Trustee by the Servicer in writing, (c) in the case of the Grantor Trustee, U.S. Bank Trust National Association, U.S. Bank Trust Center, 180 East Fifth Street, St. Paul, MN 55101, Attention: Tina Hatfield, or such other address as may hereafter be furnished to the Depositor and the Servicer in writing by the Grantor Trustee, (d) in the case of Fitch, Fitch IBCA, Inc. Service, L.P., One State Street Plaza, 33rd Floor, New York, New York 10004 Attention: Residential Mortgage Pass-Through Monitoring, or such other address as may hereafter be furnished to the Depositor, the Grantor Trustee and the Servicer in writing by Fitch and (e) in the case of Moody's, 99 Church Street, New York, New York 10007 Attention: Mortgage Surveillance or such other address as may be hereafter furnished to the Depositor, Grantor Trustee and Servicer by Moody's. Any notice required or permitted to be mailed to the Grantor Trust Certificateholder shall be given by first class mail, postage prepaid, at the address of such holder as shown in the Grantor Trust Certificate Register. Any notice so mailed within the time prescribed in this Grantor Trust Agreement shall be conclusively presumed to have been duly given, whether or not the Grantor Trust Certificateholder receives such notice.

USBT 100658

Section 8.06.  Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Grantor Trust Agreement shall be for any reason whatsoever held invalid, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Grantor Trust Agreement and shall in no way affect the validity or enforceability of the other provisions of this Grantor Trust Agreement or of the Grantor Trust Certificate or the rights of the Holder thereof.

USBT 100659

IN WITNESS WHEREOF, the Depositor and the Grantor Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the date and year first above written.

KEYSTONE MORTGAGE CORP., INC.

By:_____

    Name: TERRY L. CHURCH
    Title: PRESIDENT


U.S. BANK TRUST NATIONAL ASSOCIATION
as Grantor Trustee


By:_____

    Name:
    Title:

IN WITNESS WHEREOF, the Depositor and the Grantor Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized and their respective seals, duly attested, to be hereunto affixed, all as of the date and year first above written.

KEYSTONE MORTGAGE CORP., INC.

By:_____
    Name:
    Title:

U.S. BANK TRUST NATIONAL ASSOCIATION
as Grantor Trustee

By:_____
    Name:         C. Hatfield
    Title:        Vice President

USBT 100661

STATE OF WEST VIRGINIA          )
                                ) ss.:
COUNTY OF  MCDOWELL             )

On the 14 th day of September, 1998 before me, a notary public in and for said State, personally appeared  TERRY L. CHURCH      , known to me to be the President of Keystone Mortgage Corp., Inc., one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Grantor Trust Certificate first above written.

[Notarial Seal]

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
VIRGINIA L. BURKS
P. O. BOX 755
RT. 52, LANDGRAFF
KIMBALL, WV 24853
My Commission Expires April 8, 2007

_____
                Notary Public

STATE OF MINNESOTA             )
                                ) ss.:
COUNTY OF                      )

On the ____th day of September, 1998 before me, a notary public in and for said State, personally appeared _____, known to me to be a Vice President of U.S. Bank Trust National Association, a national banking association that executed the within instrument, and also known to me to be the person who executed it on behalf of said association, and acknowledged to me that such national banking association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Grantor Trust Certificate first above written.

_____
                Notary Public

[Notarial Seal]

STATE OF WEST VIRGINIA )
) ss.:
COUNTY OF )

On the ____th day of September, 1998 before me, a notary public in and for said State, personally appeared _____, known to me to be the President of Keystone Mortgage Corp., Inc., one of the corporations that executed the within instrument, and also known to me to be the person who executed it on behalf of said corporation, and acknowledged to me that such corporation executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Grantor Trust Certificate first above written.

_____
Notary Public

[Notarial Seal]

STATE OF MINNESOTA )
) ss.:
COUNTY OF RAMSEY )

On the 16th day of September, 1998 before me, a notary public in and for said State, personally appeared Christina Hatfield, known to me to be a Vice President of U.S. Bank Trust National Association, a national banking association that executed the within instrument, and also known to me to be the person who executed it on behalf of said association, and acknowledged to me that such national banking association executed the within instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal the day and year in this Grantor Trust Certificate first above written.



DEBORAH J. FRANCO
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2000

[Notarial Seal]

_____
Notary Public

USBT 100663

EXHIBIT A

GRANTOR TRUST CERTIFICATE

SERIES 1998-P2

THIS GRANTOR TRUST CERTIFICATE IS NOT TRANSFERABLE EXCEPT UPON SATISFACTION OF THE CONDITIONS IN SECTION 5.02 OF THE GRANTOR TRUST AGREEMENT.

THIS GRANTOR TRUST CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR THE SECURITIES LAWS OF ANY STATE AND MAY NOT BE RESOLD OR TRANSFERRED UNLESS IT IS REGISTERED PURSUANT TO SUCH ACT AND LAWS OR IS SOLD OR TRANSFERRED IN TRANSACTIONS WHICH ARE EXEMPT FROM REGISTRATION UNDER SUCH ACT AND UNDER APPLICABLE STATE LAW AND IS TRANSFERRED IN ACCORDANCE WITH THE PROVISIONS OF SECTION 5.02 OF THE GRANTOR TRUST AGREEMENT, DATED AUGUST 28, 1998, BETWEEN KEYSTONE MORTGAGE CORP., INC. AND U.S. BANK TRUST NATIONAL ASSOCIATION ("THE AGREEMENT").

NO TRANSFER OF THIS CERTIFICATE SHALL BE MADE UNLESS (i) THE GRANTOR TRUSTEE SHALL HAVE RECEIVED AN OPINION OF COUNSEL ACCEPTABLE TO AND IN FORM AND SUBSTANCE SATISFACTORY TO THE GRANTOR TRUSTEE, THE DEPOSITOR AND THE SERVICER TO THE EFFECT THAT THE PURCHASE OR HOLDING OF THIS GRANTOR TRUST CERTIFICATE IS PERMISSIBLE UNDER APPLICABLE LAW, WILL NOT CONSTITUTE OR RESULT IN ANY NON-EXEMPT PROHIBITED TRANSACTION UNDER SECTION 406 OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA"), OR SECTION 4975 OF THE CODE (OR COMPARABLE PROVISIONS OF ANY SUBSEQUENT ENACTMENTS), AND WILL NOT SUBJECT THE GRANTOR TRUSTEE, THE DEPOSITOR OR THE SERVICER TO ANY OBLIGATION OR LIABILITY (INCLUDING OBLIGATIONS OR LIABILITIES UNDER ERISA OR SECTION 4975 OF THE CODE) IN ADDITION TO THOSE UNDERTAKEN IN THE AGREEMENT, WHICH OPINION OF COUNSEL SHALL NOT BE AN EXPENSE OF THE GRANTOR TRUSTEE, THE DEPOSITOR OR THE SERVICER OR (ii) THE PROSPECTIVE TRANSFEREE SHALL HAVE PROVIDED TO THE GRANTOR TRUSTEE, THE DEPOSITOR AND THE SERVICER A CERTIFICATION, WHICH THE GRANTOR TRUSTEE MAY RELY UPON WITHOUT FURTHER INQUIRY OR INVESTIGATION, OR SUCH OTHER CERTIFICATIONS AS THE GRANTOR TRUSTEE MAY DEEM DESIRABLE OR NECESSARY IN ORDER TO ESTABLISH THAT SUCH TRANSFEREE OR THE PERSON IN WHOSE NAME SUCH REGISTRATION IS REQUESTED IS NOT AN EMPLOYEE BENEFIT PLAN OR OTHER PLAN SUBJECT TO THE PROHIBITED TRANSACTION PROVISIONS OF ERISA OR SECTION 4975 OF THE CODE, OR ANY PERSON

USBT 100664

(INCLUDING AN INVESTMENT MANAGER, A NAMED FIDUCIARY OR A GRANTOR TRUSTEE OF ANY SUCH PLAN) WHO IS USING "PLAN ASSETS" OF ANY SUCH PLAN TO EFFECT SUCH ACQUISITION; PROVIDED, HOWEVER, THAT SUCH OPINION OF COUNSEL OR CERTIFICATION WILL NOT BE REQUIRED IN CONNECTION WITH THE INITIAL TRANSFERS OF THIS GRANTOR TRUST CERTIFICATE BY THE DEPOSITOR OR ANY AFFILIATE THEREOF TO AN AFFILIATE OF THE DEPOSITOR OR TO THE ISSUER OR THE INDENTURE TRUSTEE AS PLEDGEE OF THE ISSUER (IN WHICH CASE, THE DEPOSITOR OR ANY AFFILIATE THEREOF OR THE ISSUER OR THE INDENTURE TRUSTEE SHALL HAVE DEEMED TO HAVE REPRESENTED THAT SUCH AFFILIATE OR THE ISSUER OR THE INDENTURE TRUSTEE IS NOT A PLAN OR A PERSON INVESTING "PLAN ASSETS" OF ANY PLAN) AND THE GRANTOR TRUSTEE SHALL BE ENTITLED TO CONCLUSIVELY RELY UPON A REPRESENTATION (WHICH, UPON THE REQUEST OF THE GRANTOR TRUSTEE, SHALL BE A WRITTEN REPRESENTATION) FROM THE DEPOSITOR OF THE STATUS OF SUCH TRANSFEREE AS AN AFFILIATE OF THE DEPOSITOR.

THIS GRANTOR TRUST CERTIFICATE DOES NOT REPRESENT AN INTEREST IN OR OBLIGATION OF THE DEPOSITOR, THE SERVICER, THE GRANTOR TRUSTEE OR ANY OF THEIR RESPECTIVE AFFILIATES, EXCEPT AS EXPRESSLY PROVIDED IN THE AGREEMENT OR THE TRANSACTION DOCUMENTS.

Certificate No. 1

Cut-off Date: September 16, 1998

Grantor Trust Certificate

Certificate Percentage Interest
this Grantor Trust Certificate: 100%

USBT 100665

# GRANTOR TRUST CERTIFICATE

## SERIES 1998-P2

evidencing an undivided interest in the Grantor Trust Estate, the property of which consists primarily of the Loans, sold by KEYSTONE MORTGAGE CORP., INC. (hereinafter called the "Depositor," which term includes any successor entity under the Agreement referred to below).

This Grantor Trust Certificate is payable solely from the assets of the Grantor Trust Estate, and does not represent an obligation of or interest in the Depositor, the Servicer, the Grantor Trustee or any of their affiliates. Neither this Grantor Trust Certificate nor any of the Loans is guaranteed or insured by any governmental agency or instrumentality or by the Depositor, the Servicer, the Grantor Trustee or any of their affiliates. None of the Depositor, the Servicer, the Grantor Trustee, or any of their affiliates will have any obligation with respect to any certificate or other obligation secured by or payable from payments on the Grantor Trust Certificate.

This certifies that U.S. BANK TRUST NATIONAL ASSOCIATION is the registered owner of the Certificate Percentage Interest evidenced by this Grantor Trust Certificate (as set forth on the face hereof) in certain distributions with respect to the Grantor Trust Estate, consisting primarily of the Loans, sold by Keystone Mortgage Corp., Inc.. The Grantor Trust was created pursuant to a Grantor Trust Agreement dated as specified above (as amended and supplemented from time to time, the "Agreement") between the Depositor and U.S. Bank Trust National Association, as grantor trustee (the "Grantor Trustee," which term includes any successor entity under the Agreement), a summary of certain of the pertinent provisions of which is set forth hereafter. To the extent not defined herein, the capitalized terms used herein have the meanings assigned in the Agreement. This Grantor Trust Certificate is issued under and is subject to the terms, provisions and conditions of the Agreement, to which Agreement the Holder of this Grantor Trust Certificate by virtue of the acceptance hereof assents and by which such Holder is bound.

Pursuant to the terms of the Agreement, a distribution will be made on the 25th day of each month or, if such 25th day is not a Business Day, the Business Day immediately following (each, a "Distribution Date"), commencing on the first Distribution Date specified above, to the Person in whose name this Grantor Trust Certificate is registered at the close of business on the last day (or if such last day is not a Business Day, the Business Day immediately preceding such last day) of the month immediately preceding the month of such distribution (each, a "Record Date"), in an amount equal to the sum of the Grantor Trust Certificate Interest Remittance Amount and the Grantor Trust Certificate Principal Remittance Amount. Distributions on this Grantor Trust Certificate will be made as provided in the Agreement by the Paying Agent appointed by the Grantor Trustee by wire transfer or check mailed to the Grantor Trust Certificateholder of record in the Grantor Trust Certificate Register without the presentation or surrender of this Grantor Trust Certificate or the making of any notation hereon.

Except as otherwise provided in the Agreement and notwithstanding the above. the final distribution on this Grantor Trust Certificate will be made after due notice by the Grantor Trustee of the pendency of such distribution and only upon presentation and surrender of this Grantor

A-1

Trust Certificate at the office maintained by the Grantor Trustee for that purpose in St. Paul, Minnesota.

No transfer, sale, pledge or other disposition of this Grantor Trust Certificate shall be made unless such transfer, sale, pledge or other disposition is exempt from the registration requirements of the Securities Act of 1933, as amended (the "1933 Act"), and any applicable state securities laws or is made in accordance with said Act and laws. Except as otherwise provided in Section 5.02(d) of the Agreement, in the event that a transfer of this Grantor Trust Certificate is to be made either (i)(A) the Grantor Trustee shall require a written Opinion of Counsel acceptable to and in form and substance satisfactory to the Grantor Trustee and the Depositor that such transfer may be made pursuant to an exemption, describing the applicable exemption and the basis therefor, from said Act and laws or is being made pursuant to said Act and laws, which Opinion of Counsel shall not be an expense of the Grantor Trustee, the Depositor or the Servicer; provided that such Opinion of Counsel will not be required in connection with the initial transfers of this Grantor Trust Certificate by the Depositor or any Affiliate thereof to an Affiliate of the Depositor or to the Issuer or the Grantor Trustee as pledgee of the Issuer and (B) the Grantor Trustee shall require the transferee to execute a representation letter, and the Grantor Trustee shall require the transferor to execute a representation letter, each acceptable to and in form and substance satisfactory to the Depositor and the Grantor Trustee certifying to the Depositor and the Grantor Trustee the facts surrounding such transfer, which representation letters shall not be an expense of the Grantor Trustee, the Depositor or the Servicer; provided, however, that such representation letters will not be required in connection with any transfers of any such Grantor Trust Certificate by the Depositor or any Affiliate thereof to an Affiliate of the Depositor or to the Issuer or the Grantor Trustee as pledgee of the Issuer, and the Grantor Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Grantor Trustee, shall be written representation) from the Depositor of the status, of such transferee as an Affiliate of the Depositor or (ii) the prospective transferee of this Grantor Trust Certificate shall be required to provide the Grantor Trustee, the Depositor and the Servicer with an investment letter, which investment letter shall not be an expense of the Grantor Trustee, the Depositor, or the Servicer, and which investment letter states that, among other things, such transferee (A) is a "qualified institutional buyer" as defined under Rule 144A, acting for its own account or the accounts of other "qualified institutional buyers" as defined under Rule 144A, and (B) is aware that the proposed transferor intends to rely on the exemption from registration requirements under the 1933 Act provided by Rule 144A. The Holder of this Grantor Trust Certificate desiring to effect any such transfer, sale, pledge or other disposition shall, and does hereby agree to, indemnify the Grantor Trustee, the Depositor, the Servicer and the Grantor Trust Certificate Registrar against any liability that may result if the transfer, sale, pledge or other disposition is not so exempt or is not made in accordance with such federal and state laws and the Grantor Trust Agreement.

In connection with any such transfer, either (i) the Grantor Trustee shall require an Opinion of Counsel acceptable to and in form and substance satisfactory to the Grantor Trustee, the Depositor and the Servicer to the effect that the purchase or holding of this Grantor Trust Certificate is permissible under applicable law, will not constitute or result in any non-exempt prohibited transaction under Section 406 of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or Section 4975 of the Code (or comparable provisions of any subsequent enactments), and will not subject the Grantor Trustee, the Depositor or the Servicer

to any obligation or liability (including obligations or liabilities under ERISA or Section 4975 of the Code) in addition to those undertaken in the Agreement, which Opinion of Counsel shall not be an expense of the Grantor Trustee, the Depositor or the Servicer or (ii) the prospective transferee shall be required to provide the Grantor Trustee, the Depositor and the Servicer with a certification, which the Grantor Trustee may rely upon without further inquiry or investigation, or such other certifications as the Grantor Trustee may deem desirable or necessary in order to establish that such transferee or the Person in whose name such registration is requested is not an employee benefit plan or other plan subject to the prohibited transaction provisions of ERISA or Section 4975 of the Code, or any Person (including an investment manager, a named fiduciary or a Grantor Trustee of any such plan) who is using "plan assets" of any such plan to effect such acquisition; provided, however, that such Opinion of Counsel or certification will not be required in connection with the initial transfers of this Grantor Trust Certificate by the Depositor or any Affiliate thereof to an Affiliate of the Depositor or to the Issuer or the Grantor Trustee as pledgee of the Issuer (in which case, the Depositor or any Affiliate thereof or the Issuer or the Grantor Trustee shall have deemed to have represented that such Affiliate is not a Plan or a Person investing "plan assets" of any Plan) and the Grantor Trustee shall be entitled to conclusively rely upon a representation (which, upon the request of the Grantor Trustee, shall be a written representation) from the Depositor of the status of such transferee as an Affiliate of the Depositor.

The Agreement permits the amendment thereof as specified in the Agreement.

As provided in the Agreement and subject to certain limitations therein set forth, the transfer of this Grantor Trust Certificate is registerable in the Grantor Trust Certificate Register upon surrender of this Grantor Trust Certificate for registration of transfer at the offices or agencies of the Grantor Trustee maintained in St. Paul, Minnesota, accompanied by a written instrument of transfer in form satisfactory to the Grantor Trustee duly executed by the Holder hereof or such Holder's attorney duly authorized in writing, and thereupon one new Grantor Trust Certificate of authorized denomination evidencing the same aggregate Grantor Trust Certificate Percentage Interest will be issued to the designated transferee. The initial Grantor Trust Certificate Registrar appointed under the Agreement is the Grantor Trustee.

The Grantor Trust Certificate is issuable only as a single Certificate evidencing a 100% Grantor Trust Certificate Percentage Interest.

No service charge will be made for any such registration of transfer or exchange, but the Grantor Trustee or the Grantor Trust Certificate Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith.

The Grantor Trustee, the Grantor Trust Certificate Registrar and any agent of the Grantor Trustee, or the Grantor Trust Certificate Registrar may treat the Person in whose name this Grantor Trust Certificate is registered, as the owner hereof for all purposes, and none of the Grantor Trustee, the Grantor Trust Certificate Registrar or any such agent shall be affected by any notice to the contrary.

This Grantor Trust Certificate shall be governed by and construed in accordance with the laws of the State of New York.

USBT 100668

The obligations created by the Agreement in respect of the Grantor Trust Certificate and the Grantor Trust created thereby shall terminate upon the last action required to be taken by the Grantor Trustee on the Final Distribution Date pursuant to the Agreement following the earlier of (i) the final payment or other liquidation of the last Loan remaining in the Grantor Trust Estate, or (ii) the purchase by the Servicer of all Loans pursuant to the Sale and Servicing Agreement.

USBT 100669

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Grantor Trustee, by manual signature, this Grantor Trust Certificate shall not be entitled to any benefit under the Agreement or be valid for any purpose.

IN WITNESS WHEREOF, the Grantor Trustee has caused this Grantor Trust Certificate to be duly executed.

by

U.S. BANK TRUST NATIONAL ASSOCIATION, not in its individual capacity but solely as Grantor Trustee

_____

Authorized Signatory
Dated: September _____,1998

USBT 100670

CERTIFICATE OF AUTHENTICATION

This is one of the Grantor Trust Certificate referred to in the within mentioned Agreement.

U.S. BANK TRUST NATIONAL ASSOCIATION,
not in its individual capacity
but solely as Grantor Trustee Certificate Registrar

By:_____
       Authorized Signatory

By:_____
       As Authenticating Agent of the Grantor Trust

By:_____
       Authorized Signatory

A-3

USBT 100671

ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY OR
OTHER IDENTIFYING NUMBER OF ASSIGNEE

(Please print or type name and address, including postal zip code, of assignee)

the within Grantor Trust Certificate, and all rights thereunder, hereby irrevocably constituting and appointing

to transfer said Grantor Trust Certificate on the books of the Grantor Trust Certificate Registrar, with full power of substitution in the premises.

Dated:

_____ */

Signature Guaranteed:

_____ */

_____

*/ NOTICE: The signature to this assignment must correspond with the name as it appears upon the face of the within Grantor Trust Certificate in every particular, without alteration, enlargement or any change whatever. Such signature must be guaranteed by a member firm of the New York Stock Exchange or a commercial bank or trust company.

A-9

USBT 100672

## DISTRIBUTION INSTRUCTIONS

The assignee should include the following for the information of the Grantor Trust Certificate Paying Agent:

Distribution shall be made by wire transfer in immediately available funds to

_____

_____ for the account of _____,

account number _____, or, if mailed by check, to _____.

Applicable statements should be mailed to _____.

_____
Signature of assignee or agent
(for authorization of wire transfer only)

USBT 100673

# EXHIBIT B

EXHIBIT B

EXECUTION COPY

INDENTURE

between

KEYSTONE OWNER TRUST 1998-P2,
as Trust

and

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Indenture Trustee

Dated as of August 31, 1998

KEYSTONE OWNER TRUST 1998-P2

USBT 100424

## Table of Contents

Page

### ARTICLE I

### DEFINITIONS

SECTION 1.1  Definitions...................................................................................... 2
SECTION 1.2  Rules of Construction. ................................................................... 9

### ARTICLE II

### THE NOTES

SECTION 2.1  Form.............................................................................................. 11
SECTION 2.2  Execution, Authentication, Delivery and Dating............................. 11
SECTION 2.3  Registration; Registration of Transfer and Exchange. ................... 12
SECTION 2.4  Mutilated, Destroyed, Lost or Stolen Notes.................................. 13
SECTION 2.5  Persons Deemed Owner. ............................................................... 14
SECTION 2.6  Payment of Principal and Interest; Defaulted Interest. .................. 14
SECTION 2.7  Cancellation. ................................................................................. 15
SECTION 2.8  Conditions Precedent to the Authentication and the Initial
              Issuance of Notes. ........................................................................ 15
SECTION 2.9  Release of Trust Estate.................................................................. 17
SECTION 2.10  Book-Entry Notes. ....................................................................... 18
SECTION 2.11  Notices to Clearing Agency. ......................................................... 18
SECTION 2.12  Definitive Notes. .......................................................................... 19
SECTION 2.13  Tax Treatment. ............................................................................. 19
SECTION 2.14  Transfer Restrictions. ................................................................... 19

### ARTICLE III

### COVENANTS

SECTION 3.1  Payment of Principal and Interest. ................................................. 20
SECTION 3.2  Maintenance of Office or Agency.................................................. 20
SECTION 3.3  Money for Payments To Be Held in Trust..................................... 20
SECTION 3.4  Existence. ...................................................................................... 22
SECTION 3.5  Protection of Trust Estate. ............................................................ 22
SECTION 3.6  Annual Opinions as to Trust Estate. ............................................. 23
SECTION 3.7  Performance of Obligations; Servicing of Loans........................... 23
SECTION 3.8  Negative Covenants. ..................................................................... 25
SECTION 3.9  Annual Statement as to Compliance. ............................................ 26
SECTION 3.10  Covenants of the Trust. ................................................................ 26
SECTION 3.11  Servicer's Obligations................................................................... 26
SECTION 3.12  Restricted Payments. .................................................................... 26

i

USBT 100425

SECTION 3.13   Treatment of Notes as Debt for All Purposes. ........................................ 27
SECTION 3.14   Notice of Events of Default. ............................................................... 27
SECTION 3.15   Further Instruments and Acts.............................................................. 27

ARTICLE IV

SATISFACTION AND DISCHARGE

SECTION 4.1   Satisfaction and Discharge of Indenture. ............................................... 28
SECTION 4.2   Application of Trust Money.................................................................. 29
SECTION 4.3   Repayment of Moneys Held by Paying Agent. ..................................... 29

ARTICLE V

REMEDIES

SECTION 5.1   Events of Default. ............................................................................. 30
SECTION 5.2   Acceleration of Maturity; Rescission and Annulment............................ 31
SECTION 5.3   Collection of Indebtedness and Suits for Enforcement by
              Indenture Trustee. ............................................................................. 32
SECTION 5.4   Remedies; Priorities. ........................................................................ 34
SECTION 5.5   Optional Preservation of the Trust Estate. ........................................... 35
SECTION 5.6   Limitation of Suits. ........................................................................... 36
SECTION 5.7   Unconditional Rights of Noteholders To Receive Principal and
              Interest............................................................................................ 36
SECTION 5.8   Restoration of Rights and Remedies..................................................... 36
SECTION 5.9   Rights and Remedies Cumulative. ....................................................... 37
SECTION 5.10  Delay or Omission Not a Waiver.......................................................... 37
SECTION 5.11  Control by Noteholders..................................................................... 37
SECTION 5.12  Waiver of Past Defaults. .................................................................... 37
SECTION 5.13  Undertaking for Costs. ....................................................................... 38
SECTION 5.14  Waiver of Stay or Extension Laws. ....................................................... 38
SECTION 5.15  Action on Notes. ............................................................................... 38
SECTION 5.16  Performance and Enforcement of Certain Obligations........................... 39

ARTICLE VI

THE INDENTURE TRUSTEE

SECTION 6.1   Duties of Indenture Trustee. ............................................................... 40
SECTION 6.2   Rights of Indenture Trustee. ............................................................... 41
SECTION 6.3   Individual Rights of Indenture Trustee. ................................................. 42
SECTION 6.4   Indenture Trustee's Disclaimer............................................................ 42
SECTION 6.5   Notice of Defaults............................................................................. 42
SECTION 6.6   Reports by Indenture Trustee to Holders.............................................. 42
SECTION 6.7   Compensation and Indemnity. ............................................................ 42

USBT 100426

SECTION 6.8    Replacement of Indenture Trustee. ...................................................... 43
SECTION 6.9    Successor Indenture Trustee by Merger. ............................................. 44
SECTION 6.10    Appointment of Co-Indenture Trustee or Separate Indenture Trustee......................................................................................... 44
SECTION 6.11    Eligibility; Disqualification. ............................................................... 45

## ARTICLE VII

### NOTEHOLDERS' LISTS AND REPORTS

SECTION 7.1    Trust To Furnish Indenture Trustee Names and Addresses of Noteholders. ........................................................................................ 46
SECTION 7.2    Preservation of Information; Communications to Noteholders. ......... 46
SECTION 7.3    Reports by Trust.................................................................................. 46

## ARTICLE VIII

### ACCOUNTS, DISBURSEMENTS AND RELEASES

SECTION 8.1    Collection of Money. .......................................................................... 47
SECTION 8.2    Trust Accounts; Distributions. ........................................................... 47
SECTION 8.3    General Provisions Regarding Accounts. ........................................... 48
SECTION 8.4    Servicer's Monthly Statements. ......................................................... 48
SECTION 8.5    Release of Trust Estate........................................................................ 49
SECTION 8.6    Opinion of Counsel. ............................................................................ 49

## ARTICLE IX

### SUPPLEMENTAL INDENTURES

SECTION 9.1    Supplemental Indentures Without Consent of Noteholders................ 50
SECTION 9.2    Supplemental Indentures with Consent of Noteholders...................... 51
SECTION 9.3    Execution of Supplemental Indentures. .............................................. 52
SECTION 9.4    Effect of Supplemental Indenture. ...................................................... 52
SECTION 9.5    Reserved............................................................................................... 52
SECTION 9.6    Reference in Notes to Supplemental Indentures. ............................... 52
SECTION 9.7    Amendments to Trust Agreement. ...................................................... 53

## ARTICLE X

### REDEMPTION OF NOTES

SECTION 10.1    Redemption. ........................................................................................ 54
SECTION 10.2    Form of Redemption Notice. .............................................................. 54
SECTION 10.3    Notes Payable on Termination Date; Provision for Payment of Indenture Trustee. .............................................................................. 54

USBT 100427

## ARTICLE XI

## MISCELLANEOUS

SECTION 11.1     Compliance Certificates and Opinions, etc. .......................................... 56
SECTION 11.2     Form of Documents Delivered to Indenture Trustee. ......................... 56
SECTION 11.3     Acts of Noteholders. ......................................................................... 57
SECTION 11.4     Notices. ............................................................................................. 58
SECTION 11.5     Notices to Noteholders; Waiver. ...................................................... 58
SECTION 11.6     RESERVED. ...................................................................................... 59
SECTION 11.7     RESERVED. ...................................................................................... 59
SECTION 11.8     Effect of Headings and Table of Contents. ...................................... 59
SECTION 11.9     Successors and Assigns. ................................................................... 59
SECTION 11.10    Separability. ..................................................................................... 59
SECTION 11.11    Benefits of Indenture. ...................................................................... 59
SECTION 11.12    Legal Holidays. ................................................................................ 59
SECTION 11.13    GOVERNING LAW. ........................................................................ 59
SECTION 11.14    Counterparts. .................................................................................... 59
SECTION 11.15    Recording of Indenture. ................................................................... 59
SECTION 11.16    Trust Obligation. .............................................................................. 60
SECTION 11.17    No Petition. ...................................................................................... 60
SECTION 11.18    Inspection. ........................................................................................ 60
SECTION 11.19    Conflicts of Interest. ........................................................................ 60
SECTION 11.20    Inconsistencies With the Sale and Servicing Agreement. ................. 61

## EXHIBITS

SCHEDULE A     -     Loan Schedule
EXHIBIT A       -     Form of Notes
EXHIBIT B       -     Transferee Letter
EXHIBIT C       -     Transfer Certificate

USBT 100428

INDENTURE dated as of August 31, 1998, between KEYSTONE OWNER TRUST 1998-P2, a Delaware business trust (the "Trust"), and U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as trustee and not in its individual capacity (the "Indenture Trustee").

Each party agrees as follows for the benefit of the other party and for the equal and ratable benefit of the holders of the Trust's Class A-1 Notes (the "Class A-1 Notes"), Class A-2 Notes (the "Class A-2 Notes"), Class A-3 Notes (the "Class A-3 Notes"), Class A-4 Notes (the "Class A-4 Notes"), Class A-5 Notes (the "Class A-5 Notes"), Class M-1 Notes (the "Class M-1 Notes"), Class M-2 Notes (the "Class M-2 Notes") Class B-1 Notes (the "Class B-1 Notes") and the Class B-2 Notes (the "Class B-2 Notes", and, together with the Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class M-1, Class M-2 Notes and the Class B-1 Notes, the "Notes"):

## GRANTING CLAUSE

Subject to the terms of this Indenture, the Trust hereby Grants to the Indenture Trustee for the benefit of the holders of the Notes, all of the Trust's right, title and interest in and to: (i) the Indenture Trust Estate; (ii) all right, title and interest of the Trust in the Sale and Servicing Agreement (including the Trust's right to cause the Seller to repurchase Loans from the Grantor Trust under certain circumstances described therein); (iii) all present and future claims, demands, causes of action and choses in action in respect of any or all of the foregoing and all payments on or under and all proceeds of every kind and nature whatsoever in respect of any or all of the foregoing, including all proceeds of the conversion thereof, voluntary or involuntary, into cash or other liquid property, all cash proceeds, accounts, accounts receivable, notes, drafts, acceptances, chattel paper, checks, deposit accounts, insurance proceeds, condemnation awards, rights to payment of any and every kind and other forms of obligations and receivables, instruments and other property which at any time constitute all or part of or are included in the proceeds of any of the foregoing; (iv) all funds on deposit from time to time in the Trust Accounts (other than the Certificate Distribution Account) and (v) all other property of the Trust from time to time (collectively, the "Collateral").

The foregoing Grant is made in trust to secure the payment of principal of and interest on, and any other amounts owing in respect of, the Notes, equally and ratably without prejudice, priority or distinction, and to secure compliance with the provisions of this Indenture, all as provided in this Indenture.

The Indenture Trustee, as Indenture Trustee on behalf of the holders of the Notes, acknowledges such Grant, accepts the trusts hereunder in good faith and without notice of any adverse claim or liens and agrees to perform its duties required in this Indenture to the best of its ability to the end that the interests of the holders of the Notes may be adequately and effectively protected. The Indenture Trustee further agrees and acknowledges that each item of Collateral that is physically delivered to the Indenture Trustee will be held by the Indenture Trustee in St. Paul, Minnesota.

USBT 100429

ARTICLE I

DEFINITIONS

SECTION 1.1 <u>Definitions</u>.   For all purposes of this Indenture, except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms not otherwise defined herein shall have the meanings assigned to such terms in the Sale and Servicing Agreement. All other capitalized terms used herein shall have the meanings specified herein.

"<u>Act</u>" has the meaning specified in <u>Section 11.3(a)</u>.

"<u>Administration Agreement</u>" means the Administration Agreement dated as of August 31, 1998, among the Administrator, the Trust and the Indenture Trustee.

"<u>Administrator</u>" means U.S. Bank Trust National Association, a national banking association, or any successor Administrator under the Administration Agreement.

"<u>Affiliate</u>" means, with respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"<u>Authorized Officer</u>" means, with respect to the Trust, any officer of the Owner Trustee who is authorized to act for the Owner Trustee in matters relating to the Trust and who is identified on the list of Authorized Officers delivered by the Owner Trustee to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter) and, so long as the Administration Agreement is in effect, any Assistant Vice President or more senior officer of the Administrator who is authorized to act for the Administrator in matters relating to the Trust and to be acted upon by the Administrator pursuant to the Administration Agreement and who is identified on the list of Authorized Officers delivered by the Administrator to the Indenture Trustee on the Closing Date (as such list may be modified or supplemented from time to time thereafter).

"<u>Book-Entry Notes</u>" means a beneficial interest in the Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class M-1 or Class M-2 Notes which are owned by Qualified Institutional Buyers, ownership and transfers of which shall be made through book entries by a Clearing Agency as described in <u>Section 2.10</u>.

"<u>Business Day</u>" means any day other than (i) a Saturday or a Sunday, or (ii) a day on which banking institutions in New York City or the city in which the Servicer's servicing operations are located or in the city in which the corporate trust office of the Indenture Trustee is located are authorized or obligated by law or executive order to be closed.

"<u>Capitalized Interest Account</u>" has the meaning set forth in the Sale and Servicing Agreement.

"Certificate of Trust" means the certificate of trust of the Trust substantially in the form of Exhibit B to the Trust Agreement.

"Certificate Paying Agent" has the meaning set forth in the Trust Agreement.

"Class A-1 Notes", "Class A-2 Notes", "Class A-3 Notes", "Class A-4 Notes", "Class A-5 Notes", "Class M-1 Notes", "Class M-2 Notes" ,"Class B-1 Notes" and "Class B-2 Notes" shall each have the meaning assigned thereto in the above paragraph hereof that immediately precedes the Granting Clause.

"Clearing Agency" means an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Agency Participant" means a broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"Closing Date" means September 16, 1998.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and Treasury Regulations promulgated thereunder.

"Collateral" has the meaning specified in the Granting Clause of this Indenture.

"Collected Amount" shall have the meaning set forth in the Sale and Servicing Agreement.

"Company" means Keystone Mortgage Corp., Inc., a West Virginia corporation or any successor in interest thereto.

"Corporate Trust Office" means the principal office of the Indenture Trustee at which at any particular time its corporate trust business shall be administered, which office at date of execution of this Agreement is located at 180 East Fifth Street, St. Paul, Minnesota 55101; Attention: Structured Finance, or at such other address as the Indenture Trustee may designate from time to time by notice to the Noteholders, the Trust, or the principal corporate trust office of any successor Indenture Trustee at the address designated by such successor Indenture Trustee by notice to the Noteholders and the Trust.

"Default" means any occurrence that is, or with notice or the lapse of time or both would become, an Event of Default.

"Definitive Notes" has the meaning specified in Section 2.10.

"Depository Institution" means any depository institution or trust company, including the Indenture Trustee, that (a) is incorporated under the laws of the United States of America or any State thereof, (b) is subject to supervision and examination by federal or state banking authorities and (c) has outstanding unsecured commercial paper or other short-term unsecured debt obligations that are rated "A-1" (or its equivalent) by Fitch, Moody's and Standard & Poor's.

3

"Distribution Date" means the 25th day of any month or if such 25th day is not a Business Day, the first Business Day immediately following such day, commencing in October 1998.

"Due Period" means, with respect to any Distribution Date and any Class of Notes, the calendar month immediately preceding the month of such Distribution Date.

"Event of Default" has the meaning specified in Section 5.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Executive Officer" means, with respect to any corporation, the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, Executive Vice President, any Vice President, the Secretary or the Treasurer of such corporation; and with respect to any partnership, any general partner thereof.

"Final Maturity Date" shall have the meaning set forth in the Sale and Servicing Agreement

"Fitch" means Fitch IBCA, Inc. or any successor thereto.

"Grant" means mortgage, pledge, bargain, sell, warrant, alienate, remise, release, convey, assign, transfer, create, and grant a lien upon and a security interest in and right of set-off against, deposit, set over and confirm pursuant to this Indenture. A Grant of the Collateral or of any other agreement or instrument shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including the immediate and continuing right to claim for, collect, receive and give receipt for principal and interest payments in respect of the Collateral and all other moneys payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Grantor Trust" means Keystone Grantor Trust 1998-P2, a New York trust.

"Holder" or "Noteholder" means the Person in whose name a Note is registered on the Note Register.

Indenture Trust Estate:  The Trust Estate other than the Certificate Distribution Account.

"Indenture Trustee" means U.S. Bank Trust National Association, a national banking association, as Indenture Trustee under this Indenture, or any successor Indenture Trustee under this Indenture.

"Independent" means, when used with respect to any specified Person, that the Person (a) is in fact independent of the Trust, any other obligor on the Notes or the Certificates, the Seller and any Affiliate of any of the foregoing Persons, (b) does not have any direct financial interest or any material indirect financial interest in the Trust, any such other obligor, the Seller or any Affiliate of any of the foregoing Persons and (c) is not connected with the Trust, any such other

-4-

USBT 100432

obligor, the Seller or any Affiliate of any of the foregoing Persons as an officer, employee, promoter, underwriter, trustee, partner, director or person performing similar functions.

"Independent Certificate" means a certificate or opinion to be delivered to the Indenture Trustee under the circumstances described in, and otherwise complying with, the applicable requirements of Section 11.1, made by an Independent appraiser or other expert appointed by an Issuer Order and approved by the Indenture Trustee in the exercise of reasonable care, and such opinion or certificate shall state that the signer has read the definition of "Independent" in this Indenture and that the signer is Independent within the meaning thereof.

"Issuer Order" and "Issuer Request" mean a written order or request signed in the name of the Trust by any one of its Authorized Officers and delivered to the Indenture Trustee.

"Moody's" means Moody's Investor Services, Inc., or any successor thereto.

"Non U.S. Person" shall mean a beneficial owner of the Certificates or of the Notes that is for U.S. Federal income tax purposes not (i) a citizen or resident of the United States, (ii) a corporation (or entity treated as a corporation for tax purposes) created or organized in the United States or of any state thereof, including for this purpose, the District of Columbia; (iii) a partnership ( or entity treated as a partnership for tax purposes) organized in the United States or under the laws of the United States or of any state thereof, including for this purpose the District of Columbia (unless provided otherwise by future Treasury Regulations); (iv) an estate whose income is includible in gross income for United States Tax purposes regardless of its source; or (v) a trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have authority to control substantial decisions of the trust. Notwithstanding the last clause of the preceding sentence, certain trusts in existence on August 20, 1996, and treated as U.S. persons prior to such date, may elect to continue to be U.S. persons.

"Note" means any Class A-1 Note, Class A-2 Note, Class A-3 Note, Class A-4, Class A-5, Class M-1 Note, Class M-2 Note, Class B-1 Note or Class B-2 Note, as applicable.

"Note Depository Agreement" means the agreement dated September 16, 1998, among the Trust, the Administrator, the Indenture Trustee and The Depository Trust Company, as the initial Clearing Agency, relating to the Book-Entry Notes.

"Note Distribution Account" shall have the meaning set forth in the Sale and Servicing Agreement.

"Note Rate" shall have the meaning set forth in the Sale and Servicing Agreement.

"Note Owner" means, with respect to a Book-Entry Note, the Person who is the beneficial owner of such Book-Entry Note, as reflected on the books of the Clearing Agency or on the books of a Person maintaining an account with such Clearing Agency (directly as a Clearing Agency Participant or as an indirect participant, in each case in accordance with the rules of such Clearing Agency).

"Note Register" and "Note Registrar" have the respective meanings specified in Section 2.3.

"Noteholder" means a Holder of a Note.

"Obligations" shall mean the Loans.

"Officer's Certificate" means a certificate signed by any Authorized Officer of the Trust or the Administrator, under the circumstances described in, and otherwise complying with, the applicable requirements of Section 11.1, and delivered to the Indenture Trustee. Unless otherwise specified, any reference in this Indenture to an Officer's Certificate shall be to an Officer's Certificate of any Authorized Officer of the Trust or the Administrator, as the case may be.

"Opinion of Counsel" means one or more written opinions of counsel who may, except as otherwise expressly provided in this Indenture, be employees of or counsel to the Trust and who shall be satisfactory to the Indenture Trustee, and which opinion or opinions shall be addressed to the Indenture Trustee, as Indenture Trustee and shall comply with any applicable requirements of Section 11.1 and shall be in form and substance satisfactory to the Indenture Trustee.

"Outstanding" means, with respect to any Note and as of the date of determination, any Note theretofore authenticated and delivered under this Indenture except:

(i)    Notes theretofore canceled by the Note Registrar or delivered to the Note Registrar for cancellation;

(ii)    Notes or portions thereof the payment for which money in the necessary amount has been theretofore deposited with the Indenture Trustee or any Paying Agent in trust for the Holders of such Notes (provided, however, that if such Notes are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision for such notice has been made, satisfactory to the Indenture Trustee);

(iii)    Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture unless proof satisfactory to the Indenture Trustee is presented that any such Notes are held by a bona fide purchaser; and

(iv)    Notes for which the related Maturity Date has occurred.

However, in determining whether the Holders of the requisite Outstanding Amount of the Notes have given any request, demand, authorization, direction, notice, consent, or waiver hereunder or under any Transaction Document, Notes owned by the Trust, any other obligor upon the Notes, the Seller or any Affiliate of any of the foregoing Persons shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Indenture Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent, or waiver, only Notes that the Indenture Trustee knows to be so owned shall be so disregarded, provided further, that in the event that 100% of any Class of Notes are owned by the parties described above, such Notes shall be deemed to be outstanding. Notes so owned that have been pledged in good faith

USBT 100434

may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Indenture Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not the Trust, any other obligor upon the Notes, the Seller or any Affiliate of any of the foregoing Persons.

"Outstanding Amount" means the aggregate principal amount of all Notes, or Class of Notes, as applicable, Outstanding at the date of determination.

"Owner Trustee" means First Union Trust Company, National Association, not in its individual capacity but solely as Owner Trustee under the Trust Agreement, or any successor Owner Trustee under the Trust Agreement.

"Paying Agent" means the Indenture Trustee or any other Person that meets the eligibility standards for the Indenture Trustee specified in Section 6.11 and is authorized by the Trust to make payments to and distributions from the Note Distribution Account, including payment of principal of or interest on the Notes on behalf of the Trust.

"Payment Date" means any Distribution Date.

"Person" means any individual, corporation, estate, partnership, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization, limited liability company, limited liability partnership, or government or any agency or political subdivision thereof.

"Predecessor Note" means, with respect to any particular Note, every previous Note evidencing all or a portion of the same debt as that evidenced by such particular Note; and, for the purpose of this definition, any Note authenticated and delivered under Section 2.4 in lieu of a mutilated, lost, destroyed or stolen Note shall be deemed to evidence the same debt as the mutilated, lost, destroyed or stolen Note.

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

"Qualified Institutional Buyer" shall have the meaning specified in Rule 144A of the Securities Act.

"Rating Agency Condition" means, with respect to certain actions requiring prior Rating Agency consent, that each Rating Agency shall have been given 10 days (or such shorter period as is acceptable to each Rating Agency) prior notice thereof and that each of the Rating Agencies shall have notified the Seller, the Servicer and the Trust in writing that such action will not result in a reduction or withdrawal of the then current rating of the Notes.

"Rating Agency" means any or each of (i) Moody's and (ii) Fitch. If no such organization or successor is any longer in existence, "Rating Agency" shall be a nationally recognized statistical rating organization or other comparable person designated by the Trust, notice of which designation shall have been given to the Indenture Trustee and the Servicer.

USBT 100435

"Record Date" shall have the meaning set forth in the Sale and Servicing Agreement.

"Redemption Date" means, in the case of a redemption of the Notes pursuant to Section 10.1 or a payment to Noteholders pursuant to Section 10.3, the Distribution Date specified by the Servicer or the Trust pursuant to Section 10.1 or 10.3, as applicable.

"Redemption Price" means, for each Class of Notes, in the case of a redemption of the Notes pursuant to Section 10.1, an amount equal to the unpaid principal amount of such Class of the Notes plus accrued and unpaid interest thereon at the respective Note Rate for such Class of Notes to but excluding the Termination Date.

"Registered Holder" means the Person in whose name a Note is registered on the Note Register on the applicable Record Date.

"Responsible Officer" means, with respect to the Indenture Trustee, any officer within the Corporate Trust Office of the Indenture Trustee, including any Vice President, Assistant Vice President, Assistant Treasurer, Assistant Secretary or any other officer of the Indenture Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Sale and Servicing Agreement" means the Sale and Servicing Agreement dated as of August 31, 1998, among the Trust, the Grantor Trust, Keystone Mortgage Corp., Inc., as Seller, Republic Bank, as Servicer and Claims Administrator, Wilshire Servicing Corporation, as Backup Servicer and U.S. Bank Trust National Association, as Indenture Trustee, Grantor Trustee and Contract of Insurance Holder.

"Securities Act" means the Securities Act of 1933, as amended.

"Seller" shall mean Keystone Mortgage Corp., Inc., in its capacity as seller under the Sale and Servicing Agreement, and its successor in interest.

"State" means any one of the 50 States of the United States of America or the District of Columbia.

"Successor Servicer" has the meaning set forth in the Sale and Servicing Agreement.

"Termination Date" shall have the same meaning as Redemption Date.

"Termination Price" has the meaning assigned thereto in the Sale and Servicing Agreement.

"Transaction Documents" has the meaning set forth in the Sale and Servicing Agreement.

"Trust" means the Keystone Owner Trust 1998-P2.

USBT 100436

"Trust Estate" shall mean (i) the Grantor Trust Certificate (ii) such assets and funds as are from time to time deposited in the Note Distribution Account, the Certificate Distribution Account and Capitalized Interest Account, including amounts on deposit in such accounts which are invested in Eligible Investments, (vii) the Trust's rights under the Insurance Policies and any Insurance Proceeds.

"UCC" means, unless the context otherwise requires, the Uniform Commercial Code, as in effect in the relevant jurisdiction, as amended from time to time.

(b)    Except as otherwise specified herein or as the context may otherwise require, capitalized terms used but not otherwise defined herein have the respective meanings set forth in the Sale and Servicing Agreement for all purposes of this Indenture.

SECTION 1.2 Rules of Construction.

Unless the context otherwise requires:

(i)    a term has the meaning assigned to it;

(ii)    an accounting term not otherwise defined has the meaning assigned to it in accordance with generally accepted accounting principles as in effect from time to time;

(iii)    "or" is not exclusive;

(iv)    "including" means including without limitation;

(v)    words in the singular include the plural and words in the plural include the singular; and

(vi)    any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented (as provided in such agreements) and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

USBT 100437

ARTICLE II

THE NOTES

SECTION 2.1 <u>Form</u>.  The Notes shall be designated as the "KEYSTONE OWNER TRUST 1998-P2, Asset Backed Notes, Series 1998-P2".  Each Class of Notes shall be in substantially the form set forth in <u>Exhibit A</u> with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined by the officers executing such Notes, as evidenced by their execution thereof.  Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

The Definitive Notes shall be typewritten, printed, lithographed or engraved or produced by any combination of these methods, all as determined by the officers executing such Notes, as evidenced by their execution of such Notes.

Each Note shall be dated the date of its authentication.  The terms of the Notes are set forth in <u>Exhibit A</u>.  The terms of each Class of Notes are part of the terms of this Indenture.

SECTION 2.2 <u>Execution, Authentication, Delivery and Dating</u>.  The Notes shall be executed on behalf of the Trust by an Authorized Officer of the Owner Trustee.  The signature of any such Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signature of individuals who were at any time Authorized Officers of the Owner Trustee shall bind the Trust, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Notes or did not hold such offices at the date of such Notes.

Subject to the satisfaction of the conditions set forth in <u>Section 2.8</u>, the Indenture Trustee shall upon receipt of an Issuer Order, authenticate and deliver the nine Classes of Notes for original issue in the following principal amounts:  Class A-1, $127,800,000; Class A-2, $66,800,000; Class A-3, $73,900,000; Class A-4, $69,600,000; Class A-5 $23,500,000; Class M-1, $56,500,000; Class M-2, $50,850,000; Class B-1 $45,200,000; and Class B-2 $28,250,000. The aggregate principal amount of the Classes of Notes outstanding at any time may not exceed such respective amounts.

The Notes that are authenticated and delivered by the Indenture Trustee to or upon the order of the Trust on the Closing Date shall be dated September 16, 1998.  All other Notes that are authenticated after the Closing Date for any other purpose under the Indenture shall be dated the date of their authentication.  The Notes, other than the Class B-2 Notes, shall be issuable as registered Notes in the minimum denomination of $250,000 and the Class B-2 Notes shall be issuable as registered Notes in the minimum denomination of $400,000 and in each case integral multiples of $1 in excess thereof.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication substantially in the form provided for herein executed by the Indenture Trustee by the manual signature of one of its

10

USBT 100438

authorized signatories, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

SECTION 2.3 Registration; Registration of Transfer and Exchange. The Trust shall cause to be kept a register (the "Note Register") in which, subject to such reasonable regulations as it may prescribe, the Trust shall provide for the registration of Notes and the registration of transfers of Notes. The Indenture Trustee initially shall be the "Note Registrar" for the purpose of registering Notes and transfers of Notes as herein provided. Upon any resignation of any Note Registrar, the Trust shall promptly appoint a successor or, if it elects not to make such an appointment, assume the duties of Note Registrar.

If a Person other than the Indenture Trustee is appointed by the Trust as Note Registrar, the Trust will give the Indenture Trustee prompt written notice of the appointment of such Note Registrar and of the location, and any change in the location, of the Note Register, and the Indenture Trustee shall have the right to inspect the Note Register at all reasonable times and to obtain copies thereof, and the Indenture Trustee shall have the right to rely upon a certificate executed on behalf of the Note Registrar by an Executive Officer thereof as to the names and addresses of the Holders of the Notes and the principal amounts and number of such Notes.

Upon satisfaction of the conditions set forth herein and upon the surrender for registration of transfer of any Note at the office or agency of the Trust to be maintained as provided in Section 3.2, the Owner Trustee on behalf of the Trust shall execute, and the Indenture Trustee shall authenticate and the Noteholder shall obtain from the Indenture Trustee, in the name of the designated transferee or transferees, one or more new Notes of the same Class in any authorized denominations, of a like aggregate principal amount.

At the option of the Holder, Notes may be exchanged for other Notes of the same Class in any authorized denominations, of a like aggregate principal amount, upon surrender of the Notes to be exchanged at such office or agency. Whenever any Notes are so surrendered for exchange, the Trust shall execute, and the Indenture Trustee shall authenticate and the Noteholder shall obtain from the Indenture Trustee, the Notes which the Noteholder making the exchange is entitled to receive.

All Notes issued upon any registration of transfer or exchange of Notes shall be the valid obligations of the Trust, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed by, or be accompanied by a written instrument of transfer in form satisfactory to the Indenture Trustee duly executed by, the Holder thereof or such Holder's attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in the Securities Transfer Agent's Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Exchange Act.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Trust may require payment of a sum sufficient to cover any tax or other

USBT 100439

governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes, other than exchanges pursuant to Section 2.4 or Section 9.6 not involving any transfer.

The preceding provisions of this Section notwithstanding, the Trust shall not be required to make and the Note Registrar need not register transfers or exchanges of Notes selected for redemption or of any Note for a period of 15 days preceding the due date for any payment with respect to such Note.

The Notes have not been and will not be registered under the Securities Act or the securities laws of any jurisdiction. Consequently, the Notes are not transferable other than pursuant to an exemption from the registration requirements of the Securities Act and satisfaction of certain other provisions of the Sale and Servicing Agreement.

Notwithstanding the foregoing, no transfer of a beneficial interest in a Note shall be made unless the Indenture Trustee shall have received an investment letter from the transferee thereof containing representations in substantially the form attached hereto as Exhibit B.

No sale, pledge or other transfer of any Note may be made by any person unless either (i) such sale, pledge or other transfer is made to the Trust, (ii) such sale, pledge or other transfer is made in a transaction exempt from the registration requirements of the Securities Act to an institutional accredited investor that executes a certificate, substantially in the form specified in the Sale and Servicing Agreement, to the effect that it is an institutional accredited investor acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which others also are institutional "accredited investors" unless the holder is a bank acting in its fiduciary capacity), (iii) so long as the Notes are eligible for resale pursuant to Rule 144A under the Securities Act, such sale, pledge or other transfer is made in accordance with the provisions of Rule 144A to a person whom the seller reasonably believes after due inquiry is a Qualified Institutional Buyer acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which others also are Qualified Institutional Buyers) to whom notice is given that the sale, pledge or transfer is being made in reliance on Rule 144A or (iv) such sale, pledge or other transfer is otherwise made in a transaction exempt from the registration requirements of the Securities Act, in which case (A) the Indenture Trustee will require that both the prospective transferor and the prospective transferee certify to the Indenture Trustee and the Trust in writing the facts surrounding such transfer, which certification will be in form and substance satisfactory to the Indenture Trustee and the Trust, and (B) the Indenture Trustee will require a written opinion of counsel (which will not be at the expense of the Trust or the Indenture Trustee) satisfactory to the Trust and the Indenture Trustee to the effect that such transfer will not violate the Securities Act.

No sale, pledge or other transfer of any Class B-2 Note may be made to any Person unless such Person (a) (i) represents and warrants, in writing, to the Indenture Trustee and the Note Registrar and any of their respective successors, in accordance with Exhibit C hereto, that the prospective Noteholder is not (A) an "employee benefit plan" within the meaning of Section 3(3) of ERISA, or (B) a "plan" within the meaning of Section 4975(e)(1) of the Code (any such plan or employee benefit plan, a Plan) or (C) any entity, including an insurance company separate account or general account, whose underlying assets include plan assets by reason of a plan's investment in the entity and is not directly or indirectly purchasing such Certificate on

12

USBT 100440

behalf of, as investment manager of, as named fiduciary of, as trustee of, or with assets of a Plan; or (ii) furnish to the Indenture Trustee and the Note Registrar and any of their respective successors an Opinion of Counsel acceptable to such persons that (A) the proposed issuance or transfer of such Note to such prospective Noteholder will not cause any assets of the Trust to be deemed assets of a Plan, or (B) the proposed issuance or transfer of such Note will not cause the Indenture Trustee or the Note Registrar or any of their respective successors to be a fiduciary of a Plan within the meaning of Section 3(21) of ERISA and will not give rise to a transaction described in Section 406 of ERISA or Section 4975(c)(1) of the Code for which a statutory or administrative exemption is unavailable.

(b)     By its acceptance of a Class B-2 Note, each such prospective Noteholder agrees and acknowledges that no legal or beneficial interest in all or any portion of such Notes may be transferred directly or indirectly to an individual, corporation, partnership or other person unless such transferee is a U.S. Person, and any purported transfer in violation of this restriction shall be void and have no effect. Notwithstanding the foregoing, the Class B-2 Notes can be transferred to a Non-U.S. Person if such transfer is part of a transaction in which such Non-U.S. Person is acquiring 100% of the Class B-2 Notes and 100% of the ownership interest in the Trust.

(c)     Neither the Indenture Trustee nor the Administrator shall execute, or authenticate and deliver, any Class B-2 Note in connection with any transfer thereof unless the transferor shall have provided to the Indenture Trustee or the Administrator a Certificate, substantially in the form attached as Exhibit C hereto, signed by the transferee, such Certificate shall contain the consent of the transferee to any amendments of this Indenture as may be required to effectuate further the foregoing restrictions on transfer of any Class B-2 Note and an agreement by the transferee that it will not transfer any Class B-2 Note without providing to the Note Registrar on behalf of the Owner Trustee a certificate substantially in the form attached as Exhibit C to this Indenture.

(d)     Each Class B-2 Note shall bear an additional legend referring to the foregoing restrictions contained in this paragraph     .

(e)     No Class B-2 Note may be transferred to a partnership, a subchapter S corporation or a grantor trust for U.S. federal income tax purposes unless an Opinion of Counsel is delivered to the Owner Trustee, the Certificate Registrar, and the Trust to the effect that such transfer would not cause the tax treatment of the Trust to be characterized as an association or publicly traded partnership taxable as a corporation for Federal income tax purposes.

(f)     It is the intention of all parties to this Agreement, and all parties shall agree, that the Class B-2 Notes and the Certificates of beneficial ownership shall not be transferred to a Non U.S. Person unless such Non U.S. person will own, immediately after the transfer, one hundred percent of all the beneficial interests in the Trust and one hundred percent of the Class B-2 Notes. Furthermore, such Non U.S. person shall not make any transfer of the Class B-2 Notes nor of the Certificates of beneficial ownership unless such Non U.S. Person transfers one hundred percent of all the beneficial interests and one hundred percent of the Class B-2 Notes.

USBT 100441

SECTION 2.4 <u>Mutilated, Destroyed, Lost or Stolen Notes</u>. If (i) any mutilated Note is surrendered to the Indenture Trustee, or the Indenture Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Indenture Trustee such security or indemnity as may be reasonably required by it to hold the Trust and the Indenture Trustee harmless, then, in the absence of notice to the Trust, the Note Registrar or the Indenture Trustee that such Note has been acquired by a protected purchaser, an Authorized Officer of the Owner Trustee or the Administrator on behalf of the Trust shall execute, and upon an Issuer's Request the Indenture Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note of the same Class; provided, however, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become or within seven days shall be due and payable, or shall have been called for redemption, instead of issuing a replacement Note, the Trust may pay such destroyed, lost or stolen Note when so due or payable or upon the Termination Date without surrender thereof. If, after the delivery of such replacement Note or payment of a destroyed, lost or stolen Note pursuant to the proviso to the preceding sentence, a protected purchaser of the original Note in lieu of which such replacement Note was issued presents for payment such original Note, the Trust and the Indenture Trustee shall be entitled to recover such replacement Note (or such payment) from the Person to whom it was delivered or any Person taking such replacement Note from such Person to whom such replacement Note was delivered or any assignee of such Person, except a protected purchaser, and shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Trust or the Indenture Trustee in connection therewith.

Upon the issuance of any replacement Note under this Section, the Trust may require the payment by the Holder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including the fees and expenses of the Indenture Trustee) connected therewith.

Every replacement Note issued pursuant to this Section in replacement of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Trust, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

SECTION 2.5 <u>Persons Deemed Owner</u>. Prior to due presentment for registration of transfer of any Note, the Trust, the Indenture Trustee and any agent of the Trust or the Indenture Trustee may treat the Person in whose name any Note is registered on the Note Register (as of the day of determination) as the owner of such Note for the purpose of receiving payments of principal of and interest, if any, on such Note and for all other purposes whatsoever, whether or not such Note be overdue, and none of the Trust, the Indenture Trustee or any agent of the Trust or the Indenture Trustee shall be affected by notice to the contrary.

SECTION 2.6 <u>Payment of Principal and Interest; Defaulted Interest</u>.

14

USBT 100442

(a)    Each Class of Notes shall accrue interest during the related Accrual Period at the related Note Rate and such interest shall be payable on each Distribution Date as set forth in Exhibit A hereto, and on each Class of Notes as specified in <u>Section 3.1</u>.  Any installment of interest or principal, if any, payable on any Note that is punctually paid or duly provided for by the Trust on the applicable Distribution Date shall be paid to the Person in whose name such Note (or one or more Predecessor Notes) is registered on the Note Register on the Record Date in the manner set forth in Section 5.01(g) of the Sale and Servicing Agreement.

(b)    The principal of each Note shall be payable in installments on each Distribution Date as provided in the forms of the Notes set forth in <u>Exhibit A</u> hereto and shall be payable to each Class of Notes in such amounts and in such order as specified in Section 5.01(e) of the Sale and Servicing Agreement.  Notwithstanding the foregoing, the entire unpaid principal amount of the Notes of a Class of Notes shall be due and payable, if not previously paid, on the earliest of (i) the Final Maturity Date, (ii) the Termination Date or (iii) the date on which an Event of Default shall have occurred and be continuing, if the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of the Notes have declared the Notes to be immediately due and payable in the manner provided in <u>Section 5.2</u>.  All principal payments on each Class of Notes shall be made to the Noteholders of such Class entitled thereto in accordance with Section 5.01(e) of the Sale and Servicing Agreement.  The Indenture Trustee shall notify the Person in whose name a Note is registered at the close of business on the Record Date preceding the Distribution Date on which the Trust expects that the final installment of principal of and interest on such Note will be paid.  Such notice shall be mailed or transmitted by facsimile prior to such final Distribution Date and shall specify that such final installment will be payable only upon presentation and surrender of such Note and shall specify the place where such Note may be presented and surrendered for payment of such installment.  Notices in connection with redemptions of Notes shall be mailed to Noteholders as provided in <u>Section 10.2</u>.

SECTION 2.7 <u>Cancellation</u>.  All Notes surrendered for payment, registration of transfer, exchange or redemption shall, if surrendered to any Person other than the Indenture Trustee, be delivered to the Indenture Trustee and shall be promptly canceled by the Indenture Trustee.  The Trust may at any time deliver to the Indenture Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Trust may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly canceled by the Indenture Trustee.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section, except as expressly permitted by this Indenture.  All canceled Notes may be held or disposed of by the Indenture Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Trust shall direct by an Issuer Order that they be destroyed or returned to it; provided, that such Issuer Order is timely and the Notes have not been previously disposed of by the Indenture Trustee.

SECTION 2.8 <u>Conditions Precedent to the Authentication and the Initial Issuance of Notes</u>.  The Notes may be authenticated by the Indenture Trustee, upon Issuer Request and upon receipt by the Indenture Trustee of the following:

(a)    An Issuer Order authorizing the execution and authentication of such Notes by the Trust.

USBT 100443

(b)     All of the items of the Trust Estate which shall be delivered to the Indenture Trustee or its designee.

(c)     An executed counterpart of the Trust Agreement.

(d)     Opinions of Counsel addressed to the Indenture Trustee to the effect that:

(i)     all instruments furnished to the Indenture Trustee as conditions precedent to the authentication of the Notes by the Indenture Trustee pursuant to the Indenture conform to the requirements of this Indenture and constitute all the documents required to be delivered hereunder for the Indenture Trustee to authenticate the Notes;

(ii)     all conditions precedent provided for in this Indenture relating to the authentication of the Notes have been complied with;

(iii)     the Owner Trustee has power and authority to execute, deliver and perform its obligations under the Trust Agreement;

(iv)     the Trust has been duly formed, is validly existing as a business trust under the laws of the State of Delaware, 12 Del. C. § 3801, et seq., and has power, authority and legal right to execute and deliver this Indenture, the Administration Agreement, and the Sale and Servicing Agreement;

(v)     assuming due authorization, execution and delivery thereof by the Indenture Trustee, the Indenture is the valid, legal and binding obligation of the Trust, enforceable in accordance with its terms, subject to bankruptcy, insolvency, reorganization, arrangement, moratorium, fraudulent or preferential conveyance and other similar laws of general application affecting the rights of creditors generally and to general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(vi)     the Notes, when executed and authenticated as provided herein and delivered against payment therefor, will be the valid, legal and binding obligations of the Trust pursuant to the terms of this Indenture, entitled to the benefits of this Indenture, and will be enforceable in accordance with their terms, subject to bankruptcy, insolvency, reorganization, arrangement, moratorium, fraudulent or preferential conveyance and other similar laws of general application affecting the rights of creditors generally and to general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law);

(vii)     the Trust Agreement authorizes the Trust to Grant the Collateral to the Indenture Trustee as security for the Notes and the Trust has taken all necessary action under the Trust Agreement to Grant the Collateral to the Indenture Trustee;

(viii)     Reserved;

USBT 100444

(ix)    this Indenture, together with the Grant of the Trust Estate to the Indenture Trustee, creates a valid security interest in the Trust Estate in favor of the Indenture Trustee for the benefit of the Noteholders;

(x)    such action has been taken with respect to delivery of possession of the Trust Estate, and with respect to the execution and filing of this Indenture and any financing statements as are necessary to make effective and to perfect a first priority security interest created by this Indenture in the Trust Estate in favor of the Indenture Trustee, except that with respect to the Debt Instruments, possession of such Debt Instruments must be maintained by the Indenture Trustee or an agent of the Indenture Trustee (other than the Trust or an Affiliate of the Trust) or a "securities intermediary," as defined in Section 8.102 of the UCC, as agent of the Indenture Trustee; and

(xi)    no authorization, approval or consent of any governmental body having jurisdiction in the premises which has not been obtained by the Trust is required to be obtained by the Trust for the valid issuance and delivery of the Notes, except that no opinion need be expressed with respect to any such authorizations, approvals or consents as may be required under any state securities "blue sky" laws.

(e)    An Officer's Certificate of the Trust complying with the requirements of Section 11.1 and stating that:

(i)    the Trust is not in Default under this Indenture and the issuance of the Notes applied for will not result in any breach of any of the terms, conditions or provisions of, or constitute a default under, the Trust Agreement, any indenture, mortgage, deed of trust or other agreement or instrument to which the Trust is a party or by which it is bound, or any order of any court or administrative agency entered in any proceeding to which the Trust is a party or by which it may be bound or to which it may be subject, and that all conditions precedent provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with;

(ii)    the Trust has Granted to the Indenture Trustee all of its right, title, and interest in the Trust Estate, and has delivered or caused the same to be delivered to the Indenture Trustee;

(iii)    attached thereto are true and correct copies of letters signed by Fitch and Moody's;

(iv)    all conditions precedent provided for in this Indenture relating to the authentication of the Notes have been complied with.

SECTION 2.9 Release of Trust Estate.

(a)    Except as otherwise provided in subsections (b) and (c) hereof and Section 10.1 hereof and except with respect to amounts distributed pursuant to Section 5.01(e) of the Sale and Servicing Agreement and the terms of the Transaction Documents, the Indenture Trustee shall

release property from the lien of this Indenture only upon receipt of an Issuer Request accompanied by an Officer's Certificate, an Opinion of Counsel and Independent Certificates.

(b)     The Servicer, on behalf of the Trust, shall be entitled to obtain a release from the lien of this Indenture for any Loan and the related Mortgaged Property at any time in accordance with the provisions of Section 4.17 of the Sale and Servicing Agreement.

(c)     The Indenture Trustee shall, if requested by the Servicer, temporarily release the Indenture Trustee's Loan File pursuant to the provisions of Section 4.17(b) of the Sale and Servicing Agreement upon compliance by the Servicer of the provisions thereof provided that the Indenture Trustee's Loan File shall have been stamped to signify the Trust's pledge to the Indenture Trustee under the Indenture.

SECTION 2.10     Book-Entry Notes.  The Notes other than the Class B-2 Notes, sold to Qualified Institutional Buyers, upon original issuance or upon transfer to Qualified Institutional Buyers, will be issued in the form of typewritten Notes representing the Book-Entry Notes, to be delivered to The Depository Trust Company, the initial Clearing Agency or its custodian, by, or on behalf of, the Trust.  The Book-Entry Notes shall be registered initially on the Note Register in the name of Cede & Co., the nominee of the initial Clearing Agency, and no Owner thereof will receive a definitive Note representing such Note Owner's interest in such Note, except as provided in Section 2.12.  Unless and until definitive, fully registered Notes (the "Definitive Notes") have been issued to such Note Owners pursuant to Section 2.12:

(i)     the provisions of this Section shall be in full force and effect;

(ii)     the Note Registrar and the Indenture Trustee shall be entitled to deal with the Clearing Agency for all purposes of this Indenture (including the payment of principal of and interest on the Book-Entry Notes and the giving of instructions or directions hereunder) as the sole holder of the Book-Entry Notes, and shall have no obligation to the Note Owners;

(iii)     to the extent that the provisions of this Section conflict with any other provisions of this Indenture, the provisions of this Section shall control;

(iv)     the rights of Note Owners shall be exercised only through the Clearing Agency and shall be limited to those established by law and agreements between such Note Owners and the Clearing Agency and/or the Clearing Agency Participants pursuant to the Note Depository Agreement.  Unless and until Definitive Notes are issued pursuant to Section 2.12, the initial Clearing Agency will make book-entry transfers among the Clearing Agency Participants and receive and transmit payments of principal of and interest on the Notes to such Clearing Agency Participants; and

(v)     whenever this Indenture requires or permits actions to be taken based upon instructions or directions of Holders of Notes evidencing a specified percentage of the Outstanding Amount of the Notes, the Clearing Agency shall be deemed to represent such percentage only to the extent that it has received instructions to such effect from

18

USBT 100446

Note Owners and/or Clearing Agency Participants owning or representing, respectively, such required percentage of the beneficial interest in the Notes and has delivered such instructions to the Indenture Trustee.

SECTION 2.11    Notices to Clearing Agency.    Whenever a notice or other communication to the Noteholders is required under this Indenture, unless and until Definitive Notes shall have been issued to such Note Owners pursuant to Section 2.12, the Indenture Trustee shall give all such notices and communications specified herein to be given to Holders of the Notes to the Clearing Agency, and shall have no obligation to such Note Owners.

SECTION 2.12    Definitive Notes.    If (i) the Administrator advises the Indenture Trustee in writing that the Clearing Agency is no longer willing or able to properly discharge its responsibilities with respect to the Book-Entry Notes and the Administrator is unable to locate a qualified successor, (ii) the Administrator at its option advises the Indenture Trustee in writing that it elects to terminate the book-entry system through the Clearing Agency or (iii) after the occurrence of an Event of Default, Note Owners representing beneficial interests aggregating at least a majority of the Outstanding Amount of such Notes advise the Clearing Agency in writing that the continuation of a book-entry system through the Clearing Agency is no longer in the best interests of such Note Owners, then the Clearing Agency shall notify all Note Owners and the Indenture Trustee of the occurrence of such event and of the availability of Definitive Notes to Note Owners requesting the same.    The Notes offered and sold to institutional accredited investors in reliance on the exemption from registration under Section 4(2) of the Securities Act shall be issued in the form of Definitive Notes.    The Class B-2 Notes will be issued in the form of Definitive Notes.    Upon surrender to the Indenture Trustee of the typewritten Notes representing the Book-Entry Notes by the Clearing Agency, accompanied by registration instructions, the Trust shall execute and the Indenture Trustee shall authenticate the Definitive Notes in accordance with the instructions of the Clearing Agency.    None of the Trust, the Note Registrar or the Indenture Trustee shall be liable for any delay in delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions.    Upon the issuance of Definitive Notes, the Indenture Trustee shall recognize the Holders of the Definitive Notes as Noteholders.

SECTION 2.13    Tax Treatment.    The Trust has entered into this Indenture, and the Notes will be issued, with the intention that, for all tax purposes, the Notes will qualify as indebtedness of the Trust secured by the Trust Estate.    The Trust, by entering into this Indenture, and each Noteholder, by its acceptance of a Note (and each Note Owner by its acceptance of an interest in the applicable Book-Entry Note), agree to treat the Notes as indebtedness for all tax purposes.

USBT 100447

ARTICLE III

COVENANTS

SECTION 3.1 <u>Payment of Principal and Interest</u>. The Trust will duly and punctually pay (or will cause to be duly and punctually paid) the principal of and interest, if any, on the Notes in accordance with the terms of the Notes and this Indenture. Without limiting the foregoing, the Indenture Trustee shall, pursuant to Section 5.01(e) of the Sale and Servicing Agreement, distribute all amounts on deposit in the Note Distribution Account on each Distribution Date deposited therein pursuant to the Sale and Servicing Agreement, and held therein for distribution to the Noteholders in accordance with the provisions of the Sale and Servicing Agreement (i) for the benefit of the Class A-1 Notes, to the Class A-1 Noteholders, (ii) for the benefit of the Class A-2 Notes, to the Class A-2 Noteholders, (iii) for the benefit of the Class A-3 Notes, to the Class A-3 Noteholders, (iv) for the benefit of the Class A-4 Notes, to the Class A-4 Noteholders, (v) for the benefit of the Class A-5 Notes, to the Class A-5 Noteholders (vi) for the benefit of the Class M-1 Notes, to the Class M-1 Noteholders, (vii) for the benefit of the Class M-2 Notes, to the Class M-2 Noteholders, and (viii) for the benefit of the Class B-1 Notes, to the Class B-1 Noteholders and (ix) for the benefit of the Class B-2 Notes, to the Class B-2 Noteholders. Amounts properly withheld under the Code by any Person from a payment to any Noteholder of interest and/or principal shall be considered as having been paid by the Trust to such Noteholder for all purposes of this Indenture.

The Notes shall be non-recourse obligations of the Trust and shall be limited in right of payment to amounts available from the Trust Estate, as provided in this Indenture. The Trust shall not otherwise be liable for payments on the Notes. If any other provision of this Indenture shall be deemed to conflict with the provisions of this <u>Section 3.1</u>, the provisions of this <u>Section 3.1</u> shall control.

SECTION 3.2 <u>Maintenance of Office or Agency</u>. The Trust will or will cause the Administrator to maintain in New York, New York an office or agency where Notes may be surrendered for registration of transfer or exchange, and where notices and demands to or upon the Trust in respect of the Notes and this Indenture may be served. The Trust hereby initially appoints the Administrator to serve as its agent for the foregoing purposes and to serve as Paying Agent with respect to the Notes. The Trust will give prompt written notice to the Indenture Trustee of the location, and of any change in the location, of any such office or agency. If at any time the Trust shall fail to maintain any such office or agency or shall fail to furnish the Indenture Trustee with the address thereof, such surrenders, notices and demands may be made or served at the Corporate Trust Office, and the Trust hereby appoints the Indenture Trustee as its agent to receive all such surrenders, notices and demands.

SECTION 3.3 <u>Money for Payments To Be Held in Trust</u>. As provided in <u>Section 8.2(a)</u> and <u>(b)</u>, all payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Note Distribution Account pursuant to <u>Section 8.2(c)</u> shall be made on behalf of the Trust by the Indenture Trustee or by the Paying Agent, and no amounts so withdrawn from the Collection Account and the Note Distribution Account for payments of Notes shall be paid over to the Trust except as provided in this Section.

USBT 100448

Any Paying Agent other than the Administrator shall be appointed by Issuer Order with written notice thereof to the Indenture Trustee. Any Paying Agent appointed by the Trust shall be a Person who would be eligible to be Indenture Trustee hereunder as provided in Section 6.11. The Trust shall not appoint any Paying Agent (other than the Indenture Trustee) which is not, at the time of such appointment, a Depository Institution.

The Trust will cause each Paying Agent other than the Administrator to execute and deliver to the Indenture Trustee an instrument in which such Paying Agent shall agree with the Indenture Trustee (and if the Indenture Trustee acts as Paying Agent, it hereby so agrees), subject to the provisions of this Section, that such Paying Agent will:

(i)     hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(ii)     give the Indenture Trustee notice of any default by the Trust (or any other obligor upon the Notes) of which it has actual knowledge in the making of any payment required to be made with respect to the Notes;

(iii)     at any time during the continuance of any such default, upon the written request of the Indenture Trustee, forthwith pay to the Indenture Trustee all sums so held in trust by such Paying Agent;

(iv)     immediately resign as a Paying Agent and forthwith pay to the Indenture Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment; and

(v)     comply with all requirements of the Code with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith; provided, however, that with respect to withholding and reporting requirements applicable to original issue discount (if any) on the Notes, the Trust shall have first provided the calculations pertaining thereto to the Indenture Trustee.

The Trust may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Order direct any Paying Agent to pay to the Indenture Trustee all sums held in trust by such Paying Agent, such sums to be held by the Indenture Trustee upon the same trusts as those upon which the sums were held by such Paying Agent; and upon such payment by any Paying Agent to the Indenture Trustee, such Paying Agent shall be released from all further liability with respect to such money.

Subject to applicable laws with respect to escheat of funds or abandoned property, any money held by the Indenture Trustee or any Paying Agent in trust for the payment of any amount due with respect to any Note and remaining unclaimed for two years after such amount has

21

USBT 100449

become due and payable shall be discharged from such trust and be paid to the Trust on Issuer Request; and the Holder of such Note shall thereafter, as an unsecured general creditor, look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Trust), and all liability of the Indenture Trustee or such Paying Agent with respect to such trust money shall thereupon cease; provided, however, that the Indenture Trustee or such Paying Agent, before being required to make any such repayment, shall at the expense and direction of the Trust cause to be published once, in a newspaper published in the English language, customarily published on each Business Day and of general circulation in The City of New York, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than 30 days from the date of such publication, any unclaimed balance of such money then remaining will be repaid to the Trust. The Indenture Trustee shall also adopt and employ, at the expense and direction of the Trust, any other reasonable means of notification of such repayment (including, but not limited to, mailing notice of such repayment to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in moneys due and payable but not claimed is determinable from the records of the Indenture Trustee or of any Paying Agent, at the last address of record for each such Holder).

SECTION 3.4 Existence.

(a)    Subject to Section 3.4(b), the Trust will keep in full effect its existence, rights and franchises as a business trust under the laws of the State of Delaware (unless it becomes, or any successor Trust hereunder is or becomes, organized under the laws of any other State or of the United States of America, in which case the Trust will keep in full effect its existence, rights and franchises under the laws of such other jurisdiction) and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes and the Trust Estate.

(b)    Any successor to the Owner Trustee appointed pursuant to Section 10.2 of the Trust Agreement shall be the successor Owner Trustee under this Indenture without the execution or filing of any paper, instrument or further act to be done on the part of the parties hereto.

(c)    Upon any consolidation or merger of or other succession to the Owner Trustee, the Person succeeding to the Owner Trustee under the Trust Agreement may exercise every right and power of the Owner Trustee under this Indenture with the same effect as if such Person had been named as the Owner Trustee herein.

SECTION 3.5 Protection of Trust Estate. The Trust will from time to time execute and deliver all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments, and will take such other action necessary or advisable to:

(i)    provide further assurance with respect to the Grant of all or any portion of the Trust Estate;

USBT 100450

(ii)    maintain or preserve the lien and security interest (and the priority thereof) of this Indenture or carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture;

(iv)    enforce any rights with respect to the Trust Estate; or

(v)    preserve and defend title to the Trust Estate and the rights of the Indenture Trustee and the Noteholders in such Trust Estate against the claims of all persons and parties.

The Trust hereby designates the Company its agent and attorney-in-fact to execute any financing statement, continuation statement or other instrument required to be executed pursuant to this Section 3.5.

SECTION 3.6 Annual Opinions as to Trust Estate.

On or before March 31 in each calendar year, beginning in 2003; unless waived by the Indenture Trustee, the Trust shall furnish to the Indenture Trustee an Opinion of Counsel either stating that, in the opinion of such counsel, such action has been taken with respect to the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and with respect to the execution and filing of any financing statements and continuation statements as is necessary to maintain the lien and security interest created by this Indenture and reciting the details of such action or stating that in the opinion of such counsel no such action is necessary to maintain such lien and security interest. Such Opinion of Counsel shall also describe the recording, filing, re-recording and refiling of this Indenture, any indentures supplemental hereto and any other requisite documents and the execution and filing of any financing statements and continuation statements that will, in the opinion of such counsel, be required to maintain the lien and security interest of this Indenture until August 31st of the following calendar year.

SECTION 3.7 Performance of Obligations; Servicing of Loans.

(a)    The Trust will not take any action and will use its best efforts not to permit any action to be taken by others that would release any Person from any of such Person's material covenants or obligations under any instrument or agreement included in the Trust Estate or that would result in the amendment, hypothecation, subordination, termination or discharge of, or impair the validity or effectiveness of, any such instrument or agreement, except as expressly provided in this Indenture, the Sale and Servicing Agreement or such other instrument or agreement.

(b)    The Trust may contract with or otherwise obtain the assistance of other Persons (including, without limitation, the Administrator under the Administration Agreement) to assist it in performing its duties under this Indenture, and any performance of such duties by a Person identified to the Indenture Trustee in the next sentence or in an Officer's Certificate of the Trust

USBT 100451

shall be deemed to be action taken by the Trust. Initially, the Trust has contracted with the Administrator to assist the Trust in performing its duties under this Indenture. The Administrator must at all times be the same person as the Indenture Trustee.

(c)     The Trust will punctually perform and observe all of its obligations and agreements contained in this Indenture, the Transaction Documents and in the instruments and agreements included in the Trust Estate, including but not limited to (i) filing or causing to be filed all UCC financing statements and continuation statements required to be filed by the terms of this Indenture and the Sale and Servicing Agreement and (ii) recording or causing to be recorded all Mortgages, assignments of mortgage, all intervening assignments of mortgage and all assumption and modification agreements required to be recorded by the terms of the Sale and Servicing Agreement,  in accordance with and within the time periods provided for in this Indenture and/or the Sale and Servicing Agreement, as applicable. Except as otherwise expressly provided therein, the Trust shall not waive, amend, modify, supplement or terminate any Transaction Document or any provision thereof without the consent of the Indenture Trustee and the Holders of at least a majority of the Outstanding Amount of the Notes.

(d)     If the Trust shall have actual knowledge of the occurrence of a Servicing Termination Event under the Sale and Servicing Agreement, the Trust shall promptly notify the Indenture Trustee, the Grantor Trustee, the Seller and the Rating Agencies thereof, and shall specify in such notice the action, if any, the Trust is taking with respect of such default. If such a Servicing Termination Event shall arise from the failure of the Servicer to perform any of its duties or obligations under the Sale and Servicing Agreement with respect to the Loans, the Trust shall take all reasonable steps available to it to remedy such failure.

(e)     If the Indenture Trustee shall succeed to the Servicer's duties as servicer of the Loans as provided in the Sale and Servicing Agreement, it shall do so in its individual capacity and not in its capacity as Indenture Trustee and, accordingly, the provisions of Article VI hereof shall be inapplicable to the Indenture Trustee in connection with the performance of its duties as successor Servicer and the servicing of the Loans.  In case the Indenture Trustee shall become successor Servicer under the Sale and Servicing Agreement, the Indenture Trustee shall be entitled to appoint as Servicer any one of its Affiliates, provided that it shall be fully liable for the actions and omissions of such Affiliate in such capacity as Successor Servicer.

(f)     Without derogating from the absolute nature of the assignment granted to the Indenture Trustee under this Indenture or the rights of the Indenture Trustee hereunder, the Trust agrees that it will not, without the prior written consent of the Indenture Trustee amend, modify, waive, supplement, terminate or surrender, or agree to any amendment, modification, supplement, termination, waiver or surrender of, the terms of any portion of the Trust Estate (except to the extent otherwise provided in the Sale and Servicing Agreement) or the Transaction Documents, or waive timely performance or observance by the Servicer, the Backup Servicer or the Seller under the Sale and Servicing Agreement.  If any such amendment, modification, supplement or waiver shall be so consented to by the Indenture Trustee, the Trust agrees, promptly following a request by the Indenture Trustee to do so, to execute and deliver, in its own name and at its own expense, such agreements, instruments, consents and other documents as the Indenture Trustee may deem necessary or appropriate in the circumstances.

USBT 100452

SECTION 3.8 <u>Negative Covenants</u>.  So long as any Notes are Outstanding, the Trust shall not:

(i)    except as expressly permitted by this Indenture or the Sale and Servicing Agreement, sell, transfer, exchange or otherwise dispose of any of the properties or assets of the Trust, including those included in the Trust Estate, unless directed to do so by the Indenture Trustee;

(ii)    claim any credit on, or make any deduction from the principal or interest payable in respect of, the Notes (other than amounts properly withheld from such payments under the Code) or assert any claim against any present or former Noteholder by reason of the payment of the taxes levied or assessed upon any part of the Trust Estate;

(iii)    engage in any business or activity other than as permitted by the Trust Agreement or other than in connection with, or relating to, the issuance of Notes pursuant to this Indenture, or amend the Trust Agreement as in effect on the Closing Date other than in accordance with <u>Section 11.1</u> thereof,

(iv)    issue debt obligations under any other indenture;

(v)    incur or assume any indebtedness or guaranty any indebtedness of any Person, except for such indebtedness as may be incurred by the Trust in connection with the issuance of the Notes pursuant to this Indenture;

(vi)    dissolve or liquidate in whole or in part or merge or consolidate with any other Person;

(vii)    (A) permit the validity or effectiveness of this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to the Notes under this Indenture except as may be expressly permitted hereby, (B) permit any lien, charge, excise, claim, security interest, mortgage or other encumbrance (other  than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof or any interest therein or the proceeds thereof (other than tax liens, mechanics' liens and other liens that arise by operation of law, in each case on any of the  Mortgaged Properties and arising solely as a result of an action or omission of the related Obligor) or (C) permit the lien of this Indenture not to constitute a valid first priority (other than with respect to any such tax, mechanics' or other lien) security interest in the Trust Estate;

(viii)    remove the Administrator without cause unless the Rating Agency Condition shall have been satisfied in connection with such removal; or

(ix)    take any other action or fail to take any action which may cause the Trust to be taxable as (a) an association pursuant to Section 7701 of the Code and the

USBT 100453

corresponding regulations or (b) as a taxable mortgage pool pursuant to Section 7701(i) of the Code and the corresponding regulations.

SECTION 3.9 <u>Annual Statement as to Compliance</u>.   The Trust will deliver to the Indenture Trustee, within 120 days after the end of each fiscal year of the Trust (commencing with the fiscal year 1998), an Officer's Certificate stating, as to the Authorized Officer signing such Officer's Certificate, that:

(i)     a review of the activities of the Trust during such year and of its performance under this Indenture has been made under such Authorized Officer's supervision; and

(ii)    to the best of such Authorized Officer's knowledge, based on such review, the Trust has complied with all conditions and covenants under this Indenture throughout such year, or, if there has been a default in its compliance with any such condition or covenant, specifying each such default known to such Authorized Officer and the nature and status thereof.

SECTION 3.10       <u>Covenants of the Trust</u>.

All covenants of the Trust in this Indenture are covenants of the Trust and are not covenants of the Owner Trustee. The Owner Trustee is, and any successor Owner Trustee under the Trust Agreement will be, entering into this Indenture solely in the name and on behalf of the Trust as Owner Trustee under the Trust Agreement and not in its individual capacity, and in no case whatsoever shall the Owner Trustee or any such successor Owner Trustee be personally liable on, or for any loss in respect of, or to perform any of the statements, representations, warranties or obligations of the Trust hereunder, or the Notes as to all of which the parties hereto agree to look solely to the property of the Trust.

SECTION 3.11       <u>Servicer's Obligations</u>.   The Trust shall cause the Servicer to comply with its obligations under Sections 5.01, 6.01 and Article VII of the Sale and Servicing Agreement.

SECTION 3.12       <u>Restricted Payments</u>. The Trust shall not, directly or indirectly, (i) pay any dividend or make any distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, to the Owner Trustee, Indenture Trustee or any owner of a beneficial interest in the Trust or otherwise with respect to any ownership or equity interest or security in or of the Trust or to the Servicer, (ii) redeem, purchase, retire or otherwise acquire for value any such ownership or equity interest or security or (iii) set aside or otherwise segregate any amounts for any such purpose; provided, however, that the Trust may make, or cause to be made, (x) distributions to the Indenture Trustee, the Owner Trustee and the Certificateholders as contemplated by, and to the extent funds are available for such purpose under, the Sale and Servicing Agreement or the Trust Agreement and (y) payments to the Indenture Trustee pursuant to Section 1(a)(ii) of the Administration Agreement. The Trust will not, directly or indirectly, make or cause to be made payments to or distributions from the Collection Account except in accordance with this Indenture and the Transaction Documents.

USBT 100454

SECTION 3.13    <u>Treatment of Notes as Debt for All Purposes</u>.

The Trust shall, and shall cause the Administrator to, treat the Notes as indebtedness for all purposes.

SECTION 3.14    <u>Notice of Events of Default</u>.  The Trust shall give the Indenture Trustee, the Seller and the Rating Agencies prompt written notice of each Event of Default hereunder, and each default on the part of the Servicer or the Seller of its obligations under the Sale and Servicing Agreement.

SECTION 3.15    <u>Further Instruments and Acts</u>.  Upon request of the Indenture Trustee, the Trust will execute and deliver such further instruments and do such further acts as may be reasonably necessary or proper to carry out more effectively the purpose of this Indenture.

USBT 100455

# ARTICLE IV

## SATISFACTION AND DISCHARGE

SECTION 4.1 <u>Satisfaction and Discharge of Indenture</u>.  This Indenture shall cease to be of further effect with respect to the Notes (except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, (iv) <u>Sections 3.3, 3.4, 3.5, 3.8 and 3.10</u> hereof, (v) the rights, obligations and immunities of the Indenture Trustee hereunder (including the rights of the Indenture Trustee under <u>Section 6.7</u> and the obligations of the Indenture Trustee under <u>Section 4.2</u>) and (vi) the rights of Noteholders as beneficiaries hereof with respect to the property so deposited with the Indenture Trustee payable to all or any of them), and the Indenture Trustee, on demand of and at the expense of the Trust, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture with respect to the Notes, when all of the following have occurred:

(A)    either

(1)    all Notes theretofore authenticated and delivered (other than (i) Notes that have been destroyed, lost or stolen and that have been replaced or paid as provided in <u>Section 2.4</u> and (ii) Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Trust and thereafter repaid to the Trust or discharged from such trust, as provided in <u>Section 3.3</u>) have been delivered to the Indenture Trustee for cancellation; or

(2)    all Notes not theretofore delivered to the Indenture Trustee for cancellation

    a.    have become due and payable,

    b.    will become due and payable within one year prior to the Maturity Date, or

    c.    are to be called for redemption within one year under arrangements satisfactory to the Indenture Trustee for the giving of notice of redemption by the Indenture Trustee in the name, and at the expense, of the Trust,

and the Trust, in the case of a., b. or c. above, has irrevocably deposited or caused to be irrevocably deposited with the Indenture Trustee cash or direct obligations of or obligations guaranteed by the United States of America (which will mature prior to the date such amounts are payable), in trust for such purpose, in an amount sufficient to pay and discharge the entire indebtedness on such Notes not theretofore delivered to the Indenture Trustee for cancellation when due to the Maturity Date or Termination Date (if Notes shall have been called for redemption pursuant to <u>Section 10.1</u>), as the case may be;

(B)    the later of (a) eighteen months after payment in full of all outstanding obligations under the Notes, (b) the payment in full of all unpaid Trust Fees and Expenses and (c) the date on which the Trust has paid or caused to be paid all other sums payable hereunder by the Trust; and

USBT 100456

(C)    the Trust has delivered to the Indenture Trustee an Officer's Certificate, an Opinion of Counsel and (if required by the Indenture Trustee) an Independent Certificate from a firm of certified public accountants, each meeting the applicable requirements of Section 11.1(a) and, subject to Section 11.2 hereof, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture with respect to the Notes have been complied with.

SECTION 4.2 Application of Trust Money.  All moneys deposited with the Indenture Trustee pursuant to Sections 3.3 and 4.1 hereof shall be held in trust and applied by it, in accordance with the provisions of the Notes, the Sale and Servicing Agreement and this Indenture, to the payment, either directly or through any Paying Agent, as the Indenture Trustee may determine, to the Holders of the particular Notes for the payment or redemption of which such moneys have been deposited with the Indenture Trustee, of all sums due and to become due thereon for principal and interest; but such moneys need not be segregated from other funds except to the extent required herein or in the Sale and Servicing Agreement or required by law.

SECTION 4.3 Repayment of Moneys Held by Paying Agent.  In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all moneys then held by any Paying Agent other than the Indenture Trustee under the provisions of this Indenture with respect to such Notes shall, upon demand of the Trust, be paid to the Indenture Trustee to be held and applied according to Section 3.3 and thereupon such Paying Agent shall be released from all further liability with respect to such moneys.

USBT 100457

ARTICLE V

REMEDIES

SECTION 5.1 <u>Events of Default</u>.  "Event of Default," wherever used herein, means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a)     default in the payment of any interest on any Note when the same becomes due and payable, and continuance of such default for a period of five (5) days; or

(b)     default in the payment of the principal of or any installment of the principal of any Note when the same becomes due and payable, and continuance of such default for a period of five (5) days, and default in payment of remaining Note Balance at the Final Maturity Date; or

(c)     default in the observance or performance of any covenant or agreement of the Trust in any material respect made in this Indenture (other than a covenant or agreement, a default in the observance or performance of which is elsewhere in this Section specifically dealt with), or any representation or warranty of the Trust made in this Indenture, the Sale and Servicing Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith proving to have been incorrect in any material respect as of the time when the same shall have been made, and such default shall continue or not be cured, or the circumstance or condition in respect of which such misrepresentation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of 30 days after there shall have been given, by registered or certified mail, to the Trust by the Indenture Trustee or to the Trust and the Indenture Trustee by the Holders of at least 25% of the Outstanding Amount of the Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of Default hereunder; or

(d)     default in the observance or performance of any covenant or agreement of the Company in any material respect made in the Trust Agreement or any representation or warranty of the Company made in the Trust Agreement, proving to have been incorrect in any material respect as of the time when the same shall have been made, and such default shall continue or not be cured, or the circumstance or condition in respect of which such misrepresentation or warranty was incorrect shall not have been eliminated or otherwise cured, for a period of 30 days after there shall have been given, by registered or certified mail, to the Trust by the Indenture Trustee or to the Trust and the Indenture Trustee by the Holders of at least 25% of the Outstanding Amount of the Notes, a written notice specifying such default or incorrect representation or warranty and requiring it to be remedied and stating that such notice is a notice of Default hereunder;

(e)     the filing of a decree or order for relief by a court having jurisdiction in the premises in respect of the Trust or any substantial part of the Trust Estate in an involuntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Trust or for any substantial part of the Trust Estate, or ordering the

USBT 100458

winding-up or liquidation of the Trust's affairs, and such decree or order shall remain unstayed and in effect for a period of 60 consecutive days; or

(f)     the commencement by the Trust of a voluntary case under any applicable federal or state bankruptcy, insolvency or other similar law now or hereafter in effect, or the consent by the Trust to the entry of an order for relief in an involuntary case under any such law, or the consent by the Trust to the appointment or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Trust or for any substantial part of the Trust Estate, or the making by the Trust of any general assignment for the benefit of creditors, or the failure by the Trust generally to pay its debts as such debts become due, or the taking of any action by the Trust in furtherance of any of the foregoing.

The Trust shall deliver to the Indenture Trustee and the Seller within five days after the occurrence thereof, written notice in the form of an Officer's Certificate of any event which with the giving of notice and the lapse of time would become an Event of Default under clauses (c) and (d) above, its status and what action the Trust is taking or proposes to take with respect thereto.

SECTION 5.2 Acceleration of Maturity; Rescission and Annulment.  If an Event of Default should occur and be continuing, then and in every such case the Indenture Trustee, at the direction or upon the prior written consent of the Holders of Notes representing not less than a majority of the Outstanding Amount of the Notes may declare all the Notes to be immediately due and payable, by a notice in writing to the Trust and to the Indenture Trustee, and upon any such declaration the unpaid principal amount of such Notes, together with accrued and unpaid interest thereon through the date of acceleration, shall become immediately due and payable.

At any time after such declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Indenture Trustee as hereinafter in this Article V provided, the Holders of Notes representing a majority of the Outstanding Amount of the Notes, by written notice to the Trust and the Indenture Trustee, may rescind and annul such declaration and its consequences if:

a.     the Trust has paid or deposited with the Indenture Trustee a sum sufficient to pay:

1.     all payments of principal of and interest on all Notes and all other amounts that would then be due hereunder or upon such Notes if the Event of Default giving rise to such acceleration had not occurred; and

2.     all sums paid or advanced by the Indenture Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel; and

b.     all Events of Default, other than the nonpayment of the principal of the Notes that has become due solely by such acceleration, have been cured or waived as provided in Section 5.12.

31

USBT 100459

No such rescission shall affect any subsequent default or impair any right consequent thereto.

SECTION 5.3 <u>Collection of Indebtedness and Suits for Enforcement by Indenture Trustee.</u>

(a)    The Trust covenants that if (i) default occurs in the payment of any interest on any Note when the same becomes due and payable, and such default continues for a period of five days, or (ii) default occurs in the payment of the principal of or any installment of the principal of any Note when the same becomes due and payable, and such default continues for a period of five days, the Trust will, upon demand of the Indenture Trustee, pay to the Indenture Trustee, for the benefit of the Holders of the Notes, the whole amount then due and payable on such Notes for principal and interest, with interest upon the overdue principal and, to the extent payment at such rate of interest shall be legally enforceable, upon overdue installments of interest at the rate borne by the Notes and in addition thereto such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Indenture Trustee and its agents and counsel.

(b)    In case the Trust shall fail forthwith to pay such amounts upon such demand, the Indenture Trustee may, and shall at the direction of the majority of the Holders of the Notes, institute a Proceeding for the collection of the sums so due and unpaid, and may prosecute such Proceeding to judgment or final decree, and may enforce the same against the Trust or other obligor upon such Notes and collect in the manner provided by law out of the property of the Trust or other obligor upon such Notes, wherever situated, the moneys adjudged or decreed to be payable.

(c)    If an Event of Default occurs and is continuing, the Indenture Trustee may and shall at the direction of the majority of the Holders of the Notes, as more particularly provided in <u>Section 5.4</u>, in its discretion, proceed to protect and enforce its rights and the rights of the Noteholders, by such appropriate Proceedings as the Indenture Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy or legal or equitable right vested in the Indenture Trustee by this Indenture or by law.

(d)    In case there shall be pending, relative to the Trust or any other obligor upon the Notes or any Person having or claiming an ownership interest in the Trust Estate, Proceedings under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Trust or its property or such other obligor or Person, or in case of any other comparable judicial Proceedings relative to the Trust or other obligor upon the Notes, or to the creditors or property of the Trust or such other obligor, the Indenture Trustee, irrespective of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Indenture Trustee shall have made any

USBT 100460

demand pursuant to the provisions of this Section, shall be entitled and empowered by intervention in such Proceedings or otherwise:

(i)     to file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee (including any claim for reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and its agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee (except as a result of negligence or bad faith), and of the Noteholders allowed in such Proceedings;

(ii)     unless prohibited by applicable law and regulations, to vote on behalf of the Holders of Notes in any election of a trustee, a standby trustee or Person performing similar functions in any such Proceedings;

(iii)     to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute all amounts received with respect to the claims of the Noteholders and the Indenture Trustee on their behalf; and

(iv)     to file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the Indenture Trustee or the Holders of Notes allowed in any judicial proceedings relative to the Trust, its creditors and its property; and any trustee, receiver, liquidator, custodian or other similar official in any such Proceeding is hereby authorized by each of such Noteholders to make payments to the Indenture Trustee and, in the event that the Indenture Trustee shall consent to the making of payments directly to such Noteholders, to pay to the Indenture Trustee such amounts as shall be sufficient to cover reasonable compensation to the Indenture Trustee, each predecessor Indenture Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Indenture Trustee and each predecessor Indenture Trustee except as a result of negligence or bad faith.

(e)     Nothing herein contained shall be deemed to authorize the Indenture Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof or to authorize the Indenture Trustee to vote in respect of the claim of any Noteholder in any such proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

(f)     All rights of action and of asserting claims under this Indenture, or under any of the Notes, may be enforced by the Indenture Trustee without the possession of any of the Notes or the production thereof in any trial or other Proceedings relative thereto, and any such action or Proceedings instituted by the Indenture Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment, subject to the payment of the expenses, disbursements and compensation of the Indenture Trustee, each predecessor Indenture Trustee

USBT 100461

and their respective agents and attorneys, shall be for the ratable benefit of the Holders of the Notes.

(g)    In any Proceedings brought by the Indenture Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Indenture Trustee shall be a party), the Indenture Trustee shall be held to represent all the Noteholders, and it shall not be necessary to make any Noteholder a party to any such Proceedings.

SECTION 5.4 Remedies; Priorities.

(a)    If an Event of Default shall have occurred and be continuing, the Indenture Trustee may and at the direction of a majority of the Holders of the Notes shall do one or more of the following (subject to Section 5.5):

(i)    institute Proceedings in its own name and as trustee of an express trust for the collection of all amounts then payable on the Notes or under this Indenture with respect thereto, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Trust and any other obligor upon such Notes moneys adjudged due;

(ii)    institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Trust Estate;

(iii)    exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights and remedies of the Indenture Trustee or the Noteholders; and

(iv)    sell the Trust Estate or any portion thereof or rights or interest therein in a commercially reasonable manner, at one or more public or private sales called and conducted in any manner permitted by law;  provided, however, that the Indenture Trustee may not sell or otherwise liquidate the Trust Estate following an Event of Default, unless (A) the Holders of 100% of the Outstanding Amount of the Notes consent thereto, (B) the proceeds of such sale or liquidation distributable to the Noteholders are sufficient to discharge in full all amounts then due and unpaid upon such Notes for principal and interest or (C) the Indenture Trustee determines that the Trust Estate will not continue to provide sufficient funds for the payment of principal of and interest on the Notes as they would have become due if the Notes had not been declared due and payable, and the Indenture Trustee obtains the consent of Holders of 66-2/3% of the Outstanding Amount of each Class of the Notes.  In determining such sufficiency or insufficiency with respect to clause (B) and (C), the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose.

(b)    If the Indenture Trustee collects any money or property pursuant to this Article V, it shall pay out the money or property in the following order:

USBT 100462

FIRST: to the Indenture Trustee for the Indenture Trustee Fee then due and any costs or expenses incurred by it in connection with the enforcement of the remedies provided for in this Article V and to the Owner Trustee in its individual capacity for the Owner Trustee Fee then due;

SECOND: any amounts payable to the Servicer pursuant to Section 5.01(d)(ii)(b) and (iii) of the Sale and Servicing Agreement;

THIRD: to the Noteholders for amounts due and unpaid on the Notes for interest, *pro rata*, according to the amounts due and payable on the Notes for interest;

FOURTH: to the Noteholders for amounts due and unpaid on the Notes for principal, *pro rata*, among the Holders of each Class of Notes according to the amounts due and payable and in the order and priority set forth in Section 5.01(e) of the Sale and Servicing Agreement, until the Class Principal Balance of each such Class is reduced to zero; and

FIFTH: to the Certificate Paying Agent, for any amounts to be distributed to the Certificateholders, as set forth in Section 5.03(b) of the Sale and Servicing Agreement.

The Indenture Trustee may fix a record date and payment date for any payment to be made to the Noteholders pursuant to this Section. At least 15 days before such record date, the Indenture Trustee shall mail to each Noteholder and the Trust a notice that states the record date, the payment date and the amount to be paid.

SECTION 5.5 Optional Preservation of the Trust Estate. If the Notes have been declared to be due and payable under Section 5.2 following an Event of Default and such declaration and its consequences have not been rescinded and annulled, the Indenture Trustee may, but need not, elect to maintain possession of the Trust Estate. It is the desire of the parties hereto and the Noteholders that there be at all times sufficient funds for the payment of principal of and interest on the Notes, and the Indenture Trustee shall take such desire into account when determining whether or not to maintain possession of the Trust Estate. In determining whether to maintain possession of the Trust Estate, the Indenture Trustee may, but need not, obtain and rely upon an opinion of an Independent investment banking or accounting firm of national reputation as to the feasibility of such proposed action and as to the sufficiency of the Trust Estate for such purpose.

SECTION 5.6 Limitation of Suits. No Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)    such Holder has previously given written notice to the Indenture Trustee of a continuing Event of Default;

(b)    the Holders of not less than 25% of the Outstanding Amount of the Notes have made written request to the Indenture Trustee to institute such Proceeding in respect of such Event of Default in its own name as Indenture Trustee hereunder;

5

USBT 100463

(c)    such Holder or Holders have offered to the Indenture Trustee reasonable indemnity against the costs, expenses and liabilities to be incurred in complying with such request;

(d)    the Indenture Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute such Proceedings; and

(e)    no direction inconsistent with such written request has been given to the Indenture Trustee during such 60-day period by the Holders of a majority of the Outstanding Amount of the Notes.

It is understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes or to obtain or to seek to obtain priority or preference over any other Holders or to enforce any right under this Indenture, except in the manner herein provided.

In the event the Indenture Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of Notes, each representing less than a majority of the Outstanding Amount of the Notes, the Indenture Trustee in its sole discretion may determine what action, if any, shall be taken, notwithstanding any other provisions of this Indenture.

SECTION 5.7 Unconditional Rights of Noteholders To Receive Principal and Interest. Notwithstanding any other provisions in this Indenture, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest, if any, on such Note on or after the applicable Maturity Date thereof expressed in such Note or in this Indenture (or, in the case of redemption, on or after the Termination Date) and to institute suit for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

SECTION 5.8 Restoration of Rights and Remedies. If the Indenture Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Indenture Trustee or to such Noteholder, then and in every such case the Trust, the Indenture Trustee and the Noteholders shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Indenture Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

SECTION 5.9 Rights and Remedies Cumulative. No right or remedy herein conferred upon or reserved to the Indenture Trustee or to the Noteholders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

USBT 100464

SECTION 5.10    Delay or Omission Not a Waiver.  No delay or omission of the Indenture Trustee or any Holder of any Note to exercise any right or remedy accruing upon any Default or Event of Default shall impair any such right or remedy or constitute a waiver of any such Default or Event of Default or an acquiescence therein.  Every right and remedy given by this Article V or by law to the Indenture Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Indenture Trustee or by the Noteholders, as the case may be.

SECTION 5.11    Control by Noteholders.  The Holders of a majority of the Outstanding Amount of the Notes shall have the right to direct the time, method and place of conducting any Proceeding for any remedy available to the Indenture Trustee with respect to the Notes or exercising any trust or power conferred on the Indenture Trustee; provided that:

(a)    such direction shall not be in conflict with any rule of law or with this Indenture;

(b)    subject to the express terms of Section 5.4, any direction to the Indenture Trustee to sell or liquidate the Trust Estate shall be by Holders of Notes representing not less than 100% of the Outstanding Amount of the Notes;

(c)    if the conditions set forth in Section 5.5 have been satisfied and the Indenture Trustee elects to retain the Trust Estate pursuant to such Section, then any direction to the Indenture Trustee by Holders of Notes representing less than 100% of the Outstanding Amount of the Notes to sell or liquidate the Trust Estate shall be of no force and effect; and

(d)    the Indenture Trustee may take any other action deemed proper by the Indenture Trustee that is not inconsistent with such direction.

Notwithstanding the rights of the Noteholders set forth in this Section, subject to Section 6.1, the Indenture Trustee need not take any action that it determines might involve it in liability or might materially adversely affect the rights of any Noteholders not consenting to such action.

SECTION 5.12    Waiver of Past Defaults.  Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.2, the Holders of Notes representing not less than a majority of the Outstanding Amount of the Notes may waive any past Default or Event of Default and its consequences except a Default (a) in the payment of principal of or interest on any of the Notes or (b) in respect of a covenant or provision hereof that cannot be modified or amended without the consent of the Holder of each Note.  In the case of any such waiver, the Trust, the Indenture Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.

Upon any such waiver, such Default shall cease to exist and be deemed to have been cured and not to have occurred, and any Event of Default arising therefrom shall be deemed to have been cured and not to have occurred, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereto.

37

USBT 100465

SECTION 5.13    <u>Undertaking for Costs</u>.  All parties to this Indenture agree, and each Holder of any Note by such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Indenture Trustee for any action taken, suffered or omitted by it as Indenture Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section shall not apply to (a) any suit instituted by the Indenture Trustee, (b) any suit instituted by any Noteholder, or group of Noteholders, in each case holding in the aggregate more than 10% of the Outstanding Amount of the Notes or (c) any suit instituted by any Noteholder for the enforcement of the payment of principal of or interest on any Note on or after the respective due dates expressed in such Note and in this Indenture (or, in the case of redemption, on or after the Termination Date).

SECTION 5.14    <u>Waiver of Stay or Extension Laws</u>.  The Trust covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead or in any manner whatsoever, claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of this Indenture; and the Trust (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Indenture Trustee, but will suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 5.15    <u>Action on Notes</u>.  The Indenture Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Indenture Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Indenture Trustee against the Trust or by the levy of any execution under such judgment upon any portion of the Trust Estate or upon any of the assets of the Trust.  Any money or property collected by the Indenture Trustee shall be applied in accordance with <u>Section 5.4(b)</u>.

SECTION 5.16    <u>Performance and Enforcement of Certain Obligations</u>.

(a)    Promptly following a request from the Indenture Trustee to do so and at the Administrator's expense (and will be reimbursed to the Administrator pursuant to the Administration Agreement), the Trust shall take all such lawful action as the Indenture Trustee may request to compel or secure the performance and observance by the Seller and the Servicer, as applicable, of each of their obligations to the Trust under or in connection with the Sale and Servicing Agreement, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Trust under or in connection with the Sale and Servicing Agreement to the extent and in the manner directed by the Indenture Trustee, including the transmission of notices of default on the part of the Seller or the Servicer thereunder and the institution of legal or administrative actions or proceedings to compel or secure performance by the Seller or the Servicer of each of their obligations under the Sale and Servicing Agreement.

USBT 100466

(b)    If an Event of Default has occurred and is continuing, the Indenture Trustee may, and at the direction (which direction shall be in writing or by telephone, confirmed in writing promptly thereafter) of the Holders of 66-2/3% of the Outstanding Amount of the Notes shall, exercise all rights, remedies, powers, privileges and claims of the Trust against the Seller or the Servicer under or in connection with the Sale and Servicing Agreement, including the right or power to take any action to compel or secure performance or observance by the Seller or the Servicer, as the case may be, of each of their obligations to the Trust thereunder and to give any consent, request, notice, direction, approval, extension, or waiver under the Sale and Servicing Agreement, and any right of the Trust to take such action shall be suspended.

USBT 100467

# ARTICLE VI

## THE INDENTURE TRUSTEE

SECTION 6.1 <u>Duties of Indenture Trustee.</u>

(a)    If an Event of Default has occurred and is continuing, the Indenture Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)    Except during the continuance of an Event of Default:

(i)    the Indenture Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Indenture Trustee; and

(ii)    in the absence of bad faith on its part, the Indenture Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Indenture Trustee and conforming to the requirements of this Indenture; however, the Indenture Trustee shall examine the certificates and opinions to determine whether or not they conform to the requirements of this Indenture.

(c)    The Indenture Trustee may not be relieved from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i)    this paragraph does not limit the effect of paragraph (b) of this Section;

(ii)    the Indenture Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer unless it is proved that the Indenture Trustee was negligent in ascertaining the pertinent facts; and

(iii)    the Indenture Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with a direction received by it pursuant to Section 5.11.

(d)    Every provision of this Indenture that in any way relates to the Indenture Trustee is subject to <u>paragraphs (a), (b), (c) and (g)</u> of this Section.

(e)    The Indenture Trustee shall not be liable for interest on any money received by it except as the Indenture Trustee may agree in writing with the Trust.

(f)    Money held in trust by the Indenture Trustee shall be segregated from other funds except to the extent permitted by law or the terms of this Indenture or the Sale and Servicing Agreement.

USBT 100468

(g)     No provision of this Indenture shall require the Indenture Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it; provided, however, that the Indenture Trustee shall not refuse or fail to perform any of its duties hereunder solely as a result of nonpayment of its normal fees and expenses and further provided that nothing in this Section 6.1(g) shall be construed to limit the exercise by the Indenture Trustee of any right or remedy permitted under this Indenture or otherwise in the event of the Trust's failure to pay the Indenture Trustee's fees and expenses pursuant to Section 6.7. In determining that such repayment or indemnity is not reasonably assured to it, the Indenture Trustee must consider not only the likelihood of repayment or indemnity by or on behalf of the Trust but also the likelihood of repayment or indemnity from amounts payable to it from the Trust Estate pursuant to Section 6.7.

(h)     The Indenture Trustee shall challenge any attempt at substantive consolidation of the assets and liabilities of the Trust with those of any Owner (as the term "Owner" is defined in the Trust Agreement) in connection with any insolvency proceeding of the Trust.

(i)     Every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Indenture Trustee shall be subject to the provisions of this Section.

SECTION 6.2 Rights of Indenture Trustee.

(a)     The Indenture Trustee may rely on any document believed by it to be genuine and to have been signed or presented by the proper person.  The Indenture Trustee need not investigate any fact or matter stated in the document.

(b)     Before the Indenture Trustee acts or refrains from acting, it may require an Officer's Certificate or an Opinion of Counsel.  The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith in reliance on an Officer's Certificate or an Opinion of Counsel.

(c)     The Indenture Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys or a custodian or nominee.

(d)     The Indenture Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, however, that such action or omission by the Indenture Trustee does not constitute willful misconduct, negligence or bad faith.

(e)     The Indenture Trustee may consult with counsel, and the advice or opinion of counsel with respect to legal matters relating to this Indenture and the Notes shall be full and complete authorization and protection from liability in respect to any action taken, omitted or suffered by it hereunder in good faith and in accordance with the advice or opinion of such counsel.

USBT 100469

SECTION 6.3 <u>Individual Rights of Indenture Trustee</u>.  The Indenture Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Trust or its Affiliates with the same rights it would have if it were not Indenture Trustee.  Any Paying Agent, Note Registrar, co-registrar or co-paying agent may do the same with like rights. However, the Indenture Trustee must comply with <u>Section 6.11</u>.

SECTION 6.4 <u>Indenture Trustee's Disclaimer</u>.  The Indenture Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, shall not be accountable for the Trust's use of the proceeds from the Notes, or responsible for any statement of the Trust in the Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Indenture Trustee's certificate of authentication.

SECTION 6.5 <u>Notice of Defaults</u>.  If a Default occurs and is continuing and if it is known to a Responsible Officer of the Indenture Trustee, the Indenture Trustee shall mail to each Noteholder, the Servicer and the Seller notice of the Default within 30 days after it occurs. Except in the case of a Default in payment of principal of or interest on any Note (including payments pursuant to the mandatory redemption provisions of such Note), the Indenture Trustee may withhold the notice to the Noteholders if and so long as a committee of its Responsible Officers in good faith determines that withholding the notice is in the interests of Noteholders.

SECTION 6.6 <u>Reports by Indenture Trustee to Holders</u>.  The Indenture Trustee shall deliver to each Noteholder such information as may be required to enable such holder to prepare its federal and state income tax returns.

SECTION 6.7 <u>Compensation and Indemnity</u>.   As compensation for its services hereunder, the Indenture Trustee shall be entitled to receive, on each Distribution Date, the Indenture Trustee's Fee pursuant to Section 5.01(e) of the Sale and Servicing Agreement (which compensation shall not be limited by any law on compensation of a trustee of an express trust) and shall be entitled to reimbursement for all reasonable out-of-pocket expenses incurred or made by it, including costs of collection, in addition to the compensation for its services.  Such expenses shall include the reasonable compensation and expenses, disbursements and advances of the Indenture Trustee's agents, counsel, accountants and experts.  The Trust agrees to cause the Seller to indemnify the Trust Estate and the Indenture Trustee against any and all loss, liability or expense (including attorneys' fees) incurred by it in connection with the administration of this trust and the performance of its duties hereunder.  The Indenture Trustee shall notify the Trust and the Seller promptly of any claim for which it may seek indemnity. Failure by the Indenture Trustee to so notify the Trust and the Seller shall not relieve the Trust of its obligations hereunder.  The Trust shall or shall cause the Seller to defend any such claim, and the Indenture Trustee may have separate counsel and the Trust shall or shall cause the Seller to pay the fees and expenses of such counsel.  Neither the Trust nor the Seller need to reimburse any expense or to indemnify against any loss, liability or expense incurred by the Indenture Trustee through the Indenture Trustee's own willful misconduct, negligence or bad faith.

The Trust's payment obligations to the Indenture Trustee pursuant to this Section shall survive the discharge of this Indenture.  When the Indenture Trustee incurs expenses after the occurrence of a Default specified in <u>Section 5.1(e)</u> or <u>(f)</u> with respect to the Trust, the expenses

USBT 100470

are intended to constitute expenses of administration under Title 11 of the United States Code or any other applicable federal or state bankruptcy, insolvency or similar law.

SECTION 6.8 Replacement of Indenture Trustee. No resignation or removal of the Indenture Trustee and no appointment of a successor Indenture Trustee shall become effective until the acceptance of appointment by the successor Indenture Trustee pursuant to this Section. The Indenture Trustee may resign at any time by so notifying the Trust. The Holders of a majority in Outstanding Amount of the Notes may remove the Indenture Trustee by so notifying the Indenture Trustee and may appoint a successor Indenture Trustee. The Trust shall remove the Indenture Trustee if:

(a)    the Indenture Trustee fails to comply with Section 6.11;

(b)    the Indenture Trustee is adjudged bankrupt or insolvent;

(c)    a receiver or other public officer takes charge of the Indenture Trustee or its property; or

(d)    the Indenture Trustee otherwise becomes incapable of acting.

If the Indenture Trustee resigns or is removed or if a vacancy exists in the office of Indenture Trustee for any reason (the Indenture Trustee in such event being referred to herein as the retiring Indenture Trustee), the Trust shall promptly appoint a successor Indenture Trustee.

A successor Indenture Trustee shall deliver a written acceptance of its appointment to the retiring Indenture Trustee and to the Trust. Thereupon the resignation or removal of the retiring Indenture Trustee shall become effective, and the successor Indenture Trustee shall have all the rights, powers and duties of the Indenture Trustee under this Indenture. The successor Indenture Trustee shall mail a notice of its succession to Noteholders. The retiring Indenture Trustee shall promptly transfer all property held by it as Indenture Trustee to the successor Indenture Trustee.

If a successor Indenture Trustee does not take office within 60 days after the retiring Indenture Trustee resigns or is removed, the retiring Indenture Trustee, the Trust or the Holders of a majority in Outstanding Amount of the Notes may petition any court of competent jurisdiction for the appointment of a successor Indenture Trustee.

If the Indenture Trustee fails to comply with Section 6.11, any Noteholder may petition any court of competent jurisdiction for the removal of the Indenture Trustee and the appointment of a successor Indenture Trustee.

Notwithstanding the replacement of the Indenture Trustee pursuant to this Section, the Trust's and the Administrator's obligations under Section 6.7 shall continue for the benefit of the retiring Indenture Trustee.

SECTION 6.9 Successor Indenture Trustee by Merger. If the Indenture Trustee consolidates with, merges or converts into, or transfers all or substantially all its corporate trust business or assets to, another corporation or banking association, the resulting, surviving or

42

USBT 100471

transferee corporation without any further act shall be the successor Indenture Trustee; provided, that such corporation or banking association shall be otherwise qualified and eligible under Section 6.11. The Indenture Trustee shall provide the Rating Agencies written notice of any such transaction.

In case at the time such successor or successors by merger, conversion or consolidation to the Indenture Trustee shall succeed to the trusts created by this Indenture any of the Notes shall have been authenticated but not delivered, any such successor to the Indenture Trustee may adopt the certificate of authentication of any predecessor trustee, and deliver such Notes so authenticated; and in case at that time any of the Notes shall not have been authenticated, any successor to the Indenture Trustee may authenticate such Notes either in the name of any predecessor hereunder or in the name of the successor to the Indenture Trustee; and in all such cases such certificates shall have the full force which it is anywhere in the Notes or in this Indenture provided that the certificate of the Indenture Trustee shall have.

SECTION 6.10    Appointment of Co-Indenture Trustee or Separate Indenture Trustee.

(a)    Notwithstanding any other provisions of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Trust Estate may at the time be located, the Indenture Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Trust, and to vest in such Person or Persons, in such capacity and for the benefit of the Noteholders, such title to the Trust Estate, or any part hereof, and, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Indenture Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.11 and no notice to Noteholders of the appointment of any co-trustee or separate trustee shall be required under Section 6.8 hereof.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Indenture Trustee shall be conferred or imposed upon and exercised or performed by the Indenture Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Indenture Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Indenture Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the Trust Estate or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Indenture Trustee;

(ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

44

USBT 100472

(iii)    the Indenture Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(iv)    Any notice, request or other writing given to the Indenture Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this Agreement and the conditions of this Article VI.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, jointly with the Indenture Trustee, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Indenture Trustee.  Every such instrument shall be filed with the Indenture Trustee.

(c)    Any separate trustee or co-trustee may at any time constitute the Indenture Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name.  If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Indenture Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

SECTION 6.11    Eligibility; Disqualification.  The Indenture Trustee shall have a combined capital and surplus of at least $50,000,000 or be a wholly-owned subsidiary of a bank holding company having such capital surplus as set forth in its most recent published annual report of condition.

USBT 100473

# ARTICLE VII

## NOTEHOLDERS' LISTS AND REPORTS

SECTION 7.1 <u>Trust To Furnish Indenture Trustee Names and Addresses of Noteholders</u>. The Trust will furnish or cause to be furnished to the Indenture Trustee (a) not more than five days after the earlier of (i) each Record Date and (ii) three months after the last Record Date, a list, in such form as the Indenture Trustee may reasonably require, of the names and addresses of the Holders of Notes as of such Record Date, (b) at such other times as the Indenture Trustee may request in writing, within 30 days after receipt by the Trust of any such request, a list of similar form and content as of a date not more than 10 days prior to the time such list is furnished; provided, however, that so long as the Indenture Trustee is the Note Registrar, no such list shall be required to be furnished.

SECTION 7.2 <u>Preservation of Information; Communications to Noteholders</u>.

The Indenture Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of the Holders of Notes contained in the most recent list furnished to the Indenture Trustee as provided in <u>Section 7.1</u> and the names and addresses of Holders of Notes received by the Indenture Trustee in its capacity as Note Registrar. The Indenture Trustee may destroy any list furnished to it as provided in such <u>Section 7.1</u> upon receipt of a new list so furnished.

SECTION 7.3 <u>Reports by Trust</u>.

(a)     The Trust shall file with the Indenture Trustee, such additional information, documents and reports with respect to compliance by the Trust with the conditions and covenants of this Indenture.

(b)     Unless the Trust otherwise determines, the fiscal year of the Trust shall end on December 31 of each year.

USBT 100474

# ARTICLE VIII

## ACCOUNTS, DISBURSEMENTS AND RELEASES

SECTION 8.1 <u>Collection of Money</u>.  Except as otherwise expressly provided herein, the Indenture Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Indenture Trustee pursuant to this Indenture.  The Indenture Trustee shall apply all such money received by it as provided in this Indenture.  Except as otherwise expressly provided in this Indenture, if any default occurs in the making of any payment or performance under any agreement or instrument that is part of the Trust Estate, the Indenture Trustee may take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate Proceedings.  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture and any right to proceed thereafter as provided in <u>Article V</u>.

SECTION 8.2 <u>Trust Accounts: Distributions</u>.

(a)    [RESERVED]

(b)    [RESERVED]

(c)    On each Distribution Date and Termination Date, to the extent funds are available in the Note Distribution Account, the Indenture Trustee shall make the distributions and payments in the amounts and in the priority set forth in Section 5.01(e) of the Sale and Servicing Agreement (except as otherwise provided in <u>Section 5.4(b)</u>.

(d)    On each Distribution Date and the Termination Date, to the extent of the interest of the Indenture Trustee in the Certificate Distribution Account (as described in Section 5.03(b) of the Sale and Servicing Agreement), the Indenture Trustee hereby authorizes the Certificate Paying Agent, to make the distributions from the Certificate Distribution Account as required pursuant to Section 5.03 of the Sale and Servicing Agreement.

USBT 100475

SECTION 8.3 <u>General Provisions Regarding Accounts</u>.

(a)     So long as no Default or Event of Default shall have occurred and be continuing, all or a portion of the funds in the Trust Accounts shall be invested in Eligible Investments and reinvested by the Indenture Trustee at the direction of the Company in accordance with the provisions of <u>Article V</u> of the Sale and Servicing Agreement. All income or other gain from investments of moneys deposited in the Trust Accounts shall be distributed and deposited by the Indenture Trustee pursuant to Section 5.04(b)(1) of the Sale and Servicing Agreement, and any loss resulting from such investments shall be charged to the Company to the extent such loss specified in Section 5.04(b)(2) of the Sale and Servicing Agreement. The Company will not direct the Indenture Trustee to make any investment of any funds or to sell any investment held in any of the Trust Accounts unless the security interest Granted and perfected in such account will continue to be perfected in such investment or the proceeds of such sale, in either case without any further action by any Person, and, in connection with any direction to the Indenture Trustee to make any such investment or sale, if requested by the Indenture Trustee, the Company shall deliver to the Indenture Trustee an Opinion of Counsel, acceptable to the Indenture Trustee, to such effect.

(b)     Subject to <u>Section 6.1(c)</u>, the Indenture Trustee shall not in any way be held liable by reason of any insufficiency in any of the Trust Accounts resulting from any loss on any Eligible Investment included therein except for losses attributable to the Indenture Trustee's failure to make payments on such Eligible Investments issued by the Indenture Trustee, in its commercial capacity as principal obligor and not as trustee, in accordance with their terms.

(c)     If (i) the Company shall have failed to give investment directions for any funds on deposit in the Trust Accounts to the Indenture Trustee by 11:00 a.m. Eastern Time (or such other time as may be agreed by the Trust and the Indenture Trustee) on any Business Day or (ii) a Default or Event of Default shall have occurred and be continuing with respect to the Notes but the Notes shall not have been declared due and payable pursuant to <u>Section 5.2</u> or (iii) if such Notes shall have been declared due and payable following an Event of Default, amounts collected or receivable from the Trust Estate are being applied in accordance with <u>Section 5.5</u> as if there had not been such a declaration, then the Indenture Trustee shall, to the fullest extent practicable, invest and reinvest funds in the Trust Accounts in one or more Eligible Investments.

SECTION 8.4 <u>Servicer's Monthly Statements</u>.

On each Distribution Date, the Indenture Trustee shall deliver the Servicer's Certificate (as defined in the Sale and Servicing Agreement) with respect to such Distribution Date to DTC and the Rating Agencies and shall include the Servicer's Certificate with respect to such Distribution Date with the related Distribution to Noteholders of Definitive Notes.

SECTION 8.5 <u>Release of Trust Estate</u>.

(a)     Subject to the payment of its fees and expenses pursuant to <u>Section 6.7</u>, the Indenture Trustee may, and when required by the provisions of this Indenture shall, execute instruments to release property from the lien of this Indenture, or convey the Indenture Trustee's interest in the same, in a manner and under circumstances that are not inconsistent with the provisions of this Indenture. No party relying upon an instrument executed by the Indenture

USBT 100476

Trustee as provided in this Article VIII shall be bound to ascertain the Indenture Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any moneys.

(b)    The Indenture Trustee shall, at such time as there are no Notes Outstanding and all sums due to (i) the Certificateholders pursuant to Section 5.03(b) of the Sale and Servicing Agreement and (ii) the Indenture Trustee, the Grantor Trustee, the Owner Trustee, and the Servicer have been paid, release any remaining portion of the Trust Estate that secured the Notes from the lien of this Indenture and release to the Trust or any other Person entitled thereto any funds then on deposit in the Trust Accounts. The Indenture Trustee shall release property from the lien of this Indenture pursuant to this Subsection only upon receipt of an Issuer Request accompanied by an Officer's Certificate.

SECTION 8.6 Opinion of Counsel.  The Indenture Trustee shall receive at least seven days notice when requested by the Trust to take any action pursuant to Section 8.5(a), accompanied by copies of any instruments involved, and the Indenture Trustee shall also require, as a condition to such action, an Opinion of Counsel, in form and substance satisfactory to the Indenture Trustee, stating the legal effect of any such action, outlining the steps required to complete the same, and concluding that all conditions precedent to the taking of such action have been complied with and such action will not materially and adversely impair the security for the Notes or the rights of the Noteholders in contravention of the provisions of this Indenture; provided, however, that such Opinion of Counsel shall not be required to express an opinion as to the fair value of the Trust Estate. Counsel rendering any such opinion may rely, without independent investigation, on the accuracy and validity of any certificate or other instrument delivered to the Indenture Trustee in connection with any such action.

USBT 100477

## ARTICLE IX

## SUPPLEMENTAL INDENTURES

SECTION 9.1 Supplemental Indentures Without Consent of Noteholders.

(a)    Without the consent of the Holders of any Notes but with prior notice to the Rating Agencies, the Trust and the Indenture Trustee, when authorized by an Issuer Order, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Indenture Trustee, for any of the following purposes:

(i)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the Indenture Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(ii)    to evidence the succession, in compliance with the applicable provisions hereof, of another person to the Trust, and the assumption by any such successor of the covenants of the Trust herein and in the Notes contained;

(iii)    to add to the covenants of the Trust, for the benefit of the Holders of the Notes, or to surrender any right or power herein conferred upon the Trust;

(iv)    to convey, transfer, assign, mortgage or pledge any property to or with the Indenture Trustee;

(v)    to cure any ambiguity, to correct or supplement any provision herein or in any supplemental indenture that may be inconsistent with any other provision herein or in any supplemental indenture or to make any other provisions with respect to matters or questions arising under this Indenture or in any supplemental indenture; provided, that such action shall not adversely affect the interests of the Holders of the Notes; or

(vi)    to evidence and provide for the acceptance of the appointment hereunder by a successor trustee with respect to the Notes and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the trusts hereunder by more than one trustee, pursuant to the requirements of Article VI.

The Indenture Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.

(b)    The Trust and the Indenture Trustee, when authorized by an Issuer Order, may, also without the consent of any of the Holders of the Notes but with prior consent of the Rating Agencies, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this indenture or of modifying in any manner the rights of the Holders of the Notes under this indenture; provided, however, that such action shall not, as evidenced by (i) an Opinion of

USBT 100478

Counsel or (ii) satisfaction of the Rating Agency Condition, adversely affect in any material respect the interests of any Noteholder.

SECTION 9.2 <u>Supplemental Indentures with Consent of Noteholders</u>. The Trust and the Indenture Trustee, when authorized by an Issuer Order, also may, with prior consent of the Rating Agencies, and with the consent of the Holders of not less than a majority of the Outstanding Amount of the Notes affected thereby, by Act of such Holders delivered to the Trust and the Indenture Trustee, enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, however, that no such supplemental indenture shall, without the consent of the Holder of each Outstanding Note affected thereby if such Holder is adversely affected thereby:

(a)     change the date of payment of any installment of principal of or interest on any Note, or reduce the principal amount thereof, the interest rate thereon or the Redemption Price with respect thereto, change the provisions of this Indenture relating to the application of collections on, or the proceeds of the sale of, the Trust Estate to payment of principal of or interest on the Notes, or change any place of payment where, or the coin or currency in which, any Note or the interest thereon is payable, or impair the right to institute suit for the enforcement of the provisions of this Indenture requiring the application of funds available therefor, as provided in Article V, to the payment of any such amount due on the Notes on or after the respective due dates thereof (or, in the case of redemption, on or after the Termination Date);

(b)     reduce the percentage of the Outstanding Amount of the Notes, the consent of the Holders of which is required for any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain defaults hereunder and their consequences provided for in this Indenture;

(c)     modify or alter the provisions of the proviso to the definition of the term "Outstanding";

(d)     reduce the percentage of the Outstanding Amount of the Notes required to direct the Indenture Trustee to direct the Trust to sell or liquidate the Trust Estate pursuant to <u>Section 5.4</u>;

(e)     modify any provision of this Section except to increase any percentage specified herein or to provide that certain additional provisions of this Indenture or the Transaction Documents cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby;

(f)     modify any of the provisions of this Indenture in such manner as to affect the calculation of the amount of any payment of interest or principal due on any Note on any Distribution Date (including the calculation of any of the individual components of such

USBT 100479

calculation) or to affect the rights of the Holders of Notes to the benefit of any provisions for the mandatory redemption of the Notes contained herein; or

(g)    permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Trust Estate or, except as otherwise permitted or contemplated herein, terminate the lien of this Indenture on any property at any time subject hereto or deprive the Holder of any Note of the security provided by the lien of this Indenture.

The Indenture Trustee may in its discretion determine whether or not any Notes would be affected by any supplemental indenture and any such determination shall be conclusive upon the Holders of all Notes, whether theretofore or thereafter authenticated and delivered hereunder. The Indenture Trustee shall not be liable for any such determination made in good faith.

In connection with requesting the consent of the Noteholders pursuant to this Section, the Indenture Trustee shall mail to the Holders of the Notes to which such amendment or supplemental indenture relates a notice setting forth in general terms the substance of such supplemental indenture. It shall not be necessary for any Act of Noteholders under this Section to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if such Act shall approve the substance thereof.

SECTION 9.3 Execution of Supplemental Indentures.  In executing, or permitting the additional trusts created by, any supplemental indenture permitted by this Article IX or the modification thereby of the trusts created by this Indenture, the Indenture Trustee shall be entitled to receive, and subject to Sections 6.1 and 6.2, shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture.  The Indenture Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Indenture Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise.

SECTION 9.4  Effect of Supplemental Indenture.  Upon the execution of any supplemental indenture pursuant to the provisions hereof, this Indenture shall be and shall be deemed to be modified and amended in accordance therewith with respect to the Notes affected thereby, and the respective rights, limitations of rights, obligations, duties, liabilities and immunities under this Indenture of the Indenture Trustee, the Trust and the Holders of the Notes shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications and amendments, and all the terms and conditions of any such supplemental indenture shall be and be deemed to be part of the terms and conditions of this Indenture for any and all purposes.

SECTION 9.5 Reserved

SECTION 9.6 Reference in Notes to Supplemental Indentures.  Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article IX may, and if required by the Indenture Trustee shall, bear a notation in form approved by the Indenture Trustee as to any matter provided for in such supplemental indenture.  If the Trust or the Indenture Trustee shall so determine, new Notes so modified as to conform, in the opinion of the Indenture Trustee and the Trust, to any such supplemental indenture may be prepared and

USBT 100480

executed by the Trust and authenticated and delivered by the Indenture Trustee in exchange for Outstanding Notes.

SECTION 9.7 <u>Amendments to Trust Agreement</u>.

Subject to Section 11.1 of the Trust Agreement, the Indenture Trustee shall, upon Issuer Order, consent to any proposed amendment to the Trust Agreement or an amendment to or waiver of any provision of any other document relating to the Trust Agreement, such consent to be given without the necessity of obtaining the consent of the Holders of any Notes upon satisfaction of the requirements under Section 11.1 of the Trust Agreement.

Nothing in this Section shall be construed to require that any Person obtain the consent of the Indenture Trustee to any amendment or waiver or any provision of any document where the making of such amendment or the giving of such waiver without obtaining the consent of the Indenture Trustee is not prohibited by this Indenture or by the terms of the document that is the subject of the proposed amendment or waiver.

USBT 100481

ARTICLE X

REDEMPTION OF NOTES

SECTION 10.1        Redemption.

Either the Trust or the Backup Servicer may effect an early redemption of the Notes on or after any Distribution Date on which the Pool Principal Balance declines to less than 10% of the Initial Pool Balance pursuant to the provisions of Section 11.01(b) of the Sale and Servicing Agreement.

The Trust or the Backup Servicer, as applicable, shall furnish the Rating Agencies notice of any such redemption in accordance with Section 10.2.

SECTION 10.2        Form of Redemption Notice.

(a)    Notice of redemption under Section 10.1 shall be given by the Indenture Trustee by first-class mail, postage prepaid, or by facsimile mailed or transmitted not later than 10 days prior to the applicable Termination Date to each Holder of Notes, as of the close of business on the Record Date preceding the applicable Termination Date, at such Holder's address or facsimile number appearing in the Note Register.

All notices of redemption shall state:

(i)    the Termination Date;

(ii)    the Redemption Price; and

(iii)    the place where such Notes are to be surrendered for payment of the Redemption Price (which shall be the office or agency of the Trust to be maintained as provided in Section 3.2).

Notice of redemption of the Notes shall be given by the Indenture Trustee in the name of the Trust and at the expense of the party exercising such right of early redemption pursuant to Section 10.1 hereof. Failure to give notice of redemption, or any defect therein, to any Holder of any Note shall not impair or affect the validity of the redemption of any other Note.

SECTION 10.3        Notes Payable on Termination Date; Provision for Payment of Indenture Trustee. The Notes or portions thereof to be redeemed shall, following notice of redemption as required by Section 10.2 (in the case of redemption pursuant to Section 10.1), on the Termination Date become due and payable at the Redemption Price and (unless the Trust shall default in the payment of the Redemption Price) no interest shall accrue on the Redemption Price for any period after the date to which accrued interest is calculated for purposes of calculating the Redemption Price. The Trust may not redeem the Notes unless, (i) all outstanding obligations under the Notes have been paid in full and (ii) the Indenture Trustee has been paid all amounts to which it is entitled hereunder.

USBT 100482

ARTICLE XI

MISCELLANEOUS

SECTION 11.1        Compliance Certificates and Opinions, etc.

Upon any application or request by the Trust made to the Indenture Trustee to take any action under any provision of this Indenture, the Trust shall furnish to the Indenture Trustee (i) an Officer's Certificate stating that all conditions precedent, if any, provided for in this Indenture relating to the proposed action have been complied with, (ii) an Opinion of Counsel stating that in the opinion of such counsel all such conditions precedent, if any, have been complied with and (iii) an Independent Certificate from a firm of certified public accountants meeting the applicable requirements of this Section, except that, in the case of any such application or request as to which the furnishing of such documents is specifically required by any provision of this Indenture, no additional certificate or opinion need be furnished.

Every certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture shall include:

(1)    a statement that each signatory of such certificate or opinion has read or has caused to be read such covenant or condition and the definitions herein relating thereto;

(2)    a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(3)    a statement that, in the opinion of each such signatory, such signatory has made such examination or investigation as is necessary to enable such signatory to express an informed opinion as to whether or not such covenant or condition has been complied with; and

(4)    a statement as to whether, in the opinion of each such signatory, such condition or covenant has been complied with.

SECTION 11.2        Form of Documents Delivered to Indenture Trustee.  In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Trust may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless such officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which such officer's certificate or

55

USBT 100483

opinion is based are erroneous. Any such certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Servicer, the Seller, the Trust or the Administrator, stating that the information with respect to such factual matters is in the possession of the Servicer, the Seller, the Trust or the Administrator, unless such counsel knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever in this Indenture, in connection with any application or certificate or report to the Indenture Trustee, it is provided that the Trust shall deliver any document as a condition of the granting of such application, or as evidence of the Trust's compliance with any term hereof, it is intended that the truth and accuracy, at the time of the granting of such application or at the effective date of such certificate or report (as the case may be), of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Trust to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Indenture Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

SECTION 11.3     Acts of Noteholders.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Noteholders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Indenture Trustee, and, where it is hereby expressly required, to the Trust. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Noteholders signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 6.1) conclusive in favor of the Indenture Trustee and the Trust, if made in the manner provided in this Section.

(b)     The fact and date of the execution by any person of any such instrument or writing may be proved in any manner that the Indenture Trustee deems sufficient.

(c)     The ownership of Notes shall be proved by the Note Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Indenture Trustee or the Trust in reliance thereon, whether or not notation of such action is made upon such Note.

SECTION 11.4     Notices.  Any request, demand, authorization, direction, notice, consent, waiver or Act of Noteholders or other documents provided or permitted by this Indenture shall be in writing and if such request, demand, authorization, direction, notice, consent, waiver or act of Noteholders is to be made upon, given or furnished to or filed with:

(a)     the Indenture Trustee by any Noteholder or by the Trust shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Indenture Trustee at its Corporate Trust Office, or

(b)     the Trust by the Indenture Trustee or by any Noteholder shall be sufficient for every purpose hereunder if in writing and mailed first-class, postage prepaid to the Trust addressed to: Keystone Owner Trust 1998-P2, in care of First Union Trust Company, National Association, as Owner Trustee One Rodney Square, First Floor, 920 King Street, Wilmington, Delaware 19801, Attention: Corporate Trust Administration, or at any other address previously furnished in writing to the Indenture Trustee by the Trust or the Administrator.  The Trust shall promptly transmit any notice received by it from the Noteholders to the Indenture Trustee.

Notices required to be given to the Rating Agencies by the Trust, the Indenture Trustee or the Owner Trustee shall be in writing, personally delivered or mailed by certified mail, return receipt requested, to (i) in the case of Moody's, at the following address: Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007 and (ii) in the case of Fitch, at the following address: Fitch IBCA, Inc., One State Street Plaza, New York, New York 10004 or as to each of the foregoing, at such other address as shall be designated by written notice to the other parties.

SECTION 11.5     Notices to Noteholders; Waiver.  Where this Indenture provides for notice to Noteholders of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class, postage prepaid to each Noteholder affected by such event, at his address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice. In any case where notice to Noteholders is given by mail, neither the failure to mail such notice nor any defect in any notice so mailed to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice that is mailed in the manner herein provided shall conclusively be presumed to have been duly given.

Where this Indenture provides for notice in any manner, such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Indenture Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such a waiver.

In case, by reason of the suspension of regular mail service as a result of a strike, work stoppage or similar activity, it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Indenture Trustee shall be deemed to be a sufficient giving of such notice.

USBT 100485

Where this Indenture provides for notice to the Rating Agencies, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstance constitute a Default or Event of Default.

SECTION 11.6    RESERVED.

SECTION 11.7    RESERVED.

SECTION 11.8    Effect of Headings and Table of Contents. The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 11.9    Successors and Assigns. All covenants and agreements in this Indenture and the Notes by the Trust shall bind its successors and assigns, whether so expressed or not. All agreements of the Indenture Trustee in this Indenture shall bind its successors, co-trustees and agents.

SECTION 11.10    Separability. In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

SECTION 11.11    Benefits of Indenture. Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Noteholders, the Servicer in respect of all rights expressly granted to it in this Indenture and any other party secured hereunder, and any other Person with an ownership interest in any part of the Trust Estate, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 11.12    Legal Holidays. In any case where the date on which any payment is due shall not be a Business Day, then (notwithstanding any other provision of the Notes or this Indenture) payment need not be made on such date, but may be made on the next succeeding Business Day with the same force and effect as if made on the date on which nominally due, and no interest shall accrue for the period from and after any such nominal date.

SECTION 11.13    GOVERNING LAW. THIS INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

SECTION 11.14    Counterparts. This Indenture may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

SECTION 11.15    Recording of Indenture. If this Indenture is subject to recording in any appropriate public recording offices, such recording is to be effected by the Trust and at its expense accompanied by an Opinion of Counsel (which may be counsel to the Indenture Trustee or any other counsel reasonably acceptable to the Indenture Trustee) to the effect that such

USBT 100486

recording is necessary either for the protection of the Noteholders or any other Person secured hereunder or for the enforcement of any right or remedy granted to the Indenture Trustee under this Indenture.

SECTION 11.16     Trust Obligation.  No recourse may be taken, directly or indirectly, with respect to the obligations of the Trust, the Owner Trustee or the Indenture Trustee on the Notes or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Trust or (iii) any partner, owner, beneficiary, agent, officer, director, employee or agent of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Trust, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed (it being understood that the Indenture Trustee and the Owner Trustee have no such obligations in their individual capacity) and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.  For all purposes of this Indenture, in the performance of any duties or obligations of the Trust hereunder, the Owner Trustee (as such and in its individual capacity) shall be subject to, and entitled to the benefits of, the terms and provisions of the Trust Agreement.

SECTION 11.17     No Petition.  The Indenture Trustee, by entering into this Indenture, and each Noteholder, by accepting a Note, hereby covenant and agree that they will not at any time institute against the Seller (and any wholly-owned subsidiary thereof), the Servicer or the Trust, or join in any institution against the Seller (and any wholly-owned subsidiary thereof), the Servicer or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, this Indenture or any of the Transaction Documents.

SECTION 11.18     Inspection.  The Trust agrees that, on reasonable prior notice, it will permit any representative of the Indenture Trustee, during the Trust's normal business hours, to examine all the books of account, records, reports and other papers of the Trust, to make copies and extracts therefrom, to cause such books to be audited by Independent certified public accountants, and to discuss the Trust's affairs, finances and accounts with the Trust's officers, employees, and Independent certified public accountants, all at such reasonable times and as often as may be reasonably requested.  The Indenture Trustee shall and shall cause its representatives to hold in confidence all such information except to the extent disclosure may be required by law (and all reasonable applications for confidential treatment are unavailing) and except to the extent that the Indenture Trustee may reasonably determine that such disclosure is consistent with its obligations hereunder.

SECTION 11.19     Conflicts of Interest.  In performing its duties as Administrator pursuant to the Administration Agreement, the Indenture Trustee shall not be liable for any potential conflict of interest related to its performance as Indenture Trustee hereunder.

SECTION 11.20     Inconsistencies With the Sale and Servicing Agreement.  In the event certain provisions of this Agreement conflict with the provisions of the Sale and Servicing

USBT 100487

Agreement, the parties hereto agree that the provisions of the Sale and Servicing Agreement shall be controlling.

50

USBT 100488

IN WITNESS WHEREOF, the Trust and the Indenture Trustee have caused this Indenture to be duly executed by their respective officers, thereunto duly authorized and duly attested, all as of the day and year first above written.

KEYSTONE OWNER TRUST 1998-P2

By:    FIRST UNION TRUST COMPANY
       as Owner Trustee,


By:_____
Name:
Title:        EDWARD L. TRUITT
              VICE PRESIDENT


U.S. BANK TRUST NATIONAL ASSOCIATION,
as Indenture Trustee


By:_____
Name:
Title:

IN WITNESS WHEREOF, the Trust and the Indenture Trustee have caused this Indenture to be duly executed by their respective officers, thereunto duly authorized and duly attested, all as of the day and year first above written.

KEYSTONE OWNER TRUST 1998-P2

By:    FIRST UNION TRUST COMPANY
       as Owner Trustee,

By:_____
Name:
Title:

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Indenture Trustee

By:_____
Name:        C. Hatfield
Title:
              Vice President

USBT 100490

STATE OF DELAWARE

COUNTY OF New Castle

BEFORE ME, the undersigned authority, a Notary Public in and for said county and state, on this day personally appeared _____ EDWARD L. TRUITT, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said FIRST UNION TRUST COMPANY not in its individual capacity, but solely as Owner Trustee on behalf of KEYSTONE OWNER TRUST 1998-P2, a Delaware business trust, and that such person executed the same as the act of said business trust for the purpose and consideration therein expressed, and in the capacities therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this 16 th day of September 1998.

Notary Public in and for the
State of Delaware

(Seal)

My commission expires:

NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires November 21, 1999
RITA MARIE NITROVATO LAWLESS

USBT 100491

STATE OF   MINNESOTA

COUNTY OF   RAMSEY

BEFORE ME, the undersigned authority, a Notary Public in and for said county and state, on this day personally appeared _Christina Hatfield_, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, and that such person executed the same as the act of said corporation for the purpose and consideration therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, this /6 th day of September 1998.

DEBORAH J. FRANCO
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan 31, 2000

(Seal)

Notary Public in and for the
State of ____MINNESOTA____

My commission expires:

_1/31/2000_

SCHEDULE A

Schedule of Loans

USBT 100493

EXHIBIT A

FORM OF NOTE

UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("DTC"), TO THE TRUST OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.

THE PRINCIPAL OF THIS NOTE IS PAYABLE IN INSTALLMENTS AS SET FORTH HEREIN. ACCORDINGLY, THE OUTSTANDING PRINCIPAL AMOUNT OF THIS NOTE AT ANY TIME MAY BE LESS THAN THE AMOUNT SHOWN ON THE FACE HEREOF.

THIS NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR UNDER THE SECURITIES OR BLUE SKY LAWS OF ANY STATE IN THE UNITED STATES OR ANY FOREIGN SECURITIES LAWS. BY ITS ACCEPTANCE OF THIS NOTE THE HOLDER OF THIS NOTE IS DEEMED TO REPRESENT TO THE TRUST AND THE INDENTURE TRUSTEE (i) THAT IT IS AN INSTITUTIONAL INVESTOR THAT IS AN "ACCREDITED INVESTOR" AS DEFINED IN RULE 501(a)(1), (2), (3) OR (7) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT (AN "INSTITUTIONAL ACCREDITED INVESTOR") AND THAT IT IS ACQUIRING THIS NOTE FOR ITS OWN ACCOUNT (AND NOT FOR THE ACCOUNT OF OTHERS) OR AS A FIDUCIARY OR AGENT FOR OTHERS (WHICH OTHERS ALSO ARE INSTITUTIONAL ACCREDITED INVESTORS UNLESS THE HOLDER IS A BANK ACTING IN ITS FIDUCIARY CAPACITY) FOR INVESTMENT AND NOT WITH A VIEW TO, OR FOR OFFER OR SALE IN CONNECTION WITH, THE PUBLIC DISTRIBUTION HEREOF OR (ii) THAT IT IS A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT AND IS ACQUIRING SUCH NOTE FOR ITS OWN ACCOUNT (AND NOT FOR THE ACCOUNT OF OTHERS) OR AS A FIDUCIARY OR AGENT FOR OTHERS (WHICH OTHERS ALSO ARE QUALIFIED INSTITUTIONAL BUYERS).

NO SALE, PLEDGE OR OTHER TRANSFER OF THIS NOTE MAY BE MADE BY ANY PERSON UNLESS EITHER (i) SUCH SALE, PLEDGE OR OTHER TRANSFER IS MADE IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT TO THE ISSUER, (ii) SUCH SALE, PLEDGE OR OTHER TRANSFER IS MADE TO AN INSTITUTIONAL ACCREDITED INVESTOR THAT EXECUTES A CERTIFICATE, SUBSTANTIALLY IN THE FORM SPECIFIED IN THE SALE AND SERVICING AGREEMENT, TO THE EFFECT THAT IT IS AN INSTITUTIONAL

A-1

ACCREDITED INVESTOR ACTING FOR ITS OWN ACCOUNT (AND NOT FOR THE ACCOUNT OF OTHERS) OR AS A FIDUCIARY OR AGENT FOR OTHERS (WHICH OTHERS ALSO ARE INSTITUTIONAL ACCREDITED INVESTORS UNLESS THE HOLDER IS A BANK ACTING IN ITS FIDUCIARY CAPACITY), (iii) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT, SUCH SALE, PLEDGE OR OTHER TRANSFER IS MADE IN ACCORDANCE WITH THE PROVISIONS OF RULE 144A TO A PERSON WHO THE ISSUER REASONABLY BELIEVES AFTER DUE INQUIRY IS A "QUALIFIED INSTITUTIONAL BUYER" (AS DEFINED IN RULE 144A), ACTING FOR ITS OWN ACCOUNT (AND NOT FOR THE ACCOUNT OF OTHERS) OR AS A FIDUCIARY OR AGENT FOR OTHERS (WHICH OTHERS ALSO ARE QUALIFIED INSTITUTIONAL BUYERS) TO WHOM NOTICE IS GIVEN THAT THE SALE, PLEDGE OR TRANSFER IS BEING MADE IN RELIANCE ON RULE 144A, OR (iv) SUCH SALE, PLEDGE OR OTHER TRANSFER IS OTHERWISE MADE IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT, IN WHICH CASE (A) THE INDENTURE TRUSTEE SHALL REQUIRE THAT BOTH THE PROSPECTIVE TRANSFEROR AND THE PROSPECTIVE TRANSFEREE CERTIFY TO THE INDENTURE TRUSTEE AND THE TRUST IN WRITING THE FACTS SURROUNDING SUCH TRANSFER, WHICH CERTIFICATION SHALL BE IN FORM AND SUBSTANCE SATISFACTORY TO THE INDENTURE TRUSTEE AND THE TRUST, AND (B) THE INDENTURE TRUSTEE SHALL REQUIRE A WRITTEN OPINION OF COUNSEL (WHICH SHALL NOT BE AT THE EXPENSE OF THE TRUST OR THE TRUSTEE) SATISFACTORY TO THE TRUST AND THE INDENTURE TRUSTEE TO THE EFFECT THAT SUCH TRANSFER WILL NOT VIOLATE THE SECURITIES ACT.

$[      ]

No. [   ]                                               CUSIP NO. [      ]

KEYSTONE OWNER TRUST 1998-P2

CLASS [   ] [   ] ASSET BACKED NOTES

KEYSTONE OWNER TRUST 1998-P2, a business trust organized and existing under the laws of the State of Delaware (herein referred to as the "Trust"), for value received, hereby promises to pay to CEDE & CO., or registered assigns, the principal sum of $[    ] payable in installments on each Distribution Date in an amount equal to the result obtained by multiplying (i) a fraction the numerator of which is the initial principal amount of this Class [   ] Note and the denominator of which is the aggregate principal amount of all Class [   ] Notes by (ii) the aggregate amount, if any, payable from the Note Distribution Account in respect of principal on the Class [   ] Notes pursuant to Section 5.01 of the Sale and Servicing Agreement dated as of August 31, 1998, among the Trust, Keystone Grantor Trust 1998-P2, Keystone Mortgage Corp., Inc. ("Keystone"), as seller, Republic Bank, as servicer and claims administrator, Wilshire Servicing Corporation, as backup servicer and U.S. Bank Trust National Association, a national

A-2

banking association, as indenture trustee (the "Indenture Trustee"), grantor trustee and contract of insurance holder; provided, however, that the entire unpaid principal amount of this Note shall be due and payable on the earlier of (i) the Distribution Date occurring in [         ] (the "Final Maturity Date"), (ii) the Termination Date, if any, pursuant to Section 10.1 of the Indenture dated as of August 31, 1998 between the Trust and the Indenture Trustee or (iii) the date on which an Event of Default shall have occurred and be continuing, if the Indenture Trustee or the Holders of Notes representing not less than a majority of the Outstanding Amount of the Notes have declared the Notes to be immediately due and payable in the manner provided in Section 5.2 of the Indenture. Capitalized terms used but not defined herein are defined in Article I of the Indenture, which also contains rules as to construction that shall be applicable herein.

The Trust will pay interest on this Note at the rate per annum shown above on each Distribution Date until the principal of this Note is paid or made available for payment in full, on the principal amount of this Note outstanding on the preceding Distribution Date (after giving effect to all payments of principal made on the preceding Distribution Date). Interest on this Note will accrue from the first day of the calendar month preceding the month of such Distribution Date through the last day of such calendar month (each such period, an "Accrual Period"). Interest will be computed on the basis of a 360-day year consisting of twelve 30-day months. Such principal of and interest on this Note shall be paid in the manner specified on the reverse hereof.

The principal of and interest on this Note are payable in such coin or currency of the United States of America as at the time of payment is legal tender for payment of public and private debts. All payments made by the Trust with respect to this Note shall be applied first to interest due and payable on this Note as provided above and then to the unpaid principal of this Note.

Reference is made to the further provisions of this Note set forth on the reverse hereof, which shall have the same effect as though fully set forth on the face of this Note.

Unless the certificate of authentication hereon has been executed by the Indenture Trustee whose name appears below by manual signature, this Note shall not be entitled to any benefit under the Indenture referred to on the reverse hereof, or be valid or obligatory for any purpose.

USBT 100496

IN WITNESS WHEREOF, the Trust has caused this instrument to be signed, manually or in facsimile, by its Authorized Officer, as of the date set forth below.

Date: September _____, 1998

KEYSTONE OWNER TRUST 1998-P2

By:    FIRST UNION TRUST COMPANY
       NATIONAL ASSOCIATION,
       not in its individual capacity but solely as
       Owner Trustee under the Trust Agreement

By:    _____
       Authorized Signatory

### INDENTURE TRUSTEE'S CERTIFICATE OF AUTHENTICATION

This is one of the Notes designated above and referred to in the within-mentioned Indenture.

Date: September ____, 1998

U.S. BANK TRUST NATIONAL ASSOCIATION,
not in its individual capacity but solely as Indenture Trustee,

By:    _____
       Authorized Signatory

A-4

USBT 100497

(REVERSE OF NOTE)

This Note is one of a duly authorized issue of Notes of the Trust, designated as its Class [  ] [  ] Asset Backed Notes, Series 1998-P2 (herein called the "Class [  ] Notes"), all issued under the Indenture, to which Indenture and all indentures supplemental thereto reference is hereby made for a statement of the respective rights and obligations thereunder of the Trust, the Indenture Trustee and the Holders of the Notes. The Class [  ] Notes are subject to all terms of the Indenture.

The Class A-1 Notes, the Class A-2 Notes, the Class A-3 Notes, the Class A-4 Notes, the Class A-5 Notes, the Class M-1 Notes, the Class M-2 Notes the Class B-1 Notes, and the Class B-2 Notes (collectively, the "Notes") are and will be secured by the collateral pledged as security therefor as provided in the Indenture.

Principal of the Notes will be payable in accordance with the terms of the Indenture. "Distribution Date" means the 25th day of each month, or, if any such date is not a Business Day, the next succeeding Business Day, commencing in October, 1998.

As described above, the entire unpaid principal amount of this Note shall be due and payable on the earlier of the Final Maturity Date and the Termination Date, if any, pursuant to Section 10.1 of the Indenture. Notwithstanding the foregoing, the entire unpaid principal amount of the Notes shall be due and payable on the date on which an Event of Default shall have occurred and be continuing and the Indenture Trustee, at the direction or upon the prior written consent of the Holders of the Notes representing not less than a majority of the Outstanding Amount of the Notes have declared the Notes to be immediately due and payable in the manner provided in Section 5.2 of the Indenture. All principal payments on the Class [  ] Notes shall be made *pro rata* to the holders of the Class [  ] Notes entitled thereto.

Payments of interest on this Note due and payable on each Distribution Date, together with the related installment of principal, if any, to the extent not in full payment of this Note, shall be made by wire transfer of immediately available funds to, or by check mailed to, the Person whose name appears as the Registered Holder of this Note (or one or more Predecessor Notes) on the Note Register as of the close of business on each Record Date, except that with respect to Notes registered on the Record Date in the name of the nominee of the Clearing Agency (initially, such nominee to be Cede & Co.), payments will be made by wire transfer in immediately available funds to the account designated by such nominee. Such checks shall be mailed to the Person entitled thereto at the address of such Person as it appears on the Note Register as of the applicable Record Date without requiring that this Note be submitted for notation of payment. Any reduction in the principal amount of this Note (or any one or more Predecessor Notes) effected by any payments made on any Distribution Date shall be binding upon all future Holders of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof, whether or not noted hereon. If funds are expected to be available, as provided in the Indenture, for payment in full of the then remaining unpaid principal amount of this Note on a Distribution Date, then the Indenture Trustee, in the name of and on behalf of the Trust, will notify the Person who was the Registered Holder hereof as of the Record Date preceding such Distribution Date by notice mailed or transmitted by

A-5

facsimile prior to such Distribution Date, and the amount then due and payable shall be payable only upon presentation and surrender of this Note at the Indenture Trustee's principal Corporate Trust Office or at the office of the Indenture Trustee's agent appointed for such purposes located in St. Paul, Minnesota.

As provided in the Indenture and the Sale and Servicing Agreement, the Class [   ] Notes may be redeemed (a) in whole, but not in part, at the option of the Trust or the Backup Servicer, on any Distribution Date on and after the date on which the Pool Balance is less than or equal to 10% of the Initial Pool Balance.

As provided in the Indenture and subject to certain limitations set forth therein, the transfer of this Note may be registered on the Note Register upon surrender of this Note for registration of transfer at the office or agency designated by the Trust pursuant to the Indenture, duly endorsed by, or accompanied by a written instrument of transfer in form satisfactory to the Indenture Trustee duly executed by, the Holder hereof or such Holder's attorney duly authorized in writing, with such signature guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in the Securities Transfer Agent's Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended, and thereupon one or more new Notes of authorized denominations and in the same aggregate principal amount will be issued to the designated transferee or transferees. No service charge will be charged for any registration of transfer or exchange of this Note, but the Trust may be required to pay a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any such registration of transfer or exchange.

Each Noteholder or Note Owner, by acceptance of a Note or, in the case of a Note Owner, a beneficial interest in a Note, covenants and agrees that no recourse may be taken, directly or indirectly, with respect to the obligations of the Trust, the Owner Trustee or the Indenture Trustee on the Notes or under the Indenture or any certificate or other writing delivered in connection therewith, against (i) the Indenture Trustee or the Owner Trustee in its individual capacity, (ii) any owner of a beneficial interest in the Trust or (iii) any partner, owner, beneficiary, agent, officer, director or employee of the Indenture Trustee or the Owner Trustee in its individual capacity, any holder of a beneficial interest in the Trust, the Owner Trustee or the Indenture Trustee or of any successor or assign of the Indenture Trustee or the Owner Trustee in its individual capacity, except as any such Person may have expressly agreed and except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity.

Each Noteholder or Note Owner, by acceptance of a Note or, in the case of a Note Owner, a beneficial interest in a Note, covenants and agrees by accepting the benefits of the Indenture that such Noteholder or Note Owner will not at any time institute against the Company or the Trust, or join in any institution against the Company or the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under any United States

USBT 100499

federal or state bankruptcy or similar law in connection with any obligations relating to the Notes, the Indenture or the Transaction Documents.

The Trust has entered into the Indenture and this Note is issued with the intention that, for federal, state and local income, single business and franchise tax purposes, the Notes will qualify as indebtedness of the Trust secured by the Trust Estate. Each Noteholder, by acceptance of a Note (and each Note Owner by acceptance of a beneficial interest in a Note), agrees to treat the Notes for federal, state and local income, single business and franchise tax purposes as indebtedness of the Trust.

Prior to the due presentment for registration of transfer of this Note, the Trust, the Indenture Trustee and any agent of the Trust or the Indenture Trustee may treat the Person in whose name this Note (as of the day of determination or as of such other date as may be specified in the Indenture) is registered as the owner hereof for all purposes, whether or not this Note be overdue, and none of the Trust, the Indenture Trustee or any such agent shall be affected by notice to the contrary.

The Indenture permits, with certain exceptions as therein provided, the amendment thereof and the modification of the rights and obligations of the Trust and the rights of the Holders of the Notes under the Indenture at any time by the Trust with the consent of the Holders of Notes representing a majority of the Outstanding Amount of all Notes at the time Outstanding. The Indenture also contains provisions permitting the Holders of Notes representing specified percentages of the Outstanding Amount of the Notes, on behalf of the Holders of all the Notes, to waive compliance by the Trust with certain provisions of the Indenture and certain past defaults under the Indenture and their consequences. Any such consent or waiver by the Holder of this Note (or any one or more Predecessor Notes) shall be conclusive and binding upon such Holder and upon all future Holders of this Note and of any Note issued upon the registration of transfer hereof or in exchange hereof or in lieu hereof whether or not notation of such consent or waiver is made upon this Note. The Indenture also permits the Indenture Trustee to amend or waive certain terms and conditions set forth in the Indenture without the consent of Holders of the Notes issued thereunder.

The term "Trust" as used in this Note includes any successor to the Trust under the Indenture.

The Notes are issuable only in registered form in denominations as provided in the Indenture, subject to certain limitations therein set forth.

This Note and the Indenture shall be construed in accordance with the laws of the State of New York, without reference to its conflict of law provisions, and the obligations, rights and remedies of the parties hereunder and thereunder shall be determined in accordance with such laws.

No reference herein to the Indenture and no provision of this Note or of the Indenture shall alter or impair the obligation of the Trust, which is absolute and unconditional, to pay the

A-7

USBT 100500

principal of and interest on this Note at the times, place and rate, and in the coin or currency herein prescribed.

Anything herein to the contrary notwithstanding, except as expressly provided in the Transaction Documents, none of the Trust in its individual capacity, the Owner Trustee in its individual capacity, any owner of a beneficial interest in the Trust, or any of their respective partners, beneficiaries, agents, officers, directors, employees or successors or assigns shall be personally liable for, nor shall recourse be had to any of them for, the payment of principal of or interest on this Note or performance of, or omission to perform, any of the covenants, obligations or indemnifications contained in the Indenture. The Holder of this Note by its acceptance hereof agrees that, except as expressly provided in the Transaction Documents, in the case of an Event of Default under the Indenture, the Holder shall have no claim against any of the foregoing for any deficiency, loss or claim therefrom; provided, however, that nothing contained herein shall be taken to prevent recourse to, and enforcement against, the assets of the Trust for any and all liabilities, obligations and undertakings contained in the Indenture or in this Note.

USBT 100501

ASSIGNMENT

Social Security or taxpayer I.D. or other identifying number of assignee: _____

FOR VALUE RECEIVED, the undersigned hereby sells, assigns and transfers unto:

_____

(name and address of assignee)

the within Note and all rights thereunder, and hereby irrevocably constitutes and appoints , attorney, to transfer said Note on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

_____ */

Signature Guaranteed:

_____ */

*/ NOTICE: The signature to this assignment must correspond with the name of the registered owner as it appears on the face of the within Note in every particular, without alteration, enlargement or any change whatever.  Such signature must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Note Registrar, which requirements include membership or participation in STAMP or such other "signature guarantee program" as may be determined by the Note Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

EXHIBIT B

## FORM OF INVESTMENT LETTER

U.S. Bank Trust National Association
   as Indenture Trustee
U.S. Bank Trust Center
180 East Fifth Street
St. Paul, Minnesota 55101

Ladies and Gentlemen:

In connection with our proposed purchase of $        aggregate principal amount of Asset Backed Notes, Series 1998-P1 [Class A][Class M][Class B] (the "Notes"), we confirm that:

1. We understand that the Notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), and may not be sold except as permitted in the following sentence. We understand and agree, on our own behalf and on behalf of any accounts for which we are acting as hereinafter stated, (x) that such Notes are being offered only in a transaction not involving any public offering within the meaning of the Securities Act and (y) that such Notes may be resold, pledged or transferred only (i) to an institutional investor that is an "accredited investor" as defined in Rule 501(a)(1),(2),(3) or (7) (an "Institutional Accredited Investor") under the Securities Act (as indicated by the box checked by the transferor on the Certificate of Transfer on the reverse of the Note) acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which others also are Institutional Accredited Investors unless the holder is a bank acting in its fiduciary capacity) that executes a certificate substantially in the form hereof, (ii) so long as such Note is eligible for resale pursuant to Rule 144A under the Securities Act ("Rule 144A"), to a person whom we reasonably believe after due inquiry is a "qualified institutional buyer" as defined in Rule 144A, acting for its own account (and not for the account of others) or as a fiduciary or agent for others (which others also are "qualified institutional buyers") to whom notice is given that the resale, pledge or transfer is being made in reliance on Rule 144A or (iii) in a sale, pledge or other transfer made in a transaction otherwise exempt from the registration requirements of the Securities Act, in which case (A) the Indenture Trustee shall require that both the prospective transferor and the prospective transferee certify to the Indenture Trustee and Keystone Owner Trust 1998-P2 (the "Trust") in writing the facts surrounding such transfer, which certification shall be in form and substance satisfactory to the Indenture Trustee and the Trust and (B) the Indenture Trustee shall require a written opinion of counsel (which will not be at the expense of the Trust or the Indenture Trustee) satisfactory to the Trust and the Indenture Trustee to the effect that such transfer will not violate the Securities Act, in each case in accordance with any applicable securities laws of any state of the United States. We will notify any purchaser of the Note from us of the above resale restrictions, if then applicable. We further

B-1

understand that in connection with any transfer of the Notes by us that the Trust and the Indenture Trustee may request, and if so requested we will furnish, such certificates and other information as they may reasonably require to confirm that any such transfer complies with the foregoing restrictions.

2.                            [CHECK ONE]

☐      (a)  We are an institutional investor and an "accredited investor" (as defined in Rule 501(a)(1),(2),(3) or (7) of Regulation D under the Securities Act) acting for our own account (and not for the account of others) or as a fiduciary or agent for others (which others also are Institutional Accredited Investors unless we are a bank acting in its fiduciary capacity).  We have such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of our investment in the Notes, and we and any accounts for which we are acting are each able to bear the economic risk of our or their investment for an indefinite period of time.  We are acquiring the Notes for investment and not with a view to, or for offer and sale in connection with, a public distribution.

☐      (b)  We are a "qualified institutional buyer" as defined under Rule 144A under the Securities Act and are acquiring the Notes for our own account (and not for the account of others) or as a fiduciary or agent for others (which others also are "qualified institutional buyers").  We are familiar with Rule 144A under the Securities Act and are aware that the seller of the Notes and other parties intend to rely on the statements made herein and the exemption from the registration requirements of the Securities Act provided by Rule 144A.

3.   We understand that the Trust and Bear Stearns & Co. Inc. and Coast Partners Securities, Inc. (the "Placement Agents"), as the placement agent of the Notes, and others will rely upon the truth and accuracy of the foregoing acknowledgments, representations and agreements, and we agree that if any of the acknowledgments, representations and warranties deemed to have been made by us by our purchase of the Notes, for our own account or for one or more accounts as to each of which we exercise sole investment discretion, are no longer accurate, we shall promptly notify the Trust and the Placement Agent.

USBT 100504

4.  You are entitled to rely upon this letter and you are irrevocably authorized to produce this letter or a copy hereof to any interested party in any administrative or legal proceeding or official inquiry with respect to the matters covered hereby.

Very truly yours,

_____
(Name of Purchaser)

By:_____

Date:_____

B-3

USBT 100505

EXHIBIT C

TRANSFER CERTIFICATE

U.S. Bank Trust National Association

_____

_____

Attention: _____

_____

_____

Re:    Indenture, dated as of August 31, 1998, between U.S. Bank Trust National Association, and Keystone Owner Trust 1998-P2 Asset-Backed Notes, Series 1998-P2

Ladies and Gentlemen:

The undersigned (the "Transferee") has agreed to purchase from _____ (the "Transferor") the following:

[Insert Certificate(s) to be transferred]

A.   Rule 144A "Qualified Institutional Buyers" should complete this section

I.   The Transferee is (check one):

_____       (i)     An insurance company, as defined in Section 2(13) of the Securities Act of 1933, as amended (the "Securities Act"), (ii) an investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"), (iii) a business development company as defined in Section 2(a)(48) of the Securities Act, (iv) a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the Small Business Investment Act of 1958, (v) a plan established and maintained by a state, its political subdivisions, or any agency or instrumentality of a state or its political subdivisions, for the benefit of its employees, (vi) an employee benefit plan within the meaning of Title I of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (vii) a business development company as defined in

C-1

Section 202(a)(22) of the Investment Advisors Act of 1940, (viii) an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation (other than a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution referenced in Section 3(a)(2) of the Securities Act or a foreign bank or savings and loan association or equivalent institution), partnership, or Massachusetts or similar business trust; or (ix) an investment advisor registered under the Investment Advisors Act of 1940, which, for each of (i) through (ix), owns and invests on a discretionary basis at least $100 million in securities other than securities of issuers affiliated with the Transferee, securities issued or guaranteed by the United States or a person controlled or supervised by and acting as an instrumentality of the government of the United States pursuant to authority granted by the Congress of the United States, bank deposit notes and certificates of deposit, loan participations, repurchase agreements, securities owned but subject to a repurchase agreement, and currency, interest rate and commodity swaps (collectively, "Excluded Securities");

—— a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") that in the aggregate owns and invests on a discretionary basis at least $10 million of securities other than Excluded Securities and securities constituting the whole or part of an unsold allotment to, or subscription by, Transferee as a participant in a public offering;

—— an investment company registered under the Investment Company Act that is part of a family of investment companies (as defined in Rule 144A of the Securities and Exchange Commission) which own in the aggregate at least $100 million in securities other than Excluded Securities and securities of issuers that are part of such family of investment companies;

—— an entity, all of the equity owners of which are entities described in this Paragraph A(I);

—— a bank as defined in Section 3(a)(2) of the Securities Act, any savings and loan association or other institution as referenced in Section 3(a)(5)(A) of the Securities Act, or any foreign bank or savings and loan association or equivalent institution that in the aggregate owns and invests on a discretionary basis at least $100 million in securities other than Excluded Securities and has an

USBT 100507

audited net worth of at least $25 million as demonstrated in its latest annual financial statements, as of a date not more than 16 months preceding the date of transfer of the Residual Instruments to the Transferee in the case of a U.S. Bank Trust or savings and loan association, and not more than 18 months preceding such date in the case of a foreign bank or savings association or equivalent institution.

II.    The Transferee is acquiring such Class B-2 Notes solely for its own account, for the account of one or more others, all of which are "Qualified Institutional Buyers" within the meaning of Rule 144A, or in its capacity as a dealer registered pursuant to Section 15 of the Exchange Act acting in a riskless principal transaction on behalf of a "Qualified Institutional Buyer". The Transferee is not acquiring such Class B-2 Notes with a view to or for the resale, distribution, subdivision or fractionalization thereof which would require registration of the Certificates under the Securities Act.

III.  The Transferee is acquiring such Class B-2 Notes solely for its own account, for investment, and not with a view to or for the resale, distribution, subdivision or fractionalization thereof which would require registration of the Residual Instruments under the Securities Act.

C.  If the Transferee is unable to complete one of paragraph A(I) above, the Transferee must furnish an opinion in form and substance satisfactory to the Trustee of counsel satisfactory to the Trustee to the effect that such purchase will not violate any applicable federal or state securities laws.

[To be completed by any Transferee acquiring an interest in the Class B-2 Notes]

D.  The Transferee represents that it is not (A) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) a "plan" within the meaning of Section 4975(e)(1) of the Code (any such plan or employee benefit plan, a "Plan") or (C) any entity, including an insurance company separate account or general account, whose underlying assets include plan assets by reason of a plan's investment in the entity and is not directly or indirectly purchasing such Class B-2 Notes on behalf of, as investment manager of, as named fiduciary of, as trustee of, or with assets of a Plan.

By its acceptance of the Notes, each Prospective Noteholder thereof agrees and acknowledges that no legal or beneficial interest in all or any portion of the Class B-2 Notes may be transferred directly or indirectly to an individual, corporation, partnership or other person unless such transferee is not a Non-U.S. Person (any such person being referred to herein as a "Non-permitted Foreign Holder"), and any such purported transfer shall be void and have no effect.

USBT 100508

(iii)    the Transferee is an "accredited investor" as defined in Rule 501(a) of Regulation D pursuant to the 1933 Act.

Very                    truly                    yours,
[NAME OF PURCHASER]

By: _____
Title: _____


Dated:

THE FOREGOING IS ACKNOWLEDGED THIS ____ DAY OF _____, 199_.

[NAME OF SELLER]
By:_____
Title:_____

C-4

# EXHIBIT C

EXHIBIT C

EXECUTION COPY

---

TRUST AGREEMENT

between

KEYSTONE MORTGAGE CORP., INC.,
as the Seller,

and

FIRST UNION TRUST COMPANY, NATIONAL ASSOCIATION
as Owner Trustee

Dated as of August 31, 1998

KEYSTONE OWNER TRUST 1998-P2

---

PPLP 00001

**Table of Contents**

Page

ARTICLE I

DEFINITIONS

Section 1.1   Capitalized Terms. ........................................................................... 1
Section 1.2   Other Definitional Provisions.4

ARTICLE II

ORGANIZATION

Section 2.1    Name. .............................................................................................. 5
Section 2.2    Office. .............................................................................................. 5
Section 2.3    Purposes and Powers. ..................................................................... 5
Section 2.4    Appointment of Owner Trustee. ..................................................... 6
Section 2.5    Initial Capital Contribution of Certificateholder Trust Estate. ................... 6
Section 2.6    Declaration of Trust. ...................................................................... 6
Section 2.7    Title to Trust Property.7
Section 2.8    Situs of Trust. ................................................................................ 7
Section 2.9    Representations and Warranties of the Seller; Covenant of the Seller. ........................................................................................ 7
Section 2.10   Federal Income Tax Allocations. ................................................... 9

ARTICLE III

CERTIFICATES AND TRANSFER OF INTERESTS

Section 3.1    [RESERVED] .................................................................................. 10
Section 3.2    The Certificates. ............................................................................. 10
Section 3.3    Execution, Authentication and Delivery of Certificates. ................ 10
Section 3.4    Registration of Transfer and Exchange of the Certificates. ........... 10
Section 3.5    Mutilated, Destroyed, Lost or Stolen Certificates. ........................ 11
Section 3.6    Persons Deemed Certificateholders. .............................................. 12
Section 3.7    Access to List of Certificateholders' Names and Addresses. .......... 12
Section 3.8    Maintenance of Office or Agency. ................................................. 12
Section 3.9    [RESERVED] .................................................................................. 12
Section 3.10   Restrictions on Transfer of Certificates. ........................................ 12

i

# ARTICLE IV

## ACTIONS BY OWNER TRUSTEE

Section 4.1 Prior Notice to Certificateholders with Respect to Certain Matters; Covenants of Trust and Certificateholder. ............................................. 16
Section 4.2 Action by Certificateholders with Respect to Certain Matters. ................ 18
Section 4.3 Action by Certificateholders with Respect to Bankruptcy. ..................... 19
Section 4.4 Restrictions on Certificateholders' Power. .............................................. 19
Section 4.5 Majority Control. ..................................................................................... 19

# ARTICLE V

## APPLICATION OF TRUST FUNDS; CERTAIN DUTIES

Section 5.1 Establishment of Trust Account. .............................................................. 20
Section 5.2 Application Of Trust Funds. .................................................................... 20
Section 5.3 Method of Payment. ................................................................................. 21
Section 5.4 Segregation of Moneys; No Interest. ....................................................... 22
Section 5.5 Accounting and Reports to the Certificateholders, the Internal Revenue Service and Others. .............................................................. 22
Section 5.6 Signature on Returns. ............................................................................... 22

# ARTICLE VI

## AUTHORITY AND DUTIES OF OWNER TRUSTEE

Section 6.1 General Authority. ................................................................................... 23
Section 6.2 General Duties. ........................................................................................ 23
Section 6.3 Action upon Instruction. .......................................................................... 24
Section 6.4 No Duties Except as Specified in this Agreement, the Transaction Documents or in Instructions. ............................................................... 25
Section 6.5 No Action Except Under Specified Documents or Instructions. .............. 25
Section 6.6 Restrictions. ............................................................................................. 25

# ARTICLE VII

## CONCERNING THE OWNER TRUSTEE

Section 7.1 Acceptance of Trusts and Duties. ............................................................. 26
Section 7.2 Furnishing of Documents. ........................................................................ 27
Section 7.3 Representations and Warranties. ............................................................... 27
Section 7.4 Reliance: Advice of Counsel. ................................................................... 28
Section 7.5 Not Acting in Individual Capacity. .......................................................... 29
Section 7.6 Owner Trustee Not Liable for Certificates. .............................................. 29

ii

PPLP 00003

Section 7.7     Owner Trustee May Own Certificates. ..................................................... 29
Section 7.8     Licenses. ................................................................................................ 30
Section 7.9     Rule 144A Information. ........................................................................... 30

## ARTICLE VIII

### COMPENSATION OF OWNER TRUSTEE

Section 8.1     Owner Trustee's Fees and Expenses. ...................................................... 31
Section 8.2     Indemnification. ..................................................................................... 31
Section 8.3     Payments to the Owner Trustee. ............................................................ 31

## ARTICLE IX

### TERMINATION OF TRUST AGREEMENT

Section 9.1     Termination of Trust Agreement. ........................................................... 32

## ARTICLE X

### SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 10.1     Eligibility Requirements for Owner Trustee. ........................................ 34
Section 10.2     Resignation or Removal of Owner Trustee. .......................................... 34
Section 10.3     Successor Owner Trustee. .................................................................... 35
Section 10.4     Merger or Consolidation of Owner Trustee. ......................................... 35
Section 10.5     Appointment of a Separate Owner Trustee or a Co-Owner Trustee. ......... 35

## ARTICLE XI

### MISCELLANEOUS

Section 11.1     Supplements and Amendments. ........................................................... 38
Section 11.2     No Legal Title to Certificateholder Trust Estate in Certificateholders. ................................................................................... 39
Section 11.3     Limitations on Rights of Others. ......................................................... 39
Section 11.4     Notices. ............................................................................................... 39
Section 11.5     Severability. ........................................................................................ 40
Section 11.6     Separate Counterparts. ........................................................................ 40
Section 11.7     Successors and Assigns. ...................................................................... 40
Section 11.8     No Petition. .......................................................................................... 40
Section 11.9     Covenants of Seller. ............................................................................ 40
Section 11.10    No Recourse. ....................................................................................... 40
Section 11.11    Headings. ............................................................................................. 40
Section 11.12    GOVERNING LAW. ............................................................................ 40

iii

PPLP 00004

Section 11.13  Inconsistencies with Sale and Servicing Agreement. ................................ 41
Section 11.14  No Liability of the Certificateholder ........................................................ 41

EXHIBIT A        Form of Certificate
EXHIBIT B        Certificate of Trust
EXHIBIT C        Form of Transfer Certificate

iv

PPLP 00005

TRUST AGREEMENT, dated as of August 31, 1998, between KEYSTONE MORTGAGE CORP., INC., a West Virginia corporation (the "Seller"), and FIRST UNION TRUST COMPANY, NATIONAL ASSOCIATION, a national banking association, as Owner Trustee (the "Owner Trustee").

## ARTICLE I

## DEFINITIONS

Section 1.1    Capitalized Terms.    For all purposes of this Agreement, the following terms shall have the meanings set forth below:

"Agreement" shall mean this Trust Agreement, as the same may be amended and supplemented from time to time.

"Administration Agreement" shall mean the Administration Agreement, dated as of August 31, 1998 among the Issuer, the Seller, and U.S. Bank Trust National Association, as Administrator.

"Administrator" shall mean U.S. Bank Trust National Association, or any successor in interest thereto, in its capacity as Administrator under the Administration Agreement.

"Business Trust Statute" shall mean Chapter 38 of Title 12 of the Delaware Code, 12 Del. Code § 3801 et seq., as the same may be amended from time to time.

"Certificate" shall mean each of the certificates of beneficial interest issued hereunder substantially in the form of Exhibit A hereto attached.

"Certificate Distribution Account" shall have the meaning assigned to such term in the Sale and Servicing Agreement.

"Certificate of Trust" shall mean the Certificate of Trust in the form of Exhibit B to be filed for the Trust pursuant to Section 3810(a) of the Business Trust Statute.

"Certificate Register" and "Certificate Registrar" shall mean the register mentioned in, and the registrar appointed pursuant to, Section 3.4.

"Certificateholder" or "Holder" shall mean a Person in whose name a Certificate is registered on the Certificate Register.

"Certificateholder Trust Estate" shall mean the contribution of $1 referred to in Section 2.5 and the Trust Estate (as defined in the Indenture).

"Clearing Agency" shall mean an organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"Clearing Agency Participant" shall mean a broker, dealer, bank, other financial institution or other Person for whom from time to time a Clearing Agency effects book-entry transfers and pledges of securities deposited with the Clearing Agency.

"Code" shall mean the Internal Revenue Code of 1986, as amended, and the Treasury Regulations.

"Collateral" shall have the meaning set forth in the Indenture.

"Corporate Trust Office" shall mean, with respect to the Owner Trustee, the principal corporate trust office of the Owner Trustee located at One Rodney Square, First Floor, 920 King Street, Wilmington, DE 19801, Attention: Corporate Trust Administration; or at such other address in the State of Delaware as the Owner Trustee may designate by notice to the Certificateholders and the Seller, or the principal corporate trust office of any successor Owner Trustee (the address (which shall be in the State of Delaware) of which the successor owner trustee will notify the Certificateholders and the Seller).

"ERISA" shall have the meaning assigned thereto in Section 3.10.

"Exchange Act" shall mean the Securities Exchange Act of 1934, as amended.

"Expenses" shall have the meaning assigned to such term in Section 8.2.

"Indenture" shall mean the Indenture, dated as of August 31, 1998, by and between the Issuer and the Indenture Trustee.

"Indenture Trustee" means U.S. Bank Trust National Association, as Indenture Trustee under the Indenture.

"Issuer" or "Trust" shall mean Keystone Owner Trust 1998-P2, the Delaware business trust created pursuant to this Agreement.

"Non-permitted Foreign Holder" shall have the meaning set forth in Exhibit C hereto.

"Non-U.S. Person" shall mean a beneficial owner of the Certificates or of the Notes that is for U.S. Federal income tax purposes not (i) a citizen or resident of the United States, (ii) a corporation (or entity treated as a corporation for tax purposes) created or organized in the United States or of any state thereof, including for this purpose, the District of Columbia; (iii) a partnership ( or entity treated as a partnership for tax purposes) organized in the United States or under the laws of the United States or of any state thereof, including for this purpose the District of Columbia (unless provided otherwise by future Treasury Regulations); (iv) an estate whose income is includible in gross income for United States Tax purposes regardless of its source; or (v) a trust, if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have authority to control substantial decisions of the trust. Notwithstanding the last clause of the preceding sentence, certain trusts in

existence on August 20, 1996, and treated as U.S. persons prior to such date, may elect to continue to be U.S. persons.

"Owner Trustee" shall mean First Union Trust Company, National Association, a national banking association, not in its individual capacity but solely as owner trustee under this Agreement, and any successor owner trustee hereunder.

"Paying Agent" or "Certificate Paying Agent" shall mean U.S. Bank Trust National Association or any successor in interest thereto or any other paying agent or co-paying agent appointed pursuant to the Sale and Servicing Agreement and authorized by the Issuer to make payments to and distributions from the Certificate Distribution Account, including payment of principal of or interest on the Certificates on behalf of the Issuer.

"Percentage Interest" shall mean the percentage portion of all of the Certificates evidenced by a Certificate as stated on the face of such Certificate.

"Placement Agents" shall mean Bear, Stearns & Co. Inc. and Coast Partners Securities, Inc.

"Plan" shall have the meaning assigned to such term in Section 3.10.

"Prospective Certificateholder" shall mean any prospective purchaser or prospective transferee of any Certificate.

"Rating Agency Condition" shall mean, with respect to certain actions requiring Rating Agency consent, that each Rating Agency shall have been given 10 days (or such shorter period as is acceptable to each Rating Agency) prior notice thereof and that each of the Rating Agencies shall have notified the Seller and the Owner Trustee in writing that such action will not result in a reduction or withdrawal of the then current rating of the Notes and Certificates.

"Record Date" shall mean as to each Distribution Date (other than the initial Distribution Date) the last Business Day of the month immediately preceding the month in which such Distribution Date occurs; and as to the initial Distribution Date, the Closing Date.

"Sale and Servicing Agreement" shall mean the Sale and Servicing Agreement dated as of the date hereof, among the Trust, as Issuer, the Grantor Trust, Keystone Mortgage Corp., Inc., as Seller, U.S. Bank Trust National Association as Indenture Trustee, Grantor Trustee and Contract of Insurance Holder, Republic Bank as Servicer and Claims Administrator, and Wilshire Servicing Corporation, as Backup Servicer.

"Secretary of State" shall mean the Secretary of State of the State of Delaware.

"Transaction Documents" shall have the meaning set forth in the Sale and Servicing Agreement.

PPLP 00008

"Treasury Regulations" shall mean regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

Section 1.2     Other Definitional Provisions.

(a)     Capitalized terms used herein and not otherwise defined herein have the meanings assigned to them in the Sale and Servicing Agreement or, if not defined therein, in the Indenture.

(b)     All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(c)     As used in this Agreement and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Agreement or in any such certificate or other document, and accounting terms partly defined in this Agreement or in any such certificate or other document to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles. To the extent that the definitions of accounting terms in this Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Agreement or in any such certificate or other document shall control.

(d)     The words "hereof", "herein", "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; Section and Exhibit references contained in this Agreement are references to Sections and Exhibits in or to this Agreement unless otherwise specified; and the term "including" shall mean "including without limitation".

(e)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(f)     Any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

4

PPLP 00009

# ARTICLE II

## ORGANIZATION

Section 2.1    Name.    The name of the Trust created hereby shall be "Keystone Owner Trust 1998-P2", in which name the Owner Trustee, on behalf of the Trust, shall have power and authority and is hereby authorized and empowered to conduct the business of the Trust, make and execute contracts and other instruments on behalf of the Trust and sue and be sued.

Section 2.2    Office.    The office of the Trust shall be in care of the Owner Trustee at the Corporate Trust Office or at such other address in Delaware as the Owner Trustee may designate by written notice to the Certificateholders and the Seller.

Section 2.3    Purposes and Powers.    The purpose of the Trust is, and the Trust shall have power and authority, without the need for further action on the part of the Trust, and the Owner Trustee shall have power and authority and is hereby authorized and empowered in the name and on behalf of the Trust, to do or cause to be done all acts and things necessary, appropriate, or convenient to cause the Trust, to engage in the following activities:

(i)    to execute, deliver and issue the Notes pursuant to the Indenture and to authorize, execute, issue and deliver the Certificates pursuant to this Agreement and to sell such Notes;

(ii)    to assign, grant, transfer, pledge, mortgage and convey the Collateral pursuant to the Indenture as security for the Notes (the Trust's execution and delivery of the Indenture constituting all necessary action under this Agreement for the Trust so to Grant the Collateral to the Indenture Trustee), and to hold, manage and distribute to the Certificateholders pursuant to the terms of the Sale and Servicing Agreement and this Agreement any portion of the Certificateholder Trust Estate released from the lien of, and remitted to the Trust pursuant to, the Indenture;

(iii)    to acquire, hold, manage and pledge, the Grantor Trust Certificate and the other assets of the trust and proceeds therefrom;

(iv)    to enter into, execute and deliver and perform its obligations under the Transaction Documents to which it is a party;

(v)    to engage in those activities, including entering into agreements, that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith; and

(vi)    subject to compliance with the Transaction Documents, to engage in such other activities as may be required in connection with conservation of the Certificateholder Trust Estate and the making of distributions to the Certificateholders and the Noteholders;

PPLP 00010

The Trust is hereby authorized to engage in the foregoing activities. The Trust shall not engage in any activity other than in connection with the foregoing or other than as required or authorized by the terms of this Agreement or the Transaction Documents.

Section 2.4     Appointment of Owner Trustee.     The Seller hereby appoints the Owner Trustee as trustee of the Trust effective as of the date hereof, to have all the rights, powers, authority, authorization and duties set forth herein.

Section 2.5     Initial Capital Contribution of Certificateholder Trust Estate.     The Seller hereby assigns, transfers, conveys and sets over to the Owner Trustee, as of the date hereof, the sum of $1. The Owner Trustee hereby acknowledges receipt in trust from the Seller, as of the date hereof, of the foregoing contribution, which shall constitute the initial Certificateholder Trust Estate and shall be deposited in the Certificate Distribution Account. The Seller shall pay organizational expenses of the Trust as they may arise or shall, upon the request of the Owner Trustee, promptly reimburse the Owner Trustee for any such expenses paid by the Owner Trustee.

Section 2.6     Declaration of Trust.     The Owner Trustee hereby declares that it will hold the Certificateholder Trust Estate in trust upon and subject to the conditions set forth herein for the use and benefit of the Certificateholders, subject to the obligations of the Trust under the Transaction Documents. It is the intention of the parties hereto that the Trust constitute a business trust under the Business Trust Statute and that this Agreement constitute the governing instrument of such business trust. It is the intention of the parties hereto that, solely for income and franchise tax purposes, (i) so long as there is a sole Certificateholder, the Trust shall be treated as a security arrangement, with the assets of the Trust being the Grantor Trust Certificate and other assets held by the Trust, the owner of the Grantor Trust Certificate and other assets held by the Trust being the sole Certificateholder and the Notes being non-recourse debt of the sole Certificateholder and (ii) if there is more than one Certificateholder, the Trust shall be treated as a partnership for income and franchise tax purposes, with the assets of the partnership being the Grantor Trust Certificate and other assets held by the Trust, the partners of the partnership being the Certificateholders and the Notes being debt of the partnership. The parties agree that, unless otherwise required by appropriate tax authorities, the Trust will file or cause to be filed annual or other necessary returns, reports and other forms consistent with the characterization of the Trust as a partnership for such tax purposes. Effective as of the date hereof, the Owner Trustee shall have all rights, powers, authority and authorization set forth herein and in the Business Trust Statute with respect to accomplishing the purposes of the Trust. The Owner Trustee is hereby authorized, empowered and directed to execute and file the Certificate of Trust with the Secretary of State of the State of Delaware.

Section 2.7     Title to Trust Property.

(a)     Subject to the Indenture, legal title to all the Certificateholder Trust Estate shall be vested at all times in the Trust as a separate legal entity except where applicable law in any jurisdiction requires title to any part of the Certificateholder Trust Estate to be vested in a

6

PPLP 00011

trustee or trustees, in which case title shall be deemed to be vested in the Owner Trustee and/or a separate trustee, as the case may be.

(b)     The Certificateholders shall not have legal title to any part of the Certificateholder Trust Estate.  No transfer by operation of law or otherwise of any interest of the Certificateholders shall operate to terminate this Agreement or the trusts hereunder or entitle any transferee to an accounting or to the transfer to it of any part of the Certificateholder Trust Estate.

Section 2.8     Situs of Trust.   The Trust will be located and administered in the State of Delaware.  All bank accounts maintained by the Owner Trustee on behalf of the Trust shall be located in the State of Delaware or North Carolina.  The Trust shall not have any employees; provided, however, that nothing herein shall restrict or prohibit the Owner Trustee from having employees within or without the State of Delaware.  Payments will be received by the Trust only in Delaware and payments will be made by the Trust only from Delaware.  The only office of the Trust will be at the Corporate Trust Office in Delaware.

Section 2.9     Representations and Warranties of the Seller; Covenant of the Seller.

(a)     The Seller hereby represents and warrants to the Owner Trustee (as such and in its individual capacity) as of the Closing Date that:

(i)     The Seller is a validly existing corporation in good standing under the laws of the United States of America, with the full right, power and authority (corporate and other) to own, lease and operate its properties and conduct its business as such properties are currently owned and such business is currently conducted;

(ii)     The Seller has full power and authority to execute, deliver and perform, and to enter into and consummate all transactions required of it by this Agreement and to which it is a party; has duly authorized the execution, delivery and performance of this Agreement; has duly executed and delivered this Agreement and; when duly authorized, executed and delivered by the other parties hereto and thereto, this Agreement and the other Transaction Documents to which the Seller is a party will constitute the legal, valid and binding obligations of the Seller enforceable against it in accordance with their respective terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a proceeding in equity or at law;

(iii)     None of (a) the execution and delivery of this Agreement, (b) the consummation of the transactions required of it hereunder or under any other Transaction Document to which it is a party, or (c) the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with, or result in a breach of any of, the terms, conditions or provisions of the Seller's charter or by-laws or any legal restriction or any material agreement or instrument to which the Seller is now a party or by which it is

7

PPLP 00012

bound, or which would adversely affect in any material respect the creation and administration of the Trust as contemplated hereby, or constitute a material default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject which violation might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Seller or its properties or might have consequences that would materially and adversely affect its performance hereunder;

(iv)    There is no action, suit, proceeding, investigation or litigation pending against the Seller or, to its knowledge, threatened, which, if determined adversely to the Seller, would materially adversely affect the sale of the Grantor Trust Certificate, the issuance of the Certificates, the execution, delivery or enforceability of this Agreement or any Transaction Document to which it is a party or which would have a material adverse affect on the financial condition of the Seller;

(v)    The Seller is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Seller or its properties or might have consequences that would materially and adversely affect its performance hereunder;

(vi)    No statement, report or other document furnished pursuant to this Agreement by the Seller (except the Files) or in connection with the transactions contemplated hereby contains any untrue statement of a material fact or facts or fails to state a material fact necessary to make the statements contained herein or therein not misleading;

(vii)    The Trust will not constitute an investment company within the meaning of the Investment Company Act of 1940, as amended;

(viii)    The Seller is a supervised lender in good standing under 24 C.F.R. Section 202.4 and is authorized to originate, purchase, hold, service and/or sell loans insured under 24 C.F.R. Part 201, pursuant to a valid Contract of Insurance, Number 71529-2.

(b)    The Seller covenants with the Owner Trustee that during the continuance of this Agreement it will comply in all respects with the provisions of its Articles of Incorporation in effect from time to time. The Seller covenants to take no action that would cause the Trust to be characterized as a taxable mortgage pool as described in Section 7701(i) of the Code.

Section 2.10    <u>Federal Income Tax Allocations</u>.  Net income of the Trust for any month, as determined for Federal income tax purposes (and each item of income, gain, loss and

8

deduction entering into the computation thereof), shall be allocated to the Certificateholders, on a pro rata basis in accordance with their Percentage Interests.

PPLP 00014

ARTICLE III

CERTIFICATES AND TRANSFER OF INTERESTS

Section 3.1     [RESERVED]

Section 3.2     The Certificates.   The Certificates shall not be issued with a principal or notional amount.   The Certificates shall be executed in the name and on behalf of the Trust by manual or facsimile signature of an authorized officer of the Owner Trustee and the Owner Trustee shall have power and authority, and is hereby authorized and empowered, in the name and on behalf of the Trust, to authorize, execute, authenticate, issue, and deliver the Certificates. Certificates bearing the manual or facsimile signatures of individuals who were, at the time when such signatures shall have been affixed, authorized to sign on behalf of the Trust, shall be valid and binding obligations of the Trust, notwithstanding that such individuals or any of them shall have ceased to be so authorized prior to the authentication and delivery of such Certificates or did not hold such offices at the date of authentication and delivery of such Certificates.

A transferee of a Certificate shall become a Certificateholder, and shall be entitled to the rights and subject to the obligations of a Certificateholder hereunder, upon such transferee's acceptance of a Certificate duly registered in such transferee's name pursuant to Section 3.4.

Section 3.3     Execution, Authentication and Delivery of Certificates.     Concurrently with the sale of the Loans to the Grantor Trust pursuant to the Sale and Servicing Agreement, the Owner Trustee, in the name and on behalf of the Trust, shall have power and authority, and is hereby authorized and empowered to, and shall, cause the Certificates representing 100% of the Percentage Interests of the beneficial ownership in the Trust to be executed, authenticated, issued and delivered to or upon the written order of the Seller, signed by its chairman of the board, its president or any vice president, without further corporate action by the Seller.   Thereupon, such Certificate(s) shall be duly authorized, validly issued, and entitled to the benefits of this Agreement.   No Certificate shall entitle its holder to any benefit under this Agreement, or shall be valid for any purpose, unless there shall appear on such Certificate a certificate of authentication substantially in the form set forth in Exhibit A, executed by the Owner Trustee or the Administrator, as the Owner Trustee's authenticating agent, by manual or facsimile signature; such authentication shall constitute conclusive evidence that such Certificate shall have been duly executed, authenticated, authorized, issued and delivered hereunder.   All Certificates shall be dated the date of their authentication.

Section 3.4     Registration of Transfer and Exchange of the Certificates.   The Certificate Registrar shall keep or cause to be kept, at the office or agency maintained pursuant to Section 3.8, a Certificate Register in which, subject to such reasonable regulations as it may prescribe, the Certificate Registrar shall provide for the registration of the Certificates and of transfers and exchanges of the Certificates as herein provided.   The Administrator shall be the initial Certificate Registrar.

10

PPLP 00015

Subject to satisfaction of the conditions set forth in Section 3.10, upon surrender for registration of transfer of any Certificate at the office or agency maintained pursuant to Section 3.8, the Owner Trustee shall execute, authenticate and deliver (or shall cause the Administrator as its authenticating agent to authenticate and deliver), in the name of the designated transferee or transferees, one or more new Certificates in appropriate Percentage Interests dated the date of authentication by the Owner Trustee or any authenticating agent. Thereupon, such Certificate(s) shall be duly authorized, validly issued, and entitled to the benefits of this Agreement. At the option of a Certificateholder, Certificates may be exchanged for other Certificates in appropriate Percentage Interests upon surrender of the Certificates to be exchanged at the office or agency maintained pursuant to Section 3.8.

Every Certificate presented or surrendered for registration of transfer or exchange in accordance with the provisions of this Agreement shall be accompanied by a written instrument of transfer in a form satisfactory to the Owner Trustee and the Certificate Registrar duly executed by the Certificateholder or his attorney duly authorized in writing. Each Certificate surrendered for registration of transfer or exchange shall be canceled and disposed of by the Owner Trustee in accordance with its customary practice.

No service charge shall be made for any registration of transfer or exchange of Certificates, but the Owner Trustee or the Certificate Registrar may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Certificates.

The preceding provisions of this Section notwithstanding, the Certificate Registrar shall not register transfer or exchanges of Certificates for a period of 15 days preceding the due date for any payment with respect to any of the Certificates.

Section 3.5    Mutilated, Destroyed, Lost or Stolen Certificates.    If (a) any mutilated Certificate shall be surrendered to the Certificate Registrar, or if the Certificate Registrar shall receive evidence to its satisfaction of the destruction, loss or theft of any Certificate and (b) there shall be delivered to the Certificate Registrar and the Owner Trustee (as such and in its individual capacity) such security or indemnity as may be required by them to save each of them harmless, then in the absence of notice that such Certificate shall have been acquired by a bona fide purchaser, the Owner Trustee on behalf of the Trust shall execute and the Owner Trustee, or the Administrator as the Owner Trustee's authenticating agent, shall authenticate, issue and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Certificate, a new Certificate evidencing the appropriate Percentage Interest. In connection with the issuance of any new Certificate under this Section, the Owner Trustee or the Certificate Registrar may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection therewith. Any duplicate Certificate issued pursuant to this Section shall be duly authorized, validly issued and entitled to the benefits of this Agreement, and constitute conclusive evidence of ownership of a beneficial ownership interest in the Trust, whether or not such lost, stolen or destroyed Certificate shall be found at any time.

11

PPLP 00016

Section 3.6    Persons Deemed Certificateholders.    Prior to due presentation of a Certificate for registration of transfer, the Owner Trustee and the Certificate Registrar may treat the Person in whose name any Certificate shall be registered in the Certificate Register as the owner of such Certificate for the purpose of receiving distributions pursuant to Section 5.2 and for all other purposes whatsoever, and neither the Owner Trustee nor the Certificate Registrar shall be bound by any notice to the contrary.

Section 3.7    Access to List of Certificateholders' Names and Addresses.    The Certificate Registrar shall furnish or cause to be furnished to the Servicer, the Seller and the Indenture Trustee within 15 days after receipt by the Certificate Registrar of a request therefor from the Servicer, the Seller, or the Indenture Trustee in writing, a list, in such form as the Servicer, the Seller or the Indenture Trustee may reasonably require, of the names and addresses of the Certificateholders as of the most recent Record Date.  If three or more Certificateholders (or such lesser number as there are Certificateholders) together evidencing not less than 25% of the aggregate Percentage Interests of all the Certificates apply in writing to the Certificate Registrar, and such application states that the applicants desire to communicate with other Certificateholders with respect to their rights under this Agreement or under the Certificates and such application is accompanied by a copy of the communication that such applicants propose to transmit, then the Certificate Registrar shall, within five Business Days after the receipt of such application, afford such applicants access during normal business hours to the current list of Certificateholders. Each Holder, by receiving and holding a Certificate, shall be deemed to have agreed not to hold any of the Seller, the Certificate Registrar or the Owner Trustee accountable by reason of the disclosure of its name and address, regardless of the source from which such information was derived.

Section 3.8    Maintenance of Office or Agency.    The Trust shall maintain an office or offices or agency or agencies where Certificates may be surrendered for registration of transfer or exchange and where notices and demands to or upon the Trust in respect of the Certificates and the Transaction Documents may be served.    The Trust initially designates the Administrator's office in St. Paul, Minnesota as its principal corporate trust office for such purposes. The Administrator shall give prompt written notice to the Seller, the Owner Trustee and to the Certificateholders of any change in the location of the Certificate Register or any such office or agency.

Section 3.9    [RESERVED]

Section 3.10    Restrictions on Transfer of Certificates.

(a)    No Certificate may be acquired, by or for the account of (i) an employee benefit plan (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to the provisions of Title I of ERISA, (ii) a plan described in Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), or (iii) any entity, including an insurance company separate account or general account, whose underlying assets include plan assets by reason of a plan's investment in the entity (each, a "Plan"). By accepting and holding a Certificate, the

12

PPLP 00017

Certificateholder thereof shall be deemed to have represented and warranted that it is not a Plan.

(b)     Each Prospective Certificateholder of a Certificate, other than the Seller or an affiliate of the Seller, shall represent and warrant, in writing, to the Owner Trustee and the Certificate Registrar and any of their respective successors that:

(i)     Such Person is either (A) a "qualified institutional buyer" as defined in Rule 144A under the Securities Act of 1933, as amended (the "Securities Act"), and is aware that the seller of such Certificate may be relying on the exemption from the registration requirements of the Securities Act provided by Rule 144A and is acquiring such Certificate for its own account or for the account of one or more qualified institutional buyers for whom it is authorized to act or (B) a Person involved in the organization or operation of the Trust or an affiliate, as defined in Rule 405 under the Securities Act, of such Person within the meaning of Rule 3a-7 of the Investment Company Act of 1940, as amended (including, but not limited to, the Seller or an affiliate thereof (including The First National Bank of Keystone)).

(ii)     Such Person understands that such Certificate has not been and will not be registered under the Securities Act and may be offered, sold, pledged or otherwise transferred only to a person whom the seller reasonably believes is (A) a qualified institutional buyer or (B) a Person involved in the organization or operation of the Trust or an affiliate, as defined in Rule 405 under the Securities Act, of such Person, in a transaction meeting the requirements of Rule 144A under the Securities Act and in accordance with any applicable securities laws of any state of the United States.

(iii)     Such Person understands that each Certificate bears a legend to the following effect:

THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS.   THIS CERTIFICATE MAY BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF ONLY TO (I) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE ACT, IN A TRANSACTION THAT IS REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR THAT IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT PURSUANT TO RULE 144A OR (II) A PERSON INVOLVED IN THE

13

PPLP 00018

ORGANIZATION OR OPERATION OF THE TRUST OR AN AFFILIATE, AS DEFINED IN RULE 405 UNDER THE SECURITIES ACT, OF SUCH A PERSON WITHIN THE MEANING OF RULE 3a-7 OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (INCLUDING, BUT NOT LIMITED TO, KEYSTONE AND AN AFFILIATE THEREOF (INCLUDING THE FIRST NATIONAL BANK OF KEYSTONE)) IN A TRANSACTION THAT IS REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR THAT IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS. NO PERSON IS OBLIGATED TO REGISTER THIS CERTIFICATE UNDER THE ACT OR ANY STATE SECURITIES LAWS."

(iv)     Such Person shall comply with the provisions of Section 3.10, as applicable, relating to the ERISA restrictions with respect to the acceptance or acquisition of such Certificate.

(v)     Such Person shall (a) if requested by the Seller, deliver to the Owner Trustee an Opinion of Counsel to the effect set forth in (i) above and (b) deliver to the Owner Trustee an Opinion of Counsel to the effect that the Issuer is not and after giving effect to such transfer, will not be an "investment company" as defined in the Investment Company Act of 1940, as amended.

(c)     Each Prospective Certificateholder, other than the Seller or an Affiliate thereof, shall either:

(i)     represent and warrant, in writing, to the Owner Trustee and the Certificate Registrar and any of their respective successors, in accordance with Exhibit C hereto, that the Prospective Certificateholder is not (A) an "employee benefit plan" within the meaning of Section 3(3) of ERISA, or (B) a "plan" within the meaning of Section 4975(e)(1) of the Code (any such plan or employee benefit plan, a Plan) or (C) any entity, including an insurance company separate account or general account, whose underlying assets include plan assets by reason of a plan's investment in the entity and is not directly or indirectly purchasing such Certificate on behalf of, as investment manager of, as named fiduciary of, as trustee of, or with assets of a Plan; or

(ii)     furnish to the Owner Trustee and the Certificate Registrar and any of their respective successors an Opinion of Counsel acceptable to such persons that (A) the proposed issuance or transfer of such Certificate to such Prospective Certificateholder will not cause any assets of the Trust to be deemed assets of a Plan, or (B) the proposed issuance or transfer of such Certificate will not cause the Owner Trustee or the Certificate Registrar or any of their respective successors to be a fiduciary of a Plan within the meaning of Section 3(21) of

14

ERISA and will not give rise to a transaction described in Section 406 of ERISA or Section 4975(c)(1) of the Code for which a statutory or administrative exemption is unavailable.

(d)  By its acceptance of a Certificate, each Prospective Certificateholder agrees and acknowledges that no legal or beneficial interest in all or any portion of the Certificates may be transferred directly or indirectly to an individual, corporation, partnership or other person unless such transferee is not a Non-U.S. Person (any such person being referred to herein as a "Non-permitted Foreign Holder"), and any such purported transfer shall be void and have no effect.

(e)  The Owner Trustee shall not execute, or authenticate and deliver, any Certificate in connection with any transfer thereof unless the transferor shall have provided to the Owner Trustee a Transfer Certificate, substantially in the form attached as Exhibit C to this Agreement, signed by the transferee, such Transfer Certificate shall contain the consent of the transferee to any amendments of this Agreement as may be required to effectuate further the foregoing restrictions on transfer of any Certificate and an agreement by the transferee that it will not transfer any Certificate without providing to the Certificate Registrar on behalf of the Owner Trustee a certificate substantially in the form attached as Exhibit C to this Agreement.

(f)  Each Certificate shall bear an additional legend referring to the foregoing restrictions contained in paragraph (c).

(g)  No Certificate may be transferred without an Opinion of Counsel delivered to the Owner Trustee, the Certificate Registrar, and the Seller to the effect that such transfer would not cause the tax treatment of the Trust to be characterized as an association or publicly traded partnership taxable as a corporation for Federal income tax purposes.

(h)  Transfer Restrictions.  It is the intention of all parties to this Agreement, and all parties shall agree, that the Class B-2 Notes and the Certificates of beneficial ownership shall not be transferred to a Non-U.S. Person unless such Non-U.S. Person will own, immediately after the transfer, one hundred percent of all the beneficial interests in the Trust and one hundred percent of the Class B-2 Notes. Furthermore, such Non-U.S. Person shall not make any transfer of the Class B-2 Notes nor of the Certificates of beneficial ownership unless such Non-U.S. Person transfers one hundred percent of all the beneficial interests and one hundred percent of the Class B-2 Notes.

PPLP 00020

ARTICLE IV

ACTIONS BY OWNER TRUSTEE

Section 4.1    <u>Prior Notice to Certificateholders with Respect to Certain Matters;</u> <u>Covenants of Trust and Certificateholder</u>.    With respect to the following matters, the Owner Trustee shall not take action, and the Certificateholders shall not direct the Owner Trustee to take any action, unless (1) at least 30 days before the taking of such action, the Owner Trustee shall have notified the Certificateholders in writing of the proposed action and (2)(i) the Certificateholders shall not have notified the Owner Trustee in writing prior to the 30th day after such notice is given that such Certificateholders have withheld consent or (ii) the Certificateholders have provided alternative direction to the Owner Trustee in writing prior to the 30th day after such notice is given:

(a)    the initiation of any claim or lawsuit by the Trust (except claims or lawsuits brought in connection with the collection of the Loans) and the compromise of any action, claim or lawsuit brought by or against the Trust (except with respect to the aforementioned claims or lawsuits for collection of the Loans);

(b)    the election by the Trust to file an amendment to the Certificate of Trust (unless such amendment is required to be filed under the Business Trust Statute);

(c)    the amendment or other change to this Agreement or any Transaction Document in circumstances where the consent of any Noteholder is required;

(d)    the amendment or other change to this Agreement or any Transaction Document in circumstances where the consent of any Noteholder is not required and such amendment materially adversely affects the interest of the Certificateholders;

(e)    the appointment pursuant to the Indenture of a successor Note Registrar, Paying Agent, or Indenture Trustee or pursuant to this Agreement of a successor Certificate Registrar, or the consent to the assignment by the Note Registrar, Paying Agent, or Indenture Trustee or Certificate Registrar of its obligations under the Indenture or this Agreement, as applicable;

(f)    the consent to the calling or waiver of any default of any Transaction Document;

(g)    the consent to the assignment by the Indenture Trustee or the Servicer of their respective obligations under any Transaction Document;

(h)    except as provided in Article IX hereof, dissolve, terminate or liquidate the Trust in whole or in part;

16

(i)    merge or consolidate the Trust with or into any other entity, or (other than the Grant of the Collateral to the Indenture Trustee or distributions to Certificateholders hereunder) convey or transfer a substantial portion of the Trust's assets to any other entity;

(j)    cause the Trust to incur, assume or guaranty any indebtedness other than the Notes;

(k)    do any act that conflicts with any other Transaction Document;

(l)    do any act which would make it impossible to carry on the ordinary business of the Trust;

(m)    confess a judgment against the Trust;

(n)    assign the Trust's right to property, for other than a Trust purpose;

(o)    cause the Trust to lend any funds to any entity; or

(p)    change the Trust's purpose and powers from those set forth in this Trust Agreement.

The Trust and each Certificateholder shall comply with the following covenants:

(i)    Neither the Owner Trustee nor any Certificateholder shall cause the funds and other assets of the Trust to be commingled with those of any other individual, corporation, estate, partnership, joint venture, association, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

(ii)    Neither the Owner Trustee nor any Certificateholder shall cause the Trust to be, become or hold itself out as being liable for the debts of any other party, and neither the Trust nor any Certificateholder shall act as agents for each other.

(iii)    Neither the Owner Trustee nor any Certificateholder shall cause the Trust (A) to act other than solely in its Trust name and through its duly authorized officers or agents in the conduct of its business, (B) to prepare all Trust correspondence otherwise than in the Trust name, (C) to conduct its business other than so as not to mislead others as to the identity of the entity with which they are conducting business; and no Certificateholder will be involved in the day-to-day management of the Trust.

(iv)    The Owner Trustee shall maintain on behalf of the Trust all business trust records and books of account of the Trust and neither the Owner Trustee nor any Certificateholder shall cause the Trust to commingle its business trust record and books of account with the corporate records and books of accounts maintained by any Certificateholder or the Owner Trustee on behalf of the Trust shall reflect the separate existence of the Trust. The books of the Trust may be kept (subject to any provision

17

contained in any applicable statutes) inside or outside the State of Delaware at such place or places as may be designated from time to time by the Owner Trustee.

(v)     The Trust shall take such formalities as may be necessary to authorize all of its action as may be required by law.

(vi)     The Owner Trustee shall cause the Trust to (1) conduct its business in an office separate from that of each Certificateholder, (2) maintain stationery separate from that of each Certificateholder, (3) pay all of its own expenses, (4) observe all rights and franchises as a business trust under the laws of the State of Delaware, and will obtain and preserve its qualification to do business in each jurisdiction in which such qualification is to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Trust Agreement, and (6) maintain separate bank accounts and not commingle its funds with those of any other Person.

The Trust shall maintain appropriate minutes or other records of all appropriate actions and shall maintain its office separate from the offices of the Seller and any of its respective affiliates. This Agreement is and shall be the only agreement among the parties hereto with respect to the creation, operation and termination of the Trust. For accounting purposes, the Trust shall be treated as an entity separate and distinct from any Certificateholder. The pricing and other material terms of all transactions and agreements to which the Trust is a party shall be intrinsically fair to all parties thereto.

The Owner Trustee shall not have the power or authority, except upon the written direction of the Certificateholders, and to the extent otherwise consistent with the Transaction Documents, to (i) institute proceedings to have the Trust declared or adjudicated bankrupt or insolvent, (ii) consent to the institution of bankruptcy or insolvency proceedings against the Trust, (iii) file a petition or consent to a petition seeking reorganization or relief on behalf of the Trust under any applicable federal or state law relating to bankruptcy, (iv) consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or any similar official) of the Trust or a substantial portion of the property of the Trust, (v) make any assignment for the benefit of the Trust's creditors, (vi) cause the Trust to admit in writing its inability to pay its debts generally as they become due, or (vii) take any action, or cause the Trust to take any action, in furtherance of any of the foregoing (any of the above, a "Bankruptcy Action"). So long as the Indenture remains in effect, no Certificateholder shall have the power to take, and shall not take, any Bankruptcy Action with respect to the Trust or the Seller or direct the Owner Trustee to take any Bankruptcy Action with respect to the Trust or the Seller.

Section 4.2    Action by Certificateholders with Respect to Certain Matters.   The Owner Trustee shall not have the power, except upon the written direction of the Certificateholders, and to the extent otherwise consistent with the Transaction Documents, to (a) remove the Administrator pursuant to the Administration Agreement, (b) appoint a successor Administrator pursuant to the Administration Agreement, (c) remove or replace the Servicer pursuant to the Sale and Servicing Agreement, replace the Indenture Trustee pursuant to the Indenture or (d) sell

18

PPLP 00023

the Loans after the termination of the Indenture. The Owner Trustee shall take the actions referred to in the preceding sentence only upon written instructions signed by the Certificateholders.

Section 4.3    <u>Action by Certificateholders with Respect to Bankruptcy</u>. Notwithstanding any provisions herein to the contrary, the Owner Trustee shall not have the power or authority to commence a voluntary proceeding in bankruptcy relating to the Trust without the unanimous prior approval of all Certificateholders and the delivery to the Owner Trustee by each such Certificateholder of a certificate certifying that such Certificateholder reasonably believes that the Trust is insolvent.

Section 4.4    <u>Restrictions on Certificateholders' Power</u>. The Certificateholders shall not direct the Owner Trustee to take or refrain from taking any action if such action or inaction would be contrary to any obligation of the Trust or the Owner Trustee under this Agreement or any of the Transaction Documents or would be contrary to <u>Section 2.3</u>, nor shall the Owner Trustee be obligated to follow any such direction, if given.

Section 4.5    <u>Majority Control</u>. Except as expressly provided herein, any action that may be taken and any direction that may be given by the Certificateholders under this Agreement may be taken or given only by the Certificateholders evidencing more than 50% of the aggregate Percentage Interests of all of the Certificates at the time such action is taken or such direction is given. Except as expressly provided herein, any written notice of the Certificateholders delivered pursuant to this Agreement shall be effective only if signed by Holders of Certificates evidencing more than 50% of the aggregate Percentage Interests of all of the Certificates at the time of the delivery of such notice.

19

PPLP 00024

# ARTICLE V

## APPLICATION OF TRUST FUNDS; CERTAIN DUTIES

Section 5.1    Establishment of Trust Account.    The Sale and Servicing Agreement will obligate the Indenture Trustee to establish and maintain a Certificate Distribution Account as specified in Section 5.03 of the Sale and Servicing Agreement.    Funds shall be deposited in the Certificate Distribution Account as required by the Sale and Servicing Agreement.

All of the right, title and interest of the Owner Trustee in all funds on deposit from time to time in the Certificate Distribution Account and in all proceeds thereof shall be held for the benefit of the Certificateholders and such other persons entitled to distributions therefrom. Except as otherwise expressly provided herein or in the Sale and Servicing Agreement, the Certificate Distribution Account shall be under the sole dominion and control of the Paying Agent for the benefit of the Certificateholders.

In addition to the foregoing, the Certificate Distribution Account is a Trust Account under the Sale and Servicing Agreement.   The Certificate Distribution Account shall be subject to and established and maintained in accordance with the applicable provisions of the Sale and Servicing Agreement, including, without limitation, the provisions of Section 5.03 of the Sale and Servicing Agreement regarding distributions from the Certificate Distribution Account.

The Seller agrees to direct and shall have the sole authority to direct the Paying Agent, or its successor in interest, as to the Eligible Investments in which the funds on deposit in the Trust Accounts (as such term is defined in the Sale and Servicing Agreement) may be invested.

Section 5.2    Application Of Trust Funds.

(a)    On each Distribution Date, the Paying Agent shall make the distributions and payments set forth in Section 5.03 of the Sale and Servicing Agreement from amounts on deposit in the Certificate Distribution Account.

(b)    On or before the third Business Day following each Distribution Date, the Paying Agent shall provide to each Certificateholder the statement provided to the Owner Trustee by the Servicer pursuant to Section 6.01 of the Sale and Servicing Agreement with respect to such Distribution Date.

(c)    In the event that any withholding tax is imposed on the Trust's payment (or allocations of income) to a Certificateholder, such tax shall reduce the amount otherwise distributable to the Certificateholder in accordance with this Section.   The Paying Agent is hereby authorized and directed to retain from amounts otherwise distributable to the Certificateholders sufficient funds for the payment of any tax that is legally owed by the Trust (but such authorization shall not prevent the Owner Trustee from contesting any such tax in appropriate proceedings, and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings). The amount of any withholding tax imposed with respect to a Certificateholder shall be treated as cash distributed to such Certificateholder at the time it is

20

withheld by the Trust and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution (such as a distribution to a non-U.S. Certificateholder), the Paying Agent may in its sole discretion withhold such amounts in accordance with this paragraph (c).  In the event that an Certificateholder wishes to apply for a refund of any such withholding tax, the Owner Trustee shall reasonably cooperate with such owner in making such claim so long as such Certificateholder agrees to reimburse the Owner Trustee for any out-of-pocket expenses incurred.

(d)    Upon receiving written notice from  any Certificateholder that such Certificateholder will make a capital contribution to the Trust to enable the Trust to carry out any instructions of such Certificateholder (as provided in Section 4.5 hereof), the Owner Trustee shall establish a separate trust account designated the Capital Contribution Account for the deposit of such capital contribution.   The deposit of moneys in the Capitalized Interest Account (as defined in the Sale and Servicing Agreement) shall be deemed to be a capital contribution. Any moneys remaining in the Capitalized Interest Account after the purchase of all Subsequent Loans (as defined in the Sale and Servicing Agreement) pursuant to the Sale and Servicing Agreement shall be paid into the Capital Contribution Account and shall be distributed to the Seller.  If any Certificateholder makes a capital contribution in the amount of the Termination Price less collected amounts on deposit in the Collection Account to enable the Trust to purchase Loans from the Grantor Trust and to terminate the Sale and Servicing Agreement pursuant to Section 11.01(b) thereof, the Holders of Certificates evidencing more than 50% of the aggregate Percentage Interests of all of the Certificates shall direct the Owner Trustee, on behalf of the Trust, to (i) give not less than thirty days' prior notice to the Indenture Trustee of the Trust's intention to exercise the option specified in Section 11.01(b) of the Sale and Servicing Agreement, and (ii) purchase on the date specified in such notice all, but not less than all, of the Loans, all claims made under the Contract of Insurance with respect to FHA Loans that are pending with the FHA and Foreclosed Properties then included in the Grantor Trust.  Following such purchase by the Trust, the Loans and other items purchased pursuant to this Section 5.2(d), or the proceeds from the sale thereof, as directed in writing by the Certificateholder that made such capital contribution, shall be credited to the Capital Contribution Account and shall be distributed to such Certificateholder.  If any Certificateholder makes a capital contribution to enable the Trust to take any other action, any proceeds that result from such action in an amount up to the amount of the capital contribution shall, if so directed in writing by the Certificateholder, be credited to the Capital Contribution Account and shall be distributed to the Certificateholder that made such capital contribution.

Section 5.3   Method of Payment.    Distributions required to be made to Certificateholders on any Distribution Date shall be made to each Certificateholder of record on the preceding Record Date in the manner set forth in Section 5.03 of the Sale and Servicing Agreement on a pro rata basis in accordance with its respective Percentage Interest; provided, that if the Owner Trustee shall then be acting as Paying Agent and any Distribution Date would be a day on which banking institutions in the State of Delaware or the State of North Carolina are authorized or obligated by law or executive order to be closed, then such Distribution Date shall be the next day that is a Business Day and not a day on which banking institutions in the State of

PPLP 00026

Delaware or the State of North Carolina are authorized or obligated by law or executive order to be closed.

Section 5.4    Segregation of Moneys; No Interest.    Subject to Sections 4.1 and 5.2, moneys received by the Trust hereunder and deposited into the Certificate Distribution Account will be segregated except to the extent required otherwise by law or the Sale and Servicing Agreement and shall be invested by the Indenture Trustee in Eligible Investments pursuant to Section 5.04 of the Sale and Servicing Agreement.  The Owner Trustee in its individual capacity shall not be liable for payment of any interest in respect of such moneys.

Section 5.5    Accounting and Reports to the Certificateholders, the Internal Revenue Service and Others.    The parties to this Trust Agreement hereby agree that the Trust shall be characterized as a partnership for federal income tax purpose.  The Owner Trustee shall prepare all federal income tax returns required to be filed by the Trust under the Code and the Treasury Regulations promulgated thereunder.  If required, the Seller (or such designee Certificateholder, as applicable) shall promptly sign such returns and deliver such returns after signature to the Owner Trustee and such returns shall be filed by the Owner Trustee with the appropriate tax authorities.  In no event shall the Owner Trustee in its individual capacity or the Seller (or such designee Certificateholder, as applicable) be liable for any liabilities, costs or expenses of the Trust or the Noteholders arising out of the application of any tax law, including federal, state, foreign or local income or excise taxes or any other tax imposed on or measured by income (or any interest, penalty or addition with respect thereto or arising from a failure to comply therewith) except for any such liability, cost or expense attributable to any act or omission by the Seller (or such designee Certificateholder, as applicable) or Owner Trustee, as the case may be, in breach of its obligations under this Agreement.

Section 5.6    Signature on Returns.

The Owner Trustee shall sign on behalf of the Trust the tax returns of the Trust as presented to the Owner Trustee unless applicable law requires a Certificateholder to sign such documents, in which case, for so long as there is a single Majority Certificateholder such documents shall be presented to and signed not by the Owner Trustee but by the Majority Certificateholder.

PPLP 00027

ARTICLE VI

AUTHORITY AND DUTIES OF OWNER TRUSTEE

Section 6.1    General Authority.    The Owner Trustee shall have power and authority and is hereby authorized and empowered, in the name of the Trust to execute and deliver or cause to be executed and delivered the Notes, the Certificates and the Transaction Documents to which the Trust is to be a party and each certificate or other document attached as an exhibit to or contemplated by the Transaction Documents to which the Trust is to be a party and any amendment or other agreement or instrument, in each case, in such form as the Seller shall approve, as evidenced conclusively by the Owner Trustee's execution thereof, and, on behalf of the Trust, to direct the Indenture Trustee to authenticate and deliver Classes of Notes in the following aggregate principal amounts:    Class A-1 Notes, $127,800,000; Class A-2 Notes, $66,800,000; Class A-3 Notes, $73,900,000; Class A-4 Notes, $69,600,000; Class A-5 Notes, $23,500,000; Class M-1 Notes, $56,500,000; Class M-2 Notes, $50,850,000; Class B-1 Notes, $45,200,000, and Class B-2 Notes, $28,250,000.    The Owner Trustee or the Administrator, on behalf of the Owner Trustee, shall authenticate and deliver the Certificates. In addition to the foregoing, the Owner Trustee shall have power and authority and is hereby authorized and empowered, in the name of the Trust, but shall not be obligated to take all actions required of the Trust, pursuant to the Transaction Documents.

Section 6.2    General Duties.    It shall be the duty of the Owner Trustee:

(a)    to discharge (or cause to be discharged) all of its responsibilities pursuant to the terms of this Agreement and the Transaction Documents to which the Trust is a party in the interest of the Certificateholders, subject to the Transaction Documents and in accordance with the provisions of this Agreement.    Notwithstanding the foregoing, the Owner Trustee shall be deemed to have discharged its duties and responsibilities hereunder and under the Transaction Documents to the extent the Administrator or the Seller has agreed in the Administration Agreement or this Agreement, respectively, to perform any act or to discharge any duty of the Owner Trustee or the Trust hereunder or under any Transaction Document, the Owner Trustee shall have no obligation to supervise the Administrator, the Seller, any agent, independent contractor, officer, employee, or manager of the Trust, any delegatee of any trustee, or any other Person, and the Owner Trustee shall not be held liable for the default or failure of the Administrator or the Seller to carry out its obligations under the Administration Agreement or this Agreement, respectively; and

(b)    to obtain and preserve the Issuer's qualification to do business in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of the Indenture, the Notes, the Trust Estate and each other instrument and agreement included in the Trust Estate.

PPLP 00028

Section 6.3    <u>Action upon Instruction</u>.

(a)    Subject to Article IV and in accordance with the terms of the Transaction Documents, the Certificateholders may by written instruction direct the Owner Trustee in the management of the Trust but only to the extent consistent with the limited purpose of the Trust, and the Owner Trustee shall have power and authority and is hereby authorized and empowered to follow, and shall be fully protected in following any such instruction. Such direction may be exercised at any time by written instruction of the Certificateholders pursuant to Article IV.

(b)    Notwithstanding any provisions herein to the contrary, the Owner Trustee shall not be required to take any action hereunder or under any Transaction Document if the Owner Trustee shall have reasonably determined, or shall have been advised by counsel, that such action is likely to result in liability on the part of the Owner Trustee or is contrary to the terms hereof or of any Transaction Document or is otherwise contrary to law.

(c)    Whenever the Owner Trustee is unable to decide between alternative courses of action permitted or required by the terms of this Agreement or under any Transaction Document, the Owner Trustee shall promptly give notice (in such form as shall be appropriate under the circumstances) to the Certificateholders requesting instruction from the Certificateholders as to the course of action to be adopted, and to the extent the Owner Trustee acts in good faith in accordance with any written instruction of the Certificateholders received, the Owner Trustee shall not be liable on account of such action to any Person. If the Owner Trustee shall not have received appropriate instruction within 10 days of such notice (or within such shorter period of time as reasonably may be specified in such notice or may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Transaction Documents, as it shall deem to be in the best interests of the Certificateholders, and shall have no liability to any Person for such action or inaction.

(d)    In the event that the Owner Trustee is unsure as to the application of any provision of this Agreement or any Transaction Document or any such provision is ambiguous as to its application, or is, or appears to be, in conflict with any other applicable provision, or in the event that this Agreement permits any determination by the Owner Trustee or is silent or is incomplete as to the course of action that the Owner Trustee is required to take with respect to a particular set of facts, the Owner Trustee may give notice (in such form as shall be appropriate under the circumstances) to the Certificateholders requesting instruction and, to the extent that the Owner Trustee acts or refrains from acting in good faith in accordance with any such instruction received, the Owner Trustee shall not be liable, on account of such action or inaction, to any Person. If the Owner Trustee shall not have received appropriate instruction within 10 days of such notice (or within such shorter period of time as reasonably may be specified in such notice or may be necessary under the circumstances) it may, but shall be under no duty to, take or refrain from taking such action, not inconsistent with this Agreement or the Transaction Documents, as it shall deem to be in the best interests of the Certificateholders, and shall have no liability to any Person for such action or inaction.

24

Section 6.4    No Duties Except as Specified in this Agreement, the Transaction Documents or in Instructions.    The Owner Trustee shall not have any duty or obligation to manage, make any payment with respect to, register, record, sell, dispose of, or otherwise deal with the Certificateholder Trust Estate, or to otherwise take or refrain from taking any action under, or in connection with this Agreement or any document contemplated hereby to which the Owner Trustee or the Trust is a party, except as expressly provided by the terms of this Agreement, any Transaction Document or in any document or written instruction received by the Owner Trustee pursuant to Section 6.3; and no implied duties or obligations shall be read into this Agreement or any Transaction Document against the Owner Trustee. The Owner Trustee shall have no responsibility for filing any financing or continuation statement in any public office at any time or to otherwise perfect or maintain the perfection of any security interest or lien or to prepare or file any Securities and Exchange Commission filing for the Trust or to record this Agreement or any Transaction Document. The Owner Trustee in its individual capacity nevertheless agrees that it will, at its own cost and expense, promptly take all action as may be necessary to discharge any liens on any part of the Certificateholder Trust Estate that result from actions by, or claims against, the Owner Trustee in its individual capacity that are not related to the ownership or the administration of the Certificateholder Trust Estate or the Owner Trustee's serving as trustee of the Trust.

Section 6.5    No Action Except Under Specified Documents or Instructions.    The Owner Trustee shall not manage, control, use, sell, dispose of or otherwise deal with any part of the Certificateholder Trust Estate except (i) in accordance with the powers granted to and the authority conferred upon the Owner Trustee pursuant to this Agreement, (ii) in accordance with the Transaction Documents and (iii) in accordance with any document or instruction delivered to the Owner Trustee pursuant to Section 6.3.

Section 6.6    Restrictions. (a) The Owner Trustee shall not take any action that to the actual knowledge of a Responsible Officer of the Owner Trustee would result in the Trust being characterized as an association or publicly traded partnership taxable as a corporation for Federal income tax purposes. The Certificateholders shall not direct the Owner Trustee to take action that would violate the provisions of this Section or that would be inconsistent with the purposes of the Trust set forth in Section 2.3.

(b)    The Trust will not guarantee the indebtedness of or make loans to any Certificateholder. No Certificateholder will guarantee the indebtedness of or make loans to the Trust or hold itself out as being liable for the debts of the Trust.

25

PPLP 00030

## ARTICLE VII

### CONCERNING THE OWNER TRUSTEE

Section 7.1    Acceptance of Trusts and Duties.    The Owner Trustee accepts the trusts hereby created and agrees to perform its duties hereunder with respect to such trusts but only upon the terms of this Agreement and the Transaction Documents.    The Owner Trustee also agrees to disburse all moneys actually received by it constituting part of the Certificateholder Trust Estate upon the terms of the Transaction Documents and this Agreement.    Notwithstanding any provision herein, in any Transaction Document, or otherwise to the contrary, the Owner Trustee shall not be answerable or accountable or liable in its individual capacity hereunder or under any Transaction Document or otherwise under any circumstances, except to the Trust and the Certificateholders (i) for its own willful misconduct or gross negligence or (ii) in the case of the inaccuracy of any representation or warranty contained in Section 7.3 expressly made by the Owner Trustee in its individual capacity.    In particular, but not by way of limitation (and subject to the exceptions set forth in the preceding sentence):

(a)    the Owner Trustee shall not be liable in its individual capacity for any error of judgment made by the Owner Trustee;

(b)    the Owner Trustee shall not be liable in its individual capacity with respect to any action taken or omitted to be taken by it in reliance on any provision of this Agreement, or in accordance with the instructions of the Seller or the Certificateholders;

(c)    no provision of this Agreement or any Transaction Document shall require the Owner Trustee in its individual capacity to expend or risk funds or otherwise incur any financial liability in the performance of any of its rights or powers hereunder or under any Transaction Document if the Owner Trustee shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it in its individual capacity;

(d)    under no circumstances shall the Owner Trustee be liable in its individual capacity for the Certificates or any indebtedness evidenced by or arising under any of the Transaction Documents, including the principal of and interest on the Notes;

(e)    the Owner Trustee shall not be responsible or liable in its individual capacity for or in respect of the validity or sufficiency of this Agreement or for the due execution hereof by the Seller or for the form, character, genuineness, sufficiency, value or validity of the Notes, the Certificates, or any of the Certificateholder Trust Estate or for or in respect of the validity or sufficiency of the Transaction Documents, other than the Owner Trustee's execution of or authentication on the Certificates, and the Owner Trustee shall in no event assume or incur any liability, duty, or obligation in its individual capacity to any Noteholder or to any Holder or other Person, other than as expressly provided for herein and in the Transaction Documents;

PPLP 00031

(f)    the Owner Trustee shall not be liable in its individual capacity for the default or misconduct of the Administrator, the Seller, the Paying Agent, the Certificate Registrar, the Indenture Trustee, the Servicer, or any other Person under any of the Transaction Documents or otherwise and the Owner Trustee shall have no obligation or liability in any capacity to perform the obligations of the Trust under this Agreement or the Transaction Documents that are not specifically required to be performed by the Owner Trustee or that are required to be performed by the Paying Agent, the Administrator under the Administration Agreement, the Indenture Trustee under the Indenture or the Servicer under the Sale and Servicing Agreement; and

(g)    the Owner Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Agreement, or to institute, conduct or defend any litigation under this Agreement or otherwise or in relation to this Agreement or any Transaction Document, at the request, order or direction of any of the Certificateholders, unless such Certificateholders have offered to the Owner Trustee (as such and in its individual capacity) security or indemnity satisfactory to it against the costs, expenses and liabilities that may be incurred by the Owner Trustee therein or thereby.  The right of the Owner Trustee to perform any discretionary act enumerated in this Agreement or in any Transaction Document shall not be construed as a duty, and the Owner Trustee in its individual capacity shall not be answerable other than to the Trust and the Certificateholders for its gross negligence or willful misconduct in the performance of any such act provided, that the Owner Trustee in its individual capacity shall be liable to the Trust and the Certificateholders for its negligence or willful misconduct in handling funds, in its capacity as Paying Agent, in the performance of its duties as Paying Agent in the event that it assumes the duties and obligations of the Paying Agent pursuant to Section 3.9 hereof.

Section 7.2    Furnishing of Documents.    The Owner Trustee shall furnish (a) to the Certificateholders promptly upon receipt of a written request therefor, duplicates or copies of all reports, notices, requests, demands, certificates, financial statements and any other instruments furnished to the Owner Trustee under the Transaction Documents and (b) to the Indenture Trustee promptly upon written request therefor, copies of the Sale and Servicing Agreement, the Administration Agreement and the Trust Agreement.

Section 7.3    Representations and Warranties.

First Union Trust Company, National Association hereby represents and warrants to the Seller, that:

(i)    It is a national banking association duly organized and validly existing in good standing under the laws of the United States of America.  It has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement.

(ii)    It has taken all corporate action necessary to authorize the execution and delivery by it of this Agreement, and this Agreement will be executed and

PPLP 00032

delivered by one of its officers who is duly authorized to execute and deliver this Agreement on its behalf.

(iii)     Neither the execution nor the delivery by it of this Agreement nor the consummation by it of the transactions contemplated hereby nor compliance by it with any of the terms or provisions hereof will contravene any Federal or Delaware law, governmental rule or regulation governing the banking or trust powers of the Owner Trustee or any judgment or order binding on it, or constitute any default under its charter documents or by-laws or any indenture, mortgage, contract, agreement or instrument to which it is a party or by which any of its properties may be bound.

(iv)     There is no action, suit, proceeding, investigation or litigation pending against the Owner Trustee or, to its knowledge, threatened against it, which, if determined adversely to the Owner Trustee, would materially adversely affect the issuance of the Certificates, the execution, delivery or enforceability of this Agreement or any Transaction Document to which the Trust is a party or which would have a material adverse effect on financial condition of the Owner Trustee;

(v)     The Owner Trustee is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency binding on it, which default might have consequences that would materially and adversely affect its condition (financial or other) or operations of the Owner Trustee properties or might have consequences that would materially and adversely affect its performance hereunder;

(vi)     No statement, report or other document furnished pursuant to this Agreement by the Owner Trustee or in connection with the transactions contemplated hereby contains any untrue statement of a material fact or facts or fails to state a material fact necessary to make the statements contained herein or therein not misleading.

Section 7.4     Reliance; Advice of Counsel.

(a)     The Owner Trustee shall incur no personal liability to anyone in acting upon any signature, instrument, notice, resolution, request, consent, order, certificate, report, opinion, bond, or other document or paper reasonably believed by it to be genuine and reasonably believed by it to be signed by the proper party or parties. The Owner Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party or other entity as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect. As to any fact or matter the method of the determination of which is not specifically prescribed herein, the Owner Trustee may for all purposes hereof rely on a certificate, signed by the president or any vice president or by the treasurer or other authorized officer of the relevant party, as to such fact or matter and such certificate shall constitute full protection to the Owner Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon.

28

PPLP 00033

(b)    In the exercise or administration of the trusts hereunder and in the performance of its duties and obligations under this Agreement or the Transaction Documents, the Owner Trustee (i) may act directly or through its agents or attorneys pursuant to agreements entered into with any of them, and the Owner Trustee shall not be liable in its individual capacity for the conduct or misconduct of such agents or attorneys if such agents or attorneys shall have been selected by the Owner Trustee with reasonable care, and (ii) may consult with counsel, accountants and other skilled Persons to be selected with reasonable care and employed by it. The Owner Trustee shall not be liable in its individual capacity for anything done, suffered or omitted in good faith by it in accordance with the written opinion or advice of any such counsel, accountants or other such Persons.

Section 7.5    <u>Not Acting in Individual Capacity.</u>   Except as provided in this Article VII, in accepting the trusts hereby created First Union Trust Company, National Association acts solely as Owner Trustee hereunder and not in its individual capacity and all Persons having any claim against the Owner Trustee by reason of the transactions contemplated by this Agreement or any Transaction Document shall look only to the Certificateholder Trust Estate for payment or satisfaction thereof.

Section 7.6    <u>Owner Trustee Not Liable for Certificates.</u>   The Owner Trustee assumes no responsibility for the recitals contained herein and in the Certificates (other than the signature and/or authentication of the Owner Trustee on the Certificates). The Owner Trustee makes no representations or warranties as to the validity or sufficiency of this Agreement, of any Transaction Document or of the Certificates (other than the signature and authentication of the Owner Trustee on the Certificates and as specified in <u>Section 7.3</u>) or the Notes, or the Grantor Trust Certificate or related documents. The Owner Trustee shall at no time have any responsibility or liability in its individual capacity for or with respect to the legality, validity and enforceability of the Grantor Trust Certificate, or for or with respect to the sufficiency of the Certificateholder Trust Estate or its ability to generate the payments to be distributed to Certificateholders under this Agreement or the Noteholders under the Indenture, including, without limitation: the compliance by the Seller, or the Servicer with any warranty or representation made under any Transaction Document or in any related document or the accuracy of any such warranty or representation or any action of the Seller, the Paying Agent, the Certificate Registrar, the Administrator, the Indenture Trustee, or the Servicer taken in the name of the Owner Trustee.

Section 7.7    <u>Owner Trustee May Own Certificates.</u>    The Owner Trustee in its individual or any other capacity may become the owner or pledgee of Certificates or Notes and may deal with the Seller, the Administrator and the Indenture Trustee in banking transactions with the same rights as it would have if it were not Owner Trustee.

Section 7.8    <u>Licenses.</u>   The Owner Trustee shall cause the Trust to use its best efforts to obtain and maintain the effectiveness of any licenses required in connection with this Agreement and the Transaction Documents and the transactions contemplated hereby and thereby until such time as the Trust shall terminate in accordance with the terms hereof.

29

PPLP 00034

Section 7.9   <u>Rule 144A Information</u>.   The Owner Trustee covenants to make available to the Seller and the Servicer information (i) requested by prospective purchasers of Notes that is reasonably specified and certified as necessary to satisfy the requirements of paragraph (d) (4) of Rule 144A of the Securities Act, (ii) that is reasonably available to the Owner Trustee and (iii) that is not otherwise available to the Seller or the Indenture Trustee.

The Seller shall reimburse the Owner Trustee (as such or in its individual capacity) for all reasonable costs and expenses incurred in connection with providing such information.

PPLP 00035

ARTICLE VIII

COMPENSATION OF OWNER TRUSTEE

Section 8.1    <u>Owner Trustee's Fees and Expenses</u>.  The Owner Trustee in its individual capacity shall receive as compensation for its services hereunder such fees as have been separately agreed upon before the date hereof between the Seller and the Owner Trustee, and the Owner Trustee in its individual capacity shall be entitled to be reimbursed by the Seller and the Certificateholders jointly and severally for its other reasonable expenses hereunder, including the reasonable compensation, expenses and disbursements of such agents, representatives, experts and counsel as the Owner Trustee may employ in connection with the exercise and performance of its rights and its duties hereunder.

Section 8.2    <u>Indemnification</u>.    The Seller and each Certificateholder, jointly and severally, shall indemnify, defend and hold harmless the Owner Trustee in its individual capacity and its successors, assigns, directors, officers, employees, agents and servants (collectively, the "Indemnified Parties") from and against, any and all liabilities, obligations, losses, damages, taxes, claims, actions and suits, and any and all reasonable costs, expenses and disbursements (including reasonable legal fees and expenses) of any kind and nature whatsoever (collectively, "Expenses" or "Liabilities and Expenses") which may at any time be imposed on, incurred by, or asserted against the Owner Trustee in its individual capacity or any Indemnified Party in any way relating to or arising out of this Agreement, the Transaction Documents, the Certificateholder Trust Estate, the administration of the Certificateholder Trust Estate or the action or inaction of the Owner Trustee hereunder, except only that the Seller and the Certificateholders shall not be liable for or required to indemnify an Indemnified Party from and against Liabilities and Expenses arising or resulting from any of the matters described in <u>Section 7.1</u> (i) or (ii) hereof.  The indemnities contained in this Section shall survive the resignation or termination of the Owner Trustee or the termination of this Agreement.  In any event of any claim, action or proceeding for which indemnity will be sought pursuant to this Section, the Owner Trustee's choice of legal counsel shall be subject to the approval of the Seller and the Certificateholders, which approval shall not be unreasonably withheld or delayed.

The liabilities and indemnities contained in this  Section 8.2 are for the benefit of the Owner Trustee, in its individual capacity, and shall not be construed as imposing any liabilities on the Seller, Certificateholders, or any affiliate thereof for any expense or liability of the Trust to third parties.  The Seller and the Certificateholders shall have no liabilities for the expenses and liabilities of the Trust (except as provided in <u>Section 8.1</u> and in this <u>Section 8.2</u> with respect to the Owner Trustee in its individual capacity) and all such expenses and liabilities shall be payable solely from the Certificateholder Trust Estate.

Section 8.3    <u>Payments to the Owner Trustee</u>.  Any amounts paid to the Owner Trustee in its individual capacity pursuant to this Article VIII shall be deemed not to be a part of the Certificateholder Trust Estate immediately after such payment.

31

PPLP 00036

ARTICLE IX

TERMINATION OF TRUST AGREEMENT

Section 9.1    Termination of Trust Agreement.

(a)    This Agreement (other than Article VIII and the rights, benefits, protections, privileges, and immunities of the Owner Trustee (as such or in its individual capacity) and the Trust shall terminate and be of no further force or effect on the satisfaction and discharge of the Indenture pursuant to Section 4.1 of the Indenture and the termination of the Sale and Servicing Agreement. The bankruptcy, liquidation, dissolution, death or incapacity of any Certificateholder shall not (x) operate to terminate this Agreement or the Trust, nor (y) entitle such Certificateholder's legal representatives or heirs to claim an accounting or to take any action or proceeding in any court for a partition or winding up of all or any part of the Trust or Certificateholder Trust Estate nor (z) otherwise affect the rights, obligations and liabilities of the parties hereto.

(b)    The Certificates shall be subject to an early redemption or termination at the option of the Trust, as directed by the Certificateholders owning at least 51% Percentage Interest in the Certificates, or the Backup Servicer in the manner and subject to the provisions of Section 11.01 of the Sale and Servicing Agreement.

(c)    Except as provided in Sections 9.1(a) and (b) above, neither the Seller nor any Certificateholder shall be entitled to revoke or terminate the Trust.

(d)    Notice of any termination of the Trust, specifying the Distribution Date upon which the Certificateholders shall surrender their Certificates to the Paying Agent for payment of the final distributions and cancellation, shall be given by the Owner Trustee to the Certificateholders and the Rating Agencies within five Business Days of receipt by the Owner Trustee of written notice of such termination pursuant to Section 9.1(a) or (b) above, which notice given by the Owner Trustee shall state (i) the Distribution Date upon or with respect to which final payment of the Certificates shall be made upon presentation and surrender of the Certificates at the office of the Paying Agent therein designated, (ii) the amount of any such final payment and (iii) that the Record Date otherwise applicable to such Distribution Date is not applicable, payments being made only upon presentation and surrender of the Certificates at the office of the Paying Agent therein specified. The Owner Trustee shall give such notice to the Certificate Registrar (if other than the Owner Trustee) and the Paying Agent at the time such notice is given to the Certificateholders. Upon presentation and surrender of the Certificates, the Paying Agent shall cause to be distributed to the Certificateholders amounts distributable on such Distribution Date pursuant to Sections 5.01(d) and 5.03 of the Sale and Servicing Agreement.

In the event that all of the Certificateholders shall not surrender their Certificates for cancellation within six months after the date specified in the above mentioned written notice, the Owner Trustee shall give a second written notice to the remaining Certificateholders to surrender their Certificates for cancellation and receive the final distribution with respect thereto.

PPLP 00037

If within one year after the second notice all the Certificates shall not have been surrendered for cancellation, the Owner Trustee may take appropriate steps, or may appoint an agent to take appropriate steps, to contact the remaining Certificateholders concerning surrender of their Certificates, and the cost thereof shall be paid out of the funds and other assets that shall remain subject to this Agreement. Any funds remaining in the Trust after exhaustion of such remedies shall be distributed by the Owner Trustee to the Certificateholders on a pro rata basis.

(e)    Upon the winding up of the Trust and its termination, the Owner Trustee shall cause the Certificate of Trust to be canceled by executing and filing a certificate of cancellation with the Secretary of State in accordance with the provisions of Section 3810 of the Business Trust Statute.

33

PPLP 00038

ARTICLE X

SUCCESSOR OWNER TRUSTEES AND ADDITIONAL OWNER TRUSTEES

Section 10.1   Eligibility Requirements for Owner Trustee.   The Owner Trustee shall at all times be a corporation, national banking association, or other entity satisfying the provisions of Section 3807(a) of the Business Trust Statute; authorized to exercise corporate trust powers; having a combined capital and surplus of at least $50,000,000 and subject to supervision or examination by Federal or state authorities; and having (or having a parent which has) a senior long-term debt rating of at least "A1" by Moody's.   If such corporation, national banking association, or other entity shall publish reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purpose of this Section, the combined capital and surplus of such corporation, national banking association, or other entity shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.   In case at any time the Owner Trustee shall cease to be eligible in accordance with the provisions of this Section, the Owner Trustee shall resign immediately in the manner and with the effect specified in Section 10.2.

Section 10.2   Resignation or Removal of Owner Trustee.   The Owner Trustee may at any time resign and be discharged from the trusts hereby created by giving written notice thereof to the Administrator, the Indenture Trustee and the Seller.   Upon receiving such notice of resignation, the Administrator shall promptly appoint a successor Owner Trustee by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Owner Trustee and one copy to the successor Owner Trustee.   If no successor Owner Trustee shall have been so appointed and have accepted appointment within 30 days after the giving of such notice of resignation or after any removal of the Owner Trustee, the Owner Trustee so resigning or being removed may petition any court of competent jurisdiction for the appointment of a successor Owner Trustee.

If at any time the Owner Trustee shall cease to be eligible in accordance with the provisions of Section 10.1 and shall fail to resign after written request therefor by the Administrator, or if at any time the Owner Trustee shall be legally unable to act, or shall be adjudged bankrupt or insolvent, or a receiver of the Owner Trustee or of its property shall be appointed, or any public officer shall take charge or control of the Owner Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation, then the Administrator may remove the Owner Trustee. If the Administrator shall remove the Owner Trustee under the authority of the immediately preceding sentence, the Administrator shall promptly appoint a successor Owner Trustee by written instrument in duplicate, one copy of which instrument shall be delivered to the outgoing Owner Trustee so removed and one copy to the successor Owner Trustee and payment of all amounts owed to the outgoing Owner Trustee shall be made promptly.

Any resignation or removal of the Owner Trustee and appointment of a successor Owner Trustee pursuant to any of the provisions of this Section shall not become effective until acceptance of appointment by the successor Owner Trustee pursuant to Section 10.3 and, in the

34

PPLP 00039

case of removal, payment of all fees and expenses owed to the outgoing Owner Trustee. The Administrator shall provide notice of such resignation or removal of the Owner Trustee to each of the Rating Agencies.

Section 10.3   Successor Owner Trustee.   Any successor Owner Trustee appointed pursuant to Section 10.2 shall execute, acknowledge and deliver to the Administrator and to its predecessor Owner Trustee an instrument accepting such appointment under this Agreement, and thereupon the resignation or removal of the predecessor Owner Trustee shall become effective and such successor Owner Trustee, without any further act, deed or conveyance, shall become fully vested with all the rights, powers, duties, and obligations of its predecessor under this Agreement, with like effect as if originally named as Owner Trustee. The predecessor Owner Trustee shall upon payment of its fees and expenses deliver to the successor Owner Trustee all documents and statements and monies held by it under this Agreement; and the Administrator and the predecessor Owner Trustee shall execute and deliver such instruments and do such other things as may reasonably be requested for fully and certainly vesting and confirming in the successor Owner Trustee all such rights, powers, duties, and obligations.

No successor Owner Trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor Owner Trustee shall be eligible pursuant to Section 10.1.

Upon acceptance of appointment by a successor Owner Trustee pursuant to this Section, the Administrator shall mail notice of the successor of such Owner Trustee to all Certificateholders, the Indenture Trustee, the Noteholders and the Rating Agencies. If the Administrator fails to mail such notice within 10 days after acceptance of appointment by the successor Owner Trustee, the successor Owner Trustee shall cause such notice to be mailed at the expense of the Administrator.

Section 10.4   Merger or Consolidation of Owner Trustee.   Any corporation, national banking association or other entity into which the Owner Trustee may be merged or converted or with which either may be consolidated or any corporation, national banking association or other entity resulting from or surviving any merger, conversion or consolidation to which the Owner Trustee shall be a party, or any corporation, national banking association or other entity succeeding to all or substantially all of the corporate trust business of the Owner Trustee, shall be the successor of the Owner Trustee hereunder, provided such corporation, national banking association or other entity shall be eligible pursuant to Section 10.1, without the execution or filing of any instrument or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided further that the Owner Trustee shall mail notice of such merger, conversion or consolidation to the Rating Agencies.

Section 10.5   Appointment of a Separate Owner Trustee or a Co-Owner Trustee. Notwithstanding any other provisions of this Agreement. at any time, for the purpose of meeting any legal requirements of any jurisdiction in which any part of the Certificateholder Trust Estate or any Mortgaged Property may at the time be located, or for the purpose of performing certain duties and obligations of the Owner Trustee with respect to the Trust and the Certificates under

35

PPLP 00040

the Sale and Servicing Agreement, the Administrator and the Owner Trustee acting jointly shall have the power, authority, and authorization to, and may execute and deliver all instruments to appoint one or more Persons approved by the Owner Trustee to act as co-owner trustee, jointly with the Owner Trustee, or separate owner trustee or separate trustees, of all or any part of the Certificateholder Trust Estate, and to vest in such Person, in such capacity, such title to the Trust, or any part thereof, and, subject to the other provisions of this Section, such powers, authority, authorization, duties, obligations, rights and trusts as the Administrator and the Owner Trustee may consider necessary or desirable.  If the Administrator shall not have joined in such appointment within 25 days after the receipt by it of a request so to do, the Owner Trustee acting alone shall have the power, authority and authorization to make such appointment.  No co-owner trustee or separate owner trustee appointed under this Section 10.5 shall be required to meet the terms of eligibility as a successor trustee pursuant to Section 10.1 and no notice of the appointment of any co-owner trustee or separate owner trustee shall be required pursuant to Section 10.3.

Each separate owner trustee and co-owner trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Owner Trustee shall be conferred upon and exercised or performed by the Owner Trustee and such separate owner trustee or co-owner trustee jointly (it being understood that such separate owner trustee or co-owner trustee is not authorized to act separately without the Owner Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed, the Owner Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties, and obligations (including the holding of title to the Certificateholder Trust Estate or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate owner trustee or co-owner trustee but solely at the direction of the Owner Trustee;

(ii)    no trustee under this Agreement shall be personally liable by reason of any act or omission of any other trustee under this Agreement or otherwise; and

(iii)    the Administrator and the Owner Trustee acting jointly may at any time accept the resignation of or remove any separate owner trustee or co-owner trustee.

Any notice, request or other writing given to the Owner Trustee shall be deemed to have been given to the separate owner trustees and co-owner trustees, as if given to each of them. Every instrument appointing any separate owner trustee or co-owner trustee, other than this Agreement, shall refer to this Agreement and to the conditions of this Article. Each separate owner trustee and co-owner trustee, upon its acceptance of appointment, shall be vested with the estates specified in its instrument of appointment, either jointly with the Owner Trustee or separately, as may be provided therein, subject to all the provisions of this Agreement, specifically including every provision of this Agreement relating to the conduct of, affecting the

36

PPLP 00041

liability of, or affording protection to, the Owner Trustee. Each such instrument shall be filed with the Owner Trustee and a copy thereof given to the Administrator.

Any separate owner trustee or co-owner trustee may at any time appoint the Owner Trustee as its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Agreement on its behalf and in its name. If any separate owner trustee or co-owner trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Owner Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

PPLP 00042

ARTICLE XI

MISCELLANEOUS

Section 11.1   <u>Supplements and Amendments</u>.  This Agreement may be amended by the Seller and the Owner Trustee with prior written notice to the Rating Agencies, but without the consent of any of the Noteholders or the Certificateholders or the Indenture Trustee, to cure any ambiguity, to correct or supplement any provisions in this Agreement or for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions in this Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders <u>provided, however</u>, that such action shall not adversely affect in any material respect the interests of any Noteholder or Certificateholder.  An amendment described above shall be deemed not to adversely affect in any material respect the interests of any Noteholder or Certificateholder if (i) an opinion of counsel is obtained to such effect, or (ii) the party requesting the amendment satisfies the Rating Agency Condition with respect to such amendment.

This Agreement may also be amended from time to time by the Seller and the Owner Trustee, with the prior written consent of the Rating Agencies and with the prior written consent of the Indenture Trustee, the Holders (as defined in the Indenture) of Notes evidencing more than 50% of the Note Balance of the Classes of Notes affected thereby and the Holders of Certificates evidencing more than 50% of the aggregate Percentage Interests of all of the Certificates affected thereby, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement or of modifying in any manner the rights of the Noteholders or the Certificateholders; <u>provided</u>, <u>however</u>, that no such amendment shall (a) increase or reduce in any manner the amount of, or accelerate or delay the timing of, collections of payments on the Loans or distributions that shall be required to be made for the benefit of the Noteholders or the Certificateholders or (b) reduce the aforesaid Percentage Interests required to consent to any such amendment, in either case of clause (a) or (b) without the consent of the Noteholders of all the outstanding Notes or Certificateholders of all the outstanding Certificates, as applicable.

Promptly after the execution of any such amendment or consent, the Owner Trustee shall furnish written notification of the substance of such amendment or consent to each Certificateholder, the Indenture Trustee and each of the Rating Agencies.

It shall not be necessary for the consent of Certificateholders, the Noteholders or the Indenture Trustee pursuant to this Section to approve the particular form of any proposed amendment or consent, but it shall be sufficient if such consent shall approve the substance thereof.  The manner of obtaining such consents (and any other consents of Certificateholders provided for in this Agreement or in any other Transaction Document) and of evidencing the authorization of the execution thereof by Certificateholders shall be subject to such reasonable requirements as the Owner Trustee may prescribe.

Promptly after the execution of any amendment to the Certificate of Trust, the Owner Trustee shall cause the filing of such amendment with the Secretary of State.

38

Prior to the execution of any amendment to this Agreement or the Certificate of Trust, the Owner Trustee shall be entitled to receive and rely upon an Opinion of Counsel stating that the execution of such amendment is authorized or permitted by this Agreement. The Owner Trustee may, but shall not be obligated to, enter into any such amendment which affects the Owner Trustee's own rights, duties or immunities under this Agreement or otherwise.

Notwithstanding the above, no supplement or amendment to this Agreement shall be made without the consent of any Certificateholder, if such amendment and/or supplement would modify in any manner the receipt of distributions with respect to such Certificate.

Section 11.2   No Legal Title to Certificateholder Trust Estate in Certificateholders.  The Certificateholders shall not have legal title to any part of the Certificateholder Trust Estate. The Certificateholders shall be entitled to receive distributions with respect to their undivided ownership interest therein only in accordance with Articles V and IX. No transfer, by operation of law or otherwise, of any right, title, or interest of the Certificateholders to and in their beneficial ownership interest in the Certificateholder Trust Estate shall operate to terminate this Agreement or the trusts hereunder or entitle any transferee to an accounting or to the transfer to it of legal title to any part of the Certificateholder Trust Estate.

Section 11.3   Limitations on Rights of Others.   The provisions of this Agreement are solely for the benefit of the Owner Trustee, the other Indemnified Parties, the Seller, and the Certificateholders, and, to the extent expressly provided herein, the Administrator, the Indenture Trustee and the Noteholders, and nothing in this Agreement, whether express or implied, shall be construed to give to any other Person any legal or equitable right, remedy or claim in the Certificateholder Trust Estate or under or in respect of this Agreement or any covenants, conditions or provisions contained herein.

Section 11.4   Notices.   (a)   Unless otherwise expressly specified or permitted by the terms hereof, all notices shall be in writing and shall be deemed given upon receipt by the intended recipient or three Business Days after mailing if mailed by certified mail, postage prepaid (except that notice to the Owner Trustee shall be deemed given only upon actual receipt by the Owner Trustee), at the following addresses: (i) if to the Owner Trustee, its Corporate Trust Office; (ii) if to the Seller, Keystone Mortgage Corp., Inc., 69 Main Street, Keystone, West Virginia 24852, Attention: Terry Church, President.

(b)      Any notice required or permitted to be given to a Certificateholder shall be given by first-class mail, postage prepaid, at the address of such Certificateholder as shown in the Certificate Register. Any notice so mailed within the time prescribed in this Agreement shall be conclusively presumed to have been duly given, whether or not the Certificateholder receives such notice.

Section 11.5   Severability.   Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any

PPLP 00044

such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 11.6    <u>Separate Counterparts</u>.    This Agreement may be executed by the parties hereto in separate counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 11.7    <u>Successors and Assigns</u>.    All covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the Seller, the Owner Trustee, and its successors and each owner trustee and its successors and permitted assigns. all as herein provided.  Any request, notice, direction, consent, waiver or other instrument or action by an Certificateholder shall bind the successors and assigns of such Certificateholder.

Section 11.8    <u>No Petition</u>.    The Owner Trustee (notwithstanding Sections 4.1 and 4.3 hereof), by entering into this Agreement, each Certificateholder, by accepting a Certificate, and the Indenture Trustee and each Noteholder by accepting the benefits of this Agreement, hereby covenant and agree that they will not at any time institute against the Seller, any Affiliate of the Seller, or the Trust, or join in any institution against the Seller, any Affiliate of the Seller, the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States Federal or state bankruptcy or similar law in connection with any obligations relating to the Certificates, the Notes, this Agreement or any of the Transaction Documents.

Section 11.9    <u>Covenants of Seller</u>.    The Seller shall not institute at any time any Bankruptcy proceeding against the Trust or any Affiliate of the Seller, under any United States Federal or state bankruptcy or similar law in connection with any obligations relating to the Certificates, the Notes, the Trust Agreement or any of the Transaction Documents.

Section 11.10    <u>No Recourse</u>.    Each Certificateholder by accepting a Certificate acknowledges that such Certificateholder's Certificate represents a beneficial interest in the Trust only and does not represent an interest in or an obligation of the Seller, the Administrator, the Owner Trustee in its individual capacity or any Affiliate thereof and no recourse may be had against such parties or their assets, except as may be expressly set forth or contemplated in this Agreement, the Certificates or the Transaction Documents.

Section 11.11    <u>Headings</u>.    The headings of the various Articles and Sections herein are for convenience of reference only and shall not define or limit any of the terms or provisions hereof.

Section 11.12    <u>GOVERNING LAW</u>.    THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

PPLP 00045

Section 11.13 <u>Inconsistencies with Sale and Servicing Agreement</u>. In the event certain provisions of this Agreement conflict with the provisions of the Sale and Servicing Agreement, the parties hereto agree that the provisions of the Sale and Servicing Agreement shall be controlling.

Section 11.14 <u>No Liability of the Certificateholder</u>. Except as provided in Article VIII hereof, no Certificateholder shall be liable for any losses, claims, damages, liabilities and expenses of the Trust (including expenses, to the extent not paid out of the Certificateholder Trust Estate). No Certificateholder shall have any liability in its capacity as Holder of Certificates for any losses incurred by a Noteholder.

PPLP 00046

IN WITNESS WHEREOF, the parties hereto have caused this Trust Agreement to be duly executed by their respective officers hereunto duly authorized, as of the day and year first above written.

KEYSTONE MORTGAGE CORP., INC.,
as Seller

By: _____
Name:
Title:

FIRST UNION TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity but solely as Owner Trustee

By: _____
Name:
Title:

EXHIBIT A

CERTIFICATE

THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE ."ACT"), OR ANY STATE SECURITIES LAWS. THIS CERTIFICATE MAY BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF ONLY TO (I) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE ACT, IN A TRANSACTION THAT IS REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR THAT IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT PURSUANT TO RULE 144A OR (II) A PERSON INVOLVED IN THE ORGANIZATION OR OPERATION OF THE TRUST OR AN AFFILIATE, AS DEFINED IN RULE 405 UNDER THE ACT, OF SUCH A PERSON WITHIN THE MEANING OF RULE 3a-7 OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (INCLUDING, BUT NOT LIMITED TO, KEYSTONE AND PARENT THEREOF (INCLUDING THE FIRST NATIONAL BANK OF KEYSTONE)) IN A TRANSACTION THAT IS REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR THAT IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS. NO PERSON IS OBLIGATED TO REGISTER THIS CERTIFICATE UNDER THE ACT OR ANY STATE SECURITIES LAWS.

NO TRANSFER OF THIS CERTIFICATE OR ANY BENEFICIAL INTEREST THEREIN SHALL BE MADE TO ANY PERSON UNLESS THE OWNER TRUSTEE HAS RECEIVED A CERTIFICATE FROM THE TRANSFEREE TO THE EFFECT THAT SUCH TRANSFEREE (I) IS NOT A PERSON WHICH IS AN EMPLOYEE BENEFIT PLAN, TRUST OR ACCOUNT SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE CODE OR A GOVERNMENTAL PLAN, DEFINED IN SECTION 3(32) OF ERISA SUBJECT TO ANY FEDERAL, STATE OR LOCAL LAW WHICH IS, TO A MATERIAL EXTENT, SIMILAR TO THE FOREGOING PROVISIONS OF ERISA OR THE CODE (ANY SUCH PERSON BEING A "PLAN") AND (II) IS NOT AN ENTITY, INCLUDING AN INSURANCE COMPANY SEPARATE ACCOUNT OR GENERAL ACCOUNT, WHOSE UNDERLYING ASSETS INCLUDE PLAN ASSETS BY REASON OF A PLAN'S INVESTMENT IN THE ENTITY.

KEYSTONE OWNER TRUST 1998-P2

ASSET BACKED CERTIFICATE, SERIES 1998-P2

evidencing a fractional undivided interest in the Trust. as defined below, the property of which includes a certificate evidencing 100% of the ownership interests in Keystone Grantor Trust

A-1

1998-P2 (the "Grantor Trust"), the assets of which consist primarily of a pool of Loans sold to the Grantor Trust by Keystone Mortgage Corp., Inc.

Percentage Interest: 89.81%                                        NUMBER:001

(See Reverse Pages for certain definitions)

THIS CERTIFIES THAT KEYSTONE MORTGAGE CORP., INC. is the registered owner of the Percentage Interest evidenced by this Certificate, in certain distributions with respect to KEYSTONE OWNER TRUST 1998-P2 (the "Trust") formed by Keystone Mortgage Corp., Inc. (the "Seller").

The Trust was created pursuant to a Trust Agreement dated as of August 31, 1998 (as amended and supplemented from time to time, the "Trust Agreement"), between Keystone Mortgage Corp., Inc., as the Seller and First Union Trust Company, National Association, as owner trustee (the "Owner Trustee"), a summary of certain of the pertinent provisions of which is set forth below. To the extent not otherwise defined herein, the capitalized terms used herein have the meanings assigned to them in the Trust Agreement or the Sale and Servicing Agreement dated as of August 31, 1998 (as amended and supplemented from time to time, the "Sale and Servicing Agreement"), among the Trust, Keystone Mortgage Corp., Inc., Keystone Grantor Trust 1998-P2, Republic Bank, Wilshire Servicing Corporation, and U.S. Bank Trust National Association, as applicable.

This Certificate is one of the duly authorized Certificates designated as "Keystone Asset Backed Certificates, Series 1998-P2", (herein called the "Certificates") issued under the Trust Agreement. Also issued under an Indenture dated as of August 31 1998, between the Trust and U.S. Bank Trust National Association, as Indenture Trustee, are the nine classes of Notes designated as "Asset Backed Notes, Series 1998-P2", Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class M-1, Class M-2, Class B-1 and Class B-2 (collectively, the "Notes"). This Certificate is issued under and is subject to the terms, provisions and conditions of the Trust Agreement to which Trust Agreement the holder of this Certificate by virtue of the acceptance hereof assents and by which such holder is bound. Payments of principal and interest on this Certificate shall be made by U.S. Bank Trust National Association, in its capacity as Paying Agent under the Sale and Servicing Agreement. The property of the Grantor Trust includes a pool of home improvement, debt consolidation and other loans (the "Loans"), all monies under on or after the Cut-Off Date, certain accounts and the proceeds thereof, and certain other rights under the Trust Agreement and the Sale and Servicing Agreement and all proceeds of the foregoing. The rights of the holders of the Certificates are subordinated to the rights of the holders of the Notes, as set forth in the Sale and Servicing Agreement and the Indenture.

Under the Trust Agreement, there will be distributed on the 25th day of each month or, if such 25th day is not a Business Day, the next Business Day, (each, a "Distribution Date"), commencing in October 1998, to the person in whose name this Certificate is registered at the close of business on the last Business Day of the month immediately preceding the month in which each Distribution Date occurs (each, a "Record Date"), such Certificateholder's fractional

A-2

undivided interest in the amounts distributable on such Distribution Date pursuant to Section 5.03(b) of the Sale and Servicing Agreement.

The holder of this Certificate acknowledges and agrees that its rights to receive distributions in respect of this Certificate are subordinated to the rights of the Noteholders as described in the Sale and Servicing Agreement and the Indenture.

It is the intent of the Seller, and the Certificateholders that, for purposes of federal, state and local income and single business tax and any other income taxes, the Trust will be treated as a partnership and the Certificateholders (including the Seller) will be treated as partners in that partnership. The Seller and the other Certificateholders by acceptance of a Certificate, agree to treat, and to take no action inconsistent with the treatment of, the Certificates for such tax purposes as partnership interests in the Trust.

Each Certificateholder, by its acceptance of a Certificate, covenants and agrees that such Certificateholder, as the case may be, will not at any time institute against the Trust, or join in any institution against the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Certificates, the Notes, the Trust Agreement or any of the Transaction Documents.

Distributions on this Certificate will be made as provided in the Trust Agreement and the Sale and Servicing Agreement by the Paying Agent by wire transfer or check mailed to the Certificateholder of record in the Certificate Register without the presentation or surrender of this Certificate or the making of any notation hereon, except that with respect to Certificates representing Percentage Interests of 10% or more, payments will be made by wire transfer in immediately available funds to the account designated by such nominee. Except as otherwise provided in the Trust Agreement and notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Owner Trustee of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency maintained for the purpose by the Owner Trustee in Delaware.

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

[Remainder of page intentionally left blank]

A-3

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Owner Trustee or an authenticating agent, by manual or facsimile signature, this Certificate shall not entitle the holder hereof to any benefit under the Trust Agreement or the Sale and Servicing Agreement or be valid for any purpose.

THIS CERTIFICATE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Trust and not in its individual capacity, has caused this Certificate to be duly executed.

KEYSTONE OWNER TRUST 1998-P2

By: First Union Trust Company, National Association, not in its individual capacity but solely as Owner Trustee under the Trust Agreement

By: _____
　　　　　　　Authorized Signatory

DATED: September 16, 1998

CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Trust Agreement.

U.S. Bank Trust National Association, as Administrator and Authenticating Agent

By: _____
　　　　　　　Authorized Signatory

A-4

PPLP 00051

(REVERSE OF CERTIFICATE)

The Certificates do not represent an obligation of, or an interest in, the Seller, the Servicer, the Owner Trustee in its individual capacity, Indenture Trustee, Grantor Trustee or any affiliates of any of them and no recourse may be had against such parties or their assets, except as may be expressly set forth or contemplated herein or in the Transaction Documents. In addition, this Certificate is not guaranteed by any governmental agency or instrumentality and is limited in right of payment to certain collections and recoveries respecting the Loans, all as more specifically set forth herein, in the Sale and Servicing Agreement and the Grantor Trust Agreement and in the Indenture. A copy of each of the Sale and Servicing Agreement, the Indenture, the Trust Agreement and the Grantor Trust Agreement may be examined during normal business hours at the principal office of the Owner Trustee, and at such other places, if any, designated by the Owner Trustee, by any Certificateholder upon written request.

The Trust Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Seller and the rights of the Certificateholders under the Trust Agreement at any time by the Seller and the Owner Trustee with prior written consent of the Rating Agencies, the Indenture Trustee and of the holders of the Notes and the Certificates each voting as a class evidencing not less than a majority of the Class of Notes and of the Class Principal Balance of the Certificates affected thereby. Any such consent by the holder of this Certificate shall be conclusive and binding on such holder and on all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Trust Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the holders of any of the Certificates.

As provided in the Trust Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registerable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies of the Certificate Registrar maintained in St. Paul, Minnesota, accompanied by a written instrument of transfer in form satisfactory to the Owner Trustee and the Certificate Registrar duly executed by the holder hereof or such holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same aggregate interest in the Trust will be issued to the designated transferee. The initial Certificate Registrar appointed under the Trust Agreement is the Administrator.

The Certificates are issuable only as registered Certificates. As provided in the Trust Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized Percentage Interests evidencing the same aggregate Percentage Interests, as requested by the holder surrendering the same. No service charge will be made for any such registration of transfer or exchange, but the Certificate Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith.

The Owner Trustee, the Certificate Registrar and any agent of the Owner Trustee or the Certificate Registrar may treat the person in whose name this Certificate is registered as the

PPLP 00052

owner hereof for all purposes and none of the Owner Trustee, the Certificate Registrar or any such agent shall be affected by any notice to the contrary.

The Trust, at the direction of Certificateholders owning at least 51% Percentage Interest in the Certificates or the Backup Servicer may, at their option, cause the Trust to purchase the corpus of the Grantor Trust at a price specified in the Sale and Servicing Agreement, and such purchase of the Loans and other property of the Grantor Trust will effect early retirement of the Certificates; however, such right of purchase is exercisable only on a Distribution Date on which the Pool Balance is less than 10% of the Initial Pool Balance.

The Certificates may not be acquired by (a) an employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the provisions of Title I of ERISA, (b) a plan described in Section 4975(e)(1) of the Code or (c) any entity, including an insurance company separate account or general account, whose underlying assets include plan assets by reason of a plan's investment in the entity (each, a "Plan"). By accepting and holding this Certificate, the Holder hereof shall be deemed to have represented and warranted that it is not a Plan.

PPLP 00053

## ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER
OF ASSIGNEE

_____

(Please print or type name and address, including postal zip code, of assignee)

_____

the within Certificate, and all rights thereunder, hereby irrevocably constituting and appointing

_____ Attorney to

transfer said Certificate on the books of the Certificate Registrar, with full power of substitution
in the premises.

Dated: _____

_____ */
Signature Guaranteed:

_____ */

*/    NOTICE:  The signature to this assignment must correspond with the name as it appears
upon the face of the within Certificate in every particular, without alteration, enlargement or any
change whatever.  Such signature must be guaranteed by a member firm of the New York Stock
Exchange or a commercial bank or trust company.

PPLP 00054

THE BENEFICIAL INTEREST IN THE TRUST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY STATE SECURITIES LAWS. THIS CERTIFICATE MAY BE DIRECTLY OR INDIRECTLY OFFERED OR SOLD OR OTHERWISE DISPOSED OF (INCLUDING PLEDGED) BY THE HOLDER HEREOF ONLY TO (I) A "QUALIFIED INSTITUTIONAL BUYER" AS DEFINED IN RULE 144A UNDER THE ACT, IN A TRANSACTION THAT IS REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR THAT IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT PURSUANT TO RULE 144A OR (II) A PERSON INVOLVED IN THE ORGANIZATION OR OPERATION OF THE TRUST OR AN AFFILIATE , AS DEFINED IN RULE 405 UNDER THE ACT, OF SUCH A PERSON WITHIN THE MEANING OF RULE 3a-7 OF THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (INCLUDING, BUT NOT LIMITED TO, KEYSTONE AND PARENT THEREOF (INCLUDING THE FIRST NATIONAL BANK OF KEYSTONE)) IN A TRANSACTION THAT IS REGISTERED UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR THAT IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS. NO PERSON IS OBLIGATED TO REGISTER THIS CERTIFICATE UNDER THE ACT OR ANY STATE SECURITIES LAWS.

NO TRANSFER OF THIS CERTIFICATES OR ANY BENEFICIAL INTEREST THEREIN SHALL BE MADE TO ANY PERSON UNLESS THE OWNER TRUSTEE HAS RECEIVED A CERTIFICATE FROM THE TRANSFEREE TO THE EFFECT THAT SUCH TRANSFEREE (I) IS NOT A PERSON WHICH IS AN EMPLOYEE BENEFIT PLAN, TRUST OR ACCOUNT SUBJECT TO TITLE I OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974, AS AMENDED ("ERISA") OR SECTION 4975 OF THE CODE OR A GOVERNMENTAL PLAN, DEFINED IN SECTION 3(32) OF ERISA SUBJECT TO ANY FEDERAL, STATE OR LOCAL LAW WHICH IS, TO A MATERIAL EXTENT, SIMILAR TO THE FOREGOING PROVISIONS OF ERISA OR THE CODE (ANY SUCH PERSON BEING A "PLAN") AND (II) IS NOT AN ENTITY, INCLUDING AN INSURANCE COMPANY SEPARATE ACCOUNT OR GENERAL ACCOUNT, WHOSE UNDERLYING ASSETS INCLUDE PLAN ASSETS BY REASON OF A PLAN'S INVESTMENT IN THE ENTITY.

KEYSTONE OWNER TRUST 1998-P2

ASSET BACKED CERTIFICATE, SERIES 1998-P2

evidencing a fractional undivided interest in the Trust, as defined below, the property of which includes a certificate evidencing 100% of the ownership interest in Keystone Grantor Trust 1998-P2 (the "Grantor Trust"), the assets of which consist primarily of a pool of Loans sold to the Grantor Trust by Keystone Mortgage Corp., Inc.

Percentage Interest: 10.19%                                    NUMBER:002

A-8

(See Reverse Pages for certain definitions)

THIS CERTIFIES THAT UNITED NATIONAL BANK is the registered owner of the Percentage Interest evidenced by this Certificate, in certain distributions with respect to KEYSTONE OWNER TRUST 1998-P2 (the "Trust") formed by Keystone Mortgage Corp., Inc. (the "Seller").

The Trust was created pursuant to a Trust Agreement dated as of August 31, 1998 (as amended and supplemented from time to time, the "Trust Agreement"), among Keystone Mortgage Corp., Inc., the Seller and First Union Trust Company, National Association, as owner trustee (the "Owner Trustee") a summary of certain of the pertinent provisions of which is set forth below. To the extent not otherwise defined herein, the capitalized terms used herein have the meanings assigned to them in the Trust Agreement or the Sale and Servicing Agreement dated as of August 31, 1998 (as amended and supplemented from time to time, the "Sale and Servicing Agreement"), among the Trust, Keystone Mortgage Corp., Inc., Keystone Grantor Trust 1998-P2, Republic Bank, Wilshire Servicing Corporation, and U.S. Bank Trust National Association, as applicable.

This Certificate is one of the duly authorized Certificates designated as "Keystone Asset Backed Certificates, Series 1998-P2", (herein called the "Certificates") issued under the Trust Agreement. Also issued under an Indenture dated as of August 31, 1998, between the Trust and U.S. Bank Trust National Association, as Indenture Trustee, are the nine classes of Notes designated as "Asset Backed Notes, Series 1998-P2", Class A-1, Class A-2, Class A-3, Class A-4, Class A-5, Class M-1, Class M-2, Class B-1 and Class B-2 (collectively, the "Notes"). This Certificate is issued under and is subject to the terms, provisions and conditions of the Trust Agreement to which Trust Agreement the holder of this Certificate by virtue of the acceptance hereof assents and by which such holder is bound. Payments of principal and interest on this Certificate shall be made by U.S. Bank Trust National Association, in its capacity as Paying Agent under the Sale and Servicing Agreement. The property of the Grantor Trust includes a pool of home improvement, debt consolidation and other loans (the "Loans"), all monies under on or after the Cut-Off Date, certain accounts and the proceeds thereof, and certain other rights under the Trust Agreement and the Sale and Servicing Agreement and all proceeds of the foregoing. The rights of the holders of the Certificates are subordinated to the rights of the holders of the Notes, as set forth in the Sale and Servicing Agreement and the Indenture.

Under the Trust Agreement, there will be distributed on the 25th day of each month or, if such 25th day is not a Business Day, the next Business Day, (each, a "Distribution Date"), commencing in October 1998, to the person in whose name this Certificate is registered at the close of business on the last Business Day of the month immediately preceding the month in which each Distribution Date occurs (each, a "Record Date"), such Certificateholder's fractional undivided interest in the amounts distributable on such Distribution Date pursuant to Section 5.03(b) of the Sale and Servicing Agreement.

PPLP 00056

The holder of this Certificate acknowledges and agrees that its rights to receive distributions in respect of this Certificate are subordinated to the rights of the Noteholders as described in the Sale and Servicing Agreement and the Indenture.

It is the intent of the Seller, and the Certificateholders that, for purposes of federal, state and local income and single business tax and any other income taxes, the Trust will be treated as a partnership and the Certificateholders (including the Seller) will be treated as partners in that partnership. The Seller and the other Certificateholders by acceptance of a Certificate, agree to treat, and to take no action inconsistent with the treatment of, the Certificates for such tax purposes as partnership interests in the Trust.

Each Certificateholder, by its acceptance of a Certificate, covenants and agrees that such Certificateholder, as the case may be, will not at any time institute against the Trust, or join in any institution against the Trust of, any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings, or other proceedings under any United States federal or state bankruptcy or similar law in connection with any obligations relating to the Certificates, the Notes, the Trust Agreement or any of the Transaction Documents.

Distributions on this Certificate will be made as provided in the Trust Agreement and the Sale and Servicing Agreement by the Paying Agent by wire transfer or check mailed to the Certificateholder of record in the Certificate Register without the presentation or surrender of this Certificate or the making of any notation hereon, except that with respect to Certificates representing Percentage Interests of 10% or more, payments will be made by wire transfer in immediately available funds to the account designated by such nominee. Except as otherwise provided in the Trust Agreement and notwithstanding the above, the final distribution on this Certificate will be made after due notice by the Owner Trustee of the pendency of such distribution and only upon presentation and surrender of this Certificate at the office or agency maintained for the purpose by the Owner Trustee in Delaware.

Reference is hereby made to the further provisions of this Certificate set forth on the reverse hereof, which further provisions shall for all purposes have the same effect as if set forth at this place.

[Remainder of page intentionally left blank]

PPLP 00057

Unless the certificate of authentication hereon shall have been executed by an authorized officer of the Owner Trustee or an authenticating agent, by manual or facsimile signature, this Certificate shall not entitle the holder hereof to any benefit under the Trust Agreement or the Sale and Servicing Agreement or be valid for any purpose.

THIS CERTIFICATE SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF DELAWARE, WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

IN WITNESS WHEREOF, the Owner Trustee, on behalf of the Trust and not in its individual capacity, has caused this Certificate to be duly executed.

KEYSTONE OWNER TRUST 1998-P2

By: First Union Trust Company, National Association, not in its individual capacity but solely as Owner Trustee under the Trust Agreement


By: _____
            Authorized Signatory


DATED: September 16, 1998


CERTIFICATE OF AUTHENTICATION

This is one of the Certificates referred to in the within-mentioned Trust Agreement.


U.S. Bank Trust National Association,
as Administrator and Authenticating Agent


By: _____
            Authorized Signatory


A-11

PPLP 00058

(REVERSE OF CERTIFICATE)

The Certificates do not represent an obligation of, or an interest in, the Seller, the Servicer, the Owner Trustee in its individual capacity, Indenture Trustee, Grantor Trustee or any affiliates of any of them and no recourse may be had against such parties or their assets, except as may be expressly set forth or contemplated herein or in the Transaction Documents. In addition, this Certificate is not guaranteed by any governmental agency or instrumentality and is limited in right of payment to certain collections and recoveries respecting the Loans, all as more specifically set forth herein, in the Sale and Servicing Agreement, the Grantor Trust Agreement and in the Indenture. A copy of each of the Sale and Servicing Agreement, the Indenture, the Trust Agreement and the Grantor Trust Agreement may be examined during normal business hours at the principal office of the Owner Trustee, and at such other places, if any, designated by the Owner Trustee, by any Certificateholder upon written request.

The Trust Agreement permits, with certain exceptions therein provided, the amendment thereof and the modification of the rights and obligations of the Seller and the rights of the Certificateholders under the Trust Agreement at any time by the Seller and the Owner Trustee with prior written consent of the Rating Agencies, the Indenture Trustee and of the holders of the Notes and the Certificates each voting as a class evidencing not less than a majority of the Class of Notes and of the Class Principal Balance of the Certificates affected thereby. Any such consent by the holder of this Certificate shall be conclusive and binding on such holder and on all future holders of this Certificate and of any Certificate issued upon the transfer hereof or in exchange herefor or in lieu hereof whether or not notation of such consent is made upon this Certificate. The Trust Agreement also permits the amendment thereof, in certain limited circumstances, without the consent of the holders of any of the Certificates.

As provided in the Trust Agreement and subject to certain limitations therein set forth, the transfer of this Certificate is registerable in the Certificate Register upon surrender of this Certificate for registration of transfer at the offices or agencies of the Certificate Registrar maintained in St. Paul, Minnesota, accompanied by a written instrument of transfer in form satisfactory to the Owner Trustee and the Certificate Registrar duly executed by the holder hereof or such holder's attorney duly authorized in writing, and thereupon one or more new Certificates of authorized denominations evidencing the same aggregate interest in the Trust will be issued to the designated transferee. The initial Certificate Registrar appointed under the Trust Agreement is the Administrator.

The Certificates are issuable only as registered Certificates. As provided in the Trust Agreement and subject to certain limitations therein set forth, Certificates are exchangeable for new Certificates of authorized Percentage Interests evidencing the same aggregate Percentage Interests, as requested by the holder surrendering the same. No service charge will be made for any such registration of transfer or exchange, but the Certificate Registrar may require payment of a sum sufficient to cover any tax or governmental charge payable in connection therewith.

The Owner Trustee, the Certificate Registrar and any agent of the Owner Trustee or the Certificate Registrar may treat the person in whose name this Certificate is registered as the

A-12

PPLP 00059

owner hereof for all purposes and none of the Owner Trustee, the Certificate Registrar or any such agent shall be affected by any notice to the contrary.

Certificateholders owning at least 51% Percentage Interest in the Certificates or the Servicer may, at their option, cause the Trust to purchase the corpus of the Grantor Trust at a price specified in the Sale and Servicing Agreement, and such purchase of the Loans and other property of the Grantor Trust will effect early retirement of the Certificates; however, such right of purchase is exercisable only on a Distribution Date on which the Pool Balance is less than 10% of the Initial Pool Balance.

The Certificates may not be acquired by (a) an employee benefit plan (as defined in Section 3(3) of ERISA) that is subject to the provisions of Title I of ERISA, (b) a plan described in Section 4975(e)(1) of the Code or (c) any entity, including an insurance company separate account or general account, whose underlying assets include plan assets by reason of a plan's investment in the entity (each, a "Plan"). By accepting and holding this Certificate, the Holder hereof shall be deemed to have represented and warranted that it is not a Plan.

A-13

PPLP 00060

ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

PLEASE INSERT SOCIAL SECURITY
OR OTHER IDENTIFYING NUMBER
OF ASSIGNEE

_____

(Please print or type name and address, including postal zip code, of assignee)

_____
the within Certificate, and all rights thereunder, hereby irrevocably constituting and appointing

_____ Attorney to
transfer said Certificate on the books of the Certificate Registrar, with full power of substitution
in the premises.

Dated:_____

_____  */
Signature Guaranteed:

_____  */

_____
*/     NOTICE:  The signature to this assignment must correspond with the name as it appears
upon the face of the within Certificate in every particular, without alteration, enlargement or any
change whatever.  Such signature must be guaranteed by a member firm of the New York Stock
Exchange or a commercial bank or trust company.

PPLP 00061

EXHIBIT B
TO THE TRUST AGREEMENT

CERTIFICATE OF TRUST OF
KEYSTONE OWNER TRUST 1998-P2

THIS Certificate of Trust of KEYSTONE OWNER TRUST 1998-P2 (the "Trust"), dated as of September 15, 1998, is being duly executed and filed by First Union Trust Company, National Association, a national banking association, as the sole trustee of the Trust as of such date, to form a business trust under the Delaware Business Trust Act (12 Del. Code, § 3801 et seq.).

1.      Name.  The name of the business trust formed hereby is KEYSTONE OWNER TRUST 1998-P2.

2.      Delaware Trustee.  The name and business address of the trustee of the Trust having its principal place of business in the State of Delaware is First Union Trust Company, National Association, One Rodney Square, First Floor, 920 King Street, Wilmington, Delaware 19801, Attention:  Corporate Trust Administration.

IN WITNESS WHEREOF, the undersigned, being the sole trustee of the Trust as of the date hereof, has executed this Certificate of Trust as of the date first above written.

First Union Trust Company, National Association, not in its individual capacity, but solely as Owner Trustee under a Trust Agreement dated as of August 31, 1998

By: _____
    Name:
    Title:

B-1

PPLP 00062

EXHIBIT C

TRANSFER CERTIFICATE

U.S. Bank Trust National Association

_____
_____

Attention: _____

_____
_____
_____

Re:    Trust Agreement, dated as of August 31, 1998, between Keystone Mortgage
       Corp., Inc., and First Union Trust Company, National Association; Keystone
       Owner Trust 1998-P2 Asset Backed Notes and Certificates, Series 1998-P2

Ladies and Gentlemen:

       The undersigned (the "Transferee") has agreed to purchase from
_____ (the "Transferor") the following:

[Insert Certificate(s) to be transferred]

       A. Rule 144A "Qualified Institutional Buyers" should complete this section

       I. The Transferee is (check one):

       _____        (i) An insurance company, as defined in Section 2(13) of the
                     Securities Act of 1933, as amended (the "Securities Act"), (ii) an
                     investment company registered under the Investment Company
                     Act of 1940, as amended (the "Investment Company Act"), (iii) a
                     business development company as defined in Section 2(a)(48) of
                     the Securities Act, (iv) a Small Business Investment Company
                     licensed by the U.S. Small Business Administration under Section
                     301(c) or (d) of the Small Business Investment Act of 1958, (v) a
                     plan established and maintained by a state, its political
                     subdivisions, or any agency or instrumentality of a state or its
                     political subdivisions, for the benefit of its employees, (vi) an
                     employee benefit plan within the meaning of Title I of the
                     Employee Retirement Income Security Act of 1974, as amended
                     ("ERISA"), (vii) a business development company as defined in

C-1

PPLP 00063

Section 202(a)(22) of the Investment Advisors Act of 1940, (viii) an organization described in Section 501(c)(3) of the Internal Revenue Code, corporation (other than a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution referenced in Section 3(a)(2) of the Securities Act or a foreign bank or savings and loan association or equivalent institution), partnership, or Massachusetts or similar business trust; or (ix) an investment advisor registered under the Investment Advisors Act of 1940, which, for each of (i) through (ix), owns and invests on a discretionary basis at least $100 million in securities other than securities of issuers affiliated with the Transferee, securities issued or guaranteed by the United States or a person controlled or supervised by and acting as an instrumentality of the government of the United States pursuant to authority granted by the Congress of the United States, bank deposit notes and certificates of deposit, loan participations, repurchase agreements, securities owned but subject to a repurchase agreement, and currency, interest rate and commodity swaps (collectively, "Excluded Securities");

—    a dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended (the "Exchange Act") that in the aggregate owns and invests on a discretionary basis at least $10 million of securities other than Excluded Securities and securities constituting the whole or part of an unsold allotment to, or subscription by, Transferee as a participant in a public offering;

—    an investment company registered under the Investment Company Act that is part of a family of investment companies (as defined in Rule 144A of the Securities and Exchange Commission) which own in the aggregate at least $100 million in securities other than Excluded Securities and securities of issuers that are part of such family of investment companies;

—    an entity, all of the equity owners of which are entities described in this Paragraph A(I);

—    a bank as defined in Section 3(a)(2) of the Securities Act, any savings and loan association or other institution as referenced in Section 3(a)(5)(A) of the Securities Act, or any foreign bank or savings and loan association or equivalent institution that in the aggregate owns and invests on a discretionary basis at least $100

PPLP 00064

million in securities other than Excluded Securities and has an audited net worth of at least $25 million as demonstrated in its latest annual financial statements, as of a date not more than 16 months preceding the date of transfer of the Residual Instruments to the Transferee in the case of a U.S. Bank Trust or savings and loan association, and not more than 18 months preceding such date in the case of a foreign bank or savings association or equivalent institution.

II.  The Transferee is acquiring such Certificates solely for its own account, for the account of one or more others, all of which are "Qualified Institutional Buyers" within the meaning of Rule 144A, or in its capacity as a dealer registered pursuant to Section 15 of the Exchange Act acting in a riskless principal transaction on behalf of a "Qualified Institutional Buyer". The Transferee is not acquiring such Certificates with a view to or for the resale, distribution, subdivision or fractionalization thereof which would require registration of the Certificates under the Securities Act.

III.  The Transferee is acquiring such Certificates solely for its own account, for investment, and not with a view to or for the resale, distribution, subdivision or fractionalization thereof which would require registration of the Residual Instruments under the Securities Act.

B.  If the Transferee is unable to complete one of paragraph A(I) above, the Transferee must furnish an opinion in form and substance satisfactory to the Trustee of counsel satisfactory to the Trustee to the effect that such purchase will not violate any applicable federal or state securities laws.

[To be completed by any Transferee acquiring an interest in the Certificates]

C.  The Transferee represents that it is not (A) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (B) a "plan" within the meaning of Section 4975(e)(1) of the Code (any such plan or employee benefit plan, a "Plan") or (C) any entity, including an insurance company separate account or general account, whose underlying assets include plan assets by reason of a plan's investment in the entity and is not directly or indirectly purchasing such Certificate on behalf of, as investment manager of, as named fiduciary of, as trustee of, or with assets of a Plan.

By its acceptance of a Certificate, each Prospective Certificateholder thereof agrees and acknowledges that no legal or beneficial interest in all or any portion of the Certificates may be transferred directly or indirectly to an individual, corporation, partnership or other person unless such transferee is not a Non-U.S. Person (any such person being referred to herein as a "Non-permitted Foreign Holder"), and any such purported transfer shall be void and have no effect.

PPLP 00065

(iii)    the Transferee is an "accredited investor" as defined in Rule 501(a) of Regulation D pursuant to the 1933 Act.

Very truly yours,
[NAME OF PURCHASER]

By: _____

Title: _____

Dated:

THE FOREGOING IS ACKNOWLEDGED THIS ____ DAY OF _____, 199_.

[NAME OF SELLER]
By:_____
Title:_____

C-4

PPLP 00066

# EXHIBIT D

EXHIBIT D


EXECUTION COPY


## SALE AND SERVICING AGREEMENT
Dated as of August 31, 1998

among


**KEYSTONE OWNER TRUST 1998-P2**
(Trust)

**KEYSTONE GRANTOR TRUST 1998-P2**
(Grantor Trust)

**KEYSTONE MORTGAGE CORP., INC.**
(Seller)

**REPUBLIC BANK**
(Servicer and Claims Administrator)

**WILSHIRE SERVICING CORPORATION**
(Backup Servicer)

and

**U.S. BANK TRUST NATIONAL ASSOCIATION**
(Indenture Trustee, Grantor Trustee and Contract of Insurance Holder)

Table of Contents

Page

ARTICLE I
DEFINITIONS

Section 1.01.  Definitions...................................................................................... 31
Section 1.03.  Interest Calculations. ........................................................................32

ARTICLE II
CONVEYANCE OF THE INITIAL LOANS

Section 2.01.  Conveyance of the Loans. ..................................................................32
Section 2.02.  Conveyance of the Grantor Trust Certificate. .....................................33
Section 2.03.  Ownership and Possession of Files. ...................................................33
Section 2.04.  Books and Records. .........................................................................34
Section 2.05.  Delivery of Loan Documents and the Grantor Trust Certificate. .........35
Section 2.06.  Acceptance by Grantor Trustee of the Loans; Certain Substitutions; Initial Certification. ......................................................................................39
Section 2.07.  Subsequent Transfers. .....................................................................40
Section 2.08.  Acceptance by Indenture Trustee of the Grantor Trust Certificate.....................43

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Section 3.01.  [Reserved]. .....................................................................................43
Section 3.02.  Representations, Warranties and Covenants of the Servicer. ...............43
Section 3.03.  Representations and Warranties of the Seller. .....................................46
Section 3.04.  [Reserved]. .....................................................................................55
Section 3.05.  Purchase and Substitution. ...............................................................55
Section 3.06.  Seller's Remedies .............................................................................58

ARTICLE IV
ADMINISTRATION AND SERVICING OF LOANS

Section 4.01.  Servicing Standard. ..........................................................................58
Section 4.02.  Subservicing Arrangements. ..............................................................60
Section 4.03.  Servicing Record. ............................................................................60
Section 4.04.  Annual Statement as to Compliance; Notice of Servicer Termination Event. ...63
Section 4.05.  Annual Independent Accountants' Report. ..........................................64
Section 4.06.  Access to Certain Documentation and Information Regarding Loans. .............65
Section 4.07.  Appointment of Paying Agent. ..........................................................65
Section 4.08.  Advances. .......................................................................................66
Section 4.09.  Reimbursement of Foreclosure Advances. ..........................................67
Section 4.10.  Modifications, Waivers and Amendments. ..........................................68
Section 4.11.  Due-On-Sale; Due-on-Encumbrance. .................................................69
Section 4.12.  Collection; Claims for FHA Insurance and Foreclosures. .....................70
Section 4.13.  Sale of Foreclosed Properties. ...........................................................74

USBT 100511

Section 4.14.   Management of Real Estate Owned. ....................................................... 75
Section 4.15.   Inspections. ................................................................................................ 76
Section 4.16.   Maintenance of Insurance. ........................................................................ 76
Section 4.17.   Release of Files. ......................................................................................... 77
Section 4.18.   Certain Tax Matters. ................................................................................. 78
Section 4.19.   Filing of Continuation Statements. .......................................................... 78
Section 4.20.   Fidelity Bond. ............................................................................................ 78
Section 4.21.   Errors and Omissions Insurance. .............................................................. 79
Section 4.22.   New Loan Reporting Manifest and Transfer of Note Report. ................. 79
Section 4.23.   Servicer Not Responsible. ........................................................................ 79

## ARTICLE V
### ESTABLISHMENT OF TRUST ACCOUNTS

Section 5.01.   Accounts. ................................................................................................... 79
Section 5.02.   Allocation of Losses. ................................................................................ 85
Section 5.03.   Certificate Distribution Account. ............................................................. 85
Section 5.04.   Trust Accounts; Trust Account Property. ................................................. 86
Section 5.05.   Custodianship of Physical Securities. ...................................................... 90
Section 5.06.   Capitalized Interest Account. ................................................................... 90
Section 5.07.   Pre-Funding Account ................................................................................ 91

## ARTICLE VI
### STATEMENTS AND REPORTS; SPECIFICATION OF TAX MATTERS

Section 6.01.   Servicing Certificate. ............................................................................... 92
Section 6.02.   Statement to Securityholders. .................................................................. 92

## ARTICLE VII
### CONCERNING THE CONTRACT OF INSURANCE HOLDER

Section 7.01.   Compliance with Title I and Filing of FHA Claims. ............................... 93
Section 7.02.   Regarding the Contract of Insurance Holder. .......................................... 94

## ARTICLE VIII
### [RESERVED]

## ARTICLE IX
### THE SERVICER

Section 9.01.   Indemnification; Third Party Claims. ...................................................... 95
Section 9.02.   Merger or Consolidation of the Servicer and Backup Servicer. .............. 96
Section 9.03.   Limitation on Liability of the Servicer, the Backup Servicer and Others. ......... 96
Section 9.04.   Servicer and Backup Servicer Not to Resign. .......................................... 97
Section 9.05.   Relationship of Servicer to Grantor Trust and the Grantor Trustee. ........ 97
Section 9.06.   Servicer and Backup Servicer May Own Notes. ...................................... 98
Section 9.07.   Rule 144A Information. ............................................................................ 98

USBT 100512

Section 9.08.  Servicing Compensation. ................................................................................ 99
Section 9.09.  Sub-Servicer for Backup Servicer. ................................................................. 99

ARTICLE X
DEFAULT

Section 10.01. Servicer Termination Events. ........................................................................ 100
Section 10.02. Consequences of a Servicer Termination Event. ........................................ 102
Section 10.03. Appointment of Successor. ........................................................................... 102
Section 10.04. Notification to Noteholders. .......................................................................... 103
Section 10.05. Waiver of Past Defaults. ................................................................................ 104
Section 10.06. Duties of the Backup Servicer. ..................................................................... 104

ARTICLE XI
TERMINATION

Section 11.01. Termination. ..................................................................................................... 104
Section 11.02. Notice of Termination. .................................................................................... 106

ARTICLE XII
MISCELLANEOUS PROVISIONS

Section 12.01. Acts of Securityholders. ................................................................................. 106
Section 12.02. Amendment. ..................................................................................................... 106
Section 12.03. Recordation of Agreement. ........................................................................... 107
Section 12.04. Duration of Agreement. ................................................................................. 107
Section 12.05. Governing Law. .............................................................................................. 107
Section 12.06. Notices. ............................................................................................................. 108
Section 12.07. Severability of Provisions. ............................................................................. 108
Section 12.08. No Partnership. ............................................................................................... 108
Section 12.09. Counterparts. ................................................................................................... 108
Section 12.10. Successors and Assigns. ................................................................................. 109
Section 12.11. Headings. .......................................................................................................... 109
Section 12.12. Actions of Securityholders. ........................................................................... 109
Section 12.13. Reports to Rating Agencies. .......................................................................... 109
Section 12.14. Inconsistencies Among Transaction Documents. ....................................... 110
Section 12.15. Liability of Owner Trustee. ........................................................................... 110

USBT 100513

EXECUTION COPY

SALE AND SERVICING AGREEMENT
Dated as of August 31, 1998

among

KEYSTONE OWNER TRUST 1998-P2
(Trust)

KEYSTONE GRANTOR TRUST 1998-P2
(Grantor Trust)

KEYSTONE MORTGAGE CORP., INC.
(Seller)

REPUBLIC BANK
(Servicer and Claims Administrator)

WILSHIRE SERVICING CORPORATION
(Backup Servicer)

and

U.S. BANK TRUST NATIONAL ASSOCIATION
(Indenture Trustee, Grantor Trustee and Contract of Insurance Holder)

USBT 100514

Table of Contents

Page

ARTICLE I
DEFINITIONS

Section 1.01.  Definitions..................................................................................... 31
Section 1.03.  Interest Calculations. ........................................................................ 32

ARTICLE II
CONVEYANCE OF THE INITIAL LOANS

Section 2.01.  Conveyance of the Loans. ................................................................. 32
Section 2.02.  Conveyance of the Grantor Trust Certificate. ...................................... 33
Section 2.03.  Ownership and Possession of Files. .................................................... 33
Section 2.04.  Books and Records. ......................................................................... 34
Section 2.05.  Delivery of Loan Documents and the Grantor Trust Certificate. ............. 35
Section 2.06.  Acceptance by Grantor Trustee of the Loans; Certain Substitutions; Initial Certification. ........................................................................... 39
Section 2.07.  Subsequent Transfers. ...................................................................... 40
Section 2.08.  Acceptance by Indenture Trustee of the Grantor Trust Certificate...................... 43

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Section 3.01.  [Reserved]. ...................................................................................... 43
Section 3.02.  Representations, Warranties and Covenants of the Servicer. ................... 43
Section 3.03.  Representations and Warranties of the Seller. ...................................... 46
Section 3.04.  [Reserved]. ...................................................................................... 55
Section 3.05.  Purchase and Substitution. ................................................................ 55
Section 3.06.  Seller's Remedies ............................................................................. 58

ARTICLE IV
ADMINISTRATION AND SERVICING OF LOANS

Section 4.01.  Servicing Standard. .......................................................................... 58
Section 4.02.  Subservicing Arrangements. .............................................................. 60
Section 4.03.  Servicing Record. ............................................................................ 60
Section 4.04.  Annual Statement as to Compliance; Notice of Servicer Termination Event. ...63
Section 4.05.  Annual Independent Accountants' Report. ........................................... 64
Section 4.06.  Access to Certain Documentation and Information Regarding Loans. ............. 65
Section 4.07.  Appointment of Paying Agent. .......................................................... 65
Section 4.08.  Advances. ....................................................................................... 66
Section 4.09.  Reimbursement of Foreclosure Advances. ........................................... 67
Section 4.10.  Modifications, Waivers and Amendments. ........................................... 68
Section 4.11.  Due-On-Sale; Due-on-Encumbrance. .................................................. 69
Section 4.12.  Collection; Claims for FHA Insurance and Foreclosures. ....................... 70
Section 4.13.  Sale of Foreclosed Properties. ........................................................... 71

USBT 100515

Section 4.14.  Management of Real Estate Owned. ...................................................... 75
Section 4.15.  Inspections. ............................................................................................. 76
Section 4.16.  Maintenance of Insurance. ..................................................................... 76
Section 4.17.  Release of Files. ..................................................................................... 77
Section 4.18.  Certain Tax Matters. ............................................................................... 78
Section 4.19.  Filing of Continuation Statements. ....................................................... 78
Section 4.20.  Fidelity Bond. ......................................................................................... 78
Section 4.21.  Errors and Omissions Insurance. ........................................................... 79
Section 4.22.  New Loan Reporting Manifest and Transfer of Note Report. .............. 79
Section 4.23.  Servicer Not Responsible. ...................................................................... 79

ARTICLE V
ESTABLISHMENT OF TRUST ACCOUNTS

Section 5.01.  Accounts. ................................................................................................ 79
Section 5.02.  Allocation of Losses. .............................................................................. 85
Section 5.03.  Certificate Distribution Account. ........................................................... 85
Section 5.04.  Trust Accounts; Trust Account Property. ............................................... 86
Section 5.05.  Custodianship of Physical Securities. .................................................... 90
Section 5.06.  Capitalized Interest Account. ................................................................. 90
Section 5.07.  Pre-Funding Account ............................................................................. 91

ARTICLE VI
STATEMENTS AND REPORTS; SPECIFICATION OF TAX MATTERS

Section 6.01.  Servicing Certificate. ............................................................................. 92
Section 6.02.  Statement to Securityholders. ................................................................ 92

ARTICLE VII
CONCERNING THE CONTRACT OF INSURANCE HOLDER

Section 7.01.  Compliance with Title I and Filing of FHA Claims. ............................. 93
Section 7.02.  Regarding the Contract of Insurance Holder. ....................................... 94

ARTICLE VIII
[RESERVED]

ARTICLE IX
THE SERVICER

Section 9.01.  Indemnification; Third Party Claims. ..................................................... 95
Section 9.02.  Merger or Consolidation of the Servicer and Backup Servicer. ........... 96
Section 9.03.  Limitation on Liability of the Servicer, the Backup Servicer and Others. ......... 96
Section 9.04.  Servicer and Backup Servicer Not to Resign. ....................................... 97
Section 9.05.  Relationship of Servicer to Grantor Trust and the Grantor Trustee. ..... 97
Section 9.06.  Servicer and Backup Servicer May Own Notes. .................................... 98
Section 9.07.  Rule 144A Information. .......................................................................... 98

Section 9.08.   Servicing Compensation. ................................................................99
Section 9.09.   Sub-Servicer for Backup Servicer. ..............................................99

ARTICLE X
DEFAULT

Section 10.01. Servicer Termination Events. ......................................................100
Section 10.02. Consequences of a Servicer Termination Event. ...........................102
Section 10.03. Appointment of Successor. .........................................................102
Section 10.04. Notification to Noteholders. ........................................................103
Section 10.05. Waiver of Past Defaults. .............................................................104
Section 10.06. Duties of the Backup Servicer. ....................................................104

ARTICLE XI
TERMINATION

Section 11.01. Termination. ..............................................................................104
Section 11.02. Notice of Termination. ................................................................106

ARTICLE XII
MISCELLANEOUS PROVISIONS

Section 12.01. Acts of Securityholders. ..............................................................106
Section 12.02. Amendment. ..............................................................................106
Section 12.03. Recordation of Agreement. .........................................................107
Section 12.04. Duration of Agreement. ..............................................................107
Section 12.05. Governing Law. .........................................................................107
Section 12.06. Notices. ....................................................................................108
Section 12.07. Severability of Provisions. ...........................................................108
Section 12.08. No Partnership. .........................................................................108
Section 12.09. Counterparts. ............................................................................108
Section 12.10. Successors and Assigns. .............................................................109
Section 12.11. Headings. ..................................................................................109
Section 12.12. Actions of Securityholders. ..........................................................109
Section 12.13. Reports to Rating Agencies. .........................................................109
Section 12.14. Inconsistencies Among Transaction Documents. ...........................110
Section 12.15. Liability of Owner Trustee. ..........................................................110

USBT 100517

EXHIBITS

| | |
|---|---|
| EXHIBIT A | Loan Schedule |
| EXHIBIT B | Form of Servicer Certificate / Monthly Loan Level Data |
| EXHIBIT C | Form of Monthly Statement to Securityholders |
| EXHIBIT D | Underwriting Guidelines |
| EXHIBIT E | Form of Request for Release of Files |
| EXHIBIT F | Form of Subsequent Transfer Agreement |

| | |
|---|---|
| Schedule 1 | Approved Loan Originators |

USBT 100518

This Sale and Servicing Agreement is entered into effective as of August 31, 1998, among KEYSTONE OWNER TRUST 1998-P2, a Delaware business trust (the "Trust"), KEYSTONE GRANTOR TRUST 1998-P2, a New York trust (the "Grantor Trust"), KEYSTONE MORTGAGE CORP., INC., a West Virginia corporation ("Keystone"), as seller (in such capacity, the "Seller"), REPUBLIC BANK, as servicer (in such capacity, the "Servicer") and claims administrator (in such capacity, the "Claims Administrator"), WILSHIRE SERVICING CORPORATION, a Delaware corporation, as backup servicer (the "Backup Servicer"), and U.S. BANK TRUST NATIONAL ASSOCIATION, as indenture trustee on behalf of the Noteholders (in such capacity, the "Indenture Trustee"), as grantor trustee on behalf of the holders of the Grantor Trust Certificate (in such capacity, the "Grantor Trustee") and as contract of insurance holder (in such capacity, the "Contract of Insurance Holder").

### PRELIMINARY STATEMENT

WHEREAS, the Grantor Trustee, on behalf of the Grantor Trust desires to purchase one or more pools of Loans which were and will be purchased by the Seller in the ordinary course of business of the Seller;

WHEREAS, the Grantor Trust will issue the Grantor Trust Certificate upon formation of the Grantor Trust;

WHEREAS, the Trust wishes to purchase the Grantor Trust Certificate from the Seller;

WHEREAS, the Trust will: (a) issue the Notes; (b) pledge the Grantor Trust Certificate to the Indenture Trustee as security for the Notes; (c) issue the Certificates of Beneficial Interest to the Seller and its designee; and (d) convey the Notes and the Certificates of Beneficial Interest to the Seller as consideration for the sale by the Seller of the Grantor Trust Certificate;

WHEREAS, the Servicer is willing to service the Loans in accordance with the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto hereby agree as follows:

### ARTICLE I

### DEFINITIONS

Section 1.01. <u>Definitions</u>. Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

<u>Accrual Period</u>: With respect to any Distribution Date and, (i) the Class A-1 Notes, the period from the Distribution Date in the month preceding the month of such Distribution Date (or, in the case of the first Distribution Date, from the Closing Date) through the day before such Distribution Date and (ii) any Class of Notes other than the Class A-1 Notes, the Calendar Month

USBT 100519

preceding such Distribution Date (or, in the case of the first Distribution Date from the Closing Date).

Addition Notice:  The notice given pursuant to Section 2.07 with respect to the transfer of Subsequent Loans to the Grantor Trust pursuant to such Section.

Aggregate Note Balance:  With respect to any Distribution Date, the aggregate of the Note Balances of the Notes.

Agreement:  This Sale and Servicing Agreement and all amendments hereof and supplements hereto.

Ancillary Fees.  Any amounts paid by or on behalf of an Obligor in respect of late payment charges, default interest, assumption fees, prepayment penalties, returned check fees and other fees charged by the Servicer but not including any Portability Fees.

Annual Default Percentage (Rolling Twelve Month).  As of any Determination Date, twelve times the percentage equivalent of the fraction:  (1) the numerator of which is the arithmetic average for each of the twelve immediately preceding Due Periods of the aggregate of the Principal Balances of the Loans which have become Defaulted Loans as of the Monthly Cut-Off Date with respect to each of such twelve Due Periods (if the Principal Balance of a Loan is included in the aggregate of the Principal Balances of the Loans which have become Defaulted Loans as of a Monthly Cut-Off Date and such Loan subsequently ceases to be a Defaulted Loan, such Principal Balance shall be deducted from the aggregate of the Principal Balances of the Loans which have become Defaulted Loans as of the Monthly Cut-Off Date next succeeding the date on which such Loan ceases to be a Defaulted Loan) and (2) the denominator of which is the arithmetic average of the aggregate Principal Balance of the Loans as of the Monthly Cut-Off Date with respect to each of such twelve Due Periods (excluding as of each such Monthly Cut-Off Date the Principal Balance of the Loans which are Defaulted Loans as of such Monthly Cut-Off Date and which first became Defaulted Loans as of a prior Monthly Cut-Off Date).

Approved Loan Originator.  Each of the originators of the Loans listed on Schedule 1 attached hereto.

Assignment of Mortgage:  With respect to each Loan secured by a Mortgage, an assignment, notice of transfer or equivalent instrument sufficient under the laws of the jurisdiction wherein the related Property is located to reflect of record the sale of the related Loan to the Grantor Trustee on behalf of the Grantor Trust as follows: "U.S. Bank Trust National Association, as Grantor Trustee for the Keystone Grantor Trust 1998-P2".

Backup Servicer:  Wilshire Servicing Corporation Inc., a Delaware corporation, its successors in interest or any successor servicer appointed as herein provided.

Backup Servicer Report:  As defined in Section 10.06.

USBT 100520

Backup Servicing Fee:  With respect to any Distribution Date, an amount equal to the Backup Servicing Fee Rate times the aggregate Principal Balance of the Loans, as of the close of business on the last day of the second calendar month before such Distribution Date (or the Initial Cut-Off Date, in the case of the first Distribution Date), which fee is part of Servicing Fee.

Backup Servicing Fee Rate:  0.09% per annum.

BIF:  The Bank Insurance Fund, as from time to time constituted, created under the Financial Institutions Reform, Recovery and Enhancement Act of 1989, or, if at any time after the execution of this Agreement the Bank Insurance Fund is not existing and performing duties now assigned to it, the body performing such duties on such date.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in New York City or in the city in which the Corporate Trust Office of the Indenture Trustee is located or the city in which the Servicer's servicing or banking operations are located and are authorized or obligated by law or executive order to be closed.

Calendar Month.  The period from and including the first day of a calendar month to and including the last day of such calendar month.

Capitalized Interest Account:  The Capitalized Interest Account established pursuant to Section 5.06.

Capitalized Interest Withdrawal Amount:  With respect to each Distribution Date during the Funding Period, to the extent amounts on deposit in the Note Distribution Account on such Distribution Date are insufficient to pay the Noteholders Interest Distribution Amount, the product of (A) the weighted average of the Note Rates weighted on the basis of the Note Balances of each Class of Notes immediately prior to the related Distribution Date and (B) the Pre-Funded Amount at the beginning of the related Due period.

Certificate Distribution Account:  The account established and maintained pursuant to Section 5.03.

Certificateholder:  A holder of a Certificate.

Certificate Register:  The register established pursuant to Section 3.4 of the Trust Agreement.

Certificates:  The certificates of beneficial interest issued pursuant to the Trust Agreement, evidencing the right to the amount remaining, if any, after all prior distributions have been made under this Agreement, the Indenture and the Trust Agreement.

CFR:  The Code of Federal Regulations, or any successor provisions thereto.

USBT 100521

Claims Administrator. Republic Bank, a Florida-chartered commercial bank, its successors in interest or any successor claims administrator appointed as provided herein.

Class:  With respect to the Notes, all Notes bearing the same class designation, and with respect to the Certificates, the Certificates shall be deemed to be one class.

Class A-1 Formula Rate:  As to any Distribution Date, LIBOR plus 0.08%.

Class A-1 Note:  Any Class A-1 Note in the form attached to the Indenture as Exhibit A-1.

Class A-2 Note:  Any Class A-2 Note in the form attached to the Indenture as Exhibit A-2.

Class A-3 Note:  Any Class A-3 Note in the form attached to the Indenture as Exhibit A-3.

Class A-4 Note:  Any Class A-4 Note in the form attached to the Indenture as Exhibit A-4.

Class A-5 Note:  Any Class A-5 Note in the form attached to the Indenture as Exhibit A-5.

Class B-1 Note:  Any Class B-1 Note in the form attached to the Indenture as Exhibit A-6.

Class B-1 Optimal Note Balance:  means with respect to any Distribution Date prior to the Stepdown Date, zero; and with respect to any other Distribution Date, the Pool Balance as of the preceding Determination Date minus the sum of (a) the aggregate of the Note Balances of the Senior Notes, the Class M-1 Notes and the Class M-2 Notes (after taking into account any payments made on such Distribution Date in reduction thereof) and (b) the greater of (i) 10.00% of the Pool Balance as of the preceding Determination Date plus the Targeted Overcollateralization Amount for such Distribution Date (calculated without giving effect to the proviso in the definition thereof) and (ii) 0.50% of the Initial Pool Balance.

Class B-2 Note:  Any Class B-2 Note in the form attached to the Indenture as Exhibit A-7.

Class B-2 Optimal Note Balance:  means with respect to any Distribution Date prior to the Stepdown Date, zero; and with respect to any other Distribution Date, the Pool Balance as of the preceding Determination Date minus the sum of (a) the aggregate of the Note Balances of the Senior Notes, the Class M-1 Notes, the Class M-2 Notes and the Class B-1 Notes (after taking into account any payments made on such Distribution Date in reduction thereof) and (b) the Targeted Overcollateralization Amount for such Distribution Date (calculated without giving effect to the proviso in the definition thereof).

USBT 100522

Class M-1 Note:  Any Class M-1 Note in the form attached to the Indenture as Exhibit A-8.

Class M-1 Optimal Note Balance:  means with respect to any Distribution Date prior to the Stepdown Date, zero; and with respect to any other Distribution Date, the Pool Balance as of the preceding Determination Date minus the sum of (a) the aggregate of the Note Balances of the Senior Notes (after taking into account any payments made on such Distribution Date in reduction of such Note Balances) and (b) the greater of (i) 44.00% of the Pool Balance as of the preceding Determination Date plus the Targeted Overcollateralization Amount for such Distribution Date (calculated without giving effect to the proviso in the definition thereof) and (ii) 0.50% of the Initial Pool Balance.

Class M-2 Note:  Any Class M-2 Note in the form attached to the Indenture as Exhibit A-9.

Class M-2 Optimal Principal Balance:  means with respect to any Distribution Date prior to the Stepdown Date, zero; and with respect to any other Distribution Date, the Pool Balance as of the preceding Determination Date minus the sum of (a) the aggregate of the Note Balances of the Senior Notes and the Class M-1 Notes (after taking into account any payments made on such Distribution Date in reduction of such Note Balances) and (b) the greater of (i) 26.00% of the Pool Balance as of the preceding Determination Date plus the Targeted Overcollateralization Amount for such Distribution Date (calculated without giving effect to the proviso in the definition thereof) and (ii) 0.50% of the Initial Pool Balance.

Closing Date:  September 16, 1998.

Code:  The Internal Revenue Code of 1986, as amended from time to time, and Treasury Regulations promulgated thereunder.

Collected Amount:  With respect to any Due Period, the following amounts (without duplication) which will constitute available funds for the following Distribution Date: (i) from amounts withdrawn from the Collection Account not later than the Business Day prior to such Distribution Date, (a) payments of interest (net of the related Servicing Fee) and principal in respect of the Loans received during such Due Period (exclusive of interest due on or before September 15, 1998) and (b) any reinvestment earnings in the Collection Account; (ii) all liquidation proceeds (net of related expenses) in respect of the Loans received during such Due Period; (iii) the Purchase Price for repurchased Loans and Substitution Adjustment Amounts in respect of substitutions of Loans during such Due Period; (iv) insurance proceeds received by Servicer in respect of Loans during such Due Period; (v) proceeds of FHA Claims received during such Due Period; (vi) payments received during such Due Period in respect of the Loans from the Trust or the Backup Servicer, as applicable, in connection with the termination of the Trust as provided in Section 11.01(b); and (vii) any amounts required to be withdrawn from the Capitalized Interest Account.

USBT 100523

Collection Account:  The account denominated as a Collection Account and maintained or caused to be maintained by the Grantor Trustee pursuant to Section 5.01.

Contract:  As of any date of determination, each of the manufactured housing installment sale contracts and installment loan agreements transferred and assigned to the Grantor Trust pursuant to Section 2.01 or in accordance with Section 3.05.

Contract File:  With respect to any Contract, the related contract documents listed in Section 2.05(a)(B) and any additional documents required to be added thereto pursuant to this Agreement.

Contract of Insurance:  The contract of insurance under Title I covering the FHA Loans held under the name U.S. Bank Trust National Association, or any successor thereto, as Contract of Insurance Holder hereunder.

Contract of Insurance Holder:  U.S. Bank Trust National Association, its successors in interest, and any successor thereto pursuant to the terms of this Agreement.

Conventional Loan Program.  The Seller's reunderwriting guidelines for Non-FHA Loans not purchased by the Seller under the Equiflex Loan Program.

Corporate Trust Office:  The office of the Indenture Trustee at which any particular time its corporate business shall be principally administered, located on the Closing Date at U.S. Bank Trust National Association, 180 East 5th Street, St. Paul, Minnesota 55101, Attention: Structured Finance.

Credit Files:  As defined in Section 2.05(b).

Cumulative Losses:  With respect to any Distribution Date, the aggregate amount of Realized Losses incurred since the Initial Cut-off Date through the related Monthly Cut-Off Date.

Cut-Off Date:  With respect to any Initial Loan, the Initial Cut-off Date, and with respect to each Subsequent Loan, the date specified in the related Subsequent Transfer Agreement.

Cut-Off Date Principal Balance:  With respect to any Loan, the outstanding principal balance thereof at the close of business on the applicable Cut-Off Date after giving effect to all payments of principal received thereon or prior thereto.

Debt Instrument:  The note or other evidence of indebtedness, as amended or supplemented, evidencing the indebtedness of an Obligor under a Loan.

Defaulted Loan:  A Loan with respect to which:  (i) a claim has been submitted pursuant to the Contract of Insurance, (ii) foreclosure proceedings have been commenced, (iii) any portion of a Monthly Payment is more than 150 days past due (without giving effect to any grace period)

USBT 100524

or (iv) the Servicer has determined in good faith in accordance with customary loan servicing practices that all amounts which it expects to receive from the related Obligor with respect to the Loan have been received.

Defective Loan:  A Loan required to be repurchased or substituted for pursuant to <u>Section 3.05</u> hereof.

Deferred Amount:  As to any Distribution Date, the sum of the Principal Write-Down Amount and the Write-Down Interest Amount.

Delinquent: As used herein, a Mortgage Loan is considered to be: "30 to 59 days" or "30 or more days" delinquent when a payment due on any scheduled Due Date remains unpaid as of the close of business on the next following monthly scheduled Due Date; "60 to 89 days" or "60 or more days" delinquent when a payment due on any scheduled Due Date remains unpaid as of the close of business on the second following monthly scheduled Due Date; and so on.  The determination as to whether a Loan falls into these categories is made as of the close of business on the last business day of each month.  For example, a Loan with a payment due on September 1 that remained unpaid as of the close of business on October 31 would then be considered to be 30 to 59 days delinquent.  Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

Delinquency Rate:  With respect to the Loans and any Distribution Date, the percentage equivalent of a fraction (a) the numerator of which equals the sum, without duplication of (i) 100% of the aggregate Principal Balance of all Loans that are 90 or more days Delinquent, 75% of the aggregate Principal Balance of all Loans that are in foreclosure and (iii) 100% of the aggregate Principal Balance of all Loans that are converted to REO Properties, in each case as of the last day of the related Due Period and (b) the denominator of which is the aggregate Principal Balance of the Loans as of the last day of such Due Period.

Determination Date:  With respect to any Distribution Date, the fifth Business Day preceding such Distribution Date.

Distribution Date:  The 25th day of any month or if such 25th day is not a Business Day, the first Business Day immediately following such day, commencing in October 1998.

DTC:  The Depository Trust Company.

Due Date:  With respect to any Monthly Payment, the date on which such Monthly Payment is required to be paid pursuant to the related Debt Instrument.

Due Period:  With respect to any Determination Date or Distribution Date, the Calendar Month immediately preceding such Determination Date or Distribution Date, as the case may be.

<u>Eligible Account</u>: (i) A segregated trust account that is maintained with the corporate trust department of a depository institution, or (ii) a segregated direct deposit account maintained with a depository institution or trust company organized under the laws of the United States of America, or any of the states thereof, or the District of Columbia, having a certificate of deposit, short term deposit or commercial paper rating of at least A-1+ by Fitch and P-1 by Moody's; provided, however, that with respect to cash funds held uninvested (other than Monthly Payments received by the Servicer and held uninvested prior to deposit to the Collection Account or investment in Eligible Investments in accordance with the terms hereof), an Eligible Account is a demand deposit account established in the name of the Grantor Trust or the Indenture Trustee at a bank located in the State of Minnesota satisfying the criteria set forth in (ii) above.

<u>Eligible Investments</u>:  Any one or more of the following types of investments:

(a) (i)  direct interest-bearing obligations of, and interest-bearing obligations guaranteed as to timely payment of principal and interest by, the United States or any agency or instrumentality of the United States the obligations of which are backed by the full faith and credit of the United States; and (ii) direct interest-bearing senior obligations of, and interest-bearing senior obligations guaranteed as to timely payment of principal and interest by, the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation, but only if, at the time of investment, such obligations are assigned the highest credit rating by each Rating Agency but excluding any of such securities whose terms do not provide for payment of a fixed dollar maturity or call for redemption;

(b) demand or time deposits in, certificates of deposit of, or bankers' acceptances (having original maturities of not more than 365 days) issued by any depository institution or trust company organized under the laws of the United States or any state thereof and subject to supervision and examination by federal and/or state banking authorities (including, if applicable, the Indenture Trustee, the Grantor Trustee or any agent of thereof acting in its commercial capacities); provided, however, that the short-term unsecured senior debt obligations of such depository institution or trust company at the time of such investment, or contractual commitment providing for such investment, are assigned the highest credit rating by each Rating Agency;

(c) repurchase obligations pursuant to a written agreement where (i) with respect to any obligation collateralized by the obligations described in clause (a) above, the Grantor Trustee or the Indenture Trustee has taken actual or constructive delivery of such obligation, and (ii) entered into with the corporate trust department of a depository institution or trust company organized under the laws of the United States or any state thereof, the deposits of which are insured by the Federal Deposit Insurance Corporation and the short-term unsecured debt obligations of which are rated "A-1+" by Fitch and "P-1" by Moody's (including, if applicable, the Grantor Trustee or the Indenture Trustee or any agent thereof acting in their respective commercial capacities);

USBT 100526

(d) commercial paper (having original maturities of not more than 90 days) that (i) is payable in United States dollars and (ii) is rated in the highest credit rating category by each Rating Agency;

(e) investments in money market funds (which may be 12b-1 funds, as contemplated under the rules promulgated by the Securities and Exchange Commission under the Investment Company Act of 1940) having a rating of AAA-m or AAAM-G from Fitch and Aaa from Moody's (including funds for which the Indenture Trustee or any of its Affiliates acts as an investment adviser or manager), and having a rating of AAA by Fitch; or

(f) investments in "no load" money market funds rated "AAAm" or "AAAm-G" by Fitch and "Aaa" by Moody's.

Eligible Servicer:  A Person that (i) is servicing a portfolio of mortgage loans, unsecured loans and/or manufactured housing contracts, (ii) is legally qualified to service the Loans, (iii) has demonstrated the ability professionally and competently to service a portfolio of mortgage loans, unsecured loans and/or manufactured housing contracts similar to certain of the Loans with reasonable skill and care and (iv) has with its affiliates on a consolidated basis a net worth calculated in accordance with generally accepted accounting principles of at least $20,000,000.

Equiflex Loan Program:  The Seller's current re-underwriting guidelines for the Non-FHA Loans that is described in the Underwriting Guidelines (other than the portion of such Underwriting Guidelines relating to the Seller's predecessor Conventional Loan Program) attached hereto as Exhibit D.

Excess Spread:   means with respect to any Distribution Date, the excess of (a) the Net Collected Amount over (b) the sum of (1) the aggregate Noteholders Interest Distribution and (2) the Principal Remittance Amount.

FDIC:  The Federal Deposit Insurance Corporation and any successor thereto.

FHA:  The Federal Housing Administration and any successor thereto.

FHA Insurance:  Insurance issued by FHA pursuant to Title I of the National Housing Act of 1934, as amended.

FHA Insurance Coverage Insufficiency:  At the time of a prospective claim for reimbursement under the Contract of Insurance for an FHA Loan pursuant to Section 4.12, the amount by which the sum of all claims previously paid by the FHA in respect of all FHA Loans and the amount expected to be received in respect of such prospective claim for such FHA Loan exceeds the Trust Designated Insurance Amount.

FHA Insurance Coverage Reserve Account:  The account established by the FHA pursuant to the Contract of Insurance which is established and maintained under Title I (see 24 C.F.R. 201.32(a)).

13

**FHA Insurance Payment Amount**:  With respect to any Distribution Date and with respect to an FHA Loan for which an insurance claim has been made by the Contract of Insurance Holder or the Claims Administrator and paid by the FHA or rejected by the FHA, an amount equal to the sum of such of the following as are appropriate:  (i) the amount, if any, received from the FHA, (ii) with respect to claims rejected, the amount, if any, received from the Seller or the Servicer pursuant to Section 4.12 and (iii) the amount received from the sale of FHA Pending Claims sold pursuant to Section 11.01(b).

**FHA Loans**:  The Loans designated as FHA Loans on the Loan Schedule.

**FHA Pending Claims**:  As defined in Section 11.01(b).

**FHA Premium Account**:  The account which is an Eligible Account established and maintained by the Grantor Trustee pursuant to Section 5.01(c).

**FHA Premium Account Deposit**:  With respect to any Distribution Date, an amount equal to the greater of (i) 1/12 times .75% times the aggregate Principal Balance of all FHA Loans other than Invoiced Loans as of the first day of the calendar month preceding the month of such Distribution Date (or the aggregate Principal Balance of such Loans as of the applicable Cut-Off Date with respect to the first Distribution Date) and (ii) the positive excess, if any, of (A) the projected amount of premium and other charges due under the Contract of Insurance for the next succeeding Due Period over (B) the balance in the FHA Premium Account as of the related Distribution Date.

**FHA Reserve Amount**:  As to each FHA Loan, 10% of the Principal Balance as of the Cut-Off Date of such FHA Loan.

**FHLMC**:  The Federal Loan Mortgage Corporation and any successor thereto.

**File(s)**:  Any of a Contract File, Mortgage File, Legal File, Credit File or collectively as the context may require.

**Final Maturity Date**:  With respect to: the Class A-1 Notes, November  25, 2007; Class A-2 Notes, October 25, 2010; Class A-3 Notes, January 25, 2013; Class A-4 Notes, December 25, 2018; Class A-5 Notes, January 25, 2029; Class M-1 Notes, January 25, 2029; Class M-2 Notes, January 25, 2029; Class B-1 Notes, January 25, 2029 and Class B-2 Notes, January 25, 2029.

**Fitch**:  Fitch IBCA, Inc., or any successor thereto.

**FNMA**:  The Federal National Mortgage Association and any successor thereto.

**Foreclosed Loan**:  As of any date of determination, any Loan, other than a Loan for which a claim is pending under the Contract of Insurance, that has been discharged as a result of (i) the completion of foreclosure or comparable proceedings; (ii) the Grantor Trustee's

USBT 100528

acceptance of the deed or other evidence of title to the related Property in lieu of foreclosure or other comparable proceeding; or (iii) the acquisition by the Grantor Trustee of title to the related Property by operation of law.

Foreclosed Property:  With respect to any Loan, any Property acquired by the Grantor Trust in respect of a Foreclosed Loan.

Foreclosure Advances:  As defined in Section 4.08(b).

Funding Period:  The period from the Closing Date until the earliest of (i) the date on which the amount on deposit in the Pre-Funding Account (without including investment earnings) is less than $50,000, (ii) the date on which an Event of Default occurs and (iii) December 15, 1998.

Grant:  As defined in the Indenture.

Grantor Trust:  The Keystone Grantor Trust 1998-P2 created pursuant to the Grantor Trust Agreement.

Grantor Trust Accounts:  The FHA Premium Account, Collection Account and the Pre-Funding Account

Grantor Trust Agreement:  The Trust Agreement, dated as of August 28, 1998, between the Seller and the Grantor Trustee.

Grantor Trust Certificate:  The Grantor Trust Certificate issued pursuant to the Grantor Trust Agreement.

Grantor Trust Certificate Interest Remittance Amount:  With respect to any Distribution Date an amount equal to all interest collected with respect to the Loans during the related Due Period reduced by the amount of the Servicing Fee, and Grantor Trustee Fee for such Due Period.

Grantor Trust Certificate Principal Remittance Amount:  With respect to any Distribution Date an amount equal to the Principal Remittance Amount.

Grantor Trust Certificate Remittance Amount:  With respect to any Distribution Date the sum of the related Grantor Trust Interest Remittance Amount and Grantor Trust Principal Remittance Amount reduced by the amounts set forth in Section 5.01(d)(ii)(b).

Grantor Trust Certificateholder:  The holder as shown on the Grantor Trust Register pursuant to the Grantor Trust Agreement of the Grantor Trust Certificate.

Grantor Trustee:  U.S. Bank Trust National Association. and its successors in interest.

USBT 100529

Grantor Trustee Fee:  With respect to any Distribution Date the Grantor Trustee Fee Rate times the Pool Balance as of the last day of the second preceding Due Period.

Grantor Trustee Fee Rate:  .0033%.

Grantor Trust Estate:  As defined in Section 2.01(a).

Grantor Trust Register:  The register established pursuant to the Grantor Trust Agreement.

HUD:  The United States Department of Housing and Urban Development and any successor thereto.

Indenture:  The Indenture, dated as of August 31, 1998, between the Trust and the Indenture Trustee.

Indenture Trust Estate:  The Trust Estate other than the Certificate Distribution Account.

Indenture Trustee:  U.S. Bank Trust National Association, a national banking association, as Indenture Trustee under the Indenture and this Agreement acting on behalf of the Noteholders, or any successor indenture trustee under the Indenture and this Agreement.

Indenture Trustee Fee:  With respect to any Distribution Date, the Indenture Trustee Fee Rate times the Pool Balance as of the last day of the second preceding Due Period (or the Closing Date in the case of the first Distribution Date).

Indenture Trustee Fee Rate:  .0033% per annum.

Independent:  When used with respect to any specified Person, such Person (i) is in fact independent of the Seller, the Servicer or any of their respective affiliates, (ii) does not have any direct financial interest in or any material indirect financial interest in any of the Seller, the Servicer or any of their respective affiliates and (iii) is not connected with any of the Seller, the Servicer or any of their respective affiliates as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions; provided, however, that a Person shall not fail to be Independent of the Seller, the Servicer or any of their respective affiliates merely because such Person is the beneficial owner of 1% or less of any class of securities issued by the Seller, the Servicer or any of their respective affiliates, as the case may be.

Independent Accountants:  A firm of nationally recognized certified public accountants which is Independent.

Independent Contractor:  An Independent contractor engaged pursuant to Section 4.14 hereof.

Initial Cut-Off Date:  The close of business on August 31, 1998.

16

USBT 100530

Initial Loan:  The Initial Loans transferred to the Grantor Trust on the Initial Cut-off Date.

Initial Loan Schedule:  With respect to any date, the initial schedule of Initial Loans included in the Grantor Trust as of the Initial Cut-Off Date set forth herein as Exhibit A-1.

Initial Pool Balance:  The sum of the Cut-Off Date Principal Balances of the Initial Loans and the Pre-Funded Amount as of the Closing Date.

Insurance Policies:  With respect to any Property, any related insurance policy required to be maintained under Title I or otherwise.

Insurance Proceeds:  With respect to any Property, all amounts collected in respect of Insurance Policies and not required to be applied to the restoration of the related Property or paid to the related Obligor.

Insurance Record:  The record established and maintained by the Claims Administrator (in a manner consistent with the Title I provisions set forth in 24 C.F.R. Section 201.32) setting forth the FHA insurance coverage attributable to the FHA Loans hereunder and for Related Series Loans.  To the extent consistent with adjustments pursuant to Title I to the FHA Insurance Coverage Reserve Account, the Insurance Record shall be reduced by the amount of claims approved for payment by the FHA with respect to any FHA Loan or Related Series Loan after the date of transfer of the related FHA reserve account to the Contract of Insurance Holder.

Institutional Accredited Investor:  Shall mean an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) and/or (7) under the Securities Act.

Investment Order:  With respect to amounts on deposit in an account, a written order with respect to the Eligible Investments in which the amounts in such account are to be invested, signed by an authorized officer of the Trust.

Invoiced Loan:  An FHA Loan with respect to which the related Obligor is required to pay the premium on FHA Insurance with respect to such FHA Loan separately from the payment of interest on such FHA Loan.

Land-and-Home Contract:  A Contract that is secured in part by the lien of a Mortgage.

Legal File:  As defined in Section 2.05.

LIBOR:  As to any date, the rate for United States dollar deposits for one month which appears on the Telerate Page 3750 as of 11:00 A.M., London time.  If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be reasonably selected by the Indenture Trustee after consultation with the Servicer), the rate will be the Reference Bank Rate.  If no such quotations can be obtained and no Reference Bank Rate is

USBT 100531

available, LIBOR will be (i) LIBOR applicable to the preceding Distribution Date, (ii) or if such Distribution Date is the first Distribution Date, 5.64453%.

LIBOR Business Day:  Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of New York, the State of Minnesota or in the city of London, England are required or authorized by law to be closed.

LIBOR Determination Date:  The second LIBOR Business Day prior to the first day of the related Interest Period (or the second LIBOR Business Day prior to the Closing Date, in the case of the first Distribution Date).

Liquidated Loan:  A Loan with respect to which the Servicer has determined in good faith in accordance with customary loan servicing practices that all amounts which it expects to receive with respect to such Loan have been received.

Loan:  As of any date of determination, any loan that is identified on the Loan Schedule transferred and assigned to the Grantor Trust pursuant to Section 2.01 or in accordance with Section 3.05 as the context requires or, collectively, the Contracts and the Mortgage Loans other than any Loan that becomes a Purchased Loan or for which a Substitute Loan is substituted.

Loan Purchase Agreement:  Each of the Master Loan Purchase Agreement dated September 16, 1998, as amended and supplemented, between The First National Bank of Keystone, as purchaser, and Republic Bank, as seller, and the Master Loan Purchase Agreements dated September 16, 1998 between Keystone Mortgage Corp., Inc., as purchaser, and The First National Bank of Keystone, as seller.

Loan Rate:  With respect to any Loan, the fixed rate of interest per annum set forth in the related Debt Instrument (not including any amounts payable as premium for FHA Insurance with respect to Invoiced Loans).

Loan Schedule:  With respect to any date, the schedule of Loans included in the Grantor Trust on such date, which list shall consist of the Initial Loan Schedule, together with any Subsequent Loan Schedule reflecting the Subsequent Loans transferred to the Grantor Trust on a Subsequent Transfer Date.  The Loan Schedule will be deemed to be amended from time to time to reflect Subsequent Loans, Purchased Loans and Substitute Loans.

Manufactured Home:  A unit of manufactured housing which meets the requirements of Section 25(e)(10) of the Code, including all accessions thereto, securing the indebtedness of the Obligor under the related Contract.

Majority Certificateholder:  A Certificateholder holding at least 51% of the aggregate Percentage Interests of all the Certificates.

Majority Securityholders:  (i) Until such time as the sum of the Aggregate Note Balance has been reduced to zero, the holder or holders of in excess of 50% of the Note Balance of all

USBT 100532

Classes of Notes (as a result of which the holders of the Certificates shall be excluded from any rights or actions of the Majority Securityholders during such period); and (ii) thereafter, the holder or holders of in excess of 50% of the Percentage Interest of the Certificates, provided however, that in determining the majority of the Note Balances, Notes owned by the Seller or any affiliate shall be disregarded.

Maturity Date:  With respect to any Loan and as of any date of determination, the date on which the last payment of principal is due and payable under the related Debt Instrument.

Monthly Cut-Off Date:  The last day of any calendar month, and with respect to any Distribution Date or related Determination Date, the last day of the calendar month immediately preceding such Distribution Date or related Determination Date.

Monthly Payment:  With respect to any Loan and any Due Period, the payment of principal and interest due in such Due Period from the Obligor pursuant to the related Debt Instrument (as amended or modified, if applicable, pursuant to Section 4.10).  The Monthly Payment related to a Determination Date or a Distribution Date shall be the Monthly Payment due for the preceding Due Period.

Moody's:  Moody's Investors Service, Inc., or any successor thereto.

Mortgage:  With respect to any Mortgage Loan or Land-and-Home Contract, the mortgage, deed of trust or other instrument, as amended or supplemented, creating a mortgage lien (and in a title theory state the document conveying title to the Mortgaged Property as security for the related Loan) on the related Mortgaged Property.

Mortgage File:  With respect to any Mortgage Loan, the related mortgage documents listed in Section 2.05 and any additional documents required to be added thereto pursuant to this Agreement.

Mortgaged Property:  With respect to any Mortgage Loan or Land-and-Home Contract, any fee interests in the residential property subject to the lien of the related Mortgage at the time of origination of such Mortgage Loan or Land-and-Home Contract or, if applicable, at the time of exercise of the Portability Option.

Mortgage Loan:  As of any date of determination, each of the Loans, secured by an interest in a Property, that is transferred and assigned to the Grantor Trust pursuant to Section 2.01 and Section 3.05.

Mortgagee or Obligee:  With respect to any Loan as of any date of determination, the holder of the related Debt Instrument and any related Mortgage as of such date.

Mortgagor or Obligor:  With respect to any Loan, the obligor(s) on the related Debt Instrument.

USBT 100533

**Net Collected Amount**: As to any Distribution Date the related Collected Amount reduced by the sum of (i) the Grantor Trustee Fee, the Owner Trustee Fee and the Indenture Trustee Fee for the related Due Period, (ii) Priority Expenses for the related Due Period, (iii) the FHA Premium Account Deposit, (iv) reimbursements to the Servicer for accrued and unpaid Servicing Fees, and (v) previous Foreclosure Advances for the related Due Period to the extent permitted to be reimbursed pursuant to Section 4.09.

**Net Delinquency Calculation Amount**: With respect to any Distribution Date, the excess, if any, of (x) the product of 2.0 and the Rolling Six-Month Delinquency Average over (y) the aggregate of the amounts of Excess Spread for the three preceding Distribution Dates.

**Net Funds Cap**: For any Distribution Date will equal the weighted average of the Loan Rates as of the last day of the second preceding Due Period (weighted on the basis of the related Principal Balances as of such date) minus 1.32% per annum.

**Net Loan Rate**: With respect to each Loan, the related Loan Rate less the Servicing Fee per Rate.

**New Loan Reporting Manifest**: With respect to an FHA Loan, the report complying with Title I filed with HUD, Office of Finance and Accounting pursuant to 24 CFR Section 201.30 for the purpose of causing the initial assignment of a case number to the FHA Loan by the FHA.

**Non-FHA Loans**: The Loans designated as Non-FHA Loans on the Loan Schedule.

**Note(s)**: One or more of Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class A-4 Notes, Class A-5 Notes, Class M-1 Notes, Class M-2 Notes, Class B-1 Notes or Class B-2 Notes.

**Note Balance**: With respect to any date of determination and each Class of Notes, the Original Note Balance of such Class, reduced by the sum of (a) all Noteholders' Principal Distribution Amounts previously distributed with respect to such Class and (b) the Principal Write-Down Amount, if any, previously allocated to such Class in reduction of the principal amount thereof.

**Note Distribution Account**: The account established and maintained pursuant to Section 5.01(b).

**Noteholder**: A holder of a Note.

**Noteholders' Interest Carryover Shortfall**: With respect to any Class of Notes and any Distribution Date, the sum of (a) the excess of the related Noteholders' Monthly Interest Distributable Amount for the preceding Distribution Date and any outstanding Noteholders' Interest Carryover Shortfall with respect to such Notes on such preceding Distribution Date, over the amount in respect of interest that is actually distributed to the related Class of Noteholders on such preceding Distribution Date and (b) interest on such excess, to the extent permitted by law, at the related Note Rate for the related Accrual Period.

USBT 100534

Noteholders' Interest Distribution:  With respect to any Distribution Date and each Class of Notes, the sum of (i) the applicable Noteholders' Monthly Interest Distributable Amount for such Class on such Distribution Date and (ii) the applicable Noteholders' Interest Carryover Shortfall for such Class on such Distribution Date.

Noteholders' Monthly Interest Distributable Amount:  With respect to any Distribution Date and each Class of Notes, interest at the applicable Note Rate for such Class, on the related Note Balance for such Distribution Date.

Noteholders' Principal Distribution Amount:  With respect to any Distribution Date, (A) the excess of the sum of (i) the Principal Remittance Amount for such Distribution Date and (ii) the Excess Spread for such Distribution Date to the extent required to satisfy the Targeted Overcollateralization Amount over (B) the Overcollateralization Release Amount, if any; provided however, that the Noteholders' Principal Distribution Amount shall not exceed the Aggregate Note Balance.

Note Rate:  With respect to the Class A-1 Notes, the lesser of the Class A-1 Formula Rate and the Net Funds Cap; Class A-2 Notes, 6.20%; the Class A-3 Notes, 6.39%; Class A-4 Notes, 6.84%; Class A-5 Notes, 7.40%; the Class M-1 Notes, 7.41%; the Class M-2 Notes, 8.10%; the Class B-1 Notes, 8.50%, and the Class B-2 Notes, 8.50%; provided, however, that the Note Rate for each Class of Notes then outstanding will increase by 0.50% per annum after the Optional Termination Date.

Note Register:  The register established pursuant to Section 2.3 of the Indenture.

Obligee:  See Mortgagee.

Obligor:  See Mortgagor.

Offering Circular:  The offering circular, dated August 28, 1998 relating to the offering of the Notes.

Officer's Certificate:  A certificate signed by (i) any Servicing Officer or (ii) the Chairman of the Board, the Vice Chairman of the Board, the President, a Vice President, an Assistant Vice President, the Treasurer, the Secretary or one of the Assistant Treasurers or Assistant Secretaries of Keystone, as the case may be, as required by this Agreement.

Opinion of Counsel:  A written opinion of counsel (who is acceptable to the Rating Agencies), who may be employed by the Seller, the Servicer or any of their respective affiliates.

Optional Termination Date:  The first Distribution Date on which the Pool Balance is less than 10% of the Initial Pool Balance.

Original Note Balance:  In the case of the Class A-1 Notes, $127,800,000; Class A-2 Notes, $66,300,000; Class A-3 Notes, $73,900,000; Class A-4 Notes, $69,600,000; Class A-5

USBT 100535

Notes, $23,500,000; Class M-1 Notes, $56,500,000; Class M-2 Notes, $50,850,000; Class B-1 Notes, $45,200,000 and, Class B-2 Notes, $28,250,000.

Other Fees: With respect to any Distribution Date, amounts in respect of reasonable fees and expenses due to any provider of services to the Trust and the Grantor Trust, except the Grantor Trustee, Owner Trustee, Indenture Trustee, Servicer, Claims Administrator, Contract of Insurance Holder and also except any Person, the fees of which are required by this Agreement to be paid by the Servicer, the Grantor Trustee, Claims Administrator, Contract of Insurance Holder, the Owner Trustee or the Indenture Trustee without such payor being entitled to reimbursement hereunder, but including such amounts payable to the successor Servicer pursuant to Section 10.03(c).

Overcollateralization Amount: As of any Distribution Date, the positive difference, if any, between (x) the Pool Balance as of the last day of the related Due Period and (y) the Aggregate Note Balance (after taking into account all distributions of principal on such Distribution Date).

Overcollateralization Deficiency: means, with respect to any Distribution Date, the excess, if any, of the Targeted Overcollateralization Amount for such Distribution Date over the Overcollateralization Amount for such Distribution Date (the Overcollateralization Amount to be determined, for purposes of this definition, before giving effect to payments on such Distribution Date in respect of 5.01(e)(iii).

Overcollateralization Release Amount: means with respect to any Distribution Date the excess, if any, of the Overcollateralization Amount for such Distribution Date over the Targeted Overcollateralization Amount.

Ownership Interest: As to any Security, any ownership or security interest in such Security, including any interest in such Security as the holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

Owner Trustee: First Union Trust Company, National Association, not in its individual capacity but solely as owner trustee under the Trust Agreement, and any successor owner trustee under the Trust Agreement.

Owner Trustee Fee: $2,500 initial fee and $2,500 annual fee.

Paying Agent: As defined in Section 4.07.

Payment: With respect to any Loan or the related Foreclosed Property and any Determination Date or the related Due Period, all amounts received or collected by the Servicer during such Due Period in respect of such Loan or Foreclosed Property from whatever source, including, without limitation, amounts received or collected from or representing:

(i)     the related Obligor;

22

USBT 100536

(ii)     the application to amounts due on such Loan (or, in the case of any Foreclosed Property, to amounts previously due on the related Foreclosed Loan), of any related Insurance Proceeds, any related condemnation awards or settlements or any payments made by any related guarantor or third-party credit-support provider;

(iii)    FHA Insurance Payment Amounts with respect to such Loan;

(iv)     the sale of such Loan;

(v)      the operation or sale of the related Foreclosed Property;

(vi)     the Purchase Price with respect to such Loan;

(vii)    amounts deposited into the Note Distribution Account pursuant to 11.01(b); or

Percentage Interest:  As defined in the Trust Agreement.

Person:  Any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, national banking association, unincorporated organization or government or any agency or political subdivision thereof.

Physical Security:  As defined in Section 5.05(a).

Placement Agents:  Bear, Stearns & Co. Inc. and Coast Partners Securities, Inc.

Pool Balance:  With respect to any date of determination, the sum of the Principal Balances for all Loans as of the end of the related Due Period plus the Pre-Funded Amount, if any.

Portability Fee:  Transfer fee, not to exceed 2.0% of the existing principal balance of the Loan at the time of exercise of the Portability Option, payable by or on behalf of an Obligor in connection with the exercise of a Portability Option but not including third party appraisal fees or incidental fees or costs associated with the transfer of the lien to the new Property, which fees or costs are payable by the Obligor or the Servicer to third parties.

Portability Option:  A provision in the Debt Instrument or Mortgage granting the related Obligor the option to secure the Loan with real property in substitution of the Mortgaged Property securing the Loan at its origination.

Precomputed Loan:  Any Loan which, under the terms of the related Debt Instrument, is an actuarial loan, which allocates a fixed portion of each Monthly Payment to accrued interest (30 days), regardless of when such Monthly Payment is made.

USBT 100537

Pre-Funded Amount:  With respect to any date of determination, the amount on deposit in the Pre-Funding Account on the Closing Date, as reduced on each Subsequent Transfer Date to purchase Subsequent Loans; initially, $155,185,150.12.

Pre-Funding Account:  The Pre-Funding Account established in accordance with Section 5.07 and maintained by the Grantor Trustee.

Premium Release Amount:  With respect to any Determination Date, the product of (a) the aggregate of the Cut-Off Date Principal Balances of all Invoiced Loans for which a Principal Prepayment is received during the related Due Period and (b) 0.75%.

Principal Balance:  With respect to any Loan and for any date of determination, the Cut-Off Date Principal Balance of such Loan reduced by all amounts previously received or collected in respect of principal on such Loan subsequent to the related Cut-Off Date; provided, however, that with respect to any Loan as to which the Servicer has determined in good faith that all amounts it expects to receive in respect of such Loan have been received, the Principal Balance shall be zero (except when used in the definition of Purchase Price).

Principal Prepayment:  Any payment or other receipt of principal in full due on a Loan made by an Obligor which is received in advance of the scheduled Maturity Date of such Loan.

Principal Prepayment Interest Shortfall:  As to any Loan and Principal Prepayment, the amount by which one month's interest at the related Net Loan Rate exceeds the amount of interest paid by the Obligor in connection with such Principal Prepayment.

Principal Remittance Amount:  With respect to any Distribution Date, to the extent of funds available therefor as described herein, the amount equal to the sum of the following amounts (without duplication) with respect to the related Due Period (as defined below): (i) each payment of principal on a Loan received by the Servicer during such Due Period, including all full and partial principal prepayments, (ii) net liquidation proceeds allocable to principal actually collected by the Servicer during the related Due Period, (iii) the portion of the Purchase Price allocable to principal of all repurchased Loans with respect to such Due Period, (iv) any Substitution Adjustment Amounts received on or prior to the previous Determination Date and not yet distributed and (v) with respect to the first Distribution Date following the end of the Funding Period the remaining Pre-Funded Amount, if any, (net of investment earnings thereon) on deposit in the Pre-Funding Account.

Principal Write-Down Amount:  With respect to each Class of Subordinate Notes, the amount by which the Note Balance thereof is reduced pursuant to Section 5.02.

Priority Expenses:  With respect to any Distribution Date:  (i) any taxes assessed against either the Trust or the Grantor Trust; (ii) fees of the Independent Accountants incurred during the one year period beginning on each anniversary of the Closing Date in connection with the reports required by Section 4.05(b) of this Agreement; (iii) the reasonable transition expenses of a successor Servicer incurred in acting as successor Servicer and (iv) to Keystone or its assignee

USBT 100538

$1,000 per month in connection with the performance of its duties pursuant to <u>Section 2.05(b)</u> and $500 per month in connection with the performance of its duties pursuant to <u>Section 7.02(e)</u>.

<u>Property</u>: The property (real, personal or mixed) encumbered by the Mortgage which secures the Debt Instrument evidencing a secured Loan at the time of origination of such Loan or, if a Portability Option has been exercised, at the time such option is exercised.

<u>Purchase Agreement</u>: The purchase agreement dated August 28, 1998 by and between the Placement Agents and Keystone.

<u>Purchase Price</u>: With respect to a Loan, means the Principal Balance of such Loan as of the date of purchase, plus unpaid accrued interest at the related Loan Rate to the last day of the month in which such purchase occurs.

<u>Purchased Loan</u>: As of any Monthly Cut-Off Date, any Loan (including any Defaulted Loan) that became subject to purchase or repurchase pursuant to <u>Section 3.05</u>, <u>Section 4.10</u> or <u>Section 4.12</u>, and, in each case, as to which the Purchase Price has been deposited in the Note Distribution Account by the Seller or the Servicer, as applicable.

<u>Rating Agency or Rating Agencies</u>: Each of (i) Moody's and (ii) Fitch or, if such organization or successor is no longer in existence, "Rating Agency" shall be a nationally recognized statistical rating organization or other comparable person designated by the Trust, notice of which designation shall have been given to the Owner Trustee, the Indenture Trustee and the Servicer.

<u>Ratings</u>: The ratings initially assigned to the Notes and the Certificates by the Rating Agencies, as evidenced by letters from the Rating Agencies.

<u>Realized Losses</u>: With respect to any Loan that becomes a Liquidated Loan, the amount by which the Principal Balance thereof immediately prior to such Loan becoming a Liquidated Loan exceeds the proceeds (net of related expenses and reimbursements), including Insurance Proceeds and FHA Insurance Payment Amount, that are allocable to principal of such Loan applying such proceeds first to accrued and unpaid interest and are received by the Servicer in connection with the liquidation or the disposition of the related Property.

<u>Record Date</u>: With respect to (i) the initial Distribution Date and all Notes, the Closing Date and (ii) each subsequent Distribution Date and all Notes, the last day of the month immediately preceding the month in which the related Distribution Date occurs.

<u>Reference Bank Rate</u>: The rate determined on the basis of the rates at which deposits in U.S. Dollars are offered by the reference banks (which shall be three major banks that are engaged in transactions in the London interbank market, selected by the Servicer after consultation with the Indenture Trustee) as of 11:00 A.M., London time, on the day that is two LIBOR Business Days prior to the immediately preceding Distribution Date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the

USBT 100539

Class A-1 Note Balance. The Indenture Trustee will request the principal London office of each of the reference banks to provide a quotation of its rate. If at least two such quotations are provided, the rate will be the arithmetic mean of the quotations. If on such date fewer than two quotations are provided as requested, the rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Indenture Trustee after consultation with the Servicer, as of 11:00 A.M., New York City time, on such date for loans in U.S. Dollars to leading European banks for a period of one month in amounts approximately equal to the Class A-1 Note Balance. If no such quotations can be obtained, the rate will be LIBOR for the prior Distribution Date.

Rejected Claim:  With respect to any FHA Loan, a claim for payment made to the FHA under the Contract of Insurance that has been finally rejected after all appeals with FHA have been exhausted for any reason (including a rejection of a previously paid claim and a demand by the FHA of a return of the FHA Insurance Payment Amount for the related FHA Loan) other than a refusal or rejection due to clerical error in computing the claim amount or because the amount of the FHA Insurance Coverage Reserve Account as shown in the Insurance Record is zero.

Related Series Loans:  The FHA Title I loans related to a Related Series Trust which:  (i) are sold by the Seller or The First National Bank of Keystone to a trust, and (ii) the Title I insurance coverage attributable to which is made available to cover claims with respect to such loans by virtue of terms relating to the administration of the FHA Insurance Coverage Reserve Account substantially similar to the terms hereof.

Related Series Trusts:  The Keystone Home Improvement Loan Trust 1997-P2, Keystone Owner Trust 1997-P3, Keystone Home Improvement Loan REMIC Trust 1997-P4, Keystone Owner Trust 1998-P1 and the Grantor Trust together with certain subsequent series of trusts to which Title I Loans are sold directly or indirectly by the Seller or The First National Bank of Keystone, established pursuant to pooling and servicing agreements, this Agreement and other indentures and with respect to which U.S. Bank Trust National Association is the Contract of Insurance Holder and either Republic Bank, Ocwen Federal Bank, FSB or Norwest Bank Minnesota, National Association serves as Servicer or Master Servicer and Claims Administrator.

Responsible Officer:  When used with respect to the Servicer, Grantor Trustee or the Indenture Trustee, any officer of the Servicer or any officer within the Corporate Trust Office of the Grantor Trustee or the Indenture Trustee, respectively, including with respect to each, any Vice President, Assistant Vice President, Secretary, Assistant Secretary or any other officer of the Indenture Trustee, Grantor Trustee or Servicer customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.  When used with respect to the Trust and the Grantor Trust, any officer in the Corporate Trust Administration Department of the Owner Trustee or the Grantor Trustee, respectively, with direct responsibility for the administration of the Trust

USBT 100540

Agreement and this Agreement on behalf of the Trust or the Grantor Trust Agreement, respectively.

Rolling Six-Month Delinquency Average:  With respect to any Distribution Date, the average of the applicable 60-Day Delinquency Amounts for each of the six immediately preceding Due Periods.  As used herein, the "60-Day Delinquency Amount" for any Due Period is the aggregate of the Principal Balances of all Loans that are 60 or more days delinquent, in foreclosure or Foreclosed Property as of the end of such Due Period, excluding any Liquidated Loan.

Rolling Six-Month Delinquency Rate:  As of any Distribution Date, the fraction, expressed as a percentage, equal to the average of the Delinquency Rate for each of the six(or one, two, three, four and five in the case of the first, second, third, fourth and fifth Distribution Dates) immediately preceding Due Periods.

SAIF:  The Savings Association Insurance Fund, as from time to time constituted, created under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, or if at any time after the execution of this instrument the Savings Association Insurance Fund is not existing and performing duties now assigned to it, the body performing such duties on such date.

Securities:  The Notes and/or the Certificates, as applicable.

Securities Act:  The Securities Act of 1933, as amended.

Securityholder:  A holder of a Note or Certificate, as applicable.

Seller or Keystone: Keystone Mortgage Corp., Inc., a West Virginia corporation.

Senior Notes:  The Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Notes.

Senior Optimal Note Balance:   With respect to any Distribution Date prior to the Stepdown Date, zero; with respect to any other Distribution Date, an amount equal to the Pool Balance as of the preceding Determination Date minus the greater of (a) 64.00% of the Pool Balance as of the preceding Determination Date plus the Targeted Overcollateralization Amount for such Distribution Date (without giving effect to the proviso in the definition thereof) and (b) 0.50% of the Initial Pool Balance.

Servicer: Republic Bank, a Florida-chartered commercial bank, its successors in interest or any successor servicer appointed as herein provided.

Servicer Certificate:  As defined in Section 6.01.

Servicing Fee:  With respect to any Distribution Date, an amount equal to  the Servicing Fee Rate times the aggregate Principal Balance of the Loans, as of the close of business on the last day of the second calendar month before such Distribution Date (or the Initial Cut-Off Date,

USBT 100541

in the case of the first Distribution Date), which amount includes the fees payable to the Servicer as Claims Administrator hereunder.

Servicing Fee Rate: 1.31% per annum.

Servicer Termination Event: Any event specified in Section 10.01.

Servicing Officer: Any officer of the Servicer responsible for the administration and servicing of the Loans whose name and specimen signature appears on a list of servicing officers furnished to the Grantor Trustee by the Servicer, as such list may from time to time be amended.

Servicing Record: The records maintained by the Servicer pursuant to Section 4.03.

Servicing Standard: The standard set forth in Section 4.01(a).

Simple Interest Loan: Any Loan with respect to which the portion of each payment allocable to interest or to principal under the related Debt Instrument is determined in accordance with the Simple Interest Method.

Simple Interest Method: The method of allocating the Monthly Payments received with respect to a Loan to interest in an amount equal to the product of (i) the applicable Loan Rate, (ii) the period of time (expressed as a fraction of a year, based on the actual number of days in the calendar month and 365 days in the calendar year) elapsed since the preceding payment was made under such Loan and (iii) the outstanding principal amount of the Loan, and allocating the remainder of such Monthly Payment to principal.

60-Day Delinquency Amount: With respect to any Due Period, is the aggregate of the Principal Balances of all Loans that are 60 or more days delinquent, in foreclosure or Foreclosure Property as of the end of such Due Period, excluding any Liquidated Loan.

Stepdown Date: means the first Distribution Date occurring after October 2001 as to which the aggregate of the Note Balances of the Senior Notes has been reduced to the excess of (a) the Pool Balance as of the preceding Determination Date over (b) the greater of (i) 64.00% of the Pool Balance as of the preceding Determination Date plus the greater of (x) 16.00% of the Pool Balance as of the immediately proceeding Determination Date and (y) the Net Delinquency Calculation Amount and (ii) 0.50% of the Initial Pool Balance.

Subordinate Notes: The Class M and Class B Notes.

Subsequent Cut-Off Date: With respect to any Subsequent Loans, the date specified in the Subsequent Transfer Agreement.

Subsequent Loan Schedule: As of any date of determination, each schedule that is identified as a schedule of Subsequent Loans and is attached to a Subsequent Transfer Agreement.

USBT 100542

Subsequent Loans:  The Mortgage Loans identified on a Subsequent Loan Schedule.

Subsequent Transfer Agreement:  Each Subsequent Transfer Agreement entered into between the Seller and the Grantor Trustee and substantially in the form attached as Exhibit F hereto.

Subsequent Transfer Date:  With respect to any Subsequent Loans, the date such Loans are conveyed to the Grantor Trust pursuant to the related Subsequent Transfer Agreement.

Substitution Adjustment Amount:  The meaning assigned to such term in Section 3.05.

Substitution Date:  As defined in Section 3.05.

Substitute Loan:  A Loan: (i) having characteristics such that the representations and warranties that are made pursuant to Section 3.03(b) are true and correct as of the date of substitution with respect to such Substitute Loan; (ii) each Monthly Payment with respect to such Substitute Loan shall be greater than or equal to the Monthly Payment due in the same Due Period on the Loan for which such Substitute Loan is being substituted; (iii) the Maturity Date with respect to such Substitute Loan shall be no later than one year later than the Maturity Date of the Loan for which such Substitute Loan is being substituted and in no event later than December 25, 2028; (iv) as of the date of substitution, the Principal Balance of such Substitute Loan is not more or less than the Principal Balance of the Loan for which such Substitute Loan is being substituted by more than 1%; (v) the Loan Rate with respect to such Substitute Loan is at least equal to the Loan Rate of the Loan for which such Substitute Loan is being substituted; and (vi) that is an FHA Loan if the Loan for which it is being substituted is an FHA Loan; provided, however, in the event that more than one Substitute Loan is being substituted for one or more Defective Loans on any date, then (i) the weighted average Loan Rate for such Substitute Loans must equal or exceed the weighted average Loan Rate of the Defective Loans immediately prior to giving effect to the substitution, in each case weighted on the basis of the outstanding Principal Balance of such Substitute Loans and Defective Loans, respectively, as of such day, (ii) the sum of the Monthly Payments with respect to such Substitute Loans shall be greater than or equal to the Monthly Payments due in the same Due Period on the Defective Loans for which a substitution is being made, (iii) as of the date of substitution, the aggregate Principal Balances of such Substitute Loans are not more or less than the aggregate Principal Balances of the Defective Loans for which such a substitution is being made by more than 1% and (iv) as of the date of substitution, such Substitute Loan(s) will not cause 55% or more (by Pool Balance) of the Loans to not constitute "real estate mortgages" for the purpose of Treasury Regulations §§ 301.770(i)-1(d) under the Code.

Targeted Overcollateralization Amount: means with respect to any Distribution Date occurring prior to the Stepdown Date, an amount equal to the greater of (x) 8.00% of the Initial Pool Balance and (y) the Net Delinquency Calculation Amount; with respect to any other Distribution Date, an amount equal to the greater of (x) 16.00% of the Pool Balance as of the end of the related Due Period and (y) the Net Delinquency Calculation Amount; provided, however,

USBT 100543

that the Targeted Overcollateralization Amount will in no event be less than 0.50% of the Initial Pool Balance.

Termination Date:  The earlier of (a) the Distribution Date in January, 2029 and (b) the Distribution Date next following the Monthly Cut-Off Date coinciding with or next following the date of the liquidation or disposition of the last asset held by the Grantor Trust pursuant to Sections 4.13 or 11.01.

Termination Price:  As defined in Section 11.01(b).

Title Document:  The evidence of title to or ownership of the Property required by Title I. (See 24 C.F.R. 201.26(a)(1) and 201.20).

Title I:  Section 2 of Title I of the National Housing Act of 1934, as amended, and the rules and regulations promulgated thereunder as each may be amended from time to time and any successor statute, rules or regulations thereto.

Transaction Documents:  This Agreement, the Grantor Trust Agreement, the Trust Agreement, the Indenture and the Administration Agreement.

Transfer of Note Report:  With respect to a Loan, the report complying with Title I filed with HUD, Office of Mortgage Insurance Accounting and Servicing pursuant to 24 CFR Section 201.30 advising such Office of the transfer of the Loan, the related Note, and any related Mortgage to the Person specified therein.

Trust:  Keystone Owner Trust 1998-P2.

Trust Account Property:  The Trust Accounts, all amounts and investments held from time to time in any Trust Account and all proceeds of the foregoing.

Trust Accounts:  The Note Distribution Account, the Certificate Distribution Account and the Capitalized Interest Account.

Trust Agreement:  The Trust Agreement dated as of August 31, 1998, between the Owner Trustee and Keystone.

Trust Designated Insurance Amount:  $1,964,656.61 transferred to the Insurance Coverage Reserve Account on the Closing Date in connection with the transfer of Initial Loans which are FHA Loans to the Grantor Trustee on such date, together with additional amounts transferred to the Insurance Coverage Reserve Account on Subsequent Transfer Dates with respect to FHA Loans included in the Subsequent Loans transferred to the Grantor Trustee on such dates.

Trust Estate:  As defined in Section 2.02(a).

USBT 100544

Twelve-Month Loss Amount:  With respect to any Distribution Date, an amount equal to the aggregate of all Realized Losses on the Mortgage Loans during the 12 immediately preceding Due Periods.

UCC:  The Uniform Commercial Code as enacted in the applicable jurisdiction.

Underwriting Guidelines: As described in Exhibit D.

Write-Down Interest Amount:  With respect to any Distribution Date, the interest accrued on any Principal Write-Down Amount allocated to a Class of Subordinate Notes at the related Note Rate for the related Accrual Period plus the amount of any such accrued and unpaid Write-Down Interest Amount on prior Distribution Dates.

Section 1.02.  Other Definitional Provisions.

(a)     Capitalized terms used herein and not otherwise defined herein have the meanings assigned to them in the Indenture or, if not defined therein, in the Trust Agreement.

(b)     All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(c)     As used in this Agreement and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Agreement or in any such certificate or other document, and accounting terms partly defined in this Agreement or in any such certificate or other document to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Agreement or in any such certificate or other document shall control.

(d)     The words "hereof," "herein," "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; Article, Section, Schedule and Exhibit references contained in this Agreement are references to Articles, Sections, Schedules and Exhibits in or to this Agreement unless otherwise specified; and the term "including" shall mean "including without limitation."

(e)     The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(f)     Any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of

31

agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

Section 1.03.  <u>Interest Calculations</u>.

All calculations of interest that are made in respect of the Principal Balance of a Simple Interest Loan shall be made on the basis of a 365-day year and the actual number of days elapsed.  All calculations of interest that are made in respect of the Principal Balance of a Precomputed Loan shall be made on the basis of a 360-day year consisting of twelve 30-day months.  The Note Rate for the Class A-1 Notes shall be calculated on the basis of a 360-day year and the actual number of days elapsed.  The Note Rate for the Notes, other than the Class A-1 Notes, shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.  The calculation of the Servicing Fee, the Grantor Trustee Fee, the Owner Trustee Fee and the Indenture Trustee Fee shall be made on the basis of a 360-day year consisting of twelve 30-day months.  All dollar amounts calculated hereunder shall be rounded to the nearest penny with one-half of one penny being rounded down.

ARTICLE II

CONVEYANCE OF THE INITIAL LOANS

Section 2.01.  <u>Conveyance of the Loans</u>.

(a)    In consideration of the Grantor Trust's delivery of the Grantor Trust Certificate to the Seller or its designee, upon the order of the Seller, the Seller, as of the Closing Date and each Subsequent Transfer Date and concurrently with the execution and delivery hereof, does hereby sell, transfer, assign, set over and otherwise convey to the Grantor Trust, without recourse, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Seller in and to the following: (i) such Loans as from time to time are owned by the Seller and identified on the Initial Loan Schedule and each Subsequent Loan Schedule, including Substitute Loans added to the Grantor Trust from time to time, together with the Legal Files and the Credit Files relating thereto and all proceeds thereof, (ii) the related Mortgages and security interests in Properties, (iii) all payments of principal in respect of Loans received after the applicable Cut-Off Dates and payments of interest in respect of Loans received after the applicable Cut-Off Dates (exclusive of interest due on or before September 15, 1998), (iv) the rights to FHA Insurance reserves attributable to the FHA Loans as of the applicable Cut-Off Dates, (v) such assets as from time to time are identified as Foreclosed Property, (vi) such assets and funds as are from time to time deposited in the Collection Account, the Pre-Funding Account and the FHA Premium Account, including amounts on deposit in such accounts which are invested in Eligible Investments, (vii) the Seller's rights under the related Insurance Policies and any Insurance Proceeds and (viii) all proceeds of the foregoing (collectively, the  Grantor Trust Estate").  The foregoing sale, transfer, assignment, set over and conveyance does not and is not intended to result in a creation or an assumption by the Grantor Trust of any obligation of the Seller or any other person in connection with the Grant r Trust Estate or under any agreement or instrument relating thereto except as specifically set forth herein.

USBT 100546

(b)    As of the Closing Date, the Grantor Trustee acknowledges the conveyance to it of the assets described above in Section 2.01(a), including from the Seller all right, title and interest of the Seller in and to the Grantor Trust Estate, receipt of which is hereby acknowledged by the Grantor Trustee, and the acceptance of which is made in good faith and without notice or knowledge of any adverse claims or liens. Concurrently with such delivery on the Closing Date and in exchange therefor, the Grantor Trustee, pursuant to the instructions of the Seller, has executed (not in its individual capacity, but solely as Grantor Trustee on behalf of the Grantor Trust) and caused to be authenticated and delivered the Grantor Trust Certificate to the Seller or its designee, upon the order of the Seller.

Section 2.02.  Conveyance of the Grantor Trust Certificate.

(a)    In consideration of the Trust's delivery of the Notes and Certificates to the Seller or its designee, upon the order of the Seller, the Seller, as of the Closing Date and concurrently with the execution and delivery hereof, does hereby sell, transfer, assign, set over and otherwise convey to the Trust, without recourse, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Seller in and to the following: (i) the Grantor Trust Certificate and all payments of principal and interest in respect thereof received after the Closing Date, (ii) such assets and funds as are from time to time deposited in the Note Distribution Account, the Certificate Distribution Account and the Capitalized Interest Account, including amounts on deposit in such accounts which are invested in Eligible Investments and (iii) all proceeds of the foregoing (collectively, the "Trust Estate"). The foregoing sale, transfer, assignment, set over and conveyance does not and is not intended to result in a creation or an assumption by the Trust of any obligation of the Seller or any other person in connection with the Trust Estate or under any agreement or instrument relating thereto except as specifically set forth herein.

(b)    As of the Closing Date, the Trust acknowledges the conveyance to it of the assets described above in Section 2.02(a), including from the Seller all right, title and interest of the Seller in and to the Trust Estate, receipt of which is hereby acknowledged by the Trust, and the acceptance of which is made in good faith and without notice or knowledge of any adverse claims or liens. Concurrently with such delivery and in exchange therefor, the Trust has pledged to the Indenture Trustee the Indenture Trust Estate, and the Indenture Trustee, pursuant to the written instructions of the Trust, has executed and caused to be authenticated and delivered the Notes to the Seller or its designee, upon the order of the Trust. In addition, concurrently with such delivery and in exchange therefor, the Owner Trustee, pursuant to the instructions of the Seller, has executed (not in its individual capacity, but solely as Owner Trustee on behalf of the Trust) and caused to be authenticated and delivered the Certificates to the Seller or its designee, upon the order of the Seller.

Section 2.03.  Ownership and Possession of Files.

As components of the Grantor Trust Estate and pursuant to Sections 2.01(a) and (b), the related Mortgage and the contents of the related Credit File and the related Legal File shall be vested in the Grantor Trust, although possession of the Credit Files (other than items required to

33

be maintained in the Legal Files) on behalf of and for the benefit of the holder of the Grantor Trust Certificate shall remain with the Seller, and the Grantor Trustee shall take possession of the Legal Files as contemplated in <u>Section 2.06</u>.

Section 2.04.  <u>Books and Records</u>.

(a)     The sale of each Loan shall be reflected on the Seller's balance sheets and other financial statements as a sale of assets by the Seller, as the case may be, under generally accepted accounting principles ("<u>GAAP</u>").  The Servicer shall maintain, or cause to be maintained pursuant to <u>Section 4.03</u>, a complete set of books and records for each Loan which shall be clearly marked to reflect the ownership of each Loan by the Grantor Trust.

(b)     It is the intention of the parties hereto that (i) the transfers and assignments contemplated by this Agreement shall constitute a sale of the Loans and the other property specified in <u>Sections 2.01(a)</u> and 2.07(a) from the Seller to the Grantor Trust and (ii) such property shall not be property of the Seller.  If the assignment and transfer of the Loans and the other property specified in <u>Sections 2.01(a)</u> and 2.07(a) to the Grantor Trust pursuant to this Agreement or the conveyance of the Loans or any of such other property to the Grantor Trust is held or deemed not to be a sale or is held or deemed to be a pledge of security for a loan, the Seller intends that the rights and obligations of the parties shall be established pursuant to the terms of this Agreement and that, in such event, (1) the Seller shall be deemed to have granted and does hereby grant to the Grantor Trust a first priority security interest in the entire right, title and interest of the Seller in and to the Loans and all other property conveyed to the Grantor Trust pursuant to <u>Section 2.01</u> and Section 2.07 and all proceeds thereof, and (2) this Agreement shall constitute a security agreement under applicable law.  Within five days of the Closing Date and each Subsequent Transfer Date, the Seller shall cause to be filed UCC-1 financing statements naming the Grantor Trust as "secured party" and describing the Loans being sold by the Seller to the Grantor Trust with the office of the Secretary of State of the State in which the Seller is located.

(c)     It is the intention of the parties hereto that (i) the transfers and assignments contemplated by this Agreement shall constitute a sale of the Grantor Trust Certificate and the other property specified in <u>Section 2.02(a)</u> from the Seller to the Trust, (ii) such property shall not be property of the Seller and (iii) the Notes will be treated as indebtedness of the Trust secured by the Grantor Trust Certificate for federal income tax purposes.  If the assignment and transfer of the Grantor Trust Certificate and the other property specified in <u>Section 2.02(a)</u> to the Trust pursuant to this Agreement or the conveyance of the Grantor Trust Certificate or any of such other property to the Trust is held or deemed not to be a sale or is held or deemed to be a pledge of security for a loan, the Seller intends that the rights and obligations of the parties shall be established pursuant to the terms of this Agreement and that, in such event, (1) the Seller shall be deemed to have granted and does hereby grant to the Trust a first priority security interest in the entire right, title and interest of the Seller in and to the Grantor Trust Certificate and all other property conveyed to the Trust pursuant to <u>Section 2.02</u> and all proceeds thereof, and (2) this Agreement shall constitute a security agreement under applicable law.  Within five days of the

34

Closing Date, the Seller shall cause to be filed UCC-1 financing statements naming the Trust as "secured party" and describing the Grantor Trust Certificate being sold by the Seller to the Trust with the office of the Secretary of State of the State in which the Seller is located.

Section 2.05.  Delivery of Loan Documents and the Grantor Trust Certificate.

(a)    With respect to each Loan, on the Closing Date and on each Subsequent Transfer Date, as applicable, the Seller, at the direction of the Grantor Trustee, shall have delivered or caused to be delivered to the Grantor Trustee each of the following documents (collectively, the "Legal Files"):

(A)    With respect to each Mortgage Loan:

(i)    The original Debt Instrument for each Mortgage Loan, showing a complete chain of endorsements or assignments from the named payee to the Grantor Trust and endorsed without recourse to the order of the U.S. Bank Trust National Association as Grantor Trustee for the Grantor Trust;

(ii)    With respect to each Mortgage Loan, the original Mortgage with evidence of recording indicated thereon (except that a true copy thereof certified by an appropriate public official may be substituted); provided, however, that if the Mortgage with evidence of recording thereon cannot be delivered concurrently with the execution and delivery of this Agreement solely because of a delay caused by the public recording office where such Mortgage has been delivered for recordation, there shall be delivered to the Grantor Trustee a copy of such Mortgage certified as a true copy in an Officer's Certificate, which Officer's Certificate shall certify that such Mortgage has been delivered to the appropriate public recording office for recordation, and there shall be promptly delivered to the Grantor Trustee such Mortgage with evidence of recording indicated thereon upon receipt thereof from the public recording official (or a true copy thereof certified by an appropriate public official may be delivered to the Grantor Trustee);

(iii)    With respect to each Mortgage Loan, the original assignment of Mortgage to U.S. Bank Trust National Association as Grantor Trustee in recordable form.  Such assignments may be blanket assignments, to the extent such assignments are effective under applicable law, for Mortgage Loans covering Mortgaged Properties situated within the same county.  If the assignment of Mortgage is in blanket form an assignment of Mortgage need not be included in the individual Mortgage File;

(iv)    With respect to each Mortgage Loan, all original intermediate assignments of the Mortgage, with evidence of recording thereon (or true copies thereof certified by appropriate public officials may be substituted); provided, however, that if the intermediate assignments of Mortgage with evidence of recording thereon cannot be delivered concurrently with the execution and delivery of this Agreement solely because of a delay caused by the public recording office where such assignments of Mortgage

35

have been delivered for recordation, there shall be delivered to the Grantor Trustee a copy of each such assignment of Mortgage certified as a true copy in an Officer's Certificate, which Officer's Certificate shall certify that each such assignment of Mortgage has been delivered to the appropriate public recording office for recordation, and there shall be promptly delivered to the Grantor Trustee such assignments of Mortgage with evidence of recording indicated thereon upon receipt thereof from the public recording official (or true copies thereof certified by an appropriate public official may be delivered to the Grantor Trustee); and

     (v)     An original of each assumption or modification agreement, if any, relating to such Loan; and

     (B)     With respect to each Contract:

     (i)     The original Contract stamped as follows: "This Contract has been assigned to U.S. Bank Trust National Association, as Grantor Trustee to Keystone Grantor Trust 1998-P2, or to any successor Grantor Trustee thereunder";

     (ii)     The original title document for the related Manufactured Home or a duplicate certified by the appropriate governmental authority which issued the original thereof or the application for such title document or, if the laws of the jurisdiction in which the related Manufactured Home is located do not provide for the issuance of title documents for manufactured housing, other evidence of ownership of the related Manufactured Home which is customarily relied upon in such jurisdiction as evidence of title to a manufactured housing unit;

     (iii)     Evidence of one or more of the following types of perfection of the security interest in the related Manufactured Home granted by such Contract, as appropriate:  (a) notation of such security interest on the title document, (b) a financing statement meeting the requirements of the UCC, with evidence of recording indicated thereon, or (c) such other evidence of perfection of a security interest in a manufactured housing unit as is customarily relied upon in the jurisdiction in which the related Manufactured Home is located;

     (iv)     The assignment of the Contract to the Grantor Trustee (which may be in a blanket form that also covers other Contracts);

     (v)     Any extension, modification or waiver agreements;

     (vi)     With respect to any Land-and-Home Contract, the original Mortgage with evidence of recording indicated thereon; provided, however, that if the Mortgage with evidence of recording thereon cannot be delivered concurrently with the execution and delivery of this Agreement solely because of a delay

USBT 100550

caused by the public recording office where such Mortgage has been delivered for recordation, there shall be delivered to the Grantor Trustee a copy of such Mortgage certified as a true copy in an Officer's Certificate, which Officer's Certificate shall certify that such Mortgage has been delivered to the appropriate public recording office for recordation, and there shall be promptly delivered to the Grantor Trustee such Mortgage with evidence of recording indicated thereon upon receipt thereof from the public recording official (or a true copy thereof certified by an appropriate public official may be delivered to the Grantor Trustee); and

(vii)    With respect to any Land-and-Home Contract, the original assignment of Mortgage to the Grantor Trustee, in recordable form.    Such assignments may be blanket assignments, to the extent such assignments are effective under applicable law, for Mortgage Loans covering Mortgaged Properties situated within the same county.  If the assignment of Mortgage is in blanket form an assignment of Mortgage need not be included in the individual Mortgage File.

(b)    With respect to each Loan, on the Closing Date or Subsequent Transfer Date, as applicable, the Seller shall hold in custody, as the designated agent of the Grantor Trustee, each of the following documents (collectively, the "Credit Files"): (A) An original or copy of notice signed by the Obligor acknowledging HUD insurance in the case of each FHA Loan, (B) an original or copy of truth-in-lending disclosure, (C) an original or copy of the credit application, (D) an original or copy of the consumer credit report, (E) an original or copy of verification of employment and income or verification of self-employment income, (F) with respect to each FHA Loan that is a Mortgage Loan or Land-and-Home Contract, an original or copy of evidence of the Obligor's interest in the Property, (G) an original or copy of contract of work or written description of work with cost estimates, (H) an original or copy of the completion certificate, provided, however, that such certificate shall be delivered to the Grantor Trustee within the time period required under Title I for the preparation of such certificate, (I) with respect to each FHA Loan that is a Mortgage Loan or Land-and-Home Contract, an original or copy of the report on inspection of improvements to the Mortgaged Property provided, however, that such report shall be delivered to the Grantor Trustee within the time period required under Title I for the preparation of such report, (J) with respect to each FHA Loan that is a Mortgage Loan or Land-and-Home Contract, an original or copy of notice of non-compliance, if applicable, provided, however, that such notice shall be delivered to the Grantor Trustee within the time period required under Title I for the preparation of such notice, (K) to the extent not included in (C), an original or a copy of a written verification that the Mortgagor at the time of origination of the Loan was not more than 30 days delinquent on any senior mortgage or deed of trust on the Property, (L) with respect to each Loan for which an appraisal is required pursuant to the applicable FHA regulations, an original or a copy of an appraisal of the Property as of the time of origination of the Loan, (M) if such Loan is a Mortgage Loan or Land-and-Home Contract, and in the case of FHA Loans if required by FHA regulations, an original or a copy of a title search

USBT 100551

as of the time of origination with respect to the Mortgaged Property, and (N) any other documents required for the submission of a claim with respect to each FHA Loan to the FHA.

(c)     The Seller, on the Closing Date and each Subsequent Transfer Date, has delivered to the Grantor Trustee cash in an amount equal to (i) the accrued annual FHA premium due on each FHA Loan to the applicable Cut-Off Date, and (ii) the amount of FHA premium collected in respect of the Invoiced Loans after the applicable Cut-Off Date.  The Grantor Trustee shall deposit the amount referred to in clause (ii) of the previous sentence into the FHA Premium Account and shall deposit the amount referred to in clause (i) of the previous sentence into the Collection Account.

(d)     The Grantor Trustee shall take and maintain continuous physical possession of the Legal Files in the State of Minnesota, and in connection therewith, shall act solely as agent for the holder of the Grantor Trust Certificate in accordance with the terms hereof and not as agent for the Seller or any other party.

(e)     Within 60 days of the Closing Date or the Subsequent Transfer Date, as applicable, the Grantor Trustee shall, at the Seller's expense, record each Assignment of Mortgage (which may be a blanket assignment if permitted by applicable law) in the appropriate real property or other records; provided, however, the Grantor Trustee need not cause to be recorded any such Assignment of Mortgage which relates to a Mortgage Loan in any jurisdiction under the laws of which, as evidenced by an Opinion of Counsel delivered by the Seller (at the Seller's expense) to the Grantor Trustee, and the Rating Agencies, the recordation of such Assignment of Mortgage is not necessary to protect the Grantor Trustee's interest in the related Mortgage Loan against the claims of any subsequent transferee or any creditor of the Seller. With respect to any Assignment of Mortgage as to which the related recording information is unavailable within 60 days following the Closing Date or the Subsequent Transfer Date, as applicable, such Assignment of Mortgage shall be submitted for recording within 30 days after receipt of such information but in no event later than one year after the Closing Date or Subsequent Transfer Date, as applicable.  The Grantor Trustee shall be required to retain a copy of each Assignment of Mortgage submitted for recording.  In the event that any such Assignment of Mortgage is lost or returned unrecorded because of a defect therein, the Seller shall promptly prepare a substitute Assignment of Mortgage or cure such defect, as the case may be, and thereafter the Grantor Trustee shall be required to submit each such Assignment of Mortgage Loan for recording.

(f)     On the Closing Date, the Seller shall have delivered or caused to be delivered to the Indenture Trustee, the Grantor Trust Certificate.  The Indenture Trustee shall take and maintain continuous physical possession of the Grantor Trust Certificate in the State of Minnesota until this Agreement is terminated pursuant to the provisions of Section 11.01 hereof and until the satisfaction and discharge of the Indenture pursuant to Section 4.1 thereof.

38

USBT 100552

Section 2.06.  <u>Acceptance by Grantor Trustee of the Loans; Certain Substitutions; Initial Certification.</u>

(a)    The Grantor Trustee agrees to execute and deliver on the Closing Date an acknowledgment of receipt of the Legal File for each Initial Loan and on each Subsequent Transfer Date an acknowledgment of receipt of the Legal File for each Subsequent Loan.  The Grantor Trustee declares that it will hold such documents and any amendments, replacements or supplements thereto, as well as any other assets included in the Trust Estate, upon and subject to the conditions set forth herein for the benefit of the holder of the Grantor Trust Certificate in good faith and without notice of any adverse claims or liens.  The Grantor Trustee agrees, for the benefit of the holder of the Grantor Trust Certificate to review each Legal File within 45 Business Days after the Closing Date (or, with respect to any Subsequent Loan or Substitute Loan, within 45 days after the conveyance of the related Loan to the Grantor Trust) and to deliver to the Seller, the Grantor Trust Certificateholder and the Servicer a certification to the effect that, as to each Loan listed in the Loan Schedule (other than any Loan paid in full or any Loan specifically identified in such certification as not covered by such certification), (i) all documents required to be delivered to the Grantor Trustee pursuant to this Agreement are in its possession (other than as expressly permitted in Section 2.05), (ii) all documents delivered by the Seller to the Grantor Trustee pursuant to Section 2.05 have been reviewed by the Grantor Trustee and have not been mutilated or damaged and appear regular on their face (handwritten additions, changes or corrections shall not constitute irregularities if initialed by the Obligor) and relate to such Loan, (iii) based on the examination of the Grantor Trustee, and only as to the foregoing documents, the information set forth on the Loan Schedule accurately reflects the information set forth in the Legal File and (iv) each Debt Instrument has been endorsed as provided in Section 2.05.  The Grantor Trustee shall not be under any duty or obligation (i) to inspect, review or examine any such documents, instruments, certificates or other papers to determine that they are genuine, enforceable, or appropriate for the represented purpose or that they are other than what they purport to be on their face or (ii) to determine whether any Legal File should include any of the documents specified in Section 2.05(a)(v).

(b)    The Credit Files shall be held in the custody of the Seller for the benefit of, and as agent for, the Grantor Trust Certificateholder, the Grantor Trustee and the Grantor Trust, as the owner thereof.  It is intended that by the Seller's agreement pursuant to this Section 2.06(b) the Grantor Trustee shall be deemed to have possession of the Credit Files for purposes of Section 9-305 of the Uniform Commercial Code of the State in which such documents or instruments are located.  The Seller shall promptly report to the Grantor Trustee any failure by it to hold the Credit Files as herein provided and shall promptly take appropriate action to remedy any such failure.  In acting as custodian of such documents and instruments, the Seller agrees not to assert any legal or beneficial ownership interest in the Loans or such documents or instruments.  The Seller agrees to indemnify the Grantor Trust Certificateholder and the Grantor Trustee for any and all liabilities, obligations, losses, damages, payments, costs, or expenses of any kind whatsoever which may be imposed on, incurred by or asserted against the Grantor Trust Certificateholder or the Grantor Trustee as the result of any act or omission by the Seller relating to the maintenance and custody of such documents or instruments which have been delivered to

USBT 100553

the Seller; provided, however, that the Seller will not be liable for any portion of any such amount resulting from the negligence or misconduct of the Grantor Trust Certificateholder or the Grantor Trustee and provided, further, that the Seller will not be liable for any portion of any such amount resulting from the Seller's compliance with any instructions or directions consistent with this Agreement issued to the Seller by the Grantor Trustee. The Grantor Trustee shall have no duty to monitor or otherwise oversee the Seller's performance as custodian hereunder.

(c) Upon determination by the Servicer, the Seller or the Grantor Trustee that any document constituting a part of any File was not delivered to the Grantor Trustee or, with respect to any document constituting the Credit Files, to the Seller, as custodian for the Grantor Trustee and the Grantor Trust, by the time required hereby (which in the case of (A) a failure to deliver a recorded Mortgage or recorded assignment of Mortgage pursuant to Sections 2.05(a)(A)(ii), 2.05(a)(A)(iv) or 2.05(a)(B)(vi) (only under the circumstances in which a delay is caused by the public recording office and an Officer's Certificate is required to be provided thereunder), shall be the 20th month after the Closing Date or the Subsequent Transfer Date, as applicable, (B) failure to deliver a completion certificate pursuant to Section 2.05(b)(H) and, if applicable, a notice of non-compliance, shall be the 14th month after the Closing Date or the Subsequent Transfer Date, as applicable, (C) failure to deliver an inspection report pursuant to Sections 2.05(b)(I) and (J), shall be the 14th month after the Closing Date or the Subsequent Transfer Date, as applicable, (D) a failure to deliver each other document constituting a part of any Legal File shall be the Closing Date or the Subsequent Transfer Date, as applicable, and (E) a failure to deliver each document (other than those described in clauses (B) and (C) above) specified in Section 2.05(b), shall be 45 Business Days after the Closing Date or the Subsequent Transfer Date, as applicable) to be so delivered or was defective in any material respect when delivered to the Grantor Trustee), the party identifying any of the foregoing shall give prompt written notice to the other parties. Nothing contained herein shall require the Servicer or the Grantor Trustee to undertake any independent investigation or to make any review of any File other than as required to be made by the Grantor Trustee pursuant to this Section 2.06. The Seller, upon receipt of such notice, shall comply with the cure, substitution and repurchase provisions of Section 3.05 hereof.

Section 2.07. <u>Subsequent Transfers</u>.

(a) During the Funding Period, subject to the satisfaction of the conditions set forth in paragraph (b) below and pursuant to the terms of the related Subsequent Transfer Agreement, in consideration of the Grantor Trustee's delivery on the relevant Subsequent Transfer Date to or upon the order of the Seller of all or a portion of the balance of funds in the Pre-Funding Account, the Seller shall on each Subsequent Transfer Date sell, transfer, assign, set over and otherwise convey without recourse, to the Grantor Trustee, all right, title and interest of the Seller in and to (i) such Subsequent Loans as from time to time are owned by the Seller and identified on a Loan Schedule, including Substitute Loans added to the Grantor Trust from time to time, together with the Legal Files and the Credit Files relating thereto and all proceeds thereof, (ii) the related Mortgages and security interests in Properties, (iii) all payments of principal in respect of Subsequent Loans received after the applicable Cut-Off Dates and payments of interest in respect of Subsequent Loans received after the applicable Cut-Off Dates,

USBT 100554

acceleration, under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject;

(d)    The Servicer is not in default and, upon the execution and delivery of this Agreement, its performance of and compliance with the terms hereof will not constitute a violation of any law, any order or decree of any court or any order, regulation or demand of any federal, state or local governmental or regulatory authority;

(e)    No action, suit or other proceeding or investigation is pending or, to the Servicer's knowledge, threatened before any court or any federal, state or local governmental or regulatory authority (A) asserting the invalidity of this Agreement or any other Transaction Document to which the Servicer is a party, (B) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document to which the Servicer is a party or (C) seeking any determination or ruling that would materially and adversely affect the ability of the Servicer to perform its obligations under this Agreement or any other Transaction Document to which the Servicer is a party (including any pending or threatened action, suit, proceeding or investigation which might result in the suspension, revocation or modification of the Contract of Insurance);

(f)    No consent, approval, authorization or order of, registration or filing with, or notice to, any court or any federal, state or local government or regulatory authority is required for the execution, delivery and performance by the Servicer of this Agreement or any other Transaction Document to which the Servicer is a party (other than those that have been obtained or will be obtained prior to the Closing Date);

(g)    With respect to the Servicer, none of this Agreement, any other Transaction Document to which the Servicer is a party or any statement, report or other document furnished or to be furnished by the Servicer pursuant to this Agreement or any other Transaction Document to which the Servicer is a party or in connection with the transactions contemplated hereby and thereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading;

(h)    The statements contained in the section of the Offering Circular entitled "The Servicer and Claims Administrator" which describe the Servicer are true and correct in all material respects, and do not contain any untrue statement of a material fact with respect to the Servicer and does not omit to state a material fact necessary to make the statements contained therein with respect to the Servicer under the circumstance in which they were made not misleading;

(i)    The Servicer is solvent, and the Servicer will not be rendered insolvent as a result of the performance of its obligations pursuant to this Agreement;

(j)    Each Loan will be serviced by the Servicer in compliance with this Agreement: Title I in the case of FHA Loans and all other applicable laws;

USBT 100555

(k)     The Servicer has not waived any default, breach, violation or event of acceleration existing under any Note and any related Mortgage;

(l)     The Servicer shall comply with, and shall service or cause to be serviced, each Loan, in accordance with all applicable laws, and, in particular, and, if applicable in accordance with the National Housing Act, as amended and supplemented, all rules and regulations issued thereunder, and all administrative publications published pursuant thereto including, in the case of the FHA Loans, all FHA requirements applicable to FHA Title I Loans;

(m)     The Servicer agrees that, so long as it shall continue to serve in the capacity contemplated under the terms of this Agreement, it shall remain in good standing under the laws governing its creation and existence and qualified under the laws of each state in which the nature of its business requires such qualification or shall remain exempt therefrom, it shall maintain all licenses, permits and approvals required by any law or regulations as may be necessary to perform its obligations under this Agreement and to retain all rights to service the Loans or it shall remain exempt from acquiring or maintaining such licenses, permits and approvals, and, except as provided in Section 9.02 it shall not dissolve or otherwise dispose of all or substantially all of its assets;

(n)     The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(o)     There is no action, suit, proceeding or investigation pending or, to the best of the Servicer's knowledge, threatened against the Servicer which, either in any one instance or in the aggregate, may (i) result in any material adverse change in the business, operations, financial condition, properties or assets of the Servicer or in any material impairment of the right or ability of the Servicer to carry on its business substantially as now conducted, or in any material liability on the part of the Servicer or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein, or which would be likely to impair materially the ability of the Servicer to perform under the terms of this Agreement, or (ii) which would draw into question the validity of this Agreement;

(p)     [Reserved]

(q)     [Reserved]

(r)     From time to time the Servicer shall report, as more fully set forth in this Agreement, information relating to the Loans to the Grantor Trustee and shall do every act that may be necessary or required to perform its duties under this Agreement within the time periods set forth herein after giving effect to notice and/or cure periods, if any;

(s)     No information, Officer's Certificate, statement furnished in writing, or report required hereunder, delivered by the Servicer to the Grantor Trustee or its agents shall, to the best knowledge of the Servicer, contain any untrue statement of a material fact or omit to state a material fact necessary to make the information, certificate, statement or report not misleading

-5-

and there has been no material adverse change in the financial condition of the Servicer since the date of the Servicer's most recent audited financial statements;

(t)     The Servicer is a commercial bank that actively provides servicing of mortgage loans, and the transactions contemplated by this Agreement are in the ordinary course of business of the Servicer;

(u)     The Servicer maintains all errors and omissions coverage and fidelity insurance coverage required by the FHA and has never had an FHA contract of insurance terminated by FHA;

(v)     Promptly following the Closing Date, and each Subsequent Transfer Date the Servicer will notify each Obligor that Monthly Payments are to be sent to the Servicer's designated lockbox if the Obligor has not previously been notified in writing of same;

(w)     The origination and collections practices used by the Servicer and its respective affiliates with respect to the Loans have been in all material respects legal, proper, prudent and customary in the mortgage lending and servicing business; and

(x)     The Servicer has, and at all times shall maintain, a net worth, as determined in accordance with generally accepted accounting principles, of at least $20,000,000.

It is understood and agreed that the representations and warranties set forth in this Section 3.02 shall survive the issuance and delivery of the Securities and the Grantor Trust Certificate and shall be continuing as long as any Security or the Grantor Trust Certificate shall be outstanding or this Agreement has not been terminated.

Section 3.03.  Representations and Warranties of the Seller.

(a)     The Seller hereby represents and warrants to the Trust, the Grantor Trust, the Grantor Trustee, the Grantor Trust Certificateholder, the Indenture Trustee, the Servicer and the Securityholders, that as of the Closing Date and each Subsequent Transfer Date:

(i)     The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of West Virginia with full power and authority to own its properties and conduct its business as such properties are currently owned and such business is currently conducted;

(ii)     The Seller has full power and authority to execute, deliver and perform, and to enter into and consummate all transactions required of it by this Agreement and to which it is a party; has duly authorized the execution, delivery and performance of this Agreement; has duly executed and delivered this Agreement and; when duly authorized, executed and delivered by the other parties hereto and thereto, this Agreement will constitute the legal, valid and binding obligation of the Seller enforceable against it in accordance with its respective terms, except as enforceability may be limited by

46

USBT 100557

bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a proceeding in equity or at law;

(iii)   None of (a) the execution and delivery of this Agreement, (b) the consummation of the transactions required of it hereunder or under any other Transaction Document to which it is a party, or (c) the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with, or result in a breach of any of, the terms, conditions or provisions of the Seller's charter or by-laws or any legal restriction or any material agreement or instrument to which the Seller is now a party or by which it is bound, or which would adversely affect in any material respect the creation and administration of the Grantor Trust or the Trust as contemplated hereby, or constitute a material default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject which violation might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Seller or its properties or might have consequences that would materially and adversely affect its performance hereunder;

(iv)   There is no action, suit, proceeding, investigation or litigation pending against the Seller or, to its knowledge, threatened, which, if determined adversely to the Seller, would materially adversely affect the sale of the Loans, the issuance of the Grantor Trust Certificate, the Notes or the Certificates, the execution, delivery or enforceability of this Agreement or which would have a material adverse affect on the financial condition of the Seller;

(v)   Except as has been previously obtained, no consent, approval, authorization or order of any court or governmental agency or body is required for: (a) the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement, (b) the transfer of all FHA Insurance reserves relating to the Loans to the Contract of Insurance Holder, (c) the issuance of the Grantor Trust Certificate, the Notes or the Certificates, (d) the sale of the Loans or (e) the consummation of the transactions required of it by this Agreement, except: (A) such as shall have been obtained before the Closing Date, (B) the transfer of the FHA Insurance reserves by FHA to the Contract of Insurance Holder with respect to Loans as to which an FHA case number has not been assigned as of the related Cut-Off Date, and (C) such as may be required under state securities or "Blue Sky" laws in connection with the sale of the Notes by the Placement Agents;

(vi)   The Seller is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Seller or its properties or

might have consequences that would materially and adversely affect its performance hereunder;

(vii)    [Reserved]

(viii)    Neither this Agreement nor any statement, report or other document furnished pursuant to this Agreement (except the Files) or in connection with the transactions contemplated hereby contains any untrue statement of a material fact or facts or fails to state a material fact necessary to make the statements contained herein or therein not misleading;

(ix)    Neither the Grantor Trust nor the Trust will constitute an investment company within the meaning of the Investment Company Act of 1940, as amended;

(x)    The Seller received fair consideration and reasonably equivalent value in exchange for the sale of the Loans to the Grantor Trust and for the sale of the Grantor Trust Certificate to the Trust;

(xi)    The FHA Reserve Amounts with respect to the FHA Loans transferred to the Contract of Insurance both prior to and following the transfer of the FHA Loans to the Grantor Trust will be available to satisfy claims with respect to such FHA Loans. The amount in the FHA Insurance Coverage Reserve Account, together with all amounts to be requested for transfer with respect to the Initial Loans will equal $1,964,656.61, which is approximately 10% of the initial Principal Balance of the FHA Loans; and

(xii)    The Seller is a supervised lender in good standing under 24 C.F.R. Section 202.4 and is authorized to originate, purchase, hold, service and/or sell loans insured under 24 C.F.R. Part 201, pursuant to a valid Contract of Insurance, Number 701839.

(xiii)    The Seller has complied with and will continue to maintain full compliance with the provisions of Section 13(e) of the Federal Deposit Insurance Act (12 U.S.C. §1823(E)).

(b)    The Seller hereby agrees for the benefit of the Grantor Trust, the Trust, the Servicer, the Indenture Trustee, the Grantor Trust Certificateholder and the Securityholders that the failure of any of the following representations and warranties to be true and correct as to any Loan as of the applicable Cut-Off Date for such Loan or as to the Grantor Trust Certificate as applicable, or such later date if so specified in such representation and warranty, gives rise to the remedy specified in Section 3.05:

(i)    The information pertaining to each Loan set forth in the Loan Schedule was true and correct in all material respects as of the applicable Cut-Off Date;

(ii)    As of the respective Cut-Off Date, none of the Loans were more than one month (calculated from Due Date to Due Date with respect to each Loan) past due

USBT 100559

(without giving effect to any grace period); neither the Seller nor the relevant Approved Loan Originator has advanced funds, induced, solicited or knowingly received any advance of funds from a party other than the Obligor, directly or indirectly, for the payment of any amount required by the Loan;

(iii)     The terms of the Debt Instrument and any related Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments reflected in the related File; no instrument of waiver, alteration or modification has been executed, and no Obligor has been released, in whole or in part, except in connection with an assumption agreement which assumption agreement is part of the related File and the payment terms of which are reflected in the related Loan Schedule;

(iv)     The Debt Instrument and any related Mortgage are not subject to any set-off, counterclaim or defense, including the defense of usury or of fraud in the inducement, nor will the operation of any of the terms of the Debt Instrument and any related Mortgage, or the exercise of any right thereunder, render such Mortgage unenforceable, in whole or in part, or subject to any Debt Instrument or right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(v)     Any and all material requirements of any federal, state or local law applicable to the Loan (including all origination and collection practices with respect thereto) have been complied with;

(vi)     Any related Mortgage has not been satisfied or cancelled in whole, rescinded or subordinated, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation or rescission;

(vii)     Any related Mortgage is a valid, subsisting and enforceable lien on the Mortgaged Property, including the land and all buildings on the Mortgaged Property;

(viii)     The Debt Instrument and any related Mortgage are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general principles of equity;

(ix)     All parties to the Debt Instrument and any related Mortgage had legal capacity at the time to enter into the Loan and to execute and deliver the Debt Instrument and any related Mortgage, and the Debt Instrument and any related Mortgage have been duly and properly executed by such parties;

USBT 100560

(x)     As of the applicable Cut-Off Date, the proceeds of the Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all applicable requirements set forth in the Loan documents have been complied with;

(xi)     With respect to each Loan, immediately prior to the sale, transfer and assignment to the Grantor Trust, the Seller had good and indefeasible legal title to the Loan, the related Debt Instrument and any related Mortgage, and the Seller was the sole owner thereof, subject to no liens, pledges, charges, mortgages, encumbrances or rights of others, except for such liens as will be released simultaneously with the transfer and assignment of the Loan to the Grantor Trust; and immediately upon the sale, transfer and assignment contemplated herein, the Grantor Trust will hold good title to, and be the sole owner with respect to the Loan, the related Note and any related Mortgage, subject to no liens, pledges, charges, mortgages, encumbrances or rights of others;

(xii)     There is no default, breach, violation or event of acceleration existing under the Loan, the related Debt Instrument and any related Mortgage and there is no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration;

(xiii)     Any related Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (A) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (B) otherwise by judicial foreclosure;

(xiv)     Each FHA Loan is an FHA Title I property improvement loan or manufactured housing loan (as defined in 24 C.F.R. Section 201.2) underwritten and originated by an Approved Loan Originator in accordance with FHA requirements for the Title I Loan program as set forth in 24 C.F.R. Parts 201 and 202;

(xv)     Each Loan is a fixed rate loan; each Debt Instrument shall mature within not more than 25 years and 32 days from the date of origination of the Loan; each Debt Instrument is payable in substantially equal Monthly Payments, with interest payable in arrears, and requires a Monthly Payment which if paid on the related Due Date is sufficient to amortize the original principal balance over the original term and to pay interest at the related Loan Rate; and the Debt Instrument does not provide for any extension of the original term;

(xvi)     The related Debt Instrument is not and has not been secured by any collateral, except, the lien of the corresponding Mortgage and/or security interest in the related Manufactured Home, as applicable;

(xvii)     If the related Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, or a valid substitution of trustee has been recorded

50

USBT 100561

or may be recorded and no extraordinary fees or expenses are or will become payable to the trustee under the deed of trust, except in connection with default proceedings and a trustee's sale after default by the Mortgagor;

(xviii)     The Seller has no knowledge of any circumstances or conditions not reflected in the representations set forth herein, or in the Loan Schedule, or in the related File with respect to any related Mortgage, the related Property or the Obligor which in the opinion of the Seller could reasonably be expected to materially and adversely affect the value of the related Property, or the marketability of the Loan or cause the Loan to become delinquent or otherwise in default;

(xix)     The Loan is serviced by the Servicer;

(xx)     In the case of the FHA Loans, if required pursuant to Title I (see 24 C.F.R. Section 201.40(c)), either the improvements to the Mortgaged Property or the Manufactured Home relating to each FHA Loan, as applicable, have been or shall be inspected by the related Originator within the time period and to the extent required under the Title I regulations, and evidence of such inspection shall have been delivered to the Grantor Trustee or, if not, a letter of non-compliance shall be delivered to the Grantor Trustee promptly upon the completion of such inspection;

(xxi)     Each Loan with respect to which the provisions of 24 C.F.R. Section 201.20 are applicable has been originated in compliance with the provisions of such section and the market value of the related Property has been ascertained in accordance with the procedures established by HUD;

(xxii)     There exists a File relating to each Loan and such File contains all of the original or certified documentation listed in Section 2.05) for such type of Loan. Each File has been delivered to the Grantor Trustee or a custodian on behalf of the Grantor Trustee. Each document included in the File which is required to be executed by the Obligor has been executed by the Obligor in the appropriate places. All blanks on any form required to be completed have been completed;

(xxiii)     Each Loan is in respect of a home improvement loan, debt consolidation loan, installment loan agreement or a retail installment sales contract and each related Property with respect thereto is improved by a residential dwelling which is the principal residence or an investment of property of the related Obligor;

(xxiv)     Each FHA Loan was purchased and re-underwritten by the Seller in accordance with the applicable underwriting criteria established by the FHA and HUD and each of the Non-FHA Loans was purchased and was or will be re-underwritten by the Seller in accordance with the Underwriting Guidelines or its Conventional Loan Program;

USBT 100562

(xxv)     If the related Property is in an area identified by the Federal Emergency Management Agency ("FEMA") as having special flood hazards, unless the community in which the area is situated is participating in the National Flood Insurance Program and the regulations thereunder or less than a year has passed since FEMA notification regarding such hazards, a flood insurance policy is in effect with respect to such Property with a generally acceptable carrier which complies with Section 102(a) of the Flood Disaster Protection Act of 1973;

(xxvi)     The aggregate Cut-Off Date Principal Balances of Initial Loans which are multi-units (two to four units) is less than 0.80% of the aggregate Initial Pool Balance;

(xxvii)     All costs, fees and expenses incurred in originating, closing or recording the Loans were paid;

(xxviii)     There is no obligation on the part of the Seller or any other party other than the Obligor to make payments with respect to the Loan;

(xxix)     At the time of origination of the Loan, each related prior lien, if any, was not 30 or more days delinquent;

(xxx)     All parties which have had any interest in the Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (i) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Property is located, and (ii) (A) organized under the laws of such state, or (B) qualified to do business in such state, or (C) federal savings associations or national banks having principal offices in such state, or (D) not doing business in such state;

(xxxi)     Any related Mortgage contains an enforceable provision either (i) requiring the consent of the Mortgagee to assumption of the related Loan upon sale of the Mortgaged Property or (ii) permitting the assumption of the related Loan upon the sale of the Mortgaged Property provided that certain conditions are satisfied;

(xxxii)     Except with respect to Loans where the related Mortgaged Property is located in the state of Florida, there is no homestead or other exemption available to the Mortgagor which would materially interfere with the right to sell the related Mortgaged Property at a trustee's sale or to foreclose the Mortgage;

(xxxiii)     Each FHA Loan has been submitted to the FHA for insurance pursuant to the FHA Title I loan program and each FHA Loan has been assigned a case number by the FHA for the FHA Title I loan program;

(xxxiv)     The FHA Reserve Amount with respect to each FHA Loan has been transferred to the FHA Insurance Coverage Reserve Account;

USBT 100563

(xxxv)     The related File with respect to each Mortgage Loan contains a Title Document reflecting that title to the related Property is vested at least 50% in the Obligor under such Loan;

(xxxvi)     Each Property (including each residential dwelling improvement thereon) is free of damage which materially and adversely affects the value thereof, other than damage to be corrected pursuant to the Mortgage Loan with some or all of the proceeds of such Mortgage Loan;

(xxxvii)     No Loan was adversely selected as to credit risk from the pool of home improvement loans, debt consolidation loans and manufactured housing loans owned by the Seller;

(xxxviii)     Each Contract, other than a Land-and-Home Contract, together with the related certificate of title, creates a valid, subsisting and enforceable first priority security interest in favor of the Grantor Trustee in the Manufactured Home;

(xxxix)     There is only one original executed Contract, and each original Contract is in the custody of the Grantor Trustee or its custodian;

(xl)     If the related Manufactured Home is located in a state in which notation of a security interest on the title document is required or permitted to perfect such security interest, the title document shows, or if a new or replacement title document with respect to such Manufactured Home is required, such title document has been applied for and when issued by the applicable governmental agency, will show, the Seller as the holder of a first priority security interest in such Manufactured Home. If the related Manufactured Home is located in a state in which the filing of a financing statement or the making of a fixture filing under the UCC is required to perfect a security interest in manufactured housing, such filings or recordings have been duly made and show the Seller as secured party;

(xli)     Each Contract is secured by a "single family residence" within the meaning of Section 25(e)(10) of the Code;

(xlii)     The transfer, assignment and conveyance of the Contracts and the Contract Files by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(xliii)     Assuming no material change to the applicable law or regulations in effect as of the Closing Date or Subsequent Transfer Date, as applicable, after the consummation of the transactions contemplated by this Agreement. the Grantor Trustee or its designee on behalf of the Grantor Trust will have the ability to foreclose or otherwise realize upon a Property or to enforce the provisions of the related Loan against the Obligor thereunder, if the foreclosure upon any such Property or enforcement of the

provisions of the related Loan against the Obligor is undertaken as set forth in <u>Section 4.12</u>;

(xliv)     The aggregate Principal Balances of all Contracts does not exceed 0.152% of the Initial Pool Balance;

(xlv)     [Reserved]

(xlvi)     [Reserved];

(xlvii)     The Loans have a weighted average remaining term to maturity of approximately 246 months;

(xlviii)     Each Subsequent Loan had a first payment date at least one-month prior to the end of the Funding Period;

(xlix)     No more than 100% of the Loans are Simple Interest Loans;

(l)     Not less than 0% of the Loans are Precomputed Loans;

(li)     Each Non-FHA Loan meets the description set forth in the Offering Circular under either "ORIGINATION AND UNDERWRITING GUIDELINES - Keystone Equiflex Loan Program" or "--Republic Loans";

(lii)     On the Closing Date or each Subsequent Transfer Date, as the case may be, 55% or more (by aggregate Principal Balance) of the Loans do <u>not</u> constitute "real estate mortgages" for the purpose of Treasury Regulation §301.7701(i) - 1(d) under the Code.  For this purpose a Loan constitutes a "real estate mortgage" if the Loan is an "obligation principally secured by an interest in real property."  For this purpose an "obligation is principally secured by an interest in real property" if it satisfies <u>either</u> test set out in paragraph (a) or paragraph (b) below.

(1)     *The 80-percent test.*  An obligation is principally secured by an interest in real property if the fair market value of the interest in real property securing the obligation was at least equal to 80 percent of the adjusted issue price of the obligation at the time the obligation was originated (or, if later, the time the obligation was significantly modified).

For purposes of this paragraph (a), the fair market value of the real property interest must be first reduced by the amount of any lien on the real property interest that is senior to the obligation being tested, and must be further reduced by a proportionate amount of any lien that is in parity with the obligation being tested.  The adjusted issue price of an obligation is its issue price plus the amount of accrued original issue discount, if any, as of the date of determination.

USBT 100565

(2)     *Alternative test.* An obligation is principally secured by an interest in real property if substantially all of the proceeds of the obligation were used to acquire or to improve or protect an interest in real property that, at the origination date, is the only security for the obligation. For purposes of this test, loan guarantees made by the United States or any state (or any political subdivision, agency, or instrumentality of the United States or of any state), or other third party credit enhancement are not viewed as additional security for a loan. An obligation is not considered to be secured by property other than real property solely because the obligor is personally liable on the obligation. For this purpose only, substantially all of the proceeds of the obligations," means 66⅔% or more of the gross proceeds.

(liii)     The Grantor Trust Certificate has been validly issued and is outstanding entitled to all the benefits of the Grantor Trust Agreement, the Grantor Trust Certificate evidences a 100% ownership interest in the assets of the Grantor Trust and no defaults have occurred under the Grantor Trust Agreement;

(liv)     Immediately prior to the sale and assignment by the Seller to the Trust of the Grantor Trust Certificate, the Seller had good title thereto it subject to no prior lien, claim, participation interest, mortgage, security interest, pledge, charge or other encumbrance or other interest of any nature;

(lv)     As of the Closing Date, the Seller has transferred all right, title and interest in the Grantor Trust Certificate to the Trust;

(lvi)     The Seller has not transferred the Grantor Trust Certificate to the Trust with any intent to hinder, delay or defraud any of its creditors;

(lvii)     With respect to any Loan that contains a Portability Option, such provision, and the exercise thereof by the Obligor would, as of the date of acquisition of such Loan by the Seller, (i) not permit or cause the Loan to be totally unsecured at any time and (ii) comply with all requirements of applicable federal, state and local law; and

(lviii)     Neither the Debt Instrument nor the related Mortgage contains any provision that limits the recourse of the holder of the Loan against the Obligor.

Section 3.04.  [Reserved].

Section 3.05.  Purchase and Substitution.

(a)     It is understood and agreed that the representations and warranties set forth in Section 3.03 shall survive the conveyance of the Loans to the Grantor Trust, the delivery of the Grantor Trust Certificate to the Seller, the delivery of the Grantor Trust Certificate to the Trust, the Grant of the Grantor Trust Certificate to the Indenture Trustee and the delivery of the

Securities to the Securityholders and shall be continuing as long as any Security is outstanding. Upon discovery by the Servicer, the Seller, the Grantor Trustee, the Indenture Trustee or any Securityholder, or upon a Responsible Officer of the Owner Trustee obtaining actual knowledge, of a breach of any of such representations and warranties which materially and adversely affects the value of the Loan or the interest of the Grantor Trust Certificateholder or the Securityholders, or which materially and adversely affects the interests of the Grantor Trust Certificateholder or the Securityholders in the related Loan in the case of a representation and warranty relating to a particular Loan, the party discovering such breach shall give prompt written notice to the others. In the event of a determination under Section 2.06 (that circumstances exist that require notice thereunder or in the event of a breach of a representation and warranty made pursuant to Section 3.03(b) (except with respect to a breach of the representations made by the Seller pursuant to Section 3.03(b)(xxxiii) and 3.03(b)(xxxiv)), in each case that materially and adversely affects the interests of the Grantor Trust Certificateholder or the Securityholders in the Loan with respect to which such representation is made or in the Loans, and a failure within sixty Business Days of discovery or receipt of notice of such failure to effect a cure of the circumstances giving rise to such defect, the Seller shall be obligated, on the Monthly Cut-Off Date next succeeding the expiration of such sixty-day period, to repurchase (or substitute for, to the extent permitted by subsection (b) below) the affected Loan.  The Grantor Trustee on behalf of the Grantor Trust Certificateholder and the Securityholders agrees that if an FHA Loan is a Defective Loan because a document specified in Section 2.01 is not included in the File as of the 90th day after the discovery or receipt of notice thereof, such defect shall be deemed to be cured if the Grantor Trustee shall have received during the 90-day period after such date a written statement addressed to it from the Director of HUD Title I Insurance Division that such document would not be required in connection with a claim for FHA Insurance with respect to such Loan.  It is understood and agreed that the obligation of the Seller to repurchase or substitute any such Loan pursuant to this Section shall constitute the sole remedy against it with respect to such breach of the foregoing representations or warranties or the existence of the foregoing conditions.

    With respect to a breach of the representations made by the Seller pursuant to Section 3.03(b)(xxxiii) or (xxxiv) if the FHA has not assigned a case number under the Contract of Insurance to an FHA Loan to indicate that such FHA Loan is eligible for Title I Insurance coverage under the Contract of Insurance on or before the 120th day after the Closing Date or Subsequent Transfer Date, as applicable, the Seller shall be obligated, on the Monthly Cut-Off Date next succeeding such 120th day, to repurchase such FHA Loan.  If the FHA Reserve Amount with respect to an FHA Loan has not been transferred to the FHA Insurance Coverage Reserve Account on or before the 150th day after the Closing Date or Subsequent Transfer Date, as applicable, the Seller shall be obligated, on the Monthly Cut-Off Date next succeeding such 150th day, to repurchase such FHA Loan.  The Claims Administrator shall give notice in writing to each of the Servicer, the Seller, the Grantor Trustee, the Indenture Trustee and the Owner Trustee of (i) any FHA Loan with respect to which there has not been assigned a case number under the Contract of Insurance on or before the 120th day after the Closing Date or Subsequent Transfer Date, as applicable and (ii) any FHA Loan that has not been transferred to the FHA Insurance Coverage Reserve Account on or before the 150th day after the Closing Date or Subsequent Transfer Date, as applicable.  For purposes of calculating either 120 or 150 days

USBT 100567

from the Closing Date or Subsequent Transfer Date, as applicable, in this <u>Section 3.05(a)</u>, any day on which the FHA is officially closed for reasons other than such day being a Saturday, Sunday or a day on which banking institutions in Washington, D.C. are authorized or obligated by law, executive order or governmental decree to be closed, shall not be counted in making such calculation.

If the Seller is required to repurchase any Loan on a Monthly Cut-Off Date that is not a Business Day, such repurchase shall be made on the last Business Day preceding such Monthly Cut-Off Date. Any Loan required to be repurchased pursuant to this <u>Section 3.05(a)</u> is referred to as a "<u>Defective Loan</u>".

Upon the discovery of a breach of the representations as set forth in clauses (liv) through (lv) of Section 3.03(b) the Seller shall either cure such breach within the time permitted hereunder if such breach related to a Loan or shall repurchase the Grantor Trust Certificate at the time a Loan would be required to be repurchased and shall deposit to the Collection Account an amount equal to the outstanding balance of the Grantor Trust Certificate together with accrued and unpaid interest through the last day of the month of such deposit thereon at weighted average of the Net Loan Rates.

(b)    The Seller shall be obligated to repurchase a Defective Loan for the Purchase Price, payable to the Grantor Trustee in cash on the Monthly Cut-Off Date specified in Section 3.05(a) above, for deposit in the Collection Account. Notwithstanding the foregoing, The Seller may elect in lieu of the repurchase of a Defective Loan as provided in this Section 3.05, to substitute, as of the Monthly Cut-off Date specified in Section 3.05(a), a Substitute Loan for the Defective Loan in accordance with the provisions of this Section 3.05.

(c)    The Seller shall notify the Servicer and the Grantor Trustee in writing not less than five Business Days before the related Determination Date which is on or before the date on which the Seller would otherwise be required to repurchase such Loan pursuant to Section 3.05(a) of its intention to effect a substitution under this Section. On such Determination Date (the "Substitution Date"), the Seller shall deliver to the Grantor Trustee a list of the Loans to be substituted for by such Substitute Loans, and attaching as an exhibit a supplemental Loan Schedule (the "Supplemental Loan Schedule") setting forth the same type of information appearing on the Loan Schedule and representing as to the accuracy thereof. In connection with any substitution pursuant to this Section 3.05, to the extent that the aggregate Principal Balance of any Substitute Loan or Substitute Loans is less than the aggregate Principal Balance of the corresponding Loan or Loans as of the Monthly Cut-Off Date on which the substitution is being made, the Seller shall deposit such difference (a "Substitution Adjustment Amount") to the Collection Account on such date.

(d)    Concurrently with the satisfaction of the conditions set forth in this Section 3.05 and the conveyance of such Substitute Loans to the Grantor Trustee hereto, Exhibit A to this Agreement shall be deemed to be amended to exclude all Loans being replaced by such Substitute Loans and to include the information set forth on the Supplemental Loan Schedule with respect to such Substitute Loans, and all references in this Agreement to Loans shall include

such Substitute Loans and be deemed to be made on or after the related Substitution Date, as the case may be, as to such Substitute Loans.

(e)    With respect to all Defective Loans or other Loans repurchased by the Seller pursuant to this Agreement, upon the deposit of the Purchase Price therefor to the Collection Account, or the substitution therefor of a Substitute Loan and the deposit of any Substitution Adjustment Amount into the Collection Account, the Grantor Trustee shall assign to the Seller, without recourse, representation or warranty, all the Grantor Trustee's right, title and interest in and to such Defective Loans or Loans, which right, title and interest were conveyed to the Grantor Trustee pursuant to Section 2.01.  The Grantor Trustee shall take any actions as shall be reasonably requested by the Seller to effect the repurchase of any such Loans.

Section 3.06.  Seller's Remedies

The Seller covenants and agrees with the Indenture Trustee, to the extent necessary to fulfill its obligations hereunder, to enforce, for the benefit of the Securityholders, all of the Seller's rights and remedies against its parent, The First National Bank of Keystone ("Keystone Bank") under the Loan Purchase Agreement.  If, pursuant to the provisions of Section 3.05, the Seller is obligated to repurchase a Defective Loan or substitutes a Substitute Loan for a Defective Loan, the Seller shall, to the extent necessary to fulfill its obligations hereunder, promptly exercise the remedies available to it against Keystone Bank, with respect to such Defective Loan, under the applicable Loan Purchase Agreement between the Seller, as buyer, and Keystone Bank, as seller.

## ARTICLE IV

## ADMINISTRATION AND SERVICING OF LOANS

Section 4.01.  Servicing Standard.

(a)    The Servicer is hereby authorized to act as agent for the Grantor Trust and in such capacity shall manage, service, administer and make collections on the Loans, and perform the other actions required by the Servicer under this Agreement and pursuant to the standards set forth below (the "Servicing Standard").  In performing its obligations hereunder the Servicer shall at all times act in good faith in a commercially reasonable manner in accordance with all requirements of applicable law and, with respect to the FHA Loans, requirements of the FHA applicable to the servicing of the Loans.  The Servicer shall at all times service and administer the FHA Loans in accordance with Title I, and all Loans, otherwise in accordance with all other terms of this Agreement and the respective Loans, and shall have full power and authority, subject only to this Agreement, the respective Loans, and, in the case of the FHA Loans, the specific requirements and prohibitions of Title I, to do any and all things in connection with such servicing and administration which are consistent with the manner in which prudent servicers service loans similar to the Loans, and with respect to the FHA Loans, FHA Title I home improvement mortgage loans or manufactured housing loans, owned by the Servicer or any of its affiliates or serviced by the Servicer for others and which are consistent with the ordinary practices of prudent mortgage lending institutions, but without regard to:

58

USBT 100569

(i)     any relationship that the Servicer or any affiliate of the Servicer may have with the related Obligor:

(ii)     the Seller's obligations to repurchase or substitute for a Defective Loan pursuant to <u>Section 3.05(b)</u> or any FHA Loans pursuant to <u>Section 4.12(b)</u>;

(iii)     the ownership of any Securities by the Servicer or any affiliate of the Servicer;

(iv)     the Servicer's obligation to make Foreclosure Advances pursuant to <u>Section 4.08(b)</u> or purchase any Loan pursuant to Section 4.10 or purchase any FHA Loans pursuant to <u>Section 4.12</u>; or

(v)     the Servicer's right to receive compensation for its services as provided herein.

The Servicer may take any action hereunder, including exercising any remedy under any Loan, retaining counsel in connection with the performance of any of its obligations hereunder and instigating litigation to enforce any obligation of any Obligor, without the consent or approval of the Grantor Trustee, unless any such consent or approval is expressly required hereunder or under applicable law.

(b)     The Grantor Trustee shall execute and return to the Servicer within 15 days after the date hereof, and within 5 days after a request by the Servicer, powers of attorney relating to all documents or instruments necessary to maintain the lien created by any Mortgage on the related Mortgaged Property or any portion thereof or any security interest on a Manufactured Home, and, within 5 days after a request by the Servicer, a power of attorney in favor of the Servicer with respect to any modification, waiver, or amendment to any document contained in any File and any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Loans and with respect to the related Properties prepared and delivered to the Grantor Trustee by the Servicer, all in accordance with the terms of this Agreement.

(c)     The Grantor Trustee shall furnish the Servicer within 15 days after the date hereof and 5 days after request of a Servicing Officer therefor any powers of attorney and other documents necessary and appropriate to carry out its servicing and administrative duties hereunder, including any documents or powers of attorney necessary to foreclose any Loan and to file claims with the FHA under the Contract of Insurance. The forms of any such powers or documents shall be appended to such requests. The Contract of Insurance Holder shall furnish the Claims Administrator within 5 days after request of an appropriate officer of the Claims Administrator therefor any powers of attorney and other documents necessary and appropriate to carry out its administrative duties pursuant to Section 4.12.

(d)     Nothing in this Agreement shall preclude the Servicer, in its individual capacity, from entering into other mortgage loans or other financial transactions with any Obligor or from

refinancing any Loan as a result of a general solicitation to the public or an initial inquiry of the Servicer by an Obligor not solicited by the Servicer.

(e)     The Servicer will maintain the confidentiality of all data, documents, agreements and information obtained or prepared as a result of information obtained by the Servicer in the course of performing its duties hereunder (other than information acquired by the Servicer prior to the date hereof which was not acquired by the Servicer in breach of any law or obligation of confidentiality to the Seller or any other Person with respect to such information and/or is or becomes generally available to the public other than as a result of a breach of this Agreement by the Servicer), and will use such data, documents, agreements and information only for the benefit of the Securityholders and the Seller. Nothing in this Section shall prohibit the Servicer from disclosing information requested by the Seller to be disclosed. Notwithstanding the foregoing, the Servicer shall not be obligated to hold in confidence that confidential information which (i) is required to be disclosed by regulatory authorities or (ii) is compelled to be disclosed by a court of competent jurisdiction. If the Servicer receives an order compelling disclosure of any such information, the Servicer shall give the Seller notice of such order at least five (5) Business Days prior to the date such information is to be disclosed.

Section 4.02. Subservicing Arrangements. The Servicer may perform its responsibilities relating to servicing through other subservicers, agents or independent contractors; however, no provision of this Agreement shall be deemed to relieve the Servicer of any of its duties and obligations to the Grantor Trustee or the Grantor Trust Certificateholder with respect to the servicing and administration of the Loans; it being understood that the Servicer shall be obligated with respect thereto to the same extent and under the same terms and conditions as if it alone were performing all duties and obligations set forth in this Agreement in connection with the collection, servicing and administration of such Loans.

Section 4.03. Servicing Record.

(a)     The Servicer shall establish and maintain books and records in either a printed or electronic format (the "Servicing Record") in which the Servicer shall record: (i) all Payments received or collected by the Servicer or received by the Grantor Trustee (or the Seller and delivered to the Grantor Trustee) in respect of each Loan and each Foreclosed Property and (ii) all amounts owing to the Servicer in compensation for services rendered by the Servicer hereunder or in reimbursement of costs and expenses incurred by the Servicer hereunder in respect of the Loans. In addition, the Servicer shall establish and maintain records for the Insurance Record (which shall be part of such Servicing Record) in which the Servicer shall record all claims made under the Contract of Insurance, all payments received by or on behalf of the Contract of Insurance Holder from the FHA for each such claim and the amount of FHA Insurance coverage available in the Insurance Record.

(b)     Except as otherwise provided herein, amounts received or collected by or on behalf of the Servicer or the Grantor Trustee from or on behalf of any Obligor or in respect of any Foreclosed Property or from the FHA with respect to a claim made under the Contract of Insurance shall be credited to the Servicing Record:

50

(i)    promptly following deposit of the receipt or collection in the related Collection Account; or

(ii)    in the case of any amount received directly by the Grantor Trustee, promptly following the Servicer's actual knowledge of receipt by the Grantor Trustee pursuant to the notice required by Section 4.12(d) or otherwise;

but in any event no later than the Determination Date next following the date of receipt or collection by or on behalf of the Servicer or receipt by the Grantor Trustee. Amounts received or collected by the Servicer in connection with the purchase or repurchase of any Loan or any Foreclosed Property shall be so recorded as of the date of receipt and recorded within one Business Day after such receipt. The Servicing Record shall separately reflect amounts so received or collected by the Servicer in each Due Period. All Payments received from or on behalf of an Obligor shall be allocated in the order of Monthly Payments due or past due so that all amounts received are allocated first to the Monthly Payment first coming due and with respect to such Monthly Payment, first, to scheduled interest (other than default interest) due in accordance with the related Debt Instrument, second, to any principal due and payable in accordance with the related Debt Instrument, and third, to default interest, late charges and other amounts payable under the related obligations, except to the extent that such allocation in respect of any Loan is inconsistent with the terms of the related Debt Instrument or, in the case of any FHA Loan, Title I.

(c)    The Servicer shall credit to the Servicing Record relating to each Due Period, on a Loan-by-Loan basis, each of the following Payments collected or received by or on behalf of the Servicer or received by the Grantor Trustee in respect of each Loan and each Foreclosed Property:

(i)    all payments on account of principal;

(ii)    all payments on account of interest;

(iii)    all Substitution Adjustment Amounts and proceeds of the substitution, purchase or repurchase of any Loan pursuant to Section 3.05, Section 4.10 or Section 4.12(b);

(iv)    all amounts paid by or on behalf of the related Obligor in respect of Foreclosure Advances previously advanced by the Servicer;

(v)    all revenues received or collected in respect of any Foreclosed Property, including all proceeds of the sale of any Foreclosed Property pursuant to Section 4.13;

(vi)    all proceeds of the sale of the Loans and any Foreclosed Properties pursuant to Section 11.01;

(vii)    all FHA Insurance Payment Amounts.

(viii)     all Insurance Proceeds, any condemnation awards or settlements or any payments made by any related guarantor or third-party credit-support provider and any and all other amounts received in respect of Loans and not specified above; and

(ix)     all Portability Fees received or collected.

(d)     Notwithstanding anything to the contrary herein, the Servicer shall not be required to credit to the Servicing Record, and none of the Servicer, the Grantor Trust Certificateholder or any Securityholder shall have any right to or interest in any amount due or received with respect to any Loan or any related Foreclosed Property subsequent to the date of purchase or repurchase of such Loan or Foreclosed Property from the Grantor Trust.

(e)     The Servicer shall separately record in the Servicing Record the items required to be included in the Servicer Certificate and additionally the following items to the extent not included therein:

(i)     on or before each Determination Date, the related unpaid Servicing Fee due the Servicer on the next Distribution Date;

(ii)     all related amounts retained by the Servicer in respect of the preceding Due Period in respect of amounts due Independent Contractors hired by the Servicer to operate and manage a Foreclosed Property pursuant to Section 4.14(c);

(iii)     [reserved];

(iv)     on or before each Determination Date, all amounts due as of the preceding Monthly Cut-Off Date in reimbursement of related Foreclosure Advances previously advanced by the Servicer (separately identifying the type and amount of each then due);

(v)     on or before each Determination Date and based on information provided to the Servicer by the Indenture Trustee, all Priority Expenses incurred during the related Due Period;

(vi)     promptly following each Distribution Date, the aggregate amount of the Servicing Fee paid to the Servicer on such Distribution Date;

(vii)     promptly following each Distribution Date, the aggregate amount of related Foreclosure Advances reimbursed to the Servicer on such Distribution Date;

(viii)     on or prior to each Determination Date, the Principal Balance of such Loans that became Defaulted Loans during the prior Due Period;

(ix)     on or before each Determination Date, the related 60+ Delinquency Percentage (Rolling Six Month); the related Annual Default Percentage (Rolling Twelve Month) and the related Cumulative Losses;

(x)      on or before each Determination Date, the amount deposited into the related Collection Accounts representing payments by Obligors on Invoiced Loans in respect of premium on FHA Insurance;

(xi)      on or before each Determination Date, the amount of claims made to the Insurance Coverage Reserve Account with respect to the FHA Loans, if any;

(xii)      on or before each Determination Date, identification by Loan number, Obligor name, address of Property and Principal Balance of each such Loan with respect to which the Servicer has requested that the Grantor Trustee obtain the environmental report required by Section 4.12 in connection with deciding pursuant to Section 4.12 whether to foreclose on or otherwise acquire title to the related Property;

(xiii)      on or before each Determination Date, the Principal Balance of each such Loan with respect to which the Servicer has determined under the circumstances described in Section 4.12(a) in good faith in accordance with customary mortgage loan servicing practices that all amounts which it expects to receive with respect to such Loan have been received; and

(xiv)      on or before each Determination Date, any other information with respect to the Loans reasonably required by the Grantor Trustee to determine the amount of required distributions pursuant to Section 5.01 (d) and by the Indenture Trustee to determine the amount of required distributions pursuant to Section 5.01 (e), as applicable, and determinable by the Servicer without undue burden from the items otherwise required to be maintained in the Servicing Record.

(f)      On or before each Distribution Date, the Servicer will determine, based on the date of origination of the FHA Loans as set forth in the Loan Schedule, the amount of FHA Insurance premium, if any, due on or prior to the next succeeding Distribution Date with respect to each FHA Loan.  On or before such Distribution Date, the Servicer will compare such amounts with respect to each Loan against amounts invoiced by the FHA with respect to the Contract of Insurance as due on or prior to such next succeeding Distribution Date and report all discrepancies to the Grantor Trustee.  The Seller will assist the Grantor Trustee with the transfer of FHA Insurance with respect to each Loan to the Contract of Insurance Holder.  The Servicer is not responsible for the transfer of FHA Insurance or the payment of any premium for FHA Insurance from its own funds.

Section 4.04.  Annual Statement as to Compliance; Notice of Servicer Termination Event.

(a)      The Servicer will deliver to the Grantor Trustee and the Indenture Trustee on or before March 31 of each year beginning in 1999 an Officer's Certificate signed by a Responsible Officer of the Servicer stating with respect to the Grantor Trust, that:

(i)      a review of the activities of the Servicer during the preceding calendar year (or in connection with the first such Officer's Certificate the period from the Closing

Date through the end of such calendar year) and of the Servicer's performance under this Agreement with respect to such Grantor Trust has been made under the supervision of the signer of such Officer's Certificate; and

(ii)     to the best of such signer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such year (or such portion of such year), or there has been a default in the fulfillment of any such obligation, in which case such Officer's Certificate shall specify each such default known to such signer and the nature and status thereof and what action the Servicer proposes to take with respect thereto.

(b)     The Servicer shall deliver to the Grantor Trustee, the Indenture Trustee, the Seller and the Contract of Insurance Holder promptly after having obtained knowledge thereof, but in no event later than two Business Days thereafter, written notice in an Officer's Certificate of any event which, with the giving of notice or lapse of time, or both, would become a Servicer Termination Event under Section 10.01.  Each of the Seller, the Grantor Trustee, the Indenture Trustee, the Contract of Insurance Holder and the Servicer shall deliver to the other of such Persons promptly after having obtained knowledge thereof (other than by receipt of written notice from any of such other Persons pursuant to this paragraph), but in no event later than two Business Days thereafter, written notice in an Officer's Certificate of any event which, with the giving of notice or lapse of time, or both, would become a Servicer Termination Event under Section 10.01.

Section 4.05.  <u>Annual Independent Accountants' Report</u>.

The Servicer shall cause a firm of Independent Accountants, who may also render other services to the Servicer, to deliver to the Grantor Trustee, the Indenture Trustee and the Majority Certificateholder on or before May 31 (or 150 days after the end of the Servicer's fiscal year) of each year, beginning on the first May 31 (or other applicable date) after the date that is six months after the Closing Date, with respect to the twelve months ended the immediately preceding December 31 (or other applicable date) (or such other period as shall have elapsed from the Closing Date to the date of such certificate) a report (the "Accountants' Report") including: (i) an opinion on the financial position of the Servicer at the end of its most recent fiscal year, and the results of operations and changes in financial position of the Servicer for such year then ended on the basis of an examination conducted in accordance with generally accepted auditing standards, and (ii) a statement to the effect that, based on an examination of certain specified documents and records relating to the servicing of the Servicer's mortgage loan portfolio, conducted in compliance with the audit program for mortgages serviced for FNMA, Mortgagee Audit Standards or the Uniform Single Attestation Program for Mortgage Bankers (the "Applicable Accounting Standards"), such firm is of the opinion that such servicing has been conducted in compliance with the Applicable Accounting Standards except for such exceptions as such firm shall believe to be immaterial and such other exceptions as shall be set forth in such statement.

USBT 100575

Section 4.06. <u>Access to Certain Documentation and Information Regarding Loans</u>.

The Servicer shall provide to representatives of the Grantor Trustee, the Indenture Trustee and the Certificateholders, at the expense of the Servicer, reasonable access to the documentation regarding the Loans and to those employees of the Servicer who are responsible for the performance of the Servicer's duties hereunder, provided that the examining party shall provide to the Servicer a copy of any report generated in connection with any such examination. Such records shall not include any proprietary or confidential information, as reasonably determined by the Servicer. The Servicer shall provide such access to the Grantor Trust Certificateholder and any Noteholder (on the same conditions set forth in the immediately preceding two sentences) which is a federally insured savings and loan association, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of the Office of Thrift Supervision access to the documentation regarding the Loans required by applicable regulations of the Office of Thrift Supervision and the FDIC (acting as operator of the SAIF or the BIF), such access shall be afforded without charge but only upon reasonable advance written request and during normal business hours and with any expenses of such parties being paid by such parties. Nothing in this Section shall derogate from the obligation of the Servicer to observe any applicable law prohibiting disclosure of information regarding the Obligors, and the failure of the Servicer to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section. Any Securityholder, by its acceptance of a Security (or by acquisition of its beneficial interest therein), shall be deemed to have agreed to keep confidential and not to use for its own benefit any information obtained by it pursuant to this Section, except as may be required by applicable law or by any applicable regulatory authority.

Section 4.07. <u>Appointment of Paying Agent</u>.

The U.S. Bank Trust National Association is hereby appointed as Paying Agent under this Agreement and U.S. Bank Trust National Association hereby accepts such appointment. The Paying Agent shall make distributions to Certificateholders from the Certificate Distribution Account pursuant to Section 5.2 of the Trust Agreement and Section 5.03 hereof and shall report the amounts of such distributions in writing to the Owner Trustee. The Paying Agent shall have the revocable power to withdraw funds from the Certificate Distribution Account for the purpose of making the distributions referred to above. In the event that the Administrator shall no longer be the Paying Agent, the Seller shall appoint a successor to act as Paying Agent (which shall be a bank or trust company). Such successor Paying Agent or any additional Paying Agent appointed by the Seller shall execute and deliver to the Owner Trustee an instrument in which such successor Paying Agent or additional Paying Agent shall agree with the Owner Trustee that as Paying Agent, such successor Paying Agent or additional Paying Agent will hold all sums, if any, held by it for payment to the Certificateholders in trust for the benefit of the Certificateholders entitled thereto until such sums shall be paid to such Certificateholders. The Paying Agent shall return all unclaimed funds to the Owner Trustee, and upon removal of a Paying Agent, such Paying Agent shall also return all funds in its possession to the Owner Trustee. The provisions of Sections 7.1, 7.2, 7.3, 7.4 and 8.1 of the Trust Agreement shall apply to the Paying Agent and, to the extent applicable, to any other paying agent appointed hereunder.

USBT 100576

Any reference in this Agreement or the Trust Agreement to the Paying Agent shall include any co-paying agent unless the context requires otherwise. Notwithstanding anything herein to the contrary, the Paying Agent shall be the same entity as the Indenture Trustee under the Indenture. In the event that the Indenture Trustee shall not be the same entity as the Paying Agent, the Paying Agent shall resign and the Owner Trustee or its designee shall assume the duties and obligations of the Paying Agent as provided in the Trust Agreement and under Section 5.03 hereunder.

Section 4.08. Advances.

(a)     [Reserved].

(a)     The Servicer shall advance from its own funds the following amounts in respect of any Loan or Foreclosed Property, as applicable (collectively, "Foreclosure Advances"):

(i)     all third party costs and expenses (including legal fees and costs and expenses relating to bankruptcy, insolvency, collection or other enforcement proceedings in respect of any Obligor) associated with the institution of foreclosure, collection or other enforcement proceedings or other legal proceedings in respect of the related Obligor in respect of any such Loan pursuant to Section 4.01(a) or Section 4.12;

(ii)     all insurance premiums due and payable in respect of each Foreclosed Property, prior to the date on which the related Insurance Policy would otherwise be terminated;

(iii)     all real estate taxes and assessments in respect of each Foreclosed Property that have resulted in the imposition of a lien thereon, other than amounts that are due but not yet delinquent;

(iv)     all costs and expenses necessary to maintain each Foreclosed Property;

(v)     all fees and expenses payable to any Independent Contractor hired to operate and manage a Foreclosed Property pursuant to Section 4.14(c); and

(vi)     all fees and expenses of any Independent appraiser or other real estate professional retained by the Grantor Trustee or Servicer pursuant to Section 4.13(a) or Section 4.15.

The Servicer shall advance the Foreclosure Advances described in clauses (i) through (vi) above if the Servicer would make such an advance if it would be appropriate to do so under the Servicing Standard and, in the Servicer's good faith judgment at the time of such determination, such amounts will be recoverable from related Payments.

USBT 100577

Section 4.09.  <u>Reimbursement of Foreclosure Advances</u>.

(a)    [Reserved].

(b)    The Servicer shall be entitled to be reimbursed pursuant to Section 5.01(d)(ii)(b)(z) from related Payments for previously unreimbursed Foreclosure Advances advanced by it on or prior to the related Monthly Cut-Off Date but only to the extent the Servicer has satisfied the requirements of Section 4.08.

(c)    The Indenture Trustee shall offset against amounts otherwise distributable to the respective Servicer pursuant to Section 5.01(d)(ii)(b)(z), amounts, if any, which were required to be deposited in any Collection Account pursuant to Section 5.01(a) and Section 5.01(e)(i) with respect to the related Due Period but which were not so deposited.

USBT 100578

Section 4.10.  <u>Modifications, Waivers and Amendments</u>.

(a)     The Servicer shall not agree to any modification, waiver or amendment of any provision of any Loan unless, in the Servicer's good faith judgment, such modification, waiver or amendment (i) would be reasonably likely at the time of making of such determination to produce a greater recovery on a present value basis with respect to such Loan than some other type of resolution, and (ii) in the case of any FHA Loan, complies with the requirements of Title I or is required by Title I. In either case and except as set forth in paragraph (b) below, the Servicer may agree to such modification, waiver or amendment only in the event of a payment default with respect to such Loan or in the event that a payment default with respect to such Loan is reasonably foreseeable by the Servicer. The Servicer shall agree to subordinate the position of the security interest in the Property which secures any FHA Loan (other than an FHA Loan secured by a first lien on the related Property in which case the Servicer shall not agree to any such subordination) upon the Servicer's receipt of HUD's written approval to such subordination provided such subordination (i) would permit the Obligor to refinance a related senior lien to take advantage of a lower interest rate or (ii) would permit the Obligor to extend the term of the related senior lien.

(b)     Notwithstanding the foregoing, if the Loan contains a Portability Option, the Servicer shall not permit the related Obligor to exercise such option except in accordance with the Servicing Standard and unless each of the following conditions is met: (i) the Loan will not be totally unsecured at any time; (ii) the exercise of such option complies with all requirements of applicable federal, state and local law; and (iii) the exercise of such option, at the time of exercise thereof, complies with the terms of the related Debt Instrument and Mortgage. If the provisions of the Debt Instrument or Mortgage with respect to a Loan permit third party fees and expenses or a Portability Fee to be charged to the Obligor, the Servicer shall, at the time of execution of documents relating to the exercise of such option, collect the full amount of fees and expenses and the full amount of the Portability Fee unless, in the Servicer's judgment in accordance with the Servicing Standard, the collection of all or a portion of the Portability Fee would prohibit the Obligor from exercising the Portability Option and result in a payment default with respect to the Loan. All Portability Fees collected shall be deposited by the Servicer into the Collection Account within two (2) Business Days of receipt thereof and such amounts shall be deemed to be additional interest received with respect to the Loan.

(c)     The Servicer shall notify the Grantor Trustee of any modification, waiver or amendment of any provision of any Loan and the date thereof, and shall deliver to the Grantor Trustee for deposit in the related File, an original counterpart of the agreement relating to such modification, waiver or amendment, promptly following the execution thereof. In addition, with respect to an Obligor's exercise of a Portability Option, the Servicer shall deliver to the Grantor Trustee for deposit in the related File or, if applicable, submit for recordation, promptly following the execution thereof (i) a Mortgage and assignment thereof sufficient under the laws of the jurisdiction wherein the related new real Property is located to reflect of record the Grantor Trustee's interest in the related Loan and (ii) a release of Mortgage with respect to the original Mortgaged Property.

USBT 100579

In the event it is determined by the Servicer, the Owner Trustee, the Indenture Trustee or the Grantor Trustee, as evidenced by written notice to the Servicer, that the exercise of a Portability Option and the related transfer of mortgage lien to a new Property, at the time of such exercise and transfer, did not comply with all requirements of applicable federal, state and local law, the Servicer shall, on the last day of the calendar month next succeeding the date on which such notice is received by the Servicer, purchase the affected Loan from the Grantor Trustee for the Purchase Price. The Servicer shall not be deemed to be in breach of its obligations under Section 4.10(b)(ii) if it purchases the affected Loan as provided herein.

Section 4.11.  <u>Due-On-Sale; Due-on-Encumbrance</u>.

(a)    If any Loan contains a provision, in the nature of a "due-on-sale" clause, which by its terms:

(i)    provides that such Loan shall (or may at the Obligee's option) become due and payable upon the sale or other transfer of an interest in the related Property; or

(ii)    provides that such Loan may not be assumed without the consent of the related Obligee in connection with any such sale or other transfer,

then, for so long as such Loan is included in the Grantor Trust, the Servicer to the extent it has knowledge of such sale or other transfer, on behalf of the Grantor Trustee, shall exercise any right the Grantor Trustee may have as the Obligee of record with respect to such Loan (x) to accelerate the payments thereon or (y) to withhold its consent to any such sale or other transfer, in a manner consistent with the Servicing Standard; provided, however, that if it would be appropriate under the loan documents and the Servicing Standard for the Servicer to enter into an assumption and/or modification agreement with the assignee rather than to accelerate the indebtedness and the Servicer has determined that the proposed assignee of the Loan satisfied the then current underwriting criteria of the Seller for a loan such as the Loan and that the proposed assignee has credit characteristics similar to the related Obligor, then the Servicer may do so.

(b)    If any Loan contains a provision, in the nature of a "due-on-encumbrance" clause, which by its terms:

(i)    provides that such Loan shall (or may at the Obligee's option) become due and payable upon the creation of any lien or other encumbrance on the related Property; or

(ii)    requires the consent of the related Obligee to the creation of any such lien or other encumbrance on the related Property,

then, for so long as such Loan is included in the Grantor Trust, the Servicer, on behalf of the Grantor Trustee, shall exercise any right the Grantor Trustee may have as the Obligee of record with respect to such Loan (x) to accelerate the payments thereon or (y) to withhold its consent to the creation of any such lien or other encumbrance, in a manner consistent with the Servicing

USBT 100580

Standard and as permitted by law; provided, however, that if it would be appropriate under the loan documents and the Servicing Standard for the Servicer to not accelerate the indebtedness, then the Servicer may refrain from doing so.

(c)     Nothing in this Section 4.11 shall constitute a waiver of the Grantor Trustee's right to receive notice of any assumption of a Loan, any sale or other transfer of the related Property or the creation of any lien or other encumbrance with respect to such Property.

(d)     Except as otherwise permitted by Section 4.10, the Servicer shall not agree to modify, waive or amend any term of any Loan in connection with the taking of, or the failure to take, any action pursuant to this Section 4.11.

Section 4.12.  Collection; Claims for FHA Insurance and Foreclosures.

(a)     (x)     If any Monthly Payment due under any FHA Loan is not paid when the same becomes due and payable, or if the Obligor fails to perform any other covenant or obligation under the FHA Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action (consistent with Title I, including efforts to cure the default of such Loan pursuant to 24 C.F.R. Section 201.50) as it shall deem to be in the best interest of the Grantor Trust. If the maturity of the related Debt Instrument has been accelerated pursuant to the requirements under Title I following the Servicer's efforts to cure the default of the FHA Loan (and such Loan is not required to be purchased pursuant to Section 3.05), and (i) if an FHA Insurance Coverage Insufficiency does not exist at the time, the Claims Administrator shall initiate, on behalf of the Grantor Trust and the Contract of Insurance Holder, a claim under the Contract of Insurance for reimbursement for loss on such Loan pursuant to Title I (see 24 C.F.R. Section 201.54), or (ii) if an FHA Insurance Coverage Insufficiency exists at the time, the Servicer shall determine within 90 days in accordance with Section 4.12(c) whether or not to proceed against the related Obligor or the Property securing the FHA Loan, and if thereafter an FHA Insurance Coverage Insufficiency does not exist, the Claims Administrator may submit a claim under the Contract of Insurance with respect to such Loan if it has obtained the prior approval of the Secretary of HUD pursuant to 24 C.F.R. Section 201.51; or (y) if any Monthly Payment due under any Non-FHA Loan is not paid when the same is due and payable, or if the Obligor fails to perform any other covenant or obligation under such Non-FHA Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as it shall deem to be in the best interest of the Grantor Trust including but not limited to proceeding against the Property securing such Non-FHA Loan.

In the event that in accordance with clause (a)(x)(ii) or (y) above the Servicer determines not to proceed against the Obligor or the Property, on or before the Determination Date following such determination the Servicer shall determine in good faith in accordance with the Servicing Standard that all amounts which it expects to receive with respect to such Loan have been received. If the Servicer makes such a determination, it shall record such determination pursuant to Section 4.03(e)(iii).

USBT 100581

   (b)  If the Claims Administrator initiates a claim for reimbursement for loss on any FHA Loan under this Section, the Claims Administrator shall comply with applicable provisions of Title I and diligently pursue such claim and, in any event, shall initiate such claim no later than the last day permitted under Title I (see 24 C.F.R. Section 201.54(b)). For purposes of this Agreement, the term "initiate a claim for reimbursement" shall mean the filing of the claim application pursuant to the requirements set forth in 24 C.F.R. Section 201.54, including the filing of all related assignments and documents and materials required for file review. For the purposes of such filing, the Claims Administrator shall request in writing, and the Grantor Trustee within five calendar days of receipt of such written request shall deliver to the Claims Administrator, the Note and any related Mortgage for such FHA Loan and each other item in the related File necessary to make such claim. The Grantor Trust Certificateholder hereby consents to the assignment of such FHA Loan for the sole purpose of initiating a claim under the Contract of Insurance for reimbursement with respect to such Loan. Pursuant to Section 4.01(c), the Contract of Insurance Holder shall furnish the Claims Administrator within fifteen days after the date of this Agreement a power of attorney to file claims under the Contract of Insurance. The Grantor Trustee and Contract of Insurance Holder agree to execute and deliver to the Claims Administrator, upon written request, within five Business Days after receipt from the Claims Administrator, all documents, if any, necessary to initiate and file a claim under the Contract of Insurance for such Loan, which documents shall be prepared by the Claims Administrator. If the FHA rejects or refuses to pay any claim (including a rejection of a previously paid claim and a demand by the FHA of the return of the FHA Insurance Payment Amount for such FHA Loan) made under the Contract of Insurance for an FHA Loan under this Section (other than a refusal or rejection for clerical error in computing the claim amount or because the amount of the FHA Insurance Coverage Reserve Account as shown in the Insurance Record is zero (a "Zero Balance Event")), upon receipt of the FHA's rejection notice by the Claims Administrator directly from the FHA or from the Contract of Insurance Holder pursuant to Section 4.12(e) and determination by the Claims Administrator that the rejection was not due to clerical error, then the Claims Administrator shall promptly notify the Contract of Insurance Holder (if the Contract of Insurance Holder shall not initially have received such notice) and the Grantor Trustee of such fact.

   If the FHA indicates in writing in connection with its rejection of, or refusal to pay, a claim that such rejection or refusal is due to other than a "Zero Balance Event" or a failure by the Servicer to service such FHA Loan in accordance with Title I, the Seller shall be obligated on or before the Monthly Cut-Off Date next following the date of such notice from the Claims Administrator to repurchase such Loan, either directly from FHA or from the Grantor Trustee, to repurchase such FHA Loan for the Purchase Price. Notwithstanding the foregoing, if the FHA shall have indicated in writing in connection with its rejection or refusal to pay a claim that such rejection or refusal is due to a failure to service such FHA Loan in accordance with Title I, the Claims Administrator shall notify the Seller, the Contract of Insurance Holder, the Owner Trustee, the Grantor Trustee and the Indenture Trustee of such determination, and the Servicer shall, on the last day of the calendar month next succeeding the date on which such final rejection notice is received by the Servicer from the FHA, either directly from FHA or from the Grantor Trustee, repurchase such FHA Loan for the Purchase Price. In the event that the FHA

shall not have provided the indication in writing as specified in the preceding two sentences (x) if it is not agreed by the Servicer that a rejection or refusal by the FHA is due to a servicing failure, the Seller shall be obligated to purchase such FHA Loan for the Purchase Price (except if such rejection is due to a Zero Balance Event), and (y) if it is agreed by the Servicer that a rejection or refusal by the FHA is due to a servicing failure, the Servicer shall be obligated to purchase such FHA Loan for the Purchase Price. By way of clarification of the foregoing, the parties agree that for the purpose of this Section 4.12(b) and Section 4.12(g), a rejection due to a failure to service FHA Loans in accordance with Title I shall be limited to a failure of the Servicer to comply with its duties under this Agreement only and shall not include a failure in servicing prior to the Closing Date with respect to the Initial Loans or the Subsequent Transfer Date with respect to the Subsequent Loans or a failure by any other party hereto to perform its obligations as required hereunder.

(c)    With respect to an FHA Loan which has been accelerated following the Servicer's efforts to cure the default of the Loan, in accordance with the criteria set forth in Section 4.12(a), unless otherwise prohibited by applicable law, including Title I, or court or administrative order, the Servicer, on behalf of the Grantor Trustee, may, at any time, institute proceedings to enforce the Grantor Trustee's right with respect to such FHA Loan.

The Servicer shall institute foreclosure proceedings, repossess, exercise any power of sale to the extent permitted by law, obtain a deed in lieu of foreclosure, or otherwise if it would be reasonably likely at the time of making such determination to produce a greater recovery on a present value basis with respect to such Loan than some other type of resolution. Notwithstanding the foregoing, if the Servicer has cause to reasonably believe that any Property is contaminated by hazardous material, then prior to taking title to any Property, the Servicer shall obtain and provide a copy to the Grantor Trustee of, an environmental review to be performed on such Property by a company with recognized expertise, the scope of which review is limited to the examination of public records and documents for information regarding whether such Property has on it, under it or is near, hazardous or toxic materials or waste. If such review reveals that such Property has on it, under it or is near hazardous or toxic materials or waste or reveals any other environmental problem, title shall be taken to such Property only after obtaining the written consent of the Rating Agencies.

If, in following foreclosure procedures, title to the Foreclosed Property is acquired, the deed or certificate of sale shall be issued to the Grantor Trustee.

(d)    With respect to any FHA Loan, each of the Grantor Trustee and the Contract of Insurance Holder shall deposit in the Collection Account on the day of receipt, all amounts received from the FHA or any other Person with respect to such Loan and shall transmit by facsimile, or such other method requested by the Servicer, to the Servicer on each such day the letter of transmittal received from the FHA and any other documents with respect to such receipt. Each of the Grantor Trustee and the Contract of Insurance Holder shall also promptly deliver to the Claims Administrator copies of any other correspondence received from the FHA or sent to the FHA by the Grantor Trustee or the Contract of Insurance Holder, as the case may be.

including, but not limited to, any correspondence regarding the balance of the FHA Insurance Coverage Reserve Account, premiums due and claims rejected.

(e)    If, prior to the Termination Date, the FHA rejects an insurance claim, in whole or in part, under the Contract of Insurance after having previously paid such insurance claim and the FHA demands that the Contract of Insurance Holder repurchase such FHA Loan, the Contract of Insurance Holder shall notify the Claims Administrator of such rejected claim and the Claims Administrator upon receipt of such notice shall pursue such appeals with the FHA as are reasonable.  If the FHA continues to demand that the Contract of Insurance Holder repurchase such FHA Loan after the Claims Administrator exhausts such administrative appeals as are reasonable, then notwithstanding that the Seller, the Servicer or any other Person is required to repurchase such Loan under this Agreement, the Claims Administrator shall notify the Contract of Insurance Holder of such fact and the Contract of Insurance Holder shall instruct the Grantor Trustee to cause the Grantor Trust to repurchase such Loan from funds available in the Collection Account.  The Servicer shall, to the extent possible, direct the Grantor Trustee to make all such repurchases of FHA Loans once a month and to repurchase any and all such FHA Loans from the FHA in that portion of the calendar month following the Distribution Date.  If the Grantor Trustee withdraws any amounts from the Grantor Trust for such purpose between the Determination Date and Distribution Date of any month, the Servicer shall prepare the Servicer Certificate required under Section 6.01 for such Distribution Date (or promptly revise the Servicer Certificate if already prepared for such Distribution Date) to reflect such withdrawals as if made on such Determination Date and the Grantor Trustee shall revise its determination pursuant to Section 6.01 accordingly.  To the extent allowed by the FHA, the Seller may repurchase directly from the FHA any FHA Loan for which an insurance claim has been paid and later rejected by the FHA.  If the FHA indicates in writing in connection with its rejection of or refusal to pay a claim that such rejection or refusal is due to other than a "Zero Balance Event", failure by the Contract of Insurance Holder to pay FHA premiums in accordance with the terms of this Agreement, or a failure to service the Loan in accordance with Title I or if the FHA does not indicate in writing the reason for its rejection or refusal, then the Seller shall be liable to reimburse the Grantor Trust for any amounts paid by the Grantor Trustee to the FHA in order to repurchase such FHA Loan.  The Contract of Insurance Holder shall repurchase the related Loan for which the Contract of Insurance Holder has failed to pay FHA premiums in accordance with the terms of this Agreement.  Subject to Section 4.12(b), if the FHA indicates in writing, in connection with its final rejection or refusal to pay a claim that such rejection or refusal is due to a failure by the Servicer to service such FHA Loan in accordance with Title I after the Closing Date or the Subsequent Transfer Date, as applicable, the Servicer shall be obligated to reimburse the Grantor Trust or the Seller for any amounts paid by the Grantor Trustee or the Seller, as the case may be, to the FHA in order to repurchase FHA Loans for which the FHA has rejected an insurance claim as a result of a failure to service such FHA Loan in accordance with Title I.

(f)    If, after the Termination Date, the FHA rejects an insurance claim, in whole or in part, under the Contract of Insurance after previously having paid such insurance claim and the FHA demands that the Contract of Insurance Holder repurchase such FHA Loan, the Claims

USBT 100584

Administrator shall pursue such appeals with the FHA as are reasonable. If the FHA continues to demand that the Contract of Insurance Holder repurchase such FHA Loan after the Claims Administrator exhausts such administrative appeals as are reasonable, then, notwithstanding that the Seller or any other Person is required to repurchase such Loan under this Agreement, the Claims Administrator shall notify the Contract of Insurance Holder of such fact and the Contract of Insurance Holder shall repurchase such Loan from the FHA. If the FHA indicates in writing in connection with its rejection of or refusal to pay a claim that such rejection or refusal is due to other than a failure to service the FHA Loan in accordance with Title I or if the FHA does not indicate in writing the reason for its rejection or refusal, then the Seller shall be obligated to reimburse the Contract of Insurance Holder for any amounts paid by the Contract of Insurance Holder to the FHA in order to repurchase such Loan. Subject to Section 4.12(b), if the FHA indicates in writing, in connection with its rejection or refusal to pay a claim or it is agreed by the Servicer, that such rejection or refusal is due to a failure to service such FHA Loan in accordance with Title I after the Closing Date or the Subsequent Transfer Date, as applicable, then the Servicer shall be obligated to reimburse the Contract of Insurance Holder or the Seller for any amounts paid by the Contract of Insurance Holder or the Seller to the FHA in order to repurchase FHA Loans for which the FHA has rejected an insurance claim as a result of a failure to service such Loan in accordance with Title I.

(g)     The Claims Administrator shall not be entitled to reimbursement of expenses associated with the filing of any FHA Insurance claim from and to the extent of such amounts as are reimbursed by FHA.

Section 4.13.  <u>Sale of Foreclosed Properties</u>.

(a)     The Servicer may offer to sell, in a commercially reasonable manner, to any Person any Foreclosed Property, if and when the Servicer determines, in a manner consistent with the Servicing Standard, that such a sale would be in the best interests of the Grantor Trust but shall, in any event, so offer to sell any Foreclosed Property no later than the time determined by the Servicer to be sufficient to result in the sale of such Foreclosed Property on or prior to the dates specified in Section 4.13(c). The Servicer shall, subject to the Servicing Standard, accept the highest bid received from any Person for any Foreclosed Property

(b)     Subject to the provisions of Section 4.12, the Servicer shall act on behalf of the Grantor Trustee in negotiating, and taking any other action necessary or appropriate in connection with, the sale of any Foreclosed Property including the collection of all amounts payable in connection therewith. Any sale of a Foreclosed Property shall be without recourse to the Grantor Trustee, the Servicer or the Grantor Trust or holder of the Grantor Trust Certificate and, if consummated in accordance with the terms of this Agreement, none of the Servicer or the Grantor Trustee shall have any liability to the Grantor Trust Certificateholder or any Securityholder with respect to the purchase price therefor accepted by the Servicer or the Grantor Trustee.

(c)     In the event the Grantor Trustee acquires any Foreclosed Property with respect to any Loan, the Servicer shall use its best efforts to liquidate such Foreclosed Property as soon as

commercially reasonable but in no event later than one year following the date on which the Grantor Trustee acquired such Foreclosed Property; provided, however, that if at the end of the foregoing one-year period, the Servicer has been unable to sell such Foreclosed Property, such Foreclosed Property may be retained by the Grantor Trust so long as the Servicer continues to use its best efforts to sell the Foreclosed Property in a commercially reasonable manner and the retention for such period would not cause the Grantor Trust to be treated as an association taxable as a corporation and the Grantor Trustee receives an Opinion of Counsel (which shall not be at the expense of the Servicer) to the effect that such retention would not cause the Grantor Trust to be characterized as an association or publicly traded partnership taxable as a corporation for federal income tax purposes .

Section 4.14. <u>Management of Real Estate Owned.</u>

(a)     If the Grantor Trust acquires any Foreclosed Property pursuant to Section 4.12, the Servicer shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement, to do any and all things in connection therewith as are consistent with the manner in which the Servicer manages and operates similar property owned by the Servicer or any of its affiliates, all on such terms and for such period as the Servicer deems to be in the best interests of the Grantor Trust Certificateholder and the Securityholders.

(b)     [Reserved].

(c)     The Servicer may contract with any Independent Contractor for the operation and management of any Foreclosed Property; provided, however, that:

(i)     the terms and conditions of any such contract may not be inconsistent herewith;

(ii)     any such contract shall require, or shall be administered to require, that the Independent Contractor remit all related Payments to the Servicer as soon as practicable, but in no event later than two Business Days following the receipt thereof by such Independent Contractor;

(iii)     none of the provisions of this <u>Section 4.14(c)</u> relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the Servicer of any of its duties and obligations to the Grantor Trustee for the benefit of the Grantor Trust Certificateholder and the Securityholders with respect to the operation and management of any such Foreclosed Property; and

(iv)     the Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such Foreclosed Property.

The Servicer shall be entitled to enter into, with any Independent Contractor performing services for it related to its duties and obligations hereunder, any agreement for indemnification of the

Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification. The Servicer shall be solely liable for all fees owed by it to any such Independent Contractor, but shall be entitled to be reimbursed for all such fees advanced by it pursuant to Section 4.08(b)(v) in the manner provided in Section 4.09(b).

Section 4.15.  Inspections.

The Servicer shall inspect or cause to be inspected each Property that secures any Loan at such times and in such manner as are consistent with the Servicing Standard.

Section 4.16.  Maintenance of Insurance.

(a)     The Servicer shall cause to be maintained for each Foreclosed Property acquired by the Grantor Trust such types and amounts of insurance coverage as the Servicer shall deem reasonable.  With respect to each Manufactured Housing Contract, the Servicer will cause to be maintained hazard insurance, for the benefit of the Grantor Trust, with respect to each related Property in an amount which is at least equal to the outstanding Principal Balance on the Manufactured Housing Contract, except that the amount of such insurance may be less than the actual cash value of the Manufactured Home where state law precludes a higher amount.  With respect to each Loan for which the related Property is covered by hazard insurance or flood insurance (if required), the Servicer will cause such insurance coverage to be maintained.  In addition, the Servicer shall force place or cause to be force placed flood insurance issued by the Federal Emergency Management Agency ("FEMA") or conforming to the requirements of applicable law, in an amount equal to the outstanding balance of the Loan or the maximum limit of coverage available with respect to the related Property, if (A) a determination has been made that the related Property is located in a flood area identified by FEMA and (B) the Servicer has received notice that flood insurance on the related Property is inadequate or that the related Obligor has let such insurance lapse or that such insurance is otherwise terminated.

(b)     Any amounts collected by the Servicer under any Insurance Policies, shall be paid over or applied by the Servicer as follows:

(i)     In the case of amounts received in respect of any Loan:

(A)     for the restoration or repair of the affected Property, in which event such amounts shall be released to the Obligor in accordance with the terms of the related Note, or to the extent not so used, or

(B)     in reduction of the Principal Balance of the related Loan, in which event such amounts shall be credited to the Servicing Record, unless the related instruments require a different application, in which case such amounts shall be applied in the manner provided therein; and

(ii)     Subject to Section 4.14, in the case of amounts received in respect of any Foreclosed Property, for the restoration or repair of such Foreclosed Property, unless the

USBT 100587

Servicer determines, in a manner consistent with the Servicing Standard, that such restoration or repair is not in the best economic interest of the Grantor Trust, such amounts shall be credited, as of the date of receipt, to the applicable Servicing Record, as a Payment received from the operation of such Foreclosed Property.

Section 4.17.  Release of Files.

(a)      If with respect to any Loan:

        (i)      the outstanding Principal Balance of such Loan plus all interest accrued thereon shall have been paid;

        (ii)      the Servicer shall have received, in escrow, payment in full of such Loan in a manner customary for such purposes;

        (iii)      such Loan has become a Purchased Loan or has been replaced by a Substitute Loan;

        (iv)      such Loan or the related Foreclosed Property has been sold in connection with the termination of the Trust pursuant to Section 11.01;

        (v)      the FHA has paid a claim with respect to such Loan under the Contract of Insurance; or

        (vi)      the related Foreclosed Property has been sold pursuant to Section 4.13;

and, in each such case, the Servicer shall deliver a written request, substantially in the form attached hereto as Exhibit E, requesting that the Grantor Trustee on behalf of itself and on behalf of the Owner Trustee and the Indenture Trustee release to the Servicer the related File, then the Grantor Trustee shall, within three Business Days or such shorter period as may be required by applicable law to avoid the imposition of any penalties against the Servicer for failing to timely release a lien or to return original loan documents, release the related File to the Servicer and execute and deliver such instruments of transfer or assignment, in each case without recourse, as shall be necessary to vest ownership of such Loan in the Servicer or such other Person as may be specified in such certificate, the forms of any such instrument to be appended to such certificate.

(b)      From time to time and as appropriate for the servicing or foreclosure of any Loan, the Grantor Trustee shall, upon request of the Servicer, release the related File (or any requested portion thereof) to the Servicer.  The Servicer agrees that any such File held by the Servicer shall be held by it for the benefit of and as agent of the Grantor Trust Certificateholder, the Grantor Trustee and the Grantor Trust as the owner thereof.  It is intended that by the Servicer's agreement pursuant to this section 4.17 the Grantor Trustee shall be deemed to be in possession of the File for purposes of Section 9-305 of the Uniform Commercial Code of the State in which such documents or instruments are located.  Such receipt shall obligate the Servicer to return the File (or such portion thereof) to the Grantor Trustee when the need therefor by the Servicer no

USBT 100588

longer exists, unless any of the conditions specified in subsection (a) above is satisfied prior thereto. The Grantor Trustee shall release such receipt to the Servicer (i) upon the Servicer's return of the File (or such portion thereof) to the Grantor Trustee or (ii) if the Servicer has not yet returned the File (or such portion thereof) to the Grantor Trustee, upon receipt of a certificate certifying that any of the conditions in subsection (a) above has been satisfied.

Section 4.18. Certain Tax Matters.

(a)     The Grantor Trustee shall comply with all requirements of the Code, and applicable state and local law, with respect to the withholding from any distributions made to the Grantor Trust Certificateholder of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

(b)     The Indenture Trustee shall comply with all requirements of the Code, and applicable state and local law, with respect to the withholding from any distributions made to any Securityholder of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

Section 4.19. Filing of Continuation Statements.

On or before the fifth anniversary of the filing of any financing statements by the Seller, with respect to the assets conveyed to the Grantor Trust and the Trust, the Seller shall prepare, cause to have executed by the necessary parties and file in the proper jurisdictions all financing and continuation statements necessary to maintain the liens, security interests and priorities of such liens and security interests that have been granted by the Seller and the Seller shall continue to file on or before each fifth anniversary of the filing of any financing and continuation statements such additional financing and continuation statements until the Grantor Trust and the Trust, have terminated pursuant to the Grantor Trust Agreement and the Trust Agreement, respectively. Each of the Grantor Trustee and the Indenture Trustee agrees to cooperate with the Seller in preparing, executing and filing such statements. The Grantor Trustee agrees to notify the Seller on the third Distribution Date prior to each such fifth anniversary of the requirement to file such financing and continuation statements. The filing of any such statement with respect to the Seller shall not be construed as any indication of an intent of any party contrary to the expressed intent set forth in Section 2.04. If the Seller has ceased to do business whenever any such financing and continuation statements must be filed or the Seller fails to file any such financing statements or continuation statements at least one month prior to the expiration thereof, the Grantor Trustee shall perform the services required under this Section 4.19.

Section 4.20. Fidelity Bond.

The Servicer shall maintain a fidelity bond in such form and amount as is customary for entities acting as custodian of funds and documents in respect of loans on behalf of institutional investors.

USBT 100589

Section 4.21.  <u>Errors and Omissions Insurance</u>.

The Servicer shall obtain and maintain at all times during the term of this Agreement errors and omissions insurance coverage covering the Servicer and its employees issued by a responsible insurance company.  The issuer, policy terms and forms and amounts of coverage, including applicable deductibles shall be in such form and amount as are customary for entities acting as servicers.

Section 4.22.  <u>New Loan Reporting Manifest and Transfer of Note Report</u>.

(a)    The Servicer shall prepare and file a New Loan Reporting Manifest with the Secretary of HUD pursuant to 24 CFR Section 201.30 for each FHA Loan for which no such report was previously filed.  The Servicer shall copy each such filing to the Seller simultaneously with the filing with HUD.

(b)    The Servicer shall prepare and file a Transfer of Note Report with respect to each FHA Loan for which a New Loan Reporting Manifest was previously filed with HUD, as required by Title I but in no event later than two Business Days after such FHA Loan become subject to this Agreement, in such manner as to cause the Grantor Trustee, for the benefit of the Grantor Trust, to be entitled to the benefits of the FHA Insurance applicable to the FHA Loans. The Servicer shall copy each such filing to the Seller simultaneously with the filing with HUD.

(c)    If a case number is not assigned by HUD to an FHA Loan due to incomplete or incorrect information on the related New Loan Reporting Manifest, the Servicer shall cooperate with and take such action as is directed by the Seller to supply corrected information to HUD with respect to such FHA Loan no later than five Business Days after the date of rejection of such FHA Loan by HUD.

Section 4.23.  <u>Servicer Not Responsible</u>.

The Servicer shall not be responsible or liable for, or in breach of any of its representations, warranties or agreements under this Agreement resulting from, the acts or omissions to act of any other party to this Agreement or any other Person, including, without limitation, the failure of the Seller, Grantor Trustee or Indenture Trustee to deliver to the Servicer any file or portion thereof or any other document as required pursuant to the provisions of this Agreement following the Servicer's request therefor.

ARTICLE V

ESTABLISHMENT OF TRUST ACCOUNTS

Section 5.01.  <u>Accounts</u>.

(a)    <u>Establishment of Collection Account</u>.  The Grantor Trustee has heretofore established or caused to be established and shall hereafter maintain or cause to be maintained a

USBT 100590

separate account denominated Collection Account, which in each case is and shall continue to be an Eligible Account in the name of the Indenture Trustee and shall be designated "U.S. Bank Trust National Association, as Grantor Trustee in trust for Keystone Grantor Trust Certificate, Series 1998-P2, Collection Account." The Servicer shall cause all Payments to be deposited (net of the Servicing Fee and Ancillary Fees) in the Collection Account no later than the second Business Day following the date of receipt thereof into the Servicer's designated lock-box; provided, however, that to the extent that payments are received in any location other than such lockbox, such payments must be deposited within two Business Days to such lockbox. Notwithstanding the prior sentence, the Servicer may retain Payments until two Business Days prior to the next succeeding Distribution Date and retain all reinvestment earnings thereon provided that the Servicer shall (i) within 2 Business Days of receipt thereof invest such Payments in Eligible Investments, (ii) deposit into the Collection Account any losses in respect of such investments and (iii) maintain a short-term debt rating of A-1 and P-1 by Fitch's and Moody's, respectively. The Grantor Trustee shall provide to the Servicer a monthly statement of all activity in the Collection Account. Funds in the Collection Account shall be invested in accordance with Section 5.04. The Grantor Trustee shall also cause to be deposited to the Collection Account not later than two Business Days prior to the Distribution Date following the end of the Funding Period the amount required to be deposited therein pursuant to Section 5.07 (e) hereof.

(b)    Establishment of Note Distribution Account. The Indenture Trustee has heretofore established with itself in its trust capacity at its corporate trust department for the benefit of Securityholders an account referred to herein as the Note Distribution Account. The Indenture Trustee shall at all times maintain the Note Distribution Account as an Eligible Account and shall cause such account to be designated "U.S. Bank Trust National Association, as Indenture Trustee in trust for Keystone Asset Backed Securities, Series 1998-P2, Note Distribution Account."

(c)    FHA Premium Account. The Grantor Trustee has heretofore established with itself in its trust capacity at its corporate trust department a segregated trust account referred to herein as the "FHA Premium Account" for the benefit of the Grantor Trust Certificateholder. The Grantor Trustee shall at all times maintain the FHA Premium Account as an Eligible Account and shall cause such accounts to be designated as "U.S. Bank Trust National Association, as Grantor Trustee for Keystone Grantor Trust Certificate, Series 1998-P2, FHA Premium Account". No later than the second Business Day preceding each Distribution Date, all amounts on deposit in the Collection Account representing payments by Obligors on Invoiced Loans in respect of premium on FHA Insurance shall be withdrawn by the Grantor Trustee and deposited to the FHA Premium Account. Any and all moneys transferred to the FHA Premium Account pursuant to this Section 5.01(c) shall be held by the Grantor Trustee in the FHA Premium Account subject to disbursement and withdrawal as herein provided. Amounts deposited to the FHA Premium Account shall be invested in accordance with Section 5.04. Amounts on deposit in the FHA Premium Account shall be withdrawn by the Grantor Trustee, in the amounts required, for application as follows:

USBT 100591

(i)      to payment to the FHA of any premiums due on the Contract of Insurance in respect of FHA Loans, in such amounts and on such dates as directed by the Servicer or the Seller; the Grantor Trustee shall apply all amounts on deposit in the related FHA Premium Account to payment to the FHA of any premiums due under the Contract of Insurance as invoiced by the FHA and, if, the FHA Insurance with respect to an FHA Loan shall not yet have been transferred to the Contract of Insurance and the Seller instructs the Grantor Trustee to pay the FHA Insurance with respect to such Loan to the related contract of insurance holder, then the Grantor Trustee shall make such payment, and the Seller and not the Grantor Trustee shall be liable in the event of the failure of such funds to be applied to payment of the premium with respect to such FHA Loan;

(ii)      provided that the Servicer provides the Premium Release Amount on the related Servicer Certificate for a Distribution Date, to payment to the Grantor Trust Certificateholder of the applicable Premium Release Amount; and

(iii)      on the Business Day preceding a Distribution Date that is also the Termination Date, for deposit in the related Distribution Account all amounts then on deposit in such FHA Premium Account, whereupon the FHA Premium Account shall terminate.

(d)      Withdrawals from Collection Account; Capitalized Interest Account; Deposit to the Note Distribution Account

(i)      On the Distribution Date occurring in October 1998 the Grantor Trustee shall withdraw from the Collection Account, and remit to the Seller from interest payments received on the Loans during the related Due Period, the portion thereof in respect of interest that was due on or prior to September 15, 1998. No later than the Business Day preceding each Distribution Date, the Grantor Trustee shall withdraw amounts from the Collection Account in respect of the Grantor Trust Certificate Remittance Amount with respect to such Distribution Date and deposit such amounts into the Note Distribution Account, and to the extent necessary liquidate the Eligible Investments in which such amounts are invested and deposit such amounts, together with all income from investment of funds in the Collection Account, into the Note Distribution Account; provided, however, that with respect to the Distribution Date that occurs on the earlier of (i) the Final Maturity Date and (ii) the Termination Date, the Grantor Trustee shall withdraw all amounts on deposit in the Collection Account that would be included in  the Grantor Trust Certificate Remittance Amount in the following month if such Distribution Date was not the Final Maturity Date or the Termination Date, and to the extent necessary, liquidate the Eligible Investments in which such amounts are invested, and deposit all such amounts into the Note Distribution Account. The Grantor Trustee shall have no authority to sell such Eligible Investments prior to maturity. In addition, no later than the Business Day preceding each Distribution Date the Indenture Trustee shall withdraw from the Capitalized Interest Account and deposit to the Note Distribution Account the amount specified in Section 5.06(c) and Section 5.07(b).

USBT 100592

(ii)    (a) All amounts on deposit in the Collection Account representing payments by Obligors on Invoiced Loans in respect of premiums on FHA Insurance shall be withdrawn by the Grantor Trustee from the Collection Account and deposited in the FHA Premium Account no later than the Business Day preceding each Distribution Date.

(b)    The Grantor Trustee shall also withdraw from the Collection Account the following amounts and shall remit such amounts as follows:

(w)    to the FHA Premium Account, the FHA Premium Account Deposit for such Distribution Date;

(x)    to the Grantor Trustee, the amount of the Grantor Trustee Fee;

(y)    to the persons entitled thereto, the Priority Expenses for such Distribution Date;

(z)    to the Servicer (i) previously accrued and unpaid Servicing Fees and (ii), previously unreimbursed Foreclosure Advances to the extent permitted to be reimbursed pursuant to Section 4.09.

(e)    <u>Withdrawals from Note Distribution Account</u>.  On each Distribution Date, based in part on the information set forth in the Servicer Certificate with respect to the related Determination Date, the Indenture Trustee shall (a) from the amount deposited to the Note Distribution Account from the Collection Account in respect of the Grantor Trust Certificate Remittance Amount for such Distribution Date withdraw the Owner Trustee Fee and the Indenture Trustee Fee for such Distribution Date and remit such amounts to the Owner Trustee in its individual capacity and Indenture Trustee as applicable and (b) distribute from the Net Collected Amount in respect of the remaining Grantor Trust Certificate Remittance Amount for such Distribution Date on deposit in the Note Distribution Account the following amounts in the following order of priority; provided that on the first Distribution Date following the end of the Funding Period the portion of the Grantor Trust Certificate Remittance Amount that represents a deposit to the Collection Account pursuant to Section 5.07(e) shall be distributed as a payment of principal (x) pro rata on each Class of Notes if such amount exceeds $50,000 and (y) to the Classes of Notes then entitled to distributions of principal if such amount is less than or equal to $50,000 :

(i)    to the holders of each Class of Notes in the following order of priority:

(A)    to the Class A Notes the aggregate of the related Noteholders' Interest Distributions, *pro rata*, based on the amount of interest which each such Class is entitled to receive on such Distribution Date;

(B)    to the Class M-1 Notes the related Noteholders' Interest Distribution:

USBT 100593

(C)    to the Class M-2 Notes the related Noteholders' Interest Distribution;

(D)    to the Class B-1 Notes the related Noteholders' Interest Distribution;

(E)    to the Class B-2 Notes the related Noteholders' Interest Distribution;

(F)    subject to the last paragraph of this subsection (e) to the holders of the Class A Notes then entitled to distributions of principal, sequentially, to the Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Noteholders, in that order, until the Note Balance of each such Class of Notes has been reduced to zero, the amount necessary to reduce the aggregate of the Note Balances of the Class A Notes to the Senior Optimal Note Balance;

(G)    to the Class M-1 Noteholders, the amount necessary to reduce the Note Balance thereof to the Class M-1 Optimal Note Balance;

(H)    to the Class M-2 Noteholders, the amount necessary to reduce the Note Balance thereof to the Class M-2 Optimal Note Balance;

(I)    to the Class B-1 Noteholders, the amount necessary to reduce the Note Balance thereof to the Class B-1 Optimal Note Balance;

(J)    to the Class B-2 Noteholders, the amount necessary to reduce the Note Balance thereof to the Class B-2 Optimal Note Balance;

(ii)    sequentially, to the Class M-2 Class M-1, Class B-2 and Class B-1 Noteholders, in that order, the applicable Deferred Amount, if any, until such Deferred Amount has been paid in full (any such Deferred Amount applied first to the related Write-Down Interest Amount and second to the related Principal Write-Down Amount);

(iii)    the Excess Spread, if any, remaining after the distributions in clauses (i) through (vi) above shall be distributed in the following order of priority:

(A)    subject to the last paragraph of this subsection (e) to the holders of the Class A Notes then entitled to distributions of principal, sequentially, to the Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Noteholders, in that order, up to the Overcollateralization Deficiency until the Note Balance of each such Class of Notes has been reduced to zero, the amount necessary to reduce the aggregate of the Note Balances of the Class A Notes to the Senior Optimal Note Balance;

(B)    to the Class M-1 Noteholders, up to the Overcollateralization Deficiency, the amount necessary to reduce the Note Balance thereof to the Class M-1 Optimal Note Balance;

(C)    to the Class M-2 Noteholders, up to the Overcollateralization Deficiency, the amount necessary to reduce the Note Balance thereof to the Class M-2 Optimal Note Balance;

(D)    to the Class B-1 Noteholders, up to the Overcollateralization Deficiency, the amount necessary to reduce the Note Balance thereof to the Class B-1 Optimal Note Balance;

(E)    to the Class B-2 Noteholders, up to the Overcollateralization Deficiency, the amount necessary to reduce the Note Balance thereof to the Class B-2 Optimal Note Balance;

(F)    sequentially, to the Class M-1, Class M-2, Class B-1 and Class B-2 Noteholders, in that order, the applicable Deferred Amount, if any, until such Deferred Amount has been paid in full (any such Deferred Amounts applied first to the related Write-Down Interest Amount and second to the related Principal Write-Down Amount;

(iv)    to the Certificate Distribution Account.

Notwithstanding the foregoing, on any Distribution Date on or after the date on which the Note Balances of all Classes of Subordinate Notes have been reduced to zero, distributions in respect of the Noteholders' Principal Distribution Amount shall be made to all Classes of Class A Notes pro rata based on their respective Note Balances.

(f)    <u>Additional Withdrawals from Collection Account</u>.  On the third Business Day prior to each Distribution Date, the Grantor Trustee, at the direction of the Servicer, shall also make the following withdrawals from the Collection Account, in no particular order of priority:

(i)    to withdraw any amount not required to be deposited in the Collection Account or deposited therein in error; and

(ii)    to clear and terminate the Collection Account in connection with the termination of this Agreement.

(g)    All distributions made on each Class of Notes on each Distribution Date will be made on a pro rata basis among the Noteholders of such Class of record on the preceding Record Date based on the Percentage Interest represented by their respective Notes, and except as otherwise provided in the next succeeding sentence, shall be made by wire transfer of immediately available funds to the account of such Noteholder, if such Noteholder shall own of record Notes representing at least a $1,000,000 Denomination and shall have so notified the

USBT 100595

Indenture Trustee, and otherwise by check mailed, via first class mail, postage prepaid, to the address of such Noteholder appearing in the Note Register. The final distribution on each Note will be made in like manner, but only upon presentment and surrender of such Note at the location specified in the notice to Noteholders of such final distribution. Notwithstanding the reduction of the Note Balance of a Class to zero, the final distribution with respect to each Class shall be made on the Final Maturity Date for such Class.

Whenever the Indenture Trustee, based on a Servicer Certificate, expects that the final distribution with respect to a Class of Securities will be made on the next Distribution Date, the Indenture Trustee shall, as soon as practicable, mail to each Holder of such Class of Securities as of the applicable Record Date a notice to the effect that:

(i)       the Indenture Trustee expects that the final distribution with respect to such Class of Securities will be made on such Distribution Date, and

(ii)      no interest shall accrue on such Class of Securities after such Distribution Date provided that the final distribution occurs on such Distribution Date.

Section 5.02.  Allocation of Losses.  On any Distribution Date, if after giving effect to the distributions to be made on the Notes pursuant to Section 5.01(e), the Aggregate Note Balance exceeds the Pool Balance as of the end of the related Due Period such excess will be applied as follows: (i) in reduction of the Class B-2 Note Balance until the Class B-2 Note Balance is zero; (ii) then in reduction of the Class B-1 Note Balance until the Class B-1 Note Balance is zero; (iii) then in reduction of the Class M-2 Note Balance until the Class M-2 Note Balance is zero; and (iv) then in reduction of the Class M-1 Note Balance until the Class M-1 Note Balance is zero.

Section 5.03.  Certificate Distribution Account.

(a)      Establishment.  No later than the Closing Date, the Indenture Trustee, will establish and maintain with the Indenture Trustee for the benefit of the Owner Trustee on behalf of the Certificateholders one or more separate Eligible Accounts, which while the Indenture Trustee holds such Trust Account shall be entitled "Certificate Distribution Account, First Union Trust Company, National Association, as Owner Trustee, in trust for the Keystone Owner Trust Asset-Backed Certificates, Series 1998-P2". Funds in the Certificate Distribution Account shall be invested in accordance with Section 5.04.

(b)      Distributions.  On each Distribution Date, the Indenture Trustee shall withdraw from the Note Distribution Account all amounts required to be deposited in the Certificate Distribution Account with respect to the preceding Due Period pursuant to Section 5.01(e)(iv) and will remit such amount to the Certificate Paying Agent under the Trust Agreement for deposit into the Certificate Distribution Account. On each Distribution Date, the Certificate Paying Agent under the Trust Agreement shall distribute all amounts on deposit in the Certificate Distribution Account to the Certificateholders, as specified in the Trust Agreement.

USBT 100596

Section 5.04.  <u>Trust Accounts; Trust Account Property</u>.

(a)     <u>Control of Trust Accounts</u>.  (1) Each of the Trust Accounts established hereunder has been pledged by the Trust to the Indenture Trustee under the Indenture and shall be subject to the lien of the Indenture.  In addition to the provisions hereunder, each of the Trust Accounts shall also be established and maintained pursuant to the Indenture.  Amounts distributed from each Trust Account in accordance with the Indenture and this Agreement shall be released from the lien of the Indenture upon such distribution thereunder or hereunder.  The Indenture Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Trust Accounts (other than the Certificate Distribution Account) and in all proceeds thereof and all such funds, investments, proceeds shall be part of the Trust Account Property and the Indenture Trust Estate.  If, at any time, any Trust Account ceases to be an Eligible Account, the Indenture Trustee (or, in the case of clause (i) below, the Servicer on its behalf) shall within 10 Business Days (or such longer period, not to exceed 30 calendar days, as to which each Rating Agency may consent) (i) establish a new Trust Account as an Eligible Account, (ii) terminate the ineligible Trust Account, and (iii) transfer any cash and investments from such ineligible Trust Account to such new Trust Account.

With respect to the Trust Accounts (other than the Certificate Distribution Account), the Indenture Trustee agrees, by its acceptance hereof, that each such Trust Account shall be subject to the sole and exclusive custody and control of the Indenture Trustee for the benefit of the Noteholders and the Trust, as the case may be, and the Indenture Trustee shall have sole signature and withdrawal authority with respect thereto.

In addition to this Agreement and the Indenture, the Certificate Distribution Account established hereunder also shall be subject to and established and maintained in accordance with the Trust Agreement.  Subject to rights of the Indenture Trustee hereunder and under the Indenture, the Owner Trustee on behalf of the Trust shall possess all right, title and interest for the benefit of the Certificateholders in all funds on deposit from time to time in the Certificate Distribution Account and in all proceeds thereof (including all income thereon) and all such funds, investments, proceeds and income shall be part of the Trust Account Property and the Trust Estate.  Subject to the rights of the Indenture Trustee, the Owner Trustee agrees, by its acceptance hereof, that such Certificate Distribution Account shall be subject to the sole and exclusive custody and control of the Certificate Paying Agent for the benefit of the Trust and the parties entitled to distributions therefrom, including without limitation, the Certificateholders and the Owner Trustee, and the Certificate Paying Agent under the Trust Agreement shall have sole signature and withdrawal authority with respect to the Certificate Distribution Account.  Notwithstanding the preceding, the distribution of amounts from the Certificate Distribution Account in accordance with <u>Section 5.03(b)</u> also shall be made for the benefit of the Indenture Trustee (with respect to its duties under the Indenture and this Agreement relating to the Trust Estate), and the Indenture Trustee (in its capacity as Indenture Trustee) shall have the right, but not the obligation to take custody and control of the Certificate Distribution Account and to cause the distribution of amounts therefrom in the event that the Certificate Paying Agent fails to distribute such amounts in accordance with <u>Section 5.03(b)</u>.

USBT 100597

The Grantor Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Grantor Trust Accounts and in all proceeds thereof and all such funds, investments, proceeds shall be part of the Grantor Trust Account Property and the Grantor Trust Estate. If, at any time, any Grantor Trust Account ceases to be an Eligible Account, the Grantor Trustee (or, in the case of clause (i) below, the Servicer on its behalf) shall within 10 Business Days (or such longer period, not to exceed 30 calendar days, as to which each Rating Agency may consent) (i) establish a new Grantor Trust Account as an Eligible Account, (ii) terminate the ineligible Grantor Trust Account, and (iii) transfer any cash and investments from such ineligible Grantor Trust Account to such new Grantor Trust Account.

With respect to the Grantor Trust Accounts, the Grantor Trustee agrees, by its acceptance hereof, that each such Grantor Trust Account shall be subject to the sole and exclusive custody and control of the Grantor Trustee for the benefit of the Grantor Trust Certificateholder and the Grantor Trust, as the case may be, and the Grantor Trustee shall have sole signature and withdrawal authority with respect thereto.

The Servicer shall have the power, revocable by the Indenture Trustee or by the Owner Trustee or to instruct the Indenture Trustee or Certificate Paying Agent to make withdrawals and payments from the Trust Accounts as otherwise permitted by this Agreement for the purpose of permitting the Servicer to carry out its duties hereunder or permitting the Indenture Trustee or Owner Trustee to carry out its duties herein or under the Indenture or the Trust Agreement, as applicable.

(b)     (1)     <u>Investment of Funds</u>.  The funds held in any Trust Account or Grantor Trust Account may only be invested (to the extent practicable and consistent with any requirements of the Code) in Eligible Investments, as directed by an authorized officer of the Administrator in writing. In any case, funds in any Trust Account or Grantor Trust Account must be available for withdrawal without penalty, and any Eligible Investments and the funds held in any Trust Account or Grantor Trust Account, other than the Note Distribution Account, must mature or otherwise be available for withdrawal, not later than three (3) Business Days immediately preceding the Distribution Date next following the date of such investment and shall not be sold or disposed of prior to its maturity subject to Section 5.04(b)(2) below. Amounts deposited to the Note Distribution Account pursuant to Section 5.01(b) prior to each Distribution Date shall be invested in Eligible Investments which are overnight investments from the date of deposit to the Business Day preceding each Distribution Date. All interest and any other investment earnings on amounts or investments held in any Trust Account or Grantor Trust Account shall be deposited into such Trust Account or Grantor Trust Account immediately upon receipt by the Indenture Trustee, or in the case of the Certificate Distribution Account, the Certificate Paying Agent or the Grantor Trustee, as applicable. All Eligible Investments in which funds in any Trust Account or Grantor Trust Account (other than the Certificate Distribution Account) are invested must be held by or registered in the name of "U.S. Bank National Association, as Grantor Trustee, in trust for the Keystone Grantor Trust Certificate, Series 1998-P2" or "U.S. Bank Trust National Association, as Indenture Trustee, in trust for the Keystone Asset Backed Securities, Series 1998-P2" as applicable. While the Owner Trustee

37

holds the Certificate Distribution Account, all Eligible Investments in which funds in the Certificate Distribution Account are invested shall be held by or registered in the name of "First Union Trust Company, National Association, as Owner Trustee, in trust for the Keystone Asset Backed Securities, Series 1998-P2".

(2) Insufficiency and Losses in Grantor Trust Accounts and Trust Accounts. If any amounts are needed for disbursement from any Trust Account or Grantor Trust Account and sufficient uninvested funds are not available to make such disbursement, the Indenture Trustee, Certificate Paying Agent in the case of the Certificate Distribution Account or Grantor Trustee, respectively, shall cause to be sold or otherwise converted to cash a sufficient amount of the investments in such Trust Account or Grantor Trust Account. The Indenture Trustee, Certificate Paying Agent or Administrator under the Trust Agreement in the case of the Certificate Distribution Account or the Grantor Trustee, as applicable, shall not be liable for any investment loss or other charge resulting therefrom, unless such loss or charge is caused by the failure of the Indenture Trustee, Certificate Paying Agent or Grantor Trustee, respectively, to perform in accordance with this Section 5.04.

All interest and any other investment earnings on amounts held in any Trust Account or Grantor Trust Account shall be taxed to the holders of the Certificates.

(3) Subject to Section 6.1 of the Indenture, the Indenture Trustee shall not in any way be held liable by reason of any insufficiency in any Trust Account held by the Indenture Trustee resulting from any investment loss on any Eligible Investment included therein (except to the extent that the Indenture Trustee is the obligor and has defaulted thereon).

(c)    With respect to the Trust Account Property, the Indenture Trustee acknowledges and agrees that:

(A)    Any Trust Account Property that is held in deposit accounts shall be held solely in the Eligible Accounts; and each such Eligible Account shall be subject to the exclusive custody and control of the Indenture Trustee, and the Indenture Trustee shall have sole signature authority with respect thereto;

(B)    The Indenture Trustee is, and at all times will continue to be, a bank, broker-dealer or trust company which regularly accepts in the ordinary course of its business securities as a custodial service for customers and maintains securities accounts for its customers;

(C)    All book-entries made by the Indenture Trustee with respect to Trust Account Property are and shall be complete and accurate in all respects;

(D)    Except for the claims and interest of the Indenture Trustee arising from the Granting Clause of the Indenture, the Indenture Trustee does not know of any claim (including any adverse claim) to, or interest in, the Trust Account Property;

USBT 100599

(E)     Except for the Indenture which gives the Indenture Trustee exclusive "control" (within the meaning of Section 8-106 of the UCC) of the Trust Account Property, the Indenture Trustee has not entered into, and hereafter during the term of the Indenture shall not enter into, any agreement granting "control" (within the meaning of Section 8-106 of the UCC) of the Trust Account Property to any Person;

(F)     It is a "securities intermediary" within the meaning of Section 8-102(a) of the UCC with respect to the Trust Account Property; and

(G)     It waives all liens, security interests and all rights to deduction, set-off and banker's liens that it has or subsequently obtains by agreement, operation of law or otherwise (whether or not in its capacity as Indenture Trustee) in the Trust Account property.

All interest and any other investment earnings on amounts held in any Trust Account shall be taxed to the holders of the Certificates.

(4) Subject to Section 4.07 of the Grantor Trust Agreement, the Grantor Trustee shall not in any way be held liable by reason of any insufficiency in any Grantor Trust Account held by the Grantor Trustee resulting from any investment loss on any Eligible Investment included therein (except to the extent that the Grantor Trustee is the obligor and has defaulted thereon).

With respect to the Grantor Trust Account Property, the Grantor Trustee acknowledges and agrees that:

Any Grantor Trust Account Property that is held in deposit accounts shall be held solely in the Eligible Accounts; and each such Eligible Account shall be subject to the exclusive custody and control of the Grantor Trustee, and the Grantor Trustee shall have sole signature authority with respect thereto;

The Grantor Trustee is, and at all times will continue to be, a bank, broker-dealer or trust company which regularly accepts in the ordinary course of its business securities as a custodial service for customers and maintains securities accounts for its customers;

All book-entries made by the Grantor Trustee with respect to Grantor Trust Account Property are and shall be complete and accurate in all respects;

The Grantor Trustee does not know of any claim (including any adverse claim) to, or interest in, the Grantor Trust Account Property;

The Grantor Trustee has not entered into, and hereafter during the term of the Grantor Trust Agreement shall not enter into, any agreement granting "control" (within the meaning of Section 8-106 of the UCC) of the Grantor Trust Account Property to any Person;

USBT 100600

It is a "securities intermediary" within the meaning of Section 8-102(a) of the UCC with respect to the Grantor Trust Account Property; and

It waives all liens, security interests and all rights to deduction, set-off and banker's liens that it has or subsequently obtains by agreement, operation of law or otherwise (whether or not in its capacity as Grantor Trustee) in the Grantor Trust Account property.

Section 5.05. <u>Custodianship of Physical Securities</u>.

(a)    The Indenture Trustee shall credit all Trust Account Property that constitutes "instruments" or "certificated securities" under the UCC (each, a "<u>Physical Security</u>") and shall (or shall cause) such Physical Securities to be held at the office of the Indenture Trustee or a custodian appointed by the Indenture Trustee.  Physical Securities acquired in accordance with the Indenture by or on behalf of the Issuer shall be transferred to the Indenture Trustee by (i) the Indenture Trustee crediting such Physical Security to the related Trust Account, (ii) causing the delivery of such Physical Security to the Indenture Trustee or custodian registered in the name of the Indenture Trustee or its affiliated nominee or endorsed to the Indenture Trustee or in blank, (iii) causing the Indenture Trustee or custodian to continuously identify on its books and records that such Physical Security is being held for the benefit of the Indenture Trustee hereunder and under the Indenture and (iv) causing the Indenture Trustee or custodian to maintain continuous possession of such Physical Security in the State of Minnesota.

(b)    No consent shall be required from the Issuer or any other Person with respect to any entitlement order from the Indenture Trustee with respect to the Trust Account Property. The Indenture Trustee shall not accept any entitlement orders from any Person (other than itself) with respect to the Trust Account Property.

(c)    The Grantor Trustee shall credit all Grantor Trust Account Property that constitutes a Physical Security and shall (or shall cause) such Physical Securities to be held at the office of the Grantor Trustee or a custodian appointed by the Grantor Trustee.  Physical Securities acquired in accordance with this Agreement by or on behalf of the Grantor Trust shall be transferred to the Grantor Trustee by (i) the Grantor Trustee crediting such Physical Security to the related Grantor Trust Account, (ii) causing the delivery of such Physical Security to the Grantor Trustee or custodian registered in the name of the Grantor Trustee or its affiliated nominee or endorsed to the Grantor Trustee or in blank, (iii) causing the Grantor Trustee or custodian to continuously identify on its books and records that such Physical Security is being held for the benefit of the Grantor Trustee hereunder and (iv) causing the Grantor Trustee or custodian to maintain continuous possession of such Physical Security in the State of Minnesota.

(d)    No consent shall be required from the Grantor Trust or any other Person with respect to any entitlement order from the Grantor Trustee with respect to the Grantor Trust Account Property.  The Grantor Trustee shall not accept any entitlement orders from any Person (other than itself) with respect to the Grantor Trust Account Property.

Section 5.06. <u>Capitalized Interest Account</u>.

USBT 100601

The Indenture Trustee has heretofore established or caused to be established and shall hereafter maintain or cause to be maintained a separate account denominated a Capitalized Interest Account, which is and shall continue to be an Eligible Account in the name of the Indenture Trustee and shall be designated "U.S. Bank Trust National Association, as Indenture Trustee in trust for the registered holders of the Keystone Asset Backed Notes, Series 1998-P2". The Majority Certificateholder will cause the Trust to direct the Indenture Trustee to invest the funds on deposit in the Capitalized Interest Account only in Eligible Investments or such other investment as may be acceptable to the Majority Certificateholder. No such investment in the Capitalized Interest Account shall mature later than the Business Day immediately preceding the next Distribution Date. Any investment earnings on the Capitalized Interest Account will be treated as owned by the Seller and will be taxable to the Seller for tax purposes but shall remain on deposit in the Capitalized Interest Account.

On the Closing Date, the Seller will deposit in the Capitalized Interest Account the amount of $1,839,560.34.

On the Business Day prior to each of the Distribution Dates during the Funding Period and the first Distribution Date thereafter, the Indenture Trustee shall transfer from the Capitalized Interest Account to the Note Distribution Account the Capitalized Interest Withdrawal Amount, if any, for such Distribution Date.

On the Distribution Date following the end of the Funding Period, the Indenture Trustee shall distribute to the Trust any amounts remaining in the Capitalized Interest Account after taking into account withdrawals from the Capitalized Interest Account on such Distribution Date. The Capitalized Interest Account shall be closed following such distribution.

(a)     (e) On each Distribution Date, the Indenture Trustee shall provide a monthly statement to the Rating Agencies which confirms that (i) funds on deposit in the Capitalized Interest Account have only been invested in Eligible Investments or such other investment as has been agreed upon by the Indenture Trustee and the Servicer and (ii) the Indenture Trustee has identified by book entry to its appropriate records the status of the Indenture Trust as the secured party with respect to the investment made with funds deposited in the Capitalized Interest Account.

Section 5.07.  Pre-Funding Account

The Grantor Trustee has heretofore established or caused to be established and shall hereafter maintain or cause to be maintained a separate account denominated a Pre-Funding Account, which is and shall continue to be an Eligible Account in the name of the Grantor Trustee and shall be designated "U.S. Bank Trust National Association, as Grantor Trustee in trust for the registered holders of the Keystone Grantor Trust Certificate, Series 1998-P2". The Servicer shall direct the Grantor Trustee to invest the funds on deposit in the Pre-Funding Account only in Eligible Investments or such other investment as may be agreed upon by the Servicer. No such investment in the Pre-Funding Account shall mature later than the Business Day immediately preceding the next Distribution Date.

USBT 100602

Any investment earnings on the Pre-Funding Account will be deposited to the Capitalized Interest Account on each date withdrawals from the Capitalized Interest Account are to be made pursuant to Section 5.06 prior to the calculation of any such withdrawal amounts.

On the Closing Date, the Seller will cause to be deposited in the Pre-Funding Account $155,185,150.12 as the initial Pre-Funded Amount.

(a) On any Subsequent Transfer Date, upon satisfaction of the conditions set forth in Section 2.07(b), the Grantor Trustee shall withdraw from the Pre-Funding Account an amount equal to 100% of the aggregate unpaid principal balances of the Subsequent Loans as of such date sold to the Grantor Trust on such Subsequent Transfer Date and pay such amount to or upon the order of the Seller upon satisfaction of the conditions set forth in Section 2.07 and the related Subsequent Transfer Agreement with respect to such transfer.

(b) On the Business Day preceding the Distribution Date immediately following the end of the Funding Period the Grantor Trustee shall withdraw from the Pre-Funding Account any remaining Pre-Funded Amount (after giving effect to all withdrawals from the Pre-Funding Account on such date and net of any investment earnings thereon) and deposit such amount to the Collection Account; any remaining investment earnings thereon shall be deposited to the Capitalized Interest Account.

## ARTICLE VI

### STATEMENTS AND REPORTS; SPECIFICATION OF TAX MATTERS

Section 6.01. <u>Servicing Certificate</u>. On each Determination Date, the Servicer shall deliver to the Grantor Trustee, the Indenture Trustee, the Backup Servicer, the Seller, the Owner Trustee and the Securityholders, a certificate containing the items described in Exhibit B hereto (each, a "Servicer Certificate"), prepared as of the related Determination Date and executed by a Servicing Officer. No later than the Business Day following each Determination Date, the Servicer shall deliver to the Grantor Trustee, Indenture Trustee and the Certificateholders, in a format consistent with other electronic loan level reporting supplied by the Servicer in connection with similar transactions, "loan level" information with respect to the Loans as of the related Determination Date. The Grantor Trustee, Indenture Trustee and the Certificateholders may rely on the Servicer Certificate with respect to the matters set forth therein.

Section 6.02. <u>Statement to Securityholders</u>. On or before the third Business Day following each Distribution Date, the Indenture Trustee shall mail to the Seller and each Holder of a Security (with a copy to each Rating Agency) at its address shown on the Certificate Register or Note Register, as applicable, a statement, based in part on information set forth in the Servicer Certificate for such Distribution Date, substantially in the form of Statement to Securityholders attached hereto as Exhibit C, respectively, together with a copy of such related Servicer Certificate.

USBT 100603

## ARTICLE VII

### CONCERNING THE CONTRACT OF INSURANCE HOLDER

Section 7.01. <u>Compliance with Title I and Filing of FHA Claims</u>.

(a)    The Contract of Insurance Holder shall at all times while any Securities are outstanding have a valid Contract of Insurance with the FHA covering the FHA Loans. To the extent applicable to the duties of the Contract of Insurance Holder hereunder, the Contract of Insurance Holder shall comply with the requirements of Title I and shall take or refrain from taking such actions as are necessary or appropriate to maintain a valid Contract of Insurance for the Trust with the FHA covering the FHA Loans.

(b)    If and for so long as the Contract of Insurance covers any loans other than the FHA Loans, and if HUD shall not have earmarked the coverage of the Contract of Insurance with respect to the FHA Loans, the Contract of Insurance Holder covenants and agrees not to submit any claim to FHA with respect to an FHA Loan if the effect of approval of such claim would result in the amount of claims paid by the FHA in respect of the FHA Loans to exceed the Trust Designated Insurance Amount. Notwithstanding the foregoing, the Claims Administrator shall promptly notify the Grantor Trustee, the Owner Trustee, the Indenture Trustee and the Servicer if the amount of claims submitted to FHA in respect of the FHA Loans under the Contract of Insurance exceeds the Trust Designated Insurance Amount. As of the Closing Date and at all times thereafter until the Termination Date, the Contract of Insurance Holder covenants and agrees that the Contract of Insurance will only apply to the FHA Loans and Related Series Loans, exclusively, or HUD shall have agreed pursuant to 24 C.F.R. § 201.32(d)(1) to "earmark" the FHA insurance relating to the FHA Loans and Related Series Loans, if any.

(c)    The Grantor Trustee hereby appoints Republic Bank as Claims Administrator and the Indenture Trustee hereby consents to such appointment. Republic Bank, as Claims Administrator, shall perform on behalf of the Contract of Insurance Holder the duties associated with the submission of claims under Title I in connection with the Contract of Insurance, except to the extent that certain documents must be signed by the Contract of Insurance Holder (in which case the Contract of Insurance Holder shall only sign such documents at the direction of the Claims Administrator) and shall not, in its capacity as Claims Administrator, take any action or omit to take any action that would cause the Contract of Insurance Holder to violate this Section 7.01 or otherwise fail to maintain a valid Contract of Insurance or cause any denial by FHA of an insurance claim under Title I.

(i)    The Claims Administrator may perform its responsibilities relating to claims administration through agents or independent contractors; however, no provision of this Agreement shall be deemed to relieve the Claims Administrator of any of its duties and obligations to the Grantor Trustee on behalf of Grantor Trust Certificateholder with respect to the claims administration of the FHA Loans; it being understood that the Claims Administrator shall be obligated with respect thereto to the same extent and under

the same terms and conditions as if it alone were performing all duties and obligations set forth in this Agreement in connection with the claims administration of such FHA Loans.

(d)     The Contract of Insurance Holder shall not have violated this Section 7.01 and shall otherwise incur no liability hereunder if any failure to maintain a valid Contract of Insurance or to comply with the requirements of Title I or any denial by FHA of an insurance claim under Title I shall have been caused by any act or omission of the Servicer or Claims Administrator.

Section 7.02.  Regarding the Contract of Insurance Holder.

(a)     The Contract of Insurance Holder shall not resign from the obligations and duties imposed on it by this Agreement as Contract of Insurance Holder except upon a determination that by reason of a change in legal requirements or requirements imposed by the FHA the performance of its duties under this Agreement would cause it to be in violation of such legal requirements or FHA imposed requirements in a manner which would result in a material adverse effect on the Contract of Insurance Holder or cause it to become ineligible to hold the Contract of Insurance and the Majority Securityholders does not elect to waive the obligations of the Contract of Insurance Holder to perform the duties which render it legally unable to act or to permit the Contract of Insurance Holder to delegate those duties to another Person or if the circumstances giving rise to such illegality cannot be waived or delegated.  Any such determination permitting the resignation of the Contract of Insurance Holder shall be evidenced by an Opinion of Counsel to such effect delivered and acceptable to the Grantor Trustee.  Upon receiving such notice of resignation, the Contract of Insurance shall be transferred to a qualified successor by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Contract of Insurance Holder and one copy to the successor Contract of Insurance Holder.  Notwithstanding the foregoing, the Contract of Insurance Holder may resign upon transfer of the FHA insurance and related reserves with respect to the FHA Loans and any Related Series Loans to a contract of insurance held by a successor Contract of Insurance Holder provided, however, that any Contract of Insurance held by such successor Contract of Insurance Holder shall satisfy the criteria set forth in Section 7.01(b), and, at the time of succession, shall have an FHA insurance coverage reserve account balance not less than that of the FHA Insurance Coverage Reserve Account at the time of succession.

(b)     If at any time (i) the Contract of Insurance shall be revoked, suspended or otherwise terminated, or (ii) the Contract of Insurance Holder shall become incapable of acting, or shall be adjudged as bankrupt or insolvent, or a receiver of the Contract of Insurance Holder or of its property shall be appointed, or any public officer shall take charge or control of the Contract of Insurance Holder or of its property or affairs for the purpose of rehabilitation, conservation or liquidation or the Contract of Insurance Holder shall fail to be "well capitalized" within the meaning of the Federal Deposit Insurance Act and the regulations thereunder, then, in any case the Majority Certificateholder with the consent of the Rating Agencies may remove the Contract of Insurance Holder and appoint a successor contract of insurance holder by written instrument, in duplicate, one copy of which instrument shall be delivered to the Contract of

304

USBT 100605

Insurance Holder so removed and one copy to the successor contract of insurance holder with a copy to the Claims Administrator. Upon removal of the Contract of Insurance Holder, the outgoing Contract of Insurance Holder shall take any action required to transfer the benefits of the FHA Insurance Coverage Reserve Account to the successor contract of insurance holder.

(c)     Any resignation or removal of the Contract of Insurance Holder and appointment of a successor contract of insurance holder pursuant to any of the provisions of this Section 7.02 shall become effective upon acceptance of appointment by the successor contract of insurance holder.

(d)     On or prior to the Closing Date with respect to the Initial Loans and the applicable Subsequent Transfer Date with respect to the Subsequent Loans, the Contract of Insurance Holder shall have instructed FHA to forward all payments in respect of claims under the Contract of Insurance made to the Contract of Insurance Holder to the Grantor Trustee. The Contact of Insurance Holder shall provide no further notification with respect to which such payments shall be directed unless directed by the Grantor Trustee.

(e)     For so long as the Servicer services Related Series Loans, the Seller agrees to reconcile any communications from HUD with respect to the FHA insurance premiums payable to HUD with respect to such Related Series Loans, and supply such reconciled information to the Grantor Trustee, Indenture Trustee and the Servicer. The Servicer agrees to cooperate with the Seller's efforts pursuant to this Section 7.02(e) and to provide the information required by the Seller to reconcile such information no later than two Business Days prior to the related Distribution Date.

ARTICLE VIII

[Reserved]

ARTICLE IX

THE SERVICER

Section 9.01.  Indemnification; Third Party Claims.

(a)     The Servicer shall be liable in accordance herewith only to the extent of the obligations specifically imposed upon and undertaken by the Servicer herein and the representations made by the Servicer.

(b)     The Servicer shall indemnify, defend and hold harmless the Trust, the Grantor Trust, the Indenture Trustee, the Owner Trustee in its individual capacity, the Grantor Trustee, the Backup Servicer and the Seller, their respective officers, directors, agents and employees and the Securityholders, from and against any and all costs, expenses, losses, claims, damages, and liabilities to the extent that such cost, expense, loss, claim, damage or liability arose out of, or was imposed upon the Trust, the Grantor Trust, the Grantor Trustee, the Backup Servicer, the

95

Indenture Trustee, the Owner Trustee in its individual capacity, the Seller, their respective officers, directors, agents or employees or the Securityholders, through the breach of this Agreement by the Servicer, the negligence, willful misfeasance, or bad faith of the Servicer in the performance of its duties under this Agreement or by reason of reckless disregard of its obligations and duties under this Agreement. Such indemnification shall include, without limitation, reasonable fees and expenses of counsel and expenses of litigation.

Section 9.02.  Merger or Consolidation of the Servicer and Backup Servicer.

Neither the Servicer nor the Backup Servicer shall merge or consolidate with any other Person, convey, transfer or lease substantially all its assets as an entirety to another Person, or permit any other Person to become the successor to such party's business unless, after the merger, consolidation, conveyance, transfer, lease or succession, the successor or surviving entity (i) shall be an Eligible Servicer, (ii) shall be capable of fulfilling the duties of the Servicer or Backup Servicer, as applicable, contained in this Agreement and (iii) shall have a long-term debt rating which is BBB and Baa2 by Fitch and Moody's respectively. Any corporation (i) into which the Servicer or the Backup Servicer may be merged or consolidated, (ii) resulting from any merger or consolidation to which the Servicer or the Backup Servicer shall be a party, (iii) which acquires by conveyance, transfer or lease substantially all of the assets of the Servicer or the Backup Servicer, or (iv) succeeding to the business of the Servicer or the Backup Servicer, in any of the foregoing cases shall execute an agreement of assumption to perform every obligation of the Servicer or the Backup Servicer, as applicable, under this Agreement and, whether or not such assumption agreement is executed, shall be the successor to the Servicer or the Backup Servicer, as applicable, under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties to this Agreement, anything in this Agreement to the contrary notwithstanding; provided, however, that nothing contained herein shall be deemed to release the Servicer or the Backup Servicer from any obligation. The Servicer and the Backup Servicer shall provide notice of any merger, consolidation or succession pursuant to this Section 9.02 to the Grantor Trust, the Trust, the Grantor Trustee, the Indenture Trustee and each Rating Agency. Notwithstanding the foregoing, as a condition to the consummation of the transactions referred to in clauses (i) through (iv) above, (x) immediately after giving effect to such transaction, no representation or warranty made pursuant to Section 3.02 shall have been breached (for purposes hereof, such representations and warranties shall speak as of the date of the consummation of such transaction), and (y) the Servicer or the Backup Servicer, as applicable, shall have delivered to the Trust, Grantor Trust, the Grantor Trustee and the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section 9.02 and that all conditions precedent, if any, provided for in this Agreement relating to such transaction have been complied with.

Section 9.03.  Limitation on Liability of the Servicer, the Backup Servicer and Others. None of the Servicer, the Backup Servicer, or any of their directors, officers, employees or agents shall be under any liability to the Grantor Trust, the Grantor Trustee or to the Grantor Trust Certificateholder or any Securityholder for any action taken or for refraining from the

USBT 100607

taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Servicer, the Backup Servicer or any such Person against any breach of warranties, representations or covenants made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in performing or failing to perform duties hereunder or by reason of reckless disregard of obligations and duties hereunder. The Servicer, the Backup Servicer and any of their directors, officers, employees or agents may rely in good faith on any document of any kind in accordance with the Servicing Standard with respect to any document that prima facie has been properly and duly executed and submitted by any Person respecting any matters arising hereunder.

Section 9.04.  <u>Servicer and Backup Servicer Not to Resign.</u>

(a)    Neither the Servicer nor the Backup Servicer shall resign from the obligations and duties hereby imposed on it except (i) with the consent of the Rating Agencies or (ii) upon determination that by reason of a change in legal requirements the performance of its duties under this Agreement would cause it to be in violation of such legal requirements in a manner which would result in a material adverse effect on the Servicer or the Backup Servicer, as applicable. Any such determination permitting the resignation of the Servicer or the Backup Servicer by reason of a change in such legal requirements shall be evidenced by an Opinion of Counsel to such effect delivered and acceptable to the Grantor Trustee. No resignation of the Servicer or the Backup Servicer, shall become effective until the Grantor Trustee or a successor servicer shall have assumed the Servicer's or Backup Servicer's servicing responsibilities and obligations in accordance with Section 10.02.

(b)    Notwithstanding anything to the contrary herein, the Servicer and the Backup Servicer shall remain liable for all liabilities and obligations incurred by it as Servicer and Backup Servicer, respectively, hereunder prior to the time that any resignation referred to in subsection (a) above or termination under Section 10.01 becomes effective, including the obligation to indemnify the Grantor Trustee pursuant to Section 9.01(b) hereof.

(c)    The Servicer and the Backup Servicer each agrees to cooperate with any successor in effecting the transfer of its responsibilities and rights hereunder pursuant to subsection (a), including, without limitation, the transfer to such successor of all relevant records and documents (including any Files in the possession of the Servicer and the Servicing Record) and all amounts credited to the Servicing Record or thereafter received with respect to the Loans and not otherwise permitted to be retained by the Servicer pursuant to this Agreement. In addition, the Servicer or the Backup Servicer, as applicable, at its sole cost and expense, shall prepare, execute and deliver any and all documents and instruments to its successor including all Files in its possession and do or accomplish all other acts necessary or appropriate to effect such termination and transfer of servicing responsibilities.

Section 9.05.  <u>Relationship of Servicer to Grantor Trust and the Grantor Trustee.</u>

USBT 100608

The relationship of the Servicer (and of any successor to the Servicer as servicer under this Agreement) to the Grantor Trust and the Grantor Trustee under this Agreement is intended by the parties hereto to be that of an independent contractor and not of a joint venturer, agent or partner of the Grantor Trust or the Grantor Trustee.

Section 9.06.  <u>Servicer and Backup Servicer May Own Notes</u>.

Each of the Servicer and Backup Servicer and any affiliate of the Servicer or Backup Servicer may in its individual or any other capacity become the owner or pledgee of Notes with the same rights as it would have if it were not the Servicer or Backup Servicer or an affiliate of either except as otherwise specifically provided herein.  Notes so owned by or pledged to the Servicer or Backup Servicer or such affiliate shall have an equal and proportionate benefit under the provisions of this Agreement, without preference, priority, or distinction as among all of the Notes, provided that any Notes owned by the Servicer or Backup Servicer or any affiliate of either of them, during the time such Notes are owned by them, shall be without voting rights for any purpose set forth in this Agreement.  The Servicer and Backup Servicer shall each notify the Indenture Trustee promptly after it or any of its affiliates becomes the owner or pledgee of a Note.

Section 9.07.  <u>Rule 144A Information</u>.

The Servicer covenants to make available on behalf of the Seller the information requested by prospective purchasers of Notes or Certificates necessary to satisfy the requirements of paragraph (d)(4) of Rule 144A of the Securities Act to the extent reasonably available to the Servicer (the "Rule 144A Information").  Such Rule 144A Information when so provided, will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  The Rule 144A Information shall include, without limitation, any or all of the following items requested by the prospective purchasers:

        (A)     the Offering Circular and any amendments and supplements thereto;

        (B)     this Agreement and any amendments thereto;

        (C)     the most recent Servicer Certificate required pursuant to this Agreement; and

        (D)     such other information as is reasonably available to the Servicer, in order to comply with requests for information pursuant to Rule 144A under the Securities Act.

The Servicer represents that the materials concerning the Servicer and the Loans provided by the Servicer pursuant to this Section, when so provided, will not contain an untrue statement

USBT 100609

of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Section 9.08.  Servicing Compensation.

As compensation for its services hereunder, the Servicer shall be entitled to receive from the Collection Account, the Servicing Fee.  Additional servicing compensation in the form of assumption fees, modification fees, and other administrative fees, insufficient funds charges, prepayment penalties, amounts remitted pursuant to Section 5.01, late payment charges shall be part of the servicing compensation payable to the Servicer hereunder and shall be paid either by the Servicer retaining such additional servicing compensation prior to deposit in the Collection Account pursuant to Section 5.01(a) or, if deposited into the Collection Account, as part of the servicing compensation withdrawn from the Collection Account pursuant to Section 5.01(d) or paid by the Indenture Trustee from the Note Distribution Account pursuant to Section 5.01(d).

Portability Fees, if any, collected by the Servicer will not be included as servicing compensation and will be deposited to the Collection Account as interest collected.

The Servicer shall required to pay all expenses incurred by it in connection with its servicing activities hereunder and all annual Rating Agency monitoring fees and shall not be entitled to reimbursement therefor except as specifically provided for herein.

Section 9.09.  Sub-Servicer for Backup Servicer.

The Backup Servicer may enter into sub-servicing agreements for the servicing and administration of Loans with Wilshire Financial Services Group Inc., or Wilshire Credit Corporation or any of their subsidiaries or affiliates that are Eligible Servicers to perform all or any part of Backup Servicer's obligations hereunder (including Backup Servicer's obligations as successor servicer).  The Backup Servicer covenants that any such sub-servicer agreement shall be consistent with and not in violation of the provisions of this Agreement.  The Backup Servicer shall give written notice to the Servicer and the Indenture Trustee of the appointment of any sub-servicer, and shall provide to each of them a copy of the related sub-servicing agreement.  Any sub-servicing agreement shall include the provision that such agreement may be immediately terminated, without cause and without payment of any penalty or fee, by the Indenture Trustee, in the event that the Backup Servicer shall for any reason, no longer be the Backup Servicer, together with a provision stating that the Indenture Trustee shall not be deemed a party thereto and shall have no claims, rights, obligations, duties or liabilities with respect to any sub-servicer. Backup Servicer shall be solely responsible for any fees or compensation payable to its sub-servicers.  If Backup Servicer is not itself legally qualified to service certain of the Loans, or to act as Servicer, Backup Servicer shall nevertheless be deemed an Eligible Servicer if it retains a sub-servicer legally qualified to service such loans.

USBT 100610

ARTICLE X

DEFAULT

Section 10.01.  Servicer Termination Events.

For purposes of this Agreement, each of the following shall constitute a "Servicer Termination Event":

(a)    (i) except as provided in the proviso to Section 5.01(a), failure by the Servicer to deposit all Payments in the Collection Account no later than the second Business Day following receipt thereof by the Servicer, which failure continues unremedied (i) for four Business Days if such failure occurs during the first 120 days following the Closing Date and thereafter (ii) for two Business Days; (ii) failure of the Servicer to deposit amounts referred to in the proviso to Section 5.01(a) within two Business Days after the date of required deposit thereof; or (iii) failure of the Servicer to pay when due any other amount payable by it under this Agreement; or

(b)    failure on the part of the Servicer duly to observe or perform in any material respect any of its other covenants or agreements contained in this Agreement that continues unremedied for (i) a period of 60 days if such failure occurs during the first 120 days following the Closing Date and thereafter (ii) for a period of 30 days after the earlier of (x) the date on which the Servicer gives notice of such failure to the Grantor Trustee pursuant to Section 4.04(b) and (y) the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Grantor Trustee or to the Servicer; or

(c)    failure by the Servicer to deliver the Servicer Certificate to the Grantor Trustee and the Indenture Trustee by the fourth Business Day prior to each Distribution Date, or failure on the part of the Servicer to observe its covenants and agreements set forth in Section 3.02; or

(d)    the entry of a decree or order for relief by a court or regulatory authority having jurisdiction in respect of the Servicer in an involuntary case under the federal bankruptcy laws, as now or hereafter in effect, or another present or future, federal or state, bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Servicer or of any substantial part of its properties or ordering the winding up or liquidation of the affairs of the Servicer and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days or the commencement of an involuntary case under the federal bankruptcy laws, as now or hereinafter in effect, or another present or future federal or state bankruptcy, insolvency or similar law and such case is not dismissed within 60 days; or

(e)    the commencement by the Servicer of a voluntary case under the federal bankruptcy laws, as now or hereinafter in effect, or any other present or future, federal or state bankruptcy, insolvency or similar law, or the consent by the Servicer to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Servicer or of any substantial part of its property or the making by the

USBT 100611

Servicer of an assignment for the benefit of creditors or the failure by the Servicer generally to pay its debts as such debts become due or the taking of corporate action by the Servicer in furtherance of any of the foregoing; or

(f)     any representation, warranty or statement of the Servicer made in this Agreement or any certificate, report or other writing delivered pursuant hereto shall prove to be incorrect in any material respect as of the time when the same shall have been made, and the incorrectness of such representation, warranty or statement has a material adverse effect on the Grantor Trust or the Grantor Trustee's interest in the Loans and, within 30 days after the earlier of (x) the date on which the Servicer gives notice of such failure to the Grantor Trustee pursuant to Section 4.04(b) and (y) the date on which written notice thereof shall have been given to the Servicer by the Grantor Trustee, the circumstances or condition in respect of which such representation, warranty or statement was incorrect shall not have been eliminated or otherwise cured; or

(g)     [reserved];

(h)     [reserved];

(i)     if Republic Bank is the Servicer, the Annual Default Percentage (Rolling Twelve Month) is in excess of 8.0%, (ii) the 60+ Delinquency Percentage (Rolling Six Month) is greater than 7.00% for 120 consecutive days, or (iii) Cumulative Losses exceed 13.00% of the Initial Pool Balance; or if the Backup Servicer is the Servicer:

(i)     The aggregate Rolling Six-Month Delinquency Rate is greater than 15% for the then-current Distribution Date;

(ii)     the aggregate Rolling Six-Month Delinquency Rate is greater than 13% for the then-current and two preceding Distribution Dates;

(iii)     the aggregate Twelve Month Loss Amount is greater than or equal to 2.75% of the aggregate Principal Balance of the Mortgage Loans; or

(iv)     the aggregate Realized Losses on the Mortgage Loans exceed (a) with respect to the first 12 Distribution Dates, 2.25% of the aggregate Cut-Off Date Principal Balance of the Mortgage Loans, (b) with respect to the next 12 Distribution Dates, 3.75% of the aggregate Cut-Off Date Principal Balance of the Mortgage Loans, (c) with respect to the next 12 Distribution Dates, 5.25% of the aggregate Cut-Off Date Principal Balance of the Mortgage Loans, (d) with respect to all Distribution Dates thereafter, 8.00% of the aggregate Cut-Off Date Principal Balance of the Mortgage Loans; or

(j)     the Servicer shall dissolve or liquidate, in whole or in part, in any material respect except as provided in Section 9.02 or except to the extent that any resulting successor entity is acceptable to the Rating Agencies; or

(k)     the net worth of the Servicer and its affiliates on a consolidated basis is less than $20,000,000; or

(l)     as a result of any act or omission by the Servicer the loss, suspension or termination of the Contract of Insurance; or

(b) the Servicer fails to be "adequately capitalized" as defined in the regulations of the FDIC as of the last Business Day of any calendar month.

Section 10.02.  Consequences of a Servicer Termination Event.  If a Servicer Termination Event shall occur and be continuing, the Grantor Trustee may, and at the direction of the Holders of a majority of the most senior class of Notes then outstanding shall, by notice given in writing to the Servicer and to the Grantor Trustee terminate all of the rights and obligations of the Servicer under this Agreement.  On or after the receipt by the Servicer of such written notice, and the appointment of and acceptance by a successor Servicer, all authority, power, obligations and responsibilities of the Servicer under this Agreement, whether with respect to the Grantor Trust Certificate or the Grantor Trust or otherwise, shall pass to, be vested in and become obligations and responsibilities of the successor Servicer; provided, however, that the successor Servicer shall have no liability with respect to any obligation which was required to be performed by the predecessor Servicer prior to the date that the successor Servicer becomes the Servicer or any claim of a third party based on any alleged action or inaction of the prior Servicer.  The successor Servicer is authorized and empowered by this Agreement to execute and deliver, on behalf of the predecessor Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination.  The predecessor Servicer agrees to cooperate with the successor Servicer in effecting the termination of the responsibilities and rights of the predecessor Servicer under this Agreement, including, without limitation, the transfer to the successor Servicer for administration by it of all cash amounts that shall at the time be held by the predecessor Servicer for deposit (net of the Servicing Fee and any Ancillary Fees), or have been deposited by the predecessor Servicer, in the Collection Account or thereafter received with respect to the Loans and the delivery to the successor Servicer of all Files and a computer tape in readable form containing the Servicing Record and any other information necessary to enable the successor Servicer to service the Loans and the other Grantor Trust Property.  In addition to any other amounts that are then payable to the terminated Servicer under this Agreement, the terminated Servicer shall then be entitled to receive (to the extent provided by Section 4.08 and Section 5.01(d) out of the Collected Amount, reimbursements for any outstanding Foreclosure Advances made during the period prior to the notice pursuant to this Section 10.02 which terminates the obligation and rights of the terminated Servicer under this Agreement.  The Grantor Trustee and the successor Servicer may set off and deduct any amounts owed by the terminated Servicer from any amounts payable to the terminated Servicer.  The terminated Servicer shall grant the Grantor Trustee and the successor Servicer reasonable access to the terminated Servicer's premises at such parties' reasonable expense.

Section 10.03.  Appointment of Successor.

-132-

(c) (1)On or after the time the Servicer receives a notice of termination pursuant to Section 10.02 or upon the resignation of the Servicer pursuant to Section 9.04, the Backup Servicer shall be the successor in all respects to the Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for in this Agreement, and shall be subject to all the responsibilities, restrictions, duties, liabilities and termination provisions relating thereto placed on the Servicer by the terms and provisions of this Agreement.  The Grantor Trustee shall take such action, consistent with this Agreement, as shall be necessary to effect any such succession.  If the Backup Servicer or any other successor Servicer is acting as Servicer hereunder, it shall be subject to termination under Section 10.02 upon the occurrence of a Servicer Termination Event applicable to it as Servicer.  The Backup Servicer hereby agrees to act as successor servicer pursuant to the terms of this Agreement upon the termination or resignation of the Servicer as provided in this Section 10.03.  Any successor Servicer and the Backup Servicer prior to its becoming the successor Servicer shall not be liable for any actions or omissions of any servicer prior to it or breaches of representations and warranties of the servicer prior to it.  Without limiting the foregoing, the Backup Servicer shall have no duty to repurchase an FHA Loan under Section 4.12(b) due to the servicer's failure to service such FHA Loan in accordance with Title I.

(2)  In the event that the Backup Servicer is subsequently terminated pursuant to Section 10.02 or subsequently resigns pursuant to Section 9.04 or otherwise becomes unable to perform its obligations under this Agreement, the Grantor Trustee will appoint a successor servicer in accordance with the provisions of this Section 10.03; provided, that any successor servicer, including the Backup Servicer, shall satisfy the requirements of an Eligible Servicer and shall be approved by the Rating Agencies.

(a)    Any successor Servicer shall be appointed by the Grantor Trustee and shall be acceptable to each Rating Agency and to the Seller (as evidenced in writing by each Rating Agency to the Grantor Trustee and to the Seller).  Any successor Servicer shall execute, acknowledge and deliver to the Grantor Trustee and its predecessor Servicer an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor Servicer shall become effective.

(b)    Any successor Servicer shall be entitled to such compensation (whether payable out of the Collected Amount or otherwise) as the Servicer would have been entitled to under this Agreement if the Servicer had not resigned or been terminated hereunder.  The Grantor Trustee, the Seller and a successor Servicer may agree on additional compensation to be paid to such successor Servicer; provided that such additional compensation does not result in a reduction of any of the ratings then assigned to any Class of Notes by any Rating Agency.  In addition, any successor Servicer shall be entitled, to reasonable transition expenses incurred in acting as successor Servicer.

Section 10.04.  Notification to Noteholders.  Upon any termination of the Servicer or appointment of a successor to the Servicer, the Grantor Trustee shall give prompt written notice

thereof to the Grantor Trust Certificateholder at the address appearing in the Grantor Trust Register.

Section 10.05. <u>Waiver of Past Defaults</u>.  The Grantor Trust Certificateholder may waive any default by the Servicer in the performance of its obligations hereunder and the consequences thereof.  Upon any such waiver of a past default, such default shall cease to exist, and any Servicer Termination Event arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Section 10.06. <u>Duties of the Backup Servicer</u> .  In addition to the other obligations of the Backup Servicer under this Agreement, the Backup Servicer shall:

(i)    On each Determination Date commencing with the first Determination Date following the Closing Date, perform a reconciliation of the Servicer Certificate and any other reports received by the Backup Servicer pursuant to Section 6.01 and provide the Grantor Trustee, within 5 days after the Backup Servicer receives the Servicer Certificate, with a report (the "Backup Servicer Report") detailing any errors and discrepancies in the Servicer Certificate found by the Backup Servicer; and, the Backup Servicer shall:

receive from the Servicer on a daily basis the magnetic tapes pertaining to the Loans that contain all information obtained and maintained in such form by the Servicer;

in a reasonably timely manner, establish and maintain a system of transaction accounting in regard to the Loans substantially similar to that maintained by the Servicer and post to such system all information relating to the Loans obtained by the Backup Servicer pursuant to Section 6.01, to enable the Backup Servicer to perform the obligations of a successor servicer immediately upon any termination or resignation of the Servicer; and

(C)    continue to provide the Grantor Trustee with the Backup Servicer Reports.

## ARTICLE XI

## TERMINATION

Section 11.01. <u>Termination</u>.

(a)    This Agreement shall terminate upon notice to the Grantor Trustee of either: (a) the later of (i) the satisfaction and discharge of the Indenture pursuant to Section 4.1 of the Indenture or (ii) the disposition of all funds with respect to the last Loan and the remittance of all funds due hereunder and the payment of all amounts due and payable to the Indenture Trustee, the Owner Trustee, the Grantor Trustee, the Trust, the Grantor Trust, the Servicer and the Backup Servicer; or (b) the mutual consent of the Servicer, the Seller, the Grantor Trust Certificateholder and all Securityholders in writing.

USBT 100615

(b)      Subject to the provisions of this sentence, on or after the Optional Termination Date, the Trust may or if the Trust does not exercise option the Backup Servicer may, at its option upon not less than thirty days' prior notice given to the Indenture Trustee, purchase on such date specified in such notice, all, but not less than all, the Loans, all claims made under the Contract[]of Insurance with respect to FHA Loans that are pending with the FHA ("FHA Pending Claims") and Foreclosed Properties then included in the Grantor Trust, at a purchase price (the "Termination Price"), payable in cash, equal to the sum of:

(i)      the Principal Balance of each Loan included in the Grantor Trust as of such Monthly Cut-Off Date;

(ii)      all unpaid interest accrued on the Principal Balance of each such Loan at the related Loan Rate to such Monthly Cut-Off Date;

(iii)      the aggregate fair market value of the FHA Pending Claims for which a claim has been filed with the FHA included in the Trust on such Monthly Cut-Off Date, as determined by an Independent appraiser acceptable to the Indenture Trustee as of a date not more than thirty days prior to such Monthly Cut-Off Date;

(iv)      the aggregate fair market value of each Foreclosed Property included in the Grantor Trust on such Monthly Cut-Off Date, as determined by an Independent appraiser acceptable to the Indenture Trustee as of a date not more than thirty days prior to such Monthly Cut-Off Date.

Any amount received from such sale with respect to FHA Pending Claims shall be considered FHA Insurance Payment Amounts. The expense of any Independent appraiser required under this Section 11.01(b) shall be a nonreimbursable expense of the party exercising the purchase option pursuant to this Section 11.01(b). The Trust or the Backup Servicer shall effect the purchase referred to in this Section 11.01(b) by deposit of the Termination Price into the Collection Account which shall be distributed in accordance with Section 5.01(e). On the Distribution Date following the deposit of the Termination Price as consideration for the sale of the Loans (x) the Grantor Trustee will convey the Loans to the Trust and (y) the Grantor Trustee shall withdraw from the Collection Account and deposit to the Note Distribution Account, for distribution in accordance with the provisions of the next paragraph, the sum of (a) such portion of the Termination Price as would constitute the Grantor Trust Certificate Remittance Amount for such Distribution Date if such Distribution Date were not the Termination Date and (b) the amount referred to in the proviso of Section 5.01(d)(i). Any portion of the Termination Price remaining on deposit in the Collection Account following such withdrawal shall be applied in the manner provided in Section 5.01(d)(ii)(b).

The amount to be distributed pursuant to clause (y) above shall be distributed as follows: First to accrued and unpaid interest on each Class of Class A Notes; Second in reduction of the Note Balance of each Class of Class A Notes until the Note Balance of each such Class is reduced to zero; Third to accrued and unpaid interest on the Class M-1 Notes; Fourth in reduction of the Note Balance of the Class M-1 Notes until the Note Balance thereof is reduced

USBT 100616

to zero; Fifth, to accrued and unpaid interest on the Class M-2 Notes; Sixth in reduction of the Note Balance of the Class M-2 Notes until the Note Balance thereof is reduced to zero; Seventh to accrued and unpaid interest on the Class B-1 Notes; Eighth in reduction of the Note Balance of the Class B-1 Notes until the Note Balance thereof is reduced to zero; Ninth to accrued and unpaid interest on the Class B-2 Notes; Tenth in reduction of the Note Balance of the Class B-2 Notes until the Note Balance thereof is reduced to zero, and Eleventh to the Certificate Distribution Account to be distributed in accordance with the Trust Agreement. In the event that the Termination Price is less than the amount required to make the distributions specified in Clauses First and Second above the Termination Price shall be applied pro rata to each Class of Class A Notes based on the amount due each such Class pursuant to Clause First and then pursuant to Clause Second.

Section 11.02.  Notice of Termination.

Notice of termination of this Agreement or of early redemption and termination of the Securities shall be sent (i) by the Indenture Trustee to the Noteholders in accordance with Section 2.6(b) of the Indenture, (ii) by the Trust to the Certificateholders in accordance with Section 9.1(d) of the Trust Agreement and (iii) by the Grantor Trustee to the Grantor Trust Certificateholder.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

Section 12.01.  Acts of Securityholders.

Except as otherwise specifically provided herein, whenever Securityholder action, consent or approval is required under this Agreement, such action, consent or approval shall be deemed to have been taken or given on behalf of, and shall be binding upon, all Securityholders if the Majority Securityholders agree to take such action or give such consent or approval.

Section 12.02.  Amendment.

(a)      This Agreement may be amended from time to time by the Servicer, the Backup Servicer, the Seller and the Trust by written agreement with notice thereof to the Securityholders, without the consent of any of the Securityholders, to cure any error or ambiguity, to correct or supplement any provisions hereof which may be defective or inconsistent with any other provisions hereof or to add any other provisions with respect to matters or questions arising under this Agreement; provided, however, that such action will not adversely affect in any material respect the interests of the Securityholders. An amendment described above shall be deemed not to adversely affect in any material respect the interests of the Securityholders if either (i) an opinion of counsel is obtained to such effect, or (ii) the party requesting the amendment obtains a letter from each of the Rating Agencies confirming that the amendment. if made, would not result in the downgrading or withdrawal of the rating then assigned by the respective Rating Agency to any Class of Securities then outstanding.

USBT 100617

(b)     This Agreement may also be amended from time to time by the Servicer, the Backup Servicer, the Seller and the Trust by written agreement, with the prior written consent of the Indenture Trustee and the Majority Securityholders affected thereby, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement, or of modifying in any manner the rights of the Securityholders; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, collections of payments on Loans or distributions which are required to be made on any Security, without the consent of the holders of 100% of each Class of Notes or Certificates affected thereby, (ii) adversely affect in any material respect the interests of the holders of any Class of Notes or Certificates in any manner other than as described in (i) , without the consent of the holders of 100% of such Class of Notes or the Certificates, respectively, or (iii) reduce the percentage of any Class of Notes or Certificates, the holders of which are required to consent to any such amendment, without the consent of the holders of 100% of such Class of Notes or the Certificates.

(c)     It shall not be necessary for the consent of Securityholders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Agreement, the Trust shall be entitled to receive and rely upon an opinion of counsel stating that the execution of such amendment is authorized or permitted by this Agreement.  The Trust may, but shall not be obligated to, enter into any such amendment which affects the Trust's own rights, duties or immunities under this Agreement.

Section 12.03.  <u>Recordation of Agreement</u>.

To the extent permitted by applicable law, this Agreement, or a memorandum thereof if permitted under applicable law, is subject to recordation may be recorded in any and/or all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer at the Securityholders' expense on direction of the Indenture Trustee or the Majority Securityholders, but only when such recordation is necessary for the administration or servicing of the Loans.

Section 12.04.  <u>Duration of Agreement</u>.

This Agreement shall continue in existence and effect until terminated as herein provided.

Section 12.05.  <u>Governing Law</u>.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND

307

USBT 100618

REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.

Section 12.06. Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by overnight mail, certified mail or registered mail, postage prepaid, to: (i) in the case of the Trust, Keystone Owner Trust 1998-P2, c/o First Union Trust Company, National Association, as Owner Trustee, One Rodney Square, First Floor, 920 King Street, Wilmington, Delaware 19801, Attention: Corporate Trust Administration, or such other address as may hereafter be furnished to the Securityholders and the other parties hereto, (ii) in the case of the Seller, Keystone Mortgage Corp., Inc., 69 Main Street, Keystone, West Virginia 24852, Attention: President, or such other address as may hereafter be furnished to the Securityholders and the other parties hereto, (iii) in the case of the Grantor Trust, Grantor Trustee or Indenture Trustee, U.S. Bank Trust National Association, 180 East Fifth Street, St. Paul, Minnesota 55101, Attention: Structured Finance: Keystone 1998-P2, (iv) in the case of the Servicer and Claims Administrator, Republic Bank, 1400 66th Street North, 4th Floor, St. Petersburg, Florida 33710; (vi) in the case of the Backup Servicer, Wilshire Servicing Corporation 1776 S.W. Madison Street, Portland, Oregon 97205, Attention: Keystone 1998-P2; (vii) in the case of the Grantor Trust Certificateholder, as set forth in the Grantor Trust Register; and (viii) in the case of the Securityholders, as set forth in the applicable Note Register and Certificate Register. Any such notices shall be deemed to be effective with respect to any party hereto upon the receipt of such notice by such party, except that notices to the Securityholders shall be effective upon mailing or personal delivery.

Section 12.07. Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other covenants, agreements, provisions or terms of this Agreement.

Section 12.08. No Partnership.

Nothing herein contained shall be deemed or construed to create any partnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor.

Section 12.09. Counterparts.

This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same Agreement.

USBT 100619

Section 12.10.  <u>Successors and Assigns</u>.

This Agreement shall inure to the benefit of and be binding upon the Servicer, the Seller, the Backup Servicer, the Trust, the Grantor Trust, the Grantor Trustee, the Indenture Trustee, the Grantor Trust Certificateholder and the Securityholders and their respective successors and permitted assigns.

Section 12.11.  <u>Headings</u>.

The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be part of this Agreement.

Section 12.12.  <u>Actions of Securityholders</u>.

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement to be given or taken by Securityholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Securityholders in person or by agent duly appointed in writing; and except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Servicer or the Trust.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Agreement and conclusive in favor of the Servicer and the Trust if made in the manner provided in this Section.

(b)     The fact and date of the execution by any Securityholder of any such instrument or writing may be proved in any reasonable manner which the Servicer or the Trust deems sufficient.

(c)     Any request, demand, authorization, direction, notice, consent, waiver or other act by a Securityholder shall bind every holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of anything done, or omitted to be done, by the Servicer or the Trust in reliance thereon, whether or not notation of such action is made upon such Security.

(d)     The Servicer or the Trust may require additional proof of any matter referred to in this Section 10.12 as it shall deem necessary.

Section 12.13.  <u>Reports to Rating Agencies</u>.

(a)     The Indenture Trustee shall provide to each Rating Agency copies of statements, reports and notices, to the extent received or prepared by the Servicer (except in the case of clause (i) below) hereunder, as follows:

(i)     copies of amendments to this Agreement;

(ii)    notice of any substitution or repurchase of any Loans;

USBT 100620

(iii)     notice of any termination, replacement, succession, merger or consolidation of either the Servicer or the Trust;

(iv)     notice of final payment on the Notes and the Certificates;

(v)     notice of any Servicer Termination Event;

(vi)     copies of the annual independent auditor's report delivered pursuant to Section 4.05, and copies of any compliance reports delivered by the Servicer hereunder including Section 4.04; and

(vii)     copies of any Servicer Certificate pursuant to Section 6.02; and

(b)     With respect to the requirement of the Indenture Trustee to provide statements, reports and notices to the Rating Agencies such statements, reports and notices shall be delivered to the Rating Agencies at the following addresses:  (i) if to Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007, Attention: Keystone 1998-P2, and (ii) if to Fitch, 1201 East 77th Street, Powell, Wyoming 82435, Attention:  Bo Allen.

Section 12.14.  Inconsistencies Among Transaction Documents.

In the event certain provisions of a Transaction Document conflict with the provisions of this Sale and Servicing Agreement, the parties hereto agree that the provisions of this Sale and Servicing Agreement shall be controlling.

Section 12.15.  Liability of Owner Trustee.

It is expressly understood and agreed by the parties hereto that (a) this Sale and Servicing Agreement is executed and delivered by First Union Trust Company, National Association, not individual or personally but solely as Owner Trustee under the Trust Agreement, in the exercise of the powers and authority conferred and vested in it as the Owner Trustee, (b) each representation, undertaking and agreement herein made on the part of the Trust is made and intended not as a personal representation, undertaking and agreement by First Union Trust Company, National Association but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on First Union Trust Company, National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto, the Noteholders, and by any Person claiming by, through or under the parties hereto or the Noteholders and (d) under no circumstances shall First Union Trust Company, National Association be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Sale or Servicing Agreement or any one or more of the other Transaction Documents.

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized, as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:   First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By: _____

      Name:   EDWARD L. TRUITT, JR.

      Title:   VICE PRESIDENT


KEYSTONE GRANTOR TRUST 1998-P2,

By:   U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee


By: _____

      Name:

      Title:


KEYSTONE MORTGAGE CORP., INC., as Seller


By: _____

      Name:

      Title:


REPUBLIC BANK, as Servicer and Claims Administer

By: _____

      Name:

      Title:


WILSHIRE SERVICING CORPORATION, as Backup Servicer

By: _____

      Name:

      Title:

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized, as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:    First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By:_____
        Name:
        Title:

KEYSTONE GRANTOR TRUST 1998-P2,

By:    U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By: _____
        Name:    Tamara Schultz-Fugh
        Title:    Assistant Vice President

KEYSTONE MORTGAGE CORP., INC., as Seller

By:_____
        Name:
        Title:

REPUBLIC BANK, as Servicer and Claims Administer

By:_____
        Name:
        Title:

WILSHIRE SERVICING CORPORATION, as Backup Servicer

By:_____
        Name:
        Title:

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized, as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:   First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By:_____
    Name:
    Title:

KEYSTONE GRANTOR TRUST 1998-P2,

By:   U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By:_____
    Name:
    Title:

KEYSTONE MORTGAGE CORP., INC., as Seller

By:_____
    Name:  TERRY L. Church
    Title:  President

REPUBLIC BANK, as Servicer and Claims Administer

By:_____
    Name:
    Title:

WILSHIRE SERVICING CORPORATION, as Backup Servicer

By:_____
    Name:
    Title:

USBT 100624

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized, as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:  First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By:_____

Name:
Title:

KEYSTONE GRANTOR TRUST 1998-P2,

By:  U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By:_____

Name:
Title:

KEYSTONE MORTGAGE CORP., INC., as Seller

By:_____

Name:
Title:

REPUBLIC BANK, as Servicer and Claims Administer

By:_____

Name: Alfred T. May
Title: President

WILSHIRE SERVICING CORPORATION, as Backup Servicer

By:_____

Name:
Title:

USBT 100625

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized, as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:   First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By:_____
        Name:
        Title:

KEYSTONE GRANTOR TRUST 1998-P2,

By:   U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By:_____
        Name:
        Title:

KEYSTONE MORTGAGE CORP., INC., as Seller

By:_____
        Name:
        Title:

REPUBLIC BANK, as Servicer and Claims Administer

By:_____
        Name:
        Title:

WILSHIRE SERVICING CORPORATION, as Backup Servicer

By:_____
        Name:
        Title:

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Indenture Trustee, Grantor Trustee and Contract of
Insurance Holder

By: _____

Name:     **Tamara Schultz-Fugh**

Title:     Assistant Vice President

USBT 100627

THE STATE OF _Delaware_   )

COUNTY OF _New Castle_   )

    BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared   **EDWARD L. TRUITT,** known to me to be a person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said FIRST UNION TRUST COMPANY NATIONAL ASSOCIATION, not in its individual capacity but solely in its capacity as Owner Trustee of KEYSTONE OWNER TRUST 1998-P2, and that he executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF FIRST UNION TRUST COMPANY, NATIONAL ASSOCIATION, this the ____th day of September, 1998.

                  Notary Public, State of _Delaware_

NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires November 21, 1999
RITA MARIE RITROVATO LAWLESS

NYLIB1/480056/13

USBT 100628

THE STATE OF ___Minnesota___ )

COUNTY OF ___Ramsey___ )

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared __Tamara Schultz-Fugh__, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as the Indenture Trustee, Grantor Trustee and Contract of Insurance Holder, and that she executed the same as the act of such entity for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF U.S. BANK TRUST NATIONAL ASSOCIATION, this the ___th day of September, 1998.



Notary Public, State of ___Minnesota___

TOBY ROBILLARD
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2000

USBT 100629

THE STATE OF *West Virginia*      )
                                  )
COUNTY OF *McDowell* )

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared *Terry L Church*, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said KEYSTONE MORTGAGE CORP., INC., as the Seller, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF KEYSTONE MORTGAGE CORP., INC., this the *11* th day of September, 1998. MAY, 1999.

*Robbin D. White*
Notary Public, State of *West Virginia*

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROBBIN D. WHITE
P.O. BOX 500
NORTHFORK, WV 24868
My Commission Expires June 21, 2005

USBT 100630

THE STATE OF FLORIDA      )
                          )
COUNTY OF PINELLAS        )

    BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared Alfred T. May , known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said REPUBLIC BANK, as the Servicer and Claims Administrator, and that he executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF REPUBLIC BANK, this the 20 th day of May, 1999.

_____
Notary Public, State of Florida _____

> CHRISTINE R. CLULEY
> MY COMMISSION # CC 562773
> EXPIRES: June 18, 2000
> Bonded Thru Notary Public Underwriters

USBT 100631

THE STATE OF OREGON      )
                             )

COUNTY OF                  )

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared Phillip D. Vincent known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said WILSHIRE SERVICING CORPORATION, as the Backup Servicer, and that he executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF WILSHIRE SERVICING CORPORATION, this the 18 th day of September, 1998. May, 1999.



_____
Notary Public, State of Oregon _____

OFFICIAL SEAL
**JULIE ANN O'NEIL**
NOTARY PUBLIC-OREGON
COMMISSION NO. 050021
MY COMMISSION EXPIRES JANUARY 03, 2000

E
07-1055
PLF

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

U.S. BANK NATIONAL ASSOCIATION, IN ITS CAPACITY AS
SUCCESSOR TRUSTEE AND U.S. BANK TRUST NATIONAL
ASSOCIATION, IN ITS CAPACITY AS SUCCESSOR TRUSTEE

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___88888___
(EXCEPT IN U.S. PLAINTIFF CASES)

## DEFENDANTS

BRANCH BANKING & TRUST COMPANY

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

CREIGHTON R. MAGID
DORSEY & WHITNEY LLP
1050 CONNECTICUT AVE., N.W., SUITE 1250
WASHINGTON, D.C. 20036

Case: 1:07-cv-01055
Assigned To : Friedman, Paul L.
Assign. Date : 6/14/2007
Description: General Civil

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
   Plaintiff

○ 2 U.S. Government
   Defendant

○ 3 Federal Question
   (U.S. Government Not a Party)

⊙ 4 Diversity
   (Indicate Citizenship of
   Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) FOR DIVERSITY CASES ONLY!

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ⊙ 5 | ⊙ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. Antitrust | ○ B. Personal Injury/ Malpractice | ○ C. Administrative Agency Review | ○ D. Temporary Restraining Order/Preliminary Injunction |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ⊙ E. General Civil (Other) | OR | ○ F. Pro Se General Civil |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☒ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

**No Summons Issued**

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions<br>(if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights<br>Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-<br>Employment<br>☐ 446 Americans w/Disabilities-<br>Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment &<br>Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of<br>Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting<br>(if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding　○ 2 Removed from State Court　○ 3 Remanded from Appellate Court　○ 4 Reinstated or Reopened　○ 5 Transferred from another district (specify)　○ 6 Multi district Litigation　○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
28 USC 1332(a); 28 USC 1391 - Breach of Contract, Conversion, Misrepresentation, Breach of Fiduciary Duty

| **VII. REQUESTED IN COMPLAINT** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 | DEMAND $ 11,150,000.00　Check YES only if demanded in complaint<br>JURY DEMAND:　YES ☐　NO ☒ |
|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction) | YES ☐　NO ☒　If yes, please complete related case form. |
|---|---|---|

DATE June 14, 2007　　SIGNATURE OF ATTORNEY OF RECORD　_C— Magd/n_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.　　COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.　CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.　CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.　CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.　RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.