**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

U.S. BANK NATIONAL ASSOCIATION and U.S.
BANK TRUST NATIONAL ASSOCIATION,

        Plaintiffs,

   v.                                    Civil Action No. 1:07-cv-1055-PLF

BRANCH BANKING & TRUST COMPANY,

        Defendant.

## DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER THIS LATER-FILED ACTION

Pursuant to Fed. R. Civ. P. 12(b)(3) and 28 U.S.C. §§ 1404 and 1406, Defendant Branch Banking & Trust Company ("BB&T") respectfully moves this Court to dismiss this action for lack of venue, based on an earlier filed action involving the same parties and issues, in the Southern District of Florida, West Palm Beach Division, styled, *Branch Banking & Trust Company v. U.S. Bank National Association, U.S. Bank Trust National Association and Ocwen Loan Servicing, LLC,* Cause No. 07-80508.

In the alternative, BB&T moves this Court to transfer this action to the Southern District of Florida based on the earlier filed action there, as it would promote and serve the convenience of the parties and witnesses, in the interest of justice.

The grounds for this motion are set forth more fully in the accompanying memorandum of law.

July 12, 2007

/s/
_____
Svetlana S. Gans (D.C. Bar # 478651)
**KILPATRICK STOCKTON LLP**
607 Fourteenth Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 639-4732
Facsimile: (202) 585-0052
SGans@KilpatrickStockton.com

Hayden J. Silver, III
Michael D. Crisp
**KILPATRICK STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6148
Facsimile: (404) 815-6555

Counsel for Defendant Branch Banking & Trust
Company

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

U.S. BANK NATIONAL ASSOCIATION and U.S.
BANK TRUST NATIONAL ASSOCIATION,

   Plaintiffs,

 v.

BRANCH BANKING & TRUST COMPANY,

   Defendant.

Civil. Action No. 1:07-cv-1055-PLF

## [PROPOSED] ORDER GRANTING DEFENDANT BRANCH BANKING & TRUST COMPANY'S MOTION TO DISMISS

Upon consideration of Defendant's Motion to Dismiss or in the Alternative to Transfer this matter, the supporting Memorandum of Law, arguments in opposition thereto, and the entire record herein, and in light of an earlier filed action involving the same parties and issues in the Southern District of Florida, West Palm Beach Division, styled, *Branch Banking & Trust Company v. U.S. Bank National Association, U.S. Bank Trust National Association and Ocwen Loan Servicing, LLC,* Cause No. 07-80508, Defendant's Motion to Dismiss is hereby GRANTED.

Dated: _____, 2007

         _____
         U.S. District Court Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

U.S. BANK NATIONAL ASSOCIATION and U.S.
BANK TRUST NATIONAL ASSOCIATION,

       Plaintiffs,

     v.                               Civil. Action No. 1:07-cv-1055-PLF

BRANCH BANKING & TRUST COMPANY,

       Defendant.

**[PROPOSED] ORDER GRANTING DEFENDANT BRANCH BANKING & TRUST
COMPANY'S MOTION TO TRANSFER TO THE SOUTHERN DISTRICT OF
FLORIDA**

     Upon consideration of Defendant's Motion to Dismiss or in the Alternative to Transfer

this matter, the supporting Memorandum of Law, arguments in opposition thereto, and the entire

record herein, and in light of an earlier filed action involving the same parties and issues in the

Southern District of Florida, West Palm Beach Division, styled, *Branch Banking & Trust*

*Company v. U.S. Bank National Association, U.S. Bank Trust National Association and Ocwen*

*Loan Servicing, LLC,* Cause No. 07-80508, Defendant's Motion to Transfer is GRANTED, and

this case is hereby transferred to the Southern District of Florida.

     Dated: _____, 2007

                               _____

                               U.S. District Court Judge

EXHIBIT

A

EXECUTION COPY

---

SALE AND SERVICING AGREEMENT
Dated as of August 31, 1998

among

KEYSTONE OWNER TRUST 1998-P2
(Trust)

KEYSTONE GRANTOR TRUST 1998-P2
(Grantor Trust)

KEYSTONE MORTGAGE CORP., INC.
(Seller)

REPUBLIC BANK
(Servicer and Claims Administrator)

WILSHIRE SERVICING CORPORATION
(Backup Servicer)

and

U.S. BANK TRUST NATIONAL ASSOCIATION
(Indenture Trustee, Grantor Trustee and Contract of Insurance Holder)

---

98-P201249

Table of Contents

Page

ARTICLE I
DEFINITIONS

Section 1.01. Definitions.................................................................................31
Section 1.03. Interest Calculations. ................................................................32

ARTICLE II
CONVEYANCE OF THE INITIAL LOANS

Section 2.01. Conveyance of the Loans. ........................................................32
Section 2.02. Conveyance of the Grantor Trust Certificate. ..........................33
Section 2.03. Ownership and Possession of Files. .........................................33
Section 2.04. Books and Records. ..................................................................34
Section 2.05. Delivery of Loan Documents and the Grantor Trust Certificate. ......................35
Section 2.06. Acceptance by Grantor Trustee of the Loans; Certain Substitutions; Initial
              Certification. ...............................................................................39
Section 2.07. Subsequent Transfers. ..............................................................40
Section 2.08. Acceptance by Indenture Trustee of the Grantor Trust Certificate....................43

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Section 3.01. [Reserved]. ...............................................................................43
Section 3.02. Representations, Warranties and Covenants of the Servicer. ....43
Section 3.03. Representations and Warranties of the Seller. ..........................46
Section 3.04. [Reserved]. ...............................................................................55
Section 3.05. Purchase and Substitution. .......................................................55
Section 3.06. Seller's Remedies .....................................................................58

ARTICLE IV
ADMINISTRATION AND SERVICING OF LOANS

Section 4.01. Servicing Standard. ..................................................................58
Section 4.02. Subservicing Arrangements. ....................................................60
Section 4.03. Servicing Record. .....................................................................60
Section 4.04. Annual Statement as to Compliance; Notice of Servicer Termination Event. ...63
Section 4.05. Annual Independent Accountants' Report. ...............................64
Section 4.06. Access to Certain Documentation and Information Regarding Loans. ...............65
Section 4.07. Appointment of Paying Agent. .................................................65
Section 4.08. Advances. .................................................................................66
Section 4.09. Reimbursement of Foreclosure Advances. ...............................67
Section 4.10. Modifications, Waivers and Amendments. ...............................68
Section 4.11. Due-On-Sale; Due-on-Encumbrance. ......................................69
Section 4.12. Collection; Claims for FHA Insurance and Foreclosures. .......70
Section 4.13. Sale of Foreclosed Properties. ..................................................74

i

98-P201250

Section 4.14.  Management of Real Estate Owned. .................................................. 75
Section 4.15.  Inspections. ....................................................................................... 76
Section 4.16.  Maintenance of Insurance. ................................................................ 76
Section 4.17.  Release of Files. ................................................................................ 77
Section 4.18.  Certain Tax Matters. ......................................................................... 78
Section 4.19.  Filing of Continuation Statements. .................................................. 78
Section 4.20.  Fidelity Bond. .................................................................................... 78
Section 4.21.  Errors and Omissions Insurance. ..................................................... 79
Section 4.22.  New Loan Reporting Manifest and Transfer of Note Report. .......... 79
Section 4.23.  Servicer Not Responsible. ................................................................ 79

## ARTICLE V
## ESTABLISHMENT OF TRUST ACCOUNTS

Section 5.01.  Accounts. ........................................................................................... 79
Section 5.02.  Allocation of Losses. ......................................................................... 85
Section 5.03.  Certificate Distribution Account. ..................................................... 85
Section 5.04.  Trust Accounts; Trust Account Property. ......................................... 86
Section 5.05.  Custodianship of Physical Securities. .............................................. 90
Section 5.06.  Capitalized Interest Account. ........................................................... 90
Section 5.07.  Pre-Funding Account ........................................................................ 91

## ARTICLE VI
## STATEMENTS AND REPORTS; SPECIFICATION OF TAX MATTERS

Section 6.01.  Servicing Certificate. ......................................................................... 92
Section 6.02.  Statement to Securityholders. ........................................................... 92

## ARTICLE VII
## CONCERNING THE CONTRACT OF INSURANCE HOLDER

Section 7.01.  Compliance with Title I and Filing of FHA Claims. ........................ 93
Section 7.02.  Regarding the Contract of Insurance Holder. ................................... 94

## ARTICLE VIII
## [RESERVED]

## ARTICLE IX
## THE SERVICER

Section 9.01.  Indemnification; Third Party Claims. ............................................... 95
Section 9.02.  Merger or Consolidation of the Servicer and Backup Servicer. ........ 96
Section 9.03.  Limitation on Liability of the Servicer, the Backup Servicer and Others. ........ 96
Section 9.04.  Servicer and Backup Servicer Not to Resign. ................................... 97
Section 9.05.  Relationship of Servicer to Grantor Trust and the Grantor Trustee. ....... 97
Section 9.06.  Servicer and Backup Servicer May Own Notes. ............................... 98
Section 9.07.  Rule 144A Information. ...................................................................... 98

98-P201251

Section 9.08.  Servicing Compensation. ................................................................................. 99
Section 9.09.  Sub-Servicer for Backup Servicer. .................................................................. 99

ARTICLE X
DEFAULT

Section 10.01. Servicer Termination Events. ......................................................................... 100
Section 10.02. Consequences of a Servicer Termination Event. ......................................... 102
Section 10.03. Appointment of Successor. ............................................................................. 102
Section 10.04. Notification to Noteholders. ........................................................................... 103
Section 10.05. Waiver of Past Defaults. ................................................................................. 104
Section 10.06. Duties of the Backup Servicer. ...................................................................... 104

ARTICLE XI
TERMINATION

Section 11.01. Termination. ...................................................................................................... 104
Section 11.02. Notice of Termination. .................................................................................... 106

ARTICLE XII
MISCELLANEOUS PROVISIONS

Section 12.01. Acts of Securityholders. .................................................................................. 106
Section 12.02. Amendment. ...................................................................................................... 106
Section 12.03. Recordation of Agreement. ............................................................................ 107
Section 12.04. Duration of Agreement. .................................................................................. 107
Section 12.05. Governing Law. ................................................................................................ 107
Section 12.06. Notices. .............................................................................................................. 108
Section 12.07. Severability of Provisions. .............................................................................. 108
Section 12.08. No Partnership. ................................................................................................ 108
Section 12.09. Counterparts. .................................................................................................... 108
Section 12.10. Successors and Assigns. .................................................................................. 109
Section 12.11. Headings. ........................................................................................................... 109
Section 12.12. Actions of Securityholders. ............................................................................ 109
Section 12.13. Reports to Rating Agencies. ........................................................................... 109
Section 12.14. Inconsistencies Among Transaction Documents. ....................................... 110
Section 12.15. Liability of Owner Trustee. ............................................................................ 110

98-P201252

iii

EXHIBITS

| | |
|---|---|
| EXHIBIT A | Loan Schedule |
| EXHIBIT B | Form of Servicer Certificate / Monthly Loan Level Data |
| EXHIBIT C | Form of Monthly Statement to Securityholders |
| EXHIBIT D | Underwriting Guidelines |
| EXHIBIT E | Form of Request for Release of Files |
| EXHIBIT F | Form of Subsequent Transfer Agreement |
| | |
| Schedule 1 | Approved Loan Originators |

98-P201253

iv

This Sale and Servicing Agreement is entered into effective as of August 31, 1998, among KEYSTONE OWNER TRUST 1998-P2, a Delaware business trust (the "Trust"), KEYSTONE GRANTOR TRUST 1998-P2, a New York trust (the "Grantor Trust"), KEYSTONE MORTGAGE CORP., INC., a West Virginia corporation ("Keystone"), as seller (in such capacity, the "Seller"), REPUBLIC BANK, as servicer (in such capacity, the "Servicer") and claims administrator (in such capacity, the "Claims Administrator"), WILSHIRE SERVICING CORPORATION, a Delaware corporation, as backup servicer (the "Backup Servicer"), and U.S. BANK TRUST NATIONAL ASSOCIATION, as indenture trustee on behalf of the Noteholders (in such capacity, the "Indenture Trustee"), as grantor trustee on behalf of the holders of the Grantor Trust Certificate (in such capacity, the "Grantor Trustee") and as contract of insurance holder (in such capacity, the "Contract of Insurance Holder").

<p style="text-align:center">PRELIMINARY STATEMENT</p>

WHEREAS, the Grantor Trustee, on behalf of the Grantor Trust desires to purchase one or more pools of Loans which were and will be purchased by the Seller in the ordinary course of business of the Seller;

WHEREAS, the Grantor Trust will issue the Grantor Trust Certificate upon formation of the Grantor Trust;

WHEREAS, the Trust wishes to purchase the Grantor Trust Certificate from the Seller;

WHEREAS, the Trust will: (a) issue the Notes; (b) pledge the Grantor Trust Certificate to the Indenture Trustee as security for the Notes; (c) issue the Certificates of Beneficial Interest to the Seller and its designee; and (d) convey the Notes and the Certificates of Beneficial Interest to the Seller as consideration for the sale by the Seller of the Grantor Trust Certificate;

WHEREAS, the Servicer is willing to service the Loans in accordance with the terms of this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, the parties hereto hereby agree as follows:

<p style="text-align:center">ARTICLE I</p>

<p style="text-align:center">DEFINITIONS</p>

Section 1.01. Definitions. Whenever used in this Agreement, the following words and phrases, unless the context otherwise requires, shall have the meanings specified in this Article.

Accrual Period: With respect to any Distribution Date and, (i) the Class A-1 Notes, the period from the Distribution Date in the month preceding the month of such Distribution Date (or, in the case of the first Distribution Date, from the Closing Date) through the day before such Distribution Date and (ii) any Class of Notes other than the Class A-1 Notes, the Calendar Month

98-P201254

preceding such Distribution Date (or, in the case of the first Distribution Date from the Closing Date).

Addition Notice:  The notice given pursuant to Section 2.07 with respect to the transfer of Subsequent Loans to the Grantor Trust pursuant to such Section.

Aggregate Note Balance:  With respect to any Distribution Date, the aggregate of the Note Balances of the Notes.

Agreement:  This Sale and Servicing Agreement and all amendments hereof and supplements hereto.

Ancillary Fees.  Any amounts paid by or on behalf of an Obligor in respect of late payment charges, default interest, assumption fees, prepayment penalties, returned check fees and other fees charged by the Servicer but not including any Portability Fees.

Annual Default Percentage (Rolling Twelve Month).  As of any Determination Date, twelve times the percentage equivalent of the fraction:  (1) the numerator of which is the arithmetic average for each of the twelve immediately preceding Due Periods of the aggregate of the Principal Balances of the Loans which have become Defaulted Loans as of the Monthly Cut-Off Date with respect to each of such twelve Due Periods (if the Principal Balance of a Loan is included in the aggregate of the Principal Balances of the Loans which have become Defaulted Loans as of a Monthly Cut-Off Date and such Loan subsequently ceases to be a Defaulted Loan, such Principal Balance shall be deducted from the aggregate of the Principal Balances of the Loans which have become Defaulted Loans as of the Monthly Cut-Off Date next succeeding the date on which such Loan ceases to be a Defaulted Loan) and (2) the denominator of which is the arithmetic average of the aggregate Principal Balance of the Loans as of the Monthly Cut-Off Date with respect to each of such twelve Due Periods (excluding as of each such Monthly Cut-Off Date the Principal Balance of the Loans which are Defaulted Loans as of such Monthly Cut-Off Date and which first became Defaulted Loans as of a prior Monthly Cut-Off Date).

Approved Loan Originator.  Each of the originators of the Loans listed on Schedule 1 attached hereto.

Assignment of Mortgage:  With respect to each Loan secured by a Mortgage, an assignment, notice of transfer or equivalent instrument sufficient under the laws of the jurisdiction wherein the related Property is located to reflect of record the sale of the related Loan to the Grantor Trust on behalf of the Grantor Trust as follows:  "U.S. Bank Trust National Association, as Grantor Trustee for the Keystone Grantor Trust 1998-P2".

Backup Servicer:  Wilshire Servicing Corporation Inc., a Delaware corporation, its successors in interest or any successor servicer appointed as herein provided.

Backup Servicer Report:  As defined in Section 10.06.

98-P201255

Backup Servicing Fee:  With respect to any Distribution Date, an amount equal to the Backup Servicing Fee Rate times the aggregate Principal Balance of the Loans, as of the close of business on the last day of the second calendar month before such Distribution Date (or the Initial Cut-Off Date, in the case of the first Distribution Date), which fee is part of Servicing Fee.

Backup Servicing Fee Rate:  0.09% per annum.

BIF:  The Bank Insurance Fund, as from time to time constituted, created under the Financial Institutions Reform, Recovery and Enhancement Act of 1989, or, if at any time after the execution of this Agreement the Bank Insurance Fund is not existing and performing duties now assigned to it, the body performing such duties on such date.

Business Day:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in New York City or in the city in which the Corporate Trust Office of the Indenture Trustee is located or the city in which the Servicer's servicing or banking operations are located and are authorized or obligated by law or executive order to be closed.

Calendar Month.  The period from and including the first day of a calendar month to and including the last day of such calendar month.

Capitalized Interest Account:  The Capitalized Interest Account established pursuant to Section 5.06.

Capitalized Interest Withdrawal Amount:  With respect to each Distribution Date during the Funding Period, to the extent amounts on deposit in the Note Distribution Account on such Distribution Date are insufficient to pay the Noteholders Interest Distribution Amount, the product of (A) the weighted average of the Note Rates weighted on the basis of the Note Balances of each Class of Notes immediately prior to the related Distribution Date and (B) the Pre-Funded Amount at the beginning of the related Due period.

Certificate Distribution Account:  The account established and maintained pursuant to Section 5.03.

Certificateholder:  A holder of a Certificate.

Certificate Register:  The register established pursuant to Section 3.4 of the Trust Agreement.

Certificates:  The certificates of beneficial interest issued pursuant to the Trust Agreement, evidencing the right to the amount remaining, if any, after all prior distributions have been made under this Agreement, the Indenture and the Trust Agreement.

CFR:  The Code of Federal Regulations, or any successor provisions thereto.

98-P201256

Claims Administrator. Republic Bank, a Florida-chartered commercial bank, its successors in interest or any successor claims administrator appointed as provided herein.

Class: With respect to the Notes, all Notes bearing the same class designation, and with respect to the Certificates, the Certificates shall be deemed to be one class.

Class A-1 Formula Rate: As to any Distribution Date, LIBOR plus 0.08%.

Class A-1 Note: Any Class A-1 Note in the form attached to the Indenture as Exhibit A-1.

Class A-2 Note: Any Class A-2 Note in the form attached to the Indenture as Exhibit A-2.

Class A-3 Note: Any Class A-3 Note in the form attached to the Indenture as Exhibit A-3.

Class A-4 Note: Any Class A-4 Note in the form attached to the Indenture as Exhibit A-4.

Class A-5 Note: Any Class A-5 Note in the form attached to the Indenture as Exhibit A-5.

Class B-1 Note: Any Class B-1 Note in the form attached to the Indenture as Exhibit A-6.

Class B-1 Optimal Note Balance: means with respect to any Distribution Date prior to the Stepdown Date, zero; and with respect to any other Distribution Date, the Pool Balance as of the preceding Determination Date minus the sum of (a) the aggregate of the Note Balances of the Senior Notes, the Class M-1 Notes and the Class M-2 Notes (after taking into account any payments made on such Distribution Date in reduction thereof) and (b) the greater of (i) 10.00% of the Pool Balance as of the preceding Determination Date plus the Targeted Overcollateralization Amount for such Distribution Date (calculated without giving effect to the proviso in the definition thereof) and (ii) 0.50% of the Initial Pool Balance.

Class B-2 Note: Any Class B-2 Note in the form attached to the Indenture as Exhibit A-7.

Class B-2 Optimal Note Balance: means with respect to any Distribution Date prior to the Stepdown Date, zero; and with respect to any other Distribution Date, the Pool Balance as of the preceding Determination Date minus the sum of (a) the aggregate of the Note Balances of the Senior Notes, the Class M-1 Notes, the Class M-2 Notes and the Class B-1 Notes (after taking into account any payments made on such Distribution Date in reduction thereof) and (b) the Targeted Overcollateralization Amount for such Distribution Date (calculated without giving effect to the proviso in the definition thereof).

98-P201257

8

Class M-1 Note:  Any Class M-1 Note in the form attached to the Indenture as Exhibit A-8.

Class M-1 Optimal Note Balance:  means with respect to any Distribution Date prior to the Stepdown Date, zero; and with respect to any other Distribution Date, the Pool Balance as of the preceding Determination Date minus the sum of (a) the aggregate of the Note Balances of the Senior Notes (after taking into account any payments made on such Distribution Date in reduction of such Note Balances) and (b) the greater of (i) 44.00% of the Pool Balance as of the preceding Determination Date plus the Targeted Overcollateralization Amount for such Distribution Date (calculated without giving effect to the proviso in the definition thereof) and (ii) 0.50% of the Initial Pool Balance.

Class M-2 Note:  Any Class M-2 Note in the form attached to the Indenture as Exhibit A-9.

Class M-2 Optimal Principal Balance:  means with respect to any Distribution Date prior to the Stepdown Date, zero; and with respect to any other Distribution Date, the Pool Balance as of the preceding Determination Date minus the sum of (a) the aggregate of the Note Balances of the Senior Notes and the Class M-1 Notes (after taking into account any payments made on such Distribution Date in reduction of such Note Balances) and (b) the greater of (i) 26.00% of the Pool Balance as of the preceding Determination Date plus the Targeted Overcollateralization Amount for such Distribution Date (calculated without giving effect to the proviso in the definition thereof) and (ii) 0.50% of the Initial Pool Balance.

Closing Date:  September 16, 1998.

Code:  The Internal Revenue Code of 1986, as amended from time to time, and Treasury Regulations promulgated thereunder.

Collected Amount:  With respect to any Due Period, the following amounts (without duplication) which will constitute available funds for the following Distribution Date: (i) from amounts withdrawn from the Collection Account not later than the Business Day prior to such Distribution Date, (a) payments of interest (net of the related Servicing Fee) and principal in respect of the Loans received during such Due Period (exclusive of interest due on or before September 15, 1998) and (b) any reinvestment earnings in the Collection Account; (ii) all liquidation proceeds (net of related expenses) in respect of the Loans received during such Due Period; (iii) the Purchase Price for repurchased Loans and Substitution Adjustment Amounts in respect of substitutions of Loans during such Due Period; (iv) insurance proceeds received by Servicer in respect of Loans during such Due Period; (v) proceeds of FHA Claims received during such Due Period; (vi) payments received during such Due Period in respect of the Loans from the Trust or the Backup Servicer, as applicable, in connection with the termination of the Trust as provided in Section 11.01(b); and (vii) any amounts required to be withdrawn from the Capitalized Interest Account.

98-P201258

9

Collection Account: The account denominated as a Collection Account and maintained or caused to be maintained by the Grantor Trustee pursuant to Section 5.01.

Contract: As of any date of determination, each of the manufactured housing installment sale contracts and installment loan agreements transferred and assigned to the Grantor Trust pursuant to Section 2.01 or in accordance with Section 3.05.

Contract File: With respect to any Contract, the related contract documents listed in Section 2.05(a)(B) and any additional documents required to be added thereto pursuant to this Agreement.

Contract of Insurance: The contract of insurance under Title I covering the FHA Loans held under the name U.S. Bank Trust National Association, or any successor thereto, as Contract of Insurance Holder hereunder.

Contract of Insurance Holder:. U.S. Bank Trust National Association, its successors in interest, and any successor thereto pursuant to the terms of this Agreement.

Conventional Loan Program. The Seller's reunderwriting guidelines for Non-FHA Loans not purchased by the Seller under the Equiflex Loan Program.

Corporate Trust Office: The office of the Indenture Trustee at which any particular time its corporate business shall be principally administered, located on the Closing Date at U.S. Bank Trust National Association, 180 East 5th Street, St. Paul, Minnesota 55101, Attention: Structured Finance.

Credit Files: As defined in Section 2.05(b).

Cumulative Losses: With respect to any Distribution Date, the aggregate amount of Realized Losses incurred since the Initial Cut-off Date through the related Monthly Cut-Off Date.

Cut-Off Date: With respect to any Initial Loan, the Initial Cut-Off Date, and with respect to each Subsequent Loan, the date specified in the related Subsequent Transfer Agreement.

Cut-Off Date Principal Balance: With respect to any Loan, the outstanding principal balance thereof at the close of business on the applicable Cut-Off Date after giving effect to all payments of principal received thereon or prior thereto.

Debt Instrument: The note or other evidence of indebtedness, as amended or supplemented, evidencing the indebtedness of an Obligor under a Loan.

Defaulted Loan: A Loan with respect to which: (i) a claim has been submitted pursuant to the Contract of Insurance, (ii) foreclosure proceedings have been commenced, (iii) any portion of a Monthly Payment is more than 150 days past due (without giving effect to any grace period)

or (iv) the Servicer has determined in good faith in accordance with customary loan servicing practices that all amounts which it expects to receive from the related Obligor with respect to the Loan have been received.

Defective Loan:  A Loan required to be repurchased or substituted for pursuant to Section 3.05 hereof.

Deferred Amount:  As to any Distribution Date, the sum of the Principal Write-Down Amount and the Write-Down Interest Amount.

Delinquent: As used herein, a Mortgage Loan is considered to be: "30 to 59 days" or "30 or more days" delinquent when a payment due on any scheduled Due Date remains unpaid as of the close of business on the next following monthly scheduled Due Date; "60 to 89 days" or "60 or more days" delinquent when a payment due on any scheduled Due Date remains unpaid as of the close of business on the second following monthly scheduled Due Date; and so on.  The determination as to whether a Loan falls into these categories is made as of the close of business on the last business day of each month.  For example, a Loan with a payment due on September 1 that remained unpaid as of the close of business on October 31 would then be considered to be 30 to 59 days delinquent.  Delinquency information as of the Cut-off Date is determined and prepared as of the close of business on the last business day immediately prior to the Cut-off Date.

Delinquency Rate:  With respect to the Loans and any Distribution Date, the percentage equivalent of a fraction (a) the numerator of which equals the sum, without duplication of (i) 100% of the aggregate Principal Balance of all Loans that are 90 or more days Delinquent, 75% of the aggregate Principal Balance of all Loans that are in foreclosure and (iii) 100% of the aggregate Principal Balance of all Loans that are converted to REO Properties, in each case as of the last day of the related Due Period and (b) the denominator of which is the aggregate Principal Balance of the Loans as of the last day of such Due Period.

Determination Date:  With respect to any Distribution Date, the fifth Business Day preceding such Distribution Date.

Distribution Date:  The 25th day of any month or if such 25th day is not a Business Day, the first Business Day immediately following such day, commencing in October 1998.

DTC:  The Depository Trust Company.

Due Date:  With respect to any Monthly Payment, the date on which such Monthly Payment is required to be paid pursuant to the related Debt Instrument.

Due Period:  With respect to any Determination Date or Distribution Date, the Calendar Month immediately preceding such Determination Date or Distribution Date, as the case may be.

98-P201260

11

(d) commercial paper (having original maturities of not more than 90 days) that (i) is payable in United States dollars and (ii) is rated in the highest credit rating category by each Rating Agency;

(e) investments in money market funds (which may be 12b-1 funds, as contemplated under the rules promulgated by the Securities and Exchange Commission under the Investment Company Act of 1940) having a rating of AAA-m or AAAM-G from Fitch and Aaa from Moody's (including funds for which the Indenture Trustee or any of its Affiliates acts as an investment adviser or manager), and having a rating of AAA by Fitch; or

(f) investments in "no load" money market funds rated "AAAm" or "AAAm-G" by Fitch and "Aaa" by Moody's.

Eligible Servicer:  A Person that (i) is servicing a portfolio of mortgage loans, unsecured loans and/or manufactured housing contracts, (ii) is legally qualified to service the Loans, (iii) has demonstrated the ability professionally and competently to service a portfolio of mortgage loans, unsecured loans and/or manufactured housing contracts similar to certain of the Loans with reasonable skill and care and (iv) has with its affiliates on a consolidated basis a net worth calculated in accordance with generally accepted accounting principles of at least $20,000,000.

Equiflex Loan Program:  The Seller's current re-underwriting guidelines for the Non-FHA Loans that is described in the Underwriting Guidelines (other than the portion of such Underwriting Guidelines relating to the Seller's predecessor Conventional Loan Program) attached hereto as Exhibit D.

Excess Spread:  means with respect to any Distribution Date, the excess of (a) the Net Collected Amount over (b) the sum of (1) the aggregate Noteholders Interest Distribution and (2) the Principal Remittance Amount.

FDIC:  The Federal Deposit Insurance Corporation and any successor thereto.

FHA:  The Federal Housing Administration and any successor thereto.

FHA Insurance:  Insurance issued by FHA pursuant to Title I of the National Housing Act of 1934, as amended.

FHA Insurance Coverage Insufficiency:  At the time of a prospective claim for reimbursement under the Contract of Insurance for an FHA Loan pursuant to Section 4.12, the amount by which the sum of all claims previously paid by the FHA in respect of all FHA Loans and the amount expected to be received in respect of such prospective claim for such FHA Loan exceeds the Trust Designated Insurance Amount.

FHA Insurance Coverage Reserve Account:  The account established by the FHA pursuant to the Contract of Insurance which is established and maintained under Title I (see 24 C.F.R. 201.32(a)).

98-P201262

13

FHA Insurance Payment Amount: With respect to any Distribution Date and with respect to an FHA Loan for which an insurance claim has been made by the Contract of Insurance Holder or the Claims Administrator and paid by the FHA or rejected by the FHA, an amount equal to the sum of such of the following as are appropriate: (i) the amount, if any, received from the FHA, (ii) with respect to claims rejected, the amount, if any, received from the Seller or the Servicer pursuant to Section 4.12 and (iii) the amount received from the sale of FHA Pending Claims sold pursuant to Section 11.01(b).

FHA Loans: The Loans designated as FHA Loans on the Loan Schedule.

FHA Pending Claims: As defined in Section 11.01(b).

FHA Premium Account: The account which is an Eligible Account established and maintained by the Grantor Trustee pursuant to Section 5.01(c).

FHA Premium Account Deposit: With respect to any Distribution Date, an amount equal to the greater of (i) 1/12 times .75% times the aggregate Principal Balance of all FHA Loans other than Invoiced Loans as of the first day of the calendar month preceding the month of such Distribution Date (or the aggregate Principal Balance of such Loans as of the applicable Cut-Off Date with respect to the first Distribution Date) and (ii) the positive excess, if any, of (A) the projected amount of premium and other charges due under the Contract of Insurance for the next succeeding Due Period over (B) the balance in the FHA Premium Account as of the related Distribution Date.

FHA Reserve Amount: As to each FHA Loan, 10% of the Principal Balance as of the Cut-Off Date of such FHA Loan.

FHLMC: The Federal Loan Mortgage Corporation and any successor thereto.

File(s): Any of a Contract File, Mortgage File, Legal File, Credit File or collectively as the context may require.

Final Maturity Date: With respect to: the Class A-1 Notes, November 25, 2007; Class A-2 Notes, October 25, 2010; Class A-3 Notes, January 25, 2013; Class A-4 Notes, December 25, 2018; Class A-5 Notes, January 25, 2029; Class M-1 Notes, January 25, 2029; Class M-2 Notes, January 25, 2029; Class B-1 Notes, January 25, 2029 and Class B-2 Notes, January 25, 2029.

Fitch: Fitch IBCA, Inc., or any successor thereto.

FNMA: The Federal National Mortgage Association and any successor thereto.

Foreclosed Loan: As of any date of determination, any Loan, other than a Loan for which a claim is pending under the Contract of Insurance, that has been discharged as a result of (i) the completion of foreclosure or comparable proceedings; (ii) the Grantor Trustee's

98-P201263

14

acceptance of the deed or other evidence of title to the related Property in lieu of foreclosure or other comparable proceeding; or (iii) the acquisition by the Grantor Trustee of title to the related Property by operation of law.

Foreclosed Property: With respect to any Loan, any Property acquired by the Grantor Trust in respect of a Foreclosed Loan.

Foreclosure Advances: As defined in Section 4.08(b).

Funding Period: The period from the Closing Date until the earliest of (i) the date on which the amount on deposit in the Pre-Funding Account (without including investment earnings) is less than $50,000, (ii) the date on which an Event of Default occurs and (iii) December 15, 1998.

Grant: As defined in the Indenture.

Grantor Trust: The Keystone Grantor Trust 1998-P2 created pursuant to the Grantor Trust Agreement.

Grantor Trust Accounts: The FHA Premium Account, Collection Account and the Pre-Funding Account

Grantor Trust Agreement: The Trust Agreement, dated as of August 28, 1998, between the Seller and the Grantor Trustee.

Grantor Trust Certificate: The Grantor Trust Certificate issued pursuant to the Grantor Trust Agreement.

Grantor Trust Certificate Interest Remittance Amount: With respect to any Distribution Date an amount equal to all interest collected with respect to the Loans during the related Due Period reduced by the amount of the Servicing Fee, and Grantor Trustee Fee for such Due Period.

Grantor Trust Certificate Principal Remittance Amount: With respect to any Distribution Date an amount equal to the Principal Remittance Amount.

Grantor Trust Certificate Remittance Amount: With respect to any Distribution Date the sum of the related Grantor Trust Interest Remittance Amount and Grantor Trust Principal Remittance Amount reduced by the amounts set forth in Section 5.01(d)(ii)(b).

Grantor Trust Certificateholder: The holder as shown on the Grantor Trust Register pursuant to the Grantor Trust Agreement of the Grantor Trust Certificate.

Grantor Trustee: U.S. Bank Trust National Association, and its successors in interest.

98-P201264

Grantor Trustee Fee:  With respect to any Distribution Date the Grantor Trustee Fee Rate times the Pool Balance as of the last day of the second preceding Due Period.

Grantor Trustee Fee Rate:  .0033%.

Grantor Trust Estate:  As defined in Section 2.01(a).

Grantor Trust Register:  The register established pursuant to the Grantor Trust Agreement.

HUD:  The United States Department of Housing and Urban Development and any successor thereto.

Indenture:  The Indenture, dated as of August 31, 1998, between the Trust and the Indenture Trustee.

Indenture Trust Estate:  The Trust Estate other than the Certificate Distribution Account.

Indenture Trustee:  U.S. Bank Trust National Association, a national banking association, as Indenture Trustee under the Indenture and this Agreement acting on behalf of the Noteholders, or any successor indenture trustee under the Indenture and this Agreement.

Indenture Trustee Fee:  With respect to any Distribution Date, the Indenture Trustee Fee Rate times the Pool Balance as of the last day of the second preceding Due Period (or the Closing Date in the case of the first Distribution Date).

Indenture Trustee Fee Rate:  .0033% per annum.

Independent:  When used with respect to any specified Person, such Person (i) is in fact independent of the Seller, the Servicer or any of their respective affiliates, (ii) does not have any direct financial interest in or any material indirect financial interest in any of the Seller, the Servicer or any of their respective affiliates and (iii) is not connected with any of the Seller, the Servicer or any of their respective affiliates as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions; provided, however, that a Person shall not fail to be Independent of the Seller, the Servicer or any of their respective affiliates merely because such Person is the beneficial owner of 1% or less of any class of securities issued by the Seller, the Servicer or any of their respective affiliates, as the case may be.

Independent Accountants:  A firm of nationally recognized certified public accountants which is Independent.

Independent Contractor:  An Independent contractor engaged pursuant to Section 4.14 hereof.

Initial Cut-Off Date:  The close of business on August 31, 1998.          98-P201265

16

Initial Loan: The Initial Loans transferred to the Grantor Trust on the Initial Cut-off Date.

Initial Loan Schedule: With respect to any date, the initial schedule of Initial Loans included in the Grantor Trust as of the Initial Cut-Off Date set forth herein as Exhibit A-1.

Initial Pool Balance: The sum of the Cut-Off Date Principal Balances of the Initial Loans and the Pre-Funded Amount as of the Closing Date.

Insurance Policies: With respect to any Property, any related insurance policy required to be maintained under Title I or otherwise.

Insurance Proceeds: With respect to any Property, all amounts collected in respect of Insurance Policies and not required to be applied to the restoration of the related Property or paid to the related Obligor.

Insurance Record: The record established and maintained by the Claims Administrator (in a manner consistent with the Title I provisions set forth in 24 C.F.R. Section 201.32) setting forth the FHA insurance coverage attributable to the FHA Loans hereunder and for Related Series Loans. To the extent consistent with adjustments pursuant to Title I to the FHA Insurance Coverage Reserve Account, the Insurance Record shall be reduced by the amount of claims approved for payment by the FHA with respect to any FHA Loan or Related Series Loan after the date of transfer of the related FHA reserve account to the Contract of Insurance Holder.

Institutional Accredited Investor: Shall mean an institutional "accredited investor" as defined in Rule 501(a)(1), (2), (3) and/or (7) under the Securities Act.

Investment Order: With respect to amounts on deposit in an account, a written order with respect to the Eligible Investments in which the amounts in such account are to be invested, signed by an authorized officer of the Trust.

Invoiced Loan: An FHA Loan with respect to which the related Obligor is required to pay the premium on FHA Insurance with respect to such FHA Loan separately from the payment of interest on such FHA Loan.

Land-and-Home Contract: A Contract that is secured in part by the lien of a Mortgage.

Legal File: As defined in Section 2.05.

LIBOR: As to any date, the rate for United States dollar deposits for one month which appears on the Telerate Page 3750 as of 11:00 A.M., London time. If such rate does not appear on such page (or such other page as may replace that page on that service, or if such service is no longer offered, such other service for displaying LIBOR or comparable rates as may be reasonably selected by the Indenture Trustee after consultation with the Servicer), the rate will be the Reference Bank Rate. If no such quotations can be obtained and no Reference Bank Rate is

98-P201266

available, LIBOR will be (i) LIBOR applicable to the preceding Distribution Date, (ii) or if such Distribution Date is the first Distribution Date, 5.64453%.

LIBOR Business Day:  Any day other than (i) a Saturday or a Sunday or (ii) a day on which banking institutions in the State of New York, the State of Minnesota or in the city of London, England are required or authorized by law to be closed.

LIBOR Determination Date:  The second LIBOR Business Day prior to the first day of the related Interest Period (or the second LIBOR Business Day prior to the Closing Date, in the case of the first Distribution Date).

Liquidated Loan:  A Loan with respect to which the Servicer has determined in good faith in accordance with customary loan servicing practices that all amounts which it expects to receive with respect to such Loan have been received.

Loan:  As of any date of determination, any loan that is identified on the Loan Schedule transferred and assigned to the Grantor Trust pursuant to Section 2.01 or in accordance with Section 3.05 as the context requires or, collectively, the Contracts and the Mortgage Loans other than any Loan that becomes a Purchased Loan or for which a Substitute Loan is substituted.

Loan Purchase Agreement:  Each of the Master Loan Purchase Agreement dated September 16, 1998, as amended and supplemented, between The First National Bank of Keystone, as purchaser, and Republic Bank, as seller, and the Master Loan Purchase Agreements dated September 16, 1998 between Keystone Mortgage Corp., Inc., as purchaser, and The First National Bank of Keystone, as seller.

Loan Rate:  With respect to any Loan, the fixed rate of interest per annum set forth in the related Debt Instrument (not including any amounts payable as premium for FHA Insurance with respect to Invoiced Loans).

Loan Schedule:  With respect to any date, the schedule of Loans included in the Grantor Trust on such date, which list shall consist of the Initial Loan Schedule, together with any Subsequent Loan Schedule reflecting the Subsequent Loans transferred to the Grantor Trust on a Subsequent Transfer Date.  The Loan Schedule will be deemed to be amended from time to time to reflect Subsequent Loans, Purchased Loans and Substitute Loans.

Manufactured Home:  A unit of manufactured housing which meets the requirements of Section 25(e)(10) of the Code, including all accessions thereto, securing the indebtedness of the Obligor under the related Contract.

Majority Certificateholder:  A Certificateholder holding at least 51% of the aggregate Percentage Interests of all the Certificates.

Majority Securityholders:  (i) Until such time as the sum of the Aggregate Note Balance has been reduced to zero, the holder or holders of in excess of 50% of the Note Balance of all

98-P201267

18

Classes of Notes (as a result of which the holders of the Certificates shall be excluded from any rights or actions of the Majority Securityholders during such period); and (ii) thereafter, the holder or holders of in excess of 50% of the Percentage Interest of the Certificates, provided however, that in determining the majority of the Note Balances, Notes owned by the Seller or any affiliate shall be disregarded.

Maturity Date:  With respect to any Loan and as of any date of determination, the date on which the last payment of principal is due and payable under the related Debt Instrument.

Monthly Cut-Off Date:  The last day of any calendar month, and with respect to any Distribution Date or related Determination Date, the last day of the calendar month immediately preceding such Distribution Date or related Determination Date.

Monthly Payment:  With respect to any Loan and any Due Period, the payment of principal and interest due in such Due Period from the Obligor pursuant to the related Debt Instrument (as amended or modified, if applicable, pursuant to Section 4.10).  The Monthly Payment related to a Determination Date or a Distribution Date shall be the Monthly Payment due for the preceding Due Period.

Moody's:  Moody's Investors Service, Inc., or any successor thereto.

Mortgage:  With respect to any Mortgage Loan or Land-and-Home Contract, the mortgage, deed of trust or other instrument, as amended or supplemented, creating a mortgage lien (and in a title theory state the document conveying title to the Mortgaged Property as security for the related Loan) on the related Mortgaged Property.

Mortgage File:  With respect to any Mortgage Loan, the related mortgage documents listed in Section 2.05 and any additional documents required to be added thereto pursuant to this Agreement.

Mortgaged Property:  With respect to any Mortgage Loan or Land-and-Home Contract, any fee interests in the residential property subject to the lien of the related Mortgage at the time of origination of such Mortgage Loan or Land-and-Home Contract or, if applicable, at the time of exercise of the Portability Option.

Mortgage Loan:  As of any date of determination, each of the Loans, secured by an interest in a Property, that is transferred and assigned to the Grantor Trust pursuant to Section 2.01 and Section 3.05.

Mortgagee or Obligee:  With respect to any Loan as of any date of determination, the holder of the related Debt Instrument and any related Mortgage as of such date.

Mortgagor or Obligor:  With respect to any Loan, the obligor(s) on the related Debt Instrument.

98-P201268

19

Net Collected Amount:  As to any Distribution Date the related Collected Amount reduced by the sum of (i) the Grantor Trustee Fee, the Owner Trustee Fee and the Indenture Trustee Fee for the related Due Period, (ii) Priority Expenses for the related Due Period, (iii) the FHA Premium Account Deposit, (iv) reimbursements to the Servicer for accrued and unpaid Servicing Fees, and (v) previous Foreclosure Advances for the related Due Period to the extent permitted to be reimbursed pursuant to Section 4.09.

Net Delinquency Calculation Amount:  With respect to any Distribution Date, the excess, if any, of (x) the product of 2.0 and the Rolling Six-Month Delinquency Average over (y) the aggregate of the amounts of Excess Spread for the three preceding Distribution Dates.

Net Funds Cap:  For any Distribution Date will equal the weighted average of the Loan Rates as of the last day of the second preceding Due Period (weighted on the basis of the related Principal Balances as of such date) minus 1.32% per annum.

Net Loan Rate:  With respect to each Loan, the related Loan Rate less the Servicing Fee per Rate.

New Loan Reporting Manifest:  With respect to an FHA Loan, the report complying with Title I filed with HUD, Office of Finance and Accounting pursuant to 24 CFR Section 201.30 for the purpose of causing the initial assignment of a case number to the FHA Loan by the FHA.

Non-FHA Loans:  The Loans designated as Non-FHA Loans on the Loan Schedule.

Note(s):  One or more of Class A-1 Notes, Class A-2 Notes, Class A-3 Notes, Class A-4 Notes, Class A-5 Notes, Class M-1 Notes, Class M-2 Notes, Class B-1 Notes or Class B-2 Notes.

Note Balance:  With respect to any date of determination and each Class of Notes, the Original Note Balance of such Class, reduced by the sum of (a) all Noteholders' Principal Distribution Amounts previously distributed with respect to such Class and (b) the Principal Write-Down Amount, if any, previously allocated to such Class in reduction of the principal amount thereof.

Note Distribution Account:  The account established and maintained pursuant to Section 5.01(b).

Noteholder:  A holder of a Note.

Noteholders' Interest Carryover Shortfall:  With respect to any Class of Notes and any Distribution Date, the sum of (a) the excess of the related Noteholders' Monthly Interest Distributable Amount for the preceding Distribution Date and any outstanding Noteholders' Interest Carryover Shortfall with respect to such Notes on such preceding Distribution Date, over the amount in respect of interest that is actually distributed to the related Class of Noteholders on such preceding Distribution Date and (b) interest on such excess, to the extent permitted by law, at the related Note Rate for the related Accrual Period.

98-P201269

**Noteholders' Interest Distribution:** With respect to any Distribution Date and each Class of Notes, the sum of (i) the applicable Noteholders' Monthly Interest Distributable Amount for such Class on such Distribution Date and (ii) the applicable Noteholders' Interest Carryover Shortfall for such Class on such Distribution Date.

**Noteholders' Monthly Interest Distributable Amount:** With respect to any Distribution Date and each Class of Notes, interest at the applicable Note Rate for such Class, on the related Note Balance for such Distribution Date.

**Noteholders' Principal Distribution Amount:** With respect to any Distribution Date, (A) the excess of the sum of (i) the Principal Remittance Amount for such Distribution Date and (ii) the Excess Spread for such Distribution Date to the extent required to satisfy the Targeted Overcollateralization Amount over (B) the Overcollateralization Release Amount, if any; provided however, that the Noteholders' Principal Distribution Amount shall not exceed the Aggregate Note Balance.

**Note Rate:** With respect to the Class A-1 Notes, the lesser of the Class A-1 Formula Rate and the Net Funds Cap; Class A-2 Notes, 6.20%; the Class A-3 Notes, 6.39%; Class A-4 Notes, 6.84%; Class A-5 Notes, 7.40%; the Class M-1 Notes, 7.41%; the Class M-2 Notes, 8.10%; the Class B-1 Notes, 8.50%, and the Class B-2 Notes, 8.50%; provided, however, that the Note Rate for each Class of Notes then outstanding will increase by 0.50% per annum after the Optional Termination Date.

**Note Register:** The register established pursuant to Section 2.3 of the Indenture.

**Obligee:** See Mortgagee.

**Obligor:** See Mortgagor.

**Offering Circular:** The offering circular, dated August 28, 1998 relating to the offering of the Notes.

**Officer's Certificate:** A certificate signed by (i) any Servicing Officer or (ii) the Chairman of the Board, the Vice Chairman of the Board, the President, a Vice President, an Assistant Vice President, the Treasurer, the Secretary or one of the Assistant Treasurers or Assistant Secretaries of Keystone, as the case may be, as required by this Agreement.

**Opinion of Counsel:** A written opinion of counsel (who is acceptable to the Rating Agencies), who may be employed by the Seller, the Servicer or any of their respective affiliates.

**Optional Termination Date:** The first Distribution Date on which the Pool Balance is less than 10% of the Initial Pool Balance.

**Original Note Balance:** In the case of the Class A-1 Notes, $127,800,000; Class A-2 Notes, $66,800,000; Class A-3 Notes, $73,900,000; Class A-4 Notes, $69,600,000; Class A-5

98-P201270

21

Notes, $23,500,000; Class M-1 Notes, $56,500,000; Class M-2 Notes, $50,850,000; Class B-1 Notes, $45,200,000 and, Class B-2 Notes, $28,250,000.

Other Fees:  With respect to any Distribution Date, amounts in respect of reasonable fees and expenses due to any provider of services to the Trust and the Grantor Trust, except the Grantor Trustee, Owner Trustee, Indenture Trustee, Servicer, Claims Administrator, Contract of Insurance Holder and also except any Person, the fees of which are required by this Agreement to be paid by the Servicer, the Grantor Trustee, Claims Administrator, Contract of Insurance Holder, the Owner Trustee or the Indenture Trustee without such payor being entitled to reimbursement hereunder, but including such amounts payable to the successor Servicer pursuant to Section 10.03(c).

Overcollateralization Amount:  As of any Distribution Date, the positive difference, if any, between (x) the Pool Balance as of the last day of the related Due Period and (y) the Aggregate Note Balance (after taking into account all distributions of principal on such Distribution Date).

Overcollateralization Deficiency:  means, with respect to any Distribution Date, the excess, if any, of the Targeted Overcollateralization Amount for such Distribution Date over the Overcollateralization Amount for such Distribution Date (the Overcollateralization Amount to be determined, for purposes of this definition, before giving effect to payments on such Distribution Date in respect of 5.01(e)(iii).

Overcollateralization Release Amount:  means with respect to any Distribution Date the excess, if any, of the Overcollateralization Amount for such Distribution Date over the Targeted Overcollateralization Amount.

Ownership Interest:  As to any Security, any ownership or security interest in such Security, including any interest in such Security as the holder thereof and any other interest therein, whether direct or indirect, legal or beneficial, as owner or as pledgee.

Owner Trustee:  First Union Trust Company, National Association, not in its individual capacity but solely as owner trustee under the Trust Agreement, and any successor owner trustee under the Trust Agreement.

Owner Trustee Fee:  $2,500 initial fee and $2,500 annual fee.

Paying Agent:  As defined in Section 4.07.

Payment:  With respect to any Loan or the related Foreclosed Property and any Determination Date or the related Due Period, all amounts received or collected by the Servicer during such Due Period in respect of such Loan or Foreclosed Property from whatever source, including, without limitation, amounts received or collected from or representing:

(i)     the related Obligor;

98-P201271

(ii)     the application to amounts due on such Loan (or, in the case of any Foreclosed Property, to amounts previously due on the related Foreclosed Loan), of any related Insurance Proceeds, any related condemnation awards or settlements or any payments made by any related guarantor or third-party credit-support provider;

(iii)    FHA Insurance Payment Amounts with respect to such Loan;

(iv)    the sale of such Loan;

(v)     the operation or sale of the related Foreclosed Property;

(vi)    the Purchase Price with respect to such Loan;

(vii)   amounts deposited into the Note Distribution Account pursuant to 11.01(b); or

Percentage Interest:  As defined in the Trust Agreement.

Person:  Any individual, corporation, partnership, joint venture, limited liability company, association, joint-stock company, trust, national banking association, unincorporated organization or government or any agency or political subdivision thereof.

Physical Security:  As defined in Section 5.05(a).

Placement Agents:  Bear, Stearns & Co. Inc. and Coast Partners Securities, Inc.

Pool Balance:  With respect to any date of determination, the sum of the Principal Balances for all Loans as of the end of the related Due Period plus the Pre-Funded Amount, if any.

Portability Fee:  Transfer fee, not to exceed 2.0% of the existing principal balance of the Loan at the time of exercise of the Portability Option, payable by or on behalf of an Obligor in connection with the exercise of a Portability Option but not including third party appraisal fees or incidental fees or costs associated with the transfer of the lien to the new Property, which fees or costs are payable by the Obligor or the Servicer to third parties.

Portability Option:  A provision in the Debt Instrument or Mortgage granting the related Obligor the option to secure the Loan with real property in substitution of the Mortgaged Property securing the Loan at its origination.

Precomputed Loan:  Any Loan which, under the terms of the related Debt Instrument, is an actuarial loan, which allocates a fixed portion of each Monthly Payment to accrued interest (30 days), regardless of when such Monthly Payment is made.

98-P201272

23

$1,000 per month in connection with the performance of its duties pursuant to <u>Section 2.05(b)</u> and $500 per month in connection with the performance of its duties pursuant to <u>Section 7.02(e)</u>.

<u>Property</u>: The property (real, personal or mixed) encumbered by the Mortgage which secures the Debt Instrument evidencing a secured Loan at the time of origination of such Loan or, if a Portability Option has been exercised, at the time such option is exercised.

<u>Purchase Agreement</u>: The purchase agreement dated August 28, 1998 by and between the Placement Agents and Keystone.

<u>Purchase Price</u>: With respect to a Loan, means the Principal Balance of such Loan as of the date of purchase, plus unpaid accrued interest at the related Loan Rate to the last day of the month in which such purchase occurs.

<u>Purchased Loan</u>: As of any Monthly Cut-Off Date, any Loan (including any Defaulted Loan) that became subject to purchase or repurchase pursuant to <u>Section 3.05</u>, <u>Section 4.10</u> or <u>Section 4.12</u>, and, in each case, as to which the Purchase Price has been deposited in the Note Distribution Account by the Seller or the Servicer, as applicable.

<u>Rating Agency or Rating Agencies</u>: Each of (i) Moody's and (ii) Fitch or, if such organization or successor is no longer in existence, "Rating Agency" shall be a nationally recognized statistical rating organization or other comparable person designated by the Trust, notice of which designation shall have been given to the Owner Trustee, the Indenture Trustee and the Servicer.

<u>Ratings</u>: The ratings initially assigned to the Notes and the Certificates by the Rating Agencies, as evidenced by letters from the Rating Agencies.

<u>Realized Losses</u>: With respect to any Loan that becomes a Liquidated Loan, the amount by which the Principal Balance thereof immediately prior to such Loan becoming a Liquidated Loan exceeds the proceeds (net of related expenses and reimbursements), including Insurance Proceeds and FHA Insurance Payment Amount, that are allocable to principal of such Loan applying such proceeds first to accrued and unpaid interest and are received by the Servicer in connection with the liquidation or the disposition of the related Property.

<u>Record Date</u>: With respect to (i) the initial Distribution Date and all Notes, the Closing Date and (ii) each subsequent Distribution Date and all Notes, the last day of the month immediately preceding the month in which the related Distribution Date occurs.

<u>Reference Bank Rate</u>: The rate determined on the basis of the rates at which deposits in U.S. Dollars are offered by the reference banks (which shall be three major banks that are engaged in transactions in the London interbank market, selected by the Servicer after consultation with the Indenture Trustee) as of 11:00 A.M., London time, on the day that is two LIBOR Business Days prior to the immediately preceding Distribution Date to prime banks in the London interbank market for a period of one month in amounts approximately equal to the

98-P201273

Class A-1 Note Balance. The Indenture Trustee will request the principal London office of each of the reference banks to provide a quotation of its rate. If at least two such quotations are provided, the rate will be the arithmetic mean of the quotations. If on such date fewer than two quotations are provided as requested, the rate will be the arithmetic mean of the rates quoted by one or more major banks in New York City, selected by the Indenture Trustee after consultation with the Servicer, as of 11:00 A.M., New York City time, on such date for loans in U.S. Dollars to leading European banks for a period of one month in amounts approximately equal to the Class A-1 Note Balance. If no such quotations can be obtained, the rate will be LIBOR for the prior Distribution Date.

Rejected Claim: With respect to any FHA Loan, a claim for payment made to the FHA under the Contract of Insurance that has been finally rejected after all appeals with FHA have been exhausted for any reason (including a rejection of a previously paid claim and a demand by the FHA of a return of the FHA Insurance Payment Amount for the related FHA Loan) other than a refusal or rejection due to clerical error in computing the claim amount or because the amount of the FHA Insurance Coverage Reserve Account as shown in the Insurance Record is zero.

Related Series Loans: The FHA Title I loans related to a Related Series Trust which: (i) are sold by the Seller or The First National Bank of Keystone to a trust, and (ii) the Title I insurance coverage attributable to which is made available to cover claims with respect to such loans by virtue of terms relating to the administration of the FHA Insurance Coverage Reserve Account substantially similar to the terms hereof.

Related Series Trusts: The Keystone Home Improvement Loan Trust 1997-P2, Keystone Owner Trust 1997-P3, Keystone Home Improvement Loan REMIC Trust 1997-P4, Keystone Owner Trust 1998-P1 and the Grantor Trust together with certain subsequent series of trusts to which Title I Loans are sold directly or indirectly by the Seller or The First National Bank of Keystone, established pursuant to pooling and servicing agreements, this Agreement and other indentures and with respect to which U.S. Bank Trust National Association is the Contract of Insurance Holder and either Republic Bank, Ocwen Federal Bank, FSB or Norwest Bank Minnesota, National Association serves as Servicer or Master Servicer and Claims Administrator.

Responsible Officer: When used with respect to the Servicer, Grantor Trustee or the Indenture Trustee, any officer of the Servicer or any officer within the Corporate Trust Office of the Grantor Trustee or the Indenture Trustee, respectively, including with respect to each, any Vice President, Assistant Vice President, Secretary, Assistant Secretary or any other officer of the Indenture Trustee, Grantor Trustee or Servicer customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject. When used with respect to the Trust and the Grantor Trust, any officer in the Corporate Trust Administration Department of the Owner Trustee or the Grantor Trustee, respectively, with direct responsibility for the administration of the Trust

98-P201274

Agreement and this Agreement on behalf of the Trust or the Grantor Trust Agreement, respectively.

Rolling Six-Month Delinquency Average: With respect to any Distribution Date, the average of the applicable 60-Day Delinquency Amounts for each of the six immediately preceding Due Periods. As used herein, the "60-Day Delinquency Amount" for any Due Period is the aggregate of the Principal Balances of all Loans that are 60 or more days delinquent, in foreclosure or Foreclosed Property as of the end of such Due Period, excluding any Liquidated Loan.

Rolling Six-Month Delinquency Rate: As of any Distribution Date, the fraction, expressed as a percentage, equal to the average of the Delinquency Rate for each of the six(or one, two, three, four and five in the case of the first, second, third, fourth and fifth Distribution Dates) immediately preceding Due Periods.

SAIF: The Savings Association Insurance Fund, as from time to time constituted, created under the Financial Institutions Reform, Recovery and Enforcement Act of 1989, or if at any time after the execution of this instrument the Savings Association Insurance Fund is not existing and performing duties now assigned to it, the body performing such duties on such date.

Securities: The Notes and/or the Certificates, as applicable.

Securities Act: The Securities Act of 1933, as amended.

Securityholder: A holder of a Note or Certificate, as applicable.

Seller or Keystone: Keystone Mortgage Corp., Inc., a West Virginia corporation.

Senior Notes: The Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Notes.

Senior Optimal Note Balance: With respect to any Distribution Date prior to the Stepdown Date, zero; with respect to any other Distribution Date, an amount equal to the Pool Balance as of the preceding Determination Date minus the greater of (a) 64.00% of the Pool Balance as of the preceding Determination Date plus the Targeted Overcollateralization Amount for such Distribution Date (without giving effect to the proviso in the definition thereof) and (b) 0.50% of the Initial Pool Balance.

Servicer: Republic Bank, a Florida-chartered commercial bank, its successors in interest or any successor servicer appointed as herein provided.

Servicer Certificate: As defined in Section 6.01.

Servicing Fee: With respect to any Distribution Date, an amount equal to the Servicing Fee Rate times the aggregate Principal Balance of the Loans, as of the close of business on the last day of the second calendar month before such Distribution Date (or the Initial Cut-Off Date,

98-P201275

27

in the case of the first Distribution Date), which amount includes the fees payable to the Servicer as Claims Administrator hereunder.

Servicing Fee Rate: 1.31% per annum.

Servicer Termination Event: Any event specified in Section 10.01.

Servicing Officer: Any officer of the Servicer responsible for the administration and servicing of the Loans whose name and specimen signature appears on a list of servicing officers furnished to the Grantor Trustee by the Servicer, as such list may from time to time be amended.

Servicing Record: The records maintained by the Servicer pursuant to Section 4.03.

Servicing Standard: The standard set forth in Section 4.01(a).

Simple Interest Loan: Any Loan with respect to which the portion of each payment allocable to interest or to principal under the related Debt Instrument is determined in accordance with the Simple Interest Method.

Simple Interest Method: The method of allocating the Monthly Payments received with respect to a Loan to interest in an amount equal to the product of (i) the applicable Loan Rate, (ii) the period of time (expressed as a fraction of a year, based on the actual number of days in the calendar month and 365 days in the calendar year) elapsed since the preceding payment was made under such Loan and (iii) the outstanding principal amount of the Loan, and allocating the remainder of such Monthly Payment to principal.

60-Day Delinquency Amount: With respect to any Due Period, is the aggregate of the Principal Balances of all Loans that are 60 or more days delinquent, in foreclosure or Foreclosure Property as of the end of such Due Period, excluding any Liquidated Loan.

Stepdown Date: means the first Distribution Date occurring after October 2001 as to which the aggregate of the Note Balances of the Senior Notes has been reduced to the excess of (a) the Pool Balance as of the preceding Determination Date over (b) the greater of (i) 64.00% of the Pool Balance as of the preceding Determination Date plus the greater of (x) 16.00% of the Pool Balance as of the immediately proceeding Determination Date and (y) the Net Delinquency Calculation Amount and (ii) 0.50% of the Initial Pool Balance.

Subordinate Notes: The Class M and Class B Notes.

Subsequent Cut-Off Date:  With respect to any Subsequent Loans, the date specified in the Subsequent Transfer Agreement.

Subsequent Loan Schedule: As of any date of determination, each schedule that is identified as a schedule of Subsequent Loans and is attached to a Subsequent Transfer Agreement.

98-P201276

Subsequent Loans:  The Mortgage Loans identified on a Subsequent Loan Schedule.

Subsequent Transfer Agreement:  Each Subsequent Transfer Agreement entered into between the Seller and the Grantor Trustee and substantially in the form attached as Exhibit F hereto.

Subsequent Transfer Date:  With respect to any Subsequent Loans, the date such Loans are conveyed to the Grantor Trust pursuant to the related Subsequent Transfer Agreement.

Substitution Adjustment Amount:  The meaning assigned to such term in Section 3.05.

Substitution Date:  As defined in Section 3.05.

Substitute Loan:  A Loan: (i) having characteristics such that the representations and warranties that are made pursuant to Section 3.03(b) are true and correct as of the date of substitution with respect to such Substitute Loan; (ii) each Monthly Payment with respect to such Substitute Loan shall be greater than or equal to the Monthly Payment due in the same Due Period on the Loan for which such Substitute Loan is being substituted; (iii) the Maturity Date with respect to such Substitute Loan shall be no later than one year later than the Maturity Date of the Loan for which such Substitute Loan is being substituted and in no event later than December 25, 2028; (iv) as of the date of substitution, the Principal Balance of such Substitute Loan is not more or less than the Principal Balance of the Loan for which such Substitute Loan is being substituted by more than 1%; (v) the Loan Rate with respect to such Substitute Loan is at least equal to the Loan Rate of the Loan for which such Substitute Loan is being substituted; and (vi) that is an FHA Loan if the Loan for which it is being substituted is an FHA Loan; provided, however, in the event that more than one Substitute Loan is being substituted for one or more Defective Loans on any date, then (i) the weighted average Loan Rate for such Substitute Loans must equal or exceed the weighted average Loan Rate of the Defective Loans immediately prior to giving effect to the substitution, in each case weighted on the basis of the outstanding Principal Balance of such Substitute Loans and Defective Loans, respectively, as of such day, (ii) the sum of the Monthly Payments with respect to such Substitute Loans shall be greater than or equal to the Monthly Payments due in the same Due Period on the Defective Loans for which a substitution is being made, (iii) as of the date of substitution, the aggregate Principal Balances of such Substitute Loans are not more or less than the aggregate Principal Balances of the Defective Loans for which such a substitution is being made by more than 1% and (iv) as of the date of substitution, such Substitute Loan(s) will not cause 55% or more (by Pool Balance) of the Loans to not constitute "real estate mortgages" for the purpose of Treasury Regulations §§ 301.770(i)-1(d) under the Code.

Targeted Overcollateralization Amount:  means with respect to any Distribution Date occurring prior to the Stepdown Date, an amount equal to the greater of (x) 8.00% of the Initial Pool Balance and (y) the Net Delinquency Calculation Amount; with respect to any other Distribution Date, an amount equal to the greater of (x) 16.00% of the Pool Balance as of the end of the related Due Period and (y) the Net Delinquency Calculation Amount; provided, however,

98-P201277

that the Targeted Overcollateralization Amount will in no event be less than 0.50% of the Initial Pool Balance.

Termination Date: The earlier of (a) the Distribution Date in January, 2029 and (b) the Distribution Date next following the Monthly Cut-Off Date coinciding with or next following the date of the liquidation or disposition of the last asset held by the Grantor Trust pursuant to Sections 4.13 or 11.01.

Termination Price: As defined in Section 11.01(b).

Title Document: The evidence of title to or ownership of the Property required by Title I. (See 24 C.F.R. 201.26(a)(1) and 201.20).

Title I: Section 2 of Title I of the National Housing Act of 1934, as amended, and the rules and regulations promulgated thereunder as each may be amended from time to time and any successor statute, rules or regulations thereto.

Transaction Documents: This Agreement, the Grantor Trust Agreement, the Trust Agreement, the Indenture and the Administration Agreement.

Transfer of Note Report: With respect to a Loan, the report complying with Title I filed with HUD, Office of Mortgage Insurance Accounting and Servicing pursuant to 24 CFR Section 201.30 advising such Office of the transfer of the Loan, the related Note, and any related Mortgage to the Person specified therein.

Trust: Keystone Owner Trust 1998-P2.

Trust Account Property: The Trust Accounts, all amounts and investments held from time to time in any Trust Account and all proceeds of the foregoing.

Trust Accounts: The Note Distribution Account, the Certificate Distribution Account and the Capitalized Interest Account.

Trust Agreement: The Trust Agreement dated as of August 31, 1998, between the Owner Trustee and Keystone.

Trust Designated Insurance Amount: $1,964,656.61 transferred to the Insurance Coverage Reserve Account on the Closing Date in connection with the transfer of Initial Loans which are FHA Loans to the Grantor Trustee on such date, together with additional amounts transferred to the Insurance Coverage Reserve Account on Subsequent Transfer Dates with respect to FHA Loans included in the Subsequent Loans transferred to the Grantor Trustee on such dates.

Trust Estate: As defined in Section 2.02(a).

98-P201278

Twelve-Month Loss Amount:  With respect to any Distribution Date, an amount equal to the aggregate of all Realized Losses on the Mortgage Loans during the 12 immediately preceding Due Periods.

UCC:  The Uniform Commercial Code as enacted in the applicable jurisdiction.

Underwriting Guidelines: As described in Exhibit D.

Write-Down Interest Amount:  With respect to any Distribution Date, the interest accrued on any Principal Write-Down Amount allocated to a Class of Subordinate Notes at the related Note Rate for the related Accrual Period plus the amount of any such accrued and unpaid Write-Down Interest Amount on prior Distribution Dates.

Section 1.02.  Other Definitional Provisions.

(a)    Capitalized terms used herein and not otherwise defined herein have the meanings assigned to them in the Indenture or, if not defined therein, in the Trust Agreement.

(b)    All terms defined in this Agreement shall have the defined meanings when used in any certificate or other document made or delivered pursuant hereto unless otherwise defined therein.

(c)    As used in this Agreement and in any certificate or other document made or delivered pursuant hereto or thereto, accounting terms not defined in this Agreement or in any such certificate or other document, and accounting terms partly defined in this Agreement or in any such certificate or other document to the extent not defined, shall have the respective meanings given to them under generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Agreement or in any such certificate or other document are inconsistent with the meanings of such terms under generally accepted accounting principles, the definitions contained in this Agreement or in any such certificate or other document shall control.

(d)    The words "hereof," "herein," "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement; Article, Section, Schedule and Exhibit references contained in this Agreement are references to Articles, Sections, Schedules and Exhibits in or to this Agreement unless otherwise specified; and the term "including" shall mean "including without limitation."

(e)    The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

(f)    Any agreement, instrument or statute defined or referred to herein or in any instrument or certificate delivered in connection herewith means such agreement, instrument or statute as from time to time amended, modified or supplemented and includes (in the case of

98-P201279

·31

agreements or instruments) references to all attachments thereto and instruments incorporated therein; references to a Person are also to its permitted successors and assigns.

Section 1.03. Interest Calculations.

All calculations of interest that are made in respect of the Principal Balance of a Simple Interest Loan shall be made on the basis of a 365-day year and the actual number of days elapsed. All calculations of interest that are made in respect of the Principal Balance of a Precomputed Loan shall be made on the basis of a 360-day year consisting of twelve 30-day months. The Note Rate for the Class A-1 Notes shall be calculated on the basis of a 360-day year and the actual number of days elapsed. The Note Rate for the Notes, other than the Class A-1 Notes, shall be calculated on the basis of a 360-day year consisting of twelve 30-day months. The calculation of the Servicing Fee, the Grantor Trustee Fee, the Owner Trustee Fee and the Indenture Trustee Fee shall be made on the basis of a 360-day year consisting of twelve 30-day months. All dollar amounts calculated hereunder shall be rounded to the nearest penny with one-half of one penny being rounded down.

ARTICLE II

CONVEYANCE OF THE INITIAL LOANS

Section 2.01. Conveyance of the Loans.

(a)     In consideration of the Grantor Trust's delivery of the Grantor Trust Certificate to the Seller or its designee, upon the order of the Seller, the Seller, as of the Closing Date and each Subsequent Transfer Date and concurrently with the execution and delivery hereof, does hereby sell, transfer, assign, set over and otherwise convey to the Grantor Trust, without recourse, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Seller in and to the following: (i) such Loans as from time to time are owned by the Seller and identified on the Initial Loan Schedule and each Subsequent Loan Schedule, including Substitute Loans added to the Grantor Trust from time to time, together with the Legal Files and the Credit Files relating thereto and all proceeds thereof, (ii) the related Mortgages and security interests in Properties, (iii) all payments of principal in respect of Loans received after the applicable Cut-Off Dates and payments of interest in respect of Loans received after the applicable Cut-Off Dates (exclusive of interest due on or before September 15, 1998), (iv) the rights to FHA Insurance reserves attributable to the FHA Loans as of the applicable Cut-Off Dates, (v) such assets as from time to time are identified as Foreclosed Property, (vi) such assets and funds as are from time to time deposited in the Collection Account, the Pre-Funding Account and the FHA Premium Account, including amounts on deposit in such accounts which are invested in Eligible Investments, (vii) the Seller's rights under the related Insurance Policies and any Insurance Proceeds and (viii) all proceeds of the foregoing (collectively, the "Grantor Trust Estate"). The foregoing sale, transfer, assignment, set over and conveyance does not and is not intended to result in a creation or an assumption by the Grantor Trust of any obligation of the Seller or any other person in connection with the Grantor Trust Estate or under any agreement or instrument relating thereto except as specifically set forth herein.

98-P201280

32

(b)     As of the Closing Date, the Grantor Trustee acknowledges the conveyance to it of the assets described above in Section 2.01(a), including from the Seller all right, title and interest of the Seller in and to the Grantor Trust Estate, receipt of which is hereby acknowledged by the Grantor Trustee, and the acceptance of which is made in good faith and without notice or knowledge of any adverse claims or liens. Concurrently with such delivery on the Closing Date and in exchange therefor, the Grantor Trustee, pursuant to the instructions of the Seller, has executed (not in its individual capacity, but solely as Grantor Trustee on behalf of the Grantor Trust) and caused to be authenticated and delivered the Grantor Trust Certificate to the Seller or its designee, upon the order of the Seller.

Section 2.02.  Conveyance of the Grantor Trust Certificate.

(a)     In consideration of the Trust's delivery of the Notes and Certificates to the Seller or its designee, upon the order of the Seller, the Seller, as of the Closing Date and concurrently with the execution and delivery hereof, does hereby sell, transfer, assign, set over and otherwise convey to the Trust, without recourse, but subject to the other terms and provisions of this Agreement, all of the right, title and interest of the Seller in and to the following: (i) the Grantor Trust Certificate and all payments of principal and interest in respect thereof received after the Closing Date, (ii) such assets and funds as are from time to time deposited in the Note Distribution Account, the Certificate Distribution Account and the Capitalized Interest Account, including amounts on deposit in such accounts which are invested in Eligible Investments and (iii) all proceeds of the foregoing (collectively, the "Trust Estate"). The foregoing sale, transfer, assignment, set over and conveyance does not and is not intended to result in a creation or an assumption by the Trust of any obligation of the Seller or any other person in connection with the Trust Estate or under any agreement or instrument relating thereto except as specifically set forth herein.

(b)     As of the Closing Date, the Trust acknowledges the conveyance to it of the assets described above in Section 2.02(a), including from the Seller all right, title and interest of the Seller in and to the Trust Estate, receipt of which is hereby acknowledged by the Trust, and the acceptance of which is made in good faith and without notice or knowledge of any adverse claims or liens. Concurrently with such delivery and in exchange therefor, the Trust has pledged to the Indenture Trustee the Indenture Trust Estate, and the Indenture Trustee, pursuant to the written instructions of the Trust, has executed and caused to be authenticated and delivered the Notes to the Seller or its designee, upon the order of the Trust. In addition, concurrently with such delivery and in exchange therefor, the Owner Trustee, pursuant to the instructions of the Seller, has executed (not in its individual capacity, but solely as Owner Trustee on behalf of the Trust) and caused to be authenticated and delivered the Certificates to the Seller or its designee, upon the order of the Seller.

Section 2.03.  Ownership and Possession of Files.

As components of the Grantor Trust Estate and pursuant to Sections 2.01(a) and (b), the related Mortgage and the contents of the related Credit File and the related Legal File shall be vested in the Grantor Trust, although possession of the Credit Files (other than items required to

98-P201281

be maintained in the Legal Files) on behalf of and for the benefit of the holder of the Grantor Trust Certificate shall remain with the Seller, and the Grantor Trustee shall take possession of the Legal Files as contemplated in Section 2.06.

Section 2.04. Books and Records.

(a)    The sale of each Loan shall be reflected on the Seller's balance sheets and other financial statements as a sale of assets by the Seller, as the case may be, under generally accepted accounting principles ("GAAP"). The Servicer shall maintain, or cause to be maintained pursuant to Section 4.03, a complete set of books and records for each Loan which shall be clearly marked to reflect the ownership of each Loan by the Grantor Trust.

(b)    It is the intention of the parties hereto that (i) the transfers and assignments contemplated by this Agreement shall constitute a sale of the Loans and the other property specified in Sections 2.01(a) and 2.07(a)from the Seller to the Grantor Trust and (ii) such property shall not be property of the Seller. If the assignment and transfer of the Loans and the other property specified in Sections 2.01(a) and 2.07(a) to the Grantor Trust pursuant to this Agreement or the conveyance of the Loans or any of such other property to the Grantor Trust is held or deemed not to be a sale or is held or deemed to be a pledge of security for a loan, the Seller intends that the rights and obligations of the parties shall be established pursuant to the terms of this Agreement and that, in such event, (1) the Seller shall be deemed to have granted and does hereby grant to the Grantor Trust a first priority security interest in the entire right, title and interest of the Seller in and to the Loans and all other property conveyed to the Grantor Trust pursuant to Section 2.01 and Section 2.07 and all proceeds thereof, and (2) this Agreement shall constitute a security agreement under applicable law. Within five days of the Closing Date and each Subsequent Transfer Date, the Seller shall cause to be filed UCC-1 financing statements naming the Grantor Trust as "secured party" and describing the Loans being sold by the Seller to the Grantor Trust with the office of the Secretary of State of the State in which the Seller is located.

(c)    It is the intention of the parties hereto that (i) the transfers and assignments contemplated by this Agreement shall constitute a sale of the Grantor Trust Certificate and the other property specified in Section 2.02(a) from the Seller to the Trust, (ii) such property shall not be property of the Seller and (iii) the Notes will be treated as indebtedness of the Trust secured by the Grantor Trust Certificate for federal income tax purposes. If the assignment and transfer of the Grantor Trust Certificate and the other property specified in Section 2.02(a) to the Trust pursuant to this Agreement or the conveyance of the Grantor Trust Certificate or any of such other property to the Trust is held or deemed not to be a sale or is held or deemed to be a pledge of security for a loan, the Seller intends that the rights and obligations of the parties shall be established pursuant to the terms of this Agreement and that, in such event, (1) the Seller shall be deemed to have granted and does hereby grant to the Trust a first priority security interest in the entire right, title and interest of the Seller in and to the Grantor Trust Certificate and all other property conveyed to the Trust pursuant to Section 2.02 and all proceeds thereof, and (2) this Agreement shall constitute a security agreement under applicable law. Within five days of the

98-P201282

34

Closing Date, the Seller shall cause to be filed UCC-1 financing statements naming the Trust as "secured party" and describing the Grantor Trust Certificate being sold by the Seller to the Trust with the office of the Secretary of State of the State in which the Seller is located.

Section 2.05.  Delivery of Loan Documents and the Grantor Trust Certificate.

(a)    With respect to each Loan, on the Closing Date and on each Subsequent Transfer Date, as applicable, the Seller, at the direction of the Grantor Trustee, shall have delivered or caused to be delivered to the Grantor Trustee each of the following documents (collectively, the "Legal Files"):

(A)    With respect to each Mortgage Loan:

(i)    The original Debt Instrument for each Mortgage Loan, showing a complete chain of endorsements or assignments from the named payee to the Grantor Trust and endorsed without recourse to the order of the U.S. Bank Trust National Association as Grantor Trustee for the Grantor Trust;

(ii)    With respect to each Mortgage Loan, the original Mortgage with evidence of recording indicated thereon (except that a true copy thereof certified by an appropriate public official may be substituted); provided, however, that if the Mortgage with evidence of recording thereon cannot be delivered concurrently with the execution and delivery of this Agreement solely because of a delay caused by the public recording office where such Mortgage has been delivered for recordation, there shall be delivered to the Grantor Trustee a copy of such Mortgage certified as a true copy in an Officer's Certificate, which Officer's Certificate shall certify that such Mortgage has been delivered to the appropriate public recording office for recordation, and there shall be promptly delivered to the Grantor Trustee such Mortgage with evidence of recording indicated thereon upon receipt thereof from the public recording official (or a true copy thereof certified by an appropriate public official may be delivered to the Grantor Trustee);

(iii)    With respect to each Mortgage Loan, the original assignment of Mortgage to U.S. Bank Trust National Association as Grantor Trustee in recordable form. Such assignments may be blanket assignments, to the extent such assignments are effective under applicable law, for Mortgage Loans covering Mortgaged Properties situated within the same county. If the assignment of Mortgage is in blanket form an assignment of Mortgage need not be included in the individual Mortgage File;

(iv)    With respect to each Mortgage Loan, all original intermediate assignments of the Mortgage, with evidence of recording thereon (or true copies thereof certified by appropriate public officials may be substituted); provided, however, that if the intermediate assignments of Mortgage with evidence of recording thereon cannot be delivered concurrently with the execution and delivery of this Agreement solely because of a delay caused by the public recording office where such assignments of Mortgage

98-P201283

35

have been delivered for recordation, there shall be delivered to the Grantor Trustee a copy of each such assignment of Mortgage certified as a true copy in an Officer's Certificate, which Officer's Certificate shall certify that each such assignment of Mortgage has been delivered to the appropriate public recording office for recordation, and there shall be promptly delivered to the Grantor Trustee such assignments of Mortgage with evidence of recording indicated thereon upon receipt thereof from the public recording official (or true copies thereof certified by an appropriate public official may be delivered to the Grantor Trustee); and

    (v)    An original of each assumption or modification agreement, if any, relating to such Loan; and

    (B)    With respect to each Contract:

    (i)    The original Contract stamped as follows: "This Contract has been assigned to U.S. Bank Trust National Association, as Grantor Trustee to Keystone Grantor Trust 1998-P2, or to any successor Grantor Trustee thereunder";

    (ii)    The original title document for the related Manufactured Home or a duplicate certified by the appropriate governmental authority which issued the original thereof or the application for such title document or, if the laws of the jurisdiction in which the related Manufactured Home is located do not provide for the issuance of title documents for manufactured housing, other evidence of ownership of the related Manufactured Home which is customarily relied upon in such jurisdiction as evidence of title to a manufactured housing unit;

    (iii)    Evidence of one or more of the following types of perfection of the security interest in the related Manufactured Home granted by such Contract, as appropriate: (a) notation of such security interest on the title document, (b) a financing statement meeting the requirements of the UCC, with evidence of recording indicated thereon, or (c) such other evidence of perfection of a security interest in a manufactured housing unit as is customarily relied upon in the jurisdiction in which the related Manufactured Home is located;

    (iv)    The assignment of the Contract to the Grantor Trustee (which may be in a blanket form that also covers other Contracts);

    (v)    Any extension, modification or waiver agreements;

    (vi)    With respect to any Land-and-Home Contract, the original Mortgage with evidence of recording indicated thereon; provided, however, that if the Mortgage with evidence of recording thereon cannot be delivered concurrently with the execution and delivery of this Agreement solely because of a delay

98-P201284

caused by the public recording office where such Mortgage has been delivered for recordation, there shall be delivered to the Grantor Trustee a copy of such Mortgage certified as a true copy in an Officer's Certificate, which Officer's Certificate shall certify that such Mortgage has been delivered to the appropriate public recording office for recordation, and there shall be promptly delivered to the Grantor Trustee such Mortgage with evidence of recording indicated thereon upon receipt thereof from the public recording official (or a true copy thereof certified by an appropriate public official may be delivered to the Grantor Trustee); and

(vii)    With respect to any Land-and-Home Contract, the original assignment of Mortgage to the Grantor Trustee, in recordable form. Such assignments may be blanket assignments, to the extent such assignments are effective under applicable law, for Mortgage Loans covering Mortgaged Properties situated within the same county. If the assignment of Mortgage is in blanket form an assignment of Mortgage need not be included in the individual Mortgage File.

(b)    With respect to each Loan, on the Closing Date or Subsequent Transfer Date, as applicable, the Seller shall hold in custody, as the designated agent of the Grantor Trustee, each of the following documents (collectively, the "Credit Files"): (A) An original or copy of notice signed by the Obligor acknowledging HUD insurance in the case of each FHA Loan, (B) an original or copy of truth-in-lending disclosure, (C) an original or copy of the credit application, (D) an original or copy of the consumer credit report, (E) an original or copy of verification of employment and income or verification of self-employment income, (F) with respect to each FHA Loan that is a Mortgage Loan or Land-and-Home Contract, an original or copy of evidence of the Obligor's interest in the Property, (G) an original or copy of contract of work or written description of work with cost estimates, (H) an original or copy of the completion certificate, provided, however, that such certificate shall be delivered to the Grantor Trustee within the time period required under Title I for the preparation of such certificate, (I) with respect to each FHA Loan that is a Mortgage Loan or Land-and-Home Contract, an original or copy of the report on inspection of improvements to the Mortgaged Property provided, however, that such report shall be delivered to the Grantor Trustee within the time period required under Title I for the preparation of such report, (J) with respect to each FHA Loan that is a Mortgage Loan or Land-and-Home Contract, an original or copy of notice of non-compliance, if applicable, provided, however, that such notice shall be delivered to the Grantor Trustee within the time period required under Title I for the preparation of such notice, (K) to the extent not included in (C), an original or a copy of a written verification that the Mortgagor at the time of origination of the Loan was not more than 30 days delinquent on any senior mortgage or deed of trust on the Property, (L) with respect to each Loan for which an appraisal is required pursuant to the applicable FHA regulations, an original or a copy of an appraisal of the Property as of the time of origination of the Loan, (M) if such Loan is a Mortgage Loan or Land-and-Home Contract, and in the case of FHA Loans if required by FHA regulations, an original or a copy of a title search

98-P201285

as of the time of origination with respect to the Mortgaged Property, and (N) any other documents required for the submission of a claim with respect to each FHA Loan to the FHA.

(c)    The Seller, on the Closing Date and each Subsequent Transfer Date, has delivered to the Grantor Trustee cash in an amount equal to (i) the accrued annual FHA premium due on each FHA Loan to the applicable Cut-Off Date, and (ii) the amount of FHA premium collected in respect of the Invoiced Loans after the applicable Cut-Off Date. The Grantor Trustee shall deposit the amount referred to in clause (ii) of the previous sentence into the FHA Premium Account and shall deposit the amount referred to in clause (i) of the previous sentence into the Collection Account.

(d)    The Grantor Trustee shall take and maintain continuous physical possession of the Legal Files in the State of Minnesota, and in connection therewith, shall act solely as agent for the holder of the Grantor Trust Certificate in accordance with the terms hereof and not as agent for the Seller or any other party.

(e)    Within 60 days of the Closing Date or the Subsequent Transfer Date, as applicable, the Grantor Trustee shall, at the Seller's expense, record each Assignment of Mortgage (which may be a blanket assignment if permitted by applicable law) in the appropriate real property or other records; provided, however, the Grantor Trustee need not cause to be recorded any such Assignment of Mortgage which relates to a Mortgage Loan in any jurisdiction under the laws of which, as evidenced by an Opinion of Counsel delivered by the Seller (at the Seller's expense) to the Grantor Trustee, and the Rating Agencies, the recordation of such Assignment of Mortgage is not necessary to protect the Grantor Trustee's interest in the related Mortgage Loan against the claims of any subsequent transferee or any creditor of the Seller. With respect to any Assignment of Mortgage as to which the related recording information is unavailable within 60 days following the Closing Date or the Subsequent Transfer Date, as applicable, such Assignment of Mortgage shall be submitted for recording within 30 days after receipt of such information but in no event later than one year after the Closing Date or Subsequent Transfer Date, as applicable. The Grantor Trustee shall be required to retain a copy of each Assignment of Mortgage submitted for recording. In the event that any such Assignment of Mortgage is lost or returned unrecorded because of a defect therein, the Seller shall promptly prepare a substitute Assignment of Mortgage or cure such defect, as the case may be, and thereafter the Grantor Trustee shall be required to submit each such Assignment of Mortgage Loan for recording.

(f)    On the Closing Date, the Seller shall have delivered or caused to be delivered to the Indenture Trustee, the Grantor Trust Certificate. The Indenture Trustee shall take and maintain continuous physical possession of the Grantor Trust Certificate in the State of Minnesota until this Agreement is terminated pursuant to the provisions of Section 11.01 hereof and until the satisfaction and discharge of the Indenture pursuant to Section 4.1 thereof.

98-P201286

Section 2.06.  Acceptance by Grantor Trustee of the Loans; Certain Substitutions; Initial Certification.

(a)     The Grantor Trustee agrees to execute and deliver on the Closing Date an acknowledgment of receipt of the Legal File for each Initial Loan and on each Subsequent Transfer Date an acknowledgment of receipt of the Legal File for each Subsequent Loan.  The Grantor Trustee declares that it will hold such documents and any amendments, replacements or supplements thereto, as well as any other assets included in the Trust Estate, upon and subject to the conditions set forth herein for the benefit of the holder of the Grantor Trust Certificate in good faith and without notice of any adverse claims or liens.  The Grantor Trustee agrees, for the benefit of the holder of the Grantor Trust Certificate to review each Legal File within 45 Business Days after the Closing Date (or, with respect to any Subsequent Loan or Substitute Loan, within 45 days after the conveyance of the related Loan to the Grantor Trust) and to deliver to the Seller, the Grantor Trust Certificateholder and the Servicer a certification to the effect that, as to each Loan listed in the Loan Schedule (other than any Loan paid in full or any Loan specifically identified in such certification as not covered by such certification), (i) all documents required to be delivered to the Grantor Trustee pursuant to this Agreement are in its possession (other than as expressly permitted in Section 2.05), (ii) all documents delivered by the Seller to the Grantor Trustee pursuant to Section 2.05 have been reviewed by the Grantor Trustee and have not been mutilated or damaged and appear regular on their face (handwritten additions, changes or corrections shall not constitute irregularities if initialed by the Obligor) and relate to such Loan, (iii) based on the examination of the Grantor Trustee, and only as to the foregoing documents, the information set forth on the Loan Schedule accurately reflects the information set forth in the Legal File and (iv) each Debt Instrument has been endorsed as provided in Section 2.05.  The Grantor Trustee shall not be under any duty or obligation (i) to inspect, review or examine any such documents, instruments, certificates or other papers to determine that they are genuine, enforceable, or appropriate for the represented purpose or that they are other than what they purport to be on their face or (ii) to determine whether any Legal File should include any of the documents specified in Section 2.05(a)(v).

(b)     The Credit Files shall be held in the custody of the Seller for the benefit of, and as agent for, the Grantor Trust Certificateholder, the Grantor Trustee and the Grantor Trust, as the owner thereof.  It is intended that by the Seller's agreement pursuant to this Section 2.06(b) the Grantor Trustee shall be deemed to have possession of the Credit Files for purposes of Section 9-305 of the Uniform Commercial Code of the State in which such documents or instruments are located.  The Seller shall promptly report to the Grantor Trustee any failure by it to hold the Credit Files as herein provided and shall promptly take appropriate action to remedy any such failure.  In acting as custodian of such documents and instruments, the Seller agrees not to assert any legal or beneficial ownership interest in the Loans or such documents or instruments.  The Seller agrees to indemnify the Grantor Trust Certificateholder and the Grantor Trustee for any and all liabilities, obligations, losses, damages, payments, costs, or expenses of any kind whatsoever which may be imposed on, incurred by or asserted against the Grantor Trust Certificateholder or the Grantor Trustee as the result of any act or omission by the Seller relating to the maintenance and custody of such documents or instruments which have been delivered to

98-P201287

39

the Seller; provided, however, that the Seller will not be liable for any portion of any such amount resulting from the negligence or misconduct of the Grantor Trust Certificateholder or the Grantor Trustee and provided, further, that the Seller will not be liable for any portion of any such amount resulting from the Seller's compliance with any instructions or directions consistent with this Agreement issued to the Seller by the Grantor Trustee. The Grantor Trustee shall have no duty to monitor or otherwise oversee the Seller's performance as custodian hereunder.

(c)    Upon determination by the Servicer, the Seller or the Grantor Trustee that any document constituting a part of any File was not delivered to the Grantor Trustee or, with respect to any document constituting the Credit Files, to the Seller, as custodian for the Grantor Trustee and the Grantor Trust, by the time required hereby (which in the case of (A) a failure to deliver a recorded Mortgage or recorded assignment of Mortgage pursuant to Sections 2.05(a)(A)(ii), 2.05(a)(A)(iv) or 2.05(a)(B)(vi) (only under the circumstances in which a delay is caused by the public recording office and an Officer's Certificate is required to be provided thereunder), shall be the 20th month after the Closing Date or the Subsequent Transfer Date, as applicable, (B) failure to deliver a completion certificate pursuant to Section 2.05(b)(H) and, if applicable, a notice of non-compliance, shall be the 14th month after the Closing Date or the Subsequent Transfer Date, as applicable, (C) failure to deliver an inspection report pursuant to Sections 2.05(b)(I) and (J), shall be the 14th month after the Closing Date or the Subsequent Transfer Date, as applicable, (D) a failure to deliver each other document constituting a part of any Legal File shall be the Closing Date or the Subsequent Transfer Date, as applicable, and (E) a failure to deliver each document (other than those described in clauses (B) and (C) above) specified in Section 2.05(b), shall be 45 Business Days after the Closing Date or the Subsequent Transfer Date, as applicable) to be so delivered or was defective in any material respect when delivered to the Grantor Trustee), the party identifying any of the foregoing shall give prompt written notice to the other parties. Nothing contained herein shall require the Servicer or the Grantor Trustee to undertake any independent investigation or to make any review of any File other than as required to be made by the Grantor Trustee pursuant to this Section 2.06. The Seller, upon receipt of such notice, shall comply with the cure, substitution and repurchase provisions of Section 3.05 hereof.

Section 2.07.  Subsequent Transfers.

(a)    During the Funding Period, subject to the satisfaction of the conditions set forth in paragraph (b) below and pursuant to the terms of the related Subsequent Transfer Agreement, in consideration of the Grantor Trustee's delivery on the relevant Subsequent Transfer Date to or upon the order of the Seller of all or a portion of the balance of funds in the Pre-Funding Account, the Seller shall on each Subsequent Transfer Date sell, transfer, assign, set over and otherwise convey without recourse, to the Grantor Trustee, all right, title and interest of the Seller in and to (i) such Subsequent Loans as from time to time are owned by the Seller and identified on a Loan Schedule, including Substitute Loans added to the Grantor Trust from time to time, together with the Legal Files and the Credit Files relating thereto and all proceeds thereof, (ii) the related Mortgages and security interests in Properties, (iii) all payments of principal in respect of Subsequent Loans received after the applicable Cut-Off Dates and payments of interest in respect of Subsequent Loans received after the applicable Cut-Off Dates,

98-P201288

(iv) the rights to FHA Insurance reserves attributable to the FHA Loans as of the applicable Cut-Off Dates, (v) such assets as from time to time are identified as Foreclosed Property, (vi) such assets and funds as are from time to time deposited in the Collection Account, the Pre-Funding Account and the FHA Premium Account, including amounts on deposit in such accounts which are invested in Eligible Investments, (vii) the Seller's rights under the related Insurance Policies and any Insurance Proceeds and (viii) all proceeds of the foregoing (collectively, the "Grantor Trust Estate"). The foregoing sale, transfer, assignment, set over and conveyance does not and is not intended to result in a creation or an assumption by the Grantor Trust of any obligation of the Seller or any other person in connection with the Grantor Trust Estate or under any agreement or instrument relating thereto except as specifically set forth herein. As of each Subsequent Transfer Date, the Grantor Trustee acknowledges the conveyance to it of the assets described above in this Section 2.07(a), including from the Seller all right, title and interest of the Seller in and to the Grantor Trust Estate, receipt of which is hereby acknowledged by the Grantor Trustee, and the acceptance of which is made in good faith and without notice or knowledge of any adverse claims or liens. The transfer by the Seller of the Subsequent Loans set forth on the Subsequent Loan Schedule to the Grantor Trustee shall be absolute and shall be intended by the Seller and all parties hereto to be treated as a sale by the Seller to the Grantor Trust. If the assignment and transfer of the Mortgage Loans and the other property specified in this Section 2.07 from the Seller to the Grantor Trustee pursuant to this Agreement is held or deemed not to be a sale or is held or deemed to be a pledge of security for a loan, the Seller intends that the rights and obligations of the parties shall be established pursuant to the terms of this Agreement and that, in such event, (i) the Seller shall be deemed to have granted and does hereby grant to the Grantor Trustee as of the related Subsequent Transfer Date a first priority security interest in the entire right, title and interest of the Seller in and to the Subsequent Loans and all other property conveyed to the Grantor Trustee pursuant to this Section 2.07 and all proceeds thereof, and (ii) this Agreement shall constitute a security agreement under applicable law. The amount released from the Pre-Funding Account shall be one-hundred percent (100%) of the aggregate of the Principal Balances of the Subsequent Loans so transferred.

The Seller shall transfer and deliver to the Grantor Trustee the Subsequent Loans and the other property and rights related thereto described in paragraph (a) above only upon the satisfaction of each of the following conditions on or prior to the related Subsequent Transfer Date:

    (i)    The Seller shall have provided the Grantor Trustee and the Rating Agencies with an Addition Notice, which notice shall be given not less than two Business Days prior to the related Subsequent Transfer Date and shall designate the Subsequent Loans to be sold to the Grantor Trust and the aggregate unpaid principal balance of such Loans;

    (ii)    The Seller shall have delivered to the Grantor Trustee a duly executed written agreement (including an acceptance by the Grantor Trustee) in substantially the form of Exhibit F attached hereto (the "Subsequent Transfer Agreement");

98-P201289

(iii)     The Seller shall have deposited in the Collection Account all principal collected and interest collected to the extent the same accrued in respect of such Subsequent Loans after the related Subsequent Cut-Off Date;

(iv)     The Funding Period shall not have ended;

(v)     The Seller shall have delivered to the Grantor Trustee an Officer's Certificate confirming the satisfaction of each condition precedent specified in this paragraph (b) and in the related Subsequent Transfer Agreement;

(vi)     The Seller shall have delivered an Officer's Certificate to the Grantor Trustee confirming that the representations and warranties of the Seller pursuant to Section 3.03(a) and pursuant to Section 3.03(b) are true and correct with respect to the Seller and the Subsequent Loans as of the Subsequent Transfer Date;

(vii)     As of each Subsequent Transfer Date, the Seller was not insolvent nor will the Seller be made insolvent by such transfer nor is the Seller aware of any pending insolvency;

(viii)     The Seller shall have delivered to the Grantor Trustee an Opinion of Counsel to the effect that such addition will not result in a material adverse tax consequence to the Grantor Trust or the Holders of the Notes;

(ix)     The Seller shall have delivered to the Grantor Trustee the Legal Files related to the Subsequent Loans; and

(x)     Each Subsequent Loan, as of the Subsequent Transfer Date, meets the following criteria: (i) no Subsequent Loan may be 30 or more days delinquent as of the related Cut-Off Date; (ii) the remaining term to stated maturity of each Subsequent Loan will not exceed 30 years and no more than 70% of the Subsequent Loans may have an original term exceeding 180 months; (iii) each Subsequent Loan will be secured by a Mortgage in a first or second lien position; (iv) each Subsequent Loan will have a Loan Rate equal to or greater than 8.99%; (v) following the purchase of each Subsequent Loan by the Grantor Trustee on behalf of the Grantor Trust, the Loans (including such Subsequent Loan): (a) will have a weighted average Loan Rate of at least 13.20%; (b) will have a weighted average remaining term to stated maturity of not more than 246 months; (c) will have a weighted average Combined Loan-to-Value Ratio of not more than 115%; (d) will have no Loan with a Principal Balance in excess of $90,000; (e) will have a state concentration not in excess of 35% for any one state; and (vi) each Subsequent Loan will comply with the representations and warranties in the Sale and Servicing Agreement.

The above criteria may be modified with the consent of the Rating Agencies.

98-P201290

The Grantor Trustee shall have no duty to determine whether the conditions specified in clauses (vii), (viii), (ix) or (x) have been satisfied or fulfilled.

Section 2.08. <u>Acceptance by Indenture Trustee of the Grantor Trust Certificate</u>.

(a)    The Indenture Trustee agrees to execute and deliver on the Closing Date an acknowledgment of receipt of the Grantor Trust Certificate. The Indenture Trustee declares that it will hold the Grantor Trust Certificate as well as any other assets included in the Trust Estate, upon and subject to the conditions set forth herein for the benefit of the Securityholders in good faith and without notice of any adverse claims or liens.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.01. [Reserved].

Section 3.02. <u>Representations, Warranties and Covenants of the Servicer</u>.

The Servicer hereby represents, warrants and covenants with and to the Trust, the Grantor Trust, the Grantor Trustee, the holder of the Grantor Trust Certificate, the Seller, the Indenture Trustee and the Securityholders as of the Closing Date and each Subsequent Transfer Date:

(a)    The Servicer is a commercial bank duly organized and validly existing under the laws of the State of Florida, with full power and authority to own its properties and conduct its business as such properties are currently owned and such business is currently conducted;

(b)    The Servicer has the full power and authority to execute, deliver and perform, and to enter into and consummate all transactions contemplated by this Agreement and each other Transaction Document to which it is a party; has duly authorized the execution, delivery and performance of this Agreement and each other Transaction Document to which it is a party; has duly executed and delivered this Agreement and each other Transaction Document to which it is a party, and this Agreement and each other Transaction Document to which it is a party, when duly authorized, executed and delivered by the other parties thereto, will constitute the legal, valid and binding obligation of the Servicer, enforceable against it in accordance with their respective terms;

(c)    None of (i) the execution and delivery of this Agreement or any other Transaction Document to which the Servicer is a party, (ii) the consummation of the transactions required of the Servicer herein or therein, or (iii) the fulfillment of or compliance with the terms and conditions of this Agreement or any other Transaction Document will conflict with or result in a breach of any of the terms, conditions or provisions of the Servicer's charter or by-laws or any legal restriction or any material agreement or instrument to which the Servicer is now a party or by which it is bound or which would adversely affect the creation or administration of the Grantor Trust or the Trust as contemplated hereby or constitute a material default, or result in an

98-P201291

acceleration, under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Servicer or its property is subject;

(d)     The Servicer is not in default and, upon the execution and delivery of this Agreement, its performance of and compliance with the terms hereof will not constitute a violation of any law, any order or decree of any court or any order, regulation or demand of any federal, state or local governmental or regulatory authority;

(e)     No action, suit or other proceeding or investigation is pending or, to the Servicer's knowledge, threatened before any court or any federal, state or local governmental or regulatory authority (A) asserting the invalidity of this Agreement or any other Transaction Document to which the Servicer is a party, (B) seeking to prevent the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document to which the Servicer is a party or (C) seeking any determination or ruling that would materially and adversely affect the ability of the Servicer to perform its obligations under this Agreement or any other Transaction Document to which the Servicer is a party (including any pending or threatened action, suit, proceeding or investigation which might result in the suspension, revocation or modification of the Contract of Insurance);

(f)     No consent, approval, authorization or order of, registration or filing with, or notice to, any court or any federal, state or local government or regulatory authority is required for the execution, delivery and performance by the Servicer of this Agreement or any other Transaction Document to which the Servicer is a party (other than those that have been obtained or will be obtained prior to the Closing Date);

(g)     With respect to the Servicer, none of this Agreement, any other Transaction Document to which the Servicer is a party or any statement, report or other document furnished or to be furnished by the Servicer pursuant to this Agreement or any other Transaction Document to which the Servicer is a party or in connection with the transactions contemplated hereby and thereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading;

(h)     The statements contained in the section of the Offering Circular entitled "The Servicer and Claims Administrator" which describe the Servicer are true and correct in all material respects, and do not contain any untrue statement of a material fact with respect to the Servicer and does not omit to state a material fact necessary to make the statements contained therein with respect to the Servicer under the circumstance in which they were made not misleading;

(i)     The Servicer is solvent, and the Servicer will not be rendered insolvent as a result of the performance of its obligations pursuant to this Agreement;

(j)     Each Loan will be serviced by the Servicer in compliance with this Agreement; Title I in the case of FHA Loans and all other applicable laws;

98-P201292

44

(k)    The Servicer has not waived any default, breach, violation or event of acceleration existing under any Note and any related Mortgage;

(l)    The Servicer shall comply with, and shall service or cause to be serviced, each Loan, in accordance with all applicable laws, and, in particular, and, if applicable in accordance with the National Housing Act, as amended and supplemented, all rules and regulations issued thereunder, and all administrative publications published pursuant thereto including, in the case of the FHA Loans, all FHA requirements applicable to FHA Title I Loans;

(m)    The Servicer agrees that, so long as it shall continue to serve in the capacity contemplated under the terms of this Agreement, it shall remain in good standing under the laws governing its creation and existence and qualified under the laws of each state in which the nature of its business requires such qualification or shall remain exempt therefrom, it shall maintain all licenses, permits and approvals required by any law or regulations as may be necessary to perform its obligations under this Agreement and to retain all rights to service the Loans or it shall remain exempt from acquiring or maintaining such licenses, permits and approvals, and, except as provided in Section 9.02 it shall not dissolve or otherwise dispose of all or substantially all of its assets;

(n)    The Servicer does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement;

(o)    There is no action, suit, proceeding or investigation pending or, to the best of the Servicer's knowledge, threatened against the Servicer which, either in any one instance or in the aggregate, may (i) result in any material adverse change in the business, operations, financial condition, properties or assets of the Servicer or in any material impairment of the right or ability of the Servicer to carry on its business substantially as now conducted, or in any material liability on the part of the Servicer or of any action taken or to be taken in connection with the obligations of the Servicer contemplated herein, or which would be likely to impair materially the ability of the Servicer to perform under the terms of this Agreement, or (ii) which would draw into question the validity of this Agreement;

(p)    [Reserved]

(q)    [Reserved]

(r)    From time to time the Servicer shall report, as more fully set forth in this Agreement, information relating to the Loans to the Grantor Trustee and shall do every act that may be necessary or required to perform its duties under this Agreement within the time periods set forth herein after giving effect to notice and/or cure periods, if any;

(s)    No information, Officer's Certificate, statement furnished in writing, or report required hereunder, delivered by the Servicer to the Grantor Trustee or its agents shall, to the best knowledge of the Servicer, contain any untrue statement of a material fact or omit to state a material fact necessary to make the information, certificate, statement or report not misleading

98-P201293

and there has been no material adverse change in the financial condition of the Servicer since the date of the Servicer's most recent audited financial statements;

(t)     The Servicer is a commercial bank that actively provides servicing of mortgage loans, and the transactions contemplated by this Agreement are in the ordinary course of business of the Servicer;

(u)     The Servicer maintains all errors and omissions coverage and fidelity insurance coverage required by the FHA and has never had an FHA contract of insurance terminated by FHA;

(v)     Promptly following the Closing Date, and each Subsequent Transfer Date the Servicer will notify each Obligor that Monthly Payments are to be sent to the Servicer's designated lockbox if the Obligor has not previously been notified in writing of same;

(w)     The origination and collections practices used by the Servicer and its respective affiliates with respect to the Loans have been in all material respects legal, proper, prudent and customary in the mortgage lending and servicing business; and

(x)     The Servicer has, and at all times shall maintain, a net worth, as determined in accordance with generally accepted accounting principles, of at least $20,000,000.

It is understood and agreed that the representations and warranties set forth in this Section 3.02 shall survive the issuance and delivery of the Securities and the Grantor Trust Certificate and shall be continuing as long as any Security or the Grantor Trust Certificate shall be outstanding or this Agreement has not been terminated.

Section 3.03. Representations and Warranties of the Seller.

(a)     The Seller hereby represents and warrants to the Trust, the Grantor Trust, the Grantor Trustee, the Grantor Trust Certificatcholder, the Indenture Trustee, the Servicer and the Securityholders, that as of the Closing Date and each Subsequent Transfer Date:

(i)     The Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of West Virginia with full power and authority to own its properties and conduct its business as such properties are currently owned and such business is currently conducted;

(ii)     The Seller has full power and authority to execute, deliver and perform, and to enter into and consummate all transactions required of it by this Agreement and to which it is a party; has duly authorized the execution, delivery and performance of this Agreement; has duly executed and delivered this Agreement and; when duly authorized, executed and delivered by the other parties hereto and thereto, this Agreement will constitute the legal, valid and binding obligation of the Seller enforceable against it in accordance with its respective terms, except as enforceability may be limited by

98-P201294

bankruptcy, insolvency, reorganization or other similar laws affecting the enforcement of creditors' rights generally and by equitable limitations on the availability of specific remedies, regardless of whether such enforceability is considered in a proceeding in equity or at law;

(iii)    None of (a) the execution and delivery of this Agreement, (b) the consummation of the transactions required of it hereunder or under any other Transaction Document to which it is a party, or (c) the fulfillment of or compliance with the terms and conditions of this Agreement will conflict with, or result in a breach of any of, the terms, conditions or provisions of the Seller's charter or by-laws or any legal restriction or any material agreement or instrument to which the Seller is now a party or by which it is bound, or which would adversely affect in any material respect the creation and administration of the Grantor Trust or the Trust as contemplated hereby, or constitute a material default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject which violation might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Seller or its properties or might have consequences that would materially and adversely affect its performance hereunder;

(iv)    There is no action, suit, proceeding, investigation or litigation pending against the Seller or, to its knowledge, threatened, which, if determined adversely to the Seller, would materially adversely affect the sale of the Loans, the issuance of the Grantor Trust Certificate, the Notes or the Certificates, the execution, delivery or enforceability of this Agreement or which would have a material adverse affect on the financial condition of the Seller;

(v)    Except as has been previously obtained, no consent, approval, authorization or order of any court or governmental agency or body is required for: (a) the execution, delivery and performance by the Seller of, or compliance by the Seller with, this Agreement, (b) the transfer of all FHA Insurance reserves relating to the Loans to the Contract of Insurance Holder, (c) the issuance of the Grantor Trust Certificate, the Notes or the Certificates, (d) the sale of the Loans or (e) the consummation of the transactions required of it by this Agreement, except: (A) such as shall have been obtained before the Closing Date, (B) the transfer of the FHA Insurance reserves by FHA to the Contract of Insurance Holder with respect to Loans as to which an FHA case number has not been assigned as of the related Cut-Off Date, and (C) such as may be required under state securities or "Blue Sky" laws in connection with the sale of the Notes by the Placement Agents;

(vi)    The Seller is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default might have consequences that would materially and adversely affect the condition (financial or other) or operations of the Seller or its properties or

98-P201295

47

might have consequences that would materially and adversely affect its performance hereunder;

(vii)    [Reserved]

(viii)    Neither this Agreement nor any statement, report or other document furnished pursuant to this Agreement (except the Files) or in connection with the transactions contemplated hereby contains any untrue statement of a material fact or facts or fails to state a material fact necessary to make the statements contained herein or therein not misleading;

(ix)    Neither the Grantor Trust nor the Trust will constitute an investment company within the meaning of the Investment Company Act of 1940, as amended;

(x)    The Seller received fair consideration and reasonably equivalent value in exchange for the sale of the Loans to the Grantor Trust and for the sale of the Grantor Trust Certificate to the Trust;

(xi)    The FHA Reserve Amounts with respect to the FHA Loans transferred to the Contract of Insurance both prior to and following the transfer of the FHA Loans to the Grantor Trust will be available to satisfy claims with respect to such FHA Loans. The amount in the FHA Insurance Coverage Reserve Account, together with all amounts to be requested for transfer with respect to the Initial Loans will equal $1,964,656.61, which is approximately 10% of the initial Principal Balance of the FHA Loans; and

(xii)    The Seller is a supervised lender in good standing under 24 C.F.R. Section 202.4 and is authorized to originate, purchase, hold, service and/or sell loans insured under 24 C.F.R. Part 201, pursuant to a valid Contract of Insurance, Number 701839.

(xiii)    The Seller has complied with and will continue to maintain full compliance with the provisions of Section 13(e) of the Federal Deposit Insurance Act (12 U.S.C. §1823(E)).

(b)    The Seller hereby agrees for the benefit of the Grantor Trust, the Trust, the Servicer, the Indenture Trustee, the Grantor Trust Certificateholder and the Securityholders that the failure of any of the following representations and warranties to be true and correct as to any Loan as of the applicable Cut-Off Date for such Loan or as to the Grantor Trust Certificate as applicable, or such later date if so specified in such representation and warranty, gives rise to the remedy specified in Section 3.05:

(i)    The information pertaining to each Loan set forth in the Loan Schedule was true and correct in all material respects as of the applicable Cut-Off Date;

(ii)    As of the respective Cut-Off Date, none of the Loans were more than one month (calculated from Due Date to Due Date with respect to each Loan) past due

98-P201296

(without giving effect to any grace period); neither the Seller nor the relevant Approved Loan Originator has advanced funds, induced, solicited or knowingly received any advance of funds from a party other than the Obligor, directly or indirectly, for the payment of any amount required by the Loan;

(iii)    The terms of the Debt Instrument and any related Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments reflected in the related File; no instrument of waiver, alteration or modification has been executed, and no Obligor has been released, in whole or in part, except in connection with an assumption agreement which assumption agreement is part of the related File and the payment terms of which are reflected in the related Loan Schedule;

(iv)    The Debt Instrument and any related Mortgage are not subject to any set-off, counterclaim or defense, including the defense of usury or of fraud in the inducement, nor will the operation of any of the terms of the Debt Instrument and any related Mortgage, or the exercise of any right thereunder, render such Mortgage unenforceable, in whole or in part, or subject to any Debt Instrument or right of rescission, set-off, counterclaim or defense, including the defense of usury, and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(v)    Any and all material requirements of any federal, state or local law applicable to the Loan (including all origination and collection practices with respect thereto) have been complied with;

(vi)    Any related Mortgage has not been satisfied or cancelled in whole, rescinded or subordinated, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation or rescission;

(vii)    Any related Mortgage is a valid, subsisting and enforceable lien on the Mortgaged Property, including the land and all buildings on the Mortgaged Property;

(viii)    The Debt Instrument and any related Mortgage are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization or other similar laws affecting creditors' rights generally and by general principles of equity;

(ix)    All parties to the Debt Instrument and any related Mortgage had legal capacity at the time to enter into the Loan and to execute and deliver the Debt Instrument and any related Mortgage, and the Debt Instrument and any related Mortgage have been duly and properly executed by such parties;

98-P201297

(x)     As of the applicable Cut-Off Date, the proceeds of the Loan have been fully disbursed and there is no requirement for future advances thereunder, and any and all applicable requirements set forth in the Loan documents have been complied with;

(xi)     With respect to each Loan, immediately prior to the sale, transfer and assignment to the Grantor Trust, the Seller had good and indefeasible legal title to the Loan, the related Debt Instrument and any related Mortgage, and the Seller was the sole owner thereof, subject to no liens, pledges, charges, mortgages, encumbrances or rights of others, except for such liens as will be released simultaneously with the transfer and assignment of the Loan to the Grantor Trust; and immediately upon the sale, transfer and assignment contemplated herein, the Grantor Trust will hold good title to, and be the sole owner with respect to the Loan, the related Note and any related Mortgage, subject to no liens, pledges, charges, mortgages, encumbrances or rights of others;

(xii)     There is no default, breach, violation or event of acceleration existing under the Loan, the related Debt Instrument and any related Mortgage and there is no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration;

(xiii)     Any related Mortgage contains customary and enforceable provisions such as to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security provided thereby, including, (A) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (B) otherwise by judicial foreclosure;

(xiv)     Each FHA Loan is an FHA Title I property improvement loan or manufactured housing loan (as defined in 24 C.F.R. Section 201.2) underwritten and originated by an Approved Loan Originator in accordance with FHA requirements for the Title I Loan program as set forth in 24 C.F.R. Parts 201 and 202;

(xv)     Each Loan is a fixed rate loan; each Debt Instrument shall mature within not more than 25 years and 32 days from the date of origination of the Loan; each Debt Instrument is payable in substantially equal Monthly Payments, with interest payable in arrears, and requires a Monthly Payment which if paid on the related Due Date is sufficient to amortize the original principal balance over the original term and to pay interest at the related Loan Rate; and the Debt Instrument does not provide for any extension of the original term;

(xvi)     The related Debt Instrument is not and has not been secured by any collateral, except, the lien of the corresponding Mortgage and/or security interest in the related Manufactured Home, as applicable;

(xvii)     If the related Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, or a valid substitution of trustee has been recorded

98-P201298

or may be recorded and no extraordinary fees or expenses are or will become payable to the trustee under the deed of trust, except in connection with default proceedings and a trustee's sale after default by the Mortgagor;

(xviii)    The Seller has no knowledge of any circumstances or conditions not reflected in the representations set forth herein, or in the Loan Schedule, or in the related File with respect to any related Mortgage, the related Property or the Obligor which in the opinion of the Seller could reasonably be expected to materially and adversely affect the value of the related Property, or the marketability of the Loan or cause the Loan to become delinquent or otherwise in default;

(xix)    The Loan is serviced by the Servicer;

(xx)    In the case of the FHA Loans, if required pursuant to Title I (see 24 C.F.R. Section 201.40(c)), either the improvements to the Mortgaged Property or the Manufactured Home relating to each FHA Loan, as applicable, have been or shall be inspected by the related Originator within the time period and to the extent required under the Title I regulations, and evidence of such inspection shall have been delivered to the Grantor Trustee or, if not, a letter of non-compliance shall be delivered to the Grantor Trustee promptly upon the completion of such inspection;

(xxi)    Each Loan with respect to which the provisions of 24 C.F.R. Section 201.20 are applicable has been originated in compliance with the provisions of such section and the market value of the related Property has been ascertained in accordance with the procedures established by HUD;

(xxii)    There exists a File relating to each Loan and such File contains all of the original or certified documentation listed in Section 2.05) for such type of Loan. Each File has been delivered to the Grantor Trustee or a custodian on behalf of the Grantor Trustee. Each document included in the File which is required to be executed by the Obligor has been executed by the Obligor in the appropriate places. All blanks on any form required to be completed have been completed;

(xxiii)    Each Loan is in respect of a home improvement loan, debt consolidation loan, installment loan agreement or a retail installment sales contract and each related Property with respect thereto is improved by a residential dwelling which is the principal residence or an investment of property of the related Obligor;

(xxiv)    Each FHA Loan was purchased and re-underwritten by the Seller in accordance with the applicable underwriting criteria established by the FHA and HUD and each of the Non-FHA Loans was purchased and was or will be re-underwritten by the Seller in accordance with the Underwriting Guidelines or its Conventional Loan Program;

98-P201299

(xxv)    If the related Property is in an area identified by the Federal Emergency Management Agency ("FEMA") as having special flood hazards, unless the community in which the area is situated is participating in the National Flood Insurance Program and the regulations thereunder or less than a year has passed since FEMA notification regarding such hazards, a flood insurance policy is in effect with respect to such Property with a generally acceptable carrier which complies with Section 102(a) of the Flood Disaster Protection Act of 1973;

(xxvi)    The aggregate Cut-Off Date Principal Balances of Initial Loans which are multi-units (two to four units) is less than 0.80% of the aggregate Initial Pool Balance;

(xxvii)    All costs, fees and expenses incurred in originating, closing or recording the Loans were paid;

(xxviii)    There is no obligation on the part of the Seller or any other party other than the Obligor to make payments with respect to the Loan;

(xxix)    At the time of origination of the Loan, each related prior lien, if any, was not 30 or more days delinquent;

(xxx)    All parties which have had any interest in the Loan, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (i) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Property is located, and (ii) (A) organized under the laws of such state, or (B) qualified to do business in such state, or (C) federal savings associations or national banks having principal offices in such state, or (D) not doing business in such state;

(xxxi)    Any related Mortgage contains an enforceable provision either (i) requiring the consent of the Mortgagee to assumption of the related Loan upon sale of the Mortgaged Property or (ii) permitting the assumption of the related Loan upon the sale of the Mortgaged Property provided that certain conditions are satisfied;

(xxxii)    Except with respect to Loans where the related Mortgaged Property is located in the state of Florida, there is no homestead or other exemption available to the Mortgagor which would materially interfere with the right to sell the related Mortgaged Property at a trustee's sale or to foreclose the Mortgage;

(xxxiii)    Each FHA Loan has been submitted to the FHA for insurance pursuant to the FHA Title I loan program and each FHA Loan has been assigned a case number by the FHA for the FHA Title I loan program;

(xxxiv)    The FHA Reserve Amount with respect to each FHA Loan has been transferred to the FHA Insurance Coverage Reserve Account;

98-P201300

(xxxv)     The related File with respect to each Mortgage Loan contains a Title Document reflecting that title to the related Property is vested at least 50% in the Obligor under such Loan;

(xxxvi)     Each Property (including each residential dwelling improvement thereon) is free of damage which materially and adversely affects the value thereof, other than damage to be corrected pursuant to the Mortgage Loan with some or all of the proceeds of such Mortgage Loan;

(xxxvii)     No Loan was adversely selected as to credit risk from the pool of home improvement loans, debt consolidation loans and manufactured housing loans owned by the Seller;

(xxxviii)     Each Contract, other than a Land-and-Home Contract, together with the related certificate of title, creates a valid, subsisting and enforceable first priority security interest in favor of the Grantor Trustee in the Manufactured Home;

(xxxix)     There is only one original executed Contract, and each original Contract is in the custody of the Grantor Trustee or its custodian;

(xl)     If the related Manufactured Home is located in a state in which notation of a security interest on the title document is required or permitted to perfect such security interest, the title document shows, or if a new or replacement title document with respect to such Manufactured Home is required, such title document has been applied for and when issued by the applicable governmental agency, will show, the Seller as the holder of a first priority security interest in such Manufactured Home. If the related Manufactured Home is located in a state in which the filing of a financing statement or the making of a fixture filing under the UCC is required to perfect a security interest in manufactured housing, such filings or recordings have been duly made and show the Seller as secured party;

(xli)     Each Contract is secured by a "single family residence" within the meaning of Section 25(e)(10) of the Code;

(xlii)     The transfer, assignment and conveyance of the Contracts and the Contract Files by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any applicable jurisdiction;

(xliii)     Assuming no material change to the applicable law or regulations in effect as of the Closing Date or Subsequent Transfer Date, as applicable, after the consummation of the transactions contemplated by this Agreement, the Grantor Trustee or its designee on behalf of the Grantor Trust will have the ability to foreclose or otherwise realize upon a Property or to enforce the provisions of the related Loan against the Obligor thereunder, if the foreclosure upon any such Property or enforcement of the

98-P201301

53

provisions of the related Loan against the Obligor is undertaken as set forth in <u>Section 4.12</u>;

(xliv)    The aggregate Principal Balances of all Contracts does not exceed 0.152% of the Initial Pool Balance;

(xlv)    [Reserved]

(xlvi)    [Reserved];

(xlvii)    The Loans have a weighted average remaining term to maturity of approximately 246 months;

(xlviii)    Each Subsequent Loan had a first payment date at least one-month prior to the end of the Funding Period;

(xlix)    No more than 100% of the Loans are Simple Interest Loans;

(l)    Not less than 0% of the Loans are Precomputed Loans;

(li)    Each Non-FHA Loan meets the description set forth in the Offering Circular under either "ORIGINATION AND UNDERWRITING GUIDELINES - Keystone Equiflex Loan Program" or "--Republic Loans";

(lii)    On the Closing Date or each Subsequent Transfer Date, as the case may be, 55% or more (by aggregate Principal Balance) of the Loans do <u>not</u> constitute "real estate mortgages" for the purpose of Treasury Regulation §301.7701(i) - 1(d) under the Code. For this purpose a Loan constitutes a "real estate mortgage" if the Loan is an "obligation principally secured by an interest in real property." For this purpose an "obligation is principally secured by an interest in real property" if it satisfies <u>either</u> test set out in paragraph (a) or paragraph (b) below.

(1)    *The 80-percent test.* An obligation is principally secured by an interest in real property if the fair market value of the interest in real property securing the obligation was at least equal to 80 percent of the adjusted issue price of the obligation at the time the obligation was originated (or, if later, the time the obligation was significantly modified).

For purposes of this paragraph (a), the fair market value of the real property interest must be first reduced by the amount of any lien on the real property interest that is senior to the obligation being tested, and must be further reduced by a proportionate amount of any lien that is in parity with the obligation being tested. The adjusted issue price of an obligation is its issue price plus the amount of accrued original issue discount, if any, as of the date of determination.

98-P201302

(2)     *Alternative test.* An obligation is principally secured by an interest in real property if substantially all of the proceeds of the obligation were used to acquire or to improve or protect an interest in real property that, at the origination date, is the only security for the obligation. For purposes of this test, loan guarantees made by the United States or any state (or any political subdivision, agency, or instrumentality of the United States or of any state), or other third party credit enhancement are not viewed as additional security for a loan. An obligation is not considered to be secured by property other than real property solely because the obligor is personally liable on the obligation. For this purpose only, substantially all of the proceeds of the obligations," means 66⅔% or more of the gross proceeds.

(liii)     The Grantor Trust Certificate has been validly issued and is outstanding entitled to all the benefits of the Grantor Trust Agreement, the Grantor Trust Certificate evidences a 100% ownership interest in the assets of the Grantor Trust and no defaults have occurred under the Grantor Trust Agreement;

(liv)     Immediately prior to the sale and assignment by the Seller to the Trust of the Grantor Trust Certificate, the Seller had good title thereto it subject to no prior lien, claim, participation interest, mortgage, security interest, pledge, charge or other encumbrance or other interest of any nature;

(lv)     As of the Closing Date, the Seller has transferred all right, title and interest in the Grantor Trust Certificate to the Trust;

(lvi)     The Seller has not transferred the Grantor Trust Certificate to the Trust with any intent to hinder, delay or defraud any of its creditors;

(lvii)     With respect to any Loan that contains a Portability Option, such provision, and the exercise thereof by the Obligor would, as of the date of acquisition of such Loan by the Seller, (i) not permit or cause the Loan to be totally unsecured at any time and (ii) comply with all requirements of applicable federal, state and local law; and

(lviii)     Neither the Debt Instrument nor the related Mortgage contains any provision that limits the recourse of the holder of the Loan against the Obligor.

Section 3.04. [Reserved].

Section 3.05. Purchase and Substitution.

(a)     It is understood and agreed that the representations and warranties set forth in Section 3.03 shall survive the conveyance of the Loans to the Grantor Trust, the delivery of the Grantor Trust Certificate to the Seller, the delivery of the Grantor Trust Certificate to the Trust, the Grant of the Grantor Trust Certificate to the Indenture Trustee and the delivery of the

98-P201303

Securities to the Securityholders and shall be continuing as long as any Security is outstanding. Upon discovery by the Servicer, the Seller, the Grantor Trustee, the Indenture Trustee or any Securityholder, or upon a Responsible Officer of the Owner Trustee obtaining actual knowledge, of a breach of any of such representations and warranties which materially and adversely affects the value of the Loan or the interest of the Grantor Trust Certificateholder or the Securityholders, or which materially and adversely affects the interests of the Grantor Trust Certificateholder or the Securityholders in the related Loan in the case of a representation and warranty relating to a particular Loan, the party discovering such breach shall give prompt written notice to the others. In the event of a determination under Section 2.06 (that circumstances exist that require notice thereunder or in the event of a breach of a representation and warranty made pursuant to Section 3.03(b) (except with respect to a breach of the representations made by the Seller pursuant to Section 3.03(b)(xxxiii) and 3.03(b)(xxxiv)), in each case that materially and adversely affects the interests of the Grantor Trust Certificateholder or the Securityholders in the Loan with respect to which such representation is made or in the Loans, and a failure within sixty Business Days of discovery or receipt of notice of such failure to effect a cure of the circumstances giving rise to such defect, the Seller shall be obligated, on the Monthly Cut-Off Date next succeeding the expiration of such sixty-day period, to repurchase (or substitute for, to the extent permitted by subsection (b) below) the affected Loan. The Grantor Trustee on behalf of the Grantor Trust Certificateholder and the Securityholders agrees that if an FHA Loan is a Defective Loan because a document specified in Section 2.01 is not included in the File as of the 90th day after the discovery or receipt of notice thereof, such defect shall be deemed to be cured if the Grantor Trustee shall have received during the 90-day period after such date a written statement addressed to it from the Director of HUD Title I Insurance Division that such document would not be required in connection with a claim for FHA Insurance with respect to such Loan. It is understood and agreed that the obligation of the Seller to repurchase or substitute any such Loan pursuant to this Section shall constitute the sole remedy against it with respect to such breach of the foregoing representations or warranties or the existence of the foregoing conditions.

With respect to a breach of the representations made by the Seller pursuant to Section 3.03(b)(xxxiii) or (xxxiv) if the FHA has not assigned a case number under the Contract of Insurance to an FHA Loan to indicate that such FHA Loan is eligible for Title I Insurance coverage under the Contract of Insurance on or before the 120th day after the Closing Date or Subsequent Transfer Date, as applicable, the Seller shall be obligated, on the Monthly Cut-Off Date next succeeding such 120th day, to repurchase such FHA Loan. If the FHA Reserve Amount with respect to an FHA Loan has not been transferred to the FHA Insurance Coverage Reserve Account on or before the 150th day after the Closing Date or Subsequent Transfer Date, as applicable, the Seller shall be obligated, on the Monthly Cut-Off Date next succeeding such 150th day, to repurchase such FHA Loan. The Claims Administrator shall give notice in writing to each of the Servicer, the Seller, the Grantor Trustee, the Indenture Trustee and the Owner Trustee of (i) any FHA Loan with respect to which there has not been assigned a case number under the Contract of Insurance on or before the 120th day after the Closing Date or Subsequent Transfer Date, as applicable and (ii) any FHA Loan that has not been transferred to the FHA Insurance Coverage Reserve Account on or before the 150th day after the Closing Date or Subsequent Transfer Date, as applicable. For purposes of calculating either 120 or 150 days

98-P201304

from the Closing Date or Subsequent Transfer Date, as applicable, in this <u>Section 3.05(a)</u>, any day on which the FHA is officially closed for reasons other than such day being a Saturday, Sunday or a day on which banking institutions in Washington, D.C. are authorized or obligated by law, executive order or governmental decree to be closed, shall not be counted in making such calculation.

If the Seller is required to repurchase any Loan on a Monthly Cut-Off Date that is not a Business Day, such repurchase shall be made on the last Business Day preceding such Monthly Cut-Off Date. Any Loan required to be repurchased pursuant to this <u>Section 3.05(a)</u> is referred to as a "<u>Defective Loan</u>".

Upon the discovery of a breach of the representations as set forth in clauses (liv) through (lv) of Section 3.03(b) the Seller shall either cure such breach within the time permitted hereunder if such breach related to a Loan or shall repurchase the Grantor Trust Certificate at the time a Loan would be required to be repurchased and shall deposit to the Collection Account an amount equal to the outstanding balance of the Grantor Trust Certificate together with accrued and unpaid interest through the last day of the month of such deposit thereon at weighted average of the Net Loan Rates.

(b)     The Seller shall be obligated to repurchase a Defective Loan for the Purchase Price, payable to the Grantor Trustee in cash on the Monthly Cut-Off Date specified in Section 3.05(a) above, for deposit in the Collection Account. Notwithstanding the time permitted, The Seller may elect in lieu of the repurchase of a Defective Loan as provided in this Section 3.05, to substitute, as of the Monthly Cut-off Date specified in Section 3.05(a), a Substitute Loan for the Defective Loan in accordance with the provisions of this Section 3.05.

(c)     The Seller shall notify the Servicer and the Grantor Trustee in writing not less than five Business Days before the related Determination Date which is on or before the date on which the Seller would otherwise be required to repurchase such Loan pursuant to Section 3.05(a) of its intention to effect a substitution under this Section. On such Determination Date (the "Substitution Date"), the Seller shall deliver to the Grantor Trustee a list of the Loans to be substituted for by such Substitute Loans, and attaching as an exhibit a supplemental Loan Schedule (the "Supplemental Loan Schedule") setting forth the same type of information appearing on the Loan Schedule and representing as to the accuracy thereof. In connection with any substitution pursuant to this Section 3.05, to the extent that the aggregate Principal Balance of any Substitute Loan or Substitute Loans is less than the aggregate Principal Balance of the corresponding Loan or Loans as of the Monthly Cut-Off Date on which the substitution is being made, the Seller shall deposit such difference (a "Substitution Adjustment Amount") to the Collection Account on such date.

(d)     Concurrently with the satisfaction of the conditions set forth in this Section 3.05 and the conveyance of such Substitute Loans to the Grantor Trustee hereto, Exhibit A to this Agreement shall be deemed to be amended to exclude all Loans being replaced by such Substitute Loans and to include the information set forth on the Supplemental Loan Schedule with respect to such Substitute Loans, and all references in this Agreement to Loans shall include

98-P201305

such Substitute Loans and be deemed to be made on or after the related Substitution Date, as the case may be, as to such Substitute Loans.

(e)     With respect to all Defective Loans or other Loans repurchased by the Seller pursuant to this Agreement, upon the deposit of the Purchase Price therefor to the Collection Account, or the substitution therefor of a Substitute Loan and the deposit of any Substitution Adjustment Amount into the Collection Account, the Grantor Trustee shall assign to the Seller, without recourse, representation or warranty, all the Grantor Trustee's right, title and interest in and to such Defective Loans or Loans, which right, title and interest were conveyed to the Grantor Trustee pursuant to Section 2.01. The Grantor Trustee shall take any actions as shall be reasonably requested by the Seller to effect the repurchase of any such Loans.

Section 3.06.  Seller's Remedies

The Seller covenants and agrees with the Indenture Trustee, to the extent necessary to fulfill its obligations hereunder, to enforce, for the benefit of the Securityholders, all of the Seller's rights and remedies against its parent, The First National Bank of Keystone ("Keystone Bank") under the Loan Purchase Agreement. If, pursuant to the provisions of Section 3.05, the Seller is obligated to repurchase a Defective Loan or substitutes a Substitute Loan for a Defective Loan, the Seller shall, to the extent necessary to fulfill its obligations hereunder, promptly exercise the remedies available to it against Keystone Bank, with respect to such Defective Loan, under the applicable Loan Purchase Agreement between the Seller, as buyer, and Keystone Bank, as seller.

## ARTICLE IV

## ADMINISTRATION AND SERVICING OF LOANS

Section 4.01.  Servicing Standard.

(a)     The Servicer is hereby authorized to act as agent for the Grantor Trust and in such capacity shall manage, service, administer and make collections on the Loans, and perform the other actions required by the Servicer under this Agreement and pursuant to the standards set forth below (the "Servicing Standard"). In performing its obligations hereunder the Servicer shall at all times act in good faith in a commercially reasonable manner in accordance with all requirements of applicable law and, with respect to the FHA Loans, requirements of the FHA applicable to the servicing of the Loans. The Servicer shall at all times service and administer the FHA Loans in accordance with Title I, and all Loans, otherwise in accordance with all other terms of this Agreement and the respective Loans, and shall have full power and authority, subject only to this Agreement, the respective Loans, and, in the case of the FHA Loans, the specific requirements and prohibitions of Title I, to do any and all things in connection with such servicing and administration which are consistent with the manner in which prudent servicers service loans similar to the Loans, and with respect to the FHA Loans, FHA Title I home improvement mortgage loans or manufactured housing loans, as applicable, owned by the Servicer or any of its affiliates or serviced by the Servicer for others and which are consistent with the ordinary practices of prudent mortgage lending institutions, but without regard to:

98-P201306

(i)    any relationship that the Servicer or any affiliate of the Servicer may have with the related Obligor:

(ii)    the Seller's obligations to repurchase or substitute for a Defective Loan pursuant to Section 3.05(b) or any FHA Loans pursuant to Section 4.12(b);

(iii)    the ownership of any Securities by the Servicer or any affiliate of the Servicer;

(iv)    the Servicer's obligation to make Foreclosure Advances pursuant to Section 4.08(b) or purchase any Loan pursuant to Section 4.10 or purchase any FHA Loans pursuant to Section 4.12; or

(v)    the Servicer's right to receive compensation for its services as provided herein.

The Servicer may take any action hereunder, including exercising any remedy under any Loan, retaining counsel in connection with the performance of any of its obligations hereunder and instigating litigation to enforce any obligation of any Obligor, without the consent or approval of the Grantor Trustee, unless any such consent or approval is expressly required hereunder or under applicable law.

(b)    The Grantor Trustee shall execute and return to the Servicer within 15 days after the date hereof, and within 5 days after a request by the Servicer, powers of attorney relating to all documents or instruments necessary to maintain the lien created by any Mortgage on the related Mortgaged Property or any portion thereof or any security interest on a Manufactured Home, and, within 5 days after a request by the Servicer, a power of attorney in favor of the Servicer with respect to any modification, waiver, or amendment to any document contained in any File and any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Loans and with respect to the related Properties prepared and delivered to the Grantor Trustee by the Servicer, all in accordance with the terms of this Agreement.

(c)    The Grantor Trustee shall furnish the Servicer within 15 days after the date hereof and 5 days after request of a Servicing Officer therefor any powers of attorney and other documents necessary and appropriate to carry out its servicing and administrative duties hereunder, including any documents or powers of attorney necessary to foreclose any Loan and to file claims with the FHA under the Contract of Insurance. The forms of any such powers or documents shall be appended to such requests. The Contract of Insurance Holder shall furnish the Claims Administrator within 5 days after request of an appropriate officer of the Claims Administrator therefor any powers of attorney and other documents necessary and appropriate to carry out its administrative duties pursuant to Section 4.12.

(d)    Nothing in this Agreement shall preclude the Servicer, in its individual capacity, from entering into other mortgage loans or other financial transactions with any Obligor or from

98-P201307

refinancing any Loan as a result of a general solicitation to the public or an initial inquiry of the Servicer by an Obligor not solicited by the Servicer.

(e)     The Servicer will maintain the confidentiality of all data, documents, agreements and information obtained or prepared as a result of information obtained by the Servicer in the course of performing its duties hereunder (other than information acquired by the Servicer prior to the date hereof which was not acquired by the Servicer in breach of any law or obligation of confidentiality to the Seller or any other Person with respect to such information and/or is or becomes generally available to the public other than as a result of a breach of this Agreement by the Servicer), and will use such data, documents, agreements and information only for the benefit of the Securityholders and the Seller. Nothing in this Section shall prohibit the Servicer from disclosing information requested by the Seller to be disclosed. Notwithstanding the foregoing, the Servicer shall not be obligated to hold in confidence that confidential information which (i) is required to be disclosed by regulatory authorities or (ii) is compelled to be disclosed by a court of competent jurisdiction. If the Servicer receives an order compelling disclosure of any such information, the Servicer shall give the Seller notice of such order at least five (5) Business Days prior to the date such information is to be disclosed.

Section 4.02.  Subservicing Arrangements.  The Servicer may perform its responsibilities relating to servicing through other subservicers, agents or independent contractors; however, no provision of this Agreement shall be deemed to relieve the Servicer of any of its duties and obligations to the Grantor Trustee or the Grantor Trust Certificateholder with respect to the servicing and administration of the Loans; it being understood that the Servicer shall be obligated with respect thereto to the same extent and under the same terms and conditions as if it alone were performing all duties and obligations set forth in this Agreement in connection with the collection, servicing and administration of such Loans.

Section 4.03.  Servicing Record.

(a)     The Servicer shall establish and maintain books and records in either a printed or electronic format (the "Servicing Record") in which the Servicer shall record: (i) all Payments received or collected by the Servicer or received by the Grantor Trustee (or the Seller and delivered to the Grantor Trustee) in respect of each Loan and each Foreclosed Property and (ii) all amounts owing to the Servicer in compensation for services rendered by the Servicer hereunder or in reimbursement of costs and expenses incurred by the Servicer hereunder in respect of the Loans. In addition, the Servicer shall establish and maintain records for the Insurance Record (which shall be part of such Servicing Record) in which the Servicer shall record all claims made under the Contract of Insurance, all payments received by or on behalf of the Contract of Insurance Holder from the FHA for each such claim and the amount of FHA Insurance coverage available in the Insurance Record.

(b)     Except as otherwise provided herein, amounts received or collected by or on behalf of the Servicer or the Grantor Trustee from or on behalf of any Obligor or in respect of any Foreclosed Property or from the FHA with respect to a claim made under the Contract of Insurance shall be credited to the Servicing Record:

98-P201308

(i)    promptly following deposit of the receipt or collection in the related Collection Account; or

(ii)    in the case of any amount received directly by the Grantor Trustee, promptly following the Servicer's actual knowledge of receipt by the Grantor Trustee pursuant to the notice required by Section 4.12(d) or otherwise;

but in any event no later than the Determination Date next following the date of receipt or collection by or on behalf of the Servicer or receipt by the Grantor Trustee. Amounts received or collected by the Servicer in connection with the purchase or repurchase of any Loan or any Foreclosed Property shall be so recorded as of the date of receipt and recorded within one Business Day after such receipt. The Servicing Record shall separately reflect amounts so received or collected by the Servicer in each Due Period. All Payments received from or on behalf of an Obligor shall be allocated in the order of Monthly Payments due or past due so that all amounts received are allocated first to the Monthly Payment first coming due and with respect to such Monthly Payment, first, to scheduled interest (other than default interest) due in accordance with the related Debt Instrument, second, to any principal due and payable in accordance with the related Debt Instrument, and third, to default interest, late charges and other amounts payable under the related obligations, except to the extent that such allocation in respect of any Loan is inconsistent with the terms of the related Debt Instrument or, in the case of any FHA Loan, Title I.

(c)    The Servicer shall credit to the Servicing Record relating to each Due Period, on a Loan-by-Loan basis, each of the following Payments collected or received by or on behalf of the Servicer or received by the Grantor Trustee in respect of each Loan and each Foreclosed Property:

(i)    all payments on account of principal;

(ii)    all payments on account of interest;

(iii)    all Substitution Adjustment Amounts and proceeds of the substitution, purchase or repurchase of any Loan pursuant to Section 3.05, Section 4.10 or Section 4.12(b);

(iv)    all amounts paid by or on behalf of the related Obligor in respect of Foreclosure Advances previously advanced by the Servicer;

(v)    all revenues received or collected in respect of any Foreclosed Property, including all proceeds of the sale of any Foreclosed Property pursuant to Section 4.13;

(vi)    all proceeds of the sale of the Loans and any Foreclosed Properties pursuant to Section 11.01;

(vii)    all FHA Insurance Payment Amounts;

98-P201309

(viii)    all Insurance Proceeds, any condemnation awards or settlements or any payments made by any related guarantor or third-party credit-support provider and any and all other amounts received in respect of Loans and not specified above; and

(ix)    all Portability Fees received or collected.

(d)    Notwithstanding anything to the contrary herein, the Servicer shall not be required to credit to the Servicing Record, and none of the Servicer, the Grantor Trust Certificateholder or any Securityholder shall have any right to or interest in any amount due or received with respect to any Loan or any related Foreclosed Property subsequent to the date of purchase or repurchase of such Loan or Foreclosed Property from the Grantor Trust.

(e)    The Servicer shall separately record in the Servicing Record the items required to be included in the Servicer Certificate and additionally the following items to the extent not included therein:

(i)    on or before each Determination Date, the related unpaid Servicing Fee due the Servicer on the next Distribution Date;

(ii)    all related amounts retained by the Servicer in respect of the preceding Due Period in respect of amounts due Independent Contractors hired by the Servicer to operate and manage a Foreclosed Property pursuant to Section 4.14(c);

(iii)    [reserved];

(iv)    on or before each Determination Date, all amounts due as of the preceding Monthly Cut-Off Date in reimbursement of related Foreclosure Advances previously advanced by the Servicer (separately identifying the type and amount of each then due);

(v)    on or before each Determination Date and based on information provided to the Servicer by the Indenture Trustee, all Priority Expenses incurred during the related Due Period;

(vi)    promptly following each Distribution Date, the aggregate amount of the Servicing Fee paid to the Servicer on such Distribution Date;

(vii)    promptly following each Distribution Date, the aggregate amount of related Foreclosure Advances reimbursed to the Servicer on such Distribution Date;

(viii)    on or prior to each Determination Date, the Principal Balance of such Loans that became Defaulted Loans during the prior Due Period;

(ix)    on or before each Determination Date, the related 60+ Delinquency Percentage (Rolling Six Month); the related Annual Default Percentage (Rolling Twelve Month) and the related Cumulative Losses;

98-P201310

62

(x)    on or before each Determination Date, the amount deposited into the related Collection Accounts representing payments by Obligors on Invoiced Loans in respect of premium on FHA Insurance;

(xi)    on or before each Determination Date, the amount of claims made to the Insurance Coverage Reserve Account with respect to the FHA Loans, if any;

(xii)    on or before each Determination Date, identification by Loan number, Obligor name, address of Property and Principal Balance of each such Loan with respect to which the Servicer has requested that the Grantor Trustee obtain the environmental report required by Section 4.12 in connection with deciding pursuant to Section 4.12 whether to foreclose on or otherwise acquire title to the related Property;

(xiii)    on or before each Determination Date, the Principal Balance of each such Loan with respect to which the Servicer has determined under the circumstances described in Section 4.12(a) in good faith in accordance with customary mortgage loan servicing practices that all amounts which it expects to receive with respect to such Loan have been received; and

(xiv)    on or before each Determination Date, any other information with respect to the Loans reasonably required by the Grantor Trustee to determine the amount of required distributions pursuant to Section 5.01 (d) and by the Indenture Trustee to determine the amount of required distributions pursuant to Section 5.01 (e), as applicable, and determinable by the Servicer without undue burden from the items otherwise required to be maintained in the Servicing Record.

(f)    On or before each Distribution Date, the Servicer will determine, based on the date of origination of the FHA Loans as set forth in the Loan Schedule, the amount of FHA Insurance premium, if any, due on or prior to the next succeeding Distribution Date with respect to each FHA Loan. On or before such Distribution Date, the Servicer will compare such amounts with respect to each Loan against amounts invoiced by the FHA with respect to the Contract of Insurance as due on or prior to such next succeeding Distribution Date and report all discrepancies to the Grantor Trustee. The Seller will assist the Grantor Trustee with the transfer of FHA Insurance with respect to each Loan to the Contract of Insurance Holder. The Servicer is not responsible for the transfer of FHA Insurance or the payment of any premium for FHA Insurance from its own funds.

Section 4.04.  Annual Statement as to Compliance; Notice of Servicer Termination Event.

(a)    The Servicer will deliver to the Grantor Trustee and the Indenture Trustee on or before March 31 of each year beginning in 1999 an Officer's Certificate signed by a Responsible Officer of the Servicer stating with respect to the Grantor Trust, that:

(i)    a review of the activities of the Servicer during the preceding calendar year (or in connection with the first such Officer's Certificate the period from the Closing

98-P201311

Date through the end of such calendar year) and of the Servicer's performance under this Agreement with respect to such Grantor Trust has been made under the supervision of the signer of such Officer's Certificate; and

(ii)     to the best of such signer's knowledge, based on such review, the Servicer has fulfilled all its obligations under this Agreement throughout such year (or such portion of such year), or there has been a default in the fulfillment of any such obligation, in which case such Officer's Certificate shall specify each such default known to such signer and the nature and status thereof and what action the Servicer proposes to take with respect thereto.

(b)     The Servicer shall deliver to the Grantor Trustee, the Indenture Trustee, the Seller and the Contract of Insurance Holder promptly after having obtained knowledge thereof, but in no event later than two Business Days thereafter, written notice in an Officer's Certificate of any event which, with the giving of notice or lapse of time, or both, would become a Servicer Termination Event under Section 10.01. Each of the Seller, the Grantor Trustee, the Indenture Trustee, the Contract of Insurance Holder and the Servicer shall deliver to the other of such Persons promptly after having obtained knowledge thereof (other than by receipt of written notice from any of such other Persons pursuant to this paragraph), but in no event later than two Business Days thereafter, written notice in an Officer's Certificate of any event which, with the giving of notice or lapse of time, or both, would become a Servicer Termination Event under Section 10.01.

Section 4.05.  Annual Independent Accountants' Report.

The Servicer shall cause a firm of Independent Accountants, who may also render other services to the Servicer, to deliver to the Grantor Trustee, the Indenture Trustee and the Majority Certificateholder on or before May 31 (or 150 days after the end of the Servicer's fiscal year) of each year, beginning on the first May 31 (or other applicable date) after the date that is six months after the Closing Date, with respect to the twelve months ended the immediately preceding December 31 (or other applicable date) (or such other period as shall have elapsed from the Closing Date to the date of such certificate) a report (the "Accountants' Report") including: (i) an opinion on the financial position of the Servicer at the end of its most recent fiscal year, and the results of operations and changes in financial position of the Servicer for such year then ended on the basis of an examination conducted in accordance with generally accepted auditing standards, and (ii) a statement to the effect that, based on an examination of certain specified documents and records relating to the servicing of the Servicer's mortgage loan portfolio, conducted in compliance with the audit program for mortgages serviced for FNMA, Mortgagee Audit Standards or the Uniform Single Attestation Program for Mortgage Bankers (the "Applicable Accounting Standards"), such firm is of the opinion that such servicing has been conducted in compliance with the Applicable Accounting Standards except for such exceptions as such firm shall believe to be immaterial and such other exceptions as shall be set forth in such statement.

98-P201312

Section 4.06. <u>Access to Certain Documentation and Information Regarding Loans.</u>

The Servicer shall provide to representatives of the Grantor Trustee, the Indenture Trustee and the Certificateholders, at the expense of the Servicer, reasonable access to the documentation regarding the Loans and to those employees of the Servicer who are responsible for the performance of the Servicer's duties hereunder, provided that the examining party shall provide to the Servicer a copy of any report generated in connection with any such examination. Such records shall not include any proprietary or confidential information, as reasonably determined by the Servicer. The Servicer shall provide such access to the Grantor Trust Certificateholder and any Noteholder (on the same conditions set forth in the immediately preceding two sentences) which is a federally insured savings and loan association, the Office of Thrift Supervision, the FDIC and the supervisory agents and examiners of the Office of Thrift Supervision access to the documentation regarding the Loans required by applicable regulations of the Office of Thrift Supervision and the FDIC (acting as operator of the SAIF or the BIF), such access shall be afforded without charge but only upon reasonable advance written request and during normal business hours and with any expenses of such parties being paid by such parties. Nothing in this Section shall derogate from the obligation of the Servicer to observe any applicable law prohibiting disclosure of information regarding the Obligors, and the failure of the Servicer to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section. Any Securityholder, by its acceptance of a Security (or by acquisition of its beneficial interest therein), shall be deemed to have agreed to keep confidential and not to use for its own benefit any information obtained by it pursuant to this Section, except as may be required by applicable law or by any applicable regulatory authority.

Section 4.07. <u>Appointment of Paying Agent.</u>

The U.S. Bank Trust National Association is hereby appointed as Paying Agent under this Agreement and U.S. Bank Trust National Association hereby accepts such appointment. The Paying Agent shall make distributions to Certificateholders from the Certificate Distribution Account pursuant to Section 5.2 of the Trust Agreement and Section 5.03 hereof and shall report the amounts of such distributions in writing to the Owner Trustee. The Paying Agent shall have the revocable power to withdraw funds from the Certificate Distribution Account for the purpose of making the distributions referred to above. In the event that the Administrator shall no longer be the Paying Agent, the Seller shall appoint a successor to act as Paying Agent (which shall be a bank or trust company). Such successor Paying Agent or any additional Paying Agent appointed by the Seller shall execute and deliver to the Owner Trustee an instrument in which such successor Paying Agent or additional Paying Agent shall agree with the Owner Trustee that as Paying Agent, such successor Paying Agent or additional Paying Agent will hold all sums, if any, held by it for payment to the Certificateholders in trust for the benefit of the Certificateholders entitled thereto until such sums shall be paid to such Certificateholders. The Paying Agent shall return all unclaimed funds to the Owner Trustee, and upon removal of a Paying Agent, such Paying Agent shall also return all funds in its possession to the Owner Trustee. The provisions of Sections 7.1, 7.2, 7.3, 7.4 and 8.1 of the Trust Agreement shall apply to the Paying Agent and, to the extent applicable, to any other paying agent appointed hereunder.

98-P201313

Any reference in this Agreement or the Trust Agreement to the Paying Agent shall include any co-paying agent unless the context requires otherwise. Notwithstanding anything herein to the contrary, the Paying Agent shall be the same entity as the Indenture Trustee under the Indenture. In the event that the Indenture Trustee shall not be the same entity as the Paying Agent, the Paying Agent shall resign and the Owner Trustee or its designee shall assume the duties and obligations of the Paying Agent as provided in the Trust Agreement and under Section 5.03 hereunder.

Section 4.08.  Advances.

(a)    [Reserved].

(a)    The Servicer shall advance from its own funds the following amounts in respect of any Loan or Foreclosed Property, as applicable (collectively, "Foreclosure Advances"):

(i)    all third party costs and expenses (including legal fees and costs and expenses relating to bankruptcy, insolvency, collection or other enforcement proceedings in respect of any Obligor) associated with the institution of foreclosure, collection or other enforcement proceedings or other legal proceedings in respect of the related Obligor in respect of any such Loan pursuant to Section 4.01(a) or Section 4.12;

(ii)    all insurance premiums due and payable in respect of each Foreclosed Property, prior to the date on which the related Insurance Policy would otherwise be terminated;

(iii)    all real estate taxes and assessments in respect of each Foreclosed Property that have resulted in the imposition of a lien thereon, other than amounts that are due but not yet delinquent;

(iv)    all costs and expenses necessary to maintain each Foreclosed Property;

(v)    all fees and expenses payable to any Independent Contractor hired to operate and manage a Foreclosed Property pursuant to Section 4.14(c); and

(vi)    all fees and expenses of any Independent appraiser or other real estate professional retained by the Grantor Trustee or Servicer pursuant to Section 4.13(a) or Section 4.15.

The Servicer shall advance the Foreclosure Advances described in clauses (i) through (vi) above if the Servicer would make such an advance if it would be appropriate to do so under the Servicing Standard and, in the Servicer's good faith judgment at the time of such determination, such amounts will be recoverable from related Payments.

98-P201314

Section 4.10.  <u>Modifications, Waivers and Amendments.</u>

(a)    The Servicer shall not agree to any modification, waiver or amendment of any provision of any Loan unless, in the Servicer's good faith judgment, such modification, waiver or amendment (i) would be reasonably likely at the time of making of such determination to produce a greater recovery on a present value basis with respect to such Loan than some other type of resolution, and (ii) in the case of any FHA Loan, complies with the requirements of Title I or is required by Title I. In either case and except as set forth in paragraph (b) below, the Servicer may agree to such modification, waiver or amendment only in the event of a payment default with respect to such Loan or in the event that a payment default with respect to such Loan is reasonably foreseeable by the Servicer. The Servicer shall agree to subordinate the position of the security interest in the Property which secures any FHA Loan (other than an FHA Loan secured by a first lien on the related Property in which case the Servicer shall not agree to any such subordination) upon the Servicer's receipt of HUD's written approval to such subordination provided such subordination (i) would permit the Obligor to refinance a related senior lien to take advantage of a lower interest rate or (ii) would permit the Obligor to extend the term of the related senior lien.

(b)    Notwithstanding the foregoing, if the Loan contains a Portability Option, the Servicer shall not permit the related Obligor to exercise such option except in accordance with the Servicing Standard and unless each of the following conditions is met: (i) the Loan will not be totally unsecured at any time; (ii) the exercise of such option complies with all requirements of applicable federal, state and local law; and (iii) the exercise of such option, at the time of exercise thereof, complies with the terms of the related Debt Instrument and Mortgage. If the provisions of the Debt Instrument or Mortgage with respect to a Loan permit third party fees and expenses or a Portability Fee to be charged to the Obligor, the Servicer shall, at the time of execution of documents relating to the exercise of such option, collect the full amount of fees and expenses and the full amount of the Portability Fee unless, in the Servicer's judgment in accordance with the Servicing Standard, the collection of all or a portion of the Portability Fee would prohibit the Obligor from exercising the Portability Option and result in a payment default with respect to the Loan. All Portability Fees collected shall be deposited by the Servicer into the Collection Account within two (2) Business Days of receipt thereof and such amounts shall be deemed to be additional interest received with respect to the Loan.

(c)    The Servicer shall notify the Grantor Trustee of any modification, waiver or amendment of any provision of any Loan and the date thereof, and shall deliver to the Grantor Trustee for deposit in the related File, an original counterpart of the agreement relating to such modification, waiver or amendment, promptly following the execution thereof. In addition, with respect to an Obligor's exercise of a Portability Option, the Servicer shall deliver to the Grantor Trustee for deposit in the related File or, if applicable, submit for recordation, promptly following the execution thereof (i) a Mortgage and assignment thereof sufficient under the laws of the jurisdiction wherein the related new real Property is located to reflect of record the Grantor Trustee's interest in the related Loan and (ii) a release of Mortgage with respect to the original Mortgaged Property.

98-P201316

In the event it is determined by the Servicer, the Owner Trustee, the Indenture Trustee or the Grantor Trustee, as evidenced by written notice to the Servicer, that the exercise of a Portability Option and the related transfer of mortgage lien to a new Property, at the time of such exercise and transfer, did not comply with all requirements of applicable federal, state and local law, the Servicer shall, on the last day of the calendar month next succeeding the date on which such notice is received by the Servicer, purchase the affected Loan from the Grantor Trustee for the Purchase Price. The Servicer shall not be deemed to be in breach of its obligations under Section 4.10(b)(ii) if it purchases the affected Loan as provided herein.

Section 4.11.  <u>Due-On-Sale; Due-on-Encumbrance.</u>

(a)  If any Loan contains a provision, in the nature of a "due-on-sale" clause, which by its terms:

(i)  provides that such Loan shall (or may at the Obligee's option) become due and payable upon the sale or other transfer of an interest in the related Property; or

(ii)  provides that such Loan may not be assumed without the consent of the related Obligee in connection with any such sale or other transfer,

then, for so long as such Loan is included in the Grantor Trust, the Servicer to the extent it has knowledge of such sale or other transfer, on behalf of the Grantor Trustee, shall exercise any right the Grantor Trustee may have as the Obligee of record with respect to such Loan (x) to accelerate the payments thereon or (y) to withhold its consent to any such sale or other transfer, in a manner consistent with the Servicing Standard; provided, however, that if it would be appropriate under the loan documents and the Servicing Standard for the Servicer to enter into an assumption and/or modification agreement with the assignee rather than to accelerate the indebtedness and the Servicer has determined that the proposed assignee of the Loan satisfied the then current underwriting criteria of the Seller for a loan such as the Loan and that the proposed assignee has credit characteristics similar to the related Obligor, then the Servicer may do so.

(b)  If any Loan contains a provision, in the nature of a "due-on-encumbrance" clause, which by its terms:

(i)  provides that such Loan shall (or may at the Obligee's option) become due and payable upon the creation of any lien or other encumbrance on the related Property; or

(ii)  requires the consent of the related Obligee to the creation of any such lien or other encumbrance on the related Property,

then, for so long as such Loan is included in the Grantor Trust, the Servicer, on behalf of the Grantor Trustee, shall exercise any right the Grantor Trustee may have as the Obligee of record with respect to such Loan (x) to accelerate the payments thereon or (y) to withhold its consent to the creation of any such lien or other encumbrance, in a manner consistent with the Servicing

98-P201317

Standard and as permitted by law; provided, however, that if it would be appropriate under the loan documents and the Servicing Standard for the Servicer to not accelerate the indebtedness, then the Servicer may refrain from doing so.

(c)     Nothing in this Section 4.11 shall constitute a waiver of the Grantor Trustee's right to receive notice of any assumption of a Loan, any sale or other transfer of the related Property or the creation of any lien or other encumbrance with respect to such Property.

(d)     Except as otherwise permitted by Section 4.10, the Servicer shall not agree to modify, waive or amend any term of any Loan in connection with the taking of, or the failure to take, any action pursuant to this Section 4.11.

Section 4.12.  Collection; Claims for FHA Insurance and Foreclosures.

(a)  .  (x)     If any Monthly Payment due under any FHA Loan is not paid when the same becomes due and payable, or if the Obligor fails to perform any other covenant or obligation under the FHA Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action (consistent with Title I, including efforts to cure the default of such Loan pursuant to 24 C.F.R. Section 201.50) as it shall deem to be in the best interest of the Grantor Trust.  If the maturity of the related Debt Instrument has been accelerated pursuant to the requirements under Title I following the Servicer's efforts to cure the default of the FHA Loan (and such Loan is not required to be purchased pursuant to Section 3.05), and (i) if an FHA Insurance Coverage Insufficiency does not exist at the time, the Claims Administrator shall initiate, on behalf of the Grantor Trust and the Contract of Insurance Holder, a claim under the Contract of Insurance for reimbursement for loss on such Loan pursuant to Title I (see 24 C.F.R. Section 201.54), or (ii) if an FHA Insurance Coverage Insufficiency exists at the time, the Servicer shall determine within 90 days in accordance with Section 4.12(c) whether or not to proceed against the related Obligor or the Property securing the FHA Loan, and if thereafter an FHA Insurance Coverage Insufficiency does not exist, the Claims Administrator may submit a claim under the Contract of Insurance with respect to such Loan if it has obtained the prior approval of the Secretary of HUD pursuant to 24 C.F.R. Section 201.51; or (y) if any Monthly Payment due under any Non-FHA Loan is not paid when the same is due and payable, or if the Obligor fails to perform any other covenant or obligation under such Non-FHA Loan and such failure continues beyond any applicable grace period, the Servicer shall take such action as it shall deem to be in the best interest of the Grantor Trust including but not limited to proceeding against the Property securing such Non-FHA Loan.

In the event that in accordance with clause (a)(x)(ii) or (y) above the Servicer determines not to proceed against the Obligor or the Property, on or before the Determination Date following such determination the Servicer shall determine in good faith in accordance with the Servicing Standard that all amounts which it expects to receive with respect to such Loan have been received.  If the Servicer makes such a determination, it shall record such determination pursuant to Section 4.03(e)(iii).

98-P201318

(b)     If the Claims Administrator initiates a claim for reimbursement for loss on any FHA Loan under this Section, the Claims Administrator shall comply with applicable provisions of Title I and diligently pursue such claim and, in any event, shall initiate such claim no later than the last day permitted under Title I (see 24 C.F.R. Section 201.54(b)). For purposes of this Agreement, the term "initiate a claim for reimbursement" shall mean the filing of the claim application pursuant to the requirements set forth in 24 C.F.R. Section 201.54, including the filing of all related assignments and documents and materials required for file review. For the purposes of such filing, the Claims Administrator shall request in writing, and the Grantor Trustee within five calendar days of receipt of such written request shall deliver to the Claims Administrator, the Note and any related Mortgage for such FHA Loan and each other item in the related File necessary to make such claim. The Grantor Trust Certificateholder hereby consents to the assignment of such FHA Loan for the sole purpose of initiating a claim under the Contract of Insurance for reimbursement with respect to such Loan. Pursuant to Section 4.01(c), the Contract of Insurance Holder shall furnish the Claims Administrator within fifteen days after the date of this Agreement a power of attorney to file claims under the Contract of Insurance. The Grantor Trustee and Contract of Insurance Holder agree to execute and deliver to the Claims Administrator, upon written request, within five Business Days after receipt from the Claims Administrator, all documents, if any, necessary to initiate and file a claim under the Contract of Insurance for such Loan, which documents shall be prepared by the Claims Administrator. If the FHA rejects or refuses to pay any claim (including a rejection of a previously paid claim and a demand by the FHA of the return of the FHA Insurance Payment Amount for such FHA Loan) made under the Contract of Insurance for an FHA Loan under this Section (other than a refusal or rejection for clerical error in computing the claim amount or because the amount of the FHA Insurance Coverage Reserve Account as shown in the Insurance Record is zero (a "Zero Balance Event")), upon receipt of the FHA's rejection notice by the Claims Administrator directly from the FHA or from the Contract of Insurance Holder pursuant to Section 4.12(e) and determination by the Claims Administrator that the rejection was not due to clerical error, then the Claims Administrator shall promptly notify the Contract of Insurance Holder (if the Contract of Insurance Holder shall not initially have received such notice) and the Grantor Trustee of such fact.

If the FHA indicates in writing in connection with its rejection of, or refusal to pay, a claim that such rejection or refusal is due to other than a "Zero Balance Event" or a failure by the Servicer to service such FHA Loan in accordance with Title I, the Seller shall be obligated on or before the Monthly Cut-Off Date next following the date of such notice from the Claims Administrator to repurchase such Loan, either directly from FHA or from the Grantor Trustee, to repurchase such FHA Loan for the Purchase Price. Notwithstanding the foregoing, if the FHA shall have indicated in writing in connection with its rejection or refusal to pay a claim that such rejection or refusal is due to a failure to service such FHA Loan in accordance with Title I, the Claims Administrator shall notify the Seller, the Contract of Insurance Holder, the Owner Trustee, the Grantor Trustee and the Indenture Trustee of such determination, and the Servicer shall, on the last day of the calendar month next succeeding the date on which such final rejection notice is received by the Servicer from the FHA, either directly from FHA or from the Grantor Trustee, repurchase such FHA Loan for the Purchase Price. In the event that the FHA

98-P201319

71

shall not have provided the indication in writing as specified in the preceding two sentences (x) if it is not agreed by the Servicer that a rejection or refusal by the FHA is due to a servicing failure, the Seller shall be obligated to purchase such FHA Loan for the Purchase Price (except if such rejection is due to a Zero Balance Event), and (y) if it is agreed by the Servicer that a rejection or refusal by the FHA is due to a servicing failure, the Servicer shall be obligated to purchase such FHA Loan for the Purchase Price. By way of clarification of the foregoing, the parties agree that for the purpose of this Section 4.12(b) and Section 4.12(g), a rejection due to a failure to service FHA Loans in accordance with Title I shall be limited to a failure of the Servicer to comply with its duties under this Agreement only and shall not include a failure in servicing prior to the Closing Date with respect to the Initial Loans or the Subsequent Transfer Date with respect to the Subsequent Loans or a failure by any other party hereto to perform its obligations as required hereunder.

(c)     With respect to an FHA Loan which has been accelerated following the Servicer's efforts to cure the default of the Loan, in accordance with the criteria set forth in Section 4.12(a), unless otherwise prohibited by applicable law, including Title I, or court or administrative order, the Servicer, on behalf of the Grantor Trustee, may, at any time, institute proceedings to enforce the Grantor Trustee's right with respect to such FHA Loan.

The Servicer shall institute foreclosure proceedings, repossess, exercise any power of sale to the extent permitted by law, obtain a deed in lieu of foreclosure, or otherwise if it would be reasonably likely at the time of making such determination to produce a greater recovery on a present value basis with respect to such Loan than some other type of resolution. Notwithstanding the foregoing, if the Servicer has cause to reasonably believe that any Property is contaminated by hazardous material, then prior to taking title to any Property, the Servicer shall obtain and provide a copy to the Grantor Trustee of, an environmental review to be performed on such Property by a company with recognized expertise, the scope of which review is limited to the examination of public records and documents for information regarding whether such Property has on it, under it or is near, hazardous or toxic materials or waste. If such review reveals that such Property has on it, under it or is near hazardous or toxic materials or waste or reveals any other environmental problem, title shall be taken to such Property only after obtaining the written consent of the Rating Agencies.

If, in following foreclosure procedures, title to the Foreclosed Property is acquired, the deed or certificate of sale shall be issued to the Grantor Trustee.

(d)     With respect to any FHA Loan, each of the Grantor Trustee and the Contract of Insurance Holder shall deposit in the Collection Account on the day of receipt, all amounts received from the FHA or any other Person with respect to such Loan and shall transmit by facsimile, or such other method requested by the Servicer, to the Servicer on each such day the letter of transmittal received from the FHA and any other documents with respect to such receipt. Each of the Grantor Trustee and the Contract of Insurance Holder shall also promptly deliver to the Claims Administrator copies of any other correspondence received from the FHA or sent to the FHA by the Grantor Trustee or the Contract of Insurance Holder, as the case may be,

98-P201320

including, but not limited to, any correspondence regarding the balance of the FHA Insurance Coverage Reserve Account, premiums due and claims rejected.

(e)     If, prior to the Termination Date, the FHA rejects an insurance claim, in whole or in part, under the Contract of Insurance after having previously paid such insurance claim and the FHA demands that the Contract of Insurance Holder repurchase such FHA Loan, the Contract of Insurance Holder shall notify the Claims Administrator of such rejected claim and the Claims Administrator upon receipt of such notice shall pursue such appeals with the FHA as are reasonable. If the FHA continues to demand that the Contract of Insurance Holder repurchase such FHA Loan after the Claims Administrator exhausts such administrative appeals as are reasonable, then notwithstanding that the Seller, the Servicer or any other Person is required to repurchase such Loan under this Agreement, the Claims Administrator shall notify the Contract of Insurance Holder of such fact and the Contract of Insurance Holder shall instruct the Grantor Trustee to cause the Grantor Trust to repurchase such Loan from funds available in the Collection Account. The Servicer shall, to the extent possible, direct the Grantor Trustee to make all such repurchases of FHA Loans once a month and to repurchase any and all such FHA Loans from the FHA in that portion of the calendar month following the Distribution Date. If the Grantor Trustee withdraws any amounts from the Grantor Trust for such purpose between the Determination Date and Distribution Date of any month, the Servicer shall prepare the Servicer Certificate required under Section 6.01 for such Distribution Date (or promptly revise the Servicer Certificate if already prepared for such Distribution Date) to reflect such withdrawals as if made on such Determination Date and the Grantor Trustee shall revise its determination pursuant to Section 6.01 accordingly. To the extent allowed by the FHA, the Seller may repurchase directly from the FHA any FHA Loan for which an insurance claim has been paid and later rejected by the FHA. If the FHA indicates in writing in connection with its rejection of or refusal to pay a claim that such rejection or refusal is due to other than a "Zero Balance Event", failure by the Contract of Insurance Holder to pay FHA premiums in accordance with the terms of this Agreement, or a failure to service the Loan in accordance with Title I or if the FHA does not indicate in writing the reason for its rejection or refusal, then the Seller shall be liable to reimburse the Grantor Trust for any amounts paid by the Grantor Trustee to the FHA in order to repurchase such FHA Loan. The Contract of Insurance Holder shall repurchase the related Loan for which the Contract of Insurance Holder has failed to pay FHA premiums in accordance with the terms of this Agreement. Subject to Section 4.12(b), if the FHA indicates in writing, in connection with its final rejection or refusal to pay a claim that such rejection or refusal is due to a failure by the Servicer to service such FHA Loan in accordance with Title I after the Closing Date or the Subsequent Transfer Date, as applicable, the Servicer shall be obligated to reimburse the Grantor Trust or the Seller for any amounts paid by the Grantor Trustee or the Seller, as the case may be, to the FHA in order to repurchase FHA Loans for which the FHA has rejected an insurance claim as a result of a failure to service such FHA Loan in accordance with Title I.

(f)     If, after the Termination Date, the FHA rejects an insurance claim, in whole or part, under the Contract of Insurance after previously having paid such insurance claim and the FHA demands that the Contract of Insurance Holder repurchase such FHA Loan, the Claims

98-P201321

Administrator shall pursue such appeals with the FHA as are reasonable. If the FHA continues to demand that the Contract of Insurance Holder repurchase such FHA Loan after the Claims Administrator exhausts such administrative appeals as are reasonable, then, notwithstanding that the Seller or any other Person is required to repurchase such Loan under this Agreement, the Claims Administrator shall notify the Contract of Insurance Holder of such fact and the Contract of Insurance Holder shall repurchase such Loan from the FHA. If the FHA indicates in writing in connection with its rejection of or refusal to pay a claim that such rejection or refusal is due to other than a failure to service the FHA Loan in accordance with Title I or if the FHA does not indicate in writing the reason for its rejection or refusal, then the Seller shall be obligated to reimburse the Contract of Insurance Holder for any amounts paid by the Contract of Insurance Holder to the FHA in order to repurchase such Loan. Subject to Section 4.12(b), if the FHA indicates in writing, in connection with its rejection or refusal to pay a claim or it is agreed by the Servicer, that such rejection or refusal is due to a failure to service such FHA Loan in accordance with Title I after the Closing Date or the Subsequent Transfer Date, as applicable, then the Servicer shall be obligated to reimburse the Contract of Insurance Holder or the Seller for any amounts paid by the Contract of Insurance Holder or the Seller to the FHA in order to repurchase FHA Loans for which the FHA has rejected an insurance claim as a result of a failure to service such Loan in accordance with Title I.

(g)     The Claims Administrator shall not be entitled to reimbursement of expenses associated with the filing of any FHA Insurance claim from and to the extent of such amounts as are reimbursed by FHA.

Section 4.13. Sale of Foreclosed Properties.

(a)     The Servicer may offer to sell, in a commercially reasonable manner, to any Person any Foreclosed Property, if and when the Servicer determines, in a manner consistent with the Servicing Standard, that such a sale would be in the best interests of the Grantor Trust but shall, in any event, so offer to sell any Foreclosed Property no later than the time determined by the Servicer to be sufficient to result in the sale of such Foreclosed Property on or prior to the dates specified in Section 4.13(c). The Servicer shall, subject to the Servicing Standard, accept the highest bid received from any Person for any Foreclosed Property

(b)     Subject to the provisions of Section 4.12, the Servicer shall act on behalf of the Grantor Trustee in negotiating, and taking any other action necessary or appropriate in connection with, the sale of any Foreclosed Property including the collection of all amounts payable in connection therewith. Any sale of a Foreclosed Property shall be without recourse to the Grantor Trustee, the Servicer or the Grantor Trust or holder of the Grantor Trust Certificate and, if consummated in accordance with the terms of this Agreement, none of the Servicer or the Grantor Trustee shall have any liability to the Grantor Trust Certificateholder or any Securityholder with respect to the purchase price therefor accepted by the Servicer or the Grantor Trustee.

(c)     In the event the Grantor Trustee acquires any Foreclosed Property with respect to any Loan, the Servicer shall use its best efforts to liquidate such Foreclosed Property as soon as

98-P201322

74

commercially reasonable but in no event later than one year following the date on which the Grantor Trustee acquired such Foreclosed Property; provided, however, that if at the end of the foregoing one-year period, the Servicer has been unable to sell such Foreclosed Property, such Foreclosed Property may be retained by the Grantor Trust so long as the Servicer continues to use its best efforts to sell the Foreclosed Property in a commercially reasonable manner and the retention for such period would not cause the Grantor Trust to be treated as an association taxable as a corporation and the Grantor Trustee receives an Opinion of Counsel (which shall not be at the expense of the Servicer) to the effect that such retention would not cause the Grantor Trust to be characterized as an association or publicly traded partnership taxable as a corporation for federal income tax purposes .

Section 4.14.  Management of Real Estate Owned.

(a)     If the Grantor Trust acquires any Foreclosed Property pursuant to Section 4.12, the Servicer shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement, to do any and all things in connection therewith as are consistent with the manner in which the Servicer manages and operates similar property owned by the Servicer or any of its affiliates, all on such terms and for such period as the Servicer deems to be in the best interests of the Grantor Trust Certificateholder and the Securityholders.

(b)     [Reserved].

(c)     The Servicer may contract with any Independent Contractor for the operation and management of any Foreclosed Property; provided, however, that:

(i)     the terms and conditions of any such contract may not be inconsistent herewith;

(ii)     any such contract shall require, or shall be administered to require, that the Independent Contractor remit all related Payments to the Servicer as soon as practicable, but in no event later than two Business Days following the receipt thereof by such Independent Contractor;

(iii)     none of the provisions of this Section 4.14(c) relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the Servicer of any of its duties and obligations to the Grantor Trustee for the benefit of the Grantor Trust Certificateholder and the Securityholders with respect to the operation and management of any such Foreclosed Property; and

(iv)     the Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such Foreclosed Property.

The Servicer shall be entitled to enter into, with any Independent Contractor performing services for it related to its duties and obligations hereunder, any agreement for indemnification of the

98-P201323

Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification. The Servicer shall be solely liable for all fees owed by it to any such Independent Contractor, but shall be entitled to be reimbursed for all such fees advanced by it pursuant to Section 4.08(b)(v) in the manner provided in Section 4.09(b).

Section 4.15. Inspections.

The Servicer shall inspect or cause to be inspected each Property that secures any Loan at such times and in such manner as are consistent with the Servicing Standard.

Section 4.16. Maintenance of Insurance.

(a)     The Servicer shall cause to be maintained for each Foreclosed Property acquired by the Grantor Trust such types and amounts of insurance coverage as the Servicer shall deem reasonable. With respect to each Manufactured Housing Contract, the Servicer will cause to be maintained hazard insurance, for the benefit of the Grantor Trust, with respect to each related Property in an amount which is at least equal to the outstanding Principal Balance on the Manufactured Housing Contract, except that the amount of such insurance may be less than the actual cash value of the Manufactured Home where state law precludes a higher amount. With respect to each Loan for which the related Property is covered by hazard insurance or flood insurance (if required), the Servicer will cause such insurance coverage to be maintained. In addition, the Servicer shall force place or cause to be force placed flood insurance issued by the Federal Emergency Management Agency ("FEMA") or conforming to the requirements of applicable law, in an amount equal to the outstanding balance of the Loan or the maximum limit of coverage available with respect to the related Property, if (A) a determination has been made that the related Property is located in a flood area identified by FEMA and (B) the Servicer has received notice that flood insurance on the related Property is inadequate or that the related Obligor has let such insurance lapse or that such insurance is otherwise terminated.

(b)     Any amounts collected by the Servicer under any Insurance Policies, shall be paid over or applied by the Servicer as follows:

(i)     In the case of amounts received in respect of any Loan:

(A)     for the restoration or repair of the affected Property, in which event such amounts shall be released to the Obligor in accordance with the terms of the related Note, or to the extent not so used, or

(B)     in reduction of the Principal Balance of the related Loan, in which event such amounts shall be credited to the Servicing Record, unless the related instruments require a different application, in which case such amounts shall be applied in the manner provided therein; and

(ii)     Subject to Section 4.14, in the case of amounts received in respect of any Foreclosed Property, for the restoration or repair of such Foreclosed Property, unless the

98-P201324

Servicer determines, in a manner consistent with the Servicing Standard, that such restoration or repair is not in the best economic interest of the Grantor Trust, such amounts shall be credited, as of the date of receipt, to the applicable Servicing Record, as a Payment received from the operation of such Foreclosed Property.

Section 4.17.  Release of Files.

(a)     If with respect to any Loan:

(i)     the outstanding Principal Balance of such Loan plus all interest accrued thereon shall have been paid;

(ii)     the Servicer shall have received, in escrow, payment in full of such Loan in a manner customary for such purposes;

(iii)     such Loan has become a Purchased Loan or has been replaced by a Substitute Loan; ..

(iv)     such Loan or the related Foreclosed Property has been sold in connection with the termination of the Trust pursuant to Section 11.01;

(v)     the FHA has paid a claim with respect to such Loan under the Contract of Insurance; or

(vi)     the related Foreclosed Property has been sold pursuant to Section 4.13;

and, in each such case, the Servicer shall deliver a written request, substantially in the form attached hereto as Exhibit E, requesting that the Grantor Trustee on behalf of itself and on behalf of the Owner Trustee and the Indenture Trustee release to the Servicer the related File, then the Grantor Trustee shall, within three Business Days or such shorter period as may be required by applicable law to avoid the imposition of any penalties against the Servicer for failing to timely release a lien or to return original loan documents, release the related File to the Servicer and execute and deliver such instruments of transfer or assignment, in each case without recourse, as shall be necessary to vest ownership of such Loan in the Servicer or such other Person as may be specified in such certificate, the forms of any such instrument to be appended to such certificate.

(b)     From time to time and as appropriate for the servicing or foreclosure of any Loan, the Grantor Trustee shall, upon request of the Servicer, release the related File (or any requested portion thereof) to the Servicer.  The Servicer agrees that any such File held by the Servicer shall be held by it for the benefit of and as agent of the Grantor Trust Certificateholder, the Grantor Trustee and the Grantor Trust as the owner thereof.  It is intended that by the Servicer's agreement pursuant to this section 4.17 the Grantor Trustee shall be deemed to be in possession of the File for purposes of Section 9-305 of the Uniform Commercial Code of the State in which such documents or instruments are located.  Such receipt shall obligate the Servicer to return the File (or such portion thereof) to the Grantor Trustee when the need therefor by the Servicer no

98-P201325

longer exists, unless any of the conditions specified in subsection (a) above is satisfied prior thereto. The Grantor Trustee shall release such receipt to the Servicer (i) upon the Servicer's return of the File (or such portion thereof) to the Grantor Trustee or (ii) if the Servicer has not yet returned the File (or such portion thereof) to the Grantor Trustee, upon receipt of a certificate certifying that any of the conditions in subsection (a) above has been satisfied.

Section 4.18. Certain Tax Matters.

(a)     The Grantor Trustee shall comply with all requirements of the Code, and applicable state and local law, with respect to the withholding from any distributions made to the Grantor Trust Certificateholder of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

(b)     The Indenture Trustee shall comply with all requirements of the Code, and applicable state and local law, with respect to the withholding from any distributions made to any Securityholder of any applicable withholding taxes imposed thereon and with respect to any applicable reporting requirements in connection therewith.

Section 4.19. Filing of Continuation Statements.

On or before the fifth anniversary of the filing of any financing statements by the Seller, with respect to the assets conveyed to the Grantor Trust and the Trust, the Seller shall prepare, cause to have executed by the necessary parties and file in the proper jurisdictions all financing and continuation statements necessary to maintain the liens, security interests and priorities of such liens and security interests that have been granted by the Seller and the Seller shall continue to file on or before each fifth anniversary of the filing of any financing and continuation statements such additional financing and continuation statements until the Grantor Trust and the Trust, have terminated pursuant to the Grantor Trust Agreement and the Trust Agreement, respectively. Each of the Grantor Trustee and the Indenture Trustee agrees to cooperate with the Seller in preparing, executing and filing such statements. The Grantor Trustee agrees to notify the Seller on the third Distribution Date prior to each such fifth anniversary of the requirement to file such financing and continuation statements. The filing of any such statement with respect to the Seller shall not be construed as any indication of an intent of any party contrary to the expressed intent set forth in Section 2.04. If the Seller has ceased to do business whenever any such financing and continuation statements must be filed or the Seller fails to file any such financing statements or continuation statements at least one month prior to the expiration thereof, the Grantor Trustee shall perform the services required under this Section 4.19.

Section 4.20. Fidelity Bond.

The Servicer shall maintain a fidelity bond in such form and amount as is customary for entities acting as custodian of funds and documents in respect of loans on behalf of institutional investors.

98-P201326

Section 4.21. <u>Errors and Omissions Insurance.</u>

The Servicer shall obtain and maintain at all times during the term of this Agreement errors and omissions insurance coverage covering the Servicer and its employees issued by a responsible insurance company. The issuer, policy terms and forms and amounts of coverage, including applicable deductibles shall be in such form and amount as are customary for entities acting as servicers.

Section 4.22. <u>New Loan Reporting Manifest and Transfer of Note Report.</u>

(a)    The Servicer shall prepare and file a New Loan Reporting Manifest with the Secretary of HUD pursuant to 24 CFR Section 201.30 for each FHA Loan for which no such report was previously filed. The Servicer shall copy each such filing to the Seller simultaneously with the filing with HUD.

(b)    The Servicer shall prepare and file a Transfer of Note Report with respect to each FHA Loan for which a New Loan Reporting Manifest was previously filed with HUD, as required by Title I but in no event later than two Business Days after such FHA Loan become subject to this Agreement, in such manner as to cause the Grantor Trustee, for the benefit of the Grantor Trust, to be entitled to the benefits of the FHA Insurance applicable to the FHA Loans. The Servicer shall copy each such filing to the Seller simultaneously with the filing with HUD.

(c)    If a case number is not assigned by HUD to an FHA Loan due to incomplete or incorrect information on the related New Loan Reporting Manifest, the Servicer shall cooperate with and take such action as is directed by the Seller to supply corrected information to HUD with respect to such FHA Loan no later than five Business Days after the date of rejection of such FHA Loan by HUD.

Section 4.23. <u>Servicer Not Responsible.</u>

The Servicer shall not be responsible or liable for, or in breach of any of its representations, warranties or agreements under this Agreement resulting from, the acts or omissions to act of any other party to this Agreement or any other Person, including, without limitation, the failure of the Seller, Grantor Trustee or Indenture Trustee to deliver to the Servicer any file or portion thereof or any other document as required pursuant to the provisions of this Agreement following the Servicer's request therefor.

ARTICLE V

ESTABLISHMENT OF TRUST ACCOUNTS

Section 5.01. <u>Accounts.</u>

(a)    <u>Establishment of Collection Account.</u> The Grantor Trustee has heretofore established or caused to be established and shall hereafter maintain or cause to be maintained a

98-P201327

79

separate account denominated Collection Account, which in each case is and shall continue to be an Eligible Account in the name of the Indenture Trustee and shall be designated "U.S. Bank Trust National Association, as Grantor Trustee in trust for Keystone Grantor Trust Certificate, Series 1998-P2, Collection Account." The Servicer shall cause all Payments to be deposited (net of the Servicing Fee and Ancillary Fees) in the Collection Account no later than the second Business Day following the date of receipt thereof into the Servicer's designated lock-box; provided, however, that to the extent that payments are received in any location other than such lockbox, such payments must be deposited within two Business Days to such lockbox. Notwithstanding the prior sentence, the Servicer may retain Payments until two Business Days prior to the next succeeding Distribution Date and retain all reinvestment earnings thereon provided that the Servicer shall (i) within 2 Business Days of receipt thereof invest such Payments in Eligible Investments, (ii) deposit into the Collection Account any losses in respect of such investments and (iii) maintain a short-term debt rating of A-1 and P-1 by Fitch's and Moody's, respectively. The Grantor Trustee shall provide to the Servicer a monthly statement of all activity in the Collection Account. Funds in the Collection Account shall be invested in accordance with Section 5.04. The Grantor Trustee shall also cause to be deposited to the Collection Account not later than two Business Days prior to the Distribution Date following the end of the Funding Period the amount required to be deposited therein pursuant to Section 5.07 (e) hereof.

(b)    Establishment of Note Distribution Account. The Indenture Trustee has heretofore established with itself in its trust capacity at its corporate trust department for the benefit of Securityholders an account referred to herein as the Note Distribution Account. The Indenture Trustee shall at all times maintain the Note Distribution Account as an Eligible Account and shall cause such account to be designated "U.S. Bank Trust National Association, as Indenture Trustee in trust for Keystone Asset Backed Securities, Series 1998-P2, Note Distribution Account."

(c)    FHA Premium Account. The Grantor Trustee has heretofore established with itself in its trust capacity at its corporate trust department a segregated trust account referred to herein as the "FHA Premium Account" for the benefit of the Grantor Trust Certificateholder. The Grantor Trustee shall at all times maintain the FHA Premium Account as an Eligible Account and shall cause such accounts to be designated as "U.S. Bank Trust National Association, as Grantor Trustee for Keystone Grantor Trust Certificate, Series 1998-P2, FHA Premium Account". No later than the second Business Day preceding each Distribution Date, all amounts on deposit in the Collection Account representing payments by Obligors on Invoiced Loans in respect of premium on FHA Insurance shall be withdrawn by the Grantor Trustee and deposited to the FHA Premium Account. Any and all moneys transferred to the FHA Premium Account pursuant to this Section 5.01(c) shall be held by the Grantor Trustee in the FHA Premium Account subject to disbursement and withdrawal as herein provided. Amounts deposited to the FHA Premium Account shall be invested in accordance with Section 5.04. Amounts on deposit in the FHA Premium Account shall be withdrawn by the Grantor Trustee, in the amounts required, for application as follows:

98-P201328

(i)      to payment to the FHA of any premiums due on the Contract of Insurance in respect of FHA Loans, in such amounts and on such dates as directed by the Servicer or the Seller; the Grantor Trustee shall apply all amounts on deposit in the related FHA Premium Account to payment to the FHA of any premiums due under the Contract of Insurance as invoiced by the FHA and, if, the FHA Insurance with respect to an FHA Loan shall not yet have been transferred to the Contract of Insurance and the Seller instructs the Grantor Trustee to pay the FHA Insurance with respect to such Loan to the related contract of insurance holder, then the Grantor Trustee shall make such payment, and the Seller and not the Grantor Trustee shall be liable in the event of the failure of such funds to be applied to payment of the premium with respect to such FHA Loan;

(ii)     provided that the Servicer provides the Premium Release Amount on the related Servicer Certificate for a Distribution Date, to payment to the Grantor Trust Certificateholder of the applicable Premium Release Amount; and

(iii)    on the Business Day preceding a Distribution Date that is also the Termination Date, for deposit in the related Distribution Account all amounts then on deposit in such FHA Premium Account, whereupon the FHA Premium Account shall terminate.

(d)     Withdrawals from Collection Account; Capitalized Interest Account; Deposit to the Note Distribution Account

(i)      On the Distribution Date occurring in October 1998 the Grantor Trustee shall withdraw from the Collection Account, and remit to the Seller from interest payments received on the related Due Period, the portion thereof in respect of interest that was due on or prior to September 15, 1998.  No later than the Business Day preceding each Distribution Date, the Grantor Trustee shall withdraw amounts from the Collection Account in respect of the Grantor Trust Certificate Remittance Amount with respect to such Distribution Date and deposit such amounts into the Note Distribution Account, and to the extent necessary liquidate the Eligible Investments in which such amounts are invested and deposit such amounts, together with all income from investment of funds in the Collection Account, into the Note Distribution Account; provided, however, that with respect to the Distribution Date that occurs on the earlier of (i) the Final Maturity Date and (ii) the Termination Date, the Grantor Trustee shall withdraw all amounts on deposit in the Collection Account that would be included in the Grantor Trust Certificate Remittance Amount in the following month if such Distribution Date was not the Final Maturity Date or the Termination Date, and to the extent necessary, liquidate the Eligible Investments in which such amounts are invested, and deposit all such amounts into the Note Distribution Account. The Grantor Trustee shall have no authority to sell such Eligible Investments prior to maturity. In addition, no later than the Business Day preceding each Distribution Date the Indenture Trustee shall withdraw from the Capitalized Interest Account and deposit to the Note Distribution Account the amount specified in Section 5.06(c) and Section 5.07(b).

98-P201329

(ii)    (a) All amounts on deposit in the Collection Account representing payments by Obligors on Invoiced Loans in respect of premiums on FHA Insurance shall be withdrawn by the Grantor Trustee from the Collection Account and deposited in the FHA Premium Account no later than the Business Day preceding each Distribution Date.

(b)   The Grantor Trustee shall also withdraw from the Collection Account the following amounts and shall remit such amounts as follows:

(w)   to the FHA Premium Account, the FHA Premium Account Deposit for such Distribution Date;

(x)   to the Grantor Trustee, the amount of the Grantor Trustee Fee;

(y)   to the persons entitled thereto, the Priority Expenses for such Distribution Date;

(z)   to the Servicer (i) previously accrued and unpaid Servicing Fees and (ii), previously unreimbursed Foreclosure Advances to the extent permitted to be reimbursed pursuant to Section 4.09.

(e)   <u>Withdrawals from Note Distribution Account</u>.  On each Distribution Date, based in part on the information set forth in the Servicer Certificate with respect to the related Determination Date, the Indenture Trustee shall (a) from the amount deposited to the Note Distribution Account from the Collection Account in respect of the Grantor Trust Certificate Remittance Amount for such Distribution Date withdraw the Owner Trustee Fee and the Indenture Trustee Fee for such Distribution Date and remit such amounts to the Owner Trustee in its individual capacity and Indenture Trustee as applicable and (b) distribute from the Net Collected Amount in respect of the remaining Grantor Trust Certificate Remittance Amount for such Distribution Date on deposit in the Note Distribution Account the following amounts in the following order of priority; provided that on the first Distribution Date following the end of the Funding Period the portion of the Grantor Trust Certificate Remittance Amount that represents a deposit to the Collection Account pursuant to Section 5.07(e) shall be distributed as a payment of principal (x) pro rata on each Class of Notes if such amount exceeds $50,000 and (y) to the Classes of Notes then entitled to distributions of principal if such amount is less than or equal to $50,000 :

(i)   to the holders of each Class of Notes in the following order of priority:

(A)   to the Class A Notes the aggregate of the related Noteholders' Interest Distributions, *pro rata*, based on the amount of interest which each such Class is entitled to receive on such Distribution Date;

(B)   to the Class M-1 Notes the related Noteholders' Interest Distribution;

98-P201330

82

(C) to the Class M-2 Notes the related Noteholders' Interest Distribution;

(D) to the Class B-1 Notes the related Noteholders' Interest Distribution;

(E) to the Class B-2 Notes the related Noteholders' Interest Distribution;

(F) subject to the last paragraph of this subsection (e) to the holders of the Class A Notes then entitled to distributions of principal, sequentially, to the Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Noteholders, in that order, until the Note Balance of each such Class of Notes has been reduced to zero, the amount necessary to reduce the aggregate of the Note Balances of the Class A Notes to the Senior Optimal Note Balance;

(G) to the Class M-1 Noteholders, the amount necessary to reduce the Note Balance thereof to the Class M-1 Optimal Note Balance;

(H) to the Class M-2 Noteholders, the amount necessary to reduce the Note Balance thereof to the Class M-2 Optimal Note Balance;

(I) to the Class B-1 Noteholders, the amount necessary to reduce the Note Balance thereof to the Class B-1 Optimal Note Balance;

(J) to the Class B-2 Noteholders, the amount necessary to reduce the Note Balance thereof to the Class B-2 Optimal Note Balance;

(ii) sequentially, to the Class M-2 Class M-1, Class B-2 and Class B-1 Noteholders, in that order, the applicable Deferred Amount, if any, until such Deferred Amount has been paid in full (any such Deferred Amount applied first to the related Write-Down Interest Amount and second to the related Principal Write-Down Amount);

(iii) the Excess Spread, if any, remaining after the distributions in clauses (i) through (vi) above shall be distributed in the following order of priority:

(A) subject to the last paragraph of this subsection (e) to the holders of the Class A Notes then entitled to distributions of principal, sequentially, to the Class A-1, Class A-2, Class A-3, Class A-4 and Class A-5 Noteholders, in that order, up to the Overcollateralization Deficiency until the Note Balance of each such Class of Notes has been reduced to zero, the amount necessary to reduce the aggregate of the Note Balances of the Class A Notes to the Senior Optimal Note Balance;

98-P201331

(B)     to the Class M-1 Noteholders, up to the Overcollateralization Deficiency, the amount necessary to reduce the Note Balance thereof to the Class M-1 Optimal Note Balance;

(C)     to the Class M-2 Noteholders, up to the Overcollateralization Deficiency, the amount necessary to reduce the Note Balance thereof to the Class M-2 Optimal Note Balance;

(D)     to the Class B-1 Noteholders, up to the Overcollateralization Deficiency, the amount necessary to reduce the Note Balance thereof to the Class B-1 Optimal Note Balance;

(E)     to the Class B-2 Noteholders, up to the Overcollateralization Deficiency, the amount necessary to reduce the Note Balance thereof to the Class B-2 Optimal Note Balance;

(F)     sequentially, to the Class M-1, Class M-2, Class B-1 and Class B-2 Noteholders, in that order, the applicable Deferred Amount, if any, until such Deferred Amount has been paid in full (any such Deferred Amounts applied first to the related Write-Down Interest Amount and second to the related Principal Write-Down Amount;

(iv)     to the Certificate Distribution Account.

Notwithstanding the foregoing, on any Distribution Date on or after the date on which the Note Balances of all Classes of Subordinate Notes have been reduced to zero, distributions in respect of the Noteholders' Principal Distribution Amount shall be made to all Classes of Class A Notes pro rata based on their respective Note Balances.

(f)     Additional Withdrawals from Collection Account.  On the third Business Day prior to each Distribution Date, the Grantor Trustee, at the direction of the Servicer, shall also make the following withdrawals from the Collection Account, in no particular order of priority:

(i)     to withdraw any amount not required to be deposited in the Collection Account or deposited therein in error; and

(ii)     to clear and terminate the Collection Account in connection with the termination of this Agreement.

(g)     All distributions made on each Class of Notes on each Distribution Date will be made on a pro rata basis among the Noteholders of such Class of record on the preceding Record Date based on the Percentage Interest represented by their respective Notes, and except as otherwise provided in the next succeeding sentence, shall be made by wire transfer of immediately available funds to the account of such Noteholder, if such Noteholder shall own of record Notes representing at least a $1,000,000 Denomination and shall have so notified the

98-P201332

Indenture Trustee, and otherwise by check mailed, via first class mail, postage prepaid, to the address of such Noteholder appearing in the Note Register. The final distribution on each Note will be made in like manner, but only upon presentment and surrender of such Note at the location specified in the notice to Noteholders of such final distribution. Notwithstanding the reduction of the Note Balance of a Class to zero, the final distribution with respect to each Class shall be made on the Final Maturity Date for such Class.

Whenever the Indenture Trustee, based on a Servicer Certificate, expects that the final distribution with respect to a Class of Securities will be made on the next Distribution Date, the Indenture Trustee shall, as soon as practicable, mail to each Holder of such Class of Securities as of the applicable Record Date a notice to the effect that:

      (i)     the Indenture Trustee expects that the final distribution with respect to such Class of Securities will be made on such Distribution Date, and

      (ii)    no interest shall accrue on such Class of Securities after such Distribution Date provided that the final distribution occurs on such Distribution Date.

Section 5.02. Allocation of Losses. On any Distribution Date, if after giving effect to the distributions to be made on the Notes pursuant to Section 5.01(e), the Aggregate Note Balance exceeds the Pool Balance as of the end of the related Due Period such excess will be applied as follows: (i) in reduction of the Class B-2 Note Balance until the Class B-2 Note Balance is zero; (ii) then in reduction of the Class B-1 Note Balance until the Class B-1 Note Balance is zero; (iii) then in reduction of the Class M-2 Note Balance until the Class M-2 Note Balance is zero; and (iv) then in reduction of the Class M-1 Note Balance until the Class M-1 Note Balance is zero.

Section 5.03. Certificate Distribution Account.

    (a)    Establishment. No later than the Closing Date, the Indenture Trustee, will establish and maintain with the Indenture Trustee for the benefit of the Owner Trustee on behalf of the Certificateholders one or more separate Eligible Accounts, which while the Indenture Trustee holds such Trust Account shall be entitled "Certificate Distribution Account, First Union Trust Company, National Association, as Owner Trustee, in trust for the Keystone Owner Trust Asset-Backed Certificates, Series 1998-P2". Funds in the Certificate Distribution Account shall be invested in accordance with Section 5.04.

    (b)    Distributions. On each Distribution Date, the Indenture Trustee shall withdraw from the Note Distribution Account all amounts required to be deposited in the Certificate Distribution Account with respect to the preceding Due Period pursuant to Section 5.01(e)(iv) and will remit such amount to the Certificate Paying Agent under the Trust Agreement for deposit into the Certificate Distribution Account. On each Distribution Date, the Certificate Paying Agent under the Trust Agreement shall distribute all amounts on deposit in the Certificate Distribution Account to the Certificateholders, as specified in the Trust Agreement.

98-P201333

Section 5.04.  <u>Trust Accounts: Trust Account Property</u>.

(a)      <u>Control of Trust Accounts</u>.  (1) Each of the Trust Accounts established hereunder has been pledged by the Trust to the Indenture Trustee under the Indenture and shall be subject to the lien of the Indenture.  In addition to the provisions hereunder, each of the Trust Accounts shall also be established and maintained pursuant to the Indenture.  Amounts distributed from each Trust Account in accordance with the Indenture and this Agreement shall be released from the lien of the Indenture upon such distribution thereunder or hereunder.  The Indenture Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Trust Accounts (other than the Certificate Distribution Account) and in all proceeds thereof and all such funds, investments, proceeds shall be part of the Trust Account Property and the Indenture Trust Estate.  If, at any time, any Trust Account ceases to be an Eligible Account, the Indenture Trustee (or, in the case of clause (i) below, the Servicer on its behalf) shall within 10 Business Days (or such longer period, not to exceed 30 calendar days, as to which each Rating Agency may consent) (i) establish a new Trust Account as an Eligible Account, (ii) terminate the ineligible Trust Account, and (iii) transfer any cash and investments from such ineligible Trust Account to such new Trust Account.

With respect to the Trust Accounts (other than the Certificate Distribution Account), the Indenture Trustee agrees, by its acceptance hereof, that each such Trust Account shall be subject to the sole and exclusive custody and control of the Indenture Trustee for the benefit of the Noteholders and the Trust, as the case may be, and the Indenture Trustee shall have sole signature and withdrawal authority with respect thereto.

In addition to this Agreement and the Indenture, the Certificate Distribution Account established hereunder also shall be subject to and established and maintained in accordance with the Trust Agreement.  Subject to rights of the Indenture Trustee hereunder and under the Indenture, the Owner Trustee on behalf of the Trust shall possess all right, title and interest for the benefit of the Certificateholders in all funds on deposit from time to time in the Certificate Distribution Account and in all proceeds thereof (including all income thereon) and all such funds, investments, proceeds and income shall be part of the Trust Account Property and the Trust Estate.  Subject to the rights of the Indenture Trustee, the Owner Trustee agrees, by its acceptance hereof, that such Certificate Distribution Account shall be subject to the sole and exclusive custody and control of the Certificate Paying Agent for the benefit of the Trust and the parties entitled to distributions therefrom, including without limitation, the Certificateholders and the Owner Trustee, and the Certificate Paying Agent under the Trust Agreement shall have sole signature and withdrawal authority with respect to the Certificate Distribution Account.  Notwithstanding the preceding, the distribution of amounts from the Certificate Distribution Account in accordance with <u>Section 5.03(b)</u> also shall be made for the benefit of the Indenture Trustee (with respect to its duties under the Indenture and this Agreement relating to the Trust Estate), and the Indenture Trustee (in its capacity as Indenture Trustee) shall have the right, but not the obligation to take custody and control of the Certificate Distribution Account and to cause the distribution of amounts therefrom in the event that the Certificate Paying Agent fails to distribute such amounts in accordance with <u>Section 5.03(b)</u>.

98-P201334

The Grantor Trustee shall possess all right, title and interest in all funds on deposit from time to time in the Grantor Trust Accounts and in all proceeds thereof and all such funds, investments, proceeds shall be part of the Grantor Trust Account Property and the Grantor Trust Estate. If, at any time, any Grantor Trust Account ceases to be an Eligible Account, the Grantor Trustee (or, in the case of clause (i) below, the Servicer on its behalf) shall within 10 Business Days (or such longer period, not to exceed 30 calendar days, as to which each Rating Agency may consent) (i) establish a new Grantor Trust Account as an Eligible Account, (ii) terminate the ineligible Grantor Trust Account, and (iii) transfer any cash and investments from such ineligible Grantor Trust Account to such new Grantor Trust Account.

With respect to the Grantor Trust Accounts, the Grantor Trustee agrees, by its acceptance hereof, that each such Grantor Trust Account shall be subject to the sole and exclusive custody and control of the Grantor Trustee for the benefit of the Grantor Trust Certificateholder and the Grantor Trust, as the case may be, and the Grantor Trustee shall have sole signature and withdrawal authority with respect thereto.

The Servicer shall have the power, revocable by the Indenture Trustee or by the Owner Trustee or to instruct the Indenture Trustee or Certificate Paying Agent to make withdrawals and payments from the Trust Accounts as otherwise permitted by this Agreement for the purpose of permitting the Servicer to carry out its duties hereunder or permitting the Indenture Trustee or Owner Trustee to carry out its duties herein or under the Indenture or the Trust Agreement, as applicable.

(b)    (1)    Investment of Funds. The funds held in any Trust Account or Grantor Trust Account may only be invested (to the extent practicable and consistent with any requirements of the Code) in Eligible Investments, as directed by an authorized officer of the Administrator in writing. In any case, funds in any Trust Account or Grantor Trust Account must be available for withdrawal without penalty, and any Eligible Investments and the funds held in any Trust Account or Grantor Trust Account, other than the Note Distribution Account, must mature or otherwise be available for withdrawal, not later than three (3) Business Days immediately preceding the Distribution Date next following the date of such investment and shall not be sold or disposed of prior to its maturity subject to Section 5.04(b)(2) below. Amounts deposited to the Note Distribution Account pursuant to Section 5.01(b) prior to each Distribution Date shall be invested in Eligible Investments which are overnight investments from the date of deposit to the Business Day preceding each Distribution Date. All interest and any other investment earnings on amounts or investments held in any Trust Account or Grantor Trust Account shall be deposited into such Trust Account or Grantor Trust Account immediately upon receipt by the Indenture Trustee, or in the case of the Certificate Distribution Account, the Certificate Paying Agent or the Grantor Trustee, as applicable. All Eligible Investments in which funds in any Trust Account or Grantor Trust Account (other than the Certificate Distribution Account) are invested must be held by or registered in the name of "U.S. Bank National Association, as Grantor Trustee, in trust for the Keystone Grantor Trust Certificate, Series 1998-P2" or "U.S. Bank Trust National Association, as Indenture Trustee, in trust for the Keystone Asset Backed Securities, Series 1998-P2" as applicable. While the Owner Trustee

98-P201335

87

holds the Certificate Distribution Account, all Eligible Investments in which funds in the Certificate Distribution Account are invested shall be held by or registered in the name of "First Union Trust Company, National Association, as Owner Trustee, in trust for the Keystone Asset Backed Securities, Series 1998-P2".

(2) Insufficiency and Losses in Grantor Trust Accounts and Trust Accounts. If any amounts are needed for disbursement from any Trust Account or Grantor Trust Account and sufficient uninvested funds are not available to make such disbursement, the Indenture Trustee, Certificate Paying Agent in the case of the Certificate Distribution Account or Grantor Trustee, respectively, shall cause to be sold or otherwise converted to cash a sufficient amount of the investments in such Trust Account or Grantor Trust Account. The Indenture Trustee, Certificate Paying Agent or Administrator under the Trust Agreement in the case of the Certificate Distribution Account or the Grantor Trustee, as applicable, shall not be liable for any investment loss or other charge resulting therefrom, unless such loss or charge is caused by the failure of the Indenture Trustee, Certificate Paying Agent or Grantor Trustee, respectively, to perform in accordance with this Section 5.04.

All interest and any other investment earnings on amounts held in any Trust Account or Grantor Trust Account shall be taxed to the holders of the Certificates.

(3) Subject to Section 6.1 of the Indenture, the Indenture Trustee shall not in any way be held liable by reason of any insufficiency in any Trust Account held by the Indenture Trustee resulting from any investment loss on any Eligible Investment included therein (except to the extent that the Indenture Trustee is the obligor and has defaulted thereon).

(c)     With respect to the Trust Account Property, the Indenture Trustee acknowledges and agrees that:

(A)     Any Trust Account Property that is held in deposit accounts shall be held solely in the Eligible Accounts; and each such Eligible Account shall be subject to the exclusive custody and control of the Indenture Trustee, and the Indenture Trustee shall have sole signature authority with respect thereto;

(B)     The Indenture Trustee is, and at all times will continue to be, a bank, broker-dealer or trust company which regularly accepts in the ordinary course of its business securities as a custodial service for customers and maintains securities accounts for its customers;

(C)     All book-entries made by the Indenture Trustee with respect to Trust Account Property are and shall be complete and accurate in all respects;

(D)     Except for the claims and interest of the Indenture Trustee arising from the Granting Clause of the Indenture, the Indenture Trustee does not know of any claim (including any adverse claim) to, or interest in, the Trust Account Property;

98-P201336

88

(E)    Except for the Indenture which gives the Indenture Trustee exclusive "control" (within the meaning of Section 8-106 of the UCC) of the Trust Account Property, the Indenture Trustee has not entered into, and hereafter during the term of the Indenture shall not enter into, any agreement granting "control" (within the meaning of Section 8-106 of the UCC) of the Trust Account Property to any Person;

(F)    It is a "securities intermediary" within the meaning of Section 8-102(a) of the UCC with respect to the Trust Account Property; and

(G)    It waives all liens, security interests and all rights to deduction, set-off and banker's liens that it has or subsequently obtains by agreement, operation of law or otherwise (whether or not in its capacity as Indenture Trustee) in the Trust Account property.

All interest and any other investment earnings on amounts held in any Trust Account shall be taxed to the holders of the Certificates.

(4) Subject to Section 4.07 of the Grantor Trust Agreement, the Grantor Trustee shall not in any way be held liable by reason of any insufficiency in any Grantor Trust Account held by the Grantor Trustee resulting from any investment loss on any Eligible Investment included therein (except to the extent that the Grantor Trustee is the obligor and has defaulted thereon).

With respect to the Grantor Trust Account Property, the Grantor Trustee acknowledges and agrees that:

Any Grantor Trust Account Property that is held in deposit accounts shall be held solely in the Eligible Accounts; and each such Eligible Account shall be subject to the exclusive custody and control of the Grantor Trustee, and the Grantor Trustee shall have sole signature authority with respect thereto;

The Grantor Trustee is, and at all times will continue to be, a bank, broker-dealer or trust company which regularly accepts in the ordinary course of its business securities as a custodial service for customers and maintains securities accounts for its customers;

All book-entries made by the Grantor Trustee with respect to Grantor Trust Account Property are and shall be complete and accurate in all respects;

The Grantor Trustee does not know of any claim (including any adverse claim) to, or interest in, the Grantor Trust Account Property;

The Grantor Trustee has not entered into, and hereafter during the term of the Grantor Trust Agreement shall not enter into, any agreement granting "control" (within the meaning of Section 8-106 of the UCC) of the Grantor Trust Account Property to any Person;

98-P201337

89

It is a "securities intermediary" within the meaning of Section 8-102(a) of the UCC with respect to the Grantor Trust Account Property; and

It waives all liens, security interests and all rights to deduction, set-off and banker's liens that it has or subsequently obtains by agreement, operation of law or otherwise (whether or not in its capacity as Grantor Trustee) in the Grantor Trust Account property.

Section 5.05.  Custodianship of Physical Securities.

(a)     The Indenture Trustee shall credit all Trust Account Property that constitutes "instruments" or "certificated securities" under the UCC (each, a "Physical Security") and shall (or shall cause) such Physical Securities to be held at the office of the Indenture Trustee or a custodian appointed by the Indenture Trustee.  Physical Securities acquired in accordance with the Indenture by or on behalf of the Issuer shall be transferred to the Indenture Trustee by (i) the Indenture Trustee crediting such Physical Security to the related Trust Account, (ii) causing the delivery of such Physical Security to the Indenture Trustee or custodian registered in the name of the Indenture Trustee or its affiliated nominee or endorsed to the Indenture Trustee or in blank, (iii) causing the Indenture Trustee or custodian to continuously identify on its books and records that such Physical Security is being held for the benefit of the Indenture Trustee hereunder and under the Indenture and (iv) causing the Indenture Trustee or custodian to maintain continuous possession of such Physical Security in the State of Minnesota.

(b)     No consent shall be required from the Issuer or any other Person with respect to any entitlement order from the Indenture Trustee with respect to the Trust Account Property. The Indenture Trustee shall not accept any entitlement orders from any Person (other than itself) with respect to the Trust Account Property.

(c)     The Grantor Trustee shall credit all Grantor Trust Account Property that constitutes a Physical Security and shall (or shall cause) such Physical Securities to be held at the office of the Grantor Trustee or a custodian appointed by the Grantor Trustee.  Physical Securities acquired in accordance with this Agreement by or on behalf of the Grantor Trust shall be transferred to the Grantor Trustee by (i) the Grantor Trustee crediting such Physical Security to the related Grantor Trust Account, (ii) causing the delivery of such Physical Security to the Grantor Trustee or custodian registered in the name of the Grantor Trustee or its affiliated nominee or endorsed to the Grantor Trustee or in blank, (iii) causing the Grantor Trustee or custodian to continuously identify on its books and records that such Physical Security is being held for the benefit of the Grantor Trustee hereunder and (iv) causing the Grantor Trustee or custodian to maintain continuous possession of such Physical Security in the State of Minnesota.

(d)     No consent shall be required from the Grantor Trust or any other Person with respect to any entitlement order from the Grantor Trustee with respect to the Grantor Trust Account Property.  The Grantor Trustee shall not accept any entitlement orders from any Person (other than itself) with respect to the Grantor Trust Account Property.

Section 5.06.  Capitalized Interest Account.

98-P201338

90

The Indenture Trustee has heretofore established or caused to be established and shall hereafter maintain or cause to be maintained a separate account denominated a Capitalized Interest Account, which is and shall continue to be an Eligible Account in the name of the Indenture Trustee and shall be designated "U.S. Bank Trust National Association, as Indenture Trustee in trust for the registered holders of the Keystone Asset Backed Notes, Series 1998-P2". The Majority Certificateholder will cause the Trust to direct the Indenture Trustee to invest the funds on deposit in the Capitalized Interest Account only in Eligible Investments or such other investment as may be acceptable to the Majority Certificateholder. No such investment in the Capitalized Interest Account shall mature later than the Business Day immediately preceding the next Distribution Date. Any investment earnings on the Capitalized Interest Account will be treated as owned by the Seller and will be taxable to the Seller for tax purposes but shall remain on deposit in the Capitalized Interest Account.

On the Closing Date, the Seller will deposit in the Capitalized Interest Account the amount of $1,839,560.34.

On the Business Day prior to each of the Distribution Dates during the Funding Period and the first Distribution Date thereafter, the Indenture Trustee shall transfer from the Capitalized Interest Account to the Note Distribution Account the Capitalized Interest Withdrawal Amount, if any, for such Distribution Date.

On the Distribution Date following the end of the Funding Period, the Indenture Trustee shall distribute to the Trust any amounts remaining in the Capitalized Interest Account after taking into account withdrawals from the Capitalized Interest Account on such Distribution Date. The Capitalized Interest Account shall be closed following such distribution.

(a)     (e) On each Distribution Date, the Indenture Trustee shall provide a monthly statement to the Rating Agencies which confirms that (i) funds on deposit in the Capitalized Interest Account have only been invested in Eligible Investments or such other investment as has been agreed upon by the Indenture Trustee and the Servicer and (ii) the Indenture Trustee has identified by book entry to its appropriate records the status of the Indenture Trust as the secured party with respect to the investment made with funds deposited in the Capitalized Interest Account.

Section 5.07.  Pre-Funding Account

The Grantor Trustee has heretofore established or caused to be established and shall hereafter maintain or cause to be maintained a separate account denominated a Pre-Funding Account, which is and shall continue to be an Eligible Account in the name of the Grantor Trustee and shall be designated "U.S. Bank Trust National Association, as Grantor Trustee in trust for the registered holders of the Keystone Grantor Trust Certificate, Series 1998-P2". The Servicer shall direct the Grantor Trustee to invest the funds on deposit in the Pre-Funding Account only in Eligible Investments or such other investment as may be agreed upon by the Servicer. No such investment in the Pre-Funding Account shall mature later than the Business Day immediately preceding the next Distribution Date.

98-P201339

Any investment earnings on the Pre-Funding Account will be deposited to the Capitalized Interest Account on each date withdrawals from the Capitalized Interest Account are to be made pursuant to Section 5.06 prior to the calculation of any such withdrawal amounts.

On the Closing Date, the Seller will cause to be deposited in the Pre-Funding Account $155,185,150.12 as the initial Pre-Funded Amount.

(a) On any Subsequent Transfer Date, upon satisfaction of the conditions set forth in Section 2.07(b), the Grantor Trustee shall withdraw from the Pre-Funding Account an amount equal to 100% of the aggregate unpaid principal balances of the Subsequent Loans as of such date sold to the Grantor Trust on such Subsequent Transfer Date and pay such amount to or upon the order of the Seller upon satisfaction of the conditions set forth in Section 2.07 and the related Subsequent Transfer Agreement with respect to such transfer.

(b) On the Business Day preceding the Distribution Date immediately following the end of the Funding Period the Grantor Trustee shall withdraw from the Pre-Funding Account any remaining Pre-Funded Amount (after giving effect to all withdrawals from the Pre-Funding Account on such date and net of any investment earnings thereon) and deposit such amount to the Collection Account; any remaining investment earnings thereon shall be deposited to the Capitalized Interest Account.

## ARTICLE VI

## STATEMENTS AND REPORTS; SPECIFICATION OF TAX MATTERS

Section 6.01. Servicing Certificate. On each Determination Date, the Servicer shall deliver to the Grantor Trustee, the Indenture Trustee, the Backup Servicer, the Seller, the Owner Trustee and the Securityholders, a certificate containing the items described in Exhibit B hereto (each, a "Servicer Certificate"), prepared as of the related Determination Date and executed by a Servicing Officer. No later than the Business Day following each Determination Date, the Servicer shall deliver to the Grantor Trustee, Indenture Trustee and the Certificateholders, in a format consistent with other electronic loan level reporting supplied by the Servicer in connection with similar transactions, "loan level" information with respect to the Loans as of the related Determination Date. The Grantor Trustee, Indenture Trustee and the Certificateholders may rely on the Servicer Certificate with respect to the matters set forth therein.

Section 6.02. Statement to Securityholders. On or before the third Business Day following each Distribution Date, the Indenture Trustee shall mail to the Seller and each Holder of a Security (with a copy to each Rating Agency) at its address shown on the Certificate Register or Note Register, as applicable, a statement, based in part on information set forth in the Servicer Certificate for such Distribution Date, substantially in the form of Statement to Securityholders attached hereto as Exhibit C, respectively, together with a copy of such related Servicer Certificate.

98-P201340

## ARTICLE VII

## CONCERNING THE CONTRACT OF INSURANCE HOLDER

Section 7.01. Compliance with Title I and Filing of FHA Claims.

(a)    The Contract of Insurance Holder shall at all times while any Securities are outstanding have a valid Contract of Insurance with the FHA covering the FHA Loans. To the extent applicable to the duties of the Contract of Insurance Holder hereunder, the Contract of Insurance Holder shall comply with the requirements of Title I and shall take or refrain from taking such actions as are necessary or appropriate to maintain a valid Contract of Insurance for the Trust with the FHA covering the FHA Loans.

(b)    If and for so long as the Contract of Insurance covers any loans other than the FHA Loans, and if HUD shall not have earmarked the coverage of the Contract of Insurance with respect to the FHA Loans, the Contract of Insurance Holder covenants and agrees not to submit any claim to FHA with respect to an FHA Loan if the effect of approval of such claim would result in the amount of claims paid by the FHA in respect of the FHA Loans to exceed the Trust Designated Insurance Amount.    Notwithstanding the foregoing, the Claims Administrator shall promptly notify the Grantor Trustee, the Owner Trustee, the Indenture Trustee and the Servicer if the amount of claims submitted to FHA in respect of the FHA Loans under the Contract of Insurance exceeds the Trust Designated Insurance Amount.  As of the Closing Date and at all times thereafter until the Termination Date, the Contract of Insurance Holder covenants and agrees that the Contract of Insurance will only apply to the FHA Loans and Related Series Loans, exclusively, or HUD shall have agreed pursuant to 24 C.F.R. § 201.32(d)(1) to "earmark" the FHA insurance relating to the FHA Loans and Related Series Loans, if any.

(c)    The Grantor Trustee hereby appoints Republic Bank as Claims Administrator and the Indenture Trustee hereby consents to such appointment. Republic Bank, as Claims Administrator, shall perform on behalf of the Contract of Insurance Holder the duties associated with the submission of claims under Title I in connection with the Contract of Insurance, except to the extent that certain documents must be signed by the Contract of Insurance Holder (in which case the Contract of Insurance Holder shall only sign such documents at the direction of the Claims Administrator) and shall not, in its capacity as Claims Administrator, take any action or omit to take any action that would cause the Contract of Insurance Holder to violate this Section 7.01 or otherwise fail to maintain a valid Contract of Insurance or cause any denial by FHA of an insurance claim under Title I.

(i)    The Claims Administrator may perform its responsibilities relating to claims administration through agents or independent contractors; however, no provision of this Agreement shall be deemed to relieve the Claims Administrator of any of its duties and obligations to the Grantor Trustee on behalf of Grantor Trust Certificateholder with respect to the claims administration of the FHA Loans; it being understood that the Claims Administrator shall be obligated with respect thereto to the same extent and under

98-P201341

93

the same terms and conditions as if it alone were performing all duties and obligations set forth in this Agreement in connection with the claims administration of such FHA Loans.

(d)     The Contract of Insurance Holder shall not have violated this Section 7.01 and shall otherwise incur no liability hereunder if any failure to maintain a valid Contract of Insurance or to comply with the requirements of Title I or any denial by FHA of an insurance claim under Title I shall have been caused by any act or omission of the Servicer or Claims Administrator.

Section 7.02.  Regarding the Contract of Insurance Holder.

(a)     The Contract of Insurance Holder shall not resign from the obligations and duties imposed on it by this Agreement as Contract of Insurance Holder except upon a determination that by reason of a change in legal requirements or requirements imposed by the FHA the performance of its duties under this Agreement would cause it to be in violation of such legal requirements or FHA imposed requirements in a manner which would result in a material adverse effect on the Contract of Insurance Holder or cause it to become ineligible to hold the Contract of Insurance and the Majority Securityholders does not elect to waive the obligations of the Contract of Insurance Holder to perform the duties which render it legally unable to act or to permit the Contract of Insurance Holder to delegate those duties to another Person or if the circumstances giving rise to such illegality cannot be waived or delegated.  Any such determination permitting the resignation of the Contract of Insurance Holder shall be evidenced by an Opinion of Counsel to such effect delivered and acceptable to the Grantor Trustee.  Upon receiving such notice of resignation, the Contract of Insurance shall be transferred to a qualified successor by written instrument, in duplicate, one copy of which instrument shall be delivered to the resigning Contract of Insurance Holder and one copy to the successor Contract of Insurance Holder.  Notwithstanding the foregoing, the Contract of Insurance Holder may resign upon transfer of the FHA insurance and related reserves with respect to the FHA Loans and any Related Series Loans to a contract of insurance held by a successor Contract of Insurance Holder provided, however, that any Contract of Insurance held by such successor Contract of Insurance Holder shall satisfy the criteria set forth in Section 7.01(b), and, at the time of succession, shall have an FHA insurance coverage reserve account balance not less than that of the FHA Insurance Coverage Reserve Account at the time of succession.

(b)     If at any time (i) the Contract of Insurance shall be revoked, suspended or otherwise terminated, or (ii) the Contract of Insurance Holder shall become incapable of acting, or shall be adjudged as bankrupt or insolvent, or a receiver of the Contract of Insurance Holder or of its property shall be appointed, or any public officer shall take charge or control of the Contract of Insurance Holder or of its property or affairs for the purpose of rehabilitation, conservation or liquidation or the Contract of Insurance Holder shall fail to be "well capitalized" within the meaning of the Federal Deposit Insurance Act and the regulations thereunder, then, in any case the Majority Certificateholder with the consent of the Rating Agencies may remove the Contract of Insurance Holder and appoint a successor contract of insurance holder by written instrument, in duplicate, one copy of which instrument shall be delivered to the Contract of

98-P201342

Insurance Holder so removed and one copy to the successor contract of insurance holder with a copy to the Claims Administrator. Upon removal of the Contract of Insurance Holder, the outgoing Contract of Insurance Holder shall take any action required to transfer the benefits of the FHA Insurance Coverage Reserve Account to the successor contract of insurance holder.

(c)    Any resignation or removal of the Contract of Insurance Holder and appointment of a successor contract of insurance holder pursuant to any of the provisions of this Section 7.02 shall become effective upon acceptance of appointment by the successor contract of insurance holder.

(d)    On or prior to the Closing Date with respect to the Initial Loans and the applicable Subsequent Transfer Date with respect to the Subsequent Loans, the Contract of Insurance Holder shall have instructed FHA to forward all payments in respect of claims under the Contract of Insurance made to the Contract of Insurance Holder to the Grantor Trustee. The Contact of Insurance Holder shall provide no further notification with respect to which such payments shall be directed unless directed by the Grantor Trustee.

(e)    For so long as the Servicer services Related Series Loans, the Seller agrees to reconcile any communications from HUD with respect to the FHA insurance premiums payable to HUD with respect to such Related Series Loans, and supply such reconciled information to the Grantor Trustee, Indenture Trustee and the Servicer. The Servicer agrees to cooperate with the Seller's efforts pursuant to this Section 7.02(e) and to provide the information required by the Seller to reconcile such information no later than two Business Days prior to the related Distribution Date.

<div align="center">

ARTICLE VIII

[Reserved]

ARTICLE IX

THE SERVICER

</div>

Section 9.01.  Indemnification; Third Party Claims.

(a)    The Servicer shall be liable in accordance herewith only to the extent of the obligations specifically imposed upon and undertaken by the Servicer herein and the representations made by the Servicer.

(b)    The Servicer shall indemnify, defend and hold harmless the Trust, the Grantor Trust, the Indenture Trustee, the Owner Trustee in its individual capacity, the Grantor Trustee, the Backup Servicer and the Seller, their respective officers, directors, agents and employees and the Securityholders, from and against any and all costs, expenses, losses, claims, damages, and liabilities to the extent that such cost, expense, loss, claim, damage or liability arose out of, or was imposed upon the Trust, the Grantor Trust, the Grantor Trustee, the Backup Servicer, the

98-P201343

Indenture Trustee, the Owner Trustee in its individual capacity, the Seller, their respective officers, directors, agents or employees or the Securityholders, through the breach of this Agreement by the Servicer, the negligence, willful misfeasance, or bad faith of the Servicer in the performance of its duties under this Agreement or by reason of reckless disregard of its obligations and duties under this Agreement. Such indemnification shall include, without limitation, reasonable fees and expenses of counsel and expenses of litigation.

Section 9.02.  Merger or Consolidation of the Servicer and Backup Servicer.

Neither the Servicer nor the Backup Servicer shall merge or consolidate with any other Person, convey, transfer or lease substantially all its assets as an entirety to another Person, or permit any other Person to become the successor to such party's business unless, after the merger, consolidation, conveyance, transfer, lease or succession, the successor or surviving entity (i) shall be an Eligible Servicer, (ii) shall be capable of fulfilling the duties of the Servicer or Backup Servicer, as applicable, contained in this Agreement and (iii) shall have a long-term debt rating which is BBB and Baa2 by Fitch and Moody's respectively. Any corporation (i) into which the Servicer or the Backup Servicer may be merged or consolidated, (ii) resulting from any merger or consolidation to which the Servicer or the Backup Servicer shall be a party, (iii) which acquires by conveyance, transfer or lease substantially all of the assets of the Servicer or the Backup Servicer, or (iv) succeeding to the business of the Servicer or the Backup Servicer, in any of the foregoing cases shall execute an agreement of assumption to perform every obligation of the Servicer or the Backup Servicer, as applicable, under this Agreement and, whether or not such assumption agreement is executed, shall be the successor to the Servicer or the Backup Servicer, as applicable, under this Agreement without the execution or filing of any paper or any further act on the part of any of the parties to this Agreement, anything in this Agreement to the contrary notwithstanding; provided, however, that nothing contained herein shall be deemed to release the Servicer or the Backup Servicer from any obligation. The Servicer and the Backup Servicer shall provide notice of any merger, consolidation or succession pursuant to this Section 9.02 to the Grantor Trust, the Trust, the Grantor Trustee, the Indenture Trustee and each Rating Agency. Notwithstanding the foregoing, as a condition to the consummation of the transactions referred to in clauses (i) through (iv) above, (x) immediately after giving effect to such transaction, no representation or warranty made pursuant to Section 3.02 shall have been breached (for purposes hereof, such representations and warranties shall speak as of the date of the consummation of such transaction), and (y) the Servicer or the Backup Servicer, as applicable, shall have delivered to the Trust, Grantor Trust, the Grantor Trustee and the Indenture Trustee an Officer's Certificate and an Opinion of Counsel each stating that such consolidation, merger or succession and such agreement of assumption comply with this Section 9.02 and that all conditions precedent, if any, provided for in this Agreement relating to such transaction have been complied with.

Section 9.03.  Limitation on Liability of the Servicer, the Backup Servicer and Others. None of the Servicer, the Backup Servicer, or any of their directors, officers, employees or agents shall be under any liability to the Grantor Trust, the Grantor Trustee or to the Grantor Trust Certificateholder or any Securityholder for any action taken or for refraining from the

98-P201344

taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Servicer, the Backup Servicer or any such Person against any breach of warranties, representations or covenants made herein or any liability which would otherwise be imposed by reason of willful misfeasance, bad faith or negligence in performing or failing to perform duties hereunder or by reason of reckless disregard of obligations and duties hereunder. The Servicer, the Backup Servicer and any of their directors, officers, employees or agents may rely in good faith on any document of any kind in accordance with the Servicing Standard with respect to any document that prima facie has been properly and duly executed and submitted by any Person respecting any matters arising hereunder.

Section 9.04. <u>Servicer and Backup Servicer Not to Resign</u>.

(a) Neither the Servicer nor the Backup Servicer shall resign from the obligations and duties hereby imposed on it except (i) with the consent of the Rating Agencies or (ii) upon determination that by reason of a change in legal requirements the performance of its duties under this Agreement would cause it to be in violation of such legal requirements in a manner which would result in a material adverse effect on the Servicer or the Backup Servicer, as applicable. Any such determination permitting the resignation of the Servicer or the Backup Servicer by reason of a change in such legal requirements shall be evidenced by an Opinion of Counsel to such effect delivered and acceptable to the Grantor Trustee. No resignation of the Servicer or the Backup Servicer, shall become effective until the Grantor Trustee or a successor servicer shall have assumed the Servicer's or Backup Servicer's servicing responsibilities and obligations in accordance with Section 10.02.

(b) Notwithstanding anything to the contrary herein, the Servicer and the Backup Servicer shall remain liable for all liabilities and obligations incurred by it as Servicer and Backup Servicer, respectively, hereunder prior to the time that any resignation referred to in subsection (a) above or termination under Section 10.01 becomes effective, including the obligation to indemnify the Grantor Trustee pursuant to Section 9.01(b) hereof.

(c) The Servicer and the Backup Servicer each agrees to cooperate with any successor in effecting the transfer of its responsibilities and rights hereunder pursuant to subsection (a), including, without limitation, the transfer to such successor of all relevant records and documents (including any Files in the possession of the Servicer and the Servicing Record) and all amounts credited to the Servicing Record or thereafter received with respect to the Loans and not otherwise permitted to be retained by the Servicer pursuant to this Agreement. In addition, the Servicer or the Backup Servicer, as applicable, at its sole cost and expense, shall prepare, execute and deliver any and all documents and instruments to its successor including all Files in its possession and do or accomplish all other acts necessary or appropriate to effect such termination and transfer of servicing responsibilities.

Section 9.05. <u>Relationship of Servicer to Grantor Trust and the Grantor Trustee</u>.

98-P201345

The relationship of the Servicer (and of any successor to the Servicer as servicer under this Agreement) to the Grantor Trust and the Grantor Trustee under this Agreement is intended by the parties hereto to be that of an independent contractor and not of a joint venturer, agent or partner of the Grantor Trust or the Grantor Trustee.

Section 9.06.  <u>Servicer and Backup Servicer May Own Notes</u>.

Each of the Servicer and Backup Servicer and any affiliate of the Servicer or Backup Servicer may in its individual or any other capacity become the owner or pledgee of Notes with the same rights as it would have if it were not the Servicer or Backup Servicer or an affiliate of either except as otherwise specifically provided herein.  Notes so owned by or pledged to the Servicer or Backup Servicer or such affiliate shall have an equal and proportionate benefit under the provisions of this Agreement, without preference, priority, or distinction as among all of the Notes, provided that any Notes owned by the Servicer or Backup Servicer or any affiliate of either of them, during the time such Notes are owned by them, shall be without voting rights for any purpose set forth in this Agreement.  The Servicer and Backup Servicer shall each notify the Indenture Trustee promptly after it or any of its affiliates becomes the owner or pledgee of a Note.

Section 9.07.  <u>Rule 144A Information</u>.

The Servicer covenants to make available on behalf of the Seller the information requested by prospective purchasers of Notes or Certificates necessary to satisfy the requirements of paragraph (d)(4) of Rule 144A of the Securities Act to the extent reasonably available to the Servicer (the "Rule 144A Information").  Such Rule 144A Information when so provided, will not contain an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.  The Rule 144A Information shall include, without limitation, any or all of the following items requested by the prospective purchasers:

> (A)    the Offering Circular and any amendments and supplements thereto;

> (B)    this Agreement and any amendments thereto;

> (C)    the most recent Servicer Certificate required pursuant to this Agreement; and

> (D)    such other information as is reasonably available to the Servicer, in order to comply with requests for information pursuant to Rule 144A under the Securities Act.

The Servicer represents that the materials concerning the Servicer and the Loans provided by the Servicer pursuant to this Section, when so provided, will not contain an untrue statement

98-P201346

of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

Section 9.08. Servicing Compensation.

As compensation for its services hereunder, the Servicer shall be entitled to receive from the Collection Account, the Servicing Fee. Additional servicing compensation in the form of assumption fees, modification fees, and other administrative fees, insufficient funds charges, prepayment penalties, amounts remitted pursuant to Section 5.01, late payment charges shall be part of the servicing compensation payable to the Servicer hereunder and shall be paid either by the Servicer retaining such additional servicing compensation prior to deposit in the Collection Account pursuant to Section 5.01(a) or, if deposited into the Collection Account, as part of the servicing compensation withdrawn from the Collection Account pursuant to Section 5.01(d) or paid by the Indenture Trustee from the Note Distribution Account pursuant to Section 5.01(d).

Portability Fees, if any, collected by the Servicer will not be included as servicing compensation and will be deposited to the Collection Account as interest collected.

The Servicer shall required to pay all expenses incurred by it in connection with its servicing activities hereunder and all annual Rating Agency monitoring fees and shall not be entitled to reimbursement therefor except as specifically provided for herein.

Section 9.09. Sub-Servicer for Backup Servicer.

The Backup Servicer may enter into sub-servicing agreements for the servicing and administration of Loans with Wilshire Financial Services Group Inc., or Wilshire Credit Corporation or any of their subsidiaries or affiliates that are Eligible Servicers to perform all or any part of Backup Servicer's obligations hereunder (including Backup Servicer's obligations as successor servicer). The Backup Servicer covenants that any such sub-servicer agreement shall be consistent with and not in violation of the provisions of this Agreement. The Backup Servicer shall give written notice to the Servicer and the Indenture Trustee of the appointment of any sub-servicer, and shall provide to each of them a copy of the related sub-servicing agreement. Any sub-servicing agreement shall include the provision that such agreement may be immediately terminated, without cause and without payment of any penalty or fee, by the Indenture Trustee, in the event that the Backup Servicer shall for any reason, no longer be the Backup Servicer, together with a provision stating that the Indenture Trustee shall not be deemed a party thereto and shall have no claims, rights, obligations, duties or liabilities with respect to any sub-servicer. Backup Servicer shall be solely responsible for any fees or compensation payable to its sub-servicers. If Backup Servicer is not itself legally qualified to service certain of the Loans, or to act as Servicer, Backup Servicer shall nevertheless be deemed an Eligible Servicer if it retains a sub-servicer legally qualified to service such loans.

98-P201347

ARTICLE X

DEFAULT

Section 10.01.  Servicer Termination Events.

For purposes of this Agreement, each of the following shall constitute a "Servicer Termination Event":

(a)     (i) except as provided in the proviso to Section 5.01(a), failure by the Servicer to deposit all Payments in the Collection Account no later than the second Business Day following receipt thereof by the Servicer, which failure continues unremedied (i) for four Business Days if such failure occurs during the first 120 days following the Closing Date and thereafter (ii) for two Business Days; (ii) failure of the Servicer to deposit amounts referred to in the proviso to Section 5.01(a) within two Business Days after the date of required deposit thereof; or (iii) failure of the Servicer to pay when due any other amount payable by it under this Agreement; or

(b)     failure on the part of the Servicer duly to observe or perform in any material respect any of its other covenants or agreements contained in this Agreement that continues unremedied for (i) a period of 60 days if such failure occurs during the first 120 days following the Closing Date and thereafter (ii) for a period of 30 days after the earlier of (x) the date on which the Servicer gives notice of such failure to the Grantor Trustee pursuant to Section 4.04(b) and (y) the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Servicer by the Grantor Trustee or to the Servicer; or

(c)     failure by the Servicer to deliver the Servicer Certificate to the Grantor Trustee and the Indenture Trustee by the fourth Business Day prior to each Distribution Date, or failure on the part of the Servicer to observe its covenants and agreements set forth in Section 3.02; or

(d)     the entry of a decree or order for relief by a court or regulatory authority having jurisdiction in respect of the Servicer in an involuntary case under the federal bankruptcy laws, as now or hereafter in effect, or another present or future, federal or state, bankruptcy, insolvency or similar law, or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Servicer or of any substantial part of its properties or ordering the winding up or liquidation of the affairs of the Servicer and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days or the commencement of an involuntary case under the federal bankruptcy laws, as now or hereinafter in effect, or another present or future federal or state bankruptcy, insolvency or similar law and such case is not dismissed within 60 days; or

(e)     the commencement by the Servicer of a voluntary case under the federal bankruptcy laws, as now or hereinafter in effect, or any other present or future, federal or state bankruptcy, insolvency or similar law, or the consent by the Servicer to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Servicer or of any substantial part of its property or the making by the

98-P201348

Servicer of an assignment for the benefit of creditors or the failure by the Servicer generally to pay its debts as such debts become due or the taking of corporate action by the Servicer in furtherance of any of the foregoing; or

(f)     any representation, warranty or statement of the Servicer made in this Agreement or any certificate, report or other writing delivered pursuant hereto shall prove to be incorrect in any material respect as of the time when the same shall have been made, and the incorrectness of such representation, warranty or statement has a material adverse effect on the Grantor Trust or the Grantor Trustee's interest in the Loans and, within 30 days after the earlier of (x) the date on which the Servicer gives notice of such failure to the Grantor Trustee pursuant to Section 4.04(b) and (y) the date on which written notice thereof shall have been given to the Servicer by the Grantor Trustee, the circumstances or condition in respect of which such representation, warranty or statement was incorrect shall not have been eliminated or otherwise cured; or

(g)     [reserved];

(h)     [reserved];

(i)     if Republic Bank is the Servicer, the Annual Default Percentage (Rolling Twelve Month) is in excess of 8.0%, (ii) the 60+ Delinquency Percentage (Rolling Six Month) is greater than 7.00% for 120 consecutive days, or (iii) Cumulative Losses exceed 13.00% of the Initial Pool Balance; or if the Backup Servicer is the Servicer:

(i)     The aggregate Rolling Six-Month Delinquency Rate is greater than 15% for the then-current Distribution Date;

(ii)     the aggregate Rolling Six-Month Delinquency Rate is greater than 13% for the then-current and two preceding Distribution Dates;

(iii)     the aggregate Twelve Month Loss Amount is greater than or equal to 2.75% of the aggregate Principal Balance of the Mortgage Loans; or

(iv)     the aggregate Realized Losses on the Mortgage Loans exceed (a) with respect to the first 12 Distribution Dates, 2.25% of the aggregate Cut-Off Date Principal Balance of the Mortgage Loans, (b) with respect to the next 12 Distribution Dates, 3.75% of the aggregate Cut-Off Date Principal Balance of the Mortgage Loans, (c) with respect to the next 12 Distribution Dates, 5.25% of the aggregate Cut-Off Date Principal Balance of the Mortgage Loans, (d) with respect to all Distribution Dates thereafter, 8.00% of the aggregate Cut-Off Date Principal Balance of the Mortgage Loans; or

(j)     the Servicer shall dissolve or liquidate, in whole or in part, in any material respect except as provided in Section 9.02 or except to the extent that any resulting successor entity is acceptable to the Rating Agencies; or

98-P201349

(k)    the net worth of the Servicer and its affiliates on a consolidated basis is less than $20,000,000; or

(l)    as a result of any act or omission by the Servicer the loss, suspension or termination of the Contract of Insurance; or

(b) the Servicer fails to be "adequately capitalized" as defined in the regulations of the FDIC as of the last Business Day of any calendar month.

Section 10.02.  Consequences of a Servicer Termination Event.  If a Servicer Termination Event shall occur and be continuing, the Grantor Trustee may, and at the direction of the Holders of a majority of the most senior class of Notes then outstanding shall, by notice given in writing to the Servicer and to the Grantor Trustee terminate all of the rights and obligations of the Servicer under this Agreement.  On or after the receipt by the Servicer of such written notice, and the appointment of and acceptance by a successor Servicer, all authority, power, obligations and responsibilities of the Servicer under this Agreement, whether with respect to the Grantor Trust Certificate or the Grantor Trust or otherwise, shall pass to, be vested in and become obligations and responsibilities of the successor Servicer; provided, however, that the successor Servicer shall have no liability with respect to any obligation which was required to be performed by the predecessor Servicer prior to the date that the successor Servicer becomes the Servicer or any claim of a third party based on any alleged action or inaction of the prior Servicer.  The successor Servicer is authorized and empowered by this Agreement to execute and deliver, on behalf of the predecessor Servicer, as attorney-in-fact or otherwise, any and all documents and other instruments and to do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination.  The predecessor Servicer agrees to cooperate with the successor Servicer in effecting the termination of the responsibilities and rights of the predecessor Servicer under this Agreement, including, without limitation, the transfer to the successor Servicer for administration by it of all cash amounts that shall at the time be held by the predecessor Servicer for deposit (net of the Servicing Fee and any Ancillary Fees), or have been deposited by the predecessor Servicer, in the Collection Account or thereafter received with respect to the Loans and the delivery to the successor Servicer of all Files and a computer tape in readable form containing the Servicing Record and any other information necessary to enable the successor Servicer to service the Loans and the other Grantor Trust Property.  In addition to any other amounts that are then payable to the terminated Servicer under this Agreement, the terminated Servicer shall then be entitled to receive (to the extent provided by Section 4.08 and Section 5.01(d) out of the Collected Amount, reimbursements for any outstanding Foreclosure Advances made during the period prior to the notice pursuant to this Section 10.02 which terminates the obligation and rights of the terminated Servicer under this Agreement.  The Grantor Trustee and the successor Servicer may set off and deduct any amounts owed by the terminated Servicer from any amounts payable to the terminated Servicer.  The terminated Servicer shall grant the Grantor Trustee and the successor Servicer reasonable access to the terminated Servicer's premises at such parties' reasonable expense.

Section 10.03.  Appointment of Successor.

98-P201350

(c) (1)On or after the time the Servicer receives a notice of termination pursuant to Section 10.02 or upon the resignation of the Servicer pursuant to Section 9.04, the Backup Servicer shall be the successor in all respects to the Servicer in its capacity as servicer under this Agreement and the transactions set forth or provided for in this Agreement, and shall be subject to all the responsibilities, restrictions, duties, liabilities and termination provisions relating thereto placed on the Servicer by the terms and provisions of this Agreement. The Grantor Trustee shall take such action, consistent with this Agreement, as shall be necessary to effect any such succession. If the Backup Servicer or any other successor Servicer is acting as Servicer hereunder, it shall be subject to termination under Section 10.02 upon the occurrence of a Servicer Termination Event applicable to it as Servicer. The Backup Servicer hereby agrees to act as successor servicer pursuant to the terms of this Agreement upon the termination or resignation of the Servicer as provided in this Section 10.03. Any successor Servicer and the Backup Servicer prior to its becoming the successor Servicer shall not be liable for any actions or omissions of any servicer prior to it or breaches of representations and warranties of the servicer prior to it. Without limiting the foregoing, the Backup Servicer shall have no duty to repurchase an FHA Loan under Section 4.12(b) due to the servicer's failure to servicer such FHA Loan in accordance with Title I.

(2) In the event that the Backup Servicer is subsequently terminated pursuant to Section 10.02 or subsequently resigns pursuant to Section 9.04 or otherwise becomes unable to perform its obligations under this Agreement, the Grantor Trustee will appoint a successor servicer in accordance with the provisions of this Section 10.03; provided, that any successor servicer, including the Backup Servicer, shall satisfy the requirements of an Eligible Servicer and shall be approved by the Rating Agencies.

(a)    Any successor Servicer shall be appointed by the Grantor Trustee and shall be acceptable to each Rating Agency and to the Seller (as evidenced in writing by each Rating Agency to the Grantor Trustee and to the Seller). Any successor Servicer shall execute, acknowledge and deliver to the Grantor Trustee and its predecessor Servicer an instrument accepting such appointment hereunder, and thereupon the resignation or removal of the predecessor Servicer shall become effective.

(b)    Any successor Servicer shall be entitled to such compensation (whether payable out of the Collected Amount or otherwise) as the Servicer would have been entitled to under this Agreement if the Servicer had not resigned or been terminated hereunder. The Grantor Trustee, the Seller and a successor Servicer may agree on additional compensation to be paid to such successor Servicer; provided that such additional compensation does not result in a reduction of any of the ratings then assigned to any Class of Notes by any Rating Agency. In addition, any successor Servicer shall be entitled, to reasonable transition expenses incurred in acting as successor Servicer.

Section 10.04. Notification to Noteholders. Upon any termination of the Servicer or appointment of a successor to the Servicer, the Grantor Trustee shall give prompt written notice

98-P201351

thereof to the Grantor Trust Certificateholder at the address appearing in the Grantor Trust Register.

Section 10.05. Waiver of Past Defaults. The Grantor Trust Certificateholder may waive any default by the Servicer in the performance of its obligations hereunder and the consequences thereof. Upon any such waiver of a past default, such default shall cease to exist, and any Servicer Termination Event arising therefrom shall be deemed to have been remedied for every purpose of this Agreement. No such waiver shall extend to any subsequent or other default or impair any right consequent thereon.

Section 10.06. Duties of the Backup Servicer . In addition to the other obligations of the Backup Servicer under this Agreement, the Backup Servicer shall:

(i)    On each Determination Date commencing with the first Determination Date following the Closing Date, perform a reconciliation of the Servicer Certificate and any other reports received by the Backup Servicer pursuant to Section 6.01 and provide the Grantor Trustee, within 5 days after the Backup Servicer receives the Servicer Certificate, with a report (the "Backup Servicer Report") detailing any errors and discrepancies in the Servicer Certificate found by the Backup Servicer; and, the Backup Servicer shall:

receive from the Servicer on a daily basis the magnetic tapes pertaining to the Loans that contain all information obtained and maintained in such form by the Servicer;

in a reasonably timely manner, establish and maintain a system of transaction accounting in regard to the Loans substantially similar to that maintained by the Servicer and post to such system all information relating to the Loans obtained by the Backup Servicer pursuant to Section 6.01, to enable the Backup Servicer to perform the obligations of a successor servicer immediately upon any termination or resignation of the Servicer; and

(C)    continue to provide the Grantor Trustee with the Backup Servicer Reports.

ARTICLE XI

TERMINATION

Section 11.01. Termination.

(a)    This Agreement shall terminate upon notice to the Grantor Trustee of either: (a) the later of (i) the satisfaction and discharge of the Indenture pursuant to Section 4.1 of the Indenture or (ii) the disposition of all funds with respect to the last Loan and the remittance of all funds due hereunder and the payment of all amounts due and payable to the Indenture Trustee, the Owner Trustee, the Grantor Trustee, the Trust, the Grantor Trust, the Servicer and the Backup Servicer; or (b) the mutual consent of the Servicer, the Seller, the Grantor Trust Certificateholder and all Securityholders in writing.

98-P201352

(b)　　Subject to the provisions of this sentence, on or after the Optional Termination Date, the Trust may or if the Trust does not exercise option the Backup Servicer may, at its option upon not less than thirty days' prior notice given to the Indenture Trustee, purchase on such date specified in such notice, all, but not less than all, the Loans, all claims made under the Contract[]of Insurance with respect to FHA Loans that are pending with the FHA ("FHA Pending Claims") and Foreclosed Properties then included in the Grantor Trust, at a purchase price (the "Termination Price"), payable in cash, equal to the sum of:

　　　　(i)　　the Principal Balance of each Loan included in the Grantor Trust as of such Monthly Cut-Off Date;

　　　　(ii)　　all unpaid interest accrued on the Principal Balance of each such Loan at the related Loan Rate to such Monthly Cut-Off Date;

　　　　(iii)　　the aggregate fair market value of the FHA Pending Claims for which a claim has been filed with the FHA included in the Trust on such Monthly Cut-Off Date, as determined by an Independent appraiser acceptable to the Indenture Trustee as of a date not more than thirty days prior to such Monthly Cut-Off Date;

　　　　(iv)　　the aggregate fair market value of each Foreclosed Property included in the Grantor Trust on such Monthly Cut-Off Date, as determined by an Independent appraiser acceptable to the Indenture Trustee as of a date not more than thirty days prior to such Monthly Cut-Off Date.

Any amount received from such sale with respect to FHA Pending Claims shall be considered FHA Insurance Payment Amounts. The expense of any Independent appraiser required under this Section 11.01(b) shall be a nonreimbursable expense of the party exercising the purchase option pursuant to this Section 11.01(b). The Trust or the Backup Servicer shall effect the purchase referred to in this Section 11.01(b) by deposit of the Termination Price into the Collection Account which shall be distributed in accordance with Section 5.01(e). On the Distribution Date following the deposit of the Termination Price as consideration for the sale of the Loans (x) the Grantor Trustee will convey the Loans to the Trust and (y) the Grantor Trustee shall withdraw from the Collection Account and deposit to the Note Distribution Account, for distribution in accordance with the provisions of the next paragraph, the sum of (a) such portion of the Termination Price as would constitute the Grantor Trust Certificate Remittance Amount for such Distribution Date if such Distribution Date were not the Termination Date and (b) the amount referred to in the proviso of Section 5.01(d)(i). Any portion of the Termination Price remaining on deposit in the Collection Account following such withdrawal shall be applied in the manner provided in Section 5.01(d)(ii)(b).

　　　　The amount to be distributed pursuant to clause (y) above shall be distributed as follows: First to accrued and unpaid interest on each Class of Class A Notes; Second in reduction of the Note Balance of each Class of Class A Notes until the Note Balance of each such Class is reduced to zero; Third to accrued and unpaid interest on the Class M-1 Notes; Fourth in reduction of the Note Balance of the Class M-1 Notes until the Note Balance thereof is reduced

98-P201353

to zero; Fifth, to accrued and unpaid interest on the Class M-2 Notes; Sixth in reduction of the Note Balance of the Class M-2 Notes until the Note Balance thereof is reduced to zero; Seventh to accrued and unpaid interest on the Class B-1 Notes; Eighth in reduction of the Note Balance of the Class B-1 Notes until the Note Balance thereof is reduced to zero; Ninth to accrued and unpaid interest on the Class B-2 Notes; Tenth in reduction of the Note Balance of the Class B-2 Notes until the Note Balance thereof is reduced to zero, and Eleventh to the Certificate Distribution Account to be distributed in accordance with the Trust Agreement. In the event that the Termination Price is less than the amount required to make the distributions specified in Clauses First and Second above the Termination Price shall be applied pro rata to each Class of Class A Notes based on the amount due each such Class pursuant to Clause First and then pursuant to Clause Second.

Section 11.02. Notice of Termination.

Notice of termination of this Agreement or of early redemption and termination of the Securities shall be sent (i) by the Indenture Trustee to the Noteholders in accordance with Section 2.6(b) of the Indenture, (ii) by the Trust to the Certificateholders in accordance with Section 9.1(d) of the Trust Agreement and (iii) by the Grantor Trustee to the Grantor Trust Certificateholder.

ARTICLE XII

MISCELLANEOUS PROVISIONS

Section 12.01. Acts of Securityholders.

Except as otherwise specifically provided herein, whenever Securityholder action, consent or approval is required under this Agreement, such action, consent or approval shall be deemed to have been taken or given on behalf of, and shall be binding upon, all Securityholders if the Majority Securityholders agree to take such action or give such consent or approval.

Section 12.02. Amendment.

(a)    This Agreement may be amended from time to time by the Servicer, the Backup Servicer, the Seller and the Trust by written agreement with notice thereof to the Securityholders, without the consent of any of the Securityholders, to cure any error or ambiguity, to correct or supplement any provisions hereof which may be defective or inconsistent with any other provisions hereof or to add any other provisions with respect to matters or questions arising under this Agreement; provided, however, that such action will not adversely affect in any material respect the interests of the Securityholders. An amendment described above shall be deemed not to adversely affect in any material respect the interests of the Securityholders if either (i) an opinion of counsel is obtained to such effect, or (ii) the party requesting the amendment obtains a letter from each of the Rating Agencies confirming that the amendment, if made, would not result in the downgrading or withdrawal of the rating then assigned by the respective Rating Agency to any Class of Securities then outstanding.

98-P201354

(b)    This Agreement may also be amended from time to time by the Servicer, the Backup Servicer, the Seller and the Trust by written agreement, with the prior written consent of the Indenture Trustee and the Majority Securityholders affected thereby, for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Agreement, or of modifying in any manner the rights of the Securityholders; provided, however, that no such amendment shall (i) reduce in any manner the amount of, or delay the timing of, collections of payments on Loans or distributions which are required to be made on any Security, without the consent of the holders of 100% of each Class of Notes or Certificates affected thereby, (ii) adversely affect in any material respect the interests of the holders of any Class of Notes or Certificates in any manner other than as described in (i) , without the consent of the holders of 100% of such Class of Notes or the Certificates, respectively, or (iii) reduce the percentage of any Class of Notes or Certificates, the holders of which are required to consent to any such amendment, without the consent of the holders of 100% of such Class of Notes or the Certificates.

(c)    It shall not be necessary for the consent of Securityholders under this Section to approve the particular form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.

Prior to the execution of any amendment to this Agreement, the Trust shall be entitled to receive and rely upon an opinion of counsel stating that the execution of such amendment is authorized or permitted by this Agreement. The Trust may, but shall not be obligated to, enter into any such amendment which affects the Trust's own rights, duties or immunities under this Agreement.

Section 12.03.  Recordation of Agreement.

To the extent permitted by applicable law, this Agreement, or a memorandum thereof if permitted under applicable law, is subject to recordation may be recorded in any and/or all appropriate public offices for real property records in all of the counties or other comparable jurisdictions in which any or all of the Mortgaged Properties are situated, and in any other appropriate public recording office or elsewhere, such recordation to be effected by the Servicer at the Securityholders' expense on direction of the Indenture Trustee or the Majority Securityholders, but only when such recordation is necessary for the administration or servicing of the Loans.

Section 12.04.  Duration of Agreement.

This Agreement shall continue in existence and effect until terminated as herein provided.

Section 12.05.  Governing Law.

THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND

98-P201355

REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS, WITHOUT GIVING EFFECT TO PRINCIPLES OF CONFLICTS OF LAW.

Section 12.06. Notices.

All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by overnight mail, certified mail or registered mail, postage prepaid, to: (i) in the case of the Trust, Keystone Owner Trust 1998-P2, c/o First Union Trust Company, National Association, as Owner Trustee, One Rodney Square, First Floor, 920 King Street, Wilmington, Delaware 19801, Attention: Corporate Trust Administration, or such other address as may hereafter be furnished to the Securityholders and the other parties hereto, (ii) in the case of the Seller, Keystone Mortgage Corp., Inc., 69 Main Street, Keystone, West Virginia 24852, Attention: President, or such other address as may hereafter be furnished to the Securityholders and the other parties hereto, (iii) in the case of the Grantor Trust, Grantor Trustee or Indenture Trustee, U.S. Bank Trust National Association, 180 East Fifth Street, St. Paul, Minnesota 55101, Attention: Structured Finance: Keystone 1998-P2, (iv) in the case of the Servicer and Claims Administrator, Republic Bank, 1400 66th Street North, 4th Floor, St. Petersburg, Florida 33710; (vi) in the case of the Backup Servicer, Wilshire Servicing Corporation 1776 S.W. Madison Street, Portland, Oregon 97205, Attention: Keystone 1998-P2; (vii) in the case of the Grantor Trust Certificateholder, as set forth in the Grantor Trust Register; and (viii) in the case of the Securityholders, as set forth in the applicable Note Register and Certificate Register. Any such notices shall be deemed to be effective with respect to any party hereto upon the receipt of such notice by such party, except that notices to the Securityholders shall be effective upon mailing or personal delivery.

Section 12.07. Severability of Provisions.

If any one or more of the covenants, agreements, provisions or terms of this Agreement shall be held invalid for any reason whatsoever, then such covenants, agreements, provisions or terms shall be deemed severable from the remaining covenants, agreements, provisions or terms of this Agreement and shall in no way affect the validity or enforceability of the other covenants, agreements, provisions or terms of this Agreement.

Section 12.08. No Partnership.

Nothing herein contained shall be deemed or construed to create any partnership or joint venture between the parties hereto and the services of the Servicer shall be rendered as an independent contractor.

Section 12.09. Counterparts.

This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original; such counterparts, together, shall constitute one and the same Agreement.

98-P201356

Section 12.10.  Successors and Assigns.

This Agreement shall inure to the benefit of and be binding upon the Servicer, the Seller, the Backup Servicer, the Trust, the Grantor Trust, the Grantor Trustee, the Indenture Trustee, the Grantor Trust Certificateholder and the Securityholders and their respective successors and permitted assigns.

Section 12.11.  Headings.

The headings of the various sections of this Agreement have been inserted for convenience of reference only and shall not be deemed to be part of this Agreement.

Section 12.12.  Actions of Securityholders.

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Agreement to be given or taken by Securityholders may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Securityholders in person or by agent duly appointed in writing; and except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Servicer or the Trust.  Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Agreement and conclusive in favor of the Servicer and the Trust if made in the manner provided in this Section.

(b)    The fact and date of the execution by any Securityholder of any such instrument or writing may be proved in any reasonable manner which the Servicer or the Trust deems sufficient.

(c)    Any request, demand, authorization, direction, notice, consent, waiver or other act by a Securityholder shall bind every holder of every Security issued upon the registration of transfer thereof or in exchange therefor or in lieu thereof, in respect of anything done, or omitted to be done, by the Servicer or the Trust in reliance thereon, whether or not notation of such action is made upon such Security.

(d)    The Servicer or the Trust may require additional proof of any matter referred to in this Section 10.12 as it shall deem necessary.

Section 12.13.  Reports to Rating Agencies.

(a)    The Indenture Trustee shall provide to each Rating Agency copies of statements, reports and notices, to the extent received or prepared by the Servicer (except in the case of clause (i) below) hereunder, as follows:

(i)    copies of amendments to this Agreement;

(ii)    notice of any substitution or repurchase of any Loans;

98-P201357

(iii)     notice of any termination, replacement, succession, merger or consolidation of either the Servicer or the Trust;

(iv)     notice of final payment on the Notes and the Certificates;

(v)     notice of any Servicer Termination Event;

(vi)     copies of the annual independent auditor's report delivered pursuant to Section 4.05, and copies of any compliance reports delivered by the Servicer hereunder including Section 4.04; and

(vii)     copies of any Servicer Certificate pursuant to Section 6.02; and

(b)     With respect to the requirement of the Indenture Trustee to provide statements, reports and notices to the Rating Agencies such statements, reports and notices shall be delivered to the Rating Agencies at the following addresses: (i) if to Moody's Investors Service, Inc., 99 Church Street, New York, New York 10007, Attention: Keystone 1998-P2, and (ii) if to Fitch, 1201 East 77th Street, Powell, Wyoming 82435, Attention: Bo Allen.

Section 12.14.   Inconsistencies Among Transaction Documents.

In the event certain provisions of a Transaction Document conflict with the provisions of this Sale and Servicing Agreement, the parties hereto agree that the provisions of this Sale and Servicing Agreement shall be controlling.

Section 12.15.   Liability of Owner Trustee.

It is expressly understood and agreed by the parties hereto that (a) this Sale and Servicing Agreement is executed and delivered by First Union Trust Company, National Association, not individual or personally but solely as Owner Trustee under the Trust Agreement, in the exercise of the powers and authority conferred and vested in it as the Owner Trustee, (b) each representation, undertaking and agreement herein made on the part of the Trust is made and intended not as a personal representation, undertaking and agreement by First Union Trust Company, National Association but is made and intended for the purpose of binding only the Trust, (c) nothing herein contained shall be construed as creating any liability on First Union Trust Company, National Association, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto, the Noteholders, and by any Person claiming by, through or under the parties hereto or the Noteholders and (d) under no circumstances shall First Union Trust Company, National Association be personally liable for the payment of any indebtedness or expenses of the Trust or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Trust under this Sale or Servicing Agreement or any one or more of the other Transaction Documents.

98-P201358

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized,  as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:   First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By: _____

Name:     EDWARD L. TRUITT, JR.
Title:         VICE PRESIDENT

KEYSTONE GRANTOR TRUST 1998-P2,

By:   U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By: _____

Name:
Title:

KEYSTONE MORTGAGE CORP., INC., as Seller

By: _____

Name:
Title:

REPUBLIC BANK, as Servicer and Claims Administer

By: _____

Name:
Title:

WILSHIRE SERVICING CORPORATION, as Backup Servicer

By: _____

Name:
Title:

98-P201359

NYLIB1/480056/13

109

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized, as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:   First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By: _____
      Name:
      Title:

KEYSTONE GRANTOR TRUST 1998-P2,

By:   U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By: _____
      Name:   Tamara Schultz-Fugh
      Title:   Assistant Vice President

KEYSTONE MORTGAGE CORP., INC., as Seller

By: _____
      Name:
      Title:

REPUBLIC BANK, as Servicer and Claims Administer

By: _____
      Name:
      Title:

WILSHIRE SERVICING CORPORATION, as Backup Servicer

By: _____
      Name:
      Title:

98-P201360

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized, as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:    First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By: _____
     Name:
     Title:

KEYSTONE GRANTOR TRUST 1998-P2,

By:    U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By: _____
     Name:
     Title:

KEYSTONE MORTGAGE CORP., INC., as Seller

By: _____
     Name: TERRY L. Church
     Title: President

REPUBLIC BANK, as Servicer and Claims Administer

By: _____
     Name:
     Title:

WILSHIRE SERVICING CORPORATION, as Backup Servicer

By: _____
     Name:
     Title:

98-P201361

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized,  as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:    First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By:_____
     Name:
     Title:

KEYSTONE GRANTOR TRUST 1998-P2,

By:    U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By:_____
     Name:
     Title:

KEYSTONE MORTGAGE CORP., INC., as Seller

By:_____
     Name:
     Title:

REPUBLIC BANK, as Servicer and Claims Administer

By:_____
     Name: Alfred T. May
     Title: President

WILSHIRE  SERVICING  CORPORATION,  as  Backup Servicer

By:_____
     Name:
     Title:

98-P201362

IN WITNESS WHEREOF, the following have caused their names to be signed by their respective officers thereunto duly authorized, as of the day and year first above written, to this SALE AND SERVICING AGREEMENT.

KEYSTONE OWNER TRUST 1998-P2,

By:    First Union Trust Company, National Association not in its individual capacity but solely as Owner Trustee

By: _____
　　　Name:
　　　Title:

KEYSTONE GRANTOR TRUST 1998-P2,

By:    U.S. Bank Trust National Association, not in its individual capacity but solely as Grantor Trustee

By: _____
　　　Name:
　　　Title:

KEYSTONE MORTGAGE CORP., INC., as Seller

By: _____
　　　Name:
　　　Title:

REPUBLIC BANK, as Servicer and Claims Administer

By: _____
　　　Name:
　　　Title:

WILSHIRE SERVICING CORPORATION, as Backup Servicer

By: _____
　　　Name:
　　　Title:

98-P201363

U.S. BANK TRUST NATIONAL ASSOCIATION,
as Indenture Trustee, Grantor Trustee and Contract of
Insurance Holder

By: _____

Name:
Title:    Tamara Schultz-Fugh
          Assistant Vice President

98-P201364

THE STATE OF *Delaware*            )
COUNTY OF *New Castle*            )
                                 )

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared __ EDWARD L. TRUITT, known to me to be a person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said FIRST UNION TRUST COMPANY NATIONAL ASSOCIATION, not in its individual capacity but solely in its capacity as Owner Trustee of KEYSTONE OWNER TRUST 1998-P2, and that he executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF FIRST UNION TRUST COMPANY, NATIONAL ASSOCIATION, this the ____th day of September, 1998.

                                 _Rita Marie Ritrovato Lawless_
                                 Notary Public, State of _Delaware_

NOTARY PUBLIC, STATE OF DELAWARE
My Commission Expires November 21, 1999
RITA MARIE RITROVATO LAWLESS

98-P201365

THE STATE OF _____ Minnesota _____ )
                                      )
COUNTY OF _____ Ramsey _____        )

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared _____ Tamara Schultz-Pugh _____, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said U.S. BANK TRUST NATIONAL ASSOCIATION, a national banking association, as the Indenture Trustee, Grantor Trustee and Contract of Insurance Holder, and that she executed the same as the act of such entity for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF U.S. BANK TRUST NATIONAL ASSOCIATION, this the ___th day of September, 1998.



Notary Public, State of _____ Minnesota _____

TOBY ROBILLARD
NOTARY PUBLIC - MINNESOTA
My Commission Expires Jan. 31, 2000

98-P201366

NYLIB1/480056/13

113

THE STATE OF _West Virginia_ )
                                )
COUNTY OF _Mc Dowell_ )

BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared _Larry L Church_, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said KEYSTONE MORTGAGE CORP., INC., as the Seller, and that he executed the same as the act of such corporation for the purposes and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF KEYSTONE MORTGAGE CORP., INC., this the _11_ th day of September, 1998. MAY, 1999.

_Robbin D. White_
Notary Public, State of _West Virginia_

OFFICIAL SEAL
NOTARY PUBLIC
STATE OF WEST VIRGINIA
ROBBIN D. WHITE
P. O. BOX 565
NORTHFORK, WV 24868
My Commission Expires June 21, 2005

98-P201367

THE STATE OF FLORIDA    )
                              )

COUNTY OF PINELLAS    )

     BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared Alfred T. May , known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said REPUBLIC BANK, as the Servicer and Claims Administrator, and that he executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

     GIVEN UNDER MY HAND AND SEAL OF REPUBLIC BANK, this the 20 th day of May, 1999.

Notary Public, State of Florida _____

CHRISTINE R. CLULEY
MY COMMISSION # CC 552773
EXPIRES: June 18, 2000
Bonded Thru Notary Public Underwriters

98-P201368

THE STATE OF OREGON    )
                         )

COUNTY OF              )

     BEFORE ME, the undersigned authority, a Notary Public, on this day personally appeared Phillip D. Vincent known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that the same was the act of the said WILSHIRE SERVICING CORPORATION, as the Backup Servicer, and that he executed the same as the act of such corporation for the purpose and consideration therein expressed, and in the capacity therein stated.

     GIVEN UNDER MY HAND AND SEAL OF WILSHIRE SERVICING CORPORATION, this the 18 th day of ~~September, 1993~~. May, 1999.

OFFICIAL SEAL
**JULIE ANN O'NEIL**
NOTARY PUBLIC-OREGON
COMMISSION NO. 050021
MY COMMISSION EXPIRES JANUARY 03, 2000

Notary Public, State of Oregon _____

98-P201369

# EXHIBIT

# B

SERVICING RIGHTS PURCHASE AGREEMENT

by and between

OCWEN FEDERAL BANK FSB
(Purchaser)

and

REPUBLIC BANK
(Seller)

Dated as of July _26_, 2001

TABLE OF CONTENTS
(continued)

Page

ARTICLE I
DEFINITIONS

Section 1.01      Defined Terms. ............................................................................ 1

ARTICLE II
SALE AND CONVEYANCE OF SERVICING RIGHTS

Section 2.01      Agreement to Sell the Servicing Rights.................................... 8
Section 2.02      Purchase Price................................................................................ 8
Section 2.03      Reimbursement of Advances ..................................................... 9
Section 2.04      Closing Conditions ..................................................................... 10

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Section 3.01      Representations and Warranties of the Seller ....................... 10
Section 3.02      Certain Provisions Relating to the Seller's Representations and
                  Warranties..................................................................................... 16
Section 3.03      Representations and Warranties of the Purchaser................. 17

ARTICLE IV
CLOSING DATE AND TRANSFER DATE DELIVERIES

Section 4.01      Documents, Schedules and Exhibits Required with Respect to the
                  Closing Date.................................................................................. 18
Section 4.02      Documents and Schedules Required With Respect to the Transfer Date....... 18
Section 4.03      Access to Information.................................................................. 22
Section 4.04      Transfer Expenses........................................................................ 22
Section 4.05      Purchaser to Service Pursuant to Servicing Agreements....... 22
Section 4.06      Seller Access and Reports.......................................................... 23
Section 4.07      Document Deficiencies............................................................... 23

ARTICLE V
REMEDIES

Section 5.01      Indemnification............................................................................ 26

ARTICLE VI
ADMINISTRATION OF TRANSFER OF SERVICING

Section 6.01      Interim Servicing ........................................................................ 27
Section 6.02      Notice Letters of Transfer........................................................... 27
Section 6.03      Statements..................................................................................... 28
Section 6.04      [Reserved]..................................................................................... 28
Section 6.05      Payments and Notices Received After the Transfer Date....... 28
Section 6.06      Service Bureau Cooperation...................................................... 28
Section 6.07      Limitations on Interim Servicing.............................................. 29

-i-

TABLE OF CONTENTS
(continued)

|  |  | Page |
|---|---|---|
| Section 6.08 | Custodian Approval | 29 |
| Section 6.09 | Missing Social Security Number; Forms W-8 or W-9 | 29 |
| Section 6.10 | Servicing Platform | 29 |

ARTICLE VII
ADDITIONAL AGREEMENTS

| Section 7.01 | Publicity | 31 |
| Section 7.02 | Consents | 31 |

ARTICLE VIII
MISCELLANEOUS PROVISIONS

| Section 8.01 | Amendment | 32 |
| Section 8.02 | Governing Law | 32 |
| Section 8.03 | Notices | 32 |
| Section 8.04 | Exhibits | 33 |
| Section 8.05 | General Interpretive Principles | 33 |
| Section 8.06 | Reproduction of Documents | 33 |
| Section 9.07 | Counterparts | 33 |
| Section 8.08 | Entire Agreement, Successors and Assigns | 34 |
| Section 8.09 | Intention of the Parties | 34 |
| Section 8.10 | Brokerage Commissions | 34 |
| Section 8.11 | Further Assurances | 34 |

572 761 2454    P.00/00

## EXHIBITS

1.    Contents of Mortgage File

2.    Form of Seller's Closing Certificate

3.    Form of Opinion of Counsel to the Seller

4.    List of MBS Servicing Agreements

5.    List of MBS Agreements (with Claims Administrator responsibilities)

6.    Form of Pricing Letter

7.    Form of Forbearance Agreement

8.    Document Deficiency List

## SERVICING RIGHTS PURCHASE AGREEMENT

This Servicing Rights Purchase Agreement ("Agreement") is made as of July ___, 2001 and is executed between Republic Bank, a state chartered bank organized under the laws of the State of Florida ("Seller") and Ocwen Federal Bank FSB, a federally chartered savings bank ("Purchaser").

### PRELIMINARY STATEMENT

The Seller owns the right to service certain residential mortgage loans which are subject to one of three MBS Servicing Agreements which are identified on Exhibit 4 hereto. The Seller desires to sell and transfer the Servicing Rights, and the Purchaser desires to be appointed as the servicer under the MBS Servicing Agreements and to purchase and assume the Servicing Rights to the extent hereinafter provided. In addition, the Seller desires that the Purchaser act as Claims Administrator under various mortgage-backed securities transactions described herein and the Purchaser agrees to be appointed as Claims Administrator in such transactions pursuant to the terms herein provided.

In consideration of the mutual agreements hereinafter set forth, the Seller and the Purchaser agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.01   Defined Terms. Whenever used in this Agreement, the following words and phrases shall have the following meanings specified in this Article:

"Advance": If applicable, any amounts advanced in accordance with the terms of a Servicing Agreement in connection with delinquent Monthly Payments, the payment of taxes and insurance or otherwise made with respect to a Mortgage Loan in accordance with the Servicing Requirements applicable to the Mortgage Loan and reimbursable in accordance with such Servicing Requirements.

"Agreement":   This Servicing Rights Purchase Agreement including all schedules, exhibits and supplements hereto and amendments hereof.

"Ancillary Income":   All fees, release fees, late payment charges, assumption fees, insufficient fund charges, float and other similar fees, exclusive of Prepayment Penalties.

"Assignment of Mortgage":   An assignment of a Mortgage, notice of transfer or equivalent instrument, in form acceptable for recording and sufficient under the laws of the jurisdiction wherein the Mortgaged Property is located to reflect of record the transfer of the Mortgage.

"Borrower": The individual(s) obligated to repay a Mortgage Loan.

"Business Day": A day of the week other than (a) Saturday or Sunday or (b) a day on which banking or savings institutions in the state of incorporation or principal business

1

912 751 2494    P.08/50

location of the Seller or of the Purchaser are authorized or permitted under applicable law to be closed.

"Claims Administrator": With respect to each MBS Agreement, the entity, if any, identified as the "claims administrator" therein.

"Closing Date":  _____, 2001 or such other date mutually agreed upon between the Purchaser and Seller.

"Collection Account": An account or accounts maintained by the Seller for the deposit of principal and interest payments received in respect of one or more Mortgage Loans in accordance with the Servicing Agreements, whether designated as a certificate account, collection account, custodial account or otherwise.

"Custodial File": With respect to an individual Mortgage Loan, the Mortgage Loan documents required to be held by a Custodian pursuant to the terms of the related Servicing Agreement.

"Custodian": An entity, if any, acting as Mortgage Loan document custodian pursuant to the terms of the related Servicing Agreement.

"Cut-off Date": The last day of the month preceding the month in which the Closing Date occurs.

"Data Base": All information in the computer tape format attached hereto as Exhibit 5 delivered by the Seller, whether before or on or after the Closing Date, in connection with this Agreement.

"EDP": Electronic data processing.

"Event of Default": As defined in the related Servicing Agreement.

"FHA": The Federal Housing Administration of HUD or any successor thereto including the Federal Housing Commissioner and the Secretary of HUD where appropriate under the FHA Regulations.

"FHA Approved Mortgagee": A financial institution which holds a valid Title I contract of insurance and continues to be approved by FHA under 24 CFR part 202 to originate, purchase, service, and/or sell loans insured by FHA.

"FHA Insurance Contract" or "FHA Insurance": The contractual obligation of FHA respecting the insurance of the Title I Loans pursuant to Title I of the National Housing Act, as amended.

"FHA Regulations": Regulations promulgated by FHA under the National Housing Act, codified in Title 24 of the Code of Federal Regulations, and other written FHA directives, rules or regulations relating to Title I Loans.

"FHLMC": The Federal Home Loan Mortgage Corporation or any successor.

2

DRR/MASM                                        972 761 2494    P.09/80

"FNMA": The Federal National Mortgage Association or any successor.

"Forbearance Agreement": The agreement or agreements entered into by Servicer and Trustee substantially in the form of Exhibit 7 hereto, (and approved by the requisite percentage of certificate holders, where applicable) pursuant to which each of such entities (i) waives any termination right applicable to the servicer under any applicable Servicing Agreements due to the failure to satisfy any collateral performance tests or bond rating tests applicable to the Servicer and (ii) releases the Purchaser with respect to any acts or omissions of prior servicers in servicing the Mortgage Loans prior to the Transfer Date.

"HUD": The United States Department of Housing and Urban Development.

"Interim Period": As defined in Section 6.01.

"Insurance Policy": All of the Seller's right, title and interest under any of the hazard insurance, title insurance and credit life insurance policies and certificates related to a Mortgage Loan. References in this Agreement to hazard insurance shall be construed to include flood insurance to the extent that flood insurance is required of a Mortgage Loan pursuant to the Servicing Requirements.

"Investor": With respect to each Mortgage Loan the Person or Persons who own the beneficial interest in the Mortgage Loan pursuant to the terms of the related Servicing Agreement.

"Major Consent Letters": Each of the Servicer Letters, Rating Agency Letters and Trustee Letters.

"MBS Agreement": Each of the MBS Agreements with Claims Administrator responsibilities identified on Exhibit 5 hereto.

"MBS Servicing Agreement": Each of the MBS Servicing Agreements identified on Exhibit 4 hereto.

"Monthly Payment": The scheduled monthly payment of principal and interest on a Mortgage Loan.

"Mortgage": The mortgage, deed of trust or other instrument creating a first or junior lien on real property securing the Mortgage Note.

"Mortgage File": The documents pertaining to a particular Mortgage Loan which are specified on Exhibit 1 hereto.

"Mortgage Loan": An individual mortgage loan which is subject to this Agreement and identified on the Mortgage Loan Schedule.

"Mortgage Loan Schedule": The hard copy list of Mortgage Loans attached as Schedules 1-A and 1-B to the Seller's Closing Certificate which list shall set forth, as of the date specified in such list, the following information for each Mortgage Loan

DRK/MHSM                                                972 761 2494   P.10/80

(i)     the loan number, investor code and, where available, Pool Number;

(ii)    the outstanding principal balance;

(iii)   the last due date with respect to which interest has been paid;

(iv)    codes indicating the applicable Investor and Servicing Type;

(v)     note rate, servicing fee rate payable pursuant to the Servicing Agreement and Investor guarantee fee;

(vi)    maturity date, where available;

(vii)   property location, by state;

(viii)  the guarantee fee or pool policy insurance fee, if any; and

(ix)    a code indicating the Servicing Agreement pursuant to which the Mortgage Loan is serviced; and

(x)     the servicing fee under the Servicing Agreement.

"Mortgage Note": The note or other evidence of the indebtedness of a Borrower secured by a Mortgage.

"Mortgaged Property": The underlying real property securing repayment of a Mortgage Note.

"Pool": A group of loans which includes any Mortgage Loan and is considered by the applicable Investor to be aggregated for purposes of servicing.

"Pool Number": Such pool or accounting group designation as may be required by the Investors to service the Mortgage Loans or to transfer the Servicing Rights.

"Prepayment Penalties": Penalties provided for in a relevant Mortgage for early payment of a Mortgage Loan.

"Pricing Letter": The letter agreement substantially in the form of Exhibit 6 hereto, executed by Seller and Purchaser in connection with the sale of the Servicing Rights that sets forth the terms of such sale, including a description of the related Mortgage Loans and the related Purchase Price.

"Purchase Price": As defined in Section 2.02.

"Purchaser": Ocwen Federal Bank FSB.

"Rating Agency": As defined in the MBS Servicing Agreement.

"Rating Agency Letters": With respect to each MBS Servicing Agreement, a letter or letters from the related Rating Agency or Rating Agencies sufficient to satisfy the

4

requirements of such MBS Servicing Agreement with respect to the appointment of the Purchaser as the servicer under the MBS Servicing Agreement, and which does not reduce or limit the rights or compensation of the servicer under the applicable MBS Servicing Agreement.

"Seller": Republic Bank.

"Seller's Closing Certificate": An officer's certificate in the form of Exhibit 2 prepared by or on behalf of the Seller and delivered to the Purchaser pursuant to this Agreement.

"Servicer": With respect to each MBS Servicing Agreement, the entity identified as the "servicer" therein.

"Servicer Letter": With respect to each MBS Servicing Agreement which requires notification to the Servicer, or consent of the Servicer, for the transfer of the servicing rights appurtenant to the related Mortgage Loans to the Purchaser, a letter or letters from the related Servicer sufficient to satisfy the requirements of such MBS Servicing Agreement with respect to such transfer, and which does not reduce or limit the rights or compensation of the servicer under the applicable MBS Servicing Agreement.

"Servicing Agreement": With respect to each Mortgage Loan underlying a mortgage-backed security, the related MBS Agreement and MBS Servicing Agreement pursuant to which the Mortgage Loan is serviced.

"Servicing Fee": The amount to be paid to the Purchaser under the applicable Servicing Agreement related to a Mortgage Loan, as consideration for servicing the Mortgage Loan which is specified on the Mortgage Loan Schedule.

"Servicing Requirements": With respect to each Mortgage Loan, the applicable provisions of the related Servicing Agreement with respect to the servicing, control and administration of such Mortgage Loan.

"Servicing Rights": All of Seller's right, title and interest in and to the servicing of the Mortgage Loans, including all rights under each applicable Servicing Agreement to receive or retain amounts in respect of Servicing Fees, Ancillary Income, reimbursement for Advances, or other expenses and costs, and investment earnings or other benefits from positive account balances, together with all Collection Account balances, Escrow Account balances, contract rights, incidental income and benefits to the extent payable to Seller, and exclusive rights to possession and use of servicing files and records directly or indirectly related thereto, including, without limitation, Borrower lists, Insurance Policies and tax service agreements and including the right to exercise any clean-up call, all as provided under the Servicing Agreements, subject in each case to the rights of any applicable Trustee, Rating Agency, Servicer or other party specified in any Servicing Agreement; provided, however, that the term Servicing Rights shall not include any obligations of Seller as depositor or seller under any Servicing Agreement, including but not limited to, any obligations in connection with any representations or warranties made by the Seller or any obligation to remedy breaches of any representations or warranties or to indemnify any party in connection therewith or any other recourse obligation of the Seller thereunder.

5

DKK/MHSM                                        972 761 2494    P.12/60

"Title I Loan": A Mortgage Loan which   (i) is an FHA Title I property improvement loan (as defined in 24 CFR Section 201.2(aa)) underwritten by the Seller or an entity which at the time of origination, was a lender approved by the FHA for participation in the programs under Title I of the National Housing Act, in accordance with the FHA requirements for the Title I loan program as set forth in 24 CFR Parts 201 and 202, and is the subject of FHA Insurance and  (ii) was made to provide financing for eligible home improvements for a residential dwelling which is real property under applicable state law.

"Transfer Date":  With respect to a Mortgage Loan, the date on which the physical servicing of the Mortgage Loan is transferred to the Purchaser pursuant to this Agreement which date shall be September 1, 2001, unless otherwise agreed by Seller and Purchaser.

"Transfer Instructions":  The instructions specifying the manner in which the servicing of the Mortgage Loans shall be transferred to Purchaser as agreed upon by Purchaser and Seller in good faith.

"Trustee":  With respect to each MBS Servicing Agreement, the entity identified as the "trustee" therein, including without limitation, any grantor trustee, indenture trustee or owner trustee thereunder.

"Trustee Letters":  With respect to each MBS Servicing Agreement, a letter or letters sufficient to satisfy the requirements of such MBS Servicing Agreement with respect to the appointment of the Purchaser as the servicer under the MBS Servicing Agreement, and which does not reduce or limit the rights or compensation of the servicer under the applicable MBS Servicing Agreement or impose unduly burdensome requirements on the Purchaser.

972 761 2494     P.13/50

## ARTICLE II

### SALE AND CONVEYANCE OF SERVICING RIGHTS

Section 2.01    Agreement to Sell the Servicing Rights.

Subject to the terms and provisions of this Agreement, the Purchaser hereby purchases from the Seller and the Seller hereby sells, transfers, assigns, conveys and sets over to the Purchaser as of the Closing Date, the Servicing Rights, and the Purchaser hereby agrees to perform the servicing of each Mortgage Loan in accordance with the terms of each related Servicing Agreement. In addition, the Purchaser agrees to act as Claims Administrator under terms of the MBS Agreements.

The Servicing Rights are with respect to Mortgage Loans serving as collateral for mortgage-backed securities issued and serviced pursuant to the terms of a related MBS Servicing Agreement.

In connection with the purchase of the Servicing Rights, the Purchaser shall be entitled to receive the Servicing Fees and Ancillary Income from the Cut-off Date.

Section 2.02    Purchase Price.

(a)    The purchase price to be paid by the Purchaser to the Seller for the Servicing Rights (the "Purchase Price") shall be equal to the amount set forth in the Pricing Letter. The Purchaser's obligation to pay the Purchase Price will terminate without further liability of the Purchaser in the event that the transfer of the Servicing Rights as contemplated in this Agreement is not consummated for any reason including the Seller's failure to satisfy all the required closing conditions. The Purchase Price has been based upon loan level data and other information provided by Seller. In the event that there are any material differences in this information from due diligence findings by the Purchaser, the Purchase Price shall be subject to a mutually agreeable adjustment by the Purchaser and the Seller.

(b)    The Purchase Price shall be paid by the Purchaser on the Closing Date, in one or more wire transfers of immediately available funds, to such party or parties as the Seller shall designate.

Section 2.03    Reimbursement of Advances.

On the Closing Date, the Purchaser agrees to reimburse the Seller for 90% of the amount of the unreimbursed Advances which were outstanding as of the Cut-off Date, which were made pursuant to the terms of any Servicing Agreement and which the Purchaser reasonably believes will be recoverable in accordance with the terms of such Servicing Agreement. The Seller shall, within five (5) Business Days after the Transfer Date, provide to the Purchaser evidence of the dollar amount of all Advances as of the Transfer Date, broken down by Servicing Agreement, made by the Seller as servicer which have not been previously reimbursed. As soon as practical following the Transfer Date, but in no event more than fifteen (15) Business Days following the Transfer Date, the Purchaser and Seller shall reconcile the actual amount of Advances that were outstanding as of the Transfer Date and the recoverability status of such Advances and make any monetary adjustments to the amount required to be

7

reimbursed to the Seller. Following such reconciliation, the remaining ten percent (10%) of the reimbursable Advance amount shall be paid to the Seller, as adjusted to reflect any monetary adjustments required to be made as a result of such reconciliation. To the extent that such remaining ten percent (10%) is not sufficient to compensate the Purchaser in connection with such reconciliation, the Seller shall refund to the Purchaser such price differential within three (3) Business Days of a request therefor from the Purchaser. The foregoing true-up is anticipated to be completed within 15 Business Days following the Transfer Date on which date any payment required hereunder shall be made. The Purchaser shall be entitled to retain the full amount of any reimbursements for any Advances or Ancillary Income that are received following the Transfer Date.

Section 2.04   Closing Conditions.

(a)     The obligation of the Purchaser to consummate the purchase of the Servicing Rights pursuant to this Agreement is subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(i) The Seller shall have performed in all material respects all of its covenants and agreements contained herein which are required to be performed by it on or prior to the Closing Date;

(ii) All of the representations and warranties of the Seller contained in Section 3.01(a) through (f) of this Agreement shall be true and correct in all material respects as of the Closing Date and the Transfer Date, and no material deterioration shall have occurred to the Servicing Rights between the Closing Date and the Transfer Date;

(iii) The Purchaser shall have received in escrow, or the Purchaser's attorneys shall have received in escrow, each of the documents specified in Section 4.01 for delivery on or prior to the Closing Date, duly executed by all signatories other than the Purchaser, as required by the respective terms thereof;

(iv) The Purchaser shall have received copies of the Forbearance Agreement and the Major Consent Letters required under the terms of each Servicing Agreement as provided under Section 7.02; and

(v) The Purchaser shall have received any and all other customary documents as the Purchaser shall have reasonably determined to be necessary or desirable to effectuate the intent and purposes of this Agreement and to consummate the transactions contemplated hereby.

(b)     The obligation of the Seller to consummate the sale of the Servicing Rights to Purchaser pursuant to this Agreement is subject to the satisfaction or waiver on or prior to the Closing Date of the following conditions:

(i) The Purchaser shall have performed in all material respects all of its covenants and agreements contained herein which are required to be performed by it on or prior to the Closing Date; and

8

DRR/MASM                                                972 761 2494     P. 15/60

(ii) All of the representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects as of the Closing Date.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.01    Representations and Warranties of the Seller.

The Seller represents, warrants and covenants to the Purchaser as to the Servicing Rights (and the related Mortgage Loans) that as of each date from and including the Closing Date through and including the Transfer Date;

(a)    The Seller is a state chartered bank duly organized and in good standing under the laws of the State of Florida and was at all material times and now is qualified to do business and duly licensed in those states in which each Mortgaged Property is located if the laws of such states require qualification or licensing for the conduct of banking or business of the type conducted by the Seller.

(b)    The Seller has full power and authority, corporate and otherwise, to execute and deliver this Agreement and to perform all its obligations hereunder. The execution, delivery and performance of this Agreement by the Seller and consummation of the transactions contemplated by this Agreement have been duly and validly authorized by all necessary corporate, shareholder or other action, and this Agreement has been duly and validly executed and delivered by the Seller and is valid and enforceable against the Seller in accordance with its terms, except as such enforceability may be subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and to general principles of equity.

(c)    No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by any Seller of, or compliance by any Seller with, this Agreement, or the consummation of the transactions contemplated hereby, or if any such consent, approval, authorization or order is required, the Seller has obtained such approval. Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement nor compliance with its terms and conditions, shall conflict with or result in the breach of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance of any nature upon, any of the Mortgage Loans, the Servicing Rights or the properties or assets of the Seller, any of the terms, conditions or provisions of its charter or by-laws or any similar corporate documents of the Seller or any mortgage, indenture, deed of trust, loan or credit agreement or other agreement or instrument to which the Seller is now a party or by which it is bound or any federal or state law, rule or regulation or any judicial or administrative decree, order, ruling or regulation applicable to it, or to the Servicing Rights.

(d)    There is no litigation or action at law or in equity pending, or, to its knowledge, threatened, against the Seller and no proceeding or investigation of any kind is pending or, to its knowledge, threatened, by any federal, state or local governmental or administrative body, which could reasonably be expected to materially affect the Servicing Rights or the Purchaser's ability to consummate the transactions contemplated hereby.

9

972 761 2494     P.16/60

(e)     The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller and the sale and transfer of the Servicing Rights by the Seller are not subject to the bulk transfer or similar statutory provisions of applicable state or federal law.

(f)     The Seller is the sole holder of the Servicing Rights and has good and marketable title to and has the right to assign and transfer the Servicing Rights as of the Closing Date and to assign, transfer and deliver the Servicing Rights as contemplated by this Agreement free and clear of any and all claims, charges, defenses, security interests, liens, offsets and encumbrances.

(g)     The Seller, in its capacity as servicer or as a prior holder of a Mortgage Loan, is and was at all material times, an FHA-approved mortgagee, lender and seller/servicer, as applicable, to the extent required to be so approved in order to originate, sell or service the Mortgage Loans and was in compliance with any and all applicable "doing business" and licensing requirements of the laws of the state wherein the Mortgaged Property is located. Except to the extent disclosed to the Purchaser in writing prior to the Closing Date, the Seller is not in default in the performance of its obligations under any Servicing Agreement, and the Seller is in compliance with all applicable laws and regulations relating to the Servicing Rights, and there has been no occurrence as of the Closing Date that could cause the cancellation of the Servicing Rights or material changes in procedures with respect to the Mortgage Loans. The Seller has and has at all times had all licenses, permits, consents, approvals, orders, certificates, authorizations, declarations and filings (collectively, "Permits") required by all governmental entities (including, without limitation, any federal, state or local authorities or agencies regulating debt collectors, consumer lenders, mortgage bankers, or servicers and their operations and all courts and other tribunals) which are necessary for the conduct of the servicing business and the origination, sale or servicing of the Mortgage Loans.

(h)     Except with respect to the Republic Bank Home Loan Owner Trust 1998-1, the Seller and any prior holder of each Mortgage or any prior servicer under the Servicing Agreements have taken all necessary steps to make and keep any hazard insurance policy, FHA Insurance Policy and title insurance policy valid, binding and enforceable to the extent required by the Servicing Agreements; each such insurance policy is the binding, valid and enforceable obligation of the private insurer to the full extent thereof, without surcharge, defense or set-off, subject to bankruptcy and insolvency laws and all premiums thereon have been paid. Such insurance policies may be included in a blanket insurance policy to the extent permitted under the applicable Servicing Agreement.

(i)     There are no actions, claims, litigation or governmental investigations pending or, to the knowledge of the Seller, threatened, against the Seller or with respect to any Mortgage Loan, which relate to, or affect the Mortgage Loans or the Seller's right to sell, assign and transfer the Servicing Rights (other than usual and customary actions such as foreclosure proceedings as to the Mortgage Loans).

(j)     The information set forth on the Mortgage Loan Schedule and the Data Base, and on any updates thereof or other document, instrument or schedule furnished to the Purchaser by the Seller or one of its affiliates pursuant to, or prior to and in connection with, this Agreement is accurate and complete in all material respects, and relates exclusively to the

10

972 761 2494    P.17/60

subject Mortgage Loans, as of the dates indicated thereon or otherwise applicable. All Mortgage Loan interest rate information is net of any and all insurance premiums.

(k)    All Collection Accounts and Escrow Accounts are maintained by the Seller and have been maintained in accordance with applicable law and the terms of the Mortgage Loans and the related Servicing Requirements. The Escrow Payments required by the Mortgages which have been paid to the Seller for the account of the Borrower are on deposit in the appropriate Escrow Account.

(l)    The Advances are valid and subsisting accounts owing to the Seller, and are carried on the books of the Seller at values determined in accordance with generally accepted accounting principles, and are not subject to any set-offs or claims of the account debtor.

(m)    Subject to generally accepted servicing practices of prudent lenders, documentation with respect to the servicing of the Mortgage Loans has been properly and accurately completed and executed, and all documents required hereby or by Servicing Requirements to be in the Custodial File and Mortgage File are contained therein and final certifications thereto by the Custodian have been completed.

(n)    All funds received by the Seller in connection with the Mortgage Loans, including, without limitation, foreclosure proceeds, fire insurance proceeds from fire losses, condemnation proceeds and principal reductions, have promptly been deposited in the Collection Account or Escrow Account, and all such funds have been applied to reduce the principal balance of the Mortgage Loans in question, or for reimbursement of repairs to the Mortgaged Property or as otherwise required by applicable law and the Servicing Requirements.

(o)    All payments received by the Seller with respect to any Mortgage Loan have been remitted and properly accounted for pursuant to Servicing Requirements. No payment of principal or interest on any such Mortgage Loan has been forgiven, suspended or rescheduled except as disclosed on the Mortgage Loan Schedule and Data Base, and no waiver, alteration or modification which would adversely affect the value of the Servicing Rights has been made to the terms or provisions of such Mortgage Loans except as disclosed on the Mortgage Loan Schedule and Data Base.

(p)    As to the loans in the Republic Bank Home Loan Owner Trust 1997-1 and the Republic Bank Home Loan Owner Trust 1998-1 pools, each Mortgage Loan has been originated in compliance with, or is exempt from, all applicable state or federal laws, regulations, and Servicing Requirements, including, without limitation, those pertaining to usury and at origination all Mortgage Loans documents were in compliance with applicable law and Servicing Requirements. As to the loans not in the Republic Bank Home Loan Owner Trust 1997-1 and the Republic Bank Home Loan Owner Trust 1998-1 pools, Seller is not aware of any current, unresolved violations of any applicable state or federal laws or regulations. Each Title I Loan was originated in accordance with the underwriting criteria established by the FHA and HUD for FHA Title I Loans. The origination, collection and servicing practices used by the Seller with respect to each Mortgage Note and Mortgage have been in all respects legal and customary in the home improvement loan origination and servicing industry and, with respect to each Title I Loan originated by Seller have satisfied all FHA requirements. With respect to each Title I Loan, the amount and the original term to maturity of the Title I Loan comply with the FHA Regulations at

11

972 761 2454   P.16/60

the time of origination unless the requirements with respect to such Title I Loan are specifically waived by HUD with respect to such Title I Loan.

(q)    The Seller in its capacity as servicer or as a prior holder of the Mortgage Loans has complied in all respects with every applicable federal, state, or local law, statute, and ordinance, and any rule, regulation, or order issued thereunder including, without limitation, the Servicing Requirements, the fair housing, anti-redlining, equal credit opportunity, truth-in-lending, real estate settlement procedures, fair credit reporting, and every other prohibition against unlawful discrimination in residential lending or governing consumer credit, and also including, without limitation, the Consumer Credit Reporting Act, Equal Credit Opportunity Act of 1975 and Regulation B, Fair Credit Reporting Act, Truth-in-Lending Law, in particular, Regulation Z as amended, the Flood Disaster Protection Act of 1973, the Real Estate Settlement Procedures Act of 1974 as amended, and state and local consumer credit codes and laws. The collection and all other practices of the Seller in connection with the origination or servicing of the Mortgage Loans including, without limitation, the timing and manner of liquidation, are and have been reasonable, prudent and customary and in conformity with accepted servicing practices of prudent lending institutions and in compliance with all applicable laws. There has been no improper act or omission or alleged improper act or omission, or material error by the Seller or Seller's employees, agent or representatives, with respect to the servicing or any of the Mortgage Loans. The Mortgage Loan documents being delivered to the Purchaser are adequate and sufficient to properly service the Mortgage Loans in accordance with the standards set forth in the Servicing Agreements.

(r)    Subject to obtaining the approvals referred to in Section 4.02, the sale, transfer and assignment of the Servicing Rights by the Seller and the instruments required to be executed by the Seller and delivered in connection therewith pursuant to this Agreement, Servicing Requirements, FHA or other contractual provisions, are, or will be as of the Closing Date and Transfer Date, executed, delivered, valid and enforceable in accordance with their terms, subject to bankruptcy and insolvency laws and the availability of equitable remedies and will effectively vest in the Purchaser good title to the Servicing Rights, free and clear of any and all liens, claims, or encumbrances. The Seller has not previously assigned, transferred or encumbered the Servicing Rights and there exist no sub-servicing agreements with respect to the Mortgage Loans. As of the Closing Date, there are no contracts affecting the Servicing Rights to which Purchaser is or will be bound except as contemplated hereby, disclosed to the Purchaser in writing or caused to exist by the Purchaser nor shall the Seller enter into any such contracts following the Closing Date without the consent of the Purchaser, and no other party has any interest in the Servicing Rights or in the Mortgage Loans except the applicable Investor, the holder of the Investor securities as such, or otherwise as contemplated hereby. None of the Servicing Agreements contain any uncustomary, unusual or burdensome servicing obligations with respect to the Servicing Rights or contain provisions which vary from published Investor standards, and no waivers with respect to any published or unpublished Servicing Requirements have been obtained which adversely affect the credit quality of any Mortgage Loan. None of the Mortgage Loans are loans subject to interest rate subsidies or special escrow arrangements, or loans secured by manufactured housing that is not considered to be real estate under applicable state law or mobile homes.

(s)    Neither the Seller nor any of its agents or affiliates has intentionally contacted or shall contact any Borrower for the purpose of inducing or encouraging the early

12

DRR/MHSM    972 761 2494    P.19/60

prepayment or refinancing of the related Mortgage Loan, nor has the Seller or any of its agents or affiliates utilized, nor shall they utilize, any information held or acquired by the Seller or such agency or affiliates in their capacity as mortgagees or servicers of the Mortgage Loans to derive any other incidental income or benefit from the Servicing Rights, nor has the Seller or such agents or affiliates given, nor will they give, a list of Borrowers to any person for such purpose or to derive any other incidental income or benefit from the Servicing Rights; provided, however that the foregoing shall not be construed to limit or impair other activities of the Seller in its capacities other than as servicers of the Mortgage Loans, including, without limitation, the provision of banking and related services to customers (which may include the Borrowers under the Mortgage Loans other than in their capacity as such) in the ordinary course so long as the provisions of such services does not result in the solicitation or initiation of refinancing of a Mortgage Loan by a Seller or any affiliate or the distribution to the Borrower by the Seller or any affiliate of literature regarding mortgage lending products or programs unless the Borrower makes an independent request for such literature.

(t)    Reserved.

(u)    Except for the Republic Bank Home Loan Owner Trust 1998-1, to the extent required by the related Mortgage Loan documents, all Mortgaged Properties are currently insured against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where such Mortgaged Property is located (including, where required by applicable rules or regulations, flood insurance policies) pursuant to insurance policies in conformity with Servicing Requirements and in an amount at least equal to the outstanding principal balance of the applicable Mortgage Loans or, where applicable, carry a sufficient amount of guaranteed replacement cost coverage. Such insurance policies may be included in a blanket policy to the extent permissible under the applicable Servicing Agreement. Seller informs Purchaser that the relevant Servicing Requirements with respect to the 1998-1 pool may on their face require maintenance of insurance, but such maintenance was not carried out because that was not the intent of the relevant Servicing Agreement. Seller shall cure any discrepancy in that regard prior to closing by providing a forbearance agreement waiving any right to claim a default as a result of any past or future failure to maintain insurance.

(v)    None of the Servicing Rights are subject to recourse against the servicer for losses on liquidation of a Mortgage Loan, or otherwise or any third party expenses such as attorney's fees and restoration expenses, or to repurchase obligations upon the occurrence of non-payment or other events.

(w)    There are not any fees or commissions or any expenses of any broker, finder or investment banker or anyone else acting in the capacity of a broker, finder or investment banker in connection with the transactions contemplated hereby which are required to be paid by the Purchaser.

(x)    The Seller does not know of any fact (other than facts of a general economic or political nature) which now or in the future is reasonably likely to have a material adverse effect on the Seller or the Servicing Rights which has not been disclosed to the Purchaser herein.

13

(y)  The Servicing Agreements do not create any obligations or liability on the servicer thereunder that are unduly burdensome or unusual in the mortgage servicing industry. Each Servicing Agreement delivered to Purchaser on the Closing Date represents a true, correct, and complete copy of the original as it may have been amended. Each of the Servicing Agreements is in full force and effect and has not been amended, modified, or altered, except to the extent that the Purchaser has been notified in writing prior to the Closing Date. Seller is not a party to or subject to any agreement, stipulation, conditional approval, memorandum of understanding, notice of determination, consent decree, advisory settlement, compromise, litigation, or other agreement or understanding with any Investor, court or other governmental agency or body which seeks to modify, interpret or clarify or has the effect of modifying, interpreting, or clarifying any of the terms of the Servicing Agreements or otherwise affects Seller's servicing obligations and practices (including, without limitation, Seller's escrow practices).

(z)  The Seller has performed and shall perform all obligations to be performed under the related Servicing Requirements, no Event of Default with respect to the Seller has occurred under the related Servicing Agreement except as disclosed to the Purchaser in writing, and no event has occurred and is continuing which, but for the passage of time or the giving of notice or both, would constitute with respect to the Seller an Event of Default under the related Servicing Agreement except as disclosed to the Purchaser in writing. There has been no occurrence of any event with respect to the Seller that could obligate the Seller to repurchase any Mortgage Loans or cause the termination of the Servicing Rights. The Seller has serviced the Mortgage Loans and has kept and maintained complete and accurate books and records in connection therewith, all in accordance with the related Servicing Requirements, the terms of the related Mortgage Note and applicable law, and the Seller has made all remittances required to be made by it under the related Servicing Agreement.

(aa)  The dollar amount of Advances with respect to the Mortgage Loans to be provided by the Seller to the Purchaser pursuant to this Agreement will be true and correct as of the date given. Nothing has come to the attention of Seller that would lead the Seller to believe that any Advance is not recoverable pursuant to the related Servicing Agreement.

Section 3.02   Certain Provisions Relating to the Seller's Representations and Warranties.

The Seller agrees that the representations and warranties set forth in Section 3.01 shall survive the sale of the Servicing Rights to the Purchaser, the Transfer Date, any resale thereof in whole or in part by the Purchaser and the delivery of each Mortgage File to the Purchaser and shall inure to the benefit of the Purchaser and its successors and any subsequent holder of the Servicing Rights or any of them, notwithstanding any qualified endorsement or Assignment of Mortgage or the examination or lack of examination of any Mortgage File.

Section 3.03   Representations and Warranties of the Purchaser.

The Purchaser represents, warrants and covenants to the Seller that, as of the Closing Date:

(a)  The Purchaser is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. The Purchaser has all requisite power and

14

DRR/MASM                                      972 761 2494    P.21/80

authority to own its properties and carry on its business as and where now being conducted. The Purchaser has all requisite power and authority to enter into this Agreement, and the agreements to which it is or will become a party as contemplated by this Agreement, and to carry out the transactions contemplated hereby.

(b)    The execution and delivery by the Purchaser of this Agreement, and of the agreements to be entered into pursuant hereto, and the consummation of the transactions contemplated hereby have each been duly and validly authorized by all necessary action, and this Agreement and such other agreements constitute valid and legally binding agreements enforceable in accordance with their respective terms.

(c)    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not violate, conflict with, result in a breach of, constitute a default under or be prohibited by, or require any additional approval, waiver or consent under the Purchaser's charter or other agreement relating to its organization or any instrument or agreement to which it is a party or by which it is bound or any federal or state law, rule or regulation or any judicial or administrative decree, order, ruling or regulation applicable to it, or to the Servicing Rights.

(d)    There is no litigation or action at law or in equity pending, or, to its knowledge, threatened against the Purchaser and no proceeding or investigation of any kind is pending or, to its knowledge, threatened, by any federal, state or local governmental or administrative body, which could reasonably be expected to materially affect the Servicing Rights or the Purchaser's ability to consummate the transactions contemplated hereby.

(e)    The servicing practices to be used by the Purchaser under the Servicing Agreements are and shall remain in all material respects in compliance with the Servicing Requirements, including, without limitation, all federal, state and local rules and all regulations and requirements in connection therewith, and the Purchaser is qualified, and shall use its best efforts to remain qualified, to service the Mortgage Loans under the terms of the Servicing Agreements.

972 751 2494   P. 22/60

# ARTICLE IV

## CLOSING DATE AND TRANSFER DATE DELIVERIES

Section 4.01  Documents, Schedules and Exhibits Required with Respect to the Closing Date.

(a)  The Seller shall deliver to the Purchaser, or as otherwise designated by the Purchaser, on the Closing Date or such other date as shall be specified herein the following documents, in such forms as are agreed upon and reasonably acceptable to the Purchaser:

(i)  Letters reasonably satisfactory to the Purchaser dated the Closing Date stating the incumbency of any Seller's signatory of all applicable certificates described in this Section 4.01.

(ii)  A Seller's Closing Certificate with copies of the Mortgage Loan Schedules attached thereto for the Mortgage Loans.  Such Seller's Closing Certificate shall be delivered on the Closing Date.

(iii)  A written opinion of counsel for the Seller as to the matters set forth in Exhibit 3.

(iv)  The Seller shall submit or cause to be delivered to the Purchaser all of the consents required pursuant to Section 7.02 on or before the Closing Date.

(b)  The Purchaser shall have delivered to the Seller, or as otherwise designated by the Seller, on the Closing Date the following documents, in such forms as are reasonably acceptable to the Purchaser:

(i)  To the extent required under any Servicing Agreement, an executed assumption agreement whereby the Purchaser assumes the rights and obligations of the servicer under such Servicing Agreement; provided that, the Purchaser shall not assume any repurchase or indemnification obligations pursuant to any Servicing Agreement incurred due to any action or omission of any person other than the Purchaser and shall have no liability for any action or event which occurred prior to the Closing Date.

(ii)  An executed Forbearance Agreement substantially in the form of Exhibit 7 hereto.

(iii)  Such certificates, opinions of counsel and other documents as may be reasonably required by any applicable Rating Agency or other party to a Servicing Agreement.

Section 4.02  Documents and Schedules Required With Respect to the Transfer Date.

The Seller shall deliver on the dates specified herein, the following documents and files to the Purchaser:

16

(a)     The Seller shall deliver to the Purchaser the documents and files and perform any other obligations specified in the Transfer Instructions by the dates specified therein.

(b)     Seller will pay all costs of preparing and recording Assignments of Mortgage to the extent required to be paid by the Servicer pursuant to any Servicing Agreement.

(c)     On or prior to the Transfer Date, the Seller shall deliver to the Purchaser an acknowledgment reasonably acceptable to the Purchaser of any sub-servicer that the sub-servicer has been terminated as servicer and all costs associated with such termination have been paid with such exceptions as are otherwise permitted herein.

(d)     Where applicable, the Seller and the Purchaser will use reasonable efforts to provide uninterrupted coverage of accident and health or life or disability insurance to an existing Borrower. The Purchaser shall use its best efforts to transfer existing policies or substantially similar policies. In all cases, the Purchaser shall abide by any transfer or cancellation clauses in the existing policies of the Seller. The Seller shall provide the Purchaser with a listing of each applicable Mortgage Loan in electronic format mutually agreed to by the Seller and the Purchaser with an optional coverage, a description of each coverage, copy of examples of policies of each coverage, copies of all master group policies and such other information as reasonably requested by the Purchaser. The information shall be delivered to the Purchaser not later than thirty (30) days prior to such Transfer Date to the extent requested reasonably in advance thereof.

(e)     Reserved.

(f)     The Seller shall provide to the Purchaser a reasonable time prior to the Transfer Date, records as may be reasonably requested by the Purchaser for the Purchaser to review the Investor accounting status of the Mortgage Loans; such records shall include, but, shall not be limited to, the monthly Investor remittance reports for at least the previous six months.

(g)     Seller shall have furnished the Purchaser with the following additional information and documents not later than the Transfer Date, except where otherwise specified:

(1)     A wire transfer, or at the Purchaser's option, a check, payable to the Purchaser, in trust for the applicable Investors in an amount equal to the outstanding balances identified on the mortgage records in full payment of any unremitted principal or interest. These funds must be received by the Transfer Date. The Seller shall exclude from the funds to be transferred pursuant to this subsection (g) all mortgage guaranty and Investor securities remittances due for the period through Transfer Date, payable on the applicable day of the month following such Transfer Date, and which shall be paid by Seller;

(2)     A copy of the Seller's system trial balance in electronic format mutually agreed to by the Seller and Purchaser as of such Transfer Date, which shall include, without limitation, as to each Mortgage Loan: (i) the Mortgage

17

Loan number, (ii) the next due date, (iii) the principal balance thereof, (iv) the escrow balance, and (v) the Monthly Payment, and escrow; this copy trial balance must be received by the Purchaser by the fifth Business Day after such Transfer Date;

(3)     The Mortgage File on each Mortgage Loan processed and shipped in compliance with the Transfer Instructions;

(4)     Trial balances and pool to Investor security reconciliations for each Pool for each month for at least the last six months as reasonably available and to the extent reasonably necessary to and requested by such the Purchaser, including the month of transfer;

(5)     Complete principal and interest, tax, and insurance bank account reconciliations as of such Transfer Date and the preceding month;

(6)     The loan analysis (including tax and interest statement) for each Mortgage Loan to the extent such loan analysis is reasonably necessary to and requested by such the Purchaser;

(7)     Foreclosure and bankruptcy files and collection records, including collection cards, default letters, demand letters, payment plans and other forbearance agreements, and property inspections for each Mortgage Loan as required by Servicing Requirements, which may be delivered in electronic format agreed to by the Seller and the Purchaser;

(8)     Unless Purchaser determines to keep the Mortgage Loan documents with the existing document custodian, then within thirty (30) days following the Transfer Date, a certification by an appropriate officer of the Seller to the effect that the Seller has caused the documents (including, without limitation, each executed Mortgage and related Mortgage Note, title policy and mortgage insurance policy, and/or certificate, as the case may be) held by the Seller's Custodian to have been delivered to the Purchaser's custodial bank, including a release certification from the Seller's custodial bank, and documentation evidencing that such bank has accepted such documents. The Seller shall pay all termination and delivery fees required by the Seller's Custodians; and

(9)     The Seller shall deliver to the Purchaser a copy of any available certification executed on each Pool or, if such certification is not available, the Seller shall deliver to the Purchaser a status report on a loan-by-loan basis, listing said missing documentation.

(h)     The Seller's counsel shall deliver to the Purchaser letters dated such Transfer Date indicating that the Purchaser may rely on the opinions given hereunder on the Closing Date as if given on such Transfer Date.

(i)     All records delivered or transferred to the Purchaser shall be clearly identified, segregated by Pool and in Seller loan number order. All boxes shall be sequentially

18

labeled and contain a complete listing of Mortgage Files therein. The Seller shall provide the Purchaser a summary schedule reflecting Mortgage Files therein and exceptions thereto and the Purchaser shall sign and return one copy of the summary schedule.

(j)    No later than five (5) Business Days after the Transfer Date, a copy of the Seller's delinquency report showing the due date of the Monthly Payment and the paid-to date as of such Transfer Date.

(k)    No later than five (5) Business Days after the Transfer Date, a copy of loan payment history and escrow analysis for each Mortgage Loan since the Seller became the servicer of each Mortgage Loan in electronic format.

(l)    Reserved.

(m)    Reserved.

(n)    Reserved.

(o)    At least fifteen (15) days prior to the Transfer Date, copies of notifications prepared by the Seller, in duplicate, addressed to each of the related flood insurance companies (or where applicable, hazard insurance companies) requesting endorsements to the mortgagee clause to the Purchaser.

(p)    A Seller's Closing Certificate, dated the Transfer Date.

(q)    At least fifteen (15) days prior to the Transfer Date, a true and correct copy of each Servicing Agreement.

(r)    No later than fifteen (15) Business Days after the Transfer Date, the Seller's certification of the Advances as of the Transfer Date, the amount thereof to be paid in cash by the Purchaser pursuant to Section 2.03.

(s)    A corporate resolution or power of attorney, in form and substance acceptable to the Purchaser, appointing the Purchaser as attorney-in-fact for the Seller for the purpose of executing Mortgage Loan documents and processing and endorsing payments, all as may be reasonable and appropriate to effectuate the purposes of this Agreement.

Section 4.03    Access to Information.

Upon reasonable prior notice to the Seller, the Seller shall afford reasonable cooperation to the Purchaser and its counsel, accountants and other representatives in providing reasonable access during normal business hours throughout the period prior to the Transfer Date, to the Mortgage Files and all the Seller's files, books and records relating to the Mortgage Loans, the Advances and the Servicing Rights; provided, however, that the Seller shall be entitled to take reasonable and appropriate actions to assure that the Purchaser maintains, and the Purchaser hereby agrees to maintain, the confidentiality of the names and addresses of the Borrowers under the Mortgage Loans and all non-public information obtained in such investigation that could reasonably be construed to be of a confidential or proprietary nature, and the Seller shall provide the Purchaser with access to and reasonable cooperation with its officers and employees  The

19

972 761 2494    P:26/50

Purchaser and its representatives and affiliates shall treat as confidential all information obtained in such investigation and not otherwise in the public domain.

Section 4.04   Transfer Expenses.

Except as provided below, the Seller shall pay for all costs relating to transfer of the Servicing Rights including, without limitation, all costs of insured delivery to Purchaser of all of the Mortgage Files and Custodial Files to the persons designated by the Purchaser, all costs of preparing and recording Assignments of Mortgage as contemplated hereby, all Investor transfer fees required hereunder, all costs relating to the Seller's computer service transfer, custodial transfer fees of the Seller's custodian, the expenses of the Custodian, with respect to providing the Purchaser access to image Mortgage Files and Custodial Files, and all costs related to preparing, obtaining and delivering such documents as are necessary, including but not limited to, the Real Estate Settlement Procedures Act and to obtain Investor-required final certification and recertification with respect to the Pools. The Purchaser shall at its expense deliver notices in a form acceptable to the Purchaser and the Seller to each Borrower regarding the transfer of the related Servicing Rights and provide a copy of such notices to the Seller. The Purchaser shall pay all costs related to Purchaser's computer service transfer. Except as otherwise provided in this Agreement, the Seller and the Purchaser shall each bear their own expenses incurred in connection with the transactions contemplated by this Agreement.

Section 4.05   Purchaser to Service Pursuant to Servicing Agreements.

(a)   On the Closing Date, and subject to the satisfaction or waiver of all of the conditions of the Seller set forth herein, all of the Seller's rights and obligations with respect to the Servicing Rights shall be transferred to the Purchaser without the necessity of any further act or deed on the part of the Seller. From and after the Closing Date, the Purchaser shall assume the Servicing Rights and be responsible for assuring that the Mortgage Loans are serviced in accordance with the Servicing Requirements and shall have full power and authority, acting alone, to do any and all things in connection with such servicing and administration that the Purchaser may deem necessary or desirable, consistent with the terms of this Agreement and the Servicing Requirements. In addition, the Purchaser agrees to act as "Claims Administrator" under terms of the MBS Agreements.

(b)   On and after the Closing Date the Purchaser shall be responsible for assuring that all remittances required to be made in accordance with the Servicing Agreements are made, with the exception of Prepayment Penalties which shall belong to the Seller and shall be remitted on a monthly basis to the Seller; provided that, the Seller agrees to perform all Investor reporting requirements attributable to the period prior to the Closing Date and during the Interim Period, whether or not such reports are required to be provided prior to or after the Closing Date.

Section 4.06   Seller Access and Reports.

(a)   Not more than two times each calendar year or as reasonably requested by the Seller, the Purchaser shall provide the Seller, upon reasonable request and during normal business hours, reasonable access to any facility at which the Purchaser is providing the services required to be performed by the Purchaser pursuant to the terms of this Agreement. Such access

20

shall be for the purpose of performing inspections of the servicing of the Mortgage Loans to verify compliance with this Agreement. The Purchaser will provide to the Seller assistance that it may reasonably require in connection with such review, but such assistance shall be at the Seller's sole expense. The Seller acknowledges that the Purchaser is not responsible for providing such services but shall assist the Seller in monitoring compliance with this Agreement. The Seller agrees to hold the results of such servicing review in the strictest confidence.

(b)  No later than the tenth Business Day following each distribution date, the Purchaser shall provide the Seller with a monthly report for the prior calendar month in an electronic format mutually agreed to by the Purchaser and the Seller with such information as the Seller may reasonably require to allow it to monitor the servicing of the Mortgage Loans by the Purchaser.

Section 4.07    Document Deficiencies.

Following the Closing Date, the Seller agrees to exercise best efforts to cure the document deficiencies identified on Exhibit 8 hereto with respect to the Mortgage Loans. The Seller shall be responsible for all out of pocket costs and expenses incurred in connection with curing any such document deficiencies. The Seller agrees to designate sufficient personnel to assist in curing any such document deficiencies and to cooperate with the Trustees and Custodians in connection with tracking, identifying and curing same. In the event that the Purchaser incurs any such out of pocket costs, the Seller shall reimburse such amounts to the Purchaser. In the event that the Seller fails to cure any document deficiency specified on Exhibit 8 with respect to any Mortgage Loan within one hundred twenty (120) days following the Transfer Date, the Seller shall be required to indemnify the Purchaser for any losses related to the missing documentation as provided in Section 5.01 of this Agreement.

With respect to any document deficiencies not identified on Exhibit 8 hereto and related to an MBS Agreement or MBS Servicing Agreement, the Purchaser shall use customary and reasonable efforts of a prudent servicer to cure such document deficiencies to the extent such deficiencies would impair the Purchaser's ability to recover payment under any Insurance Policy or enforce the terms of the related Mortgage Note; provided that the Purchaser shall not be required to incur any out of pocket costs or expenses in connection with curing any such deficiency or any costs or expenses in excess of those customarily borne by a servicer. With respect to the Keystone Owner Trust 1998-P2, Purchaser shall use customary and reasonable efforts to cure document deficiencies relating to an unrecorded or missing intervening assignment at Seller's expense of $15 per Mortgage Loan and only as required to enforce the terms of the Mortgage Note.

DRRU HRSN                                             972 751 2494     P.28/60

ARTICLE V

REMEDIES

Section 5.01   Indemnification.

(a)     The Seller shall indemnify, by repurchase or otherwise, and hold the Purchaser and its successors and assigns harmless from, and will reimburse the Purchaser and its successors and assigns for, all material losses, liabilities, damages, penalties, fines, forfeitures, deficiencies, claims, judgments or other costs or expenses (including attorney's fees and related costs) actually incurred by the Purchaser to the extent that such loss, damage, deficiency, claim or expense results from:

(i)     Any non-compliance by the Seller with Servicing Requirements existing on the Closing Date or the Transfer Date, whether or not such defects are subsequently discovered;

(ii)    Acts or omissions of the Seller or prior servicers with respect to the Servicing Rights or in servicing any of the Mortgage Loans occurring prior to the Transfer Date, or otherwise in breach of the Seller's obligations under this Agreement, or HUD, FHA, FNMA, FHLMC, investor rules, regulations, guides or applicable laws, including, without limitation, incomplete or erroneous loan documentation, fraud by the Seller or prior servicer in the origination of the Mortgage Loan, improper escrow disbursements, misapplied payments or claims not covered by insurance;

(iii)   A material breach of the Seller's representations and warranties contained in Section 3.01 of this Agreement;

(iv)    Any recourse obligation owed to any Investor with respect to the servicing of the Mortgage Loans, including without limitation REO or foreclosure expenses and third party expenses, including attorney's fees and restoration expenses; or

(v)     Any reduction or diminution of the value of the Servicing Rights related to the Seller's failure to maintain the Servicing Platform described in Section 6.10 and for the costs and expenses related to such reduction or diminution.

(b)     The Purchaser shall indemnify and hold the Seller and its successors and assigns harmless from, and will reimburse the Seller and its successors and assigns for, all material losses, liabilities, damages, penalties, fines, forfeitures, deficiencies, claims, judgments or other costs or expenses (including attorney's fees and related costs) actually incurred by the Seller (excluding, however, punitive damages, exemplary damages and loss-of-profit damages) to the extent that such loss, damage, deficiency, claim or expense results from a claim made against Seller by a third party, and arises from:

(i)     Any non-compliance by the Purchaser with  Servicing Requirements existing on the Closing Date or the Transfer Date, whether or not such defects are subsequently discovered;

22

972 761 2494   P.29/60

(ii)     Acts or omissions of the Purchaser with respect to the Servicing Rights or in servicing any of the Mortgage Loans occurring after the Transfer Date, or otherwise in breach of the Purchaser's obligations under this Agreement, or HUD, FHA, FNMA, FHLMC, investor rules, regulations, guides or applicable laws, including, without limitation, incomplete or erroneous loan documentation, fraud by the Purchaser with respect to improper escrow disbursements, misapplied payments or claims not covered by insurance; or

(iii)     A material breach of the Purchaser's representations and warranties contained in Section 3.02 of this Agreement.

## ARTICLE VI
## ADMINISTRATION OF TRANSFER OF SERVICING

Section 6.01   Interim Servicing.

The Seller and the Purchaser mutually acknowledge that it may be impracticable for the Purchaser immediately to perform the Servicing Requirements as of the Closing Date and that a period of time from the Cut-off Date to the Transfer Date with respect to each Mortgage Loan (as to any Servicing Rights and Servicing Requirements, the "Interim Period") may be required for the Purchaser directly to assume and perform the physical tasks of such servicing. During the Interim Period, the Seller agrees to act as Claims Administrator pursuant to the MBS Agreements and to interim service all Mortgage Loans as provided in this Section and in accordance with the provisions of the related Servicing Agreements as the sub-servicer of the Purchaser. Notwithstanding anything in this Agreement to the contrary, the Seller shall make all remittances and comply with all reporting requirements set forth in Section 4.05(b) during the Interim Period. The Purchaser agrees to pay to the Seller at the termination of the Interim Period an interim servicing fee equal to 1/12 of 0.40% times the outstanding unpaid principal balance for each Mortgage Loan, which is less than 150 days delinquent at the beginning of each month, for each month during the Interim Period. The Seller and the Purchaser mutually agree that at the termination of the Interim Period the Seller shall deliver to the Purchaser all Servicing Fees and Ancillary Income received during the Interim Period. In lieu of both the Seller and the Purchaser making a payment pursuant to this Section 6.01, the amounts required to be paid hereunder may be netted against one another, with only the net amount being made by the Seller or the Purchaser, as the case may be.

The Seller and the Purchaser shall notify each Servicer and Trustee of the Transfer Date thirty (30) days prior to the Transfer Date.

Section 6.02   Notice Letters of Transfer.

Prior to the Transfer Date, unless otherwise agreed by the parties, the Purchaser shall, at the Purchaser's expense, deliver a "hello" letter notifying each Borrower of the transfer of the Servicing Rights and instruct the Borrower to remit all Monthly Payments and all tax and insurance notices to the Purchaser after the Transfer Date, and the Seller shall, at the Seller's expense, deliver a "goodbye" letter notifying each Borrower of the same information. Such letters shall be mailed on such date and be in such form as is reasonably acceptable to the Seller and the Purchaser. The Seller shall provide copies of the "goodbye" letters to the Purchaser prior

23

972 761 2494    P. 30760

to mailing such letters. The Seller shall also, at Seller's expense, notify any Custodian and insurance companies and/or agents, that the Servicing Rights are being transferred and instruct such entities to deliver all payments, notices, and insurance statements to the Purchaser after the Transfer Date. Such notices shall instruct such entities to deliver, from and after the Transfer Date, all applicable payments, notices, bills, statements, records, files and other documents to Purchaser. All such notices sent to hazard, flood, earthquake, private mortgage guarantee and other insurers shall comply with the requirements of the applicable master policies and shall instruct such insurers to change the mortgagee clause to "Ocwen Federal Bank FSB, its successors and assigns" or as otherwise required under applicable Servicing Requirements. Seller shall be responsible for the cost of preparing and delivering all notices described in this Section except for the "hello" letters and shall provide Purchaser with a copy of the form of each notice used by Seller to comply with this Section.

Section 6.03    Statements.

The Seller shall provide each Borrower with an annual year-end statement in accordance with the Servicing Agreements, and Internal Revenue Service or Treasury Department regulations. Such statement shall reflect the status of the Mortgage Loan up to and including the Transfer Date. The Purchaser shall not have any responsibility for providing such information for the period of time the Mortgage Loan was serviced by the Seller.

Section 6.04    Reserved.

Section 6.05    Payments and Notices Received After the Transfer Date.

The Seller and the Purchaser acknowledge that, during the sixty (60) day period after the Transfer Date, all funds received in connection with the Mortgage Loans, including, but not limited to, tax, insurance, principal, interest and all other types of payments, including, without limitation, mortgage guaranty or mortgage insurance payments, insurance loss drafts and tax refunds, are to be immediately paid over to the Purchaser without offset or deduction. The Purchaser shall be entitled to the service fees and other servicing related income on all such payments. During such sixty (60) day period such funds shall be identified by the Seller's loan numbers and shall be immediately transferred to the Purchaser at the Seller's expense by overnight courier, for next Business Day delivery, at the address for notices to the Purchaser. In addition, Seller shall deliver or cause to be delivered to the Purchaser, as promptly as practicable after receipt by Seller, copies of all correspondence received from FHA, HUD, any Investor or any Borrower or otherwise relating to any Mortgage Loans. Following such sixty (60) day period, all such funds and correspondence shall be returned to the sender with a letter of explanation a copy of which letter shall be sent to the Purchaser. The Seller hereby covenants and agrees that it shall maintain such staff and facilities during such sixty (60) day period that are sufficient to perform all of such responsibilities.

Section 6.06    Service Bureau Cooperation.

The Seller will cause its service bureau and/or EDP department to cooperate with the Purchaser, and the Seller will provide a test tape, trial tape, and an accurate conversion tape containing all history maintained by the service bureau from (i) the origination of any Mortgage Loans if such Mortgage Loan was originated by the Seller or (ii) the date of transfer of servicing

24

of any Mortgage Loans to the Seller, until the Transfer Date, Pool and loan information as of the Transfer Date so as to complete the conversion of all loan, Pool, and security information recorded on an EDP to EDP basis, or such other basis as may reasonably be requested by Purchaser, including the information set forth in Section 4.02. Such tapes shall be provided to Purchaser in accordance with Section 4.02.

Section 6.07    Limitations on Interim Servicing.

      : From and after the Closing Date, the sole and exclusive ownership of the Servicing Rights shall vest in the Purchaser as of the Cut-off Date. The possession of all Mortgage Files and other books, records, accounts and funds by the Seller following the Closing Date is solely in a fiduciary capacity for and at the will of the Purchaser.

Section 6.08    Custodian Approval.

      If required under the applicable agreement, the Seller will use its best efforts to obtain and deliver to the Purchaser prior to the Transfer Date, an approval by the Seller's document Custodian(s) reflecting its or their willingness to continue to perform the custodial activities for the Purchaser. The Seller shall pay all fees to the Custodian when due if the related Servicing Agreement does not provide for such custodial fees to be paid from collections or other sources and that Purchaser shall have no liability for such fees. The Seller will facilitate the assignment of any existing agreement between such Custodian and the Purchaser. The Purchaser will name its Custodian at least 30 days prior to the Transfer Date.

Section 6.09    Missing Social Security Number; Forms W-8 or W-9.

      The Seller will provide a report satisfactory in form and content to the Purchaser to substantiate compliance with Internal Revenue Service and other applicable Treasury Department regulations and requirements applicable to reporting of interest and obtaining Social Security numbers. The Seller also agrees to provide the certification of an authorized officer that the Seller has complied with all Internal Revenue Service and U.S. Treasury Department requirements for due diligence in obtaining and maintaining tax identification numbers for each Mortgage Loan transferred. In addition to the foregoing, the Seller agrees to reimburse the Purchaser for any and all penalties incurred because of Internal Revenue Service and, or, Treasury Department requirements for any missing tax numbers and forms incurred as a result of infractions prior to the Transfer Date.

Section 6.10    Servicing Platform.

      The term "Servicing Platform" includes the following:

    (a)     Seller's current office space in St. Petersburg, Florida;

    (b)     all of the computer equipment and related accessories and facilities used as of the Closing Date in connection with the servicing of the Mortgage Loans, including, but not limited to the computer hardware required to operate and run the Seller's imaging software;

(c)     all of the computer software, including the imaging software and all enhancements thereof being operated on the computer equipment as of the Closing Date in connection with the servicing of the Mortgage Loans;

(d)     sufficient consultants and support staff with respect to the computer hardware and software to operate the computer system in the same manner it was operated as of the Closing Date in connection with the servicing of the Mortgage Loans;

(e)     all furniture and fixtures and other equipment used as of the Closing Date in connection with the servicing of the Mortgage Loans; and

(f)     sufficient number of the Seller's employees to service the Mortgage Loans in accordance with the requirements of law and the Servicing Requirements.

The Seller represents and warrants to the Purchaser that the Servicing Platform is adequate and sufficient for the Seller to perform all of the Seller's obligations as servicer under the Servicing Agreements during the Interim Period.

The Seller acknowledges that a portion of the Purchase Price represents consideration paid by the Purchaser for the Seller's maintaining the Servicing Platform during the Interim Period. The obligations and performance of the Purchaser under this Agreement are conditioned upon and subject to Seller maintaining the Servicing Platform for the period commencing on the Cut-off Date and continuing thereafter through and including the Transfer Date. The Purchaser will receive all servicing revenues from the Servicing Agreement for this period including without limitation, all Servicing Fees and Ancillary Income in accordance with Section 6.01. The Seller agrees that the Purchaser shall assume no obligations or liabilities and shall not become responsible for the performance or satisfaction of any obligations or liabilities with respect to or arising out of the Servicing Platform. In the event that the Seller fails to maintain the Servicing Platform, then, without waiving any rights or remedies which the Purchaser may have, the Purchaser shall assume the Servicing Requirements subject to the terms and conditions set forth in this Agreement and each Forbearance Agreement; provided, however, the Seller shall indemnify the Purchaser pursuant to Section 5.01 with respect to any reduction or diminution of the value of the Servicing Rights and for the costs and expenses related to curing any servicing deficiencies which result from such failure to maintain the Servicing Platform. The Purchaser shall invoice the Seller with respect to any unreimbursed amounts, and the Seller shall pay such amounts within ten (10) days of receipt of such invoice.

972 761 2494    P.33/00

## ARTICLE VII
## ADDITIONAL AGREEMENTS

Section 7.01   Publicity.

As soon as practicable after the Closing, the parties will issue simultaneously their respective separate press releases, in such form as mutually agreed by the parties hereto.  No other publicity regarding the transactions contemplated by this Agreement shall be made without the prior written approval of the parties hereto, except as may be required by applicable law upon the advice of counsel.

Section 7.02   Consents.

(a)     The purchase and sale of any Servicing Rights is subject to Seller obtaining all Major Consent Letters at its sole expense and obtaining the consent of each Trustee and Servicer to the Forbearance Agreement.  The Seller shall obtain the Major Consent Letters prior to the Closing Date.  The Purchaser shall cooperate with Seller in obtaining the Major Consent Letters and shall timely respond to all reasonable requests from the Investor concerning the Purchaser and its business operations.   The Seller shall notify the Purchaser in writing immediately upon obtaining the Major Consent Letters and the Seller shall provide a copy of each such consent letter to Purchaser.

(b)     The Seller shall obtain any consent letters not provided for in subsection (a) above and provide any notice letters that are required with respect to any Custodian or other third party prior to the Transfer Date at its sole expense with respect to any Mortgage Loan.  In the event that any such consent which is required to be obtained on or before the Transfer Date is not obtained by such date, the Purchaser shall have the right to require the Seller to repurchase the related Servicing Rights at a price equal to the Purchase Price paid by the Purchaser with respect to such Servicing Rights at the Closing Date.

27

ARTICLE VIII
MISCELLANEOUS PROVISIONS

Section 8.01  Amendment.

This Agreement may be amended from time to time by the Purchaser and the Seller only by written agreement signed by the Purchaser and the Seller.

Section 8.02  Governing Law.

THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA EXCEPT TO THE EXTENT PREEMPTED BY FEDERAL LAW.

Section 8.03  Notices.

All notices or other communications hereunder shall be in writing and shall be deemed to have been given and received: (a) upon receipt if delivered personally (unless subject to clause (b)) or if mailed by registered or certified mail return receipt requested, postage prepaid; (b) (at 5:00 p.m. local time on the business day following dispatch if sent by a nationally recognized overnight courier; or (c) upon completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) if transmitted by telecopy or other means of facsimile which provided immediate or near immediate transmission to compatible equipment in the possession of the recipient, in any case to the parties at the following addresses or telecopy numbers (or at such other address or telecopy number for a party as will be specified by like notice):

If to the Purchaser:

Ocwen Federal Bank FSB
The Forum, Suite 1002
1675 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33401
Attention: Secretary
Facsimile Number:    (561) 682-8177
Confirmation Number (561) 682-8517

If to the Seller

Republic Bank
111 Second Avenue NE, Suite 300
St. Petersburg, FL 33701
Attention: William Falzone
Facsimile Number: (727) 825-0269
Confirmation Number: (727) 823-7300 x 3345

28

Section 8.04   Exhibits.

The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 8.05   General Interpretive Principles.

For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)   the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular;

(b)   accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)   references herein to "Articles," "Sections," "Subsections," "Paragraphs," and other subdivisions without reference to a document are to designated Articles, Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)   a reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)   the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)   the term "include" or "including" shall mean without limitation by reason of enumeration.

Section 8.06   Reproduction of Documents.

This Agreement and all documents relating thereto, including, without limitation, (i) consents, waivers and modifications which may hereafter be executed, (ii) documents received by any party at the closing, and (iii) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

Section 8.07   Counterparts.

This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one instrument. It shall not be necessary in making proof of this Agreement or any counterpart thereof to produce or account for any other counterpart.

Section 8.08    Entire Agreement, Successors and Assigns.

Except as otherwise provided herein, this Agreement together with the Pricing Letter constitute the entire agreement between the parties hereto and supersedes all rights and prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof. This Agreement (A) is in writing, (B) is being executed by the Seller (and any person claiming an interest under the Seller) contemporaneously with the sale of the Servicing Rights by the Seller, (C) is approved by either the board of directors or the loan committee of the Seller and the authority for such approval is reflected in the minutes of said board or committee, and (D) shall be, continuously from the time of its execution, an official record of the Seller. This Agreement shall not be assignable in whole or in part by the Seller. The Purchaser shall be permitted to assign this Agreement, in whole or in part to an affiliate. This Agreement and any rights, remedies, obligations or liabilities under or by reason of the Agreement shall inure to the benefit of and be binding on the parties hereto or their respective successors and permitted assigns.

Section 8.09    Intention of the Parties

It is the intention of the parties that the Seller is selling, and the Purchaser is purchasing, only the Servicing Rights to the Mortgage Loans and not any interest in the Mortgage Loans themselves.

Section 8.10    Brokerage Commissions.

The Purchaser and the Seller represent, each to the other party hereto, that it has dealt with no broker in connection with the transactions contemplated by this Agreement who is entitled to a commission or fee payable by the other party hereunder and each party shall indemnify the other party against any claims for brokerage commissions based solely on such party's own acts.

Section 8.11    Further Assurances.

From time to time prior to the Transfer Date, the Seller shall furnish to the Purchaser such reports, information or documentation supplementary to the information contained in the documents and schedules delivered pursuant hereto and deliver such reports as may reasonably be requested by the Purchaser and as are reasonably normal and customary in the mortgage servicing industry, and the Purchaser and the Seller shall afford reasonable cooperation each to the other both prior to and following the Transfer Date.

The Seller and the Purchaser will each, at the request of the other, execute and deliver to each other all such other instruments or documentation that either may reasonably request in order to perfect the transfer, assignment and delivery to the Purchaser of the Servicing Rights and the consummation of the agreements hereunder, the assumption by the Purchaser of the Servicing Requirements, and the release of the Seller from the Servicing Requirements.

IN WITNESS WHEREOF, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

OCWEN FEDERAL BANK FSB
(Purchaser)

By:
Title:    RICHARD DELGADO
Dated:    Vice President

REPUBLIC BANK
(Seller)

By:
Title:
Dated:

31

IN WITNESS WHEREOF, the parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

OCWEN FEDERAL BANK FSB
(Purchaser)

By:_____
Title:_____
Dated:_____

REPUBLIC BANK
(Seller)

By:  *Chris Hunter*
Title:  SENIOR VICE PRES.
Dated:  7/26/01

31

SCHEDULE A

MORTGAGE LOAN SCHEDULE

32

EXHIBIT 1

CONTENTS OF MORTGAGE FILE

With respect to each Mortgage Loan, the Mortgage File shall include each of the following items:

1.  Copy of the original Mortgage Note.

2.  Copy of the original recorded Mortgage or Deed of Trust or certified true copy of the Mortgage submitted for recording if the original recorded Mortgage has not yet been returned except that, in Louisiana and Puerto Rico, a true copy thereof, certified by a Notary, may be substituted and if the Mortgage Loan is evidenced by a consolidated mortgage and the consolidation was not accomplished within the body of the most recent Mortgage of record, then a copy of the original recorded Consolidation Agreement shall be included as well.

3.  A copy of the original Assignment of Mortgage executed by the Seller pursuant to Servicing Requirements, which assignment shall be in form and substance acceptable for recording and, if required by Servicing Requirements, recorded. Subject to the foregoing and to Servicing Requirements, such assignments may be by blanket assignments for Mortgage Loans covering Mortgaged Properties situated within the same county.

4.  Copy of the original of each assumption, extension and modification agreements, if applicable. [Open item as to some broker assignments in Keystone pool]

5.  Copy of the original recorded intervening Assignments of Mortgage, if applicable.

6.  Original hazard insurance policy or certificate thereof, if applicable and, if required by law, evidence of flood insurance, with extended coverage of the hazard insurance policy, if applicable.

7.  Residential appraisal, if available.

8,  Origination documents, if available:

    A.  FHA application 2900 and/or conventional loan application;

    B.  Credit Report;

    C.  Preliminary Title Report and/or Commitment for Title Insurance. Copies of easements and/or restrictions and Tax Search sheet, if applicable;

    D.  FHA Conditional Commitment or Conventional Commitment, if any;

1

E.    FHA Firm Commitment, if applicable; and

F.    FHA property description (FHA 2800-1).

9.    Closing certificates:

A.    Executed Truth in Lending statement pursuant to Federal Reserve Board Regulation Z;

B.    Notices pursuant to the Equal Credit Opportunity Act and Federal Reserve Board Regulation B, as amended, if available;

C.    Form HUD-1 (Real Estate Settlement Procedures Act);

D.    If a refinance Mortgage, copy of the notice of right to rescind, signed and dated, if available and applicable; and

E.    Sale contract/deposit receipt, or escrow instructions, as required, if available.

10.    With respect to each Title I Loan, to the extent in the Seller's possession, (a) the completion certificate for the related improvement as required by FHA for the Title I Loan, and (b) a complete list of case numbers with the transfer date reported to HUD; and

11.    Other papers and records developed or originated by the Seller or others, required to document the Mortgage Loan or to service the Mortgage Loan pursuant to Servicing Requirements.

2

EXHIBIT 2

FORM OF SELLER'S CLOSING CERTIFICATE

I, _____, hereby certify that I am the duly elected [Vice] President of REPUBLIC BANK, a state chartered bank organized under the laws of the State of Florida (the "Seller") and further as follows:

1.    There are no actions, suits or proceedings pending (nor, to my knowledge, are any actions, suits or proceedings threatened), against or affecting the Seller which if adversely determined, individually or in the aggregate, would adversely affect the Seller's obligations under the Servicing Rights Purchase Agreement dated as of July _____ 2001 between the Seller and Ocwen Federal Bank FSB (the "Purchase Agreement").

2.    Each person who, as an officer or representative of the Seller, signed the Purchase Agreement and any document delivered prior hereto or on the date hereof in connection with the purchase described in the Purchase Agreement was, at the respective times of such signing and delivery, and is now duly elected or appointed, qualified and acting as such officer or representative, and the signatures of such persons appearing on such documents are their genuine signatures.

3.    Attached hereto is a certified true copy of the authorization of the execution of the Purchase Agreement, and such authorization has not been amended, modified, annulled or revoked and is in full force and effect.

1

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

Dated: _____, 2001

                                        REPUBLIC BANK

                                        By:_____
                                        Name: _____
[Seal]                                  Title:  Secretary

I, _____, a _____ of REPUBLIC BANK, hereby certify that _____ is the duly elected, qualified and acting Secretary of the Seller and that the signature appearing above is [her] [his] genuine signature.

IN WITNESS WHEREOF, I have hereunto assigned my name.

Dated: _____, 2001

                                        REPUBLIC BANK

                                        By:_____
                                        Name:_____
                                        Title:_____

[Seal]

2

512 101 2459   P.44/56

EXHIBIT 3

FORM OF OPINION OF COUNSEL TO SELLER

(Date)

Ocwen Federal Bank FSB
The Forum, Suite 1002
1675 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33401

Dear Sirs:

We have acted as counsel to REPUBLIC BANK, a state chartered bank organized under the laws of the State of Florida (the "Seller"), with respect to certain matters in connection with the sale by the Seller of servicing rights (as defined in the) pursuant to that certain Servicing Rights Purchase Agreement, dated as of July ___ 2001 (the "Purchase Agreement"), by and between the Seller and Ocwen Federal Bank FSB, a federally chartered thrift (the "Purchaser"), by and between Seller and Purchaser. This opinion is being provided to you pursuant to Section 4.01 of the Purchase Agreement.

Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Purchase Agreement.

We have reviewed the Purchase Agreement and such other documents as we deemed necessary or advisable for purposes of the opinions set forth below. To the extent that we have deemed appropriate, we have relied upon representations and certifications of officers of the Seller. We have assumed the authenticity of all documents submitted to us as originals, the genuineness of all signatures, the legal capacity of natural persons and the conformity to the originals of all documents. Based upon the foregoing, we are of the opinion that:

1. The Seller has the requisite power, authority and legal right to engage in the transactions contemplated by the Purchase Agreement and to execute and deliver the Purchase Agreement and to perform and observe the terms and conditions of such agreement.

2. The Purchase Agreement has been duly authorized, executed and delivered by the Seller and is the legal, valid and binding obligation of the Seller enforceable in accordance with its respective terms against the Seller, subject to bankruptcy, insolvency and other similar laws and to the availability of equitable remedies.

3. No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of, or compliance by the Seller with, the Purchase Agreement, or the sale of the Servicing Rights or the consummation of the transactions contemplated by the Purchase Agreement except as expressly contemplated by its terms and except for any Investor approval or consent that is required to be given in connection with the Purchase Agreement.

3

4.      There is no action, suit, proceeding or investigation pending or, to the best of our knowledge, threatened against the Seller which in our judgement, either in any one instance or in the aggregate, would draw into question the validity of the Purchase Agreement or which would be likely to impair materially the ability of the Seller to perform under the terms of the Purchase Agreement.

Very truly yours,

4

Ь/2 761 2494     P.46/60

EXHIBIT 4

LIST OF MBS SERVICING AGREEMENTS

1. Sale and Servicing Agreement, dated as of December 1, 1997 among Republic Bank Home Loan Owner Trust 1997-1 (Issuer), Republic Bank (Servicer and Transferor) and U.S. Bank National Association (Indenture Trustee and Co-Owner Trustee)

2. Sale and Servicing Agreement, dated as of June 1, 1998 among Republic SPC2 Corp. (Transferor), Republic Bank Home Loan Owner Trust 1998-1 (Trust and Issuer), Republic Bank (Servicer), Ocwen Federal Bank FSB (Backup Servicer) and U.S. Bank, National Association (Indenture Trustee and Co-Owner Trustee)

1

EXHIBIT 5

LIST OF MBS AGREEMENTS (WITH CLAIMS ADMINISTRATOR RESPONSIBILITIES)

1. Sale and Servicing Agreement, dated as of August 31, 1998 among Keystone Owner Trust 1998-P2 (Trust), Keystone Grantor Trust 1998-P2 (Grantor Trust), Keystone Mortgage Corp., Inc. (Seller), Republic Bank (Servicer and Claims Administrator), Wilshire Servicing Corporation (Backup Servicer) and U.S. Bank Trust, National Association (Indenture Trustee, Grantor Trustee and Contract of Insurance Holder)

2

PRICING LETTER

Ocwen Federal Bank FSB
The Forum, Suite 1002
1675 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33401

July 26, 2001

REPUBLIC BANK
111 Second Avenue NE, Suite 300
St. Petersburg, FL 33701

Re:    Servicing Rights Purchase Agreement (the "Agreement") dated as of July 26,
2001, between Ocwen Federal Bank FSB and REPUBLIC BANK

Ladies and Gentlemen:

This letter agreement between Republic Bank (the "Seller") and Ocwen Federal
Bank FSB (the "Purchaser") is made pursuant to the terms and conditions of that certain
Servicing Rights Purchase Agreement (the "Agreement") dated as of July 26, 2001, between the
Seller and the Purchaser. Capitalized terms used but not defined herein shall have the meanings
set forth in the Agreement.

The purchase price (the "Purchase Price") shall be equal to $7,792,948.54.

The rights granted hereunder shall be cumulative with the rights provided under
the Agreement and shall inure to the benefit of the Purchaser and its successors and assigns.
This letter agreement shall survive the closing of the transaction and shall not be merged with the
Agreement or any other agreement, and shall be independently enforceable by the parties hereto.
This letter agreement may be signed in any number of counterparts, each of which shall be
deemed to be an original, but taken together, shall constitute a single document.

Please acknowledge your agreement with the foregoing by signing and returning the enclosed copy of this letter to the undersigned.

Very truly yours,

OCWEN FEDERAL BANK FSB

By: _____
    Name: Richard Delgado
    Title: Vice President

Acknowledged and Agreed:

REPUBLIC BANK

By: _____
Name:
Title:

PRICING LETTER

Ocwen Federal Bank FSB
The Forum, Suite 1002
1675 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33401

July 26, 2001

REPUBLIC BANK
111 Second Avenue NE, Suite 300
St. Petersburg, FL 33701

Re:   Servicing Rights Purchase Agreement (the "Agreement") dated as of July 26,
2001, between Ocwen Federal Bank FSB and REPUBLIC BANK

Ladies and Gentlemen:

This letter agreement between Republic Bank (the "Seller") and Ocwen Federal
Bank FSB (the "Purchaser") is made pursuant to the terms and conditions of that certain
Servicing Rights Purchase Agreement (the "Agreement") dated as of July 26, 2001, between the
Seller and the Purchaser. Capitalized terms used but not defined herein shall have the meanings
set forth in the Agreement.

The purchase price (the "Purchase Price") shall be equal to $7,792,948.54.

The rights granted hereunder shall be cumulative with the rights provided under
the Agreement and shall inure to the benefit of the Purchaser and its successors and assigns.
This letter agreement shall survive the closing of the transaction and shall not be merged with the
Agreement or any other agreement, and shall be independently enforceable by the parties hereto.
This letter agreement may be signed in any number of counterparts, each of which shall be
deemed to be an original, but taken together, shall constitute a single document.

Please acknowledge your agreement with the foregoing by signing and returning the enclosed copy of this letter to the undersigned.

Very truly yours,

OCWEN FEDERAL BANK FSB

By: _____

Name: Richard Delgado
Title: Vice President

Acknowledged and Agreed:

REPUBLIC BANK

By: _____

Name: William R. Falzone
Title: EVP - CFO

EXHIBIT 7

FORM OF FORBEARANCE AGREEMENT

THIS FORBEARANCE AGREEMENT (this "Agreement"), dated as of _____ __, 2001, by and among REPUBLIC BANK, as seller ("Seller") and in its capacity as servicer [and claims administrator] for the Transactions defined below, [U.S. BANK NATIONAL ASSOCIATION][U.S. BANK TRUST NATIONAL ASSOCIATION], in its capacity as indenture trustee [co-owner trustee] [grantor trustee] for the Transactions as defined below ("USB") and OCWEN FEDERAL BANK FSB, a federally chartered savings bank (the "Purchaser"), recites and provides as follows:

WITNESSETH:

WHEREAS, USB serves as indenture trustee [co-owner trustee] [grantor trustee] with respect to the _____ series of securitized asset transactions described on Schedule 1 hereto (the "Transactions") and with respect to each Transaction, in its capacity as the indenture trustee [co-owner trustee] [grantor trustee], USB is referred to herein as the "Trustee";

WHEREAS, the trust related to each of the Transactions for which USB is Trustee (each, a "Trust") has been established and is serviced pursuant to the terms of a Sale and Servicing Agreement (each, a "Sale and Servicing Agreement");

WHEREAS, Seller has entered into a Servicing Rights Purchase Agreement in the form attached hereto as Exhibit A (the "Purchase Agreement") with the Purchaser for the sale and conveyance of servicing rights and the assumption of servicing responsibilities with respect to the Transactions, and certain other transactions, to and by the Purchaser;

WHEREAS, the conveyance to and assumption of servicing rights and responsibilities by the Purchaser, the closing of the Purchase Agreement with respect to the Transactions and the Acquisition (as defined below) are subject to the prior consent of the Trustee; and

WHEREAS, the Trustee (i) may assert certain rights and remedies against Seller in respect of various defaults under the terms of certain of the Sale and Servicing Agreements and (ii) have various rights of consent to the appointment of any Servicer for the Transactions;

NOW, THEREFORE, in consideration of the mutual covenants herein contained, the parties hereto hereby agree as follows:

1.    *Definitions.* Except as otherwise expressly provided herein or unless the context otherwise requires, capitalized terms used and not otherwise defined herein shall have the meanings assigned to them in the Sale and Servicing Agreements. In addition, the following terms shall have the following definitions:

5

1.  *"Acquisition"* shall mean (i) the assumption by Seller of rights and duties of the Servicer under the Sale and Servicing Agreements, (ii) the assignment, sale and transfer to the Purchaser of Seller's rights, title and interest in the capacity and position of Servicer under the Sale and Servicing Agreements and the related servicing rights, functions and responsibilities for each of the Transactions, and (iii) the Purchaser's acceptance and assumption of the position of Servicer and the rights, functions, and responsibilities for each of the Transactions as set forth in the Sale and Servicing Agreements, except as otherwise provided in the Purchase Agreement.

2.  *"Closing Date"* shall mean the date on which the Acquisition transactions are closed.

2.  **Acquisition and Performance of Servicing.**

1.  The Purchaser agrees to assume and perform all obligations, duties and functions of the Servicer, including, without limitation, all fee and expense payments arising, and indemnity payments which arise or are related to the Purchaser's actions and duties performed from and after the Closing Date, as set forth in the Sale and Servicing Agreements, with respect to each of the Transactions, but only from the Closing Date forward.

2.  In the event that any trigger condition or event occurs or exists such that the Purchaser can be terminated as Servicer under the Sale and Servicing Agreements, the Trustee hereby agrees that it will not commence such Servicer termination actions until the Trustee has first requested a direction from the related Transaction's Certificateholders whether or not to undertake such termination. If the Trustee receives direction responses from holders of at least fifty-one percent of the outstanding Certificates, the Trustee will follow the direction of the majority of holders that do respond. If the Trustee does not receive the required minimum direction as described above, the Trustee will determine in its own judgment whether or not to proceed with termination of the Purchaser as Servicer.

3.  *Conditions Precedent to the Obligations of the Parties Hereunder.* The obligations of the parties under this Agreement shall not arise until the following condition (the "Conditions Precedent") is satisfied (or waived), as evidenced by an officer's certificate from each of the parties to such effect:

The credit rating agencies that currently maintain credit ratings for Transaction Certificates (the "Rating Agencies") have advised the Trustee that the appointment of the Purchaser as successor Servicer for the Transactions will not, in and of itself, result in the reduction or withdrawal of such ratings or other actions with negative implications regarding such ratings;

4.  **Covenants; Representations and Warranties.**

1.  Seller shall release or transfer to the Purchaser any Custody Agreement arrangements for the Mortgage Loans in the Trusts respecting the Transactions.

6

2.    Each of the Parties hereby represents and warrants that each of the following statements is true and accurate as of the date hereof:

1.    This Agreement has been duly authorized and validly executed and delivered by such party and constitutes such party's legal, valid and binding obligation, enforceable against such party in accordance with its terms;

2.    Such party is not subject to any restriction, agreement or law, order, writ, injunction, decree, rule or regulation of any court, administrative agency or other governmental authority that, with or without the giving of notice, the passage of time or both, would prohibit, contravene, be violated by, or be inconsistent with the execution, delivery and performance by such party of this Agreement or the consummation of the transactions effected hereby or contemplated herein; and

3.    There is no action, suit or proceeding pending or, to the best of such party's knowledge and belief, threatened against such party that questions the validity of, in any way legally impairs, or seeks to enjoin or otherwise prevent the execution, delivery and/or performance by such party of this Agreement or, if adversely determined, would have a material adverse effect on such party's ability to perform its obligations hereunder.

5.    *Attorneys' Fees.*  In the event any litigation, arbitration or other proceeding is commenced by a party hereto against one or more of the other parties hereto for purposes of enforcing the terms of this Agreement, the prevailing party in such litigation, arbitration or other proceeding shall be entitled to recover its reasonable attorneys' fees and expenses from the non-prevailing party or parties in such litigation, arbitration or other proceeding.

6.    *GOVERNING LAW.*  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

7.    *Notices.*  All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered at or mailed by registered mail, postage prepaid, addressed as follows, or such other address as may be furnished by proper notice as described herein (facsimile numbers are provided below for convenience of communication and not as an alternative means of delivery of notice):

    Seller:       Republic Bank
                  111 Second Avenue, NE, Suite 300
                  St. Petersburg, Florida 33701
                  Attention: _____
                  Fax No.: _____

    USB:          [U.S. Bank National Association]
                  [U.S. Bank Trust National Association]
                  Corporate Trust Services

180 East Fifth Street
St. Paul, Minnesota 55101
Attention: _____
Fax No.: _____

Purchaser:        Ocwen Federal Bank FSB
The Forum, Suite 1002
1675 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33401
Attention: Secretary
Facsimile No.: (561) 682-8177

8.    *Relationship of Parties.*  Nothing herein contained shall be deemed or construed to create a partnership or joint venture between or among the parties hereto.

9.    *Counterparts.*  This Agreement may be executed in one or more counterparts and by the different parties hereto on separate counterparts, each of which, when so executed, shall be deemed to be an original and such counterparts, together, shall constitute one and the same agreement.

10.    *Term.*  Subject to the following sentence, the term of this Agreement shall extend until satisfaction of all obligations of the parties hereunder and until payment in full of any and all amounts required to be paid hereunder and final termination of each of the Transactions pursuant to the termination provisions of the applicable Sale and Servicing Agreements. This Agreement shall be terminated and have no force or effect if the Acquisition Closing Date does not occur on or before _____, 2001 or such date as mutually agreed upon.

11.    *Entire Agreement; Amendment.*  This Agreement and the Purchase Agreement constitute the entire agreements and understanding among the Trustee and the Purchaser concerning the subject matter hereof and supersedes and terminates all prior written and oral agreements, proposals, promises and representations of the any such party respecting the subject matter hereof. No representation or promise hereafter made, nor any modification or amendment of this Agreement in any way effecting the rights, interests or obligations of any party hereto, shall be binding upon such party, unless made in writing and signed by all parties hereto affected by such amendment.

12.    *Assignment; Binding Effect.*  Except as provided below, none of the parties hereto may assign its rights hereunder or delegate its duties and obligations hereunder without the express prior written consent of USB. Subject to all terms and conditions hereof, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

13.    *Severability.*  Should any term or provision of this Agreement be legally determined not to be valid or enforceable, all other terms and provisions hereof shall be and remain fully valid and enforceable.

8

14.    *Agreement Confidentiality.*    Notwithstanding any provision of this Agreement, each party hereto shall have the right to disclose this Agreement to directors, officers, partners, employees, attorneys, agents, contractors or advisors of such party or its affiliates, auditors, regulators, lenders or potential lenders, and to other parties if in the opinion of its in-house or outside counsel, it is required to make such disclosure by response to verbal questions, interrogatories, requests for information, subpoena, civil investigation demand or similar process.

15.    *Facsimile Signatures.*    Signatures of this Agreement evidenced and delivered by facsimile shall be as valid as an original thereof.

[Signature Page Follows]

9

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer thereunto as of the day and year first above written.

REPUBLIC BANK

By:_____
Name:
Title:

[U.S. BANK NATIONAL ASSOCIATION] [U.S. BANK TRUST NATIONAL ASSOCIATION], as Indenture Trustee [Co-Owner Trustee] [Grantor Trustee]

By:_____
Name:
Title:

OCWEN FEDERAL BANK FSB

By:_____
Name:
Title:

10

Schedule I

11

EXHIBIT A

FORM OF SERVICING RIGHTS PURCHASE AGREEMENT

EXHIBIT 8

DOCUMENT DEFICIENCY LIST

[To be provided prior to the Transfer Date]

TOTAL P.60

# EXHIBIT

# C

*1998-P2*

## SUBSERVICING TERMS AGREEMENT

THIS SUBSERVICING TERMS AGREEMENT (this "Agreement"), dated as of August 1, 2001 by and among OCWEN FEDERAL BANK FSB, a federal savings bank (the "Subservicer") and REPUBLIC BANK, a state chartered bank organized under the laws of the State of Florida (the "Servicer").

WHEREAS, the Servicer is the "Servicer" and "Claims Administrator" under the Sale and Servicing Agreement dated as of August 31, 1998 among Keystone Owner Trust 1998-P2, Keystone Grantor Trust 1998-P2, Keystone Mortgage Corp., Inc., Republic Bank, Wilshire Servicing Corporation and U.S. Bank Trust National Association (the "Sale and Servicing Agreement"); and

WHEREAS, the Servicer and the Subservicer desire to enter into this Agreement to provide for the subservicing of all mortgage loans subject to the Sale and Servicing Agreement (the "Mortgage Loans") by the Subservicer on behalf of the Servicer consistent with the terms of the Sale and Servicing Agreement.

NOW, THEREFORE, in consideration of the mutual promises, covenants, and conditions hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Definitions.  Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in the Sale and Servicing Agreement.

2.     Subservicing Agreement.  Effective as of September 1, 2001 (the "Transfer Date"); the Subservicer agrees to subservice all Mortgage Loans and act as subclaims administrator on behalf of the Servicer in accordance with the terms of this Agreement and the Sale and Servicing Agreement. Prior to the Transfer Date, the Subservicer and the Servicer hereby agree to comply with the interim servicing procedures set forth in Section 6.01 of the Amended and Restated Servicing Rights Purchase Agreement (the "Purchase Agreement"), dated as of July 26, 2001 as amended and restated to and including August 13, 2001, between the Servicer and the Subservicer. The Subservicer shall comply with the applicable provisions of the Sale and Servicing Agreement in all material respects in connection with its subservicing of the Mortgage Loans. The Servicer shall transfer the subservicing on the Mortgage Loans to the Subservicer in accordance with the applicable transfer procedures set forth in the Purchase Agreement.

3.     Servicing Fees.  The Subservicer shall be entitled to such fees and compensation that the Servicer is entitled to under the Sale and Servicing Agreement from and after July 1, 2001.

4.     Servicer Termination.  If the Servicer shall for any reason no longer be the servicer under the Sale and Servicing Agreement, the Servicer shall reimburse the Subservicer the purchase price paid by the Subservicer to the Servicer as set forth in that certain pricing letter dated August __, 2001 between the Servicer and the Subservicer for the right to subservice the Mortgage Loans; provided, however, the Servicer shall not be required to reimburse the Subservicer in the event that (i) the Certificateholders waive the enforcement of a Servicer

[TPW:NY05:7071295.1]  17498-00027  08/22/01 09:22PM

Termination Event or (ii) the Subservicer fails to subservice the Mortgage Loans in accordance with the terms of the Sale and Sale Servicing which directly results in the termination of the Servicer. The Subservicer shall thereafter transfer the Mortgage Loans to such party designated by the Servicer at the Servicer's cost and expense.

5.    Amendment. This Agreement may be amended from time to time by the Subservicer and the Servicer only by written agreement signed by the Subservicer and the Servicer.

6.    Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF FLORIDA EXCEPT TO THE EXTENT PREEMPTED BY FEDERAL LAW.

7.    Notices. All notices or other communications hereunder shall be in writing and shall be deemed to have been given and received: (a) upon receipt if delivered personally (unless subject to clause (b)) or if mailed by registered or certified mail return receipt requested, postage prepaid; (b) (at 5:00 p.m. local time on the Business Day following dispatch if sent by a nationally recognized overnight courier; or (c) upon completion of transmission (which is confirmed by telephone or by a statement generated by the transmitting machine) if transmitted by telecopy or other means of facsimile which provided immediate or near immediate transmission to compatible equipment in the possession of the recipient, in any case to the parties at the following addresses or telecopy numbers (or at such other address or telecopy number for a party as will be specified by like notice):

If to the Subservicer:

Ocwen Federal Bank FSB
The Forum, Suite 1002
1675 Palm Beach Lakes Blvd.
West Palm Beach, Florida 33401
Attention: Secretary
Facsimile Number:    (561) 682-8177
Confirmation Number (561) 682-8517

If to the Servicer:

Republic Bank
111 Second Avenue NE, Suite 300
St. Petersburg, FL 33701
Attention: William Falzone
Facsimile Number: (727) 825-0269
Confirmation Number: (727) 823-7300 x 3345

8.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original and all of which together shall be deemed to be one instrument. It shall not be necessary in making proof of this Agreement or any counterpart thereof to produce or account for any other counterpart.

2

[TPW:NY05:707l295.1] 17498-00027 08/22/01 09:22PM

9.    Entire Agreement, Successors and Assigns.  This Agreement constitutes the entire agreement between the parties hereto and supersedes all rights and prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.  This Agreement (A) is in writing, (B) is being executed by the Servicer (and any person claiming an interest under the Servicer), (C) is approved by either the board of directors or the loan committee of the Servicer and the authority for such approval is reflected in the minutes of said board or committee, and (D) shall be, continuously from the time of its execution, an official record of the Servicer.  This Agreement shall not be assignable in whole or in part by the Servicer.  The Subservicer shall be permitted to assign this Agreement, in whole or in part to an affiliate.  This Agreement and any rights, remedies, obligations or liabilities under or by reason of the Agreement shall inure to the benefit of and be binding on the parties hereto or their respective successors and permitted assigns.

10.    Further Assurances.  From time to time prior to the Transfer Date, the Servicer shall furnish to the Subservicer such reports, information or documentation supplementary to the information contained in the documents and schedules delivered pursuant hereto and deliver such reports as may reasonably be requested by the Subservicer and as are reasonably normal and customary in the mortgage servicing industry, and the Subservicer and the Servicer shall afford reasonable cooperation each to the other both prior to and following the Transfer Date.  The Servicer and the Subservicer will each, at the request of the other, execute and deliver to each other all such other instruments or documentation that either may reasonably request in order to consummate the agreements hereunder.

[Signatures appear on next page]

3

IN WITNESS WHEREOF, the parties have caused these presents to be executed by their proper officers this the day and year first above written.

OCWEN FEDERAL BANK FSB, as Subservicer

By:

Name:    RICHARD DELGADO

Title:    Vice President


REPUBLIC BANK, as Servicer

By:

Name: WILLIAM R. FALZONE

Title: EXEC, VICE PRES

[TPW:NY05:7071295.1]  17498-00027  08/22/01 09:22PM

EXHIBIT

D



**Corporate Trust Services**
EP-MN-WS1D
60 Livingston Avenue
St. Paul, MN 55107

April 30, 2007

Mr. Thomas Mann
Branch Banking & Trust Company
360 Central Avenue, 17th Floor
St. Petersburg, Florida 33701

      Re:    Notice and Demand Regarding Servicer Failure to Deposit Payments Collected
               for Defaulted Loans Under Keystone Owner Trust 1998-P2

Dear Mr. Mann:

      U.S. Bank National Association, as Indenture Trustee (the "Indenture Trustee") under
the Indenture dated August 31, 1998, with Keystone Owner Trust 1998-P2 (the "Trust"), hereby
provides notice to and makes demand upon Branch Banking & Trust Company ("BB&T") with
respect to its duties as Servicer (the "Servicer") of the Trust pursuant to the Sale and Servicing
Agreement dated as of August 31, 1998 (the "SSA"). Capitalized terms used but not expressly
defined herein, shall have the respective meanings provided in the SSA. The Servicer, through
the actions of its sub-servicing agent Ocwen, Inc., has breached its obligation under SSA Section
5.01(a) to deposit the full amount of Payments into the Collection Account. Such breach has
resulted from the past and on-going retention by Ocwen of 50% of the amounts collected
("Recoveries") on certain defaulted Loans (the "Subject Loans") held in the Trust, notwithstanding
that retention of any portion of those collected Recoveries as servicing compensation is not
authorized under the SSA or under any other transaction documents provided to the Indenture
Trustee or at law or in equity. The full amount of the Subject Loans' Recoveries are required to be
deposited in the Collection Account and related servicing activities are compensated by specified,
limited Servicing Fee arrangements, not by extra deductions from such collected Recoveries. The
total amount of such unauthorized retention of defaulted Loan collections ("Payment Deficiencies")
was recently determined to be $10,891,372, and may have increased.

      Under SSA Section 4.02, the Servicer may perform services through Ocwen as its
subservicer, but no provision of the SSA relieves the Servicer from any duties or obligations
regarding the servicing of Loans. Further, the Servicer is obligated for such subservicer's
performance as if the Servicer alone performed all duties in connection with collection, servicing
and administration of Loans. Ocwen retention of 50% of the Recoveries that were part of Subject
Loan Payments, was and is conversion of Trust assets for which the Servicer is legally liable.

      The Trustee hereby demands that the Servicer (i) immediately cause Ocwen to cease
the retention of any portion of Subject Loan collection Recoveries in violation of SSA Section
5.01(a), and (ii) no later than May 7, 2007, deposit into the Collection Account the full amount of
Payment Deficiencies existing on the date of such deposit. If the Servicer fails to comply with the

Mr. Thomas Mann
April 30, 2007
Page 2

actions demanded above, the Trustee will then determine what legal actions will be taken to remedy the breach of SSA Servicer obligations and to recover the full Payment Deficiencies amount that has been converted from the Trust.

U.S. Bank National Association,
as Trustee

By _____
Pamela Wieder
Vice President

cc:     Craig Currie, Esq.

EXHIBIT

E

 **Branch Banking & Trust Co.**

360 Central Avenue, 17th Floor
St. Petersburg, FL 33701

May 4, 2007

By Fax: 561-682-8163

Paul Koches, General Counsel
Ocwen Financial Corporation
1661 Worthington Road
West Palm Beach, Florida 33409-6480

Re: Keystone Owner Trust 1998-P2

Dear Mr. Koches:

Branch Banking and Trust has received the enclosed letter relating to an alleged breach of the Sales and Servicing Agreement for the above-referenced trust. This is to request that you provide the trustee with a response to their demand relating to this alleged breach.

BB&T has retained Michael Thimmig of the firm of Greenberg Traurig, to advise the bank in this matter. Mr. Thimmig's telephone number is (214) 665-3606 and his address is at the bottom of this letter. I will be unavailable next week. In addition to me, please copy Mr. Thimmig with a copy of your response to the Trustee.

Thank you for your assistance in responding to and resolving this matter.

Sincerely yours,

Thomas A. Mann II
Senior Vice President
Associate General Counsel

Enclosure

Copies to:
Michael Thimmig, Esq., Greenberg Traurig, 2200 Ross Ave., Suite 5200, Dallas, Texas 75201
Pamela Wieder, US Bank, 60 Livingston Avenue, St. Paul, MN 55107
Michael Pocisk, BB&T Mortgage Loan Investment Accounting Manager, MC 900-01-08-30
Tim Day, BB&T Mortgage Loan Servicing Manager, MC 900-01-08-30

# EXHIBIT

## F



# O'MELVENY & MYERS LLP

| | | |
|---|---|---|
| BEIJING | 1625 Eye Street, NW | NEWPORT BEACH |
| BRUSSELS | Washington, D.C. 20006-4001 | NEW YORK |
| CENTURY CITY | | SAN FRANCISCO |
| HONG KONG | TELEPHONE (202) 383-5300 | SHANGHAI |
| LONDON | FACSIMILE (202) 383-5414 | SILICON VALLEY |
| LOS ANGELES | www.omm.com | TOKYO |

May 9, 2007

**OUR FILE NUMBER**
632360-0091

## VIA FACSIMILE AND U.S. MAIL

**WRITER'S DIRECT DIAL**
(202) 383-5127

Craig Currie, Esq.
Dorsey & Whitney LLP
Suite 1500
50 South Sixth Street
Minneapolis, Minnesota 55402

**WRITER'S E-MAIL ADDRESS**
bbrooks@omm.com

Re:   *Keystone Owner Trust 1998-P2*

Dear Mr. Currie:

My client Ocwen Loan Servicing, LLC ("Ocwen") has asked me to respond to the letter dated April 30, 2007 from Ms. Pamela Wieder of your client U.S. Bank to Mr. Thomas Mann of Branch Banking & Trust Company ("BB&T"), and the related letter dated May 4, 2007 from Mr. Mann to Mr. Paul Koches of Ocwen. Those letters relate to Ocwen's collection efforts and related fees earned in connection with liquidated loans in the above-referenced mortgage trust.

Ms. Wieder's letter suggests that Ocwen's retention of a 50 percent asset recovery fee for certain liquidated loans constitutes a violation of the Sale and Servicing Agreement dated as of as of August 31, 1998 ("SSA"). Suffice it to say that that suggestion is incorrect. There is no provision of the SSA that prohibits Ocwen's collection efforts and related compensation for liquidated loans.

By contrast, the letter agreement dated June 28, 2001 by and between Ocwen and Republic Bank ("Letter Agreement"), pursuant to which Ocwen assumed servicing of the relevant loan portfolio, expressly authorizes Ocwen to "provide asset recovery services at a 50% contingency fee" for "charged-off loans" in the portfolio. That arrangement is underscored by a nearly six-year course of dealing in which Ocwen undertook extraordinary asset recovery efforts not otherwise required under the SSA; retained the 50 percent fee set forth in the Letter Agreement; and provided monthly reports to U.S. Bank detailing both assert recoveries for the trust and the amount of asset recovery fees retained by Ocwen in connection with such recoveries. On August 30, 2005, Mr. Koches provided express notice of the asset recovery fee arrangement to Messrs. Sommers, Malami, and Williamson of the Federal Deposit Insurance Corporation ("FDIC"). Thus, Ocwen's asset recovery efforts and related compensation were

O'MELVENY & MYERS LLP
Craig Currie, Esq., May 9, 2007 - Page 2

expressly authorized by contract; were reflected in a lengthy course of dealing that was fully communicated to U.S. Bank as trustee, Republic Bank as master servicer, and BB&T as successor to Republic Bank; and were disclosed to the FDIC nearly two years ago. In light of these facts, the allegations of "conversion" and related allegations contained in Ms. Wieder's letter are nothing more than high-flown rhetoric that have no basis in fact or law.

Having said that, the SSA imposes no obligation on the part of the servicer to attempt to collect liquidated loans, and Ocwen's efforts with respect to such loans had been premised on its authorization under the Letter Agreement to earn compensation for doing so. Through those efforts, Ocwen has been able to locate and work out payment plans with approximately 90 borrowers whose liquidated loans otherwise likely would have been charged off as uncollectible. It is unclear from Ms. Wieder's letter whether U.S. Bank intends to instruct Ocwen to cease collection efforts for these and other liquidated loans. If so, please advise in writing immediately.

Very truly yours,

Brian P. Brooks

cc:    Paul A. Koches, Esq., Ocwen Loan Servicing, LLC, 1661 Worthington Road, West Palm
         Beach, FL  33409
       Ms. Pamela Wieder, U.S. Bank, 60 Livingston Avenue, St. Paul, MN 55107
       Thomas A. Mann II, Esq., Branch Banking & Trust Co., 360 Central Avenue, St.
         Petersburg, FL 33701
       Michael Thimmig, Esq., Greenberg Traurig, 2200 Ross Avenue, Suite 5200, Dallas, TX
         75201

EXHIBIT

G



CRAIG CURRIE
(612) 340-6391
FAX (612) 340-2643
currie.craig@dorsey.com

May 31, 2007

**VIA FEDERAL EXPRESS**
Thomas A. Mann, II, Esq.
Senior Vice President
Associate General Counsel
Branch Banking & Trust Co.
360 Central Avenue, 17th Floor
St. Petersburg, Florida 33701

Michael Thimmig, Esq.
Greenberg Traurig
2200 Ross Avenue
Suite 5200
Dallas, TX 75201

      Re:    Keystone Owner Trust 1998-P2 Notes and Residual Interests
              Keystone Grantor Trust 1998-P2 Mortgage Loans

Gentlemen:

      As counsel to U.S. Bank National Association, as Indenture Trustee and Grantor Trustee and to U.S. Bank Trust National Association as Owner Trustee (collectively, the "Trustee") for the above-captioned securitization financing transaction, I am writing to address the matters set forth in the Trustee's letter dated April 30, 2007, from Ms. Pamela Wieder to Mr. Mann, regarding the Trustee's claim and demand upon Branch Banking & Trust Company ("BB&T") with respect to its breach of duties as Servicer of the Grantor Trust pursuant to the Sales and Servicing Agreement ("SSA") dated as of August 31, 1998. I received a letter dated May 9, 2007, (a copy of which was sent to each of you) from Brian P. Brooks of O'Melveny & Myers LLP, counsel for Ocwen Loan Servicing LLC ("Ocwen"), in which Mr. Brooks at the request of Mr. Mann, made arguments seeking to justify certain actions taken by Ocwen in connection with BB&T's breach of Servicer duties.

      Please be advised that the Trustee intends to pursue its rights in this matter directly with BB&T as the named Servicer under the SSA, responsible for the breach of such duties and liable for the resulting damages. The Trustee finds the arguments contained in Mr. Brooks' letter to be incorrect and without any basis to justify the actions of BB&T and its sub-servicer agent, or to prevent or limit BB&T's liability in this matter. Moreover, Ocwen has no legal relationship with the Grantor Trust, and any arguments and positions regarding its liability, or its separate arrangements with BB&T, are not relevant to the Trustee's rights and claims against



Thomas A. Mann, II, Esq.
Michael Thimmig, Esq.
May 31, 2007
Page 2

BB&T as Servicer under the SSA. The Trustee does not intend to address these matters with Ocwen's counsel or enforce claims against Ocwen, unless further developments should demonstrate the existence of any independent cause of action of the Trustee against Ocwen, in addition to any actions the Trustee brings against BB&T.

Therefore, the Trustee reiterates its position, claims and demands as stated in Ms. Wieder's April 30 letter, to and upon BB&T as named Servicer. Further, the Trustee demands that BB&T pay the Trustee's fees and expenses incurred in pursuing this matter. Finally, notwithstanding statements in Mr. Brook's letter, the Trustee fully expects the Servicer to continue to administer and pursue collection on all defaulted loans as required by the SSA.

If BB&T does not immediately cause the cessation of Ocwen's retention of any portion of Subject Loan Collection Recoveries in violation of the SSA, and deposit into the Collection Account the full amount of the Payment Deficiencies on or before June 7, 2007, (as those terms are defined and described in the April 30 letter), then the Trustee shall commence legal action against BB&T pursuant to a Complaint in the form enclosed herewith (and with such modifications thereto as the Trustee may determine to make prior to the filing thereof). To confirm the amount of such Collection Account deposit, BB&T should contact Ms. Tamara Schultz-Fugh (651-495-3880) at the Trustee.

If BB&T does not comply with the Trustee's demands as provided above and legal action is commenced against BB&T, such action shall not limit, waive or release any other rights, claims or remedies that the Trustee may have under the SSA or otherwise which are not the subject of that legal action.

Very truly yours,

Craig A. Currie

CAC:clf
Enclosure

cc:    Ms Pamela Wieder (w/o enclosure)
       Ms. Tamara Schultz-Fugh (w/o enclosure)
       Brian P. Brooks, Esq. (w/o enclosure)

DORSEY & WHITNEY LLP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| U.S. BANK NATIONAL ASSOCIATION, and U.S. BANK TRUST NATIONAL ASSOCIATION, each in Its Capacity as Successor Trustee, | CIVIL ACTION FILE # |
| Plaintiffs, |  |
| v. |  |
| BRANCH BANKING & TRUST COMPANY, |  |
| Defendant. |  |

## COMPLAINT

Plaintiffs U.S. Bank National Association, and U.S. Bank Trust National Association, each in its capacity as successor trustee (the "Successor Trustee"), as and for its Complaint against defendant Branch Banking & Trust Company, states and alleges as follows:

### Parties

1.    U.S. Bank National Association ("U.S. Bank") is a national banking association whose articles of association designate Ohio as the location of its main office, and whose principal place of business is Minneapolis, Minnesota. U.S. Bank is a citizen of Ohio under 28 U.S.C. § 1348 and *Wachovia Bank, Nat'l Ass'n v. Schmidt*, 546 U.S. 303, 126 S. Ct. 941, 945 (2006) ("Wachovia v. Schmidt").

2.    Plaintiff U.S. Bank Trust National Association ("U.S. Bank Trust") is a national banking association whose articles of association designate Delaware as the location of its main office, and whose principal place of business is in Wilmington, Delaware. U.S. Bank Trust is a citizen of Delaware under 28 U.S.C. § 1348 and Wachovia v. Schmidt.

3.    Branch Banking & Trust Company ("BB&T") is a bank organized under the laws of North Carolina and with its principal place of business in North Carolina.

### Jurisdiction

4.    The parties are of diverse citizenship.

5.    The amount or value of the property in controversy exceeds the sum of $75,000.00, exclusive of interest and costs.

6.    Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332(a).

### Venue

7.    BB&T is subject to personal jurisdiction in the District of Columbia and, accordingly, venue is properly in this Court pursuant to 28 U.S.C. § 1391.

### Claim

8.    U.S. Bank is the successor to U.S. Bank Trust National Association ("USBT") (a former legal entity which merged into U.S. Bank that had the same name as, but was an organization different from U.S. Bank Trust), as Grantor

2

Trustee (the "Grantor Trustee") of Keystone Grantor Trust 1998-P2 (the "Grantor Trust") under the terms of a Grantor Trust Agreement (the "Grantor Trust Agreement"), with Keystone Mortgage Corp., Inc., as Seller dated as of August 28, 1998. A copy of the Grantor Trust Agreement is attached hereto as Exhibit A.

9.     U.S. Bank is also the successor to USBT as Indenture Trustee (the "Indenture Trustee") under the Indenture ((the "Indenture") dated August 31, 1998, with Keystone Owner Trust 1998-P2. A copy of the Indenture is attached hereto as Exhibit B.

10.     U.S. Bank Trust is the successor to First Union Trust Company, N.A., as Owner Trustee (the "Owner Trustee") of Keystone Owner Trust 1998-P2 (the "Owner Trust") under the terms of a Trust Agreement (the "Owner Trust Agreement") dated as of August 31, 1998, with Keystone Mortgage Corp., Inc.. A copy of the Owner Trust Agreement is attached hereto as Exhibit C.

11.     BB&T is successor to Republic Bank as Servicer for the Grantor Trust under the Sale and Servicing Agreement described herein.

12.     As part of the financing transaction described herein, a Sale and Servicing Agreement dated as of August 31, 1998 (the "Sale and Servicing Agreement") was entered into among the Grantor Trust, the Owner Trust, Keystone Mortgage Corp. Inc., as Seller, Republic Bank (BB&T's predecessor), as Servicer, Wilshire Servicing Corporation, U.S. Bank Trust National Association

3

(U.S. Bank's predecessor) as Indenture Trustee and Grantor Trustee. A copy of the Sale and Servicing Agreement is attached hereto as Exhibit D.

13.    Under the terms of the Sale and Servicing Agreement, Keystone Mortgage Corp., as Seller, transferred to the Grantor Trust more than 11,000 residential mortgage loans (the "Mortgage Loans"). A certificate of beneficial interest in the Grantor Trust's Mortgage Loans was issued to the Owner Trust. The Owner Trust then issued and sold $542,400,000 principal amount of notes to investors, pledged the beneficial interest in the Mortgage Loans as collateral for the said notes, pursuant to the Indenture, and issued to other parties interests in and distribution rights to the residual cash and other assets of the Owner Trust available after the said notes are paid.

14.    Principal and interest payments due on the Mortgage Loans, to the extent collected, first are applied to pay monthly debt service on the notes issued by the Owner Trust under the Indenture, and any excess loan collections are payable to holders of the residual interest in the Owner Trust (the "Residual Holders").

15.    Under the terms of the Sale and Servicing Agreement, Republic Bank was appointed and obligated, and as legal successor to Republic Bank, BB&T is obligated, to "service" the Mortgage Loans as named servicer of the Grantor Trust ("Servicer"). The Servicer's powers and duties expressly include collecting from

4

Mortgage Loan obligors the monthly payments as due on such loans, and in connection with defaulted Mortgage Loans, pursuing past due loan payments, exercising collection rights, enforcing remedies, settling default claims, and disposing of collateral properties, as necessary to obtain defaulted payment recoveries belonging to the Grantor Trust and provide increased funds to pay the Owner Trust's notes and distributions to its Residual Holders.

16.    Under the terms of the Sale and Servicing Agreement, the Grantor Trustee established a Collection Account (the "Collection Account"), and the Servicer is obligated to cause all amounts received or collected with respect to the Mortgage Loans, including defaulted Mortgage Loans, (defined as the "Payments" in the Sale and Servicing Agreement), net only of those amounts of Servicer fees expressly authorized by the Sale and Servicing Agreement, to be deposited into the Collection Account. The existence, amount and timing of collections from defaulted Mortgage Loans, and the deposit thereof as Payments into the Collection Account, are entirely within the control of the Servicer and it alone has the dealings with Mortgage Loan obligors and maintains the records and information related to such matters. Pursuant to the Sale and Servicing Agreement the Successor Trustee must rely entirely upon the Servicer to collect and deposit such Payments as property of the Grantor Trust.

5

17.    Under the terms of Section 4.02 of the Sale and Servicing Agreement, the Servicer may perform its responsibilities relating to servicing through sub-servicers or agents, but the Servicer is not relieved of any responsibility or obligation with respect to its servicing duties or any liability related thereto, and is obligated with respect to the actions of such sub-servicer or agent to the same extent and under the same terms and conditions as if the Servicer alone were performing all duties and obligations set forth in the Sale and Servicing Agreement in connection with the collections, servicing and administration of the Mortgage Loans. Beginning in 2001, Republic (and subsequently BB&T) performed its responsibilities under the Sale and Servicing Agreement through a sub-servicer, Ocwen Federal Bank FSB ("Ocwen Bank").

18.    Contrary to it obligations and duties as Servicer under the Sale and Servicing Agreement, BB&T has failed to deposit and continues to fail to deposit into the Collection Account the entire amount of the monthly Payments actually collected with respect to defaulted Mortgage Loans because its sub-servicer and agent, Ocwen Bank, has withheld and diverted and continues to withhold and divert from deposit to the Collection Account proceeds of such defaulted Mortgage Loan collection, equal to 50% of the collected amounts (the "Diverted Proceeds"). No such collection proceeds are authorized to be retained by the Servicer or its

6

sub-servicer under any provision of the Sale and Servicing Agreement. The aggregate amount of the Diverted Proceeds is currently in excess of $11,150,000.

19.    Monthly servicing certificates provided to the Trustee by Ocwen Bank during the entire period it has acted as sub-servicer on behalf of BB&T as Servicer, contained false and misleading statements regarding the amount of defaulted Mortgage Loan collections constituting Payments to be deposited to the Collection Account for such months. By such false and misleading statements the amount of such collections was understated and misrepresented to the Trustee in the amount of the Diverted Proceeds.

## Count I (Breach of Contract)

20.    Plaintiffs restate and reallege each of the allegations in paragraphs 1 through 19 of the Complaint.

21.    BB&T's past and continuing failure to deposit the Diverted Proceeds into the Collection Account has and continues to constitute a breach of its express duties under the Sale and Serving Agreement.

22.    BB&T's breach of the Sale and Servicing Agreement has damaged the Grantor Trust, and prevented payments due to the Residual Holders, by an amount equal to the Diverted Proceeds.

### Count II (Conversion)

23.    Plaintiffs restate and reallege each of the allegations in paragraphs 1 through 22 of the Complaint.

24.    Plaintiffs owned and had the right to possession of the Diverted Proceeds.  BB&T in its individual capacity and through its agent Ocwen Bank, has exercised dominion over the property or interference with the Diverted Proceeds, in derogation of Plaintiffs' rights, and thereby converted Plaintiffs' property.

### Count III (Misrepresentation)

25.    Plaintiffs restate and reallege each of the allegations in paragraphs 1 through 24 of the Complaint.

26.    BB&T made misrepresentations and/or material omissions of facts which were false and known by BB&T to be false, made for the purpose of inducing Plaintiffs to rely upon them.  Plaintiffs justifiably relied on the misrepresentations and/or material omissions, and suffered injury as a result.

### Count IV (Breach of Fiduciary Duty)

27.    Plaintiffs restate and reallege each of the allegations in paragraphs 1 through 26 of the Complaint.

28.    With respect to the collection and deposit into the Collection Account of the Payments related to defaulted Mortgage Loans, BB&T has owed and continues to owe fiduciary duties to the Grantor Trust.

8

29.    BB&T's past and continuing failure to deposit the Diverted Proceeds

into the Collection Account has and continues to constitute a breach of its fiduciary

duties to the Grantor Trust.

WHEREAS, Plaintiffs pray for judgment as follows:

A.    For judgment against BB&T in an amount equal to the Diverted Proceeds

with respect to each of the counts stated above.

B.    For its costs, disbursements and legal fees incurred herein.

C.    For such other and further relief as the Court deems equitable and just.

**DORSEY & WHITNEY LLP**

By_____

Patrick J. McLaughlin
mclaughlin.patrick@dorsey.com
Todd Pearson
pearson.todd@Dorsey.com
DORSEY & WHITNEY LLP
50 S. 6th Street
Suite 1500
Minneapolis, MN 55402-1498
Telephone:  612-340-2600
Fax:  612-340-2868

**ATTORNEYS FOR PLAINTIFFS U.S.
BANK NATIONAL ASSOCIATION, and
U.S. BANK TRUST NATIONAL
ASSOCIATION, each in Its Capacity as
Successor Trustee**

9

EXHIBIT

H

JUN-06-2007  10:12        OMM                                                P.02/03



## O'MELVENY & MYERS LLP

BEIJING
BRUSSELS
CENTURY CITY
HONG KONG
LONDON
LOS ANGELES

1625 Eye Street, NW
Washington, D.C. 20006-4001

TELEPHONE (202) 383-5300
FACSIMILE (202) 383-5414
www.omm.com

NEWPORT BEACH
NEW YORK
SAN FRANCISCO
SHANGHAI
SILICON VALLEY
TOKYO

June 6, 2007

OUR FILE NUMBER
632360-

### VIA FACSIMILE

WRITER'S DIRECT DIAL
(202) 383-5127

Thomas A. Mann, Esq.
Senior Vice President
Associate General Counsel
Branch Banking & Trust Co.
360 Central Avenue, 17th Floor
St. Petersburg, Florida 33701

WRITER'S E-MAIL ADDRESS
bbrooks@omm.com

Michael Thimmig, Esq.
Greenberg Traurig
2200 Ross Avenue
Suite 5200
Dallas, Texas 75201

Re:    *Keystone Owner Trust 1998-P2*

Gentlemen:

I write in reference to the letter addressed to you from Craig Currie, Esq., dated May 31, 2007. Based on that letter and Mr. Mann's letter to Paul Koches dated May 4, 2007, Ocwen understands that BB&T does not intend for Ocwen to undertake any further asset recovery efforts with respect to liquidated loans pursuant to the letter agreement dated June 28, 2001 ("Letter Agreement"). Therefore, effective immediately, Ocwen has ceased such efforts. If BB&T's intentions are otherwise, please inform me in writing immediately.

With respect to asset recovery efforts undertaken prior to today's date, Ocwen successfully negotiated special payment plans pursuant to which it is now making collections for approximately 90 borrowers whose loans qualified as liquidated loans under the relevant sale and servicing agreement. In undertaking those extraordinary collection efforts which were not required under the sale and servicing agreement, Ocwen relied on the Letter Agreement, in which the parties agreed that Ocwen would be entitled to a 50 percent contingency fee for such asset recovery efforts. Unless you instruct otherwise, Ocwen will advise the subject borrowers that it has been directed to terminate these payment plans and will return any subsequent payments to the borrowers.

JUN-06-2007  10:12          OMM                                      P.03/03

O'MELVENY & MYERS LLP

Thomas A. Mann, Esq., Michael Thimmig, Esq., June 6, 2007 - Page 2

Very truly yours,

Brian P. Brooks

cc:    Craig Currie, Esq.
       Dorsey & Whitney LLP
       Suite 1500
       50 South Sixth Street
       Minneapolis, Minnesota  55402

EXHIBIT

I

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

| | | |
|---|---|---|
| BRANCH BANKING AND TRUST COMPANY, | § § | |
| Plaintiff, | § § | |
| v. | § § | **07-80508** |
| U.S. BANK NATIONAL ASSOCIATION, U.S. BANK TRUST NATIONAL ASSOCIATION, AND OCWEN LOAN SERVICING, LLC, | § § § § | Civil No. _____ CIV-MARRA |
| Defendants. | § | MAGISTRATE JUDGE JOHNSON |

**PLAINTIFF'S ORIGINAL COMPLAINT AND REQUESTS FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Branch Banking and Trust Company ("BB&T") files its Original Complaint and Requests for Declaratory Injunctive Relief ("Complaint") against Defendants U.S. Bank National Association ("U.S. Bank"), U.S. Bank Trust National Association ("U.S. Bank Trust"), and Ocwen Loan Servicing, LLC ("Ocwen"), respectfully alleging as follows:

I.
**JURISDICTION AND VENUE**

1.    This Court has jurisdiction over this proceeding because complete diversity of citizenship exists between BB&T and the Defendants and the amount in controversy exceeds the minimum jurisdictional amount for this court.

2.    This Court has subject matter jurisdiction over the request for Declaratory Judgment under 28 U.S.C. §§ 2201 and 2202 as a declaratory judgment action arising under the Declaratory Relief Act.

3.      Venue of this civil action is proper in the Southern District of Florida under 28 U.S.C. § 1391(a) as it is the judicial district where at least one of the defendants, Ocwen, resides and where a substantial part of the events or omissions giving rise to the claims occurred.

## II.
## THE PARTIES

4.      Plaintiff BB&T is a bank organized under the laws of North Carolina whose principal place of business is located in North Carolina.

5.      Defendant U.S. Bank is a national banking association whose articles of association designate Ohio as the location of its main office, making it a citizen of Ohio under 28 U.S.C. § 1348, and whose principal place of business at 800 Nicollet Mall, Minneapolis, Minnesota 55402.

6.      Defendant U.S. Bank Trust is a national banking association whose articles of association designate Delaware as the location of its main office, making it a citizen of Delaware under 28 U.S.C. § 1348, and whose principal place of business is 300 East Delaware Avenue, 8th Floor, Wilmington, Delaware 19809.

7.      Ocwen Loan Servicing, LLC is a Florida Limited Liability Company whose principal place of business is in West Palm Beach, Florida. Ocwen may be served with process by delivering process to its registered agent for service of process, Corporation Service Company, 1201 Hays Street, Tallahassee, Florida 32301-2525.

## III.
## FACTUAL BACKGROUND

8.      U.S. Bank is the successor to U.S. Bank Trust National Association ("USBT") (a former legal entity which merged into U.S. Bank that had the same name as, but was a different organization from U.S. Bank Trust), as Grantor Trustee of Keystone Grantor Trust 1998-P2 (the

"Grantor Trust") under the terms of a Grantor Trust Agreement, with Keystone Mortgage Corp., Inc., as Seller, dated as of August 28, 1998.

9.      U.S. Bank Trust is the successor to First Union Trust Company, N.A. as Owner Trustee of Keystone Owner Trust 1998 P-2 (the "Owner Trust"), under the terms of a Trust Agreement dated as of August 31, 1998, with Keystone Mortgage Corp., Inc.

10.     On or about August 31, 1998, the Grantor Trust, the Owner Trust, Keystone Mortgage Corp., Inc., as Seller, Republic Bank ("Republic") as Servicer (as that term is defined in the SSA), Wilshire Servicing Corporation, and U.S. Bank Trust National Association as Indenture Trustee and Grantor Trustee entered into a Sale and Servicing Agreement ("SSA").  A copy of the SSA is attached hereto as Exhibit A.

11.     Under the terms of the SSA, the Servicer of the mortgage loans subject to the SSA is authorized to act as agent for the Grantor Trust and is obligated to manage, service, administer and make collections on the Loans (as that term is defined in the SSA).  Pursuant to Section 4.01(a) of the SSA, the Servicer has the full power and authority to do any and all things in connection with such servicing and administration which are consistent with the manner in which prudent servicers service similar loans and which are consistent with the ordinary practices of prudent mortgage lending intuitions.

12.     In addition, under Section 4.02 the SSA, the Servicer has the authority to enter subservicing contracts with third parties and allow such third party subservicer to perform the Servicer's obligations under the SSA.

13.     On or about July 26, 2001, Republic entered a Servicing Rights Purchase Agreement ("SRPA") with Ocwen Federal Bank, FSB (Ocwen FB), pursuant to which Ocwen FB assumed

Republic's obligation to service the Loans pursuant to the terms of the SSA. A copy of the SRPA is attached as Exhibit B.

14.    In addition, on or about August 1, 2001, Ocwen FB and Republic entered into an Subservicing Terms Agreement ("STA"). Pursuant to the STA, Ocwen FB accepted responsibility for servicing the Loans under the SSA, and specifically agreed to "comply with the applicable provisions of the [SSA] in all material respects in connection with its subservicing of the Mortgage Loans," including, without limitation, the servicing standard under the SSA referenced above in Paragraph 11. A copy of the STA is attached hereto as Exhibit C.

15.    Under the terms of the SRPA and STA, Ocwen is entitled to receive as a "Servicing Fee" the amounts to be paid under the SSA to the Servicer.

16.    Pursuant to the terms of the SRPA and STA, Ocwen has acted as Servicer under the SSA since on or about September 1, 2001.

17.    Subsequent to Republic and Ocwen entering into the SRPA and STA, in June 2004, BB&T became the successor in interest to Republic, thus assuming Republic's obligations under the SSA, SRPA and STA.

18.    On or about June 30, 2005, Ocwen FB voluntarily terminated its status as a federal savings bank. In connection with this process, Ocwen FB and Ocwen Loan Servicing, LLC ("Ocwen") entered into an Assignment and Assumption Agreement, dated June 28, 2005, whereby Ocwen assumed all of Ocwen FB's assets and liabilities, including its obligations under the SRPA and STA.

19.    On or about April 30, 2007, BB&T, as successor in interest to Republic, received from U.S. Bank a demand letter claiming that BB&T had breached the SSA as a result of the actions of Ocwen because Ocwen had failed to deposit the full amount of Payments (as that term is defined

in the SSA) into the Collection Account (as that term is defined in the SSA). U.S. Bank claimed that Ocwen had retained and continued to retain 50% of any amounts collected by Ocwen on certain defaulted, liquidated loans held in the Trust (the "Recoveries"). U.S. Bank further claimed that the retention of 50% of the Recoveries by Ocwen was not authorized under the SSA or under any other transaction documents between U.S. Bank and the Servicer. Accordingly, U.S. Bank demanded that BB&T remit to U.S. Bank the entire amount of the withheld Recoveries, which are currently in excess of $11,150,000. U.S. Bank further stated that in the event BB&T or Ocwen did not remit to U.S. Bank the withheld Recoveries, U.S. Bank would hold BB&T responsible for the withheld Recoveries. A copy of this April 30, 2007 letter is attached hereto as Exhibit D.

20.    BB&T forwarded U.S. Bank's April 30, 2007 demand letter to Ocwen and requested that Ocwen provide U.S. Bank with a response to the demand. On or about May 9, 2007, Ocwen responded to U.S. Bank's demand letter by claiming that its retention of the withheld Recoveries was not a violation of the SSA because: (1) nothing in the SSA prohibits Ocwen's collection efforts and related compensation for liquidated loans; (2) the June 28, 2001 letter agreement under which Ocwen offered to purchase Republic's rights under the SSA authorizes Ocwen to "provide asset recovery services at a 50% contingency fee" for "charged-off loans" in the portfolio; (3) this had been the normal course of dealings between U.S. Bank and Ocwen for nearly six years, during which Ocwen had provided to U.S. Bank "monthly reports . . . detailing both asset recoveries for the trust and the amount of asset recovery fees retained by Ocwen in connection with such recoveries." A copy of this May 9, 2007 letter is attached hereto as Exhibit E. Notably, the June 28, 2001 letter agreement referenced by Ocwen was specifically replaced by, and not made part of, the SRPA.

21.    On or about May 31, 2007, U.S. Bank responded to Ocwen's letter by sending a letter to BB&T in which it stated that Ocwen's arguments were incorrect, and in any event, not relevant to

the claims of U.S. Bank because Ocwen and U.S. Bank have no legal relationship. Accordingly, U.S. Bank informed BB&T that it intended to pursue its claims against BB&T, as successor in interest to Republic, for breach of the SSA and for damages resulting from such alleged breach. In addition, U.S. Bank stated that it "fully expects the Servicer to continue to administer and pursue collection of all defaulted loans as required by the SSA." A copy of this May 31, 2007 letter is attached as Exhibit F.

22.    In addition, U.S. Bank informed BB&T that it would "commence legal action against BB&T pursuant to a Complaint in the form enclosed herewith." *See* Exhibit F. U.S. Bank then attached a copy of a draft complaint to the letter. *See* Exhibit F.

23.    In response to U.S. Bank's May 31, 2007 letter, on or about June 6, 2007, Ocwen informed BB&T that it "understands that BB&T does not intend for Ocwen to undertake any further asset recovery efforts with respect to the liquidated loans pursuant to the letter agreement dated June 28, 2001. Therefore, effective immediately, Ocwen has ceased such efforts." Ocwen further stated that, with respect to the 90 borrowers with whom Ocwen had negotiated special payment plans for the collection of these borrower's liquidated loans, Ocwen would "advise the subject borrowers that it has been directed to terminate these payment plans and will return any subsequent payments to the borrowers." A copy of this June 6, 2007 letter is attached as Exhibit G.

24.    Contrary to Ocwen's representations in its June 6, 2007 letter, BB&T never instructed Ocwen to cease its asset recovery efforts with respect to the liquidated loans.

25.    Later that same day, on June 6, 2007, U.S. Bank again informed BB&T that U.S. Bank disagreed with Ocwen's interpretation of the SSA and that Ocwen's threatened actions "will constitute further breaches of the Servicer's duties under the [SSA] and BB&T will be responsible

for all damages resulting from such breaches." A copy of this June 6, 2007 letter is attached as Exhibit H.

26.     Ocwen's termination of its further asset recovery efforts is a direct violation of the SRPA and STA, thus putting Ocwen in breach of the SRPA and STA, which has caused and will continue to cause BB&T irreparable injury. Ocwen's stated refusal to continue performing under the SRPA and STA and to refund monies owed by Borrowers will cause confusion among borrowers who are ultimately indebted to U.S. Bank, who will in turn look to BB&T, as successor in interest to Republic, to pay for any losses suffered as a result of Ocwen's breach.

27.     An actual justiciable controversy exists among the parties because BB&T is unable to determine the rights, obligations and interests of the parties under the SRPA, STA and the SSA with regard to the portion of the Recoveries that have been withheld by Ocwen. However, in the event Ocwen did not have the right to retain the withheld Recoveries under the SRPA, STA and SSA, BB&T asserts that Ocwen should be liable to U.S. Bank and U.S. Bank Trust for any and all funds improperly retained, and any and all damages resulting therefrom. In the alternative, pursuant to the SRPA, Ocwen is obligated to indemnify BB&T against any liability BB&T may have to U.S. Bank and U.S. Bank Trust as a result of Ocwen's action under the SRPA and STA.

28.     All conditions precedent to the bringing of this lawsuit and any causes of action hereunder have been met, or have been waived.

## IV.
## CAUSES OF ACTION

### Count One
### (Breach of Contract against Ocwen)

29.     BB&T realleges and incorporates the allegations of paragraphs 1 through 27 above as if fully set forth herein.

30.     Republic, BB&T's predecessor in interest, and Ocwen FB, Ocwen's predecessor in interest, executed the SRPA on or about July 26, 2001.

31.     Republic, BB&T's predecessor in interest, and Ocwen FB, Ocwen's predecessor in interest, executed the STA on or about August 1, 2001

32.     BB&T, as successor in interest to Republic, and Ocwen are parties to valid, enforceable contracts to wit, the SRPA and STA.

33.     Under the terms of the SRPA and STA, Republic and Ocwen made several valid and enforceable mutual agreements.

34.     Republic and BB&T, as successor in interest to Republic, performed its obligations under the SRPA and STA.

35.     Pursuant to the SRPA, STA and SSA, Ocwen has an obligation to continue to service the Loans and perform the Servicer obligations under the SSA, including continuing asset recovery efforts with respect to any liquidated loans under the SSA.

36.     As a result of Ocwen's actions in ceasing its efforts to undertake any further asset recovery efforts with respect to the liquidated loans, Ocwen has breached the SPRA and STA, such breach being a material breach of the SPRA and STA.

37.     As a direct and proximate result of Ocwen's material breach of the SPRA and STA, BB&T has suffered and will continue to suffer injury and substantial damages, including, without limitation, the amount of funds Ocwen would recover under its asset recovery efforts.

## Count Two
### (Request for Declaratory Judgment)

38.     BB&T realleges and incorporates the allegations of paragraphs 1 through 36 above as if fully set forth herein.

39.    As set forth in more detail above, it is clear that Ocwen, U.S. Bank and U.S. Bank Trust have differing views regarding whether Ocwen's retention of the withheld Recoveries is permitted under the SSA. Without further discovery into the relevant factual history of this dispute, BB&T cannot currently take any position regarding whether Ocwen's retention of the Recoveries is permitted under the SSA, at law or in equity.

40.    Ocwen, U.S. Bank and U.S. Bank Trust's disagreement regarding whether Ocwen's retention of the withheld Recoveries was permitted under the SSA is an actual and justiciable case and controversy.

41.    Accordingly, with this action, BB&T seeks to have the Court define the rights, obligations and interests of itself, U.S. Bank, U.S. Bank Trust and Ocwen under the SSA, SRPA, and STA, resolve the substantial controversy between the parties and declare:

a.    Whether Ocwen's retention of the withheld Recoveries is permitted under any of the agreements, at law or in equity;

b.    Whether U.S. Bank and U.S. Bank Trust have any claim against BB&T or Ocwen with respect to the retention of the withheld Recoveries by Ocwen;

c.    Whether, in the event Ocwen's retention of the withheld Recoveries is not permitted under the SSA, SRPA and STA, Ocwen is obligated to remit the withheld Recoveries to the Collection Account pursuant to the terms of the SSA, SRPA and STA.

d.    Whether Ocwen is obligated to indemnify BB&T for any all losses, damages and expenses incurred as a result of this dispute

### Count Three
### (Request for Injunctive Relief against Ocwen)

42.    BB&T realleges and incorporates the allegations of paragraphs 1 through 36 above as if fully set forth herein.

43.    Ocwen's actions in ceasing its asset recovery efforts under the SSA, SRPA and STA will cause BB&T irreparable harm and injury in that it is impossible to determine the amount of funds Ocwen would have been able to recover had it not ceased its asset recovery efforts.  In addition, Ocwen's failure to continue its asset recovery efforts under the SSA, SRPA and STA and its failure to continue to collect the payments due under the special payment plans described above will cause BB&T irreparable harm because it will result in massive confusion and disruption among the borrowers obligated under the loans at issue, potentially causing a substantial diminution of the value of the SSA and increase in operating and servicing expenses incurred from "cleaning up" the problems caused by Ocwen's unexcused breach, thus resulting in BB&T being in breach of the SSA.

44.    Likewise, Ocwen's actions in returning funds to borrowers under the special payment plans will also result in irreparable harm to BB&T because it will also cause a substantial diminution of the value of the SSA and increase in operating and servicing expenses incurred from "cleaning up" the problems caused by Ocwen's unexcused breach, thus resulting in BB&T being in breach of the SSA.  Moreover, as these payment plans related to defaulted and liquidated loans, it is likely that BB&T will never be able to recover these funds once they are returned to the defaulted borrowers.

45.    Accordingly, BB&T requests that the Court enter a preliminary injunction: (1) enjoining Ocwen from ceasing its asset recovery efforts of the liquidated loans; (2) enjoining Ocwen from informing the borrowers under the special payment plans described above that it has been directed to terminate these payment plans; (3) enjoining Ocwen from returning any subsequent

payments under these payment plans to the borrowers, and 4) enjoining Ocwen from spending or dissipating any of the withheld Recoveries.

46.     No harm will result to Ocwen by the issuance of a preliminary injunction pending a determination of the issues raised in this Complaint.

47.     BB&T stands ready to post such security as the Court may deem proper under Rule 65(c), Fed. R. Civ. P., prior to the issuance of the preliminary injunction prayed for herein.

48.     The facts and applicable law show a strong likelihood that BB&T will prevail on the merits of its breach of contract claim set forth herein.

49.     Absent the entry of the requested preliminary injunction, BB&T has no adequate remedy at law.

## V.
## ATTORNEYS' FEES

50.     As a result of Ocwen's conduct, BB&T has been required to retain the services of Greenberg Traurig, LLP and has agreed to pay Greenberg Traurig, LLP a reasonable fee.

51.     Pursuant to Section 5.01 of the SRPA, BB&T is entitled to and seeks to recover its reasonable attorneys' fees and court costs incurred in prosecuting this action from Ocwen.

## VI.
## REQUESTED RELIEF

BB&T requests that U.S. Bank National Association, U.S. Bank Trust National Association and Ocwen Federal Bank FSB be cited to answer and appear and that, upon final hearing, BB&T have judgment against Defendants for the following:

> a.  Declaring the rights, obligations, and interests of BB&T, U.S. Bank, U.S. Bank Trust, and Ocwen under the SSA, SRPA and STA with regard to: (1) whether Ocwen's retention of the withheld Recoveries is permitted under these

agreements, at law or in equity; and (2) in the event Ocwen's retention of the withheld Recoveries is not permitted under the SSA, SRPA and STA, that Ocwen is obligated to remit the withheld Recoveries to the Collection Account pursuant to the terms of the SSA, SRPA and STA;

b. All of the damages, actual, consequential and special, to which it proves entitlement at trial;

c. The injunctive relief requested above;

d. Reasonable attorneys' fees and court costs;

e. Pre-judgment and post-judgment interest on all the foregoing sums at the highest respective legal rates; and

f. Any other relief to which BB&T may be entitled.

Respectfully submitted,

**GREENBERG TRAURIG, LLP**

By: _____

Jason M. Fedo, Esq., FBN 186287
777 South Flagler Drive, Suite 300
West Palm Beach, FL 33401
Telephone: (561) 650-7900
Facsimile: (561) 655-6222

Of Counsel:

Stephen C. Carlin, Esq.
State Bar No. 03807700
Penelope Brobst Blackwell, Esq.
State Bar No. 24029456
2200 Ross Avenue, Suite 5200
Dallas, Texas 75201
Telephone: (214) 665-3600
Facsimile: (214) 665-3601

EXHIBIT

J



**CRAIG CURRIE**
(612) 340-6391
FAX (612) 340-2643
currie.craig@dorsey.com

June 12, 2007

Ms. Penelope Brobst Blackwell                                    **VIA U.S. MAIL**
Greenberg Traurig
2200 Ross Avenue
Suite 5200
Dallas, Texas 75201

     Re:    Branch Banking & Trust Company v. U.S. Bank National Association, et al.; Case
           Number 07-80508

Dear Ms. Brobst Blackwell:

    Enclosed are signed copies of the Waiver of Service of Summons for each of U.S. Bank
Trust National Association and U.S. Bank National Association.

                           Very truly yours,

                           Craig Currie

AO 399 (Rev. 10/2002) Waiver of Service of Summons

## WAIVER OF SERVICE OF SUMMONS

Case Number: 07-80508

TO: U.S. Bank Trust National Association c/o Craig A. Currie, Dorsey & Whitney LLP

I, Craig A. Currie on behalf of U.S. Bank Trust N.A. , acknowledge receipt of your request that I waive
(DEFENDANT NAME)

service of summons in the action of Branch Banking and Trust Company v. U.S. Bank National Association, et al.
(CAPTION OF ACTION)

which is case number 07-80508 in the United States District Court for the
(DOCKET NUMBER)

Southern District of Florida

I have also received a coy of the complaint in the action, two copies of this instrument, and a means by which I
can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not
requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule
4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the
jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the
summons.

I understand that a judgment may be entered against me (or the party on whose behalf I am acting) if an answer or
motion under Rule 12 is not served upon you within 60 days after 6/11/2007
(DATE REQUEST WAS SENT)

or within 90 days after that date if the request was sent outside the United States.

June 12, 2007
(DATE)

Craig A. Currie
(SIGNATURE)

Printed/Typed Name: Craig A. Currie

As legal counsel of U.S. Bank Trust N.A.
(TITLE)                          (CORPORATE DEFENDANT)

### Duty to Avoid Unnecessary Costs of Service of Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons
and complaint. A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States to
waive service of summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return
the waiver.

It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought
in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives
service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later
object to the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented
plaintiff) a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this
time, a default judgment may be taken against that defendant. By waiving service, a defendant is allowed more time to answer than if the summons
had been actually served when the request for waiver of service was received.

AO 399 (Rev. 10/2002) Waiver of Service of Summons

## WAIVER OF SERVICE OF SUMMONS

Case Number: 07-80508

TO: U.S. Bank ~~████~~ National Association c/o Craig A. Currie, Dorsey & Whitney LLP

I, Craig A. Currie on behalf of U.S. Bank N.A. , acknowledge receipt of your request that I waive
(DEFENDANT NAME)
service of summons in the action of Branch Banking and Trust Company v. U.S. Bank National Association, et al.
(CAPTION OF ACTION)
which is case number 07-80508 in the United States District Court for the
(DOCKET NUMBER)
Southern District of Florida

I have also received a coy of the complaint in the action, two copies of this instrument, and a means by which I
can return the signed waiver to you without cost to me.

I agree to save the cost of service of a summons and an additional copy of the complaint in this lawsuit by not
requiring that I (or the entity on whose behalf I am acting) be served with judicial process in the manner provided by Rule
4.

I (or the entity on whose behalf I am acting) will retain all defenses or objections to the lawsuit or to the
jurisdiction or venue of the court except for objections based on a defect in the summons or in the service of the
summons.

I understand that a judgment may be entered against me (or the party on whose behalf I am acting) if an answer or
motion under Rule 12 is not served upon you within 60 days after                    6/11/2007
(DATE REQUEST WAS SENT)
or within 90 days after that date if the request was sent outside the United States.

June 12, 2007
(DATE)

_Craig A. Currie_
(SIGNATURE)

Printed/Typed Name: Craig A. Currie

As legal counsel of U.S. Bank N.A.
(TITLE)                    (CORPORATE DEFENDANT)

### Duty to Avoid Unnecessary Costs of Service of Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain parties to cooperate in saving unnecessary costs of service of the summons
and complaint. A defendant located in the United States who, after being notified of an action and asked by a plaintiff located in the United States to
waive service of summons, fails to do so will be required to bear the cost of such service unless good cause be shown for its failure to sign and return
the waiver.

It is not good cause for a failure to waive service that a party believes that the complaint is unfounded, or that the action has been brought
in an improper place or in a court that lacks jurisdiction over the subject matter of the action or over its person or property. A party who waives
service of the summons retains all defenses and objections (except any relating to the summons or to the service of the summons), and may later
object to the jurisdiction of the court or to the place where the action has been brought.

A defendant who waives service must within the time specified on the waiver form serve on the plaintiff's attorney (or unrepresented
plaintiff) a response to the complaint and must also file a signed copy of the response with the court. If the answer or motion is not served within this
time, a default judgment may be taken against that defendant. By waiving service, a defendant is allowed more time to answer than if the summons
had been actually served when the request for waiver of service was received.

# EXHIBIT

# K

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

U.S. BANK NATIONAL ASSOCIATION and
U.S. BANK TRUST NATIONAL
ASSOCIATION,

        Plaintiffs,

      v.

BRANCH BANKING & TRUST COMPANY,

        Defendant.

Civil. Action No. 1:07-cv-1055-PLF

## DECLARATION OF MICHAEL POCISK IN SUPPORT
## OF DEFENDANT'S MOTION TO DISMISS OR TRANSFER

I, Michael Pocisk, do hereby declare and state as follows:

1.     My name is Michael Pocisk. I am over the age of eighteen years, of sound mind and competent to make this affidavit. The facts stated in this declaration are of my personal knowledge, and I know them to be true and correct.

2.     I am a Vice President of Branch Banking & Trust Company ("BB&T"). BB&T is a North Carolina corporation with its principal place of business in Winston-Salem, North Carolina.

3.     Attached to Defendant's Motion to Dismiss or Transfer as Exhibit A is a true and correct copy of the Sale and Servicing Agreement ("SSA"), dated August 31, 1998 among Keystone Owner Trust 1998-P2, Keystone Grantor Trust 1998-P2, Keystone Mortgage Corp., Inc., Republic Bank, Wilshire Servicing Corporation, and U.S. Bank Trust National Association.

4.    Attached to Defendant's Motion to Dismiss or Transfer as Exhibit B is a true and correct copy of the Servicing Rights Purchase Agreement ("SRPA") dated July 26, 2001, by and between Ocwen Federal Bank FSB and Republic Bank.

5.    Attached to Defendant's Motion to Dismiss or Transfer as Exhibit C is a true and correct copy of the Subservicing Terms Agreement ("STA") dated August 1, 2001 by and between Ocwen Federal Bank FSB and Republic Bank.

6.    Attached to Defendant's Motion to Dismiss or Transfer as Exhibit D is a true and correct copy of a Letter from Pamela Wieder at U.S. Bank National Association ("U.S. Bank") to Thomas Mann at BB&T dated April 30, 2007.

7.    Attached to Defendant's Motion to Dismiss or Transfer as Exhibit E is a true and correct copy of a Letter from Thomas Mann to Paul Koches at Ocwen Loan Servicing, LLC ("Ocwen") dated May 4, 2007.

8.    Attached to Defendant's Motion to Dismiss or Transfer as Exhibit F is a true and correct copy of a Letter from Brian Brooks, counsel for Ocwen, to Craig Currie, counsel for U.S. Bank dated May 9, 2007.

9.    Attached to Defendant's Motion to Dismiss or Transfer as Exhibit G is a true and correct copy of a Letter from Craig Currie to Thomas Mann and Michael Thimmig, counsel for BB&T, dated May 31, 2007.

10.    Attached to Defendant's Motion to Dismiss or Transfer as Exhibit H is a true and correct copy of a Letter from Brian Brooks to Thomas Mann and Michael Thimmig dated June 6, 2007.

11.    Attached to Defendant's Motion to Dismiss or Transfer as Exhibit I is a true and correct copy of Complaint filed in *Branch Banking & Trust Company v. U.S.*

*Bank National Association, U.S. Bank Trust National Association and Ocwen Loan Servicing, LLC,* Cause No. 07-80508, pending in the United States District Court for the Southern District of Florida, West Palm Beach Division (the "Florida Action").

12.     Attached to Defendant's Motion to Dismiss or Transfer as Exhibit J is are true and correct copies of Waivers of Service executed on behalf of U.S. Bank by its counsel in the Florida Action.

13.     Pursuant to the terms of the SRPA and STA, Ocwen has acted as Servicer under the SSA since on or about August 1, 2001.

14.     Subsequent to Republic and Ocwen entering into the SRPA and STA, in June 2004, BB&T became the successor in interest to Republic Bank, thus assuming Republic's obligations under the SSA, SRPA and STA.

15.     Since that time, BB&T has had no involvement in the servicing of the loans under the SSA because Ocwen continues to act as subservicer and performs all obligations required under the SSA on behalf of BB&T.

16.     On June 11, 2007, BB&T filed the Florida Action against Ocwen and U.S. Bank.  BB&T determined that the action should be filed in the Southern District of Florida because: (1) that is where Ocwen resides; (2) that is where Ocwen has provided the servicing of the loans under the SSA since 2001; (3) it is BB&T's understanding that the issues raised by U.S. Bank regarding the proceeds of the liquidated loans were discovered during an audit of Ocwen performed by the FDIC at Ocwen's location in West Palm Beach, Florida; and (4) Republic Bank was also a resident of Florida when it negotiated and executed the SSA.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on July 12, 2007.

Michael Pocisk

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

U.S. BANK NATIONAL ASSOCIATION and U.S.
BANK TRUST NATIONAL ASSOCIATION,

      Plaintiffs,

     v.                                  Civil Action No. 1:07-cv-1055-PLF

BRANCH BANKING & TRUST COMPANY,

      Defendant.

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT BRANCH BANKING & TRUST COMPANY'S
MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO TRANSFER**

Defendant Branch Banking & Trust Company ("BB&T") respectfully submits this memorandum in support of its motion to dismiss or transfer the Complaint filed by Plaintiffs U.S. Bank National Association ("U.S. Bank NA") and U.S. Bank Trust National Association ("U.S. Bank Trust") (collectively, "U.S. Bank").

## I.  INTRODUCTION

The Court should grant this Motion to Dismiss or Transfer because no party, document or event that gives rise to this dispute has any connection to this district, and there is a prior pending case in the Southern District of Florida between these parties based on the same transactions and agreements.  Indeed, pursuant to 28 U.S.C. § 1391(a)(3) venue in this district could only be proper if there was no other district in which venue could properly lie.  However, there is such a venue.  The United States District Court for the Southern District of Florida in which BB&T first filed an action for damages and declaratory judgment against U.S. Bank and Ocwen Loan Servicing, LLC over the exact issues raised in the Complaint at hand.  Therefore, because another more appropriate venue exists (with numerous direct connections to the underlying

1

parties and facts) and because BB&T's suit was first filed and U.S. Bank's claims are therefore compulsory counterclaims in that case, this Court should dismiss this action or transfer it for consolidation with the prior pending case in the Southern District of Florida.

In 1998, U.S. Bank and Republic Bank entered a Sale and Servicing Agreement ("SSA"), pursuant to which Republic Bank agreed to service a certain pool of mortgage loans. Under the terms of the SSA, the loan servicer has the right to enter a subservicing agreement, under which the servicer may assign its servicing obligations to a third party. Republic Bank entered into such a subservicing agreement with Ocwen Federal Bank ("Ocwen FB") in July 2001. Accordingly, since July 2001, Ocwen has performed all of the servicing obligations for the loans under the SSA. After that time, Republic had no involvement with the servicing of these loans. In June 2004, BB&T became the successor to Republic Bank by merger. However, BB&T had no involvement with the servicing of these loans, as Ocwen has continued to act as servicer of the loans under the SSA and the subservicing agreements.

In April 2007, U.S. Bank sent BB&T a demand letter asserting that BB&T had breached the SSA because Ocwen has allegedly, since 2001, improperly withheld certain proceeds from the collection of "liquidated loans" subject to the SSA. As a result of this and subsequent demand letters from U.S. Bank and Ocwen's denial of liability for the alleged claims, on June 11, 2007, BB&T filed a lawsuit in the Southern District of Florida, West Palm Beach Division (which is where the loans have been serviced by Ocwen since 2001), styled *Branch Banking & Trust Company v. U.S. Bank National Association, U.S. Bank Trust National Association and Ocwen Loan Servicing, LLC*, Cause No. 07-80508 ("Florida Action"). In that complaint, BB&T seeks declaratory relief requesting that the court determine the rights and obligations of the parties with respect to the collection of liquidated loans under the SSA and subservicing

2

agreements.  In addition, BB&T asserted claims for breach of contract and requested injunctive relief against Ocwen based on the alleged improper withholding of the proceeds of the liquidated loans.

Despite knowing that BB&T had filed suit in the Florida Action and accepting service of that complaint, three days later on June 14, 2007, U.S. Bank filed this action asserting claims based on the same facts and agreements at issue in the Florida Action.  In addition, although U.S. Bank admits in the Complaint filed here that the actions complained of by U.S. Bank are the actions of Ocwen, U.S. Bank failed to name Ocwen as a party to this litigation.

Unfortunately for U.S. Bank, its choice of forum -- the District of Columbia -- has no connection or nexus to the transactions and events alleged in the Complaint (or to those transactions that resulted in the negotiation, execution or performance of the SSA) nor do any of the parties involved in this transactions or events even reside in the District of Columbia.  Accordingly, this Court lacks venue over this action under 28 U.S.C. § 1391.  As a result, this case should either be dismissed or transferred under 28 U.S.C. § 1404.  Transfer to the Southern District of Florida is proper under well developed precedent in this Circuit.  Because the District of Columbia is not the place of residence of any party, Plaintiffs' choice of forum is entitled to no deference and the burden is on Plaintiffs to establish that this action should proceed here, something they simply cannot do because of the lack of nexus between this suit and the District of Columbia.  Also, Plaintiffs' blatant forum shopping here clearly violates the well established "first-filed" rule, which provides that, when related cases are pending before two federal courts, the court in which the last case was filed may refuse to hear it if the issues raised by the cases substantially overlap.  Finally, Plaintiffs' claims in this action violate the compulsory counterclaim rule under Federal Rule of Civil Procedure 13, which requires that claims such as

those set forth here be brought as counterclaims to the Florida Action.  For these reasons, this Court can, and should, stay its hand in this matter and dismiss this action or transfer it for consolidation with the Florida Action.

## II.  FACTUAL BACKGROUND

U.S. Bank NA is the successor to U.S. Bank Trust National Association ("USBT") (a former legal entity that merged into U.S. Bank NA that had the same name as, but was a different organization from U.S. Bank Trust), as Grantor Trustee of Keystone Grantor Trust 1998-P2 (the "Grantor Trust") under the terms of a Grantor Trust Agreement, with Keystone Mortgage Corp., Inc., as Seller, dated as of August 28, 1998.  *See* Complaint ¶ 8.  U.S. Bank  NA is a national banking association whose articles of association designate Ohio as the location of its main office, making it a citizen of Ohio under 28 U.S.C. § 1348, and whose principal place of business is in Minneapolis, Minnesota.  *See* Complaint ¶ 1.

U.S. Bank Trust is the successor to First Union Trust Company, N.A. as Owner Trustee of Keystone Owner Trust 1998 P-2 (the "Owner Trust"), under the terms of a Trust Agreement dated as of August 31, 1998, with Keystone Mortgage Corp., Inc.  *See* Complaint ¶ 9.  U.S. Bank Trust is a national banking association whose articles of association designate Delaware as the location of its main office, making it a citizen of Delaware under 28 U.S.C. § 1348, and whose principal place of business is in Wilmington, Delaware.  *See* Complaint ¶ 2.

On or about August 31, 1998, the Grantor Trust, the Owner Trust, Keystone Mortgage Corp., Inc., as Seller, Republic Bank as Servicer (as that term is defined in the SSA), Wilshire Servicing Corporation, and U.S. Bank Trust National Association as Indenture Trustee and Grantor Trustee entered into the SSA.  *See* SSA  attached as Exhibit A.

4

Under the terms of the SSA, the Servicer of the mortgage loans subject to the SSA is authorized to act as agent for the Grantor Trust and is obligated to manage, service, administer and make collections on the Loans (as that term is defined in the SSA). *See* Ex. A at 58. Pursuant to Section 4.01(a) of the SSA, the Servicer has full power and authority to do any and all things in connection with such servicing and administration that are consistent with the manner in which prudent servicers service similar loans and which are consistent with the ordinary practices of prudent mortgage lending intuitions. *Id.* In addition, under Section 4.02 the SSA, the Servicer has the authority to enter subservicing contracts with third parties and allow such third party subservicer to perform the Servicer's obligations under the SSA. *Id.* at 60.

On or about July 26, 2001, Republic Bank entered a Servicing Rights Purchase Agreement ("SRPA") with Ocwen FB,[1] pursuant to which Ocwen FB assumed Republic's obligation to service the Loans pursuant to the terms of the SSA. *See* SRPA, attached as Exhibit B. In addition, on or about August 1, 2001, Ocwen FB and Republic Bank entered a Subservicing Terms Agreement ("STA"). Pursuant to the STA, Ocwen FB accepted responsibility for servicing the Loans under the SSA, and specifically agreed to "comply with the applicable provisions of the [SSA] in all material respects in connection with its subservicing of the Mortgage Loans," including, without limitation, the servicing standard under the SSA referenced above in Paragraph 11. *See* STA, attached as Exhibit C. Pursuant to the terms of the SRPA and STA, Ocwen has acted as Servicer under the SSA since on or about August 1, 2001. *See* Declaration of Michael Pocisk ("Pocisk Decl.") attached  as Exhibit K, ¶ 13.

---

[1] On or about June 30, 2005, Ocwen FB voluntarily terminated its status as a federal savings bank. In connection with this process, Ocwen FB and Ocwen Loan Servicing, LLC ("Ocwen") entered into an Assignment and Assumption Agreement, dated June 28, 2005, whereby Ocwen assumed all of Ocwen FB's assets and liabilities, including its obligations under the SRPA and STA.

5

Subsequent to Republic and Ocwen entering into the SRPA and STA, in June 2004, BB&T became the successor in interest to Republic Bank by merger. *See* Pocisk Decl., ¶ 14. Since that time, BB&T has had no involvement in the servicing of the loans under the SSA – and in fact was virtually unaware of them - because Ocwen continues to act as subservicer and performs all obligations required under the SSA on behalf of BB&T. *See* Pocisk Decl., ¶ 15.

On or about April 30, 2007, BB&T, as successor in interest to Republic, received from U.S. Bank a demand letter claiming that BB&T had breached the SSA as a result of the actions of Ocwen because Ocwen had failed to deposit the full amount of Payments (as that term is defined in the SSA) into the Collection Account (as that term is defined in the SSA). *See* Letter dated April 30, 2007 from U.S. Bank to BB&T attached as Exhibit D. U.S. Bank claimed that Ocwen had retained and continued to retain 50% of any amounts collected by Ocwen on certain defaulted, liquidated loans held in the Trust (the "Recoveries"). *Id.* U.S. Bank further claimed that the retention of 50% of the Recoveries by Ocwen was not authorized under the SSA or under any other transaction documents between U.S. Bank and the Servicer. *Id.* Accordingly, U.S. Bank demanded that BB&T remit to U.S. Bank the entire amount of the withheld Recoveries, which are currently in excess of $11,150,000. *Id.* U.S. Bank further stated that in the event BB&T or Ocwen did not remit to U.S. Bank the withheld Recoveries, U.S. Bank would hold BB&T responsible for the withheld Recoveries. *Id.*

BB&T forwarded U.S. Bank's April 30, 2007 demand letter to Ocwen and requested that Ocwen provide U.S. Bank with a response to the demand. *See* Letter from BB&T to Ocwen dated May 4, 2007, attached as Exhibit E. On or about May 9, 2007, Ocwen responded to U.S. Bank's demand letter by claiming that its retention of the withheld Recoveries was not a violation of the SSA because: (1) nothing in the SSA prohibits Ocwen's collection efforts and

related compensation for liquidated loans; (2) the June 28, 2001 letter agreement under which Ocwen offered to purchase Republic's rights under the SSA authorizes Ocwen to "provide asset recovery services at a 50% contingency fee" for "charged-off loans" in the portfolio; (3) this had been the normal course of dealings between U.S. Bank and Ocwen for nearly six years, during which Ocwen had provided to U.S. Bank "monthly reports . . . detailing both asset recoveries for the trust and the amount of asset recovery fees retained by Ocwen in connection with such recoveries." *See* Letter from B. Brooks to C. Currie dated May 9, 2007, attached as Exhibit F.

On or about May 31, 2007, U.S. Bank responded to Ocwen's letter by sending a letter to BB&T in which it stated that Ocwen's arguments were incorrect, and in any event, not relevant to the claims of U.S. Bank because Ocwen and U.S. Bank have no legal relationship. *See* Letter from C. Currie to T. Mann and M. Thimmig dated May 31, 2007, attached as Exhibit G. Accordingly, U.S. Bank informed BB&T that it intended to pursue its claims against BB&T, as successor in interest to Republic, for breach of the SSA and for damages resulting from such alleged breach. *Id.* In addition, U.S. Bank stated that it "fully expects the Servicer to continue to administer and pursue collection of all defaulted loans as required by the SSA." *Id.*

In response to U.S. Bank's May 31, 2007 letter, on or about June 6, 2007, Ocwen informed BB&T that it "understands that BB&T does not intend for Ocwen to undertake any further asset recovery efforts with respect to the liquidated loans pursuant to the letter agreement dated June 28, 2001. Therefore, effective immediately, Ocwen has ceased such efforts." *See* Letter from B. Brooks to T. Mann and M. Thimmig dated June 6, 2007, attached as Exhibit H. Ocwen further stated that, with respect to the 90 borrowers with whom Ocwen had negotiated special payment plans for the collection of these borrower's liquidated loans, Ocwen would

"advise the subject borrowers that it has been directed to terminate these payment plans and will return any subsequent payments to the borrowers." *Id.*

As a result of this correspondence, on June 11, 2007, BB&T determined that it needed to file suit against both Ocwen and U.S. Bank and seek to have the parties' rights and obligations under the SSA defined by the court because the SSA does not clearly provide for the collection of liquidated loans, nor does it clearly provide what additional compensation, if any, the servicer is entitled to receive for the collection of such loans. *See* Complaint filed in the Florida Action, attached as Exhibit I. BB&T determined that the action should be filed in the Southern District of Florida because: (1) that is where Ocwen resides; (2) that is where Ocwen has provided the servicing of the loans under the SSA since 2001; (3) it is BB&T's understanding that the issues raised by U.S. Bank regarding the proceeds of the liquidated loans were discovered during an audit of Ocwen performed by the FDIC at Ocwen's location in West Palm Beach, Florida and (4) Republic Bank was also a resident of Florida when it negotiated and executed the SSA. *See* Pocisk Decl., ¶ 16. In addition to seeking declaratory relief from the Court in the Florida Action, BB&T asserted breach of contract claims and indemnity claims against Ocwen based on Ocwen's alleged improper withholding of a portion of the proceeds of the liquidated loans. *See* Ex. I. Counsel for U.S. Bank was sent a copy of the Florida Action Complaint on June 11, 2007, and U.S. Bank signed waivers of service in the Florida Action on June 12, 2007. *See* Waivers of Service, attached as Exhibit J.

Despite knowing of and accepting service of the first-filed Florida Action, the fact that none of the parties reside in the District of Columbia and the fact that none of the facts, transactions or events at issue in this action took place in the District of Columbia, on June 14, 2007, U.S. Bank filed this lawsuit asserting claims against BB&T based on exactly the same

8

facts and transactions at issue in the Florida Action. *See* Complaint, filed with this Court June 14, 2007. Because this court is not the proper venue for this action, it must be dismissed or transferred and consolidated with the Florida Action.

### III. ARGUMENT

**A.     This Court Is Not The Proper Venue For This Action.**

Under 28 U.S.C. § 1406(a), "[t]he district court of a district in which is filed a case laying venue in the wrong division or district ***shall dismiss, or if it be in the interest of justice, transfer*** such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a) (emphasis added). As Judge Walton of this district has recognized, "[t]his language makes clear that a court has no discretion to reach the merits of a case in which venue is improper and an objection to venue has been properly raised; the case must either be dismissed or transferred to a proper venue." *Joyner v. Reno*, 466 F. Supp. 2d 31, 40 (D.D.C. 2006) (citing *Smith v. U.S. Investigations Servs., Inc.,* No. 04-0711, 2004 WL 2663143, *2 (D.D.C. Nov. 18, 2004) (holding that "[i]f the district in which the action is brought does not meet the requirements of section 1391(b), then that district court may either dismiss or . . . transfer such case to any district or division in which it could have been brought") (internal quotation marks omitted); *Glendora v. Anderson*, 55 Fed. Appx. 470, 2003 WL 202108, *1 (9th Cir. Jan. 24, 2003) (concluding that "[t]he district court properly declined to reach the merits of the dispute because the merits may only be decided by a court with jurisdiction and venue.")).

Likewise, Federal Rule of Civil Procedure 12(b)(3) instructs the court to dismiss or transfer a case if venue is improper or inconvenient in the plaintiffs' chosen forum. F<small>ED</small>. R. C<small>IV</small>. P. 12(b)(3). When federal jurisdiction is premised on diversity of citizenship, 28 U.S.C. § 1391(a) controls venue, which provides as follows:

9

> A civil action wherein jurisdiction is founded only on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a).

The purpose of this statutory venue provision is to protect a defendant against the risk that a plaintiff will select an unfair or inconvenient forum. 15 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE & PROCEDURE: JURISDICTION 2d, § 3801 at 4.  As a result, the plaintiff has the burden of alleging and proving that venue is proper.. *See Davis v. Am. Soc'y of Civil Eng'rs*, 290 F. Supp. 2d 116, 121 (D.D.C. 2003), and cases cited therein.  As explained below, Plaintiffs have not shown, and cannot show, that venue properly lies in this Court.

In their Complaint, Plaintiffs make the mere conclusory statement that: "BB&T is subject to personal jurisdiction in the District of Columbia and, accordingly, venue is proper in this Court pursuant to 28 U.S.C. § 1391." *See* Complaint at ¶ 7.  Plaintiffs, however, apparently have failed to read and understand the entirety of Section 1391.  Section 1391 *only* provides for venue based on personal jurisdiction when "*there is no district in which the action may otherwise be brought*."  28 U.S.C. § 1391(a)(3) (emphasis added).  When it is clear that venue would exist in another district, a plaintiff cannot base his choice of forum on Section 1391(a)(3).  *See Osan Ltd. v. Accenture LLP*, No. 04-1296, 2005 WL 2902246, *4  (D.D.C. Sept. 30, 2005) ("Venue in the District of Columbia cannot be premised on § 1391(a)(3) because the evidence demonstrates that in accord with § 1391(a)(2) venue could rest in another district.").  Here it is clear that, pursuant to 28 U.S.C. § 1391(a)(2), this action could have been -- and should have been -- brought in the

10

Southern District of Florida.[2]   Ocwen is located West Palm Beach in the Southern District of Florida, and has been since the SRPA and STA were executed in 2001.  *See* Ex. B at 28; and Ex. C at  2.  Since 2001, Ocwen has been servicing the loans pursuant to the SSA from its location in West Palm Beach, Florida.  *See* Pocisk Decl. ¶ 13.  Moreover, it is BB&T's understanding that the issues raised by U.S. Bank regarding Ocwen's retention of the proceeds of the liquidated loans arose from an audit that was performed by the FDIC at Ocwen's location in West Palm Beach, Florida.  *See id.* at ¶ 16.  Because the claims set forth in this action arise from Ocwen's servicing of the loans and from the audit of Ocwen in West Palm Beach, it is impossible to see how any other location could be where "substantial part of the events or omissions giving rise to the claim occurred."  *See* 28 U.S.C. § 1391(a)(2).  Accordingly, because venue clearly exists in another district – the Southern District of Florida – Plaintiffs' reliance on Section 1391(a)(3) is improper and this Court is not the proper venue for this action.  Thus, because venue does not lie in this Court and venue clearly is proper in the United States District Court for the Southern District of Florida,  this Court should grant BB&T's Rule 12(b)(3) motion.

**B.**     __The Court Should Transfer This Case for the Convenience of the Parties and Witnesses.__

Under Section 1406(a) of the United States Code, if this Court determines that venue is improper in this District, then it may either dismiss Plaintiffs' Complaint, or, in the interests of

---

[2] Likewise, Plaintiffs do not and cannot allege that venue is proper in this Court under either § 1391(a)(1) or (a)(2). Section (a)(1) provides that venue is proper if the action is brought where any defendant resides, if all the defendants reside in the same state. Here, Plaintiffs' admit in their Complaint that BB&T is a resident of North Carolina. *See* Complaint ¶ 2. And, under no scenario can it be said that "a substantial part of the events giving rise to the claim occurred" in the District of Columbia. § 1391(b)(2). In fact, the District of Columbia is only mentioned once in the Complaint -- in the paragraph regarding venue. *See* Complaint ¶ 7.  As set forth above, the events giving rise to Plaintiffs' claims all occurred in the Southern District of Florida, which is where Ocwen is located and has been servicing the loans since 2001. Moreover, although BB&T was not a party to the SSA when it was originally entered into, it is reasonable to assume that the negotiation and execution of the SSA occurred in the states where the parties to the SSA resided at the time the agreement was executed, which was Minnesota for USBT, Delaware for First Union Trust Company, and St. Petersburg, Florida for Republic Bank -- none resided in the District of Columbia. *See* Ex. A at 108.

justice, it may transfer it to any district or division in which the case could have been brought

under 28 U.S.C. §1404(a), which provides:

> For the convenience of parties and witnesses, in the interest of justice, a district
> court may transfer any civil action to any other district or division where it might
> have been brought.

28 U.S.C. § 1404(a).  The statute "was designed to curtail abuse of the broad venue statutes,

which sometimes allow a plaintiff to bring suit in a forum that is markedly less convenient than

another forum."  *Smiths Indus. Med. Sys., Inc. v. Ballard Med. Prods., Inc.*, 728 F. Supp. 6, 7

(D.D.C. 1989).  In an action where venue is improper such as this one, the decision of whether

dismissal or transfer is "in the interest of justice" is committed to the sound discretion of the

district court.[3]  *Naartex Consulting Corp. v. Watt,* 722 F.2d 779, 789 (D.C. Cir. 1983).

Generally, the interest of justice requires transferring such cases to the appropriate judicial

district rather than dismissing them. *Goldlawr, Inc. v. Heiman,* 369 U.S. 463, 467 (1962); *James

v. Booz-Allen,* 227 F. Supp. 2d 16, 20 (D.D.C. 2002).  When deciding a transfer motion under §

1404(a), a court considers and balances case-specific factors, including the private interests of

the parties and witnesses and the related public interests.  *See Stewart Org., Inc. v. Ricoh Corp.*,

487 U.S. 22, 30 (1988); *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C.

1996).  Ultimately, if the balance of private interests and public interests favors transfer of venue,

then the transferor court is within its discretion to grant a transfer.  *Osan Ltd.*, 2005 WL 2902246

at *3.  In this case, venue in the District of Columbia is improper and the interests of the parties

and the interest of justice warrant transfer of venue to the Southern District of Florida.

**1.     <u>Private Interest Factors Favor Transfer To The Southern District of Florida.</u>**

---

[3] Even assuming Plaintiffs had made out a prima facie case for venue in this forum (which is not the case here), this
suit should be transferred to and consolidated with the Florida Action based on Section 1404(a).

When deciding a transfer motion, courts typically consider six categories of inter-relating private interests including: (1) the plaintiff's choice of forum, (2) the defendants' choice of forum, (3) where the claim arose, (4) the convenience of the parties, (5) the convenience of the witnesses, and (6) the ease of access to sources of proof.  *See Trout,* 944 F. Supp. at 16.

While it is true that a plaintiff's choice of forum is normally accorded deference, the courts in this district uniformly agree that such deference is "substantially" diminished "when the forum preferred by the plaintiff is not his home forum."  *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 52 (D.D.C. 2000); *see also Gemological Inst. of Am., Inc.  v. Thi-Dai Phan*, 145 F. Supp. 2d 68, 71-72 (D.D.C. 2001); *Boers v. United States*, 133 F. Supp. 2d 64, 65 (D.D.C. 2001); *DeLoach v. Philip Morris Cos., Inc.,* 132 F. Supp. 2d 22, 24-25 (D.D.C. 2000); *Trout,* 944 F. Supp. 13 at 17.  Precedent after precedent issued out of this district consistently rejects the primacy of the plaintiff's choice when the forum is not the plaintiff's home forum.  *See cases cited id.* This District is not the Plaintiffs' home forum.  Instead, they reside in Minnesota and Delaware, respectively.

What is more, transfer is appropriate because, as set forth above, all of the events giving rise to the claims in this lawsuit took place outside the District of Columbia.  *See Hawksbill Sea Turtle v. FEMA,* 939 F. Supp. 1, 3 (D.D.C. 1996) (ordering transfer where D.C. had "insubstantial factual nexus" with alleged activities) (citations omitted); *Armco Steel Co., L.P. v. CSX Corp.,* 790 F. Supp. 311, 323 (D.D.C. 1991) (ordering transfer where activities underlying suit "have little, if any, connection with" D.C.) (citation omitted); *Martin-Trigona v. Meister*, 668 F. Supp. 1, 3 (D.D.C. 1987) (ordering transfer where "practically all of the actions in which defendants are alleged to have engaged took place" outside D.C.).  Instead, as set forth above, it is clear that virtually all of the events giving rise to the claims in this action took place in the

Southern District of Florida, where Ocwen is located and services the loans. Critically, **none** occurred in this District. Accordingly, BB&T's choice of forum, unlike the Plaintiffs' choice of forum, satisfies the venue requirements of § 1391(a)(2), because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of Florida.

On balance, a transfer can be presumed to serve the convenience of the parties, as Plaintiffs are corporations residing outside of the District of Columbia, Plaintiffs have not asserted significant connections to this district, and BB&T has requested a transfer to the Southern District of Florida. *See Osan Ltd*., 2005 WL 2902246 at *4. The convenience of the parties and witnesses and the "ease of access to evidence" does not support this case remaining in the District of Columbia because none of the parties or witnesses are present in the District of Columbia. Instead, because the parties to these agreements are residents of Minnesota, Delaware, North Carolina and Florida, it can be assumed that all documents, evidence and witnesses will be located in those states. There is absolutely no evidence that **any** documents or witnesses will be located in the District of Columbia.

In addition, one consideration given "great weight" in the transfer calculus is the "desire to avoid multiplicity of litigation from a single transaction." WRIGHT ET AL., *supra*, § 3854, at 441; *see also Reiffin*, 104 F. Supp. 2d at 58 ("compelling public interest in avoiding duplicative proceedings (and potentially inconsistent judgments)"); *Martin-Trigona*, 668 F. Supp. at 3 ("[t]he interests of justice are better served when a case is transferred to the district where related actions are pending.") (citations omitted); *Islamic Republic of Iran v. Boeing Co.*, 477 F. Supp. 142, 144 (D.D.C. 1979) ("[l]itigation of . . . related claims in the same forum is strongly favored") (citations omitted).

14

Here there is a first filed action in the Southern District of Florida. *See* Ex. I. U.S. Bank was served with that complaint and accepted such service before it filed this lawsuit. Accordingly, because U.S. Bank is already a party to related litigation in the Southern District of Florida where venue is proper, the interests of justice would be better served by transferring this action to the Southern District of Florida to avoid duplicative proceedings. *See Reiffin*, 104 F. Supp. 2d at 58; *Islamic Republic*, 477 F. Supp. at 144.

As the District of Columbia has no connection to the parties, witnesses, or material events in this case, there is only one obvious, but irrelevant, possible reason the case was filed here: some of Plaintiffs' counsel is located here. But the interest and convenience of counsel "carries little, if any, weight in an analysis under § 1404(a)." *Armco Steel*, 790 F. Supp. at 324; *see Gemological Inst.*, 145 F. Supp. 2d at 74 ("The fact that plaintiff's counsel has an office in the District of Columbia but not the Southern District of Texas is of little moment."); *Islamic Republic,* 477 F. Supp. at 143 (convenience of counsel "is of minor, if any, importance under § 1404(a)"). What matters under § 1404(a) is what should be the priority in every case: the parties, the witnesses, and the facts and issues -- not the lawyers. And none of those interests weigh in favor of maintaining venue here.

### 2. Public Interest Factors Also Favor Transfer To The Southern District Of Florida.

In addition to the public interest factors, when assessing 28 U.S.C. § 1404(a) requests to transfer venue, this Court must weigh certain public interests related to the controversy at hand to determine whether the interest of justice warrant transfer of venue. Public interest factors include: (1) the transferee court's familiarity with governing law, (2) the relative congestion of the courts involved, and (3) the local interest in deciding local controversies at home. *See Trout Unlimited*, 944 F. Supp. at 16.

15

Here, the SSA specifically states that it will be governed by the laws of the State of New York.  *See* Ex. A at 107-08.  Accordingly, this factor does not weigh in favor of either the District of Columbia or the Southern District of Florida.  The relative congestion of the courts involved actually favors transfer to the Southern District of Florida.  The most recent data show that the median time to disposition in civil cases is 9.3 months in the District of Columbia and 6.2 months for the Southern District of Florida.[4]  Finally, because there are no parties to this dispute who reside in the District of Columbia and no transactions or events occurred in the District of Columbia, the District of Columbia has no "local interest" in deciding this controversy.  Florida, however, is the residence of Ocwen and the location where the loans have been serviced since the SSA was signed in 1998.  Because the servicing of the loans by Ocwen and the compensation charged for such services are at the heart of this dispute, highly relevant documents and witnesses are located in the Southern District of Florida, where Ocwen is located.  Accordingly, Florida has a significant interest in deciding these controversies.

Finally, before the Court may transfer venue, the Court must ensure as a preliminary matter that venue is proper and that the defendants are subject to personal jurisdiction in the transferee forum. *Sharp Elecs. Corp. v. Hayman Cash Register Co.,* 655 F.2d 1228, 1230 (D.C. Cir. 1981) (per curiam); *Crisler v. Schmeltzer*, No. 89-3057, 1990 WL 113887, *2 (D.D.C. July 24, 1990).  As set forth in detail above, venue is proper in the Southern District of Florida. BB&T has consented to personal jurisdiction in Florida by filing the action there.  Likewise, U.S. Bank is subject to personal jurisdiction in the State of Florida pursuant to FLA. STAT. CH. 48.193, which provides that a defendant is subject to personal jurisdiction in the State of Florida when the cause of action arises from the defendant conducting business in the State of Florida.  *See id.*

---

[4] *See* Table C-5, U.S. District Courts, Median Time Intervals From Filing to Disposition of Civil Cases Terminated, available at http://www.uscourts.gov/caseload2006/tables/C05Mar06.pdf.

USADMIN 9222263.1

48.193(1)(a).  The claims set forth in the Florida Action clearly arise from U.S. Bank conducting business first with Republic Bank and, since 2001, Ocwen in Florida.  Since entering into the SSA in 1998, U.S. Bank has been conducting business in Florida with Florida companies and receiving substantial monetary benefits from such business through the collections on the loans subject to the SSA.   Accordingly, U.S. Bank is clearly subject to jurisdiction in Florida.

When the "factual center of gravity" so strongly pulls a case away from this forum, the law applied in this District (not to mention common sense) requires adherence to that gravitational force.  *Martin-Trigona*, 668 F. Supp. at 3 (quoting *Hodgdon v. Needham-Skyles Oil Co.,* 556 F. Supp. 75, 79 (D.D.C. 1982).  Accordingly, for these reasons, there is little question that this action should be transferred pursuant to Section 1404(a) to the Southern District of Florida.

## C.    Transfer Is Also Appropriate Based On The First-Filed Rule And Fed. R. Civ. P. 13(a).

This Circuit has repeatedly decried the wastefulness of parallel litigation of factually-related cases in separate courts.  *See Handy v. Shaw, Bransford, Veilleux & Roth*, 325 F.3d 346, 349-50 (D.C. Cir. 2003) (collecting cases); *BCCI Holdings (Luxembourg), Societe Anonyme v. Mahfouz*, 828 F. Supp. 92, 98 (D.D.C. 1993) (noting that dismissal "will relieve the defendants of the burdens of litigating parallel proceedings and will negate the possibility of inconsistent judgments.")  There is little question that this case and the Florida Action arise out of exactly the same transactions and agreements and contain overlapping claims.  *Compare* Complaint filed in this action on June 14, 2007 with Complaint filed in the Florida Action, Ex. I.

Under well-established law, the "first-to-file" rule dictates that "[w]hen lawsuits involving the same controversy are filed in more than one jurisdiction, the general rule is that the

17

court that first acquired jurisdiction has priority." *Biochem Pharma, Inc. v. Emory Univ.*, 148 F. Supp. 2d 11, 13 (D.D.C. 2001).

Likewise, pursuant to Federal Rule of Civil Procedure 13(a), U.S. Bank's claims against BB&T should have been brought as compulsory counterclaims in the Florida Action.    This Circuit's holding in *Columbia Plaza Corp. v. Sec. Natl. Bank*, 525 F.2d  620, 626 (D.C. Cir. 1975) is instructive here:

> An adjudication pursuant to Rule 13(a) that two actions are parts of a single controversy should lead to resolution of both in a single forum. Sound judicial administration counsels against separate proceedings, and the wasteful expenditure of energy and money incidental to separate litigation of identical issues should be avoided. Rule 13(a), by compelling a counterclaim in such instances unless an exception applies, limits consideration of matters encompassed in one transaction to one court. Here the same issues, and apparently to a large extent the same evidence, will be considered in both actions, and two proceedings could duplicate discovery.  We take note of crowded court dockets across the country, and the consequent desirability of deciding common issues in one tribunal rather than two.  We also note, in addition to economic factors, the value of eliminating the risk of inconsistent adjudications and races to obtain judgments.  We hold that the District Court erred in ruling, without reference to the common origin of the two actions involved here, that they could be pursued in two courts.

*Id.*

As noted above, the claims in this action and the Florida action are clearly part of a "single controversy."   Accordingly, because the Florida Action was the first-filed action (and because venue is not proper in this Court), U.S. Bank's claims should have been filed as counterclaims in the Florida Action, not brought separately here.  To allow this action to remain pending would not only violate the venue provisions set forth above, but would also be a waste of judicial resources, and could potentially subject the parties to inconsistent judgments.  For these additional reasons, the Court should dismiss this action or transfer it to the Southern District of Florida to be consolidated with the Florida Action.

## IV. CONCLUSION

For all of the foregoing reasons, Branch Banking & Trust Company respectfully requests that this Court: (1) dismiss this action based on improper venue; (2) alternatively, transfer the action to the District Court for the Southern District of Florida and order it be consolidated with the Florida Action; and (3) grant Branch Banking & Trust Company such other relief to which it may be entitled.

July 12, 2007

<div style="margin-left: 40%;">

_____/s/_____

Svetlana S. Gans (D.C. Bar # 478651)
**KILPATRICK STOCKTON LLP**
607 Fourteenth Street, NW, Suite 900
Washington, DC 20005
Telephone: (202) 639-4732
Facsimile: (202) 585-0052
SGans@KilpatrickStockton.com

Hayden J. Silver, III
Michael D. Crisp
**KILPATRICK STOCKTON LLP**
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309
Telephone: (404) 815-6148
Facsimile: (404) 815-6555

Counsel for Defendant Branch Banking & Trust Company

</div>

19

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I served on July 12, 2007, via the Court's Electronic Filing System, a true and correct copy of: (1) Defendant's Motion to Dismiss, or in the Alternative, To Transfer, (2) Defendant's Memorandum of Law and Exhibits in Support thereof, and (3) Proposed Orders upon Plaintiffs' Counsel of Record:

<div align="center">

Creighton R. Magid
DORSEY & WHITNEY, L.L.P.
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20036
(202) 442-3555
Fax: (202) 442-3199
Email: magid.chip@dorseylaw.com

</div>

_____/s/_____
Svetlana S. Gans

USADMIN 9222263.1